# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
    4805 Mount Hope Drive
    Baltimore, MD 21215
    (City of Baltimore),

NAACP SOUTH CAROLINA STATE
CONFERENCE,
    201 Columbia Mall Blvd., Suite 113
    Columbia, SC 29223,

NAACP FLORENCE BRANCH,
    P.O. Box. 5653
    Florence, SC 29502,

NAACP TEXAS STATE CONFERENCE,
    6633 Highway 290-East, Suite 303
    Austin, TX 78723,

NAACP LUBBOCK BRANCH,
    P.O. Box 1903
    Lubbock, TX 79408,

MARA GREENGRASS, o/b/o B.F., a minor
child,
    (Montgomery County, MD)
    c/o Education Law Center
    60 Park Place, Suite 300
    Newark, NJ 07102,

JANE DOE 1, o/b/o C.E., a minor child, and
JANE DOE 2, o/b/o C.C., a minor child,
    (Montgomery County, MD)
    c/o Education Law Center
    60 Park Place, Suite 300
    Newark, NJ 07102,

Civil Action No. 25-965

**COMPLAINT**

NATIONAL EDUCATION ASSOCIATION,
   1201 16th Street, NW
   Washington, D.C. 20036,

PRINCE GEORGE'S COUNTY
EDUCATORS' ASSOCIATION,
   8008 Marlboro Pike,
   Forestville, MD 20747
   (Prince George's County),


             and

AFSCME COUNCIL 3,
   1410 Bush Street, Suite A
   Baltimore, MD 21230
   (City of Baltimore),

             *Plaintiffs*,

             v.

THE UNITED STATES OF AMERICA,
   c/o Attorney General of the United States
   U.S. Department of Justice
   950 Pennsylvania Avenue, NW
   Washington, D.C. 20530,

UNITED STATES DEPARTMENT OF
EDUCATION,
   400 Maryland Avenue, SW
   Washington, D.C. 20202,

            and

LINDA MCMAHON, *in her official capacity as
Secretary of Education*,
   400 Maryland Avenue, SW
   Washington, D.C. 20202,

            *Defendants.*

## INTRODUCTION

1.      The U.S. Department of Education is charged by Congress with advancing educational opportunity and quality by implementing the nation's federal education laws in all fifty states and in hundreds of thousands of schools, colleges and universities. Despite Congress's clear directives to the Department, the Trump Administration has stated numerous times, in the clearest possible terms, its intention to close this vital agency, most recently in a March 20, 2025, Executive Order. The Administration has taken drastic, escalating steps to incapacitate the Department, including cancelation of $1.5 billion in grants and contracts for the performance of core functions and mass layoffs of half its workforce. These actions are unconstitutional and violate Congress's directives in creating the Department and assigning it specific duties and appropriations. Plaintiffs seek declaratory and injunctive relief from the harm Defendants' dismantling of the Department has already caused, and will continue to cause, to tens of millions of students, families, educators, and schools across the country.

2.      In creating the Department in 1979 and delegating mandatory programs and responsibilities to it, Congress struck a considered balance between state and local control of education and support and oversight from the federal government to expand and improve educational access. This balance both "promote[s] improvements in the quality and usefulness of education" and "strengthen[s] the Federal commitment to ensuring access to equal educational opportunity for every individual," 20 U.S.C. § 3402(1), (4), from pre-kindergarten through adult education. Between 1980—the year after the Department was formed—and 2020, high school graduation rates for Black students increased from 51% to 81%, reducing the graduation-rate gap between Black students and their white peers from 21% in 1980 to 9% in 2020. Likewise, high school graduation rates for Hispanic students rose from 45% to 83%, shrinking the graduation-rate

gap with white students from 27% in 1980 to just 7% in 2020.[1]

3.      Similarly, in 1979, less than a third (31%) of American adults aged 25 and over had completed some postsecondary education. By 2022, that figure had doubled to almost two-thirds (62%).[2] Significantly, the college attendance gap between white and Black Americans fell from 10 percentage points in 1980 to just 4 percentage points by 2020, while women moved from trailing men in four-year college completion rates by 7% to a rate three points higher.[3]

4.      The Department also dramatically expanded educational opportunities for students with disabilities through its implementation of the Individuals with Disabilities Education Act ("IDEA"). In 1970, U.S. schools educated only one in five children with a disability. By the 2022-23 school year, more than 8 million students ages 3 through 21 received special education and related services in public schools and over two-thirds now learn with their non-disabled peers for at least 80% of their school day.[4]

5.      The Department has also helped to close deep and longstanding equity gaps. Title I of the Elementary and Secondary Education Act ("ESEA") allows school districts that serve large populations of economically disadvantaged students to hire staff, construct facilities, and purchase materials that would otherwise be unaffordable. Federal student aid under Title IV of the Higher Education Act ("HEA") funds and makes postsecondary education accessible to all Americans, to promote financial independence and career advancement.

6.      Despite Congress's mandates and the Department's successes, President Trump has

---

[1] NCES, Digest of Education Statistics, tbls. 104.10 and 219.46, https://bit.ly/4iEtrUp.
[2] Paige Shoemaker DeMio & Tania Otero Martinez, *Frequently Asked Questions About the U.S. Department of Education*, Ctr. for Am. Progress (Feb. 13, 2025), https://bit.ly/4l0ELMb.
[3] NEA, *Educational Attainment, Income and Earnings, and Unemployment* (last visited Mar. 16, 2025), https://bit.ly/4iAoVGb.
[4] OSEP, U.S. Dep't of Educ., *A History of the Individuals with Disabilities Education Act* (Feb. 16, 2024), https://bit.ly/4ig4e2w.

repeatedly insisted he will "eliminate the federal Department of Education," and give "education back to the States." The President picked his Secretary of Education, Linda McMahon, so she could put herself "out of a job." She understood the assignment, calling on Department employees to join her "final mission" of dismantling the agency.

7.     To fulfill that stated goal, Department officers have taken a series of escalating steps since January 20, 2025, to abolish the Congressionally created, constituted and funded agency. They terminated at least $1.5 billion in awarded contracts and grants for required research, evaluation, and data collection as well as teacher training and recruitment programs established by Congress. They have brought to a grinding halt the Department's enforcement of federal civil rights laws. And Defendants have eviscerated the Department's workforce, cutting the staff in half since January 20, 2025, through a combination of deferred resignations, early retirement incentives, and staff terminations, culminating on March 11, 2025, in a massive reduction in force ("RIF") of approximately 1,300 Department workers.

8.     The March 11 RIF reached every corner of the Department and eliminated all or nearly all employees in certain Department offices. Debilitating cuts were made to the Office for Civil Rights ("OCR"), the Office of Federal Student Aid ("FSA"), and the Institute for Education Sciences ("IES"). The RIF's effects are so devastating that the Department can no longer discharge its mandatory statutory functions. Taken together, Defendants' steps since January 20, 2025, constitute a de facto dismantling of the Department by executive fiat.

9.     But the Constitution gives power over "the establishment of offices [and] the determination of their functions and jurisdiction" to Congress—not to the President or any officer working under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Executive agencies like the Department "are creatures of statute," brought into existence by Congress and taken out of

existence only by Congress, through bicameralism and presentment. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). And if Congress cannot delegate far more modest grants of regulatory authority through "modest words," "vague terms," or "subtle devices," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), then an agency surely lacks any constitutional or statutory authority to cease its statutorily mandated functions, or hollow out its workforce so dramatically that it lacks the capacity to execute them, without any direction from Congress at all.

10.    Defendants' *ultra vires* destruction of the Department violates the separation of powers and the Constitution's Take Care, Spending, and Appropriations Clauses. It is also contrary to law, and arbitrary and capricious, in violation of the Administrative Procedure Act ("APA").

11.    If allowed to stand, Defendants' actions will irrevocably harm Plaintiffs, their members and PK-12 and postsecondary education across the United States.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

13.    Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

14.    Plaintiff National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the oldest and largest civil rights organization in the United States. Its mission is to ensure the educational, political, social, and economic equality of all persons and eliminate race-based discrimination. The NAACP has over two million supporters and members, including parents of school-age children, high school and college students, and educators, organized in nearly 2,200 units across the United States, with more than three dozen units in Maryland, including the Maryland State Conference, the Prince George's County Branch, and the Montgomery County Branch. The dismantling of the Department has harmed and will

continue to harm the NAACP and its members by preventing the enforcement and implementation of anti-discrimination laws through the OCR complaint process and eliminating technical assistance for key federal programs. The NAACP is headquartered in Baltimore, Maryland.

15.    Plaintiffs NAACP South Carolina State Conference ("South Carolina NAACP"), NAACP Texas State Conference ("Texas NAACP"), NAACP Florence Branch ("Florence NAACP"), and NAACP Lubbock Branch ("Lubbock NAACP") are nonprofit, nonpartisan membership organizations in Texas and South Carolina which work to ensure educational equality and eliminate racial hatred and discrimination. To pursue these missions, the NAACP branches rely on the work of the Department and particularly OCR. The dismantling of the Department has and will continue to harm the Plaintiff branches and their members by denying them redress for civil rights violations, including resolution of pending OCR complaints.

