# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
    4805 Mount Hope Drive
    Baltimore, MD 21215
    (City of Baltimore, MD),

NAACP SOUTH CAROLINA STATE
CONFERENCE,
    201 Columbia Mall Blvd., Suite 113
    Columbia, SC 29223,

NAACP FLORENCE BRANCH
    P.O. Box 5653
    Florence, SC 29502,

NAACP TEXAS STATE CONFERENCE,
    6633 Highway 290-East, Suite 303
    Austin, TX 78723,

NAACP LUBBOCK BRANCH,
    P.O. Box 1903
    Lubbock, TX 79408,

MARA GREENGRASS, o/b/o B.F., a minor
child,
    (Montgomery County, MD)
    c/o Education Law Center
    60 Park Place, Suite 300
    Newark, NJ 07102,

JANE DOE 1, o/b/o C.E., a minor child, and
JANE DOE 2, o/b/o C.C., a minor child,
    (Montgomery County, MD)
    c/o Education Law Center
    60 Park Place, Suite 300
    Newark, NJ 07102,

Civil Action No. 25-965

**FIRST AMENDED
COMPLAINT**

NATIONAL EDUCATION ASSOCIATION,
    1201 16th Street, NW
    Washington, D.C. 20036,

PRINCE GEORGE'S COUNTY EDUCATORS
ASSOCIATION,
    8008 Marlboro Pike,
    Forestville, MD 20747
    (Prince George's County, MD),

       and

AFSCME COUNCIL 3,
    1410 Bush Street, Suite A
    Baltimore, MD 21230
    (City of Baltimore, MD),

       *Plaintiffs*,

       v.

THE UNITED STATES OF AMERICA,
    c/o Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C. 20530,

UNITED STATES DEPARTMENT OF
EDUCATION,
    400 Maryland Avenue, SW
    Washington, D.C. 20202,

       and

LINDA MCMAHON, *in her official capacity as
Secretary of Education*,
    400 Maryland Avenue, SW
    Washington, D.C. 20202,

       *Defendants*.

## INTRODUCTION

1.      The U.S. Department of Education ("the Department") is charged by Congress with advancing educational opportunity and quality by implementing federal education laws in all fifty states and in hundreds of thousands of schools, colleges, and universities. Despite these clear statutory mandates, since January 2025, Defendants have moved to shutter the Department's core functions, a decision memorialized in President Trump's March 20, 2025 Executive Order 14,242, directing Secretary of Education Linda McMahon to close down the agency. Exec. Order 14,242, 90 Fed. Reg. 13679 (Mar. 20, 2025) ("March 20 Executive Order"). Both before and since the Executive Order, Defendants have taken drastic, escalating steps to incapacitate the Department, including cancelation of $1.5 billion in grants and contracts for the performance of core functions, mass layoffs of half the Department's workforce, and withholding of nearly $6.8 billion in mandatory federal formula grant funding. These actions are unconstitutional and violate the statutes that create the Department, assign it specific duties, and fund it. Plaintiffs—civil rights and labor organizations and parents—seek declaratory and injunctive relief from the harm Defendants' dismantling of the Department has already caused, and will continue to cause, to their members and to tens of millions of students, families, educators, and schools across the country.

2.      In creating the Department, Congress struck a considered balance between state and local control of education and federal support and oversight, to both "promote improvements in the quality and usefulness of education" and "strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual." 20 U.S.C. § 3402(1), (4). Between 1980 (the year the Department was formed) and 2020, high school graduation rates for Black students increased from 51% to 81%, reducing the gap between Black students and their white

peers from 21% in 1980 to 9% in 2020. Graduation rates for Hispanic students rose from 45% to 83%, shrinking the gap with white students from 27% in 1980 to just 7% in 2020.[1]

3.      Similarly, in 1979, less than a third (31%) of American adults aged 25 and over had completed some postsecondary education. By 2022, that figure had doubled to almost two-thirds (62%).[2] Significantly, the college attendance gap between white and Black Americans fell from 10 percentage points in 1980 to just 4 percentage points by 2020, while women moved from trailing men in four-year college completion rates by 7% to a rate three points higher.[3]

4.      The Department dramatically expanded educational opportunities for students with disabilities through its implementation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–82. In 1970, U.S. schools educated only one in five children with a disability. By the 2022-2023 school year, more than 8 million students ages 3 through 21 received special education and related services in public schools, and over two-thirds of students with disabilities now learn with their non-disabled peers for at least 80% of their school day.[4]

5.      The Department has also helped to close deep and longstanding equity gaps. Title I of the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. §§ 6301–7981, allows school districts that serve large populations of economically disadvantaged students to hire staff, construct facilities, and purchase materials that would otherwise be unaffordable. Likewise, institutional and student financial aid under the Higher Education Act ("HEA"), 20 U.S.C. §§ 1001–1161aa-1, makes postsecondary education accessible to all Americans.

---

[1] NCES, U.S. Dep't of Educ., *Digest of Education Statistics*, tbls. 104.10 and 219.46, https://bit.ly/4iEtrUp (last visited June 27, 2025).
[2] Paige Shoemaker DeMio & Tania Otero Martinez, *Frequently Asked Questions About the U.S. Department of Education*, Ctr. for Am. Progress (Feb. 13, 2025), https://bit.ly/4l0ELMb.
[3] NEA, *Educational Attainment, Income and Earnings, and Unemployment*, https://bit.ly/4iAoVGb (last visited June 25, 2025).
[4] OSEP, U.S. Dep't of Educ., *A History of the Individuals with Disabilities Education Act* (Feb. 16, 2024), https://bit.ly/4ig4e2w.

6.      Despite Congress's mandates and the Department's successes, President Trump is determined to "eliminate the federal Department of Education." He chose his Secretary of Education, Linda McMahon, so she could put herself "out of a job." She, in turn, has called on Department employees to join her "final mission" of dismantling the agency.

7.      To fulfill that stated goal, Department officers have taken a series of escalating steps since January 20, 2025, to abolish the Congressionally created, constituted, and funded agency. First, they terminated at least $1.5 billion in awarded contracts and grants for required research, evaluation, and data collection as well as teacher training and recruitment grant programs established by Congress. Next, they halted most of the Department's civil rights enforcement. And then, they eviscerated the Department's workforce, culminating on March 11, 2025, in a massive reduction in force ("RIF") of more than 1,300 Department workers. Most recently, on June 30, 2025, Defendants announced that they are withholding nearly $6.8 billion in formula grant funding that the ESEA and other laws require them to allocate to states in amounts calculated under the applicable statutory formulas. *See* 20 U.S.C. §§ 6301–39, 6571–78, 6801–7014, 7111, 7171.[5]

8.      The March 11 RIF reached every corner of the Department and eliminated all or nearly all employees in certain units, including the Institute of Education Sciences ("IES") and critical components of the Office of Federal Student Aid ("FSA") and the Office for Civil Rights ("OCR"). The cuts, paired with grant and contract terminations, gutted the Department's formula grant program infrastructure and ended numerous mandatory competitive grant programs. Each of these actions prevents the Department from discharging its statutory duties and is unlawful.

9.      Taken together, Defendants' steps since January 20, 2025, constitute a de facto dismantling of the Department by executive fiat. But the Constitution gives power over "the

---

[5] Mark Lieberman, *Trump Tells States He's Holding Back $6.8 Billion for Schools*, Education Week (June 30, 2025), https://www.edweek.org/policy-politics/trump-tells-states-hes-holding-back-6-8-billion-for-schools/2025/06.

establishment of offices [and] the determination of their functions and jurisdiction" to Congress—not to the President or any officer working under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Executive agencies like the Department "are creatures of statute," brought into existence by Congress, that only Congress can abolish, through bicameralism and presentment. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). And if Congress cannot make far more routine grants of regulatory authority through "modest words," "vague terms," or "subtle devices," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), then Defendants surely lack constitutional or statutory authority to cease the Department's statutorily mandated functions, or hollow out its resources so dramatically that it cannot execute those functions, without any direction from Congress at all.

10.     Defendants' *ultra vires* destruction of the Department violates the separation of powers and the Constitution's Take Care, Spending, and Appropriations Clauses. It is also contrary to law, in excess of Defendants' statutory authority, and arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). If allowed to stand, Defendants' actions will irrevocably harm Plaintiffs, their members, public elementary and secondary education, and postsecondary education across the United States.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

12.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

13.     Plaintiff National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the oldest and largest civil rights organization in the United States. Its mission is to ensure the educational, political, social, and economic equality of all

persons and eliminate race-based discrimination. The NAACP has over two million supporters and members, including parents of school-age children, high school and college students, and educators, organized in nearly 2,200 units across the United States. Its three dozen units in Maryland include the Maryland State Conference, the Prince George's County Branch, and the Montgomery County Branch. The dismantling of the Department has harmed and will continue to harm the NAACP and its members by demolishing OCR, eliminating FSA functions that the NAACP and its members depended upon, and preventing the Department from administering formula and competitive grant programs that support essential educational services for NAACP members' children. The NAACP is headquartered in Baltimore, Maryland.

14.    Plaintiffs NAACP South Carolina State Conference, NAACP Texas State Conference, NAACP Florence Branch, and NAACP Lubbock Branch ("Lubbock NAACP") are nonprofit, nonpartisan membership organizations in Texas and South Carolina which work to ensure educational equality and eliminate racial hatred and discrimination. They rely on the Department's work, and particularly OCR, in pursuing these aims. The dismantling of the Department has and will continue to harm the Plaintiff branches and their members by denying them redress for civil rights violations, including resolution of Lubbock NAACP's pending OCR complaints, and eliminating Department-funded educational services for Plaintiffs' children.

15.    Plaintiff Mara Greengrass resides in Rockville, Maryland. Her son, a high school sophomore in Montgomery County Public Schools ("MCPS"), has had an Individualized Education Program ("IEP") under IDEA for a year and a half. He receives daily paraeducator support, specialized educational programming, a dedicated counselor, and a class on executive function skills. Before these supports, her son struggled to pay attention in class, complete

assignments, or talk to other students, and received poor grades. Plaintiff Greengrass expects that disruptions in IDEA grant administration will jeopardize her son's vital IEP services.

16.    Plaintiff Jane Doe 1 resides in Montgomery County, Maryland, and is a member of the NAACP. Her son is a high school senior in MCPS with an IEP. In June 2024, Jane Doe 1 filed an OCR complaint alleging disability discrimination and retaliation against her son, which was in the Philadelphia office. She fears the office's closure will deprive her son of meaningful redress.