16.    Plaintiff Mara Greengrass is a resident of Rockville, Maryland and the parent of a high school sophomore in Montgomery County Public Schools ("MCPS"). Her son has had an Individualized Education Program ("IEP") under IDEA for a year and a half and receives daily paraeducator support, specialized educational programming, a dedicated counselor, and a class on executive function skills. Before these supports, her son struggled to pay attention in class, complete assignments, or talk to other students, and received poor grades. Plaintiff Greengrass expects that disruptions in IDEA administration will jeopardize her son's vital IEP services.

17.    Plaintiff Jane Doe 1 is a resident of Montgomery County, Maryland and a member of the NAACP. Her son is a high school senior in MCPS with an IDEA IEP. In June 2024, she filed an OCR complaint, alleging disability discrimination and retaliation against her son. The OCR investigator assigned to Jane Doe 1's case was based in Philadelphia. Jane Doe 1 fears that the shuttering of OCR's Philadelphia office and the staffing cuts at OCR will deprive her son of

meaningful redress.

18.    Plaintiff Jane Doe 2 is a resident of Montgomery County, Maryland, and has three children in Title I schools in MCPS. Her elementary-school age child, C.C., receives Emergent Language Development services under ESEA, including individualized comprehension support and pull-out sessions with a certified Emergent Multilingual Learners teacher and paraeducator support. Jane Doe 2 expects the Department's dismantling will deprive her child of these services.

19.    Plaintiff National Education Association ("NEA"), headquartered in Washington, D.C., is the nation's largest union of educational professionals with some three million members who work at every level of education, from preschool to university graduate programs, and serve some 50 million students. NEA has affiliate organizations in every state and in nearly 14,000 communities across the United States. To advance educational opportunity, NEA advocated for the Department's creation and passage of the Department of Education Organization Act. NEA's mission "is to advocate for education professionals and to unite our members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world." NEA advocates for "improving the quality of teaching, increasing student achievement and making schools safer, better places to learn."[5]

20.    Plaintiff Prince George's County Educators Association ("PGCEA"), affiliated with NEA, is a labor union headquartered in Forestville, Maryland. It represents employees of the Prince George's County Public Schools, including classroom teachers, specialized instructional support personnel, and other certified staff.

21.    Plaintiff AFSCME Council 3, affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO is a council of labor unions in Maryland, which is

---

[5] NEA, *Our Mission, Vision, & Values* (2025), https://bit.ly/4iWJqNA.

headquartered in Baltimore, Maryland. It represents over 300 public-school employees including paraprofessionals and instructional assistants, as well as other critical support personnel such as counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff. Thousands of Council 3 members also work in the University System of Maryland. Many members of Council 3 rely on Department grants for their salaries and for classroom resources.

22. Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the APA. 5 U.S.C. § 702.

23. Defendant U.S. Department of Education (the "Department") is a Cabinet agency headquartered in Washington, D.C., responsible for federal education and civil rights laws.

24. Defendant Linda McMahon is the U.S. Secretary of Education, and is sued in her official capacity.

## LEGAL FRAMEWORK

### I.    Origins of the Department of Education

25. Initially formed in the wake of the Civil War to "collect[] such statistics and facts as shall show the condition and progress of education in the several States and Territories," and promote public education, P.L 39-73, Ch. 158, § 1, 14 Stat. 434 (1867), the Department was quickly demoted to an "office" in the Department of the Interior.[6]

26. After World War II and the onset of the Cold War, Congress again elevated the office by including it in the newly formed Department of Health, Education, and Welfare ("HEW").[7] HEW's portfolio grew when Congress enacted the Elementary and Secondary Education Act ("ESEA") and the Higher Education Act ("HEA"). Congress directed HEW's

---

[6] *See, e.g.*, Cong. Globe, 40th Cong., 2d Sess. 1140 (1868); *see also* Donald R. Warren, *The U.S. Department of Education: A Reconstruction Promise to Black Americans*, 43 J. Negro Educ. 437, 443–44 (1974).
[7] *See* H.R.J. Res. Resolution, 83 Cong. Ch. 14, 67 Stat. 18 (1953); Reorganization Plan No. 1 of 1953, 18 Fed. Reg. 2,053 (Apr. 11, 1953), *reprinted in* 5 U.S.C. app. at 65–66.

Office of Education to administer the new laws' grant and funding programs and ensure compliance with Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973, in federally funded schools and postsecondary institutions. These laws gave HEW a clear mandate to eliminate discrimination in American education.

## II.     The Department of Education Organization Act

27.     In the 1970s, to elevate, centralize and ensure efficiencies, Congress passed, and President Carter signed, the Department of Education Organization Act ("DEOA"), Pub. L. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510), establishing the present-day Department under the supervision of a Secretary of Education.

28.     The DEOA transferred the education-related functions and authorities vested in HEW and other Cabinet agencies to the Department, Pub. L. 96-88, §§ 301(a), 411(a); 20 U.S.C. §§ 3441(a), 3471(a), charging it with administering and implementing ESEA, the HEA, federal statutes protecting the rights of students with disabilities, and laws promoting and providing funding for vocational education. *See* 20 U.S.C. § 3441(a)(2). The Department also assumed primary responsibility for enforcing federal civil rights laws in elementary, secondary, and postsecondary education. Pub. L. 96-88, § 301(a)(3); 20 U.S.C. § 3441(a)(3).

29.     The DEOA establishes five Department program offices, each supervised by a congressionally specified officer: OCR, the Office of Elementary and Secondary Education ("OESE"); the Office of Postsecondary Education; the Office of Career, Technical, and Adult Education ("OCTAE"); and the Office of Special Education and Rehabilitative Services ("OSERS").[8] The DEOA also made an Office of General Counsel ("OGC") within the

---

[8] 20 U.S.C. §§ 3411(a)–(c), 3413(a), 3414–22.

Department.

30.     Under the DEOA, the Secretary may not modify statutory delegations to particular Department officers or "aboli[sh]" Department offices established by statute, with limited exceptions. 20 U.S.C. § 3473(a)–(b); *see id.* §§ 3413, 3417 (functions of OCR and OSERS).

31.     Congress directs the Department to carry out the mandates of the federal education laws, the most significant of which are:

a)  **The Elementary and Secondary Education Act ("ESEA")**, 20 U.S.C. §§ 6301–7981, is the main source of federal financial assistance for elementary and secondary education and in FY24, provided $28.9 billion in funding through more than 35 grant programs.[9]

b)  **The Individuals with Disabilities Education Act ("IDEA")**, 20 U.S.C. §§ 1400–82, requires states to provide a free appropriate public education to all students with disabilities in exchange for federal funding of early intervention and special education programs. In FY24, IDEA awarded $15.5 billion to states and school districts through five formula and competitive grant programs.

c)  **The Higher Education Act of 1965 ("HEA")**, 20 U.S.C. §§ 1001 to 1161aa-1, authorizes financial aid programs that award 9.9 million students pursuing postsecondary education and training about $120.8 billion in aid[10] and creates the Office of Federal Student Aid ("FSA"), a quasi-independent entity "responsible for managing" these programs subject to a Chief Operating Officer's "independent control," *id.* § 1018.

d)  **The Carl D. Perkins Career and Technical Education Act ("Perkins V")**, 20 U.S.C. §§ 2301–414, supports career and technical education programs for secondary and postsecondary students through grant funding (about $1.46 billion in FY 2024) to states

---

[9] *See* U.S. Dep't of Educ, *FY 2024 Congressional Action* 1–4 (2024), https://bit.ly/3DNQVHC.
[10] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 15 (2024), https://bit.ly/4hLZ0dE.

and career and technical institutions.[11]

e) **Federal Civil Rights Statutes**: OCR enforces the federal civil rights laws that prevent discrimination in schools and colleges that receive federal funds.[12]

32.    The DEOA also created a research office in the Department, which the 2002 Education Sciences Reform Act ("ESRA") reconstituted as the Institute of Education Sciences or "IES," a nonpartisan, independent research division. *See* 20 U.S.C. §§ 9501–84.  IES operates four research centers, including the National Center for Education Statistics ("NCES"). *See id.* §§ 9511(c), 9531–34, 9541–48, 9561–64, 9567–67b.

## FACTUAL ALLEGATIONS

### III.    Defendants' Actions to Dismantle the Department

33.    Throughout the 2024 presidential campaign, President Trump repeatedly proclaimed he would close the Department, telling supporters: "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington, D.C. and sending all education and education work and needs back to the states."[13] After the election, Trump continued with his "effort" to "send Education BACK TO THE STATES" that Defendant Linda McMahon would "spearhead," and called for "[a] virtual closure of [the] Department."[14]

34.    At her confirmation hearing, McMahon testified that she was "ready to enact" "the President's vision" of "abolish[ing]" the Department." She said that she would "downsize" or close

---

[11] *FY 2024 Congressional Action*, *supra*, at 4.

[12] These are Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–03, and Title II of the Americans with Disabilities Act of 1990 ("ADA"), *id.* §§ 12131–65.

[13] *Agenda47: President Trump's Ten Principles for Great Schools Leading to Great Jobs* at 3:16, Trump-Vance 2025 (Sept. 13, 2023), https://bit.ly/4kRNdgX; *see also, e.g.*, Annie Ma, *Trump Has Called for Dismantling the Education Department. Here's What That Would Mean*, Associated Press (Nov. 20, 2024), https://bit.ly/421JLay.