17.    Plaintiff Jane Doe 2 resides in Montgomery County, Maryland, and has three children in Title I schools in MCPS. Her elementary-school age child, C.C., receives English learner ("EL") services under the ESEA, including individualized comprehension support, pull-out sessions with a certified EL teacher, and paraeducator support. Jane Doe 2 expects disruptions in ESEA grant administration will deprive C.C. of these services.

18.    Plaintiff National Education Association ("NEA"), headquartered in Washington, D.C., is the nation's largest union of education professionals with some three million members who work at every level of education, from preschool to university graduate programs, and serve some 50 million students. NEA has affiliate organizations in every state and in nearly 14,000 communities across the United States. To advance educational opportunity, NEA advocated for the Department's creation. NEA's mission is to advocate for education professionals and to unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world. NEA advocates for improving the quality of teaching, increasing student achievement and making schools safer, better places to learn.

19.    Plaintiff Prince George's County Educators Association ("PGCEA") is a labor union and NEA affiliate headquartered in Forestville, Maryland. It represents certified staff, including teachers and specialized support personnel, in Prince George's County Public Schools.

20.     Plaintiff AFSCME Council 3, affiliated with the American Federation of State, County and Municipal Employees, AFL-CIO, is a council of Maryland labor unions, headquartered in Baltimore. It represents over 300 public-school employees, including paraprofessionals, instructional assistants, counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff, and thousands of employees in the University System of Maryland. Department grants pay many AFSCME Council 3 member salaries.

21.     Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the APA. 5 U.S.C. § 702.

22.     Defendant the U.S. Department of Education ("the Department") is a Cabinet agency headquartered in Washington, D.C., responsible for federal education and civil rights laws.

23.     Defendant Linda McMahon is the U.S. Secretary of Education and is sued in her official capacity.

## LEGAL FRAMEWORK

24.     In 1979, Congress enacted the Department of Education Organization Act ("DEOA"), establishing the Department under the supervision of a Secretary of Education. Pub. L. No. 96-88, 93 Stat. 668 (1979) (codified as amended at 20 U.S.C. §§ 3401–510).

25.     The DEOA charged the Department with vast statutory responsibilities including implementation of the ESEA, the HEA, and federal statutes protecting the rights of students with disabilities and supporting vocational education. *See* 20 U.S.C. § 3441(a)(2). Congress also directed the Department to enforce Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d, Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–89, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, in education. 20 U.S.C. § 3441(a)(3).

26.    To carry out these duties, the DEOA directs that the Department must have an Office of General Counsel ("OGC"), an Office of Inspector General, and five principal offices: OCR, the Office of Elementary and Secondary Education ("OESE"), the Office of Special Education and Rehabilitative Services ("OSERS"), the Office of Postsecondary Education ("OPE"), and the Office of Career, Technical, and Adult Education ("OCTAE"). *Id.* § 3412–17.

27.    Since 1979, Congress has enacted new laws, including the IDEA, and amended existing laws like the ESEA and HEA, that expanded the Department's portfolio. These laws have created new, mandatory divisions within the agency—like FSA, IES, the Office for Special Education Programs ("OSEP") within OSERS, and the Office of English Language Acquisition ("OELA")—to carry out the Department's new functions. *See id.* §§ 1018(a), 1402(a), 3420, 9511(b)(2). Today, the most significant laws the Department administers are:

a)  **Federal Civil Rights Statutes,** the laws prohibiting discrimination in schools and colleges that receive federal funds, like Title VI, Title IX, Section 504, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65.

b)  **The ESEA,** which is the main source of federal financial assistance for K–12 schools. In fiscal year ("FY") 2024, the ESEA's 35-plus grant programs provided $28.9 billion in funding.[6] Of that amount, Congress appropriated $18.8 billion to the ESEA's signature program, Title I-A,[7] which supports elementary and secondary schools with a relatively high concentration of students from low-income families. These funds serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools, including more than 500 schools in Maryland, where Plaintiffs' members work and learn.[8]

c)  **The IDEA**, which requires states to provide a free appropriate public education to all students with disabilities in exchange for federal funding of early intervention and special education programs. In FY 2024, IDEA awarded $15.5 billion through five formula and competitive grant programs, which supported the educational needs of an estimated 7.5 million children ages 3 to 21 (15% of all elementary and secondary school students).[9]

d)  **The HEA,** which establishes grants to support institutions of higher education and financial aid programs that award 9.9 million students pursuing postsecondary education and

---

[6] *See* U.S. Dep't of Educ., *FY 2024 Congressional Action* 1–4 (2024), https://bit.ly/3DNQVHC.

[7] U.S. Dep't of Educ., *Fiscal Year 2024 Agency Financial Report* 38 (2024), https://bit.ly/3DR2NbK.

[8] U.S. Dep't of Educ., *Education for the Disadvantaged, Fiscal Year 2026 Budget Request* 11, https://bit.ly/3Tgn3Ys (last visited June 29, 2025); Maryland State Dep't of Educ., *Title 1, Part A School List 2024-2025* 6 (June 2025), https://bit.ly/4keuE4U.

[9] NCES, U.S. Dep't of Educ., *Students With Disabilities* (May 2024), http://bit.ly/44Dv9Rg.

training about $120.8 billion in aid each year.[10] The law creates FSA, a quasi-independent Performance Based Organization, to manage the financial aid programs. 20 U.S.C. § 1018.

e)   **The Carl D. Perkins Career and Technical Act ("Perkins V")**, 20 U.S.C. §§ 2301–414, which supports secondary and postsecondary career and technical education ("CTE") programs through grants (about $1.46 billion in FY 2024) to states and schools.[11]

f)   **The Education Sciences Reform Act of 2002 ("ESRA")**, *id.* §§ 9501–84, which reconstituted the research office created by the DEOA as IES, a nonpartisan, semi-independent research division within the Department, consisting of four centers with specific responsibilities under the statute.

28.    Congress has consistently appropriated funds to support Department operations, including, for FY 2024, over $268 billion, with specific appropriations for IES, FSA and OCR. *See* Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, 138 Stat. 460, 682–693 (2024); USAFacts, *What does the Department of Education do?*, https://bit.ly/4kkNSG7 (last accessed June 28, 2025). For FY 2025, Congress level-funded the Department, "to the extent and in the manner . . . provided by the [2024] appropriations act," with minor exceptions. Act of Mar. 15, 2025, Pub. L. No. 119-4, § 1102, 139 Stat. 9, 35 (making further continuing appropriations).[12]

29.    The President has not proposed the rescission of any funds appropriated to the Department for FY 2025, even though he has proposed rescissions of other appropriations.

## FACTUAL ALLEGATIONS

**I.    Defendants Dismantle the Department.**

30.    President Trump attempted to persuade Congress to close the Department during his first term in office, without success, and has since repeatedly vowed to "clos[e] up the Department of Education in Washington, D.C."[13] After the 2024 presidential election, President

---

[10] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 15 (2024), https://bit.ly/4hLZ0dE.

[11] *FY 2024 Congressional Action*, *supra* note 6, at 4.

[12] FY 2025 appropriations are subject to the 2024 act's "limitations" on transfer and reprogramming authority. Pub. L. No. 119-4, § 1105, 139 Stat. at 10–11; *see* Pub. L. No. 118-47, §§ 302, 514, 138 Stat. at 541, 617.

[13] *Agenda47: President Trump's Ten Principles for Great Schools Leading to Great Jobs* at 3:16, Trump-Vance 2025 (Sept. 13, 2023), https://bit.ly/4kRNdgX.

Trump again called for the "closure of [the] Department" and encouraged Secretary of Education Linda McMahon to "put herself out of a job."[14]

31.    At her confirmation hearing, Secretary McMahon testified that she was "ready to enact" "the President's vision" of "abolish[ing]" the Department.[15] Accordingly, on the night of Secretary McMahon's Senate confirmation, she announced her decision to close the Department in a communication to all employees titled "Our Department's Final Mission," urging them to join her in "perform[ing] one final, unforgettable public service"—demolishing the Department.[16]

32.    Days later, Congress level-funded the Department for FY 2025, with the expectation that its statutory functions would continue at FY 2024 levels. *See* Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. at 11.

33.    Within a week, on March 20, 2025, President Trump issued Executive Order 14,242, directing Secretary McMahon to "take all necessary steps to facilitate the closure of the Department of Education." President Trump said that the Secretary would "take all lawful steps to shut down the department . . . and shut it down as quickly as possible."[17]

34.    The very next day, President Trump announced that "all of the student loan portfolio" and "special needs" would move "out of the Department of Education immediately," to the Small Business Administration and the Department of Health and Human Services.[18]

---

[14] TIME Staff, *Read the Full Transcript of Donald Trump's 2024 Person of the Year Interview with TIME*, TIME Mag. (Dec. 12, 2024), https://bit.ly/3RiRfkE; Jeff Mason, *Trump Seeks Executive Order, Cooperation with Congress to Shut Education Department*, Reuters (Feb. 4, 2025), https://bit.ly/4hlRAOd.

[15] Assoc. Press, *LIVE: Linda McMahon's Confirmation Hearing for Secretary of Education* at 22:43, 31:41, YouTube (Feb. 13, 2025), https://bit.ly/4hHjILK.

[16] Speech, U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://bit.ly/4iZLCUh.

[17] Joey Garrison & Zachary Schermele, *President Trump Signs Order Aimed at Dismantling the Department of Education*, USA Today (Mar. 20, 2025, 6:19 PM), https://bit.ly/4bXYKHk.

[18] C-SPAN *President Trump and Defense Secretary Hegseth Deliver Remarks on F-47 Fighter Jet* (Mar. 21, 2025), https://bit.ly/4kVK3bV.

35.    The President and his agents have no authority to "shut down" an agency created by Congress. Yet Defendants have been on a "final mission" of closing the Department for months.

## A.    Defendants' Escalating Steps to Incapacitate the Department

### 1.    *Mass Termination of Contracts and Competitive Grants*

36.    Defendants' first step to halt the work of the Department was to implement Executive Order 14,151, directing agencies to halt diversity, equity, and inclusion initiatives. Exec. Order. No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025). To that end, on February 5, 2025, Acting Secretary of Education Denise Carter issued a directive instructing the Department's grant-making offices—including OESE, OSERS, OELA, OCTAE, and OPE—to identify new, upcoming, and already-awarded grants that "fund discriminatory practices," including "DEI." These grants, deemed "inconsistent" with the Administration's anti-DEI agenda, were to be "terminated."[19] Within days, Defendants began slashing activities allegedly connected to "DEI" or purported waste, defunding scores of mandatory functions and competitive grant programs in the process.