[14] TIME Staff, *Read the Full Transcript of Donald Trump's 2024 Person of the Year Interview with TIME*, TIME Mag. (Dec. 12, 2024), https://bit.ly/3RiRfkE.

the Department or "parts of" it but would "work[] with Congress" to formally shutter the agency.[15]

35.    The night of McMahon's Senate confirmation, she sent an email to all Department employees with the subject line "Our Department's Final Mission,"[16] urging them to join her in "perform[ing] one final, unforgettable public service" by closing the agency.

36.    On March 20, 2025, President Trump issued an Executive Order directing McMahon to "take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." *Improving Education Outcomes by Empowering Parents, States, and Communities*, Exec. Order § 2(a).[17] In signing the Order, President Trump said that McMahon and other officials would "take all lawful steps to shut down the department . . . and shut it down as quickly as possible," but the Department would continue to administer ESEA Title I-A; IDEA; and federal student aid.[18]

37.    The very next day, President Trump announced that "all of the student loan portfolio" and "special needs" would move "out of the Department of Education immediately," to the Small Business Administration and the Department of Health and Human Services.[19]

38.    The President and his agents have no authority to unilaterally close a Cabinet-level agency created by Congress or to reassign its functions elsewhere. Yet Defendants have been on a "final mission" of closing the Department since the beginning of the Trump Administration.

---

[15] Associated Press, *LIVE: Linda McMahon's Confirmation Hearing for Secretary of Education* at 22:43, 31:41, YouTube (Feb. 13, 2025), https://bit.ly/4hHjILK.
[16] Speech, U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://bit.ly/4iZLCUh.
[17] https://bit.ly/4kRdawX.
[18] Joey Garrison & Zachary Schermele, *President Trump Signs Order Aimed at Dismantling the Department of Education*, USA Today (Mar. 20, 2025, 6:19 PM), https://bit.ly/4bXYKHk.
[19] https://bit.ly/4kVK3bV.

### A.     Sweeping Layoffs Decimate the Department's Workforce

39.     As of January 20, 2025, the Department employed 4,133 staff nationwide.[20] Approximately 1,444 staff in FSA[21]; about 580 in OCR[22]; 184 in IES[23]; and the rest in other offices that ensure compliance with Congress's directives under federal education law and appropriations. The Department has the smallest staff of any federal agency, despite having the third-largest discretionary budget.[24] Defendants have crippled the Department, leaving it unable to carry out its core statutory obligations.

40.     Within the first month of the Trump Administration, at least 175 Department employees, many from OCR, were placed on administrative leave (at least 55 on January 31, 2025, and another 120 on February 14, 2025).[25] By March 10, 2025, an additional 572 Department employees were exited through "voluntary resignation opportunities and retirement."[26]

41.     On March 11, 2025, Defendants announced a massive reduction in force (the "March 11 RIF")—undertaken "[a]s part of the Department of Education's final mission"—that would affect "[a]ll divisions within the Department."[27]

42.     The March 11 RIF terminated approximately 1,378 Department employees in Washington, D.C. and in the Department's regional offices across the country. These employees

---

[20] Press Release, U.S. Dep't of Educ., *U.S. Dep't of Educ. Initiates Reduction in Force* (Mar. 11, 2025) [Mar. 11 Press Release], https://bit.ly/42fXyf8.

[21] *FY2024 Annual Report, supra,* at 11 (2024), https://bit.ly/4hLZ0dE.

[22] OCR, U.S. Dep't of Educ., *Fiscal Year 2025 Budget Request*, 8–9 (2024), https://bit.ly/3RhAXIL.

[23] Jeffrey Mervis, *Layoffs Gut Research Agency that Helped Monitor U.S. Education*, Science (Mar. 13, 2025, 11:10 AM), https://bit.ly/424EKOS.

[24] U.S. Dep't of Educ., *Federal Role in Education* (last updated Jan. 14, 2025), https://bit.ly/4ivG0S7.

[25] Yamiche Alcindor, *Union Official Says Education Department Employees Were Placed on Leave After Taking Diversity Training During Trump's First Term*, NBC News (Feb. 2, 2025), https://bit.ly/3Rk97LY; Brooke Schultz, *Trump Shakeup Stops Most Work at Education Department's Civil Rights Office*, Education Week (Feb. 14, 2025), https://bit.ly/41WoKOO.

[26] Mar. 11 Press Release, *supra; see* OPM, *Deferred Resignation Email to Federal Employees* (Jan. 28, 2025), https://bit.ly/421KbOa ("Fork in the Road" memorandum encouraging federal employees to resign effective September 30, 2025); Rebecca Carballo, *Education Department to Staffers: Quit by Monday and Get $25K in Cash*, Politico (Feb. 28, 2025, 2:39 PM), https://bit.ly/4bAWrK5.

[27] Mar. 11 Press Release, *supra*.

were placed on administrative leave beginning on March 21, 2025, and are now unable to perform their duties even though their termination date is June 9, 2025.[28]

43.    The Department reports the combined impact of its staff reductions since January 20, 2025, have reduced its workforce by "roughly" 1,950 workers, cutting its staff in half.

44.    McMahon claimed that the RIF reflected a "commitment to efficiency, accountability, and ensuring that resources are directed where they matter most."[29] But in a March 11, 2025, interview on Fox News' *The Ingraham Angle*, McMahon described the RIF as "the first step" towards carrying out "the President's mandate" to dismantle the Department.[30]

45.    McMahon asserted that she "wanted to make sure that we kept all of the right people and the good people" in the Department's "outward-facing" programs. But, on information and belief, Defendants undertook no individualized evaluations of positions or employees to identify the "right" and "good" people to keep.

46.    On information and belief, the RIF adversely affected every component of the Department. OCR lost nearly half of its workforce, including its entire staff in seven now-closed regional offices—Philadelphia, New York City, Dallas, San Francisco, Boston, Cleveland, and Chicago. All but one of the Office of English Language Acquisition ("OELA")'s 15 employees will be terminated and the unit abolished.[31] Less than 10% of employees remain in IES; its subdivision NCES was reduced from roughly 100 employees to around five.[32] Approximately 75% of employees in OGC and nearly 25% of workers in FSA were terminated. And these are just

---

[28] *Id.*
[29] *Id.*
[30] The Ingraham Angle, *Education Secretary Says Department Took First Steps to Eliminate 'Bureaucratic Bloat'* at 1:12, Fox News (Mar. 11, 2025), https://bit.ly/3Y4RR15.
[31] Kayln Belsha, *Trump Education Department Decimates Office Serving 5 Million English Learners in Public Schools*, Chalkbeat, (Mar. 21, 2025, 3:35 PM), https://bit.ly/4iyuXaK.
[32] Jill Barshay, *Chaos and Confusion As the Statistics Arm of the Education Department Is Reduced to a Skeletal Staff of 3*, Hechinger Rep. (Mar. 14, 2025), https://bit.ly/4hE1MSl.

examples of the devastation Defendants have wrought.

47.    The scope and scale of the RIF leaves the Department incapable of carrying out its core statutory functions. And these harms will be compounded by the speed of the reductions and Defendants' reckless failure to consider or plan for the Department's continued operations.

**B.    Unilateral Termination of Grants and Contracts for Critical Programs**

48.    On February 10, 2025, the Department terminated hundreds of contracts totaling over $1 billion, mostly for IES's statutorily mandated functions.[33] The Department canceled another "$350 million in contracts and grants" awarded to statutorily required Regional Educational Laboratories (overseen by IES) and Equity Assistance Centers, 42 U.S.C. § 2000c-2,[34] "over $600 million in grants" created by ESEA and the HEA to support teacher preparation programs, "18 grants totaling $226 million" for technical assistance centers that improve instructional quality for economically disadvantaged students.[35] Since January 20, 2025, Defendants have canceled hundreds of grants and contracts totaling at least $1 billion, many of which fulfilled statutory mandates.

**C.    Unilateral Freeze of Civil Rights Enforcement Activities**

49.    Defendants have also prevented OCR from enforcing civil rights laws in American schools. As of January 14, 2025, OCR was investigating approximately 12,000 complaints. Of these, nearly 6,000 alleged disability discrimination; an additional 3,200 alleged racial discrimination or harassment; and 1,000 alleged sexual harassment or sexual violence.[36]

---

[33] *See* Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025, 7:13 PM), https://bit.ly/4hgOATj, X (Feb. 10, 2025, 7:43 PM), https://bit.ly/4bZxqZc.
[34] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025), https://bit.ly/4iZdwzN.
[35] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Cancels Divisive and Wasteful Grants Under the Comprehensive Centers Program* (Feb. 19, 2025), https://bit.ly/4bAXkSV; U.S. Dep't of Educ., *Comprehensive Centers Program* (Jan. 14, 2025), https://bit.ly/3XYJcgw.
[36] *See* OCR, U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (last updated Jan. 14, 2025), https://bit.ly/4inbJEP.