37.    First, on February 10, 2025, the Department canceled over $1 billion in grants and contracts, including most contracts for IES's research, data collection, and evaluation functions.[20]

38.    On information and belief, Defendants cut these core activities without consulting any IES staff, including the employees that ran them. Employees eventually persuaded Defendants to resuscitate a handful of contracts for required IES functions and save some of the contracts that remained. But to do this, Defendants demanded that each contract's costs be reduced by at least 50%. This re-scoping stripped out many core services.

---

[19] Directive on Development Grant Priorities, U.S. Dept. of Educ. (Feb. 5, 2025), *AACTE v. McMahon*, No. 1:25-cv-00702 (D. Md. Mar. 17, 2025), Dkt. No. 24-2.
[20] *See* Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025, 7:13 PM), https://bit.ly/4hgOATj; Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025, 7:43 PM), https://bit.ly/4bZxqZc.

39.    Three days later, the Department ended all contracts for the ESRA-mandated Regional Educational Laboratories ("RELs"), which it characterized as "woke spending."[21]

40.    On February 17, the Department terminated competitive grants, totaling "over $600 million," awarded through ESEA and HEA programs to support teacher preparation and professional development. Defendants claimed the grants promoted impermissible "race-based discrimination and gender ideology."[22] On information and belief, the terminations cut all or nearly all grant awards in the affected programs, such that the programs functionally ceased to exist.

### 2.    Pausing Civil Rights Enforcement

41.    Next, Defendants pressed paused on most of the Department's civil rights enforcement work. As of January 14, 2025, OCR was investigating approximately 12,000 complaints.[23] But on information and belief, soon after January 20, 2025, Defendants directed OCR staff to stop all work on open matters and all processing of new complaints.[24] Defendants eventually allowed employees to process disability discrimination complaints, but complaints related to race, sex (except those concerning transgender students' participation in school athletics and access to facilities), and age discrimination remained on hold.[25] This lopsided pause in enforcement activity was unprecedented. And the situation worsened with drastic workforce reductions that prevented prompt investigation of OCR complaints as required by law.

---

[21] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025), https://bit.ly/4iZdwzN.

[22] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants* (Feb. 17, 2025), https://bit.ly/4kAfaJT.

[23] *See* OCR, U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (last updated Jan. 14, 2025), https://bit.ly/4inbJEP.

[24] Jodi S. Cohen & Jennifer Smith Richards, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025, 9:30 PM), https://bit.ly/4iYUXM3.

[25] Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025, 8:35 PM), https://bit.ly/4iZeoo3.

### 3. Sweeping Layoffs Demolish the Department's Workforce

42.    As of January 20, 2025, the Department employed 4,133 staff,[26] including approximately 190 employees in IES,[27] 1,444 employees in FSA,[28] 555 employees in OCR,[29] and the rest in other units. Defendants immediately set out to eliminate workers: by March 10, 2025, 572 Department employees had been exited through "voluntary resignation opportunities and retirement" offered by Defendants, including deferred resignation and buyout offers.[30]

43.    On March 11, 2025, Defendants announced a massive RIF that affected "[a]ll divisions within the Department" and eliminated 1,378 Department employees.[31] The Department reported that the combined impact of the RIF and its other staff reductions since January had reduced its workforce by half, to "roughly 2,183 workers."[32] Impacted Department staff were placed on administrative leave beginning March 21, 2025, and scheduled to be terminated on June 9, 2025. On information and belief, they were immediately locked out of Department systems and could not send external emails or transition their work.

44.    On information and belief, the March 11 RIF adversely affected every component of the Department, with many of its statutorily mandated units hit especially hard:

a.    IES was functionally dismantled when Defendants slashed its staff by about 90%, from nearly 200 to fewer than 20 employees. Three of its four subdivisions were demolished: the National Center for Education Statistics ("NCES") was left with only 3 of its roughly 100 employees, while the National Center for Education Evaluation and Regional Assistance ("NCEE") and the National Center for Education Research ("NCER") were each reduced to a single employee—their Commissioners.

---

[26] Press Release, U.S. Dep't of Educ., *U.S. Dep't of Educ. Initiates Reduction in Force* (Mar. 11, 2025), https://bit.ly/42fXyf8 ("Mar. 11 Press Release").
[27] IES, U.S. Dep't of Educ., *Fiscal Year 2025 Budget Request* 76 (2024), https://bit.ly/4kTre8B.
[28] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 11 (2024), https://bit.ly/4hLZ0dE.
[29] OCR, U.S. Dep't of Educ., *Fiscal Year 2025 Budget Request* 8–9 (2024), https://bit.ly/3RhAXIL.
[30] Mar. 11 Press Release, *supra* note 26.
[31] *Id.*
[32] *Id.*

b.  FSA lost about 25% of its staff—the entire Vendor Oversight Division, the entire Vendor Performance Division, 80% of the School Eligibility and Oversight Service Group, and about half of the Ombudsman's Office.

c.  OCR's staff was cut nearly in half, as Defendants shuttered 7 of its 12 regional offices, in Philadelphia, New York City, Dallas, San Francisco, Boston, Cleveland, and Chicago.

d.  OESE, OSERS, OCTAE, and OPE—the offices that administer the ESEA, IDEA, Perkins V, and HEA, respectively—lost all or nearly all staff in their executive offices and management support units, which perform various functions essential to the Department's grant program administration. Another program office, OELA, was abolished and all but one of its 15 employees eliminated, while OGC's attorney staff was reduced by about 75%.

45.    The Department initially claimed the March 11 RIF served its interests in "efficiency, accountability, and ensuring that resources are directed where they matter most."[33] But in an interview that same day, Secretary McMahon described the layoffs as a "first step" towards achieving "the President's mandate" to dismantle the Department.[34]

46.    Other statements made by Defendants after March 11 confirm that advancing the "final mission," not efficiency or accountability, was the true reason for the March 11 RIF. On information and belief, soon after the March 11 RIF, a Department official told staff in one abolished unit that their work would not be reassigned because the Department was winding down as an agency and would not exist moving forward. As a result, the official said, the agency would no longer be responsible for the statutory duties performed by laid-off employees.

47.    On May 2, 2025, Defendants informed Congress in their FY 2026 discretionary budget request that the Department would "wind down its operations and reduce its workforce."[35]

48.    In a June 10, 2025, court filing, a Department official said that the process of rehiring the employees subject to the March 11 RIF (under that court's preliminary injunction)

---

[33] Mar. 11 Press Release, *supra* note 26.

[34] The Ingraham Angle, *Education Secretary Says Department Took First Steps to Eliminate 'Bureaucratic Bloat'* at 1:12, Fox News (Mar. 11, 2025), https://bit.ly/3Y4RR15.

[35] Off. of Mgmt. & Budget, *Fiscal Year 2026 Discretionary Budget Request* 6–7 (May 2, 2025), https://bit.ly/4leT3Ig.

was "not dissimilar to 'standing up' an entire agency"—effectively conceding that the RIF had demolished the Department and required the agency to be rebuilt.[36]

49.    Nor did Defendants consider the consequences of the RIF or alternatives to it before eliminating positions. On March 11, 2025, Secretary McMahon stated that Defendants had designed the cuts to "make sure that we kept all of the right people and the good people" in the "outward-facing" programs.[37] But Defendants did not evaluate the positions or employees to determine which "right" and "good" people to keep. In fact, on June 3, 2025, Secretary McMahon admitted to Congress that she did not do any "actual analysis" or "study" before cutting staff.[38]

50.    In addition, under the DEOA, the Secretary may not modify statutory delegations to Department offices or abolish offices established by statute, with limited exceptions. 20 U.S.C. § 3473. Even where an exception applies, as with OELA and NCES, the DEOA requires the Secretary to give Congress 90 days' notice of her intention to abolish a statutorily created division of the Department. *Id.* § 3473(b)(2). On information and belief, Secretary McMahon did not provide any notice before gutting OELA and NCES.

**B.    Defendants' Actions Since the March 11 RIF**

51.    Defendants continue to pursue the "final mission," ending more and more statutory functions, eliminating competitive grant programs, and planning to move Department functions to other agencies. From March to May 2025, Defendants withdrew from the Federal Register notices inviting applications ("NIAs") for various FY 2025 grant competitions.[39] As of this filing, none of

---

[36] R. Oglesby Decl. ¶ 6, *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass. June 10, 2025), Dkt. No. 147-1.

[37] The Ingraham Angle, *supra* note 34.

[38] Press Release, U.S. Senate Comm. on Appropriations, *Pressed by Murray, McMahon Says "No" Analysis Was Conducted Before Firing Half of the Department of Education's Staff* (June 3, 2025), https://bit.ly/4eikXAQ.

[39] Withdrawal of Notice Inviting Applications and Cancellation of the Competition for the Native Hawaiian Career and Technical Education Program, 90 Fed. Reg. 19287 (May 7, 2025); Withdrawal of Notice Inviting Applications and Cancellation of the Competition for the Native American Career and Technical Education Program, 90 Fed. Reg. 19288 (May 7, 2025); Withdrawal of Notices Inviting Application and Cancellation of the Competitions

these grant opportunities have been reposted, and Defendants have not said how they plan to use the money appropriated to these programs.

52.     Defendants also have not yet published FY 2025 NIAs for competitive grant programs created by the HEA and funded by Congress, more than a dozen of which were scheduled to be announced in the spring and early summer of 2025. On information and belief, in light of Defendants' dismantling of OPE, there is no longer sufficient time or staff for competitive higher education grants to be obligated and committed by the close of FY 2025, on September 30, 2025.

53.     Defendants have also indicated that they do not intend to carry out the Department's statutory obligations to obligate and distribute funds for certain statutorily required federal grant programs. As of this filing, they have not yet obligated FY 2025 funds appropriated by Congress to specific Department programs, including $224 million for Comprehensive State Literacy Grants authorized under ESEA Title II-B. *See* Pub. L. No. 118-47, div. D, tit. III, 138 Stat. at 681–93.

54.     Of particular importance, on April 29, 2025, Defendants informed hundreds of states, school districts, and institutions of higher education that the Department would discontinue grants for school-based mental health services, effective December 31, 2025, for which Congress has specifically appropriated funds, because the grantees supposedly "used the funding to implement race-based actions like recruiting quotas."[40]

55.     On information and belief, the Department is reviewing additional competitive grant programs for potential termination based on their alleged connection to "DEI" activities and is likely to announce further terminations of properly awarded funds.

---

for the Fulbright-Hays Group Projects Abroad Program, Doctoral Dissertation Research Abroad Program, and Faculty Research Abroad Fellowship Program, 90 Fed. Reg. 19688 (May 9, 2025).

[40] Cory Turner, *Education Department Stops $1 Billion in Funding for School Mental Health*, NPR (May 1, 2025 11:21 AM), bit.ly/4l2K7Gh.