50.     On information and belief, soon after January 21, 2025, the OCR enforcement division was directed to stop all work on open matters.[37] Defendants eventually allowed employees to resume processing "complaints that allege only disability-based discrimination," but the freeze remained in place on discrimination complaints based on race, sex, or age.[38]

51.     Secretary McMahon formally lifted the processing freeze on March 6, 2025.[39] But days later, the March 11 RIF purged at least 243 employees and additional supervisors from OCR. The cuts terminated all staff in, and closed, regional field offices serving 26 states, Puerto Rico, and the U.S. Virgin Islands.[40]

## IV.     Defendants' Actions Prevent the Department from Fulfilling Mandatory Functions

### A.     Enforcing Civil Rights Laws in American Schools

52.     One of the Department's overriding missions under DEOA is "to ensure equal access for all Americans to educational opportunities of a high quality" regardless of "race, creed, color, national origin, or sex." 20 U.S.C. § 3401(2). Congress charged OCR with enforcing the civil rights laws prohibiting discrimination on the basis of race, color, national origin, sex, disability, or age in federally funded education programs. *Id.* §§ 3413(a), 3441(a)(3).[41]

53.     To fulfill these duties, regulations require OCR to "make a ***prompt*** investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply." 34 C.F.R. § 100.7(c) (emphasis added); *see id.* §§ 104.61, 106.81, 110.30–33; 28 C.F.R. § 35.171.

---

[37] Jodi S. Cohen & Jennifer Smith Richards, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025, 9:30 PM), https://bit.ly/4iYUXM3; Schultz, *supra*.; *see* Heather Hollingsworth, Collin Binkley & Annie Ma, *Kids' Disability Rights Cases Stalled as Trump Began to Overhaul Education Department*, AP News (Feb. 20, 2025, 6:08 PM), https://bit.ly/4j0EEhM.
[38] Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025, 8:35 PM), https://bit.ly/4iZeoo3.
[39] *Id.*
[40] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://bit.ly/3RnaeKM.
[41] OCR also enforces the Boy Scouts of America Equal Access Act, 20 U.S.C. § 7905.

54.    OCR's enforcement activities are essential to Congress's objective to advance educational opportunity. Between January 2021 and December 2024, the Office received 71,385 complaints alleging unlawful discrimination (including nearly 23,000 new complaints in 2024) and resolved 56,383 complaints involving disability discrimination, 3,871 complaints of bullying or harassment based on race, and 3,366 complaints related to sex-based harassment.[42]

55.    The OCR process provides a free and confidential forum for students, staff (including NEA, PGCEA, and AFSCME Council 3 members), and stakeholders like NAACP and its members to communicate concerns about potentially discriminatory policies and practices in their school, district, or college. Because OCR investigations take place at no charge, the Office offers crucial advocacy services for students and families who cannot afford legal representation.

56.    When OCR finds evidence of systemic unlawful discrimination, it can require a school district or college to implement system-wide remedies and monitor for compliance. OCR resolution agreements thus provide both individual and systemic redress.

57.    NAACP members benefit from OCR investigations and enforcement activities. The NAACP has used and would continue to use the OCR process to advance educational opportunity, through resolution agreements improving education for students of color by addressing racial disparities in school discipline, special education services, and access to advanced coursework.

58.    For example, Plaintiff Lubbock NAACP has filed an OCR complaint challenging the failure of two West Texas school districts to effectively stop and prevent near daily racial bullying and harassment of Black students in their schools and to cease imposing inappropriate and harmful discipline against those students. The Lubbock NAACP's complaints were being

---

[42] OCR, U.S. Dep't of Educ., *Protecting Civil Rights: Highlights of Activities, Office for Civil Rights 2021–2025*, at 5, 12, 14, 19 (2025), https://bit.ly/3DRCq5y; Collin Binkley, *Education Department Layoffs Gut Its Civil Rights Office, Leaving Discrimination Cases in Limbo*, Associated Press (Mar. 12, 2025), https://bit.ly/3DZHl4k.

investigated in OCR's Dallas regional office, but that office was shut down on March 11, and no information has been provided.

59.    Similarly, the South Carolina NAACP and the Florence NAACP filed an OCR complaint regarding the zero-tolerance disciplinary policy adopted by Florence School District One, under which students who are disciplined even once may be automatically recommended for expulsion. The complaint alleges that the district's pattern of disciplining students of color at much higher rates than their peers means students of color will likely be disproportionately subjected to the zero-tolerance policy. Staff in OCR's Washington, D.C. office initiated an investigation. But since January 20 and after the March 11 RIF, despite attempts to reach OCR, no information has been provided about how or whether the investigation will proceed.

60.    As of January 2025, OCR had more than 580 staff.[43] On information and belief, most of these staff had caseloads of 50 or more complaints,[44] and OCR had over 12,000 pending investigations.[45] For FY25, OCR even requested an increase in staffing to 643 full-time employees to deal with its caseload.[46] Defendants have not, and cannot, explain how OCR can fulfill its statutory obligations with less than 60% of its prior staff.

61.    In practice, gutting OCR denies complainants the timely investigations Congress requires and that students depend upon. An unresolved civil rights complaint could leave a child without access to accommodations and services to which they are entitled under the disability laws or without recourse to address discrimination that interferes with their right to learn in a safe and supportive environment. As Brittany Coleman, an attorney in OCR's Dallas office until its closure,

---

[43] Tyler Kingkade & Adam Edelman, *What the Education Department Layoffs Could Mean for Students with Disabilities*, NBC News (Mar. 12, 2025), https://bit.ly/421HfBe.
[44] Binkley, *supra*.
[45] U.S. Dep't of Educ., *Pending Cases Currently Under Investigation, supra*.
[46] OCR, *Fiscal Year 2025 Budget Request, supra*, at 8–9 (2024), https://bit.ly/3RhAXIL.

reported, fewer staff members and higher caseloads will mean that "students with disabilities fighting for accommodations for test-taking, for example, will have to wait longer for help from the department—and it could arrive too late."[47]

62.    An OCR attorney explained, "Part of OCR's work is to physically go to places. As part of the investigation, we go to schools, we look at the playground, we see if it's accessible. . . . We show up and look at softball and baseball fields. We measure the bathroom to make sure it's accessible. We interview student groups. It requires in-person work. That is part of the basis of having regional offices."[48] These on-site investigations will not happen in the 26 states served by the now shuttered offices.

63.    The dismantling of OCR will have immediate adverse effects on complainants including the Plaintiff NAACP branches and Jane Doe 1 and will affect the ability of NEA, PGCEA, NAACP, and AFSCME Council 3 members to bring OCR complaints.

64.    OCR is required by regulation to provide technical assistance to help funding recipients comply with the civil rights laws. *See* 34 C.F.R. § 100.6(a), 106.81, 104.61. Its work under this mandate is extensive—in FY24 alone, OCR conducted 211 technical assistance presentations.[49]

65.    Defendants' dismantling of OCR eliminated technical assistance resources on which the public relies. On information and belief, Defendants cut nearly all 25 employees in OCR's OPEN Center and Resource Management Group ("RMG"). These units provided proactive technical assistance to stakeholders and responded to public requests for help navigating the OCR complaint process. The elimination of OPEN Center and RMG staff has deprived the public,

---

[47] Kingkade & Edelman, *supra*.
[48] Cohen & Richards, *Massive Layoffs at the Department of Education*, *supra*.
[49] U.S. Dep't of Educ., *FY2024 Annual Report (2024)*, https://bit.ly/4kXd7zK.

including NAACP and its members, who previously utilized this hotline, of valuable assistance.

**B.    Ensuring Equal Educational Access for Students with Disabilities**

66.    Defendants have also undermined the Department's implementation of its mandatory duties under IDEA, the main federal statute related to special education and early intervention services for children with disabilities from birth through age 21. 20 U.S.C. § 1401(9).

67.    An estimated 7.5 million children with disabilities ages 3 to 21—15% of all elementary and secondary school students—receive services under IDEA.[50] The Department supports these services by disbursing IDEA funds ($15.5 billion in FY24 alone[51]) to states and school districts, monitoring their IDEA compliance and providing essential technical assistance.

68.    Congress gave the Department exclusive authority to implement IDEA and directed the Department to create "within [OSERS] . . . , an Office of Special Education Programs [OSEP]" to act as "the principal agency" responsible for IDEA. 20 U.S.C. §§ 1402(a), 1406. OSEP administers IDEA's grant programs, including Part B-611's formula grants for states "to provide special education and related services to children with disabilities." *Id.* § 1411(a)(1). Most of these funds go from the states to school districts to pay excess and high special education costs, develop and provide early intervention services, and defray certain administrative costs. *Id.* §§ 1411(f), 1413(a), (f). Part B's formula grant program provides similar support for special education and related services for children aged 3 to 5. *Id.* § 1419(a).

69.    Every state and the District of Columbia depends on Part B grants to pay the salaries and benefits of special educators, specialized instructional support personnel, and education support professionals,[52] including thousands of NEA, PGCEA, and AFSCME Council 3 members.

---

[50] NCES, U.S. Dep't of Educ., *Students with Disabilities* (May 2024), https://bit.ly/4kXTZS2.
[51] U.S. Dep't of Educ., *Fiscal Year 2024 Agency Financial Report* 38, 128 (2024), https://bit.ly/3DR2NbK.
[52] NEA, *Federal Education Funding for Selected Programs by State and Program* (Feb. 10, 2025), https://bit.ly/3Rkxnxu.

In FY24, Maryland received about $250 million in Part B funding,[53] which supports the salaries of NEA, PGCEA, and AFSCME Council 3 members working in special education roles as well as critical resources and technology.