56.    Nor do Defendants intend to limit their unlawful withholding of funds to competitive grant programs. On June 30, 2025, Defendants informed states and congressional staffers that they intend to withhold nearly $6.8 billion in funding appropriated to mandatory formula grant programs, including ESEA formula grants to support educational services for migratory children (Title I-C); efforts to improve educator quality, recruitment, and retention in high-needs areas (Title II-A); supplemental services for English learners (Title III-A); expanded access to Advanced Placement, arts, foreign languages and STEM education, as well as services to promote students' physical and mental health (Title IV-A); and the creation of before and after-school and summer programs for high-needs students (Title IV-B).[41]

57.    On information and belief, the Department's communications informing states of the withholding said that the Department was "reviewing the FY 2025 funding" for these programs for alignment "with the President's priorities." But the ESEA obligates the Department to make awards through these programs to eligible grantees in the amounts determined by the statutory formulas. *See* 20 U.S.C. §§ 6301–39, 6571–78, 6801–7014, 7111, 7171. The Department has no discretion to decide whether, to whom, or in what amount to issue payments. Moreover, for decades, the Department has made the first tranche of funding through these programs for the upcoming school year available on July 1, so that states and school districts can rely on the awards in their budgets for the new academic year. The Department's failure to distribute funds by that date this year introduces substantial financial uncertainty for states and districts across the country.

58.    If these steps towards shuttering the Department were not enough evidence of Defendants' continued pursuit of the "final mission," in a June 10, 2025, court filing, Defendants

---

[41] Lieberman, *supra*.

admitted that they have been making steps towards "implementing significant interagency agreements" to transfer Department functions to other agencies.[42]

59.     These agreements include a May 21, 2025, "interagency agreement with the Department of Labor" that would transfer billions appropriated to the Department by Congress to fund Perkins V formula and competitive grants and shift administration of these programs to the Department of Labor. The agreement states that the transfer "'return[s] authority over education to the States and local communities…' in accordance with Executive Order No. 14,242."[43]

60.     These continued failures to carry out the Department's statutory duties, and explicit attempts to move congressionally mandated and funded Department functions to other agencies, leave no doubt that Defendants intend to complete the "final mission," with or without Congress.

## II.    Defendants Have Dismantled Mandatory Department Offices and Functions.

61.     Defendants' decision to shutter the Department has resulted in the closure of key agency offices and has gutted the Department's mandatory statutory functions.

### A.    Facilitating Research, Data Collection, and Reporting on America's Schools

62.     Congress directed in ESRA that the Department "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need" related to education. 20 U.S.C. § 9511(b)(2); *see also id.* § 9512. ESRA created IES to carry out these functions and instructed the Secretary to delegate the Department's statutory research and data collection duties to IES. *Id.* §§ 9512–13. Each of IES's four "National Education Centers" fulfills a subset of its ESRA responsibilities. *Id.* § 9576(a), (c).

63.     Of particular importance is the National Center for Education Statistics ("NCES"), which must administer the National Assessment of Educational Progress ("NAEP") and collect

---

[42] R. Oglesby Decl. ¶ 9, *New York v. McMahon*, No. 1:25-cv-10601.
[43] *Id.* ¶ 9 & Ex. B.

the data necessary to study education systems, provide guidance to states and school districts, develop and implement policy initiatives, and distribute federal formula grants, among other mandatory functions. NCES also must submit to Congress, by June 1 of each year, the statutorily required annual *Report on the Condition of Education*. *Id.* §§ 9543, 9545(b), 9621–24.

64.     Another of the four centers, the National Center for Education Evaluation and Regional Assistance ("NCEE"), provides technical assistance to states and school districts; evaluates the effectiveness of federal education programs and instructional models; and communicates the results of peer-reviewed research for lay audiences through platforms like the Education Resources Information Center ("ERIC") (a free database of education research and publications) and the What Works Clearinghouse (a portal established to provide practitioners with easy access to expert reviews of evidence-based interventions and practices). *Id.* § 9561.

65.     ESRA also directs that NCEE maintain the REL network to provide applied research, development, and technical assistance to states and school districts. *Id.* § 9564.[44]

66.     Beyond ESRA, IES carries out data collections, program evaluations, and assessments required by other statutes, including the ESEA, IDEA, HEA, and Perkins V. *See, e.g.*, *id.* §§ 1015a (HEA data collections and surveys), 1464(a)–(d) (IDEA evaluations), 2324(a)(3) (Perkins V data collection), 7981(b), (d) (ESEA evaluations).[45]

67.     But on February 10, 2025, Defendants canceled most of the contracts IES used to carry out its research, data collection, and evaluation functions.[46] Three days later, they terminated all contracts for the RELs, which they characterized as "woke spending."[47]

---

[44] The other centers, NCER and the National Center for Special Education Research, sponsor research topics including the educational "needs of infants, toddlers, and children with disabilities." 20 U.S.C. §§ 9531, 9567(b)(1).

[45] NCEE, IES, U.S. Dep't of Educ., *Evaluations* (2025), https://bit.ly/4hE2gYF.

[46] *See* Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025, 7:13 PM), https://bit.ly/4hgOATj; Dep't of Gov't Efficiency (@DOGE), X (Feb. 10, 2025, 7:43 PM), https://bit.ly/4bZxqZc.

[47] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025), https://bit.ly/4iZdwzN.

68.    Because Congress has restricted IES's use of appropriated funds to pay employee salaries, IES relies on external contractors and interagency agreements to complete its statutorily required work.[48] As a result, on information and belief, the mass termination of contracts, and the mandatory "re-scoping" of remaining contracts, brought many IES functions and programs, including the RELs and research and development for future NAEP assessments, to a halt.

69.    Defendants further demolished the Department's research, data collection, and reporting infrastructure by reducing IES's staff of nearly 200 employees to fewer than 20.

70.    On information and belief, this skeletal staff cannot manage the sheer volume of IES's mandatory functions—at least 30 data collections and assessments, hundreds of competitive research grants, and production of public-facing resources. The Department is already failing to fulfill its obligations under ESRA: for the first time in its history, the agency missed this year's congressionally mandated June 1 deadline to submit the *Report on the Condition on Education*.[49]

71.    NEA, PGCEA, and AFSCME Council 3 members are injured by IES's destruction, as the mandatory research, data, and dissemination activities that Defendants canceled provided direct services and benefits to these members, their students, and their schools.

72.    For example, NEA members and students were participating in IES-sponsored pilots and studies that Defendants abruptly terminated. One such program, the "Charting My Path for Future Success" study, was piloting two different models to provide transition services for students with disabilities nearing the end of high school. The study enrolled about 1,600 students in 13 school districts and employed about 60 special education personnel.[50] Defendants pulled the

---

[48] AMSTAT, *Nation's Data at Risk* 54 (July 24, 2024), https://bit.ly/4kTkZBN.
[49] Jill Barshay, *Education Department Misses Key Deadline for Delivering Statistics Report*, The Hechinger Report (June 2, 2025), https://bit.ly/4kh5TVO.
[50] *See* Cory Turner, *Students with Disabilities Lost a Helpful Program to DOGE Cuts*, NPR (Apr. 14, 2025 5:00 AM), http://bit.ly/40twyrb.

funding for Charting My Path as part of their mass cancelation of IES contracts, bringing the pilot to an immediate halt. NEA members employed as program instructors in Spotsylvania, Virginia; Paulding County, Georgia; Newton, Massachusetts; and Aurora, Colorado, lost their positions in the study and experienced harms ranging from pay cuts and reassignment to potential job loss and emotional distress. Defendants do not intend to reinstate or otherwise complete the pilot program.[51]

73.    NEA, PGCEA, and AFSCME Council 3 members also utilized resources and services available through REL projects in their states and districts. As of February 2025, NEA members in Tacoma, Washington, and University City, Missouri, were engaged in REL-sponsored professional development, training, and educator support programs. These projects ended when Defendants shuttered the RELs. On information and belief, Defendants claim they plan to re-compete the REL contracts, but with only one NCEE employee, the Department cannot do so.

74.    NEA and PGCEA members widely consult resources on ERIC and the What Works Clearinghouse to pursue advanced degrees and training and implement evidence-based practices in the classroom. For example, members use Clearinghouse Practice Guides, which synthesize academic research into various formats, to improve the education services they offer to students.[52]

75.    In addition, NEA staff use IES studies, data sets, reports, and other resources in the course of their research and advocacy work. For example, staff routinely access the Common Core of Data, a compilation of data from all public K–12 school districts and schools, to calculate NEA's member density; track trends in school enrollment and staffing levels; and support affiliate bargaining and member initiatives, among other things. Staff rely on IES school finance surveys

---

[51] *See* Aff. of Jennifer Sokolower, Ex. 1, *Am. Educ. Rsch. Ass'n v. U.S. Dep't of Educ.*, No. 8:25-cv-01230 (D. Md. June 5, 2025), Dkt No. 46-2.

[52] *See* IES, U.S. Dep't of Educ., *Practitioner Perspectives of the What Works Clearinghouse* (Sept. 2024), https://bit.ly/41YeLZh.

to create resources related to states' and districts' receipt and uses of Department funding.[53] And NEA uses the National Teacher and Principal Survey's descriptive data about educator demographics and experiences to study changes in educator working conditions and attrition.

**B. Opening Pathways to Postsecondary Education via Student Financial Aid**

76.    Title IV of the HEA ("Title IV") advances equal access to postsecondary education and training by authorizing more than $120,816,000,000 in new federal grant and loan awards for students pursuing postsecondary education each year.[54] 20 U.S.C. §§ 1070–99d. In 1998, Congress created FSA as a quasi-independent entity responsible for managing the Title IV programs, with a statutory focus on "performance" and limited Secretarial oversight. *See id.* § 1018(a)(1). The programs FSA manages include the Federal Pell Grant Program, the Teacher Education Assistance for College and Higher Education Grant Program, and the William D. Ford Direct Loan Program.

77.    The Direct Loan Program, which issues loans directly to students and accounts for most federal student loans, is the largest of the Title IV programs. *Biden v. Nebraska*, 600 U.S. 477, 484 (2023). In FY 2024, Congress appropriated more than $1 trillion to fund it and various legacy federal student loan programs.[55] For that year, FSA directly managed or oversaw a loan portfolio of more than $1.6 trillion, consisting of 217.2 million student loans to more than 45 million borrowers (almost 17% of Americans aged 18 and over).[56]

78.    The HEA creates additional programs to assist borrowers after graduation. It mandates that FSA "shall offer" income-driven loan repayment plans and "shall cancel" the

---

[53] *See, e.g.*, NEA, *Federal Education Funding for Selected Programs by State and Program* (Feb. 26, 2025), http://bit.ly/3GqoyAp.