70.    On information and belief, all OSERS front office staff and OGC attorneys who specialized in the administration and implementation of IDEA grants were eliminated in the March 11 RIF, leaving OSEP ill-equipped to timely review state plans seeking IDEA Part B funding, award grants under the statutory formula, administer grant programs, and monitor compliance. The staff reductions also jeopardize critical technical assistance for IDEA compliance. To receive Part B funds, states must provide all students with a free appropriate public education; develop and review IEPs for each child with a disability; provide procedures to challenge a school district's failure to provide services; and ensure that school districts recruit, hire, train, and retain skilled, qualified personnel to serve children with disabilities. 20 U.S.C. §§ 1412(a)(4), (6), (14); 1415.

71.    IDEA also directs that "[t]he Secretary shall . . . furnish technical assistance" to the states. *Id.* § 1417(a). Technical assistance provided, shared, or coordinated by OSERS staff is essential to bringing and keeping districts in compliance.

72.    The OSERS terminations also prevent the Department from conducting mandatory monitoring activities to ensure compliance and make "needs assistance" determinations, including on-site verification visits and review of state performance plans and reports. *See id.* § 1416.

73.    If a school district fails to meet the Free Appropriate Public Education requirement, IDEA gives parents the right to seek recourse through statutorily mandated dispute resolution processes administered at the state level. *See id.* § 1415(e)–(j); 34 C.F.R. §§ 300.151–.153, 300.506–.518. OSEP is also responsible for ensuring that states comply with these requirements.

---

[53] *Id.*

74.     The March 11 RIF undermines the Department's ability to fulfill these IDEA responsibilities, harming NAACP, NEA, PGCEA, and AFSCME Council 3 members and the students, families, and schools that rely on IDEA resources and enforcement. Plaintiffs' members rely on OSERS guidance to ensure that they provide students with IEPs with appropriate supports. And NEA staff use OSERS guidance and trainings to create and disseminate resources for members on how to implement legally compliant strategies for special education services.

### C.    Promoting Equal Educational Opportunities for All Students

75.     The DEOA charges the Department with implementing ESEA and its 35 formula and competitive grants to support economically disadvantaged students (Title I), English Learners ("ELs") (Title III), students from marginalized racial and ethnic groups (Title VI), rural school students (Title V), and migrant, homeless, and foster students (Titles I, III, IX).

76.     ESEA's signature program, Title I-A, supports students attending elementary and secondary schools with a relatively high concentration of students from low-income families. 20 U.S.C. §§ 6311–39. States opt in to Title I-A by submitting a plan to the Department that shows their school systems meet statutory criteria like having "challenging academic content standards and aligned academic achievement standards" and administering "high-quality student academic assessments." *Id.* § 6311. If a state plan falls short, the Department must provide the state with technical assistance to resubmit a legally adequate plan. *See id.* § 6311(a)(4)(A)(vi).

77.     For FY24, Congress appropriated $18.8 billion—out of total ESEA appropriations of $28.9 billion—to fund Title I-A.[54] These funds serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools, including 221,584 students and 500

---

[54] *Fiscal Year 2024 Agency Financial Report*, *supra*, at 38.

schools in Maryland where Plaintiffs' members work and learn.[55] Title I-A allows districts to hire additional staff; adopt remedial and intervention programs; and offer professional development and other services.

78.     The DEOA established OESE to administer and implement statutes like ESEA. OESE ensures that ESEA grants are properly implemented as directed by Congress, through grant administration, compliance monitoring, and policy guidance.

79.     OESE relies on NCES, the Department's statistics and data analysis branch, to calculate Title I allocations as required by the statute.[56] To do so, NCES staff compute a poverty concentration weight factor using U.S. Census Bureau Data to analyze district boundaries, income levels, and other demographic characteristics.[57] After determining the formula-eligible population, NCES calculates the adjusted state per pupil expenditure. These two factors drive district and state Title I-A allocations.[58]

80.     Defendants' near-elimination of NCES has put at risk the Department's ability to administer ESEA's formula grant programs, including Title I-A, in compliance with the statute. The necessary analysis would normally already have begun for the 2026-27 school year. But, because Defendants have gutted NCES, on information and belief, that work is behind schedule and the timely allocation and distribution of these critical funds is in jeopardy. Former NCES employees report that "the data needed to drive the next round of Title I, and grants to rural schools, and grants to other programs, isn't going to happen as a result of the cuts to NCES staff and

---

[55] NCES, U.S. Dep't of Educ., *Common Core of Data: Local Education Agency (School District) Universe Survey (2022-23); School District Finance Survey (F-33), 2021-22,* https://bit.ly/43Wx1EN; Digest of Education Statistics, *supra,* at tbls. 204.04, 204.06; *Federal Education Funding for Selected Programs by State and Program, supra.*
[56] NCES, IES, U.S. Dep't of Educ., *Allocations* (last visited Mar. 21, 2025), https://bit.ly/4kRQf4F.
[57] Jonaki Mehta, *How the Education Department Cuts Could Hurt Low-Income and Rural Schools,* NPR (Mar. 21, 2025, 5:00 AM), https://bit.ly/4l67vTY.
[58] *See* NCES, IES, U.S. Dep't of Educ., NCES 2019-016, *Study of the Title I, Part A Grant Program Mathematical Formulas* xi (2019), https://bit.ly/4hxN4w4. *See generally* William Sonneberg, NCES, IES, *Allocating Grants for Title I* 15–20 (2016), https://bit.ly/4kNifXf.

contracts."[59]

81.    These harms will be especially pronounced for under-resourced rural schools that receive supplemental Title I-A funding and other formula grant awards through ESEA Title V-B's Rural Education Achievement Program ("REAP"). 20 U.S.C. §§ 7351–51d. For example, NCES staff develop and apply the mandatory locale code framework that decides whether a district is "rural" and thus eligible for REAP. *Id.* §§ 5211(b)(1), 5221(b). Defendants' destruction of NCES will prevent the Department from updating the framework and assigning designations for the 2026-27 school year, and thus from awarding REAP funds using the statutorily required methodology.

82.    The Department's failure to administer ESEA funds in a manner consistent with the statute will directly harm NEA, PGCEA, and AFSCME Council 3 members. Title I funding supports more than 180,000 teacher positions (5.64% of the teacher workforce nationally) that serve 2.8 million vulnerable students across the country and many paraprofessional positions, including NEA, PGCEA, and AFSCME Council 3 members. Without Title I awards, 32 states would lose at least 5% of teacher positions, with losses as high as 10 or 12% in some states.[60] Even delays in receipt of funds for the upcoming school year or misallocations of funds due to reliance on outdated or inaccurate data would likely result in the loss of positions. NEA, PGCEA, and AFSCME Council 3 members' employment will inevitably be impacted by the fallout.

83.    Another ESEA program, Title III, creates programs and supports for EL students across the country. *See generally* 20 U.S.C. §§ 6801–7014. On information and belief, since January 20, 2025, the Department has effectively dismantled OELA, the office responsible for administering Title III by statute, *see id.* § 3420, eliminating all but one of its positions. Though

---

[59] Mehta, *supra*.
[60] Weade James & Will Ragland, *Project 2025's Elimination of Title I Funding Would Hurt Students and Decimate Teaching Positions in Local Schools*, Ctr. for Am. Progress (July 25, 2024), https://bit.ly/42fLUzV.

DEOA requires the Secretary to give 90 days' notice to Congress of her intent to abolish OELA, *id*. § 3473(b)(2), McMahon did not do so. Her unilateral elimination of OELA clearly violates DEOA and will harm Title III grant administration and EL technical assistance utilized by states, districts, practitioners, and families, including Plaintiffs and their members.

### D.   Training, Recruiting, and Retaining Effective Educators

84.   Defendants' dismantling of the Department likewise interferes with mandatory competitive grant programs to train, recruit, and retain highly qualified and effective educators.

85.   One such program is ESEA's Supporting Effective Educator Development ("SEED") Program, which creates pathways for underrepresented educators to serve in traditionally underserved schools. 20 U.S.C. §§ 6611–92. Likewise, the HEA establishes the Teacher Quality Partnership ("TQP") Program, *id.* §§ 1022–22h, supporting educator preparation partnerships between colleges and high-need schools, *id*. § 1022a.

86.   In February 2025, the Department announced it had terminated "over $600 million dollars in grants" awarded to fund congressionally mandated programs with some connection to diversity, equity, and inclusion activities, including all FY25 SEED and TQP grants.[61]

87.   Department regulations limit how Defendants may terminate an existing grant. *See* 2 C.F.R. pt. 200, § 3474. A grant may be terminated "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities" ***and*** the grant award notification clearly and unambiguously included this language. *Id.* § 200.340(a)(4), (b).

88.   The Department also may terminate grants for noncompliance with the terms and conditions of the award. 2 C.F.R. § 200.340(a)(1).

89.   On information and belief, TQP and SEED grant award notifications for FY2025,

---

[61] Feb. 17 Press Release, *supra.*

which began on October 1, 2024, did not specify that awards could be terminated for failure to effectuate the Department's goals and priorities. Nor did the Department identify any areas of noncompliance for the FY25 TQP and SEED grants. Even if it had, before ending a grant for noncompliance, the Department must "determine[] that noncompliance cannot be remedied by" project monitoring, technical assistance, or other oversight. *Id.* §§ 200.339, 200.208(c). On information and belief, none of this occurred.

90.    And the Department did not provide TQP or SEED grant recipients the requisite written notice of termination or opportunities to be heard before withdrawing funds. *See* 2 C.F.R. §§ 200.341(a), 200.342.