[54] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 16 (2024), https://bit.ly/4hLZ0dE.

[55] *FY 2024 Congressional Action, supra* note 6, at 6.

[56] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 16 (2024), https://bit.ly/4hLZ0dE.

student debt of borrowers eligible for the Public Service Loan Forgiveness Program ("PSLF") or the Teacher Loan Forgiveness Program. 20 U.S.C. §§ 1078(b), 1087, 1087e(d).[57]

79.    Under the HEA, FSA must handle "administrative and oversight functions supporting" Title IV programs, including "accounting and financial management," distribution of financial aid, and student loan servicing. *Id.* § 1018(a)(1). Three main functions are relevant.

80.    First, the HEA requires FSA to certify that colleges are sufficiently financially responsible and competent to participate in Title IV programs, a prerequisite for their students to access federal financial aid. *See id.* §§ 1002(a)(5), 1099c. FSA's School Eligibility and Oversight Service Branch ("SEOS") carries out the Department's certification functions by determining whether institutions provide the services they advertise, comply with Title IV requirements, and meet all financial obligations. *Id.* § 1099c(c)(1). After certification, SEOS fulfills FSA's duty to continuously monitor institutions by conducting thousands of reviews each year related to recertification, deficient audit resolutions, flagged financial statements, program reviews, and heightened cash monitoring. *See id.* §§ 1099c, 1099c-1(a); 34 C.F.R. § 668.23(a)(2), (b).

81.    This critical, statutorily required work can only be done with substantial staffing. Yet, on information and belief, after the March 11 RIF, only two of SEOS's eight sections, and approximately 20% of its pre-RIF employees, remain. This decimation leaves FSA unable to carry out its eligibility, certification, and oversight obligations.

82.    Second, the HEA directs FSA to oversee third-party loan servicers' day-to-day operation of the student loan programs to prevent waste, fraud, and abuse and ensure that loans are serviced and forgiven in compliance with the law. 20 U.S.C. §§ 1018(b)(2)(A)(iv), (v), 1078–

---

[57] PSLF forgives the balance remaining on Direct Loans for borrowers who have completed the requisite years of public service employment and number of monthly payments. *See* 20 U.S.C. § 1087e(m); 34 C.F.R. §§ 685.212(i), 685.219. The Teacher Loan Forgiveness Program repays up to $17,500 in student loans for qualifying teachers in an elementary or secondary school. *See* 20 U.S.C. §§ 1078–10, 1087j; 34 C.F.R. §§ 682.216, 685.212(h), 685.217.

10(b), 1087f. To implement these mandates, FSA's vendor oversight employees ensured that loan servicers and other contractors met their contractual and statutory obligations and provided adequate customer service and user support to borrowers.

83.     On information and belief, Defendants abolished the Vendor Oversight and Vendor Performance Divisions and terminated nearly all vendor oversight employees in the March 11 RIF. As a result, FSA cannot fulfill its mandate to oversee loan servicers' operations and legal compliance as they administer repayment, including by computing payments and interest and processing applications for loan repayment plans and forgiveness programs.

84.     Third, the HEA requires FSA to "ensure [Title IV] program[s] [operate with] integrity" and "appoint a Student Loan Ombudsman to provide timely assistance to borrowers" by processing and informally resolving borrower complaints and disputes. *Id.* § 1018(b)(1), (f)(1). The Ombudsman's Office functions as a clearinghouse for borrower complaints that cannot be resolved through typical FSA customer service channels, by troubleshooting and liaising with loan servicers and other FSA divisions to resolve issues like incorrectly calculated payments, interest, and balances or a servicer's failure to credit qualifying payments or employment for PSLF eligibility. The Ombudsman's Office also frequently collaborated with the vendor oversight employees to resolve borrower complaints involving loan servicers.

85.     On information and belief, the March 11 RIF cut staffing for the Ombudsman's Office, which had a backlog of more than 3,000 borrower complaints, by about half. This leaves the Office unable to meet its own statutory mandates. Paired with Defendants' gutting of vendor oversight, this leaves borrowers with servicer-related complaints without the statutory recourse through the Department to which they are entitled.

86.    Just last year, the Department determined that FSA needed an additional 250 full-time employees to fulfill its many statutory responsibilities.[58] Yet, since January 20, 2025, the Secretary has significantly reduced FSA staffing. The Department has not explained how FSA can carry out its statutory duties after the reduction in staff.

87.    Plaintiffs' members receive innumerable benefits from FSA's certification, oversight, and monitoring of student aid programs. Hundreds of thousands of Plaintiffs' members receive federal student financial aid each year, including many of NEA's 41,000 Aspiring Educator members, who are enrolled in postsecondary educator preparation programs, and NEA, PGCEA, AFSCME Council 3, and NAACP members who take on parent loans to finance their children's postsecondary education. Plaintiffs' members likewise rely on the institutional oversight provided by SEOS and will be harmed by its inability to fulfill its statutory obligations.

88.    Tens of thousands of Plaintiffs' members are currently repaying federal student loans and have received or plan to pursue income-driven repayment or loan forgiveness through federal programs. As of January 2025, PSLF had provided more than one million public servants—including NEA, PGCEA, NAACP, and AFSCME Council 3 members—with loan relief totaling over $78 billion.[59] Likewise, as of 2024, the Teacher Loan Forgiveness Program had discharged $3.87 billion in debt held by about 470,000 teachers, including NEA and PGCEA members.[60]

89.    Defendants' crippling of FSA's oversight and borrower service functions means that, when loan servicers make errors that impact Plaintiffs' members' loan payments, PSLF

---

[58] U.S. Dep't of Educ., *Student Aid Administration: Fiscal Year 2025 Budget Request* 11, https://www.ed.gov/media/document/r-saapdf-39388.pdf (last visited June 30, 2025).

[59] Sara Partridge & Madison Weiss, *Tracker: Student Loan Debt Relief Under the Biden-Harris Administration,* Ctr. for Am. Progress (Sept. 4, 2025), https://bit.ly/3TLIjp5; Julia Turner, Kathryn Blanchard & Rajeev Darolia, U.S. Dep't of Educ., *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?* 2, 5 (2025), https://bit.ly/4l0ze8h (43% of PSLF recipients work in education, and 28% work specifically in K–12 school systems).

[60] Melanie Hanson, *Student Loan Forgiveness Statistics,* Educ. Data Initiative (Aug. 28, 2024), https://bit.ly/4kH3hlx.

eligibility, or applications for loan forgiveness or income-driven repayment, the members cannot seek recourse through FSA, even though the HEA entitles them to assistance. For years, the PSLF system was riddled with such errors, causing Plaintiffs' members financial and emotional harms.

90.    To remedy the harms these deficiencies inflicted on its members, NEA advocated for the Department to reform its PSLF implementation, including its oversight of loan servicers. Beginning in 2021, the Department did so. It began putting reforms in place and provided guidance and technical assistance that would allow individuals to access the PSLF program. Both NEA and the NAACP have used that FSA technical assistance to assist their members in seeking PSLF. NEA has offered webinars to guide members through the application process, educate members about the Department's income-driven repayment and loan forgiveness programs, and address member questions. These information sessions have reached tens of thousands of members. The NAACP has run similar education and outreach programs for its members, many of whom choose careers in public service in reliance on the PSLF program operating as Congress requires. The cuts to FSA will harm these ongoing efforts and deprive NEA, NAACP, and their members of information and redress necessary to access their statutory rights to student loan forgiveness.

91.    On information and belief, the sweeping FSA staff reductions will prevent the Department from fulfilling its oversight, monitoring, and loan servicing obligations under Title IV and thereby harm countless Americans, including Plaintiffs' members, who now receive federal student aid or hold federal student debt.

## C.    Enforcing Civil Rights Laws in America's Schools

92.    Congress directed OCR to carry out "all functions" related to the enforcement of federal civil rights laws (including Title VI, Title IX, Section 504, and the ADA) that prohibit discrimination in federally funded education programs. 20 U.S.C. §§ 3413(a), 3441(a)(3). These

statutes each require the Department to "effectuate" their antidiscrimination provisions—*i.e.*, to meaningfully enforce them. *See Adams v. Richardson*, 480 F.2d 1159, 1163 (D.C. Cir. 1973). To fulfill this duty, OCR must, as its regulations provide, "make a *prompt* investigation" of and resolve civil rights complaints in Department-funded programs. 34 C.F.R. § 100.7(c) (emphasis added) (Title VI); *see id.* §§ 104.61 (Title IX), 106.81 (Section 504); 28 C.F.R. § 35.171 (ADA).

93.    For decades, OCR's twelve regional offices have implemented this mandate, often as the first line of defense for students experiencing civil rights violations in schools, colleges, and universities.[61] Regional staff review incoming complaints to confirm OCR's jurisdiction; conduct document review, interviews, and site visits; and determine whether a violation has occurred.

94.    When OCR finds evidence of unlawful discrimination, it usually enters a voluntary resolution agreement, in which the recipient consents to implement system-wide remedies, and OCR monitors its compliance. During monitoring, staff assess the school district's or university's progress towards compliance benchmarks by reviewing policy changes, trainings, and other activities, including through data collection. Monitoring lasts until OCR is satisfied that the district or university has fully remedied the past violation and will prevent future violations.

95.    Defendants have gutted the Department's ability to enforce federal civil rights laws by decimating OCR's regional enforcement structure and saddling the remaining offices and staff with untenable caseloads. On information and belief, the seven closed regional offices employed about half of OCR's enforcement staff and handled more than 50% of open cases. Shifting OCR's entire caseload to the remaining enforcement staff will result in an average caseload of about 86 cases per investigator, more than twice the already-unsustainable FY 2024 average of 36 cases.

---

[61] U.S. Dep't of Educ., *About OCR*, https://bit.ly/4iBRVgV (last visited June 28, 2025).

96.     Defendants' actions leave the Department unable to carry out its obligation to provide timely and effective investigations, and the problems will only worsen. To facilitate swifter resolutions, OCR offered voluntary mediation, with a goal of scheduling sessions within 30 days, and a "rapid resolution" procedure, which could settle cases in less than two weeks. On information and belief, since January 2025, OCR has not offered these options to new complainants and has canceled or failed to schedule mediations of existing complaints.

97.     The dismantling of OCR has already harmed Plaintiffs and their members. The NAACP has used and would continue to use the OCR process to advance educational equity through resolution agreements that address racial disparities in school discipline, special education services, and access to advanced coursework. The Lubbock NAACP has active OCR complaints challenging two West Texas school districts' failure to effectively stop and prevent racial bullying and harassment of Black students and imposition of inappropriate and harmful discipline against those students. The Lubbock NAACP's complaints were pending in OCR's Dallas regional office, but since that office was closed on March 11, there have not been any substantive improvements or remedies for the ongoing discrimination. Likewise, Jane Doe 1 has received little information about her OCR complaint, which was pending in the now-closed Philadelphia office.