91.    NEA members across the country participated in programs funded by the canceled SEED and TQP grants. As a result of Defendants' unilateral termination of these grants, numerous NEA members have lost access to critical professional development, mentoring, and coaching programs as well as opportunities to pursue graduate studies and earn extra compensation. For example, the Department canceled a five-year TQP grant to a teacher residency partnership between Sacred Heart University and two Connecticut school districts experiencing critical teacher shortages, including Bridgeport, which employs 1,368 NEA members.[62] In exchange for reduced tuition and a substantial living stipend, participants complete a year-long, co-teaching residency and commit to teach in that district for at least 3 years after graduating.[63] Twenty students, including NEA members, have already participated and, over the next five years, 60 more were expected to do so. Participants received a grant-funded stipend for this work and ongoing professional development opportunities such as graduate education and school leadership roles.

---

[62] *See* SHU Grant Proposal Narrative, PR Award # S336S240065, at 15 (2024), https://bit.ly/4iOm9hb.
[63] *Id.* at 19; Press Release, Sacred Heart Univ., *SHU's Farrington College of Education & Human Development Secures $3 Million Grant* (Oct. 3, 2024), https://bit.ly/3DTesXE.

Over the five years of the grant, the program also planned to develop and offer access to an Advanced Mentor Academy and micro-credential programs.[64]

92.     On information and belief, Defendants' cancelation of the TQP grant means the Bridgeport program lacks funding for the 2025-26 school year. Its expected closure will eliminate teacher mentor compensation, tuition benefits, and professional development opportunities for NEA members. The Department also canceled a 2022-2027 TQP grant awarded to fund Project PREP, a partnership between the University of North Florida and Florida's Clay County District Schools, where 1,491 NEA members are employed.[65] Before the Department pulled its funding, NEA members were engaged in Project PREP as students and teacher leaders and received grant-funded stipends for enrollment in graduate coursework at UNF, professional learning opportunities, and access to certification programs.[66] NEA members have been harmed by the loss of this financial support, training, and mentorship—in the middle of the school year.

93.     The 484 NEA members working in Monroe Public Schools in Michigan received similarly valuable professional learning in literacy instruction through participation in Western Michigan University's High-Impact Leadership for School Renewal Project (HIL 2.0), a professional development and technical assistance program for innovation in high-need districts. In 2024, HIL 2.0 received a two-year SEED grant, which Defendants terminated on or around February 14, 2025.[67] The termination has deprived NEA's Monroe members of access to professional learning and grant-compensated positions as team leaders, program facilitators, and

---

[64] SHU Grant Proposal Narrative, PR Award # S336S240065, *supra*, at 8, 27–29.
[65] Press Release, Univ. of North Florida, *UNF and Clay County Schools Partner to Build Educator Pathways* (Feb. 28, 2024), https://bit.ly/4kRNjFl.
[66] *See* Nicholas Brooks, *$7M Grant Addressing Teacher Shortage in North Florida Defunded Midway Through Program*, Action News Jax (Feb. 18, 2025 6:28 PM), https://bit.ly/4kBMn7K; Rebecca Burns et al., *Bridging Gaps in the System: Project PREP's Transformative Approach to Educator Development*, 32 Southeastern Reg'l Ass'n of Teacher Educators J. 1, 6 (2023), https://bit.ly/3FzBB1G.
[67] Grace Teachout, *Two WMU Grant-Funded Program Awards Terminated*, Western Herald (Feb. 15, 2025), https://bit.ly/3DTesXE.

coordinators.

94.     The Department also terminated SEED and TQP grants serving numerous other districts that employ NEA members and inflicted similar harms on these NEA members.

**E.     Opening Pathways to Postsecondary Opportunities**

**1.     Support for Postsecondary Education and Training**

95.     Through implementing the HEA the Department advances equal access to postsecondary education and training. Most significantly, FSA implements Title IV of the statute, which appropriates more than $120,816,000,000 in new federal grant and loan awards for students pursuing postsecondary education each year.[68] 20 U.S.C. §§ 1070–99d.

96.      Congress created FSA as a quasi-independent entity, "responsible for managing the administrative and oversight functions supporting" Title IV programs with a statutory focus on "performance," and limited Secretarial oversight. *See id.* § 1018(a)(1). Yet on information and belief, since January 20, 2025, the Secretary has reduced FSA staffing by more than 40% from 1,444 to approximately 800.[69]

97.     FSA cannot fulfill its statutorily mandated functions with less than 60% of its staff. FSA handles administrative, accounting and financial management for all Title IV grant and loan programs, including the development and maintenance of the Free Application for Federal Student Aid or FAFSA; the disbursement of grant funds allocated for student aid; and oversight of colleges' accreditation and eligibility status. *See* 20 U.S.C. §§ 1018(b), 1087mm–87rr, 1090–91, 1099c. In addition, FSA is required to "provide timely assistance to borrowers" who take federal student loans, including resolution of borrower complaints and disputes. *Id.* § 1018(b)(1), (f).

---

[68]*FY2024 Annual Report, supra*, at 16 (2024).
[69] *See* Cory Turner, *The Education Department Is Being Cut in Half. Here's What's Being Lost*, NPR (Mar. 13, 2025), https://bit.ly/4hH88Ab.

98.     On the grant side, FSA administers the Federal Pell Grant Program, as to which the HEA orders that the Department "shall pay" "in the amount for which [each qualifying] student is eligible" under the statute. 20 U.S.C. § 1070a(8)(A). FSA also oversees the Teacher Education Assistance for College and Higher Education ("TEACH") Grant Program, a service payback program that provides scholarships to undergraduate and graduate students in exchange for their commitment to teach for four years in a high-need field, at a school or educational service agency that serves students from low-income families. *See id.* §§ 1070g to 1070g-4.

99.     FSA also administers the Title IV federal student loan programs, including the Federal Direct Loan Program. 20 U.S.C. §§ 1071 to 1087-4. Direct Loans are made to students and parents from the public fisc and constitute the majority of the federal government's student loan spending. *See id.* § 1087a(a). Appropriations to fund the program are mandatory, meaning that the HEA sets the eligibility rules and benefit formulas for the program and sufficient funding is automatically appropriated each year. *See id.*[70]

100.     In FY24, Congress appropriated more than $1 trillion to fund the various federal student loan programs.[71] For that year, FSA directly managed or oversaw a loan portfolio of more than $1.6 trillion, consisting of 217.2 million student loans to more than 45 million borrowers (almost 17% of Americans aged 18 and over).[72] Plaintiffs' members receive innumerable benefits from the many services that FSA provides and the programs FSA manages. Many of Plaintiffs' members have federal student loans issued through the Title IV programs and use repayment programs, including income-based repayment programs, to afford repayment. They rely on the guidance, information, and other technical assistance that FSA provides to understand their

---

[70] *See* Cong. Budget Off., *Mandatory Spending Options* (2024), https://bit.ly/3DMELyL.
[71] *FY 2024 Congressional Action, supra*, at 6.
[72] *FY2024 Annual Report, supra*, at 16.

repayment options. NEA has approximately 41,000 Aspiring Educator members, who are enrolled in a postsecondary program preparing them for careers as educators. A substantial portion of these members receive Pell Grants or TEACH Grants and take federal student loans. And tens of thousands of active NEA and PGCEA members are repaying federal student loans they took to fund their postsecondary education.

101.    To implement these enormous federal financial aid programs, FSA, through its staff, carries out a wide array of statutorily mandated oversight, monitoring, and technical assistance functions that directly benefit tens of thousands of Plaintiffs' members.

102.    For example, through the School Eligibility and Oversight Service Group ("SEOSG"), FSA (i) certifies whether institutions can participate in Title IV programs given their ability to provide the services they advertise, comply with Title IV, and meet all financial obligations, 20 U.S.C. § 1099c(c)(1)[73]; and (ii) administers a program of eligibility, certification, financial analysis, and oversight of participating schools."[74] This critical statutorily required work can only be done with substantial staffing. Yet, on information and belief, after the March 11 RIF, the SEOSG had no or too few employees to carry out these responsibilities.

103.    FSA also administers the two major service-based student loan forgiveness programs: the Public Service Loan Forgiveness Program ("PSLF") and the Teacher Loan Forgiveness Program. PSLF, 20 U.S.C. § 1087e(m); 34 C.F.R. §§ 685.212(i), 685.219. The PSLF forgives the balance remaining on Federal Direct Loans held by borrowers who have completed ten years of full-time employment in eligible public service jobs and made 120 qualifying monthly

---

[73] FSA, U.S. Dep't of Educ., *Program Review Guide for Institutions* vii (2017), https://bit.ly/41XDmgI.
[74] U.S. Dep't of Educ., *FSA Functional Statements – Partner Participation and Oversight* (Jan. 14, 2025), https://bit.ly/4iCkP0G. Last year, SEOSG conducted more than 1,100 institution oversight reviews, more than 3,000 school eligibility actions, and more than 2,300 other institutional eligibility actions; *FY2024 Annual Report*, *supra*, at 116.Last year, SEOSG conducted more than 1,100 institution oversight reviews, 3,000 school eligibility actions, and 2,300 other institutional eligibility actions; *FY2024 Annual Report*, *supra*, at 116.

payments. *See* 20 U.S.C. § 1087e(m). As of January 2025, over one million public servants—including Plaintiffs' members—had received student loan relief, totaling more than $1.8 billion, through this program.[75] At least 43% PSLF beneficiaries work in the education sector, and 28% work in PK-12 education systems.[76]

104.    Likewise, the Teacher Loan Forgiveness Program, 20 U.S.C. §§ 1078-10, 1087j; 34 C.F.R. §§ 682.216, 685.212(h), 685.217, repays up to $17,500 in qualifying federal student loans for teachers with 5 consecutive years of full-time service in an elementary or secondary school. As of 2024, the Program had discharged a total of $3.87 billion in student loan debt held by approximately 470,000 teachers.[77]

105.    Both PSLF and Teacher Loan Forgiveness are mandatory programs; the HEA instructs that the Department "shall carry out" these programs in the manner specified by Congress and "shall cancel" loan balances for qualified borrowers. 20 U.S.C. §§ 1078-10(b), 1087e(m)(1). Many beneficiaries of these programs are NEA, PGCEA, and AFSCME Council 3 members.