98.     In addition, NEA members work in school districts, like Adams 14 School District (Colorado) and Norwin School District (Pennsylvania), that are under OCR monitoring to remedy systemic discrimination.[62] This monitoring protects members' civil rights in the workplace.

99.     Defendants' destruction of these OCR functions will undermine Plaintiffs' members' enjoyment of educational opportunities and safe workplaces.

---

[62] OCR, U.S. Dep't of Educ., Letter re Adams Cnty. Sch. Dist. 14, Case No. 08-10-1112-D (Apr. 25, 2014), https://bit.ly/41CC0YL; OCR, U.S. Dep't of Educ., Letter re Norwin Sch. Dist., Case No. 03-22-1010 (Oct. 2, 2024), https://bit.ly/41v98S4.

**D.    Promoting Equal Educational Access through Formula Grant Administration**

100.    The Department also administers formula grant programs that distribute billions of dollars in federal financial assistance to states, school districts, colleges, and universities each year. Grantees' awards under these programs are calculated according to the formula set forth in the governing statute. *See* 20 U.S.C. § 3402(6); 34 C.F.R. §§ 75.1(c)(1), 76.1.

101.    Most of the Department's signature programs are formula grants, including:

a.    16 of the ESEA's more than 35 grant programs, which ensure that economically disadvantaged students (Title I), English learners (Title III), and rural students (Title V), among others, can access educational opportunities. Title I allows districts to hire more staff, adopt remedial and intervention programs, and offer professional development. 20 U.S.C. §§ 6311–39. Title V's Rural Education Achievement Program ("REAP") provides additional support for under-resourced rural schools. *Id.* §§ 7341–7355c. Title III-A helps states and districts fund programs and services for English learners. *Id.* §§ 6801–71.

b.    IDEA Parts B and C grants for special education services, which help states and school districts pay excess and high special education costs, offer early intervention services, and defray certain administrative costs. *Id.* §§ 1411(f), 1413(a), 1419, 1443. Every state and the District of Columbia depends on IDEA funding to pay the salaries of special education teachers, specialized instructional support personnel, and paraprofessionals.

c.    Perkins V Basic State Grants, which make resource-intensive CTE programs attainable for states and school districts by funding instructor salaries, specialized equipment, career exploration activities, and professional development. *Id.* §§ 2321, 2355(b).

d.    HEA formula grants to support Historically Black Colleges and Universities ("HBCUs") and Minority Serving Institutions ("MSIs"). *Id.* §§ 1051–68h, 1101–03g.

102.    To administer these and other formula grant programs, the Department must determine applicants' eligibility, allocate formula funds accurately, distribute awards in a timely manner, and monitor their use by recipients to prevent waste, fraud, and abuse.

103.    On information and belief, grant-making offices within OESE, OELA, OSERS, OCTAE, and OPE have primary responsibility for eligibility determinations, allocation calculations, and policy, monitoring, and accountability functions with respect to formula grant programs under the ESEA, IDEA, Perkins V, and HEA, respectively. But the statutorily required

29

work of the Department's other divisions is essential to the program offices' ability to administer the formula grant programs in a legally compliant manner at each step of the grant-making process.

104.    Before Defendants' dismantling of the Department, NCES played a critical role in formula grant-making. Through partnerships with the U.S. Census Bureau, NCES created custom school district poverty estimates used in formulas under Title I, Perkins V, and many other grant programs and the locale code framework that decides whether a district is "rural" and therefore eligible for REAP funds, among other uses. NCES staff also collected key data inputs required by the formulas, for example, average daily attendance and financial data that NCES used to compute the average state per-pupil expenditure figures required to make Title I allocations.

105.    In addition, NCES maintained EDFacts, the online platform used by OESE, OELA, and OSERS to collect program data that states are required to submit as a condition of formula grant funding. *See* 34 C.F.R. § 76.720. Staff in those offices developed and implemented questions for EDFacts collections, in collaboration with NCES and the program offices. Statisticians in NCES and the executive offices of the grant-making divisions would clean and process the data for use by program staff in monitoring and otherwise administering the formula grant programs.

106.    On information and belief, OESE and OSERS use state-reported EDFacts data to calculate the next allocation cycle's formula awards for certain programs. For example, EDFacts data on numbers of English learners are used to make Title III-A allocations.

107.    On information and belief, NCES worked with OCTAE to complete the mandatory state-reported data collection for Perkins V programs. State-submitted population count and per-capita income data from this collection are used in the next year's Perkins V formula calculations.

108.    On information and belief, another NCES collection, the Integrated Postsecondary Education Data System ("IPEDS") mandated by the HEA, provides student demographic data used to determine college and university eligibility for HBCU and MSI formula and competitive grants.

109.    By gutting the Department's data infrastructure, Defendants have left the agency unable to collect the necessary data for future formula grant allocations and performance monitoring. On information and belief, Defendants eliminated all of the NCES staff who worked on formula grant data and related collections, all of the data specialists in grant-making offices, and the key contracts and interagency agreements to produce custom data indicators. This will force the Department to use incorrect and outdated inputs in future calculations, with the effects of distorting state and district awards and producing mistaken eligibility determinations.[63]

110.    Nor will the Department be able to rely on updated state-reported data. On information and belief, Defendants have stripped out critical support for EDFacts and have eliminated all of the staff in NCES, OESE, OSERS, OCTAE, and OPE with the knowledge to retrieve, clean, and process data needed for the program offices to administer the formula grants. For example, beyond its use in Title III-A allocation, EDFacts data drives IDEA performance monitoring. IDEA Parts B and C require the Department to make an annual determination that states are successfully implementing program requirements before renewing their funding. *See* 20 U.S.C. §§ 1416(d)(1), 1442. On information and belief, staff rely on EDFacts data to complete this review; without the ability to update the platform or access data submitted, their determinations may improperly reduce state awards. And this is just one likely effect of Defendants' actions.

111.    On information and belief, updated data for the 2025-2026 formula grant allocations is available, because it was collected, processed, and shared with the relevant program

---

[63] Defendants' hobbling of SEOS further undermines accountability for institutions of higher education, as that branch enforced institutions' compliance with the Title IV requirement that they submit data via IPEDS.

offices before Defendants began demolishing the Department. But the Department should be working now to carry out the surveys and collections needed to produce updated inputs for future allocations. It takes months or even years to carry out the data collections the formula grant programs require; on information and belief, staff were working on data collections for the school years from 2024 to 2028 when Defendants began dismantling the data infrastructure.

112.    This continuous data collection process is mandatory, as Congress expects the Department to use the most recent, most accurate version of the data the statute requires to determine grantee eligibility and calculate allocations. *See, e.g.*, 20 U.S.C. §§ 7345(b)(1)(A)(ii), 7351(b)(1)(A)(ii) (directing the Secretary to use NCES "locale code[s]" to determine REAP eligibility). For example, Title I-A directs the Department to use "the most recent satisfactory data . . . available from the [Census Bureau]" on "the number of children, aged 5 to 17, inclusive, from families below the poverty level" in each school district, adjusted "annually." *Id.* § 6333(c)(2), (3)(A). On information and belief, the Department has long understood these and similar provisions to require that it refresh the data input each year, except in emergency situations.

113.    Beyond data, Defendants have gutted the Department's ability to carry out its mandatory monitoring and accountability functions in the formula grant programs. On information and belief, Defendants completely abolished OELA and cut staff in the OCTAE and OPE divisions responsible for administering certain Perkins V and HEA formula funds. Even in offices that suffered fewer cuts, like OESE and OSERS, Defendants eliminated the executive office personnel who ensured that funds reached grantees' accounts, completed mandatory state performance reports, and obtained clearance for information collections, as required by law.

114.    Without these functions, mandatory program evaluations and performance reports have ceased, the program offices cannot conduct meaningful reviews, and the internal checks to

assure legal compliance and prevent fraud, waste, and abuse are gone. Defendants thus have functionally repealed the accountability schemes in each of the major education laws.

115.    Defendants' decimation of the formula grant infrastructure has created widespread uncertainty for states and school districts about whether the Department will fulfill its obligation to timely distribute accurately calculated awards. Predictably, states and school districts have already begun to respond to this uncertainty by cutting personnel and services funded by formula grant money. This has harmed and will continue to harm Plaintiffs and their members.

116.    The children of many NAACP members and the parent plaintiffs rely on educational services funded by ESEA formula grants, including Title I programming, English language learning services under Title III-A, and educational opportunities made available through Title II-A and Title IV activities, and IDEA services. Reductions in ESEA-funded supports will severely diminish these students' ability to participate in their education, while interruptions, reductions, or loss of IDEA services will impact their academic performance and class participation and aggravate their physical and mental impairments.

117.    In addition, hundreds of thousands of NEA, PGCEA, and AFSCME Council 3 members are paid through federal formula grant funds. NEA alone estimates that approximately 330,000 member positions are supported by formula and competitive grant awards. Threats to grant administration put these jobs at risk. NEA members in Illinois and Georgia are already experiencing reductions in force due to Defendants' dismantling of the Department.

118.    Defendants' eleventh-hour withholding of formula grant funds under Titles I-C, II-A, III-A, and IV will exacerbate the harms by eliminating billions of dollars on which states and school districts relied in planning for school year. Inevitably, states and schools will make further cuts in personnel and services as they scramble to account for an unexpected hole in their budgets.

119.    NEA, PGCEA, and AFSCME Council 3 members also rely on formula grant-funded resources to do their jobs. For example, 125 NEA members work at the Lehigh Career & Technical Institute in Schnecksville, Pennsylvania, which serves over 2,700 students from nine different public-school districts and offers training in more than 45 programs. Lehigh receives federal funding through Perkins V that allows Lehigh to purchase costly equipment necessary to provide adequate CTE—for instance, forklifts, table saws, carpentry tools, or a car lift; to offer instructional assistance to students with disabilities; and to support student clubs.

120.    Similarly, in FY 2024, Maryland received about $250 million in IDEA Part B funding,[64] which supports not just the salaries of NEA, PGCEA, and AFSCME Council 3 members working in special education roles, but also critical classroom resources and technology.

121.    The Department's inability to administer the formula grant programs in compliance with the relevant statutes thus will inflict significant harm on NEA, PGCEA, and AFSCME Council 3 members, ranging from job loss to reductions in essential programs and materials.