106.    For years, NEA has used FSA technical assistance to assist its members in seeking PSLF, including through webinars to guide members through the application process, educate members about the Department's income-driven repayment and loan forgiveness programs, and address member questions. NEA has held dozens of these information sessions, reaching tens of thousands of its members. NEA plans to continue this support for its members and will be harmed by any impairment in FSA's ability to perform its administrative and technical assistance functions for the programs.

---

[75] The White House, *Fact Sheet: The Biden-Harris Administration Record* (Jan. 15, 2025); https://bit.ly/4igHcbM; Educ. Data Initiative, *Student Loan Forgiveness Statistics* (Aug. 28, 2024), https://bit.ly/4kH3hlx.
[76] Julia Turner, Kathryn Blanchard & Rajeev Darolia, Off. of the Chief Economist, U.S. Dep't of Educ., *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?* 2, 5 (2025), https://bit.ly/4l0ze8h.
[77] Educ. Data Initiative, *supra*.

107.    Third-party companies handle the day-to-day management of PSLF and the Teacher Loan Forgiveness program under Department contracts. As part of the March 11 RIF, the Department eliminated the jobs of all 58 employees in FSA's Vendor Performance Division, within its Office of Loan Management. On information and belief, the Vendor Performance Division was responsible for quality control, compliance, and oversight of the federal student loan servicers and guaranty agencies.

108.    On information and belief, Defendants also cut staffing for FSA's Ombudsman Office by about 66%. The Ombudsman is responsible for: (i) resolving hundreds of thousands of complaints by students, parents, and borrowers who are having difficulties with any aspect of any Title IV program; (ii) compiling and analyzing complaint data to make appropriate recommendations; and (iii) conducting mandatory stakeholder consultations.

109.    Just last year, the Department determined 1,691 full-time employees were necessary for FSA to fulfill these and many other statutory responsibilities.[78] The Department has not published any updated analysis, or otherwise explained how FSA can carry out the same statutory responsibilities with only half that number of employees.

110.    On information and belief, the sweeping FSA staff reductions will prevent that office from fulfilling its statutory obligations and thereby harm countless Americans, including Plaintiffs' members who now receive federal student aid or hold federal student debt.

### 2.    Support for Career and Technical Education

111.    The DEOA requires that there "shall be in the Department an Office of Career, Technical, and Adult Education," led by an Assistant Secretary, to administer Department programs related to career and technical education among other areas. 20 U.S.C. § 3416.

---

[78] *Student Aid Administration: Fiscal Year 2025 Budget Request, supra*, at 11.

112.    OCTAE's Division of Academic and Technical Education ("DATE") makes resource-intensive CT programs attainable for states and school districts through its administration of Perkins V.[79] In 2024, Congress appropriated more than $1.4 billion for CTE through Perkins V, which, among other things, awards formula funds to states through the Basic States Grant ("BSG") program. The states, in turn, subgrant most BSG funds to school districts to support CTE programs. 20 U.S.C. § 2321. States and school districts use Perkins V funds to pay for specialized equipment; career exploration activities; professional development; support for partnerships with postsecondary institutions and area employers; and initiatives to increase employment for the chronically unemployed and underemployed. *See id.* § 2355(b).[80]

113.    Scores of NEA, PGCEA, and AFSCME Council 3 members, including certified student career coaches in Charles County Public School District, are CTE educators and benefit from OCTAE's work with respect to CTE funding and technical assistance.

114.    For example, 125 NEA members work at the Lehigh Career & Technical Institute in Schnecksville, Pennsylvania, which serves over 2,700 students from nine different public-school districts and offers training in more than 45 programs. Lehigh receives federal funding through Perkins V that allows Lehigh to purchase costly equipment necessary to provide adequate CTE—for instance, forklifts, table saws, carpentry tools, or a car lift; to offer instructional assistance to students with IEPs; and to support student clubs.

115.    As in ESEA's formula grant programs, NCES was previously responsible for calculating states' BSG allotments under Perkins V's statutory formula. Staff calculated each state's allotment ratio, a weighting factor based on individual per capita income and state needs.

---

[79] Adam K. Edgerton, Cong. Rsch. Serv., R47071, *Strengthening Career and Technical Education for the 21st Century Act (Perkins V): A Primer* 1 (2022) [*CRS Perkins V Report*], https://bit.ly/4iTNyxu.
[80] *Id.* at 4.

NCES personnel also accounted for the statutory formula's various floors and caps on state allocations in running the formula each year.[81]

116.    Defendants' gutting of NCES has eviscerated the Department's ability to collect the information and develop the models to calculate BSG allocations for the 2026-27 school year. Normally, NCES staff would already be in the process of preparing for the 2026-27 calculations. But the skeletal staff remaining at NCES will likely be unable to complete this intricate work in time for states and school districts to receive funding on July 1, 2026.

117.    For the thousands of NEA, PGCEA, and AFSCME Council 3 members whose positions are funded in whole or in part by Perkins V awards, and who rely on Perkins V funds to obtain the resources necessary to provide CTE, the Department's inability to administer the BSG Program in compliance with the statute will inflict significant harm, ranging from job losses to reductions in essential programs, materials, and equipment.

118.    Perkins V also requires states to set goal levels of performance on a variety of "core indicators" and mandates that the Department provide technical assistance to states that fall short of their goals by more than 10%. 20 U.S.C. §§ 2323(3)(A)(i)(II), 2343. DATE fulfills this statutory obligation for the Department, for example, by helping a state or school district to conduct the mandatory Perkins V comprehensive local needs assessment and administering the Perkins Collaborative Research Network, which provides critical data, tools, best practices guides, and other resources to state officials and staff who administer CTE programs.[82]

119.    On information and belief, in the past six weeks, 65–75% of OCTAE's 65-person staff have been terminated. These cuts have demolished OCTAE's leadership and will prevent the

---

[81] NCES, IES, *The Allocation Process for Perkins Vocational and Technical Education Grants* 3–8 (Mar. 21, 2025), https://bit.ly/4bZq6Nq.
[82] *See* Perkins Collaborative Resource Network, U.S. Dep't of Educ., *Perkins V* (Mar. 12, 2025), https://bit.ly/4iD22SA.

Department from providing the technical assistance mandated by Perkins V.

   **F.    Facilitating Research and Data Collection on America's Schools**

   120.    Across all these program areas, ESRA requires that the Department "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need" related to education. 20 U.S.C. § 9511(b)(2); *see also id.* § 9512. The Department may choose to carry out these functions directly or indirectly but must delegate ESRA implementation and mandatory research activities to IES. *Id.* §§ 9512–13.

   121.    IES also carries out program evaluations and assessments required by statutes other than ESRA, including IDEA and ESEA. 20 U.S.C. §§ 1464(a)–(d), 7981(b), (d).[83]

   122.    IES datasets are essential to the Department's ability to carry out its program responsibilities including grant allocation as Congress mandated.[84] IES's work is also invaluable to education policymakers, administrators, educators, advocates, and researchers, who have accessed IES's resources database more than 33,000 times in the past year.[85]

   123.    For example, IES publishes and collects basic information on public elementary and secondary schools and school districts in the Common Core of Data, a comprehensive, annual national dataset that provides directory information and data on student enrollment, staff, locale, finances, and graduation rates, among other metrics, for every public PK-12 school and school district in the country. There is no other dataset of similar scope available to stakeholders.

   124.    NEA staff use the Common Core of Data to assess the distribution of resources across school districts, perform comparative statistical analyses, and better understand member needs in furtherance of NEA's support of affiliate bargaining and policy initiatives.

---

[83] Nat'l Ctr. for Educ. Evaluation, IES, U.S. Dep't of Educ., *Evaluations* (2025), https://bit.ly/4hE2gYF.
[84] *See* IES, U.S. Dep't of Educ., *Common Core of Data Files* (2025), https://nces.ed.gov/ccd/files.asp.
[85] Educ. Resources Info Ctr., IES, U.S. Dep't of Educ., *U.S. Dep't of Educ.: Publisher Report* (Mar. 11, 2025), https://bit.ly/4hE2z5L.