**E.    Awarding Grants to Train, Recruit, and Retain Effective Educators**

122.    The Department similarly administers numerous competitive grant programs under the ESEA, IDEA, Perkins V, HEA, ESRA, and other laws. Congress directs that the Secretary "*shall* award grants" under many competitive programs, *see, e.g.*, 20 U.S.C. §§ 6632(a), 6672 (emphasis added), but allows the Secretary some leeway to determine which applicants receive awards. 34 C.F.R. § 75.1(b). The Department sets funding priorities for competitive grant programs, if authorized by the grant-creating statute, by notice and comment. 20 U.S.C. § 1232(a) (defining regulation to include requirements for grant programs); 34 C.F.R. §§ 75.100, 75.105(a), 75.200, 75.209, 75.210, 75.217(a).

---

[64] NEA, *Federal Education Funding for Selected Programs by State and Program* (Feb. 26, 2025), https://bit.ly/3Rkxnxu.

123.    Among the many competitive grants administered by the Department are a series of programs that support educator training, recruitment, and retention. The ESEA mandates that the Secretary "shall award" competitive grants through the Supporting Effective Educator Development ("SEED") Grants Program, "to increase the number of highly effective educators" in "traditionally underserved" school districts, and through the Teacher and School Leader Incentive Grants ("TSL") Program to help states and school districts improve systems for educator hiring, training, and professional development. 20 U.S.C. §§ 6632, 6672(a). And the HEA's Teacher Quality Partnership ("TQP") Program authorizes the Department to fund partnerships between high-need school districts and colleges for teacher preparation, teacher residency, and school leader preparation programs. *Id.* §§ 1021(6), 1022b(b)(3), 1022a(a), 1022a(c)(1), 1022h.

124.    The Department made scores of SEED, TQP, and TSL awards in FY 2022, 2023, and 2024, after setting competitive priorities by notice and comment.[65]

125.    Within two days of the Department's February 5 directive to cancel all equity-focused grants, Defendants issued uniform termination letters to 104 of 109 recipients of open SEED and TQP awards,[66] along with most TSL grantees. The letters all said that because the grants "promote[d] or [took] part in DEI initiatives," they were "inconsistent with, and no longer effectuate[d], Department priorities" and were terminated under 2 C.F.R. § 200.340(a)(4). None of the letters gave individualized grounds for cutting off grantees' funds mid-year.

---

[65] *See* Applications for New Awards; Teacher Quality Partnership Grant Program, 85 Fed. Reg. 29691 (May 18, 2022); Applications for New Awards; Teacher Quality Partnership Grant Program, 87 Fed. Reg. 10906 (Feb. 25, 2022); Applications for New Awards; Teacher Quality Partnership Grant Program, 89 Fed. Reg. 23573; Applications for New Awards; Supporting Effective Educator Development Program, 87 Fed. Reg. 19487 (Apr. 4, 2022); Final Priorities, Requirements, and Definitions—School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60092 (Oct. 4, 2022); Final Priorities, Requirements, and Definitions—Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 60083 (Oct. 4, 2022); Applications for New Awards; Teacher and School Leader Incentive Program, 88 Fed. Reg. 33592 (May 24, 2023).

[66] Feb. 17 Press Release, *supra* note 22; *see* Decl. of Rachel Oglesby ¶ 27, *California v. U.S. Dep't of Educ.*, No. 1:25-cv-10548.

126.    Defendants are required to maintain the SEED, TQP, and TSL programs, which are created by statute and to which Congress specifically appropriated funds for FY 2024 and 25. 2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159, tit. II, 136 Stat. 113, 1322–33; Pub. L. No. 118-47, div. D, tit. III, 138 Stat. at 471–77; Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. at 11.

127.    Defendants' blanket cancelation of virtually every SEED, TQP, and TSL grant award in effect shuttered the programs entirely, without any plan to fund program activities.

128.    Even now, the Department still has not announced how it intends to use the funds appropriated for SEED, TQP, and TSL grants or announced new competitions. To the contrary, on March 6, 2025, the Department withdrew the open notice inviting applications ("NIA") for FY 2025 SEED grant awards, to "ensure that all priorities and requirements . . . align with the program priorities set by the Trump Administration." Withdrawal of Notice Inviting Applications and Cancellation of the Competition for the Supporting Effective Educator Development Program, 90 Fed. Reg. 11412 (Mar. 6, 2025). Defendants have not issued a new NIA for the SEED grant.

129.    The blanket terminations also violated statutes and binding regulations. Under 2 C.F.R. § 200.340(a)(4), if consistent with other applicable laws, the Department may terminate a grant that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But grants may be terminated on this basis only if they do not further program goals established by Congress in creating the grant program or the priorities set by the Department through notice and comment, which "may change only pursuant to APA notice and comment." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon* (*AACTE*), 770 F. Supp. 3d 822, 853 (D. Md. 2025).

130.    Defendants have not initiated a notice and comment process to reverse the priorities under which the Department made the terminated SEED, TQP, and TSL awards.

131.    Nor could they, as the ESEA and HEA provisions creating the programs specifically require that they fund projects to increase educator diversity and support traditionally underserved communities. *See* 20 U.S.C. §§ 1022a–b, 6632, 6672(a). Defendants could not adopt a competitive priority contrary to these statutory program goals.

132.    The SEED and TSL grant terminations were also contrary to the General Education Provisions Act ("GEPA"), *id.* §§ 1221–35. Part D of that law only allows termination of covered Department grant awards[67] in the middle of a budget period if, after written notice and an opportunity for a hearing, the Secretary finds that "the recipient has failed to comply substantially with a requirement of law." *Id.* § 1234d(b)(2), (c); *see* 34 C.F.R. pt. 81. The law—unlike 2 C.F.R. part 200—does not authorize grant terminations based on conflicts with Department priorities.

133.    Where GEPA Part D applies, the Department does not have the authority to bypass its statutory standards and procedures in favor of the termination standards set forth in 2 C.F.R. part 200. Defendants' mass termination of SEED and TSL grants under 2 C.F.R. § 200.340(a)(4), which did not apply the GEPA Part D standard or follow its processes, was contrary to the statute.

134.    On April 29, 2025, Defendants informed hundreds of states, school districts, and higher education institutions that it would discontinue their grants under the School-Based Mental Health Services ("SBMH") and Mental Health Service Professional Demonstration ("MHSP") Programs. Established under ESEA Title VI, 20 U.S.C. § 7281(a)(1)(B), and the 2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159, tit. II, 136 Stat. at 1322–33, these programs support efforts to recruit, hire, and train school-based mental health professionals in underserved communities. Congress appropriated more than $1 billion to fund SBMH and MHSP awards. *Id.*

---

[67] GEPA Part D, which establishes compliance and enforcement mechanisms for Department grant programs, applies to most programs for which the Department has administrative responsibility as provided by law, *see* 20 U.S.C. §§ 1221(c)(1), 1234i(2); 34 C.F.R. pt. 81, but excludes HEA grant programs, including the TQP program, *see* 20 U.S.C. § 1234i(2).

135.    The Department sent boilerplate letters to more than 200 (of about 260) SBMH and MHSP grant recipients, claiming that they "used the funding to implement race-based actions like recruiting quotas." Because these uses "conflict[ed] with [the priorities] of the current Administration," the grants were "inconsistent with…the best interest of the Federal Government" and were being discontinued under 34 C.F.R. § 75.253(a)(5), effective December 31, 2025. On information and belief, the Department did not undertake any individualized analysis and has not indicated how it will use the funds appropriated to the programs or re-compete the money.

136.    Defendants' discontinuation of these hundreds of SBMH and MHSP grant awards was unlawful. On information and belief, before January 2025, the Department had never relied on 34 C.F.R. § 75.253(a)(5) to discontinue a grant award or asserted that grants in conflict with the current administration's politics are not in the "best interest of the Federal Government."

137.    That makes sense: GEPA subjects changes in grantmaking policy to notice and comment rulemaking, *see* 20 U.S.C § 1232(a)(2); 34 C.F.R. § 75.105; *AACTE*, 770 F. Supp. 3d at 853. Even if the "best interest of the federal government" might extend to political preferences, changes in the priorities governing the Department's competitive grantmaking can only be made by notice and comment. *AACTE*, 770 F. Supp. 3d at 853. Defendants cannot end-run GEPA's notice and comment requirement by invoking 34 C.F.R. § 75.253(a)(5).

138.    Defendants' summary discontinuation of the SBMH and MHSP grants was therefore contrary to law.

139.    Moreover, the mass discontinuation of these awards effectively eliminated the SBMH and MHSP programs. But Congress specifically appropriated $1 billion for the Department to operate competitive grant programs that would promote school-based mental health services. Defendants' dismantling of the programs thus is also contrary to the will of Congress.

140.    NEA members across the country participated in programs funded by now-defunct SEED, TQP, TSL, SBMH, and MHSP grants. As a result of Defendants' unilateral termination of the programs, numerous NEA members have lost access to professional development, mentoring, and coaching as well as opportunities to pursue graduate studies and earn extra compensation.

141.    For example, the Department canceled a five-year TQP grant to a teacher residency partnership between Sacred Heart University and two Connecticut school districts experiencing critical teacher shortages, including Bridgeport, which employs 1,368 NEA members.[68] In exchange for reduced tuition and a substantial living stipend, participants complete a year-long, co-teaching residency and commit to teach in that district for at least 3 years after graduating.[69] Twenty students, including NEA members, have already participated and, over the next five years, 60 more were expected to do so. Current teachers participating in the program as mentors received ongoing professional development opportunities such as graduate education and school leadership roles, in addition to extra compensation. Over the life of the grant, the program also planned to develop an Advanced Mentor Academy and micro-credential programs.[70] On information and belief, Defendants' cancelation of the TQP grant means the program lacks funding for the 2025-2026 school year. Its expected closure will eliminate these benefits for NEA members.

142.    The Department also canceled a 2022-2027 TQP grant awarded to fund Project PREP, a partnership between the University of North Florida and Florida's Clay County District Schools, where 1,491 NEA members are employed.[71] Before the Department pulled its funding, NEA members were engaged in Project PREP as students and teacher leaders and received grant-

---

[68] *See* SHU Grant Proposal Narrative, PR Award # S336S240065, at 15 (2024), https://bit.ly/4iOm9hb.
[69] *Id.* at 19; Press Release, Sacred Heart Univ., *SHU's Farrington College of Education & Human Development Secures $3 Million Grant* (Oct. 3, 2024), http://bit.ly/4lvcX20.
[70] SHU Grant Proposal Narrative, PR Award # S336S240065, *supra* note 67, at 8, 27–29.
[71] Press Release, Univ. of N. Fla., *UNF and Clay County Schools Partner to Build Educator Pathways* (Feb. 28, 2024), https://bit.ly/4kRNjFl.

funded stipends for enrollment in graduate coursework at UNF, professional learning opportunities, and access to certification programs.[72] NEA members have been harmed by the loss of this financial support, training, and mentorship—in the middle of the school year.