125.    In the classroom, NEA and PGCEA members widely consult the resources available through IES's What Works Clearinghouse, a portal established to provide practitioners with easy access to expert reviews of evidence-based interventions and practices.[86] The Clearinghouse includes Practice Guides that synthesize large bodies of academic research in a variety of formats, which educators use to improve the services they provide to their students.[87]

126.    Defendants have also unilaterally canceled contracts and grants that provide direct services and benefits to NEA and PGCEA members, students, and schools. For example, ESRA requires that IES enter contracts to establish Regional Educational Laboratories and Comprehensive Centers which provide critical technical assistance and professional development to states and school districts, especially low-performing, economically disadvantaged, and rural districts. 20 U.S.C. §§ 9564(a), 9602(a)(2).

127.    These centers directly benefit NEA, PGCEA, and AFSCME Council 3 members, but are now closed. On information and belief, Defendants have taken no steps to replace the required services and programs provided through these contracts. Researchers, advocates, and practitioners, including NEA staff and NEA and AFSCME members, will lose access to new publications, data, best practices guides, and professional development tools that allow them to disseminate, evaluate, and apply evidence-based methods in their daily work.

128.    These cancelations have also directly harmed students and NEA members who were participating in IES-sponsored pilots and studies. One such program, the "Charting My Path for Future Success" study, was evaluating different models to provide transition services for students with disabilities who are nearing the end of high school. To do this, researchers piloted

---

[86] IES, U.S. Dep't of Educ., *What Works Clearinghouse* (last visited Mar. 20, 2025), https://bit.ly/41TDkGK.
[87] *See* IES, U.S. Dep't of Educ., *Practitioner Perspectives of the What Works Clearinghouse* (Sept. 2024), https://bit.ly/41YeLZh.

two different transition models in 13 school districts across the country. The programs hired approximately 60 special education personnel and enrolled about 1,600 students nationwide to participate in the program as part of their school day.[88]

129.    On February 10, 2025, Defendants pulled IES funding for Charting My Path, bringing the pilot program to an immediate stop in all 13 districts. This abrupt termination harmed student participants, who lost access to a highly beneficial educational opportunity, and NEA members serving as instructors in the program in districts like Spotsylvania, Virginia; Paulding County, Georgia; Newton, Massachusetts; and Aurora, Colorado, who were impacted in ways ranging from pay cuts to reassignment.

130.    Defendants have also prevented IES from being able to conduct its statutorily required data collection and assessment activities. It is impossible for the skeletal IES staff that remains to compile and publish the next Common Core of Data, support the NAEP, or carry out any other of IES's numerous statutory responsibilities. This not only violates the DEOA, ESRA and other statutes delegating research and data collection responsibility to IES, it also eliminates a key source of the information needed for researchers and advocates, including NEA staff, to hold Defendants accountable for their education policy decisions.

## CAUSES OF ACTION

### COUNT ONE

### Take Care Clause, U.S. Const. art. II, § 3 (Against Defendant Linda McMahon)

131.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

132.    Plaintiffs have an inherent equitable right of action to enjoin and declare unlawful

---

[88] Eric Garcia, *The Department of Education Approved a Grant to Help Students with Disabilities into Adulthood. Then Trump Came Along*, The Independent (Feb. 19, 2025), https://bit.ly/4hE0HKh; Dana Goldstein & Sarah Mervosh, *Are Schools Succeeding? Trump Education Department Cuts Could Make It Hard to Know*, N.Y. Times (Mar. 12, 2025), https://bit.ly/420WE54.

official action that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.* ("*PCAOB*"), 561 U.S. 477, 491 n.2 (2010).

133.    The Constitution obligates the President—and by extension all subordinate executive officers—to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

134.    The Take Clare Clause prohibits the President from directing federal officers to act in derogation of federal statute and federal officers from implementing such directives.

135.    The March 20 Executive Order directing McMahon to dismantle the Department, and her actions to dismantle the Department to do so, violate the Take Care Clause.

## COUNT TWO

**Appropriations and Spending Clauses, U.S. Const. art. I, § 8, cl. 1; art. I, § 9, cl. 7**

**(Against Defendant Linda McMahon)**

136.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

137.    Plaintiffs have an inherent equitable right of action to enjoin and declare unlawful official action that violates the Constitution. *See PCAOB*, 561 U.S. at 491 n.2.

138.    The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Accordingly, the Clause "gives Congress control over the public fisc . . . ." *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024).

139.    The Spending Clause of the Constitution provides: "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposes and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse exclusively in Congress.

140.    The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations. *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

141.    Defendant McMahon's unlawful impoundment of the Department's congressionally appropriated funds infringes Congress's exclusive power over the federal purse. That exclusive power is conferred and protected in part by the Appropriations Clause and the Spending Clause, and the Executive Branch has no constitutional authority to countermand it.

## COUNT THREE

### Violation of the Separation of Powers (Against Defendant Linda McMahon)

142.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

143.    Plaintiffs have an inherent equitable right of action to enjoin and declare unlawful official action that violates the Constitution. *See PCAOB*, 561 U.S. at 491 n.2.

144.    Defendant McMahon's dismantling of the Department, reflected in the March 20 Executive Order, exceeds Executive Branch authority and impermissibly arrogates power that is reserved to Congress, in violation of the separation of powers. See U.S. Const. art. I, § 1; U.S. Const. art. I, § 7, cl. 2; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. II, § 3.

## COUNT FOUR

### APA, 5 U.S.C. § 706(2)(A)–(C) (Against All Defendants)

145.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

146.    Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

147.    Defendants' dismantling of the Department, reflected in the March 20 Executive

Order, constitutes a final agency action reviewable under 5 U.S.C. § 704.

148.    Defendants' actions are contrary to law and in excess of statutory authority. No Defendant possesses either the constitutional authority, as an agent of the President, or the statutory authority to dismantle the Department; to direct its subagencies to cease work on statutorily mandated programs and activities; or to withhold, terminate, or otherwise interfere with the disbursement of funds duly appropriated to the Department for its programs and operations. Defendants' actions are also contrary to law because they violate Department's own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954).

149.    Defendants' actions are also contrary to the United States Constitution because they violate fundamental separation of powers principles, as well as the Take Care Clause, the Appropriations Clause, and the Spending Clause.

150.    Defendants' dismantling of the Department is arbitrary and capricious because Defendants have failed to account for the devastating consequences of eliminating the Department and its programs for millions of American students and families; have not provided any non-pretextual explanation for their dismantling of the Department or reduction of staff previously determined to be necessary to the Department's statutory responsibilities; and have failed to account for the substantial reliance interests of students, families, educators, local communities, borrowers and states in the continued functioning of the Department.

151.    The Court should hold Defendants' dismantling of the Department to be arbitrary and capricious, in violation of the APA.

### COUNT FIVE

### *Ultra Vires* Action (Against All Defendants)

152.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

153.    Plaintiffs have an equitable right to enjoin as *ultra vires* Executive Branch practices.

*See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022).

154.    No statute, constitutional provision, or other source of law authorizes Defendants to dismantle the Department in violation of the DEOA and the statutes the Department administers. To the contrary, statutes such as ESEA, IDEA, HEA, Perkins, and ESRA create clear and mandatory statutory duties for the Department and its subdivisions to execute, and Congress has consistently appropriated funds to enable the Department to fulfill those obligations.

155.    Defendants' dismantling of the Department is therefore "in excess of [their] delegated powers," *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare unlawful and set aside the March 20 Executive Order;

B.    Issue a preliminary and permanent injunction barring Defendants from continuing their dismantling of the Department and implementing the March 20 Executive Order;

C.    Declare unlawful and set aside Defendants' actions to dismantle the Department as unconstitutional; arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and *ultra vires*;

D.    Award Plaintiffs reasonable attorneys' fees and costs; and

E.    Grant such other relief as the Court deems necessary, just, and proper.

Date: March 24, 2025                                 Respectfully submitted,

/s/*Abigail V. Carter*

Joseph M. Sellers (D. Md. Bar No. 06284)
Ethan Judd*
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue, NW, Suite 800
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699
jsellers@cohenmilstein.com
ejudd@cohenmilstein.com

Robert Kim*
Jessica Levin*
Wendy Lecker*
Theresa Luhm*
**Education Law Center**
60 Park Place, Suite 300
Newark, NJ 07102
Tel. (973) 624-1815
Fax (973) 624-7339
rkim@edlawcenter.org
jlevin@edlawcenter.org
wlecker@edlawcenter.org
tluhm@edlawcenter.org

*Attorneys for NAACP, NAACP South Carolina State Conference, NAACP Florence Branch, NAACP Texas State Conference, NAACP Lubbock Branch, Mara Greengrass, and Jane Does 1 & 2*

Abigail V. Carter (D. Md. Bar No. 20952)
Lane Shadgett**
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
acarter@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for National Education Association, Prince George's County Educators' Association, AFSCME Council 3*

Alice O'Brien*
Marissa Marandola*
**National Education Association**
1201 16th Street NW
Washington, DC 20036
Tel. (202) 822-7035
aobrien@nea.org
mmarandola@nea.org

*Attorneys for National Education Association and Prince George's County Educators' Association*

Aaron S. Ament*
Daniel A. Zibel**
Eric Rothschild*
**National Student Legal Defense Network**
1701 Rhode Island Avenue N.W.
Washington, D.C. 20036
Tel. (202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org
eric@defendstudents.org

*Attorneys for National Education Association*

*Pro Hac Vice Motion Forthcoming
**Admission to District of Maryland Bar Pending*