143.    The 484 NEA members working in Monroe Public Schools in Michigan received valuable professional learning in literacy instruction through participation in Western Michigan University's High-Impact Leadership for School Renewal Project ("HIL 2.0"), a professional development and technical assistance program for innovation in high-need districts. In 2024, HIL 2.0 received a two-year SEED grant, which Defendants terminated on or around February 14, 2025.[73] The termination has deprived NEA's Monroe members of access to professional learning and grant-compensated positions as team leaders, program facilitators, and coordinators.

144.    A terminated TSL grant, "AZ PRIME," awarded to the National Institute for Excellence in Teaching provided job opportunities, professional development, and classroom support for NEA members in Arizona's Avondale and Osborn Elementary School Districts. The three-year grant provided funding for Avondale, Osborn, and a third district to strengthen systems of support for classroom teaching, build instructional leadership capacity for school leaders, and raise student achievement.[74] AZ PRIME supported additional master teacher and instructional coach positions, mentorship and coaching programs for new teachers, and extensive professional development opportunities in Osborn and Avondale. Because of the grant termination, multiple NEA members employed as instructional coaches or master teachers in Avondale and Osborn have

---

[72] *See* Nicholas Brooks, *$7M Grant Addressing Teacher Shortage in North Florida Defunded Midway Through Program*, Action News Jax (Feb. 18, 2025 6:28 PM), https://bit.ly/4kBMn7K; Rebecca Burns et al., *Bridging Gaps in the System: Project PREP's Transformative Approach to Educator Development*, 32 Southeastern Reg'l Ass'n of Teacher Educators J. 1, 6 (2023), https://bit.ly/3FzBB1G.

[73] Grace Teachout, *Two WMU Grant-Funded Program Awards Terminated*, Western Herald (Feb. 15, 2025), https://bit.ly/3DTesXE.

[74] Press Release, NIET, *Building the Profession: Three-year Federal Grant will Grow and Retain Educators in Arizona* (Sept. 7, 2023), http://bit.ly/4lyWY36.

been displaced. At least two master-teacher members in Osborn received reduction in force notices. And all professional development and training in Avondale has been canceled.

145.    NEA members also participated in SBMH and MHSP grant programs nationwide. PGCEA members, and NEA members in Anne Arundel and Montgomery County, Maryland schools, benefited from the STAR Project, an MHSP grant to recruit and retain culturally and linguistically diverse school counselors and school psychologists.[75] The grant funded tuition reimbursement for students, recruitment efforts, and mentoring and practicum programs. Members in all three districts received training, professional development, and compensation for their work as mentors and intern or practicum supervisors in the Project that is now in jeopardy.

146.    NEA members have been similarly impacted. At least fourteen NEA affiliates have reported harms to members due to the termination of SBMH grants including Crystal Lake Elementary Teachers' Association (Illinois), whose district lost funding for 12 positions, including 11 social workers or counselors; the Eureka Teachers Association (California), whose district lost funding for 7 mental health service providers; the La Mesa-Spring Valley Teachers' Association (California), whose district lost funding for 30 mental health professionals who staffed a Parent Empowerment program and after-school programming for students; and the Lemon Grove Teachers Association (California), whose district lost funding for two new social worker positions. The loss of these positions harms students and staff and is contrary to Congress's direction.

147.    On information and belief, the Department has ordered OPE to review all continuing awards for "DEI" objectives, as opposed to the ordinary "substantial progress" review for continuing grants, and to cancel any grants with "DEI" objectives.

---

[75] Press Release, Bowie State, *U.S. Department of Education Awards Bowie State $5 Million Grant to Diversify Pipeline of School Counselors* (Apr. 25, 2023), http://bit.ly/4nhxE34.

148.    Plaintiffs' members rely on these funds and will be impacted by the inevitable loss of services and positions that will result if the Department continues its current trajectory and funding is not provided.

## CAUSES OF ACTION

### COUNT ONE

**Take Care Clause, U.S. Const. art. II, § 3 (Against Defendant Linda McMahon**)

149.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

150.    This Court has the authority to enjoin and declare unlawful official action that violates the Constitution. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

151.    The Constitution obligates the President—and by extension all subordinate executive officers—to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

152.    The Take Clare Clause prohibits the President from directing federal officers to act in derogation of federal statute and federal officers from implementing such directives.

153.    The President's directives to his subordinates to close the Department or dismantle any of its congressionally mandated functions, including the directive set forth in the March 20 Executive Order, violate the Take Care Clause, as do the actions of Secretary McMahon in implementing those directives.

### COUNT TWO

**Appropriations and Spending Clauses, U.S. Const. art. I, § 8, cl. 1; art. I, § 9, cl. 7 (Against Defendant Linda McMahon)**

154.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

155.    This Court has the authority to enjoin and declare unlawful official action that violates the Constitution. *Armstrong,* 575 U.S. at 326–27.

156.    The Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, "gives Congress control over the public fisc," *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024), while the Spending Clause vests the power of the purse solely in Congress, U.S. Const. art. I, § 8, cl. 1.

157.    These Clauses deny the Executive Branch constitutional authority to override or disregard Congress's appropriations. *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

158.    Secretary McMahon's unlawful impoundment of the Department's congressionally appropriated funds infringes Congress's exclusive power over the federal purse. That exclusive power is conferred and protected in part by the Appropriations Clause and the Spending Clause, and the Executive Branch has no constitutional authority to countermand it.

## COUNT THREE

### Violation of the Separation of Powers (Against Defendant Linda McMahon)

159.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

160.    This Court has the authority to enjoin and declare unlawful official action that violates the Constitution. *Armstrong,* 575 U.S. at 326–27.

161.    The directives set forth in the March 20 Executive Order, the prior directives from the President that it memorializes, and Secretary McMahon's actions to implement those directives exceed Executive Branch authority and arrogate power that is reserved to Congress, in violation of the separation of powers. *See* U.S. Const. art. I, § 1; art. I, § 7, cl. 2; art. I, § 9, cl. 7; art. II, § 3.

## COUNT FOUR

### APA, 5 U.S.C. § 706(2)(A)–(C) (Against All Defendants)

162.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

163.    Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"

"contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

164.    Defendants' dismantling of the Department, closure of statutorily mandated offices and components, cessation of mandatory statutory functions necessary for formula grant program administration, termination of competitive grant programs, and decimation of the Department's workforce through the March 11 RIF and other actions, constitute final agency actions.

165.    Defendants' actions are contrary to law and in excess of statutory authority. Defendants lack the constitutional or statutory authority, as the President's agents, to dismantle the Department; wind down its statutorily mandated programs and activities; or withhold, terminate, or otherwise interfere with funds appropriated to the Department for its programs and operations. Defendants' actions are also contrary to law because they violate the Department's own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954).

166.    Defendants' actions are also contrary to the Constitution because they violate the separation of powers, the Take Care Clause, the Appropriations Clause, and the Spending Clause.

167.    Defendants' dismantling of the Department is also arbitrary and capricious. Defendants have not provided any non-pretextual explanation for the dismantling, closure of statutorily mandated offices and components of the Department, cessation of mandatory statutory functions and grant programs, and decimation of the Department's workforce through the March 11 RIF and other actions. Nor have they accounted for the substantial reliance interests of students, families, educators, local communities, and borrowers in the Department's continued functioning.

## COUNT FIVE

### *Ultra Vires* Action (Against All Defendants)

168.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

169.    Plaintiffs have an equitable right to enjoin as *ultra vires* Executive Branch practices. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022).

170.    No statute, constitutional provision, or other source of law authorizes Defendants to dismantle the Department, close any of its statutorily mandated components or offices, or shut down any of its statutorily mandated functions in violation of the DEOA and the statutes the Department administers. To the contrary, the DEOA and statutes such as ESEA, IDEA, HEA, Perkins, and ESRA create clear and mandatory statutory duties for the Department and its subdivisions to execute, and Congress has consistently appropriated funds to enable the Department to fulfill those obligations.

171.    Defendants' dismantling of the Department is therefore "in excess of [their] delegated powers," *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and *ultra vires*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare unlawful and set aside the March 20 Executive Order;

B.    Issue a preliminary and permanent injunction barring Defendants from continuing their dismantling of the Department and implementing the March 20 Executive Order;

C.    Declare unlawful and set aside Defendants' actions to dismantle the Department as unconstitutional; arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and *ultra vires*;

D.    Award Plaintiffs reasonable attorneys' fees and costs; and

E.    Grant such other relief as the Court deems necessary, just, and proper.

Date: July 1, 2025

Respectfully submitted,

*/s/ Abigail V. Carter*

Joseph M. Sellers (D. Md. Bar No. 06284)
Ethan Judd*
Ryan Wheeler*
Jenna Waldman*
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue, NW, Suite 800
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699
jsellers@cohenmilstein.com
ejudd@cohenmilstein.com
rwheeler@cohenmilstein.com
jwaldman@cohenmilstein.com

Robert Kim*
Jessica Levin*
Wendy Lecker*
Theresa Luhm*
**Education Law Center**
60 Park Place, Suite 300
Newark, NJ 07102
Tel. (973) 624-1815
Fax (973) 624-7339
rkim@edlawcenter.org
jlevin@edlawcenter.org
wlecker@edlawcenter.org
tluhm@edlawcenter.org

*Attorneys for NAACP, NAACP South Carolina State Conference, NAACP Florence Branch, NAACP Texas State Conference, NAACP Lubbock Branch, Mara Greengrass, and Jane Does 1 & 2*

Aaron S. Ament*
Daniel A. Zibel (D. Md. Bar No. 31554)
Eric Rothschild*
**National Student Legal Defense Network**
1701 Rhode Island Avenue N.W.
Washington, D.C. 20036
Tel. (202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org

Leon Dayan**
Abigail V. Carter (D. Md. Bar No. 20952)
John Pellettieri*
Kara A. Naseef**
Grace Rybak**
Lane Shadgett (D. Md. Bar No. 31686)
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
jpellettieri@bredhoff.com
knaseef@bredhoff.com
grybak@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for National Education Association, Prince George's County Educators Association, AFSCME Council 3*

Alice O'Brien*
Marissa Marandola*
Kristin Garcia*
**National Education Association**
1201 16th Street NW
Washington, D.C. 20036
Tel. (202) 822-7035
aobrien@nea.org
mmarandola@nea.org
krgarcia@nea.org

*Attorneys for National Education Association and Prince George's County Educators Association*

46

eric@defendstudents.org

*Attorneys for National Education Association*

*Admitted Pro Hac Vice
**Admission Pro Hac Vice pending