**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| |
|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., |
| *Plaintiffs*, |
| v. |
| THE UNITED STATES OF AMERICA, et al., |
| *Defendants*. |

Civil Action No. 25-965-JRR

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................... iii

GLOSSARY OF ACRONYMS........................................................................... xi

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 3

   I.  Congress Established the Department and Has Charged It with Carrying Out
      an Array of Statutory Functions. ............................................................... 3

   II.  Defendants Are Implementing their Decision to Close the Department, Without
      Congressional Authorization, By Taking Action to Shrink and Incapacitate It. ......... 4

   III. Defendants Have Effectively Shut Down Multiple Statutorily Mandated Offices
      and Functions of the Department. .............................................................. 8

      A.  The Institute of Education Sciences ("IES") .......................................... 8

          1. Congress Created IES to Gather, Analyze, and Publish Needed Data. ........... 8

          2. Defendants Have Dismantled IES and Its Functions. ........................... 9

      B.  Office of Federal Student Aid ("FSA") ............................................. 10

          1. Congress Created FSA to Administer Student Financial Aid Programs. ....... 10

          2. Defendants Have Dismantled FSA and Its Financial Aid Functions............. 12

      C.  Office for Civil Rights ("OCR")..................................................... 13

          1. Congress Created OCR to Enforce Civil Rights Laws in Education............. 13

          2. Defendants Have Dismantled OCR and its Civil Rights Functions. ............ 14

      D.  Formula Grants ......................................................................... 15

          1. Congress Requires the Administration of Formula Grant Programs. ............ 15

          2. Defendants Have Disabled Formula Grant Programs..................... 17

      E.  Competitive Grants ................................................................... 19

          1. Competitive Grant Program Administration........................ 19

          2. Defendants Have Disabled Competitive Grants. .......................... 20

LEGAL STANDARD........................................................................................ 21

ARGUMENT ................................................................................................. 22

   I.  Plaintiffs Are Likely to Succeed on the Merits............................................ 22

      A.  Defendants Have Violated the Constitution and Acted Ultra Vires. ............... 22

          1. Closing the Department is Unconstitutional and Ultra Vires. ................. 24

          2. Abolishing Statutorily Mandated Offices & Functions is Unconstitutional... 25

             a.  IES Is Foreclosed From Performing its Statutory Functions. ............... 25

             b.  FSA is Foreclosed From Performing its Statutory Functions. ............... 26

             c.  OCR Is Foreclosed from Performing its Statutory Functions. ............... 27

             d.  Statutory Formula Grant Requirements Cannot Be Met. ...................... 28

i

   e. Defendants Have Cancelled Statutorily Required Competitive Grants. . 29

  3. Defendants Unconstitutionally Refuse to Expend Appropriated Funds. ........ 30

 B. Defendants' Actions Violate the Administrative Procedure Act. ......................... 32

  1. The Agency Actions Are Final. ...................................................................... 32

  2. The Actions Are Contrary to Law and in Excess of Statutory Authority. ....... 35

  3. The Actions Are Arbitrary and Capricious. ..................................................... 37

II. Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction. ............... 40

III. The Balance of Interests Favors Preliminary Relief. .................................................. 44

CONCLUSION ......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Richardson*,
   480 F.2d 1159 (D.C. Cir. 1973) ....................................................................................27

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ................................................................................24, 30

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon* (*AACTE*),
   770 F. Supp. 3d. 822 (D. Md. 2025) ..............................................................34, 36, 37, 39

*Am. Educ. Rsch. Ass'n v. U.S. Dep't of Educ.*,
   No. 8:25-cv-01230, 2025 WL 1665401 (D. Md. June 12, 2025) ....................................22

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ....................................................................................................23

*Ass'n for Educ. Fin. & Pol'y v. McMahon*,
   No. 1:25-cv-00999, 2025 WL 1568301 (D.D.C. June 3, 2025) ....................................22

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................................33

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ....................................................................................................11

*Carter v. U.S. Dep't of Educ.*,
   No. 25-cv-00744, 2025 WL 1453562 (D.D.C. May 21, 2025) ....................................22

*Casa de Maryland v. DHS*,
   924 F.3d 684 (4th Cir. 2019) ......................................................................................37

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
   601 U.S. 416 (2024) ....................................................................................................30

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................................30, 31

*City of New York v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) ................................................................................32, 44

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ....................................................................................................23

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)..................................................................................................32

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..................................................................................................38

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)..................................................................................................37, 39

*EEOC v. Astra U.S.A., Inc.*,
94 F.3d 738 (1st Cir. 1996)........................................................................................42

*FDA v. Wages & White Lion Invs., L.L.C.*,
145 S. Ct. 898 (2025)................................................................................................39

*Frazier v. Prince George's Cnty.*,
86 F.4th 537 (4th Cir. 2023) .....................................................................................21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)..................................................................................................23

*Healthy Teen Network v. Azar*,
322 F. Supp. 3d 647 (D. Md. 2018) ...........................................................................35

*HIAS, Inc. v. Trump*,
415 F. Supp. 3d 669 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021) ...............45

*Kendall v. U.S. ex rel. Stokes*,
37 U.S. 524 (1838)....................................................................................................31

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
No. 25-cv-1363, 2025 WL 1585051 (D. Md. June 5, 2025)......................................33

*Maryland v. USDA*,
770 F. Supp. 3d 779 (D. Md. 2025) ........................................................................33, 44

*Maryland v. USDA*,
No. 25-cv-748, 2025 WL 973159 (D. Md. Apr. 1, 2025).......................................34, 45

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) .....................................................................................37

*Michigan v. EPA*,
576 U.S. 743 (2015)..................................................................................................37

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ..................................................................................21, 44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................................37

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sanra Townes Powell*,
    915 F.3d 197 (4th Cir. 2019) ............................................................................40

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) ............................................................................44

*Myers v. United States*,
    272 U.S. 52 (1926)........................................................................................2, 23

*Nat'l Council of Nonprofits v. OMB*,
    763 F. Supp. 3d 36 (D.D.C. 2025) .....................................................................34

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)......................................................................................2, 23

*Nat'l Treasury Emps. Union (NTEU) v. Vought*,
    No. 25-cv-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ............................23, 39

*New York v. McMahon*,
    No. 25-cv-10601, 2025 WL 1463009 (D. Mass. May 22, 2025),
    *stay pending appeal denied*, 139 F.4th 63 (1st Cir. 2025),
    *emergency application pending*, No. 24A1203 (S. Ct.)...................................*passim*

*John T. ex rel. Paul T. v. Del. Cnty. Interm. Unit*,
    No. 98-cv-5781, 2000 WL 558582 (E.D. Pa. May 8, 2000).................................43

*RFE/RL, Inc. v. Lake*,
    No. 25-cv-799, 2025 WL 900481 (D.D.C. Mar. 25, 2025) ..................................34

*Rhode Island v. Trump*,
    1:25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025).........................................33

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ............................................................................45

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ..........................................................................39

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020).........................................................................................23

*Sierra Club v. U.S. Dep't of Interior*,
    899 F.3d 260 (4th Cir. 2018) ............................................................................37

*Victim Rights L. Ctr. v. U.S. Dep't of Educ.*,
    No. 25-cv-11042, 2025 WL 1704311 (D. Mass. June 18, 2025).......................................22, 28

*Widakuswara v. Lake*,
    No. 25-cv-2350, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025), *extended by*,
    1:25-cv-1015, 2025 WL 1176991 (D.D.C. Apr. 18, 2025) ............................................34, 40

*Wiley v. Kennedy*,
    No. 2:25-cv-00227, 2025 WL 1384768 (S.D.W. Va. May 13, 2025) ....................................33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................................44

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................................23

**Statutes**

5 U.S.C. § 704.........................................................................................................................32

5 U.S.C. § 706...................................................................................................................32, 36

20 U.S.C. § 1002......................................................................................................................11

20 U.S.C. § 1015a....................................................................................................................29

20 U.S.C. § 1018................................................................................................................11, 12

20 U.S.C. § 1021......................................................................................................................20

20 U.S.C. § 1022a..........................................................................................................20, 31, 36

20 U.S.C. § 1022b..........................................................................................................20, 31, 36

20 U.S.C. § 1022h................................................................................................................20, 36

20 U.S.C. §§ 1051–68h.............................................................................................................16

20 U.S.C. §§ 1070–99d.............................................................................................................11

20 U.S.C. § 1070a-14...............................................................................................................21

20 U.S.C. § 1070e.....................................................................................................................21

20 U.S.C. § 1078......................................................................................................................11

20 U.S.C. § 1078-10.................................................................................................................12

20 U.S.C. § 1087......................................................................................................................11

20 U.S.C. § 1087e ..................................................................................................11

20 U.S.C. § 1094 ....................................................................................................16

20 U.S.C. § 1099c ..................................................................................................11

20 U.S.C. §§ 1101–03g ..........................................................................................16

20 U.S.C. § 1223 ....................................................................................................30

20 U.S.C. § 1225 ..............................................................................................30, 31

20 U.S.C. § 1226a ..................................................................................................31

20 U.S.C. § 1228a ..................................................................................................31

20 U.S.C. § 1232 ....................................................................................................37

20 U.S.C. § 1234d ..................................................................................................36

20 U.S.C. § 1411 ....................................................................................................15

20 U.S.C. § 1419 ....................................................................................................15

20 U.S.C. § 1443 ....................................................................................................15

20 U.S.C. § 1464 ....................................................................................................26

20 U.S.C. § 2321 ....................................................................................................15

20 U.S.C. § 2324 ....................................................................................................29

20 U.S.C. § 3401 ......................................................................................................1

20 U.S.C. § 3402 ...............................................................................................3, 15

20 U.S.C. § 3411 ....................................................................................................23

20 U.S.C. § 3413 ....................................................................................................13

20 U.S.C. § 3419 ......................................................................................................8

20 U.S.C. § 3441 ....................................................................................................13

20 U.S.C. § 3473 ....................................................................................................24

20 U.S.C. §§ 6301–39 .............................................................................................8

20 U.S.C. §§ 6311–39 ...........................................................................................15

20 U.S.C. § 6333 .............................................................................................................29

20 U.S.C. §§ 6391–99 .........................................................................................................7

20 U.S.C. §§ 6571–78 .........................................................................................................8

20 U.S.C. § 6632 ...........................................................................................19, 20, 31, 36

20 U.S.C. § 6672 ...........................................................................................19, 20, 31, 36

20 U.S.C. §§ 6801–71 ..................................................................................................15, 18

20 U.S.C. §§ 6801–7014 .....................................................................................................8

20 U.S.C. § 7111 .................................................................................................................8

20 U.S.C. § 7171 .................................................................................................................8

20 U.S.C. §§ 7341–51d .....................................................................................................15

20 U.S.C. § 7345 ...............................................................................................................29

20 U.S.C. § 7351 ...............................................................................................................29

20 U.S.C. § 7981 ...............................................................................................................26

20 U.S.C. § 9511 .................................................................................................................8

20 U.S.C. § 9514 .................................................................................................................8

20 U.S.C. § 9541 .................................................................................................................8

20 U.S.C. § 9543 ...........................................................................................................8, 26

20 U.S.C. § 9545 ...........................................................................................................8, 26

20 U.S.C. § 9561 .................................................................................................................9

20 U.S.C. § 9564 .................................................................................................................9

20 U.S.C. § 9576 .................................................................................................................8

20 U.S.C. §§ 9621–24 ...................................................................................................8, 26

20 U.S.C. § 9622 .................................................................................................................8

42 U.S.C. § 2000d .............................................................................................................27

42 U.S.C. § 2000d-1 ......................................................................................................3, 27

2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159, tit. II, 136 Stat. 1313 ................20

Act of Mar. 15, 2025, Pub. L. No. 119-4, § 1102, 139 Stat. 9...............................................4, 5, 20

Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 669 (1979)....................3

The Elementary and Secondary Education Act or 1965, 20 U.S.C. §§ 6301, *et seq.* ...............3, 15

Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, 138 Stat. 460 (2024)..4, 20

Higher Education Act, 20 U.S.C. §§ 1001, *et seq.* .....................................................................3

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* ......................................3

**Other Authorities**

2 C.F.R. § 200.340 ...........................................................................................20, 21, 35

2 C.F.R. § 200.341 ...........................................................................................................20

2 C.F.R. § 3474.1 .............................................................................................................35

28 C.F.R. § 35.101 ...........................................................................................................13

28 C.F.R. § 35.171 ...........................................................................................................27

34 C.F.R. § 75.1 ..........................................................................................................15, 19

34 C.F.R. § 75.217 ...........................................................................................................19

34 C.F.R. § 75.235 ...........................................................................................................19

34 C.F.R. § 75.236 ...........................................................................................................19

34 C.F.R. § 75.253 ..................................................................................................21, 36, 37

34 C.F.R. § 76.1 ...............................................................................................................15

34 C.F.R. § 76.720 ...........................................................................................................16

34 C.F.R. § 100.1 .............................................................................................................13

34 C.F.R. § 100.7 .........................................................................................................14, 27

34 C.F.R. § 104.1 .............................................................................................................13

34 C.F.R. § 104.61 ...........................................................................................................27

34 C.F.R. § 106.2 .............................................................................................................13

34 C.F.R. § 106.81 ...............................................................................................................27

U.S. Const. art. I, § 8, cl. 1 ................................................................................................30

U.S. Const. art. I, § 9, cl. 7 ................................................................................................30

U.S. Const. art. II, § 3 ...................................................................................................23, 31

**GLOSSARY OF ACRONYMS**

| | |
|---|---|
| AFSCME | American Federation of State, County and Municipal Employees |
| APA | Administrative Procedure Act |
| DEI | Diversity, Equity and Inclusion |
| DEOA | Department of Education Organization Act |
| ESEA | Elementary and Secondary Education Act |
| FSA | Office of Federal Student Aid |
| FY | Fiscal Year |
| GEPA | General Education Provisions Act |
| HBCUs | Historically Black Colleges and Universities |
| HEA | Higher Education Act |
| IDEA | Individuals with Disabilities Education Act |
| IES | Institute of Education Sciences |
| MHSP | Mental Health Service Professional |
| MSIs | Minority Serving Institutions |
| NAACP | National Association for the Advancement of Colored People |
| NCEE | National Center for Education Evaluation and Regional Assistance |
| NCES | National Center for Education Statistics |
| NEA | National Education Association |
| OCR | Office for Civil Rights |
| OCTAE | Office of Career, Technical and Adult Education |
| OELA | Office of English Language Acquisition |
| OESE | Office of Elementary and Secondary Education |
| OGC | Office of the General Counsel |
| OGM | Office of Grants Management |
| OPE | Office of Postsecondary Education |
| OSERS | Office of Special Education and Rehabilitative Services |
| PGCEA | Prince George's County Educators Association |
| REAP | Rural Education Achievement Program |
| RELs | Regional Education Laboratories |
| RIF | Reduction in Force |
| SBMH | School-Based Mental Health Services |
| SEED | Supporting Effective Educator Development |
| SEOS | School Eligibility & Oversight Service Branch |
| TQP | Teacher Quality Partnership |
| TSL | Teacher and School Leader Incentive Program |

## INTRODUCTION

Congress created the U.S. Department of Education ("the Department") in 1979 and charged it with a mission that is critical to the Nation and its citizens—to increase the quality of public education nationwide and ensure that all Americans from all backgrounds have equal access to high-quality educational opportunities. *See* 20 U.S.C. § 3401(2), (7). In the following decades, the Department has worked tirelessly to carry out that mission. The Department collected and analyzed data essential to improving educational outcomes; it administered well over a trillion dollars in student loans to provide access to postsecondary education; it enforced federal civil rights laws to ensure students access to educational opportunities; and it awarded and distributed billions of dollars in grants to states, colleges and universities, and school districts throughout the country to improve the Nation's education system.

Despite the Department's notable successes in furthering Congress's goals, President Trump and his administration have repeatedly stated, in the clearest possible terms, their intent to abolish the Department. Since January 2025, Defendants have taken a series of concrete final agency actions to implement this decision, including a massive reduction in force and en masse cancellations of grants awarded through statutorily required programs. President Trump ratified these steps and confirmed his plan to dismantle the Department in Executive Order 14,242, issued on March 20, 2025, which instructs Secretary of Education Linda McMahon to "take all necessary steps to facilitate the closure of the Department of Education." Exec. Order 14,242 § 2, 90 Fed. Reg. 13679 (Mar. 20, 2025) (attached as Carter Decl., Ex. A-1 at 1).

Defendants' actions to terminate the Department's congressionally mandated functions, including research and data analysis, oversight of student financial aid programs, and civil rights enforcement, have wreaked havoc nationwide and have significantly harmed Plaintiffs, a coalition

1

of civil rights organizations, labor unions representing public-school employees, and families of public-school students. Defendants have jeopardized grants that support approximately 420,000 educator positions nationwide—many of which are held by members of Plaintiffs National Education Association ("NEA"), Prince George's County Educators Association ("PGCEA"), and American Federation of State, County and Municipal Employees Council 3 ("AFSCME")—and that provide critical resources to schools and students throughout the country, including aid for rural schools, English language learners, and students with disabilities. Serious allegations of discrimination, including civil rights complaints brought by Plaintiff parents and National Association for the Advancement of Colored People ("NAACP") branches or their members, remain uninvestigated and unresolved. And blanket cancellations of competitive grants have left schools without funding for essential services and positions, including school-based mental-health services that members of Congress from both parties have lauded as effective and necessary. *See, e.g.*, Carter Decl., Ex. A-30 (2022 press release).

The actions by the Defendants are unconstitutional, contrary to law, and arbitrary and capricious. The Constitution gives power over "the establishment of offices [and] the determination of their functions and jurisdiction" to Congress—not to the President or any officer under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Only Congress can abolish a congressionally created office or function, and it must do so through affirmative legislation, not passive acquiescence. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). Consequently, the Executive Branch may not unilaterally close an agency created by Congress or terminate its congressionally mandated functions, let alone, as here, do so in a haphazard, arbitrary manner that ignores profound reliance interests on the Department's continued operation.

Plaintiffs seek relief from the irreparable harm that Defendants' dismantling of the Department has inflicted and will continue to inflict on them and their members, as well as on tens of millions of students, families, and educators across the country. For the reasons explained below, the Court should issue a preliminary injunction.

## BACKGROUND

I.    **Congress Established the Department and Has Charged It with Carrying Out an Array of Statutory Functions.**

Congress created the Department in 1979 through the Department of Education Organization Act ("DEOA"), Pub. L. No. 96-88, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3401–3510), to advance "equal educational opportunity"; "promote improvements in . . . education through federally supported research, evaluation, and sharing of information"; and "improve the management and efficiency of Federal education activities, especially with respect to . . . the dispersal of Federal funds." 20 U.S.C. § 3402(1), (4), (6).

From the start, Congress gave the Department responsibility for a wide array of statutory functions. The new Department was tasked with administering millions of dollars of grants authorized in two landmark education statutes that Congress enacted in 1965, the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. §§ 6301, *et seq.*, and the Higher Education Act ("HEA"), 20 U.S.C. §§ 1001, *et seq.* Congress also directed the Department to ensure that grant recipients complied with federal antidiscrimination laws. *See, e.g.*, 42 U.S.C. § 2000d-1.

Over the subsequent years, Congress enacted several statutes, including the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, that markedly expanded the Department's portfolio of mandatory statutory responsibilities. The Department's current statutory responsibilities are broad and include, as most relevant here: (i) research, data collection, and publication of statistics and other information necessary to implement federal education programs;

(ii) the administration of student financial aid programs; (iii) the enforcement of federal civil rights laws; and (iv) the distribution and administration of grants to recipients at every level of the education system. To carry out these significant, mandatory statutory responsibilities, Congress has created a variety of offices within the Department, discussed in detail *infra*.

Congress has repeatedly funded the operations of the Department through yearly appropriations. In Fiscal Year ("FY") 2024, Congress appropriated over $268 billion for the Department to operate and carry out its statutory functions, programs, and activities. Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, 138 Stat. 460, 682-693 (2024) (discretionary appropriations); Carter Decl., Ex. A-26 at 1–2 (Department explanation of discretionary and mandatory appropriations). Congress generally funded the Department for FY 2025 at the same levels, Act of Mar. 15, 2025, Pub. L. No. 119-4, § 1102, 139 Stat. 9, 35, subject to the same "requirements, authorities, conditions, [and] limitations," *id.* § 1105, 139 Stat. at 35, including restrictions on the Department's authority to transfer or reprogram appropriated funds, *see* Pub. L. No. 118-47, §§ 302, 514, 38 Stat. at 541, 617.

## II.    Defendants Are Implementing their Decision to Close the Department, Without Congressional Authorization, By Taking Action to Shrink and Incapacitate It.

President Trump attempted to persuade Congress to close the Department during his first term in office, without success, and has since repeatedly called for the abolition of the Department. Carter Decl., Ex. A-4; *see also, e.g.*, *id.*, Exs. A-6, A-7 at 9. After his re-election, President Trump resolved to close the Department immediately and encouraged Secretary McMahon to "put herself out of a job." *Id.*, Exs. A-8 at 2, A-9. The night of her Senate confirmation on March 3, 2025, Secretary McMahon announced her decision to close the Department in a communication to employees titled, "Our Department's Final Mission," urging Department staff to "perform one final, unforgettable public service"—demolishing the agency. *Id.*, Ex. A-2 at 3. Even though

4

Congress subsequently level-funded the Department for FY 2025, *see* Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. at 35, within a week, on March 20, 2025, President Trump issued an Executive Order formally directing Secretary McMahon to "take all necessary steps to facilitate the closure of the Department of Education." Carter Decl., Ex. A-1 at 1.

Defendants began their efforts to close the Department almost immediately after the change in administration. Carter Decl., Ex. A-10 (Directive on Department Grant Priorities). In February 2025, Defendants cancelled numerous contracts to carry out Department functions and terminated numerous grants. *See infra* pp. 9, 20–21. Then, on March 11, 2025, Defendants announced a massive reduction in force (the "March 11 RIF") that would affect "[a]ll divisions within the Department" and "impact[] nearly 50% of the Department's workforce," eliminating approximately 1,378 Department employees. Carter Decl., Ex. A-11 (press release). These employees were placed on administrative leave beginning March 21, 2025; were immediately locked out of Department systems, email accounts, and shared files; and were unable to perform their duties or transition their work to remaining employees. Young Decl. ¶¶ 24–26 & Exs. LLL-1, LLL-2 (IES); Doe 9 Decl. ¶¶ 29–30 & Exs. R-1, R-2 (IES); Downey Decl. ¶¶ 19–21 (OGM); Doe 7 Decl. ¶¶ 11–12 (OELA); Doe 5 Decl. ¶¶ 15–16 (OCR); Gittleman Decl. ¶ 3 (FSA); Tessitore Decl. ¶¶ 17–19 (FSA); Newman Decl. ¶¶ 27–29 (OESE); Ortiz Decl. ¶¶ 19–22 (OCR).

Many offices that carry out the Department's major functions have been hit especially hard. The key actions taken to date include:

- The Department's Institute of Education Sciences ("IES")—a congressionally mandated research and data office, *see infra* pp. 8–9—has been stripped of more than 90% of its nearly 200 employees. Doe 9 Decl. ¶ 30; Young Decl. ¶¶ 25–26; Doe 8 Decl. ¶ 34.

- The Department's Office of Federal Student Aid ("FSA")—a congressionally mandated Performance Based Organization that oversees the nation's $1.6 trillion student loan portfolio, *see infra* pp. 10–12—has had crucial divisions gutted. The Vendor Performance Division and Vendor Oversight Division—the offices responsible for holding student loan

servicers accountable for fulfilling contractual and statutory obligations—have been shut down altogether. Campbell Decl. ¶¶ 12, 15; Tessitore Decl. ¶ 16. The School Eligibility & Oversight Service Branch ("SEOS")—the component responsible for certifying and monitoring institutions of higher education for eligibility to participate in FSA programs, *see infra* pp. 11–12—has lost approximately 80% of its employees. Doe 4 Decl. ¶¶ 26–28. And the Ombudsman's Office, which provides critical assistance to student debt holders, has lost approximately half of its staff. Gittleman Decl. ¶ 4.

- The Office for Civil Rights ("OCR")—a congressionally mandated office of core importance to the Department's mission, *see infra* pp. 13–14—has lost nearly half its workforce as Defendants abolished seven of its twelve regional enforcement offices. Gonzales Decl. ¶ 28; Doe 6 Decl. ¶ 12; Doe 5 Decl. ¶ 11; Doe 10 Decl. ¶¶ 12–14.

- Program offices across the Department lost units that performed functions essential to grant administration. Newman Decl. ¶¶ 27–28 (OESE); Doe 11 Decl. ¶ 7 (OSERS); Doe 13 Decl. ¶¶ 9–10 (OCTAE); Joseph Decl. ¶¶ 4–9 (OPE); Cottrell Decl. ¶¶ 13–17 (OPE); Downey Decl. ¶ 19 (OGM); Leheny Decl. ¶¶ 14–22 (OGC); Garibay Decl. ¶¶ 10–13 (OELA); Doe 7 Decl. ¶ 11 (OELA).

The combined effect of the March 11 RIF and Defendants' previous staff reductions was to shrink the agency's workforce to about half of what it was on January 20, 2025—from 4,133 employees down to "roughly 2,183 workers." Carter Decl., Ex. A-11. Although Secretary McMahon initially claimed the RIF was meant to "make sure that we kept all of the right people," *id.*, Ex. A-3 at 1, there is no evidence that Defendants undertook any substantive evaluation of the positions they eliminated or the functions those positions supported. Indeed, Secretary McMahon conceded in recent testimony before Congress that she did not do any "actual analysis" or "study" of the RIF's effects before cutting staff. *Id.*, Ex. A-12 at 4; *see also* Campbell Decl. ¶ 17 (directed to analyze impact of the RIF only after the fact). Rather, Secretary McMahon has described the layoffs as her "first step on the road to a total shutdown" as the Department's closure was "the President's mandate." Carter Decl., Ex. A-3 at 1; *see also* Doe 3 Decl. ¶ 12 (unit's statutory functions not reassigned because the agency was winding down); Picard Decl. ¶ 3 (told FSA would be "doing less with less"). The reality that this is a shutdown is confirmed by the shared understanding of former Department Secretaries and senior staff that the drastic staff reductions

6

make it impossible to fulfill the Department's statutory obligations. Cardona Decl. ¶¶ 9–19; King Decl. ¶¶ 16, 20–30, 35; Lhamon Decl. ¶¶ 35–49; Easton Decl. ¶¶ 17–20; Leheny Decl. ¶¶ 14–22.

Defendants continue to pursue their "Final Mission," by ending more and more Department functions. Of particular importance, on April 29, 2025, Defendants informed hundreds of states, school districts, and institutions of higher education that effective December 31, 2025, the Department would discontinue over a billion dollars in mental-health grants for which Congress has specifically appropriated funds, *see infra* pp. 19–21, because the grantees supposedly "used the funding to implement race-based actions like recruiting quotas." Carter Decl., Ex. A-27 at 3. On May 21, 2025, the Department entered into an unprecedented agreement with the Labor Department to transfer administration of $2.7 billion in grants to Labor, citing the Executive Order directing the Department's closure. Carter Decl., Ex. A-13 (Oglesby Decl. ¶ 7 & Ex. B at 5).

On June 30, 2025, the Department informed states and congressional staffers that it would not be distributing about $6.8 billion in ESEA and other formula grants on July 1—the date on which the Department has for decades made the first tranche of formula grant funding for the upcoming school year available so that states and districts can rely on them in budgeting. Carter Decl., Ex. 31 (EdWeek article). Its communications stated that the Department was "reviewing the FY 2025 funding" for alignment "with the President's priorities." Bilal-Threats Decl. ¶ 25. The affected ESEA programs support education services for migratory children (Title I-C, 20 U.S.C. §§ 6391–99); efforts to improve educator quality, recruitment, and retention in high-need areas (Title II-A,); supplemental services for English learners (Title III-A); expanded access to educational opportunities in areas like Advanced Placement, the arts, foreign languages, and STEM, as well as services to promote students' physical and mental health (Title IV-A); and the creation of before and after-school and summer programs (Title IV-B). Each program is statutorily

mandated, with states' eligibility for funds and allocations calculated under pre-set, statutory formulas that leave the Department with no discretion as to whether to award the grants or in what amounts. 20 U.S.C. §§ 6301–39, 6571–78, 6801–7014, 7111, 7171.

### III.    Defendants Have Effectively Shut Down Multiple Statutorily Mandated Offices and Functions of the Department.

Defendants have already effectively shut down multiple statutorily mandated offices of the Department and terminated many of its statutorily mandated functions.

### A.    The Institute of Education Sciences ("IES")

#### 1.    Congress Created IES to Gather, Analyze, and Publish Needed Data.

Congress required that "[t]here *shall* be in the Department of Education the Institute of Education Sciences, which *shall* be administered in accordance with the Education Sciences Reform Act of 2002." 20 U.S.C. § 3419 (emphases added). Congress structured IES as a semi-independent, nonpartisan agency within the Department that consists of four mandatory "National Education Centers" and is led by a Director confirmed by the Senate to serve a six-year term. *Id.* §§ 9511(c), 9514(b)(1). Congress mandated that IES "*shall* compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities," *id.* § 9511(b)(2) (emphasis added), which may be published without the Secretary's approval, *id.* § 9576(a), (c).

Each of IES's four Centers has its own statutorily mandated set of functions. *See* Easton Decl. ¶¶ 8–16. For example, the National Center for Education Statistics ("NCES") "*shall* . . . collect and analyze education information and statistics," 20 U.S.C. § 9541(b)(1) (emphasis added); "*shall* [annually] submit to . . . the appropriate congressional committees a statistical report on the condition and progress of education," *id.* § 9545(b) (emphasis added); and "*shall* . . . carry out" the National Assessment of Educational Progress, *id.* § 9622 (emphasis added). *See also id.* §§ 9543, 9621–9624; Easton Decl. ¶¶ 8, 10–12. NCES also collects data necessary for various

purposes, including studying education systems, providing guidance to states and school districts, and developing and implementing policy initiatives. Easton Decl. ¶¶ 8, 10–12.

In addition, NCES plays an essential role in the Department's administration of grants created by Congress, including a major category known as "formula" grants. Formula grants use a pre-defined formula—based on factors that change over time, like population, poverty rate, and other demographic information—to allocate among eligible recipients a given fixed sum of federal funds appropriated to support that statutory program. *See infra* pp. 15–16. To assign values to many formula factors and to determine eligibility for certain grants, the Department needs NCES to collect, update, and supply the underlying data. Doe 8 Decl. ¶¶ 10–24, 27; Cottrell Decl. ¶ 17.

Similarly, the National Center for Education Evaluation and Regional Assistance ("NCEE") provides technical assistance to states and school districts; evaluates the effectiveness of federal education programs and innovative models; and publicizes the results of peer-reviewed, reliable research through platforms like the Education Resources Information Center and the What Works Clearinghouse. *See* 20 U.S.C. § 9561; Easton Decl. ¶¶ 8, 16; *see generally* Young Decl. NCEE also maintains a network of ten congressionally mandated Regional Educational Laboratories ("RELs") that support applied research, development, and technical assistance in partnership with states and districts. 20 U.S.C. § 9564; Easton Decl. ¶ 8; Young Decl. ¶ 9.

### 2. Defendants Have Dismantled IES and Its Functions.

On February 10, 2025, Defendants cancelled most of the contracts IES used to carry out its mandatory research, data collection, and evaluation functions. Carter Decl., Exs. A-14, A-15. Defendants claimed these contracts were wasteful but did not consult with the Department employees who ran the programs or any other IES staff before cutting the contracts. Young Decl. ¶¶ 14–18; Doe 9 Decl. ¶¶ 21–25, 29. IES employees later persuaded Defendants to resuscitate

some contracts for certain required functions, but Defendants demanded that costs be reduced by at least 50%, well below the level that employees and contractors viewed as necessary to carry out their statutorily required activities. Easton Decl. ¶ 19; Doe 9 Decl. ¶¶ 25–28; Young Decl. ¶¶ 21–22. On February 13, 2025, the Department terminated all contracts for the congressionally mandated RELs, which it characterized as "woke spending." Carter Decl., Ex. A-16. That mass termination caused the shuttering of all ten of the laboratories. Young Decl. ¶ 23.

Because IES relies on external contractors and interagency agreements to complete much of its statutorily required work, the mass termination of IES contracts brought many statutorily mandated functions and programs to a halt. Easton Decl. ¶¶ 17–18, 20; Doe 9 Decl. ¶¶ 6–7, 18, 20, 21–24; Doe 8 Decl. ¶¶ 7–8; Young Decl. ¶¶ 7, 15–20. The March 11 RIF then reduced IES's staff of nearly 200 employees to fewer than 20, with only three of about 100 employees remaining in NCES. Easton Decl. ¶ 17; Young Decl. ¶¶ 25–26; Doe 9 Decl. ¶¶ 30–31. This skeletal staff cannot manage the sheer volume of IES's mandatory functions—at least 30 data collections and assessments, hundreds of competitive research grants, and production of public-facing resources. Easton Decl. ¶¶ 10–16; Doe 9 Decl. ¶¶ 3–7; Young Decl. ¶¶ 5–13. And because the RIF eliminated data specialists in the Department's principal offices, such as the Office of Elementary and Secondary Education ("OESE"), there is no one left anywhere in the agency to retrieve, clean, or process the data used by program staff. Newman Decl. ¶¶ 11, 28; Doe 8 Decl. ¶¶ 13–14, 17, 21–24, 27; Garibay Decl. ¶¶ 16, 20; Witt Decl. ¶ 15; Doe 11 Decl. ¶¶ 11–12.

### B.    Office of Federal Student Aid ("FSA")

#### 1. Congress Created FSA to Administer Student Financial Aid Programs.

Congress has authorized a multitude of programs to assist with financing postsecondary education. In 1998, Congress created FSA, a quasi-independent Performance Based Organization

that "shall be . . . responsible for managing" various congressionally mandated financial aid programs set forth in Title IV of the Higher Education Act. 20 U.S.C. § 1018(a)(1). The programs in FSA's domain include the Federal Pell Grant Program, which provides need-based grants to undergraduates; the Teacher Education Assistance for College and Higher Education Grant Program; and the William D. Ford Direct Loan Program. *See id.* §§ 1070–99d. The "Direct Loan" Program, which issues loans to students, is the largest of these programs and accounts for most of the federal government's student loan spending. *See Biden v. Nebraska*, 600 U.S. 477, 484 (2023).

By law, FSA is responsible for the entire life cycle of student loans—from determining school eligibility, to ensuring ongoing institutional compliance with Title IV requirements, to loan servicing, and finally to implementing congressionally mandated income-driven loan repayment plans and loan forgiveness programs, including the Public Service Loan Forgiveness Program and the Teacher Loan Forgiveness Program. 20 U.S.C. §§ 1078(b), 1087, 1087e(d). Of FSA's many important statutory functions, three are of particular relevance here.

First, FSA is required by statute to certify which institutions are sufficiently sound to be eligible for the loan program, a prerequisite before students may access federal financial aid. *See* 20 U.S.C. §§ 1002(a)(5), 1099c. FSA implements this function through its School Eligibility and Oversight Service Branch ("SEOS"). Doe 4 Decl. ¶¶ 4, 12–14. For an institution to be certified, SEOS must determine, among other things, whether it is able to "provide the services described in its official publications and statements" and "meet all of its financial obligations." 20 U.S.C. § 1099c(c)(1). After certification, FSA is statutorily obligated to monitor to ensure that institutions continue to meet certification requirements. *Id.* § 1099c-1. SEOS conducts thousands of reviews each year to fulfill this statutory mandate. Doe 4 Decl. ¶¶ 6, 15–16, 28–29. Violations of the Title

IV requirements are common, and SEOS's certification and monitoring work are the principal means by which these violations are consistently identified and rectified. Miller Decl. ¶¶ 6–10.

Second, through its vendor oversight functions, FSA employees, mainly those assigned to the Vendor Oversight and Vendor Performance Divisions, carry out Congress's mandate that the Department oversee student loans administered by third-party vendors to prevent waste, fraud, and abuse, and ensure that loans are made, serviced, and forgiven in compliance with the law. *See* 20 U.S.C. § 1078-10(b) (the Department "shall carry out" student loan programs in the manner specified by Congress). The vendor oversight employees ensure that third-party loan servicers fulfill contractual and statutory obligations and provide adequate service to student borrowers. Campbell Decl. ¶¶ 3–11; Doe 2 Decl. ¶¶ 4–40; Tessitore Decl. ¶¶ 3–4, 7–12; *see* Gittleman Decl. ¶ 18 (coordination between vendor oversight and Ombudsman's Office).

Third, FSA is statutorily required to "improve service to students and other" financial aid recipients and to appoint a Student Loan Ombudsman, who is to "provide timely assistance to borrowers" by processing and informally resolving complaints within the Department or with institutions, lenders, guaranty agencies, or loan servicers. 20 U.S.C. § 1018(f)(1), (3). The Ombudsman's Office receives complaints directly from borrowers and from state or federal officials on behalf of constituents. Picard Decl. ¶ 6; Gittleman Decl. ¶ 7. In FY 2024, the Ombudsman's Office received 289,523 individual complaints. Carter Decl., Ex. A-17 at 128.

### 2.    Defendants Have Dismantled FSA and Its Financial Aid Functions.

Defendants have gutted FSA's ability to carry out these statutorily mandated functions. Defendants shuttered six of the eight SEOS branches and eliminated all of their employees, including staff with specialized oversight experience. Miller Decl. ¶¶ 13–14; Doe 4 Decl. ¶¶ 27, 30. That leaves approximately 30 employees—fewer than 20% of the pre-RIF total—to complete

thousands of certifications, compliance and financial audits, and program reviews for approximately 5,500 institutions. Miller Decl. ¶ 14; Doe 4 Decl. ¶ 28.

Defendants entirely abolished FSA's Vendor Performance and Vendor Oversight Divisions. *Supra* pp. 5–6. The vendor oversight functions performed by these divisions saved individual borrowers and the federal government tens of millions of dollars by remedying errors by loan servicers. Campbell Decl. ¶ 25; Doe 2 Decl. ¶¶ 15–18; Gittleman Decl. ¶ 8; Tessitore Decl. ¶ 25; Pringle Decl. ¶ 38. The abolition of these divisions precludes FSA from meeting the Department's statutory mandate to effectively oversee loan servicers' daily operations and ensure statutory and regulatory compliance. Doe 2 Decl. ¶¶ 39–42; Campbell Decl. ¶¶ 13, 23–24, 29; Tessitore Decl. ¶¶ 21–29; Doe 4 Decl. ¶ 32.

Finally, by cutting more than half of the Ombudsman's Office's staff, Gittleman Decl. ¶ 4, Defendants have reduced the Office's processing and closing of cases to a trickle. Picard Decl. ¶¶ 9–13. For example, one Ombudsman unit that previously resolved between 250 and 450 cases per month resolved just 20 in April and 67 in May. Picard Decl. ¶ 12. In addition, the Office has stopped assigning new cases to case workers: as of May 2025, over 3,000 cases had not even been assigned to case workers. *Id.* ¶ 13.

### C.    Office for Civil Rights ("OCR")

### 1.    Congress Created OCR to Enforce Civil Rights Laws in Education.

Congress created the Office for Civil Rights to enforce the statutory prohibitions against discrimination in any program or activity receiving financial assistance from the Department. 20 U.S.C. §§ 3413(a), 3441(a)(3), (4); 34 C.F.R. § 100.1 (Title VI of Civil Rights Act of 1964); *id.* § 106.2 (Title IX of Education Amendments of 1972); *id.* § 104.1 (Section 504 of Rehabilitation Act of 1973); 28 C.F.R. § 35.101 (Americans with Disabilities Act). To fulfill that obligation, OCR

must "make a prompt investigation" of any "possible failure to comply" with the civil rights laws. 34 C.F.R. § 100.7. Since at least 1999, OCR has understood that a "prompt investigation" means within 180 days (a school year) for the vast majority (80%) of cases. Lhamon Decl. ¶ 30; Nosanchuk Decl. ¶ 9; Doe 3 Decl. ¶¶ 3–6; Gonzales Decl. ¶¶ 11–13; Doe 12 Decl. ¶ 5.

For decades, OCR's twelve regional offices have implemented this mandate, even while complaints have skyrocketed, acting as the first and often only line of defense for students experiencing civil rights violations in schools, colleges, and universities. Lhamon Decl. ¶ 11; Gonzales Decl. ¶¶ 9–10; Doe 6 Decl. ¶¶ 15–16; Doe 12 Decl. ¶¶ 7–9. Enforcement staff in the regional offices conduct investigations that involve document review, witness interviews, and site visits. Lhamon Decl. ¶ 12; Ortiz Decl. ¶ 8; Doe 6 Decl. ¶ 4; Doe 5 Decl. ¶ 5. OCR resolves most violations through voluntary resolution agreements, in which recipients agree to take specific remedial actions under OCR monitoring. OCR conducts monitoring until it is satisfied that the recipient has fully remedied the past violation and will prevent future violations. Lhamon Decl. ¶¶ 13–15; Ortiz Decl. ¶¶ 9–10; Doe 6 Decl. ¶¶ 5, 20; Gonzales Decl. ¶¶ 23–24.

## 2. Defendants Have Dismantled OCR and its Civil Rights Functions.

Defendants have gutted OCR's ability to enforce federal civil rights laws by decimating its regional offices, slashing its staff, and saddling the remaining offices and staff with impossible caseloads that are double or even triple prior loads, all of which has left complainants without any redress. Lhamon Decl. ¶¶ 29–32; Nosanchuk Decl. ¶¶ 10–11; Gonzales Decl. ¶ 37; Ortiz Decl. ¶ 25; Doe 6 Decl. ¶¶ 18–19; Doe 5 Decl. ¶ 22; Doe 10 Decl. ¶¶ 20–21; Doe 12 ¶ 13. The seven closed regional offices had existed for decades, serving 25 states, and included the largest, highest-performing regional offices. Lhamon Decl. ¶ 27; Doe 6 Decl. ¶ 13; Doe 12 Decl. ¶ 11. They

employed approximately 50-60% of OCR's total enforcement staff and handled approximately 57% of the Office's open cases. Doe 6 Decl. ¶¶ 16–17; Doe 5 Decl. ¶ 17.

Shifting responsibility for all OCR cases to approximately half of its previous enforcement staff will result in an average caseload of about 86 cases per investigator—more than twice the already-excessive fiscal year 2024 average of 36 cases. Doe 6 Decl. ¶ 18; Doe 5 Decl. ¶ 17; Doe 12 Decl. ¶¶ 10, 13. Intake burdens in some offices doubled or even tripled. Doe 10 Decl. ¶¶ 20–21; Doe 12 Decl. ¶ 13; Doe 6 Decl. ¶¶ 18, 20. Parties with pending OCR complaints have not had any development on their cases since January 2025, Secka Decl. ¶¶ 15–19; Pl. Jane Doe 1 Decl. ¶¶ 8–15 & Ex. W, and advocates now counsel clients to take their concerns elsewhere, Heiser Decl. ¶ 7; Lipsitt Decl. ¶ 26. These devastating cuts have "nulli[fied]" the ability of OCR to fulfill its statutory obligations. Doe 12 Decl. ¶ 17.

### D.    Formula Grants

#### 1.    Congress Requires the Administration of Formula Grant Programs.

Among the Department's primary responsibilities is the administration of formula grant programs that distribute billions of dollars in federal financial assistance to states, school districts, and institutions of higher education each year according to the allocation formula in each program's governing statute. *See* 20 U.S.C. § 3402(6); 34 C.F.R. §§ 75.1(c)(1), 76.1.

Most of the Department's signature programs are formula grants, including:

- 16 programs that Congress mandated through the Elementary and Secondary Education Act of 1965 (ESEA), including aid for school districts with large populations of economically disadvantaged students (Title I-A, 20 U.S.C. §§ 6311–39), English learners (Title III-A, 20 U.S.C. §§ 6801–71), and rural schools (Title V-B, 20 U.S.C. §§ 7341–51d);

- Two programs that Congress mandated through IDEA to support special education, preschool, and early intervention services for children with disabilities (Parts B-611, B-619, and C, 20 U.S.C. §§ 1411, 1419, 1443);

- The career and technical education program that Congress mandated in the Carl D. Perkins Career and Technical Education Act, as amended (Perkins V) (20 U.S.C. § 2321); and

- Support mandated for Historically Black Colleges and Universities ("HBCUs") and Minority Serving Institutions ("MSIs") (20 U.S.C. §§ 1051–68h, 1101–03g).

To administer these and other formula grant programs, the Department must determine applicants' eligibility, allocate formula funds accurately, distribute awards in a timely manner, and monitor their use by recipients to prevent waste, fraud, and abuse. Wall Decl. ¶¶ 6–12. Employees in the Department's grant-making offices are responsible for all of these functions. *See* Cottrell Decl. ¶¶ 9–17, 20; Doe 13 Decl. ¶ 8; Witt Decl. ¶ 3; Spitz Decl. ¶¶ 4–5, 9; Garibay Decl. ¶¶ 4–7.

In addition, other units throughout the Department are responsible for functions that are essential to administering the formula grant programs. Leheny Decl. ¶ 17; Downey Decl. ¶¶ 6–14; Wall Decl. ¶¶ 6–7. In particular, NCES (the statistics center housed within IES) must collect and compute many key data inputs required by the statutory formulas. Doe 8 Decl. ¶¶ 13–14, 17, 21–24, 27; Witt Decl. ¶¶ 5, 9–13; Newman Decl. ¶¶ 7–14; Cottrell Decl. ¶¶ 9–17. And during the allocations process, NCES must coordinate with other Department offices to resolve data-related problems and otherwise ensure that award amounts are ultimately calculated in accordance with the statutory formulas. Newman Decl. ¶ 8; Wall Decl. ¶ 7.

NCES also facilitates the mandatory collection of recipient-reported data needed to perform formula calculations. The Center maintains EDFacts, the Department's administrative platform for collecting performance data that states must submit as a condition of formula grant funding under applicable statutes. *See* 34 C.F.R. § 76.720. The Center also must administer the system of surveys though which colleges and universities participate in statutorily mandated data collections, *see* 20 U.S.C. § 1094(a); Doe 8 Decl. ¶¶ 25–31; Cottrell Decl. ¶¶ 10–11, and facilitate the collection of required data under Perkins V, Doe 8 Decl. ¶¶ 6, 22; Doe 13 Decl. ¶ 8.

## 2. Defendants Have Disabled Formula Grant Programs.

By gutting the Department's data infrastructure, Defendants have left the agency unable to collect and retrieve the necessary data for future formula grant allocations and performance reviews. Doe 8 Decl. ¶¶ 34–35; Newman Decl. ¶¶ 21, 31–32; Doe 11 Decl. ¶¶ 11–12. As a result, the Department will have no choice but to contravene congressional commands by plugging outdated and hence inaccurate data into the statutory allocation formulas, improperly underpaying some states and school districts while overpaying others. Doe 8 Decl. ¶ 35; Newman Decl. ¶ 31; Johnson Decl. ¶¶ 7–9; Witt Decl. ¶¶ 14–15.

Consider, for example, the program that Congress mandated in Title I-A of the ESEA to support districts serving economically disadvantaged students. That program distributes $18.4 billion per year to serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools. Carter Decl., Ex. A-28 at 11. The distribution of these funds between states and school districts can shift significantly based on even minor changes to the formula inputs: a $1 change in average per-pupil expenditure can alter a state's Title I-A allocation by more than $1 million. Doe 8 Decl. ¶ 11. The same is true of changes in poverty estimates and formula-eligible child counts. Because school district boundaries and demographics shift each year, these inputs also shift. *Id.* ¶¶ 9, 14, 19–22; Newman Decl. ¶ 19. As a result, NEA estimates that, in the five school years from 2016-2020, about 13% of schools' eligibility for Title I funds changed year to year, with at least 10% of ineligible schools moving into eligible status from one year to the next. Bilal-Threats Decl. ¶¶ 17–18. Had eligibility been determined, and allocations calculated, using previous years' data, these schools would not have received the Title I-A funding to which the statutory formula entitles them. *Id.* ¶ 19.

Allocations under other congressionally mandated programs will be similarly affected. Doe 8 Decl. ¶ 12. For example, to qualify for the program to assist rural schools (known as "REAP"), a district must be assigned a locale code that designates it as rural by NCES. *Id.* ¶¶ 23–24; Johnson Decl. ¶¶ 6–7. Relying on classifications from the previous school year will result in districts that should be reclassified as rural losing out on funds that Congress intended for them to receive. Johnson Decl. ¶ 7. In addition, the REAP formula grant for rural and low-income school districts relies on poverty estimates calculated by NCES, so the use of outdated income and population data further harms school districts that should be reclassified as eligible for that grant. *Id.* ¶ 8. As another example, state-reported EDFacts data is a component of the estimates of English learners that are a mandatory factor in the statutory formula for funds to provide supplemental language services to students. Doe 8 Decl. ¶ 14.

The effects of Defendants' actions on formula grant administration go far beyond the loss of data. Defendants have abolished at least one program office outright—the Office of English Language Acquisition ("OELA"), which administers the congressionally mandated program to support English learners, *see* 20 U.S.C. §§ 6801–71 (ESEA Title III-A)—and cut essential staff from program offices and other units involved in grant administration.[1] Doe 7 Decl. ¶¶ 4–9, 11; Doe 13 Decl. ¶¶ 9–10; Spitz Decl. ¶¶ 12–15; Doe 11 Decl.¶¶ 5–7; Cottrell Decl. ¶¶ 17–20. And the Department has indicated that even when it possesses the data necessary to allocate formula grants, it will withhold at least some formula grants that it deems inconsistent with administration policy preferences. *See* Bilal-Threats Decl. ¶ 25; Carter Decl., Ex. 31 (EdWeek article).

---

[1] These include Office of Grants Management ("OGM") teams who trained and certified staff to obligate and commit funds as required by law, Downey Decl. ¶¶ 4, 8–12; Office of General Counsel ("OGC") attorneys who ensured compliance with program statutes and regulations, including states' implementation of IDEA requirements, Leheny Decl. ¶ 17; and executive office staff in OESE and the Office of Special Education and Rehabilitative Services ("OSERS") who shepherded funds to grantees' accounts, completed mandatory state performance reports, and obtained clearances for information collections, Newman Decl. ¶¶ 6, 12–14; Doe 11 Decl. ¶ 5; Spitz Decl. ¶¶ 5–9.

E.    **Competitive Grants**

1.  **Competitive Grant Program Administration.**

In contrast to formula grants, "competitive" grants do not automatically go to every applicant that meets specified eligibility criteria. Rather, they are awarded competitively. This does not mean, however, that Congress has given the Department discretion over whether to administer competitive grant programs. Quite to the contrary, Congress has declared that the Secretary "*shall award grants*" under many competitive programs, *see, e.g.*, 20 U.S.C. §§ 6632(a), 6672, allowing the Secretary leeway to determine which applicants receive awards but no leeway to discard congressionally mandated grant programs. 34 C.F.R. § 75.1(b).

To run a grant competition, the Department must engage in notice and comment rulemaking to establish funding priorities or selection criteria (unless both the priorities and the criteria are mandated by the grant-creating statute) and publish a notice inviting applications. Program staff facilitate peer review of the applications where required; rank the applications based on the selection criteria, competitive preference points, and peer review feedback; and propose a slate of awardees for approval. *Id.* § 75.217(c), (d); Wall Decl. ¶¶ 13–14; Petracca Decl. ¶¶ 12–13, 18. As with the formula grants, once competitive grant awards are made, the Department must monitor recipients' performance and use of funds, often over multi-year grant performance periods. 34 C.F.R. §§ 75.235, 75.236; Wenger Decl. ¶¶ 15–18.

Among the many competitive grants administered by the Department are those that support elementary and secondary educators. Congress has directed that the Secretary "shall award" competitive grants through the Supporting Effective Educator Development ("SEED") Program, "to increase the number of highly effective educators" in "traditionally underserved" school districts, and through the Teacher and School Leader Incentive ("TSL") Program, to help states

and school districts improve systems for educator hiring, training, and professional development. 20 U.S.C. §§ 6632, 6672(a). Congress also established the Teacher Quality Partnership ("TQP") Program to fund partnerships between high-need school districts and institutions of higher education to carry out programs for teacher preparation, teacher residency, and school leader preparation. 20 U.S.C. §§ 1021(6), 1022b(b)(3), 1022a(a), 1022a(c)(1), 1022h. And the School-Based Mental Health Services ("SBMH") and Mental Health Service Professional Demonstration ("MHSP") Programs, established under ESEA Title VI, 20 U.S.C. § 7281(a)(1)(B), and the 2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159, tit. II, 136 Stat. 1313, 1340, support efforts to recruit and hire school-based mental health professionals for underserved students.[2]

### 2. Defendants Have Disabled Competitive Grants.

Defendants have effectively shut down the SEED, TQP, TSL, SBMH, and MHSP competitive grant programs for elementary and secondary educator recruitment and retention and have not moved to implement some $2 billion in higher education competitive grants. *See generally* Carter Decl., Ex. A-29 (FY 2025 Higher Education budget requests).

On February 5, the Department issued a communication to its grant-administration employees informing them that any grant deemed inconsistent with the administration's anti-DEI agenda was to be "terminated" under 2 C.F.R. §§ 200.340(a)(4), 200.341, and directing them to "conduct an internal review of all new grant awards, grants that have not yet been awarded," "and issued grants" to identify grants that "fund discriminatory practices," including "DEI." Carter Decl., Ex. A-10. Within two days of the directive, Defendants issued uniform termination letters to 104 of 109 recipients of open SEED and TQP awards, Carter Decl., Ex. A-21 (Oglesby Decl.

---

[2] While the TQP, SBMH, and MHSP programs are not permanently mandatory like the SEED and TSL programs, Congress made them mandatory through at least September 30, 2025, by appropriating specific funds. *See* Pub. L. No. 117-159, tit. II, 136 Stat. at 1340; Pub. L. No. 118-47, div. D, tit. III, 138 Stat. at 681; Pub. L. No. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (2025); Carter Decl., Ex. A-20 at 7 (TQP); Doe 3 Decl. ¶ 8.

¶ 27); Wenger Decl. ¶ 20, along with many TSL grantees. The letters' boilerplate language said that because the cancelled projects "promote[d] or [took] part in [DEI] initiatives," they were "inconsistent with, and no longer effectuate[d], Department priorities" and were subject to termination under 2 C.F.R. § 200.340(a)(4). *See, e.g.*, Hermes Decl. ¶¶ 25, 27 & Ex. GG-1 (TSL). The letters did not give individualized grounds for cutting off funds mid-year. *See, e.g.*, *id.*

On April 29, Defendants issued similar boilerplate letters to more than 200 (of about 260) recipients of SBMH and MHSP grants. Wall Decl. ¶¶ 19–21. The letters advised grantees that their awards were "inconsistent with . . . the best interest of the Federal Government," under 34 C.F.R. § 75.253(a)(5), because they "conflict[ed] with [the priorities] of the current Administration," including the Department's anti-DEI policies. Vinson Decl. ¶ 33 & Ex. FFF-1. The Department had therefore determined that the grants—valued at over $1 billion, *see* Wall Decl. ¶¶ 17–22—would "not be continued" after December 31, 2025. Vinson Decl., Ex. FFF-1. Again, the Department engaged in no individualized analysis of the reasons for the discontinuation.[3]

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction "must establish . . . (1) that [they are] likely to succeed on the merits; (2) that [they are] likely to suffer irreparable harm if preliminary relief isn't granted; (3) that the balance of equities favors [them]; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). When the movant seeks to enjoin the federal government, "the balance of equities and the public interest" merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

---

[3] Defendants have also delayed, perhaps permanently, a number of competitive grants that OPE is charged with administering and awarding annually to assist low-income and disadvantaged students pursuing higher education. *See, e.g.,* 20 U.S.C. § 1070e (Child Care Access Means Parents in Schools program); *id.* § 1070a-14 (TRIO programs, including Student Support Services program); Carter Decl., Ex. A-19 at 4 (FY 2024 Joint Explanatory Statement excerpt) (chart showing appropriated funding). The process for awarding those grants—which benefit Plaintiffs' members, as well as thousands of students and their families—has not begun in many instances, and time is running short before the end of the fiscal year. Cottrell Decl. ¶¶ 22–27.

## ARGUMENT

**I.    Plaintiffs Are Likely to Succeed on the Merits.**

Defendants' actions are unprecedented and unlawful. No prior administration has mounted a full-on attack against a Cabinet agency created and funded by Congress, and for good reason. It is a bedrock feature of our constitutional system that there is a separation of powers between the Legislative Branch and the Executive Branch. The Legislative Branch creates federal departments and agencies, assigns those agencies functions and responsibilities by statute, and funds them through appropriations laws. The Executive Branch faithfully executes those congressionally prescribed and funded responsibilities. It has no authority to unilaterally decide to abolish an agency created by Congress and then implement that decision by disabling the agency from within, so that it cannot carry out its congressionally assigned responsibilities. That is precisely what Defendants have done. They have violated the Constitution and have acted contrary to law and arbitrarily and capriciously under the Administrative Procedure Act ("APA"). A federal district court in the District of Massachusetts concluded as much in a case challenging the Department's extra-statutory dismantlement. *See New York v. McMahon*, No. 25-cv-10601, 2025 WL 1463009 (D. Mass. May 22, 2025), *stay pending appeal denied*, 139 F.4th 63 (1st Cir. 2025), *emergency application pending*, No. 24A1203 (S. Ct.).[4] Plaintiffs are likely to succeed on the merits.

**A.    Defendants Have Violated the Constitution and Acted Ultra Vires.**

Defendants have demonstrated a blatant disregard for numerous statutory provisions establishing, structuring, funding, and assigning mandatory functions to the Department and its

---

[4] The Massachusetts case is one of several cases challenging actions at the Department. *See, e.g.*, *Ass'n for Educ. Fin. & Pol'y v. McMahon*, No. 1:25-cv-00999, 2025 WL 1568301 (D.D.C. June 3, 2025) (IES RIF and contract cancellations); *Am. Educ. Rsch. Ass'n v. U.S. Dep't of Educ.*, No. 8:25-cv-01230, 2025 WL 1665401 (D. Md. June 12, 2025) (same); *Carter v. U.S. Dep't of Educ.*, No. 25-cv-00744, 2025 WL 1453562 (D.D.C. May 21, 2025) (effects of RIF in OCR); *Victim Rights L. Ctr. v. U.S. Dep't of Educ.*, No. 25-cv-11042, 2025 WL 1704311 (D. Mass. June 18, 2025) (same).

component offices. They have exceeded their authority under Article II, arrogated power that the Constitution allocates to Congress, and violated their obligation to take care that the laws are faithfully executed. This Court has the authority to enjoin federal officers who, as here, are "violating, or planning to violate," the Constitution or federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *see also Nat'l Treasury Emps. Union (NTEU) v. Vought*, No. 25-cv-0381, 2025 WL 942772, at *40 (D.D.C. Mar. 28, 2025) (injunction stayed in part).

Article I of the Constitution gives Congress power over "the establishment of offices [and] the determination of their functions and jurisdiction." *Myers*, 272 U.S. at 129. "Congress has plenary control over the . . . existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117 (explaining that executive agencies "are creatures of statute" that "possess only the authority that Congress has provided"). The Department's existence and functions (like those of every executive agency) accordingly derive from an organic statute enacted by Congress, here the Department of Education Organization Act (DEOA). 20 U.S.C. § 3411 ("There is established an executive department to be known as the Department of Education."). DEOA, and other subsequently enacted statutes, expressly define how the Department must be structured and function.

The authority of the President "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The President is not "a lawmaker." *Id.* at 587. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Rather, the President must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, an obligation the President executes through subordinates in the Executive Branch. *See Myers*, 272 U.S. at 117; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203–04 (2020).

Conversely, the President and subordinate executive officers and agencies "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

### 1. Closing the Department is Unconstitutional and Ultra Vires.

As set forth in detail *supra*, Congress unambiguously created the Department, it has repeatedly expanded the Department's mandatory statutory obligations, and as recently as March 2025, it has passed appropriations legislation funding the Department's future operations. Given this congressional direction, the Executive Branch has no authority to close the Department. Nor may the Executive Branch act contrary to this congressional direction by preventing the Department from performing its statutory functions, or by restructuring it in a way that contravenes statutes enacted by Congress to organize the Department and assign and fund its responsibilities.

President Trump's directive to close the Department, formalized in his March 20 Executive Order, is therefore unconstitutional. The directive contravenes the DEOA and other duly enacted legislation. As the President's subordinate, the Secretary of Education likewise lacks authority to close or reorganize the Department contrary to congressional direction, whether through RIFs or grant cancellations. Indeed, Congress has explicitly limited the Secretary's ability to alter or reallocate the functions of offices and units, 20 U.S.C. § 3473(a)(1), or abolish certain "organizational entities" that Congress established within the Department, *id.* § 3473(a)(2).[5]

To be sure, the Executive Order does contain generic provisos stating that it is to be implemented to the "maximum extent . . . permitted by law" and "consistent with applicable law." Carter Decl., Ex. A-1. But in the absence of legislation authorizing a closure, any concrete steps

---

[5] OELA and NCES are among the few Department entities the Secretary may "consolidate, alter, or discontinue," but to do so, she must first give 90 days' notice to Congress and provide an explanation of her proposed action. 20 U.S.C. § 3473(b). No such notice or explanation has been provided.

to implement a closure necessarily are *inconsistent* with applicable law. And Secretary McMahon has taken such steps; indeed, she has admitted that the March 11 RIF was "the first step on the road to a total shutdown." *Supra* p. 6.

Even without that admission, Defendants could scarcely deny the point, as the vast scope of the RIF defies rational explanation except as a means of initiating the closure of the Department. Especially telling is the wholesale elimination of positions in the National Center for Education Statistics ("NCES"), which crunches the data necessary to allocate formula grants. *Supra* p. 16. Because there is a necessary lag between when that data is collected and the fiscal year for which the data is inserted into the formula, Newman Decl. ¶¶ 15, 16, the decision to shrink NCES to a skeletal staff of three makes sense only if there is not a Department in the next fiscal year.

In sum, both the Defendants' words and their course of conduct execute the President's unlawful directive to close the Department rather than the controlling laws enacted by Congress. Defendants' actions have thus been unconstitutional and ultra vires.

### 2.    Abolishing Statutorily Mandated Offices & Functions is Unconstitutional.

Even if the Secretary's actions are considered individually (rather than as constituent parts of an overall effort to close the Department), they are ultra vires, violate the separation of powers, and contravene the Executive Branch's duty to take care that the laws are faithfully executed.

### a.    IES Is Foreclosed From Performing its Statutory Functions.

As set out above, Congress established IES as a nonpartisan, semi-autonomous division of the Department with four centers and a specific list of *mandatory* statutory responsibilities. *Supra* pp. 8–9. Those mandatory duties include data analysis and statistical reporting that are important both for their own sake and to ensure the accuracy of the demographic variables used to allocate mandatory formula grants to school districts and other governmental bodies. *Supra* p. 15.

Defendants have functionally abolished IES by reducing IES from nearly 200 employees to less than 20 and gutting contracts necessary to perform its mandatory statutory functions. Easton Decl. ¶ 20; Doe 9 Decl. ¶¶ 30–33; Young Decl. ¶ 28; Doe 8 Decl. ¶¶ 34–36. As already noted, IES now lacks capacity to meet its obligation to supply the current demographic and other statistical information needed for accurate formula grant distributions. *Supra* pp. 9–10; Newman Decl. ¶ 16; Doe 8 Decl. ¶ 35. In addition, Defendants terminated contracts and eliminated staff necessary to carry out statutorily mandated program evaluations and assessments assigned to NCEE. *See, e.g.*, 20 U.S.C. §§ 1464(a)–(d), 7981(b), (d); Young Decl. ¶ 6. Reflecting IES's inability to function, for the first time in its history, the agency missed the June 1 deadline set by Congress in 20 U.S.C. §§ 9543, 9545(b), to submit the congressionally mandated annual *Report on the Condition on Education,* because it no longer has the capacity to track or produce the required annual report on the national state of education. Doe 8 Decl. ¶ 36; Carter Decl., Ex. A-22.

### b.  FSA is Foreclosed From Performing its Statutory Functions.

Defendants have likewise shut down mandatory functions of FSA, the higher-education financial aid office. As detailed above, Defendants have terminated the Vendor Performance and Oversight Divisions within FSA, eviscerated SEOS, and hollowed out the Ombudsman's Office. *Supra* pp. 12–13. In taking these actions, Defendants have caused the Department to fail in its certification and oversight responsibilities and its responsibility to timely assist borrowers. *See* Gittleman Decl. ¶¶ 13–18; Campbell Decl. ¶¶ 13, 23–24, 29; Doe 2 Decl. ¶¶ 35–38; Tessitore Decl. ¶¶ 21, 24, 29; Doe 4 Decl. ¶¶ 29–32; Miller Decl. ¶¶ 16–18. All of those responsibilities are mandated by statute. *Supra* pp. 10-12. Defendants therefore have acted ultra vires and in violation of the Constitution by causing the Department to breach those statutory duties.

### c. OCR Is Foreclosed from Performing its Statutory Functions.

The Department must "effectuate," 42 U.S.C. § 2000d-1, the statutory prohibitions against discrimination in any program or activity receiving federal financial assistance, *see* 42 U.S.C. § 2000d. *See also supra* p. 13 (detailing the other civil rights laws that OCR is charged with enforcing). Consistent with regulation, that duty requires the "prompt investigation" and resolution of complaints, 34 C.F.R. § 100.7(c); *see also id.* § 104.61 (applying Title VI regulations to Title IX), *id.* § 106.81 (same for Section 504); 28 C.F.R. § 35.171 (same for ADA), which the Department has understood for decades to require the resolution of most complaints (80%) within 180 days (a school year's time). Carter Decl., Ex. A-18 at 3; Doe 12 Decl. ¶ 5. *See also Adams v. Richardson*, 480 F.2d 1159, 1165 (D.C. Cir. 1973) (proposing 180 days as appropriate timeline for prompt resolution).

Defendants' decision to close seven OCR enforcement offices, including the largest and most productive offices, and dump their dockets on to those of the five remaining offices, which include the smallest and least productive offices, with no planned transition or even communication with complainants, contravenes the congressional directive to effectuate the enforcement of the civil rights laws. OCR had approximately 12,000 pending investigations in January 2025. Carter Decl., Ex. A-5 at 3. Thousands of those cases were left "in limbo" and complainants left in the dark by the office closures. Doe 5 Decl. ¶ 16; Doe 10 Decl. ¶¶ 17–19. As a result of the unsustainable caseloads in the five remaining offices, it is not possible to triage the incoming complaints, much less conduct essential field visits to interview witnesses, access documents, or investigate school access for disabled students, meaning that cases will languish for years. Lhamon Decl. ¶ 30; Nosanchuk Decl. ¶ 9; Doe 3 Decl. ¶¶ 3–6; Gonzalez Decl. ¶¶ 11–13; Doe 5 Decl. ¶¶ 5, 9, 21; Doe 10 Decl. ¶ 5; Ortiz Decl. ¶ 7; Doe 6 Decl. ¶ 4; Doe 12 Decl. ¶¶ 13, 17. As another court has already concluded, "the RIF leaves OCR with the capacity to address

only a small fraction of the complaints that it receives, making it impossible for OCR to comply with its statutory and regulatory obligations." *Victim Rights L. Ctr.*, 2025 WL 1704311, at *5 (finding plaintiffs likely to succeed on claim that Department's cuts to OCR are ultra vires and violate the APA). In addition, because OCR now lacks capacity to monitor recipients' compliance with voluntary resolution agreements, it cannot ensure that the Department's enforcement actions result in meaningful redress and compliance, resulting in perverse incentives for charged parties. Gonzales Decl. ¶ 35; Doe 6 Decl. ¶ 25; Lipsitt Decl. ¶¶ 24–28; Heiser Decl. ¶¶ 4, 8.

Defendants have no authority to shut down OCR in whole or in part by leaving complainants without access to the remedies Congress intended. This lack of effective enforcement is contrary to the Department's statutory duties. *See New York*, 2025 WL 1463009, at *28.

### d.    Statutory Formula Grant Requirements Cannot Be Met.

Defendants have also prevented the Department from fulfilling its responsibilities to administer formula grant programs. The formulas that determine how these grants are administered require accurate, current data and analysis that the Department is no longer providing.

As set forth above, many of the Department's signature statutorily mandated programs are complex formula grants. *See supra* pp. 15–16. With a skeletal staff of only three employees and only a handful of pertinent contracts remaining in NCES, the Department cannot collect or develop the mandatory formula inputs NCES has historically provided, including the average per-pupil expenditure figures, average daily attendance, and school district poverty estimates that enter into the formulas for Title I grants to school districts serving the economically disadvantaged. Doe 8 Decl. ¶¶ 9–14, 17, 20–24, 34–35; Newman Decl. ¶¶ 31–32; Witt Decl. ¶¶ 13–14. Nor will the Department be able to develop the "locale codes" used to determine districts' eligibility for rural school support through the REAP program. And without statisticians working in NCES or OESE, there is nobody to retrieve and process the EDFacts-reported data needed for the funding formula

for English learners. Newman Decl. ¶¶ 11, 28; Doe 8 Decl. ¶¶ 7–8, 14; Garibay Decl. ¶ 8. The Department's ability to process the necessary data to calculate allocations for career and technical programs and for formula grants that support Predominantly Black Institutions will be similarly affected. Doe 8 Decl. ¶¶ 6, 22, 25–31; Doe 13 Decl. ¶¶ 11–19; Cottrell Decl. ¶¶ 17–18.

The use of up-to-date, accurate data to administer formula grants is not merely desirable; it is in many cases a statutory mandate. *See, e.g.,* 20 U.S.C. § 7345(b)(1)(A)(i)(II)(ii) (requiring use of NCES-developed "locale code" to determine districts' eligibility for rural assistance under the REAP program); *id.* § 7351(b)(1)(A)(ii) (similar); 20 U.S.C. § 6333(c)(1) (requiring the Department, to administer Title I grants, to determine for each school district, and adjust "annually," "the number of children . . . from families below the poverty level"); *see also* Newman Decl. ¶¶ 12, 14; Doe 8 Decl. ¶¶ 20–22.

Defendants' actions not only violate the statutory requirements related to formula grant eligibility and allocation, they also violate statutory requirements that the Department monitor grantees' use of funds and performance. *See, e.g.*, 20 U.S.C. § 2324(a)(3); *id.* § 1015a. Program offices rely on statisticians in NCES and other offices to produce the necessary data for these functions. Doe 11 Decl. ¶ 12 (IDEA); Doe 13 Decl. ¶ 13 (Perkins V); Spitz Decl. ¶ 14 (ESEA). Without these data specialists, the program offices and their partners, like OGC, lack sufficient information and support to complete the mandated reviews and, in some cases, the personnel to create mandatory performance reports. Newman Decl. ¶ 32; Leheny Decl. ¶ 17. In effect, Defendants have functionally repealed the accountability schemes that Congress established.

### e. Defendants Have Cancelled Statutorily Required Competitive Grants.

Defendants have cancelled nearly all awards in the Department's competitive SEED, TQP, TSL, SBMH, and MHSP grant programs for elementary and secondary education. *See supra* pp. 20–21. As explained above, each of those programs is required to be funded in FYs 2024 and 2025

29

by a statute creating the program, an appropriations statute specifically funding the program, or both. *Supra* pp. 19–20. But Defendants' blanket cancellation of virtually every SEED, TQP, and TSL grant award for FY 2025, and sweeping discontinuations of SBMH and MHSP awards, have effectively ended these programs. Wenger Decl. ¶¶ 20–22; Wall Decl. ¶¶ 23–25; Bilal-Threats Decl. ¶¶ 37–42, 46–47; Hermes Decl. ¶¶ 26, 28; Vinson Decl. ¶¶ 34–35. As those programs were all congressionally mandated, the Executive Branch had no authority to eliminate them.

### 3. Defendants Unconstitutionally Refuse to Expend Appropriated Funds.

The Executive Branch further violates separation of powers and the Take Care Clause by refusing to spend appropriated funds in the manner and for the purposes specified by Congress. "The Constitution gives Congress control over the public fisc." *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024); *see* U.S. Const. art. I, § 8, cl. 1; art. I, § 9, cl. 7. Thus, while "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," a "President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.); *accord City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

Congress unambiguously denied the President discretion to decide whether and how to spend certain money appropriated to the Department. Congress requires the distribution of formula grants according to pre-determined formulas that give the Executive Branch no leeway to change the amount of the grants, let alone decide not to award the grants at all. Moreover, because recipients of education funding generally must plan their budgets in advance for the next school year, Congress sought to eliminate uncertainty for funding recipients, by forward-funding certain Department programs and allowing the Department to make funds available on a school-year schedule rather than a fiscal-year schedule. 20 U.S.C. §§ 1223, 1225(a). Any unspent funds "remain available" for obligation and expenditure by grantees, as directed by Congress, during the

next fiscal year. *Id.* § 1225(b)(1). And to prevent an administration from unilaterally overriding Congress's education policy choices, the Secretary cannot "transfer funds from one appropriation to another within the Department" unless an appropriations act grants her authority to do so and the amount transferred is less than 5% of the affected appropriations. *Id.* §§ 1226a(a), 3484.

Defendants have openly flouted Congress's directives. Defendants are purportedly "reviewing the FY 2025 funding" for $6.8 billion in formula grants, but Congress's clear commands in the ESEA and other laws foreclose any such review—Defendants must distribute the funds to eligible recipients according to the statutory formulas. Similarly, by dismantling core IES, FSA, and OCR functions, Defendants are not using the money appropriated to fund those offices in the manner intended by Congress. Likewise, Defendants' cancellation of the SEED, TQP, TSL, SBMH, and MHSP competitive grant programs amounts to an unlawful refusal to spend appropriated funds. Defendants' explanation for ending the programs—their supposed "unlawful DEI" connections—further contravenes Congress's requirement that the Department fund initiatives that promote diversity in the educator workforce, equity among the student population, and supports for students of diverse backgrounds and with diverse educational needs. *Id.* §§ 1022a–b, 1228a(b), 6632, 6672(a). That Defendants disagree with these Congressional policy choices provides no license for disregarding them.

The Constitution denies the President and his subordinates the authority they have asserted to supplant Congress's policy choices with their own: "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235. Instead, the President has a constitutional duty to "Take Care" that the appropriations laws be "faithfully executed." U.S. Const. art. II, § 3; *see Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 612–13 (1838). Defendants have failed to comply with those obligations.

**B.    Defendants' Actions Violate the Administrative Procedure Act.**

The APA empowers courts to set aside final agency action that is "arbitrary [and] capricious," "not in accordance with law," "contrary to constitutional . . . power," or "in excess of statutory authority." 5 U.S.C. §§ 704, 706(2)(A)–(C). Plaintiffs are likely to show that Defendants' actions are unlawful on each of these grounds.

### 1.    The Agency Actions Are Final.

The Secretary's decision to close the Department is a final agency action. So too are at least three constituent acts by Defendants to carry out the decision: the March 11 RIF, the dismantlement of IES, and the blanket cancellation of competitive grant programs.

The Supreme Court has identified two factors to determine whether agency action is final. First, the action must "mark[] the consummation of the agency's decisionmaking process." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted). Second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted). "To meet [the second] requirement, a party must demonstrate that the challenged act had an immediate and practical impact, or alter[ed] the legal regime in which it operates." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation and quotation marks omitted). The actions above meet these requirements.

First, the decision to close the Department is a final agency action. *See New York*, 2025 WL 1463009, at *24 (decision to close the Department is a final agency action). That decision was made at the very outset of this administration and was later memorialized both in Secretary McMahon's "Final Mission" communication to Department employees, *supra* p. 4, and in President Trump's subsequent Executive Order, *supra* p. 5. Secretary McMahon has made clear that she is complying with that directive, stating that the Department is "wind[ing] down its

operations and reduc[ing] its workforce." Carter Decl., Ex. A-23 at 6. *See supra* pp. 4–8. There can be no dispute that "legal consequences will flow" from the closure of the Department. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). Defendants have abolished IES, dismantled critical FSA functions, gutted OCR, and cancelled $1.5 billion in grants and contracts. *See supra* pp. 8–21. When a statute creates a right to agency resources and services, an agency action that deprives people of those resources and services is a final agency action. *Wiley v. Kennedy*, No. 2:25-cv-00227, 2025 WL 1384768, at *9–10 (S.D.W. Va. May 13, 2025).

Second, the largescale March 11 RIF is a final agency action. The mass termination of employees marked the end of the decision-making process and had an immediate impact on both the employees and the public they serve. *See Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1363, 2025 WL 1585051, at *12–15 (D. Md. June 5, 2025) ("removing over 750 [National Civilian Community Corps] members from service . . . constitutes final agency action"); *Maryland v. USDA*, 770 F. Supp. 3d 779, 801 (D. Md. 2025) (a mass layoff is final agency action—it "effects self-evident legal consequences for both parties and plainly marks the end of the agency's decision-making with respect to the employee").

Third, the dismantlement of IES through mass layoffs and terminations of contracts was a final agency action. This marked the end of the Department's decision-making process, and it had immediate consequences for employees and members of the public. *See* Doe 9 Decl. ¶¶ 29–31 (employee describing communication regarding and effects of RIFs); Curley Decl. ¶¶ 17–22 (educator describing effects of cancelled contract) & Ex. I-2 (immediate stop-work order from vendor on terminated contract because of Department's "Termination for Convenience" notice); *see also Rhode Island v. Trump*, 1:25-cv-128, 2025 WL 1303868, at *9 (D.R.I. May 6, 2025) (holding that, through "stripped down" functions, mass layoffs, and grant terminations, agency

took final action by "adopt[ing] a policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum").

Fourth, the blanket competitive-grant cancellations, following on the heels of the February 5 directive to terminate all "DEI"-related programs, are also final agency action. Defendants summarily terminated SEED, TQP, and TSL grants en masse in February 2025 and then summarily discontinued SBMH and MHSP grants en masse in April 2025. *See supra* pp. 20–21. As the cancellation letters to recipients reflect, *see, e.g.*, Vinson Decl., Ex. FFF-1, the Department has "taken a firm position that all grants are terminated," *RFE/RL, Inc. v. Lake*, No. 25-cv-799, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025). The cancellations have legal consequences for the recipients who will no longer receive the funds. *See* Ashton Decl. ¶¶ 8–9 (cuts to mental health services); Vinson Decl. ¶¶ 34–37 (loss of union positions); Hermes Decl. ¶¶ 28–29 (loss of union position); Christy Decl. ¶ 33; Bilal-Threats Decl. ¶¶ 39–44, 48–49 (describing national impacts). Other courts have correctly concluded that similar grant cancellations are final agency action. *See, e.g.*, *RFE/RL, Inc.*, 2025 WL 900481, at *3 ("no trouble concluding" that the cancellations were final agency action); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon* (*AACTE*), 770 F. Supp. 3d. 822, 852 (D. Md. 2025) ("[T]he Department's termination of the subject TQP, SEED, and TSL Grant Awards constituted final agency action."); *see also Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025) (freezing disbursement of financial assistance was final action).

Courts across the country confronted with similar claims of agency closures, largescale RIFs, and grant terminations have concluded that those agency actions are final under the APA. *See, e.g.*, *Widakuswara v. Lake*, No. 25-cv-2350, 2025 WL 945869, at *4 (S.D.N.Y. Mar. 28, 2025), *extended by*, 1:25-cv-1015, 2025 WL 1176991 (D.D.C. Apr. 18, 2025) (terminating contracts, dismantling infrastructure "are final agency actions"); *Maryland v. USDA*, No. 25-cv-

748, 2025 WL 973159, at *14 (D. Md. Apr. 1, 2025) ("past or anticipated mass firings" of agency employees "are final agency actions") (injunction stayed). The same conclusion is warranted here.

### 2.    The Actions Are Contrary to Law and in Excess of Statutory Authority.

**a.**    The final agency actions by Defendants are contrary to law and in excess of statutory authority for the same reasons those actions are ultra vires, violate the separation of powers, and contravene the Take Care Clause. Congress created the Department to carry out an array of statutory responsibilities. Defendants cannot unilaterally close the Department, nor can they cannibalize it from within so that it cannot perform its statutorily mandated responsibilities. They likewise cannot abolish statutorily mandated offices or functions, or eliminate competitive grant programs that Congress directly mandated in statutes and appropriations legislation. *See Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 661 (D. Md. 2018) ("The ultimate touchstone for all agency action is . . . the power delegated to it by Congress.").

**b.**    The blanket terminations and discontinuations of the SEED, TQP, TSL, SBMH, and MHSP competitive grants are also contrary to law because Defendants violated the statutes and regulations that govern termination and discontinuation.

Defendants have invoked a general regulation, 2 C.F.R. § 200.340(a)(4), to justify their summary terminations of the SEED, TQP, and TSL programs. The regulation allows the Department to terminate a previously awarded grant in the middle of a funded budget period if the Department determines that the grant "no longer effectuates the program goals or agency priorities." *Id.*; *see id.* § 3474.1 (extending 2 C.F.R. pt. 200 to the Department). Defendants contend that all of the terminated grants no longer effectuate agency priorities because they support "DEI" programs that are inconsistent with the Administration's anti-DEI agenda. *Supra* pp. 20–21. This rationale for the terminations fails for three independent reasons.

*First.* As *AACTE* correctly held, the term "agency priorities" in the regulation, as applied to Department programs, must be construed in the context of relevant provisions in the General Education Provisions Act ("GEPA"), leading to the conclusion that "agency priorities" refers to the competitive grant priorities the Department sets and may change "only pursuant to APA notice and comment." 770 F. Supp. 3d. at 852–53. Defendants made no effort to follow the APA process—or any process—to reverse or modify the competitive priorities in effect when SEED, TQP, and TSL grants were awarded. They acted summarily and therefore contrary to law.

*Second.* Any effort to follow the APA process to change grant priorities would have been doomed to fail as to the SEED, TQP, and TSL programs, because the statutory provisions underlying those programs specifically require that they be awarded to support traditionally underserved communities, students, and educators. 20 U.S.C. §§ 1022a–b, 1022h, 6632, 6672(a). Adopting competitive grant priorities that forbid consideration of whether applications further this statutory program goal would be contrary to law and invalid. *See* 5 U.S.C. § 706(2)(A), (C).

*Third.* Applying the regulations to allow the Department to terminate SEED and TSL grants in the middle of a funded budget period, based on a blanket pronouncement, would further conflict with the GEPA provisions that require notice and an opportunity for a hearing before the Department may terminate a covered grant award. 20 U.S.C. § 1234d; Hermes Decl. ¶¶ 25–27; Petracca Decl. ¶ 28. Even if the "agency priorities" regulation otherwise applied—and it does not, *see* Petracca Decl. ¶ 30—a statute like GEPA of course overrides a mere regulation.[6]

Defendants' blanket discontinuation of the SBMH and MHSP grants is similarly unlawful. Their boilerplate discontinuance letters cited 34 C.F.R. § 75.253(a), a regulation that allows the

---

[6] Because the TQP grants are not covered by GEPA, this third independent ground for finding the blanket terminations contrary to law does not apply to those grants. *See* Petracca Decl. ¶ 29. Nevertheless, the other two grounds do apply, rendering the blanket termination of the TQP grants contrary to law independent of GEPA.

Department to discontinue a multiyear grant award if it determines that continuation of the project is not "in the best interest of the federal government." Petracca Decl. ¶¶ 25–26; Vinson Decl., Ex. FFF-1. At the outset, neither the Department nor any court has ever construed this phrase to refer to the political interests of the sitting administration. Petracca Decl. ¶ 27. But even if the "best interest of the federal government" did extend to political preferences, under GEPA, 20 U.S.C. § 1232(d), changes in competitive-grant-policy priorities, such as those supporting SBMH and MHSP grants, must be made by notice and comment rulemaking and thus can be changed only through the same process. *AACTE*, 770 F. Supp. 3d at 852-53. It would frustrate GEPA's purpose to construe 34 C.F.R. § 75.253(a) as allowing the Department to evade the notice and comment that otherwise must accompany its adoption or revision of policy priorities. The summary discontinuation of SBMH and MHSP grants is therefore contrary to law.

### 3.  The Actions Are Arbitrary and Capricious.

Defendants' actions are also arbitrary and capricious. The APA requires that an agency "consider[] the relevant factors" and "articulate a satisfactory explanation for its action." *Casa de Maryland v. DHS*, 924 F.3d 684, 703 (4th Cir. 2019) (cleaned up); *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (APA requires "'reasoned decisionmaking.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015))). Agency action fails to clear this threshold if the agency "entirely failed to consider an importance aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)); *see Mayor of Baltimore v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020).

Defendants have provided no reasoned explanation for their decision to close the Department or gut its ability to carry out statutory functions. Secretary McMahon has stated

publicly that she wishes to implement the President's vision of abolishing the Department, *see supra* pp. 4–8, but that provides no adequate justification for shuttering a Cabinet agency that Congress has created, has vested with mandatory statutory responsibilities, and has regularly funded. A federal agency must provide "genuine justifications for important decisions," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), and it is difficult to imagine a more important decision than closing down the agency. Defendants have provided nothing that approaches a reasoned decision that could survive arbitrary-and-capricious review.

Defendants have likewise failed to articulate a reasoned explanation for the March 11 RIF. To the contrary, Defendants' explanations contradict themselves. Secretary McMahon told the media that the RIF was designed to keep "the right people," but she has since admitted to Congress that neither she nor the Department did any analysis to determine who the right people were. Moreover, any efficiency justification is inconsistent with the statements in the Executive Order indicating that the Department needs far more staff, not far fewer. *See* Carter Decl., Ex. A-1 (stating that the Department has "fewer than 1,500 [employees] in its Office of Federal Student Aid" even though it "manages a student loan debt portfolio of more than $1.6 trillion," an amount "roughly the size of" Wells Fargo's holdings, which has "more than 200,000 employees"). These inconsistent and illogical explanations for the RIF establish that it was arbitrary and capricious.

Nor have Defendants adequately explained the decision to incapacitate IES via mass contract cancellations and a mass RIF that have prevented the Department from collecting, processing, and updating the data needed for timely, accurate allocation of formula grants to the statutorily entitled recipients. Defendants provided no explanations to employees, and to the public, Defendants have simply made conclusory statements to the effect that the contracts were "wasteful." Young Decl. ¶¶ 14–18, 27–28; Doe 9 Decl. ¶¶ 21–25; Carter Decl., Ex. A-24.

Defendants' explanations for their mass competitive-grant cancellations fare no better. Defendants have relied on generalized assertions that the grants involved "woke spending" but have provided no indication that they evaluated each grant on an individual basis. To the contrary, it appears that they lumped masses of grants together for bulk cancellation—an action that was unprecedented, *see* Petracca Decl. ¶ 27, on top of being arbitrary. *See NTEU*, 2025 WL 942772, at *40 (action likely arbitrary and capricious where "there was little or no analysis undertaken before the employees were ordered to put their pencils down, before all of the agency's contracts were cancelled"). The reasons proffered to terminate the SEED, TQP, and TSL grants are particularly inadequate given that they reverse the Department's prior priorities, developed through notice and comment, without explaining the reversal or undertaking required rulemaking. *See supra* pp. 36–37 (discussing notice and comment requirement); *AACTE*, 770 F. Supp. 3d at 850–51 (action is "arbitrary and capricious if the agency has acted 'without observance of procedure required by law'" (quoting *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017))).

\*       \*       \*

Defendants' failures to explain their final agency actions are troubling enough on their own. But those failures are particularly pronounced given the reliance interests at stake. A dramatic "change [in] course" in delivering statutorily mandated programs and activities must account for the fact that the agency's "longstanding" practices "'may have engendered serious reliance interests.'" *Regents*, 591 U.S. at 30 (citation omitted). It is "arbitrary and capricious to ignore such matters." *Id*. (citation omitted); *accord FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025) (agencies must "provide a reasoned explanation for the change [in policy], display awareness that they are changing position, and consider serious reliance interests" (cleaned up)). The reliance here is substantial. States and school districts' budgets—and in turn, educators' jobs—depend on the timely, accurate, and certain receipt of federal funding. *See* Vinson Decl.

¶¶ 18–21; Hermes Decl. ¶¶ 14–17; Johnson Decl. ¶ 10; Bilal-Threats Decl. ¶¶ 15–25; Moran Decl. ¶ 17. Student loan borrowers rely on the Department's eligibility certifications and vendor oversight to protect them from deception, fraud, overpayment and to access loan forgiveness provided by Congress. King Decl. ¶ 16; Gittleman Decl. ¶¶ 7–8; Picard Decl. ¶ 5; Pringle Decl. ¶¶ 24, 26, 40; Mills Decl. ¶ 26; Williams Decl. ¶ 24. And states, colleges and universities, school districts, and members of the public rely on the Department to provide information about their legal obligations and meaningful recourse for violations. Cardona Decl. ¶¶ 10, 12, 15; King Decl. ¶¶ 23–28; Ashton Decl. ¶¶ 11–12; Cole Decl. ¶¶ 10–15. Defendants gave these decades-old reliance interests no consideration before deciding to act. *Widakuswara*, 2025 WL 945869, at *5 (violation of APA when "[d]efendants failed to provide adequate reasoning behind the sweeping changes to [an agency] and seemingly failed to consider any reliance issues in effectively closing the agency"). The actions are arbitrary and capricious under the APA and must be reversed.

## II.     Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction.

To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is neither remote nor speculative, but actual and imminent," and "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sanra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (cleaned up). In carrying out their decision to close the Department, Defendants have shut down offices created by Congress and have terminated congressionally mandated functions. Plaintiffs and their members rely on and benefit from those office and functions and will be irreparably harmed absent an injunction.

First, Plaintiffs are and will be irreparably harmed by the dismantlement of IES and the termination of its mandatory functions, including research, data collection, and information-reporting. NEA members across the country rely on valuable professional development, training,

and educator support programs offered by the statutorily mandated Regional Educational Laboratories, support that ended when Defendants shuttered all ten of those Laboratories. Bilal-Threats Decl. ¶¶ 31–32. NEA and PGCEA members also use the resources provided by IES while they pursue advanced degrees and training or seek to implement evidence-based practices in their classrooms. Bilal-Threats Decl. ¶¶ 26–32; Christy Decl. ¶¶ 22–23. In addition, NEA and NAACP staff depend on IES data and resources to engage in their research and advocacy work. Bilal-Threats Decl. ¶¶ 33–34; Cole Decl. ¶¶ 6–7, 10, 12.

Second, Plaintiffs are and will be irreparably harmed by the closure of FSA offices responsible for (1) ensuring that institutions of higher education are eligible to participate in FSA programs (School Eligibility & Oversight Service Branch); (2) holding student loan servicers accountable for fulfilling contractual and statutory obligations (Vendor Oversight and Performance Divisions); and (3) assisting borrowers (Ombudsman's Office). Thousands of Plaintiffs' members receive some type of federal student financial aid each year pursuant to financial aid programs administered by FSA. Pringle Decl. ¶¶ 25–26; Moran Decl. ¶ 22; Christy Decl. ¶ 24; Cole Decl. ¶ 3; Murphy Decl. ¶ 13; Scott Decl. ¶ 8; Yancy Decl. ¶ 14. Without oversight by the SEOS, members will not know if they are taking loans to attend institutions that meet minimum statutory requirements, leaving them at risk of incurring debt to attend institutions that are unable to provide minimally adequate educational services or that may even close. Pringle Decl. ¶¶ 25–26; *see also* Cole Decl. ¶¶ 12–13. Closing the Vendor Performance and Oversight Divisions and significantly reducing the Ombudsman's Office leaves members without recourse when loan servicers miscalculate payments, do not correctly determine eligibility for Public Service Loan Forgiveness, or fail to process an application for forgiveness or income-driven repayment. *Supra* pp. 10–13; *see also* Mills Decl. ¶¶ 32–34; Williams Decl. ¶ 24. Among other

things, the absence of these functions at the Department will necessitate the reallocation of resources for Plaintiffs, who will have to seek meaningful student debt relief for its members. Williams Decl. ¶ 24; Mills Decl. ¶ 26; Pringle Decl. ¶¶ 28–40.

Third, Plaintiffs are and will be irreparably harmed by the RIFs that have left OCR unable to carry out its obligations to enforce the civil rights laws. The Department's inability to enforce the civil rights laws will permit discrimination at schools, colleges, and universities to persist, as Plaintiff Lubbock NAACP has already experienced with respect to its pending OCR complaints. Ashton Decl. ¶¶ 11–12; *see also* Secka Decl. ¶¶ 15–19 (no substantive updates on pending OCR complaints). The failure of enforcement undermines the ability of Plaintiffs' members and their children to fully participate in educational opportunities and fails to ensure safe workplaces for educators, all of which are harms to civil rights and learning experiences that cannot be remedied after judgment. *Cf. EEOC v. Astra U.S.A., Inc.*, 94 F.3d 738, 745 (1st Cir. 1996); *New York*, 2025 WL 1463009, at *37.

Fourth, Plaintiffs and their members are or will be irreparably harmed by Defendants' dismantling of the Departments' infrastructure for administering formula grants, including its termination of essential functions within IES. Hundreds of thousands of NEA members' positions are funded by formula grants, and NEA members have already received layoff notices because of school district concerns about the uncertainty of formula grant funding. Pringle Decl. ¶¶ 14–16; Bilal-Threats Decl. ¶¶ 9–15. Members of PGCEA and AFSCME Council 3 similarly rely on formula grant funding for their positions, exposing those members to potential layoffs. Christy Decl. ¶¶ 16–19, 25–28; Moran Decl. ¶¶ 16–17. The harms to members from their lost wages and loss of professional opportunities cannot be remedied by relief at the end of this lawsuit. Uncertainty in federal funding will also threaten school district programs, which in turn diminishes

the quality and quantity of the educational services available to Plaintiffs' members and their children enrolled in federally funded institutions. Hermes Decl. ¶¶ 14–16; Pringle Decl. ¶ 14; Murphy Decl. ¶¶ 8–11; Yancy Decl. ¶¶ 9–12; Greengrass Decl. ¶¶ 5–8. An NAACP member-parent has attested, for example, that her minor son—who has been diagnosed with high-needs autism and is non-verbal—will risk physical harm when his IDEA services (which are reliant on federal funding) are even marginally interrupted. Gordon Decl. ¶¶ 5–17. NAACP members also rely on formula grants for HBCUs and MSIs. Mimms Decl. ¶ 10; Rosier Decl. ¶¶ 9–11; Doe 8 Decl. ¶¶ 27–30. Shortfalls in formula grant funding will be especially devastating for rural and high-need school districts that rely on federal formula grants to provide basic education services and programming. Johnson Decl. ¶ 10; Cardona Decl. ¶¶ 11–15; Vinson Decl. ¶¶ 18–20; Hermes Decl. ¶¶ 9–16; Shaner Decl. ¶ 14. These learning and resource losses are irreparable, as "[c]ompensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time." *John T. ex rel. Paul T. v. Del. Cnty. Interm. Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000). This is because "as students fall behind, it becomes harder to bring them back up." *New York*, 2025 WL 1463009, at *30–31.

Fifth, Plaintiffs are and will be irreparably harmed by Defendants' termination of competitive grant programs that support, among other things, educator recruitment, training, and retention. *See supra* pp. 19–21. Many NEA, PGCEA, and AFSCME Council 3 members are employed in school districts that received funding through a now-defunct SEED, TQP, TSL, SBMH, or MHSP grant project. Moran Decl. ¶ 21; Bilal-Threats Decl. ¶¶ 37–42, 46–47; Christy Decl. ¶ 21; Hermes Decl. ¶¶ 21, 25; Vinson Decl. ¶¶ 28, 33. The unexpected loss of this funding has forced school districts to eliminate members' positions and will continue to do so for the next school year. Vinson Decl. ¶ 35; Hermes Decl. ¶¶ 28–29. Even members who have not lost their

positions have been and will continue to be harmed by the loss of tuition assistance and living stipends; additional compensation; and access to professional development and training opportunities. Bilal-Threats Decl. ¶¶ 37–42, 46–47; Christy Decl. ¶ 21; Hermes Decl. ¶¶ 21–23. These harms are irreparable because financial damages are not available as relief at the conclusion of this litigation. *See, e.g.*, *City of New York*, 913 F.3d at 430 (money damages not available under APA); *Maryland*, 770 F. Supp. 3d at 813 (finding harm irreparable because money damages not available under APA). And in any event, the financial losses suffered by members entail additional harm, such as lost professional opportunities, that will lack a remedy. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (economic damages may constitute irreparable harm where no remedy available).[7]

## III.    The Balance of Interests Favors Preliminary Relief.

The last two factors merge when the federal government is a party. *See Miranda*, 34 F.4th at 365. The Court's inquiry thus focuses on whether the harm to Plaintiffs if the Court denies relief outweighs the harm to the government if it does not. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The balance decidedly favors Plaintiffs.

Absent emergency relief, millions of students, educators, families, and schools—including NAACP members, the parent plaintiffs, and NEA, PGCEA, and AFSCME Council 3 members— nationwide will lose access to Department services, resources, and functions. As Plaintiffs' experiences demonstrate, students, educators, families, and other stakeholders rely on the OCR process to seek recourse for civil rights violations. Because OCR investigations take place at no charge, the Office's advocacy services are a crucial resource for students and families who cannot afford legal representation. Gonzales Decl. ¶ 36; Ortiz Decl. ¶ 12; Doe 5 Decl. ¶ 7; Vinson Decl.

---

[7] Many NAACP members reside in or attend schools in districts that implemented programs that relied on cancelled SBMH grants and thus are harmed by the loss of educator positions. Ashton Decl. ¶ 9.

¶ 17. Defendants have already dismantled the regional offices on which these families relied, preventing them from getting meaningful redress. Lipsitt Decl. ¶¶ 5–8, 17–23; Heiser Decl. ¶¶ 5, 10; Keranen Decl. ¶¶ 10–13. Likewise, Title I-A and IDEA Parts B and C formula grant funds support critical education services for an estimated 26 million children attending eligible schools and an estimated 7.5 million children with disabilities, respectively. Carter Decl., Ex. A-28 (26 million children); Carter Decl., Ex. A-25 (7.5 million children with disabilities). These programs also allow school districts to hire and pay hundreds of thousands of educators. Pringle Decl. ¶ 12; Bilal-Threats Decl. ¶¶ 9, 12. And the 9.9 million students who receive federal student financial aid each year rely on Department certification and oversight to ensure that the institutions they attend are financially and academically sound and to help them access income-driven repayment, loan forgiveness, and assistance resolving servicer issues after they graduate. The results of the Defendants' dismantling the Department, and of these key functions, will be devastating.

On the other side of the ledger, the harms to the government from granting a preliminary injunction are minimal at best. The balance of the equities tilts against the government when it seeks "to flout statutes enacted by Congress and regulations duly promulgated pursuant to statutory authority." *Maryland v. USDA*, 2025 WL 973159, at *31. And "the public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (citation omitted); *see also HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) (finding a "substantial public interest in having governmental agencies abide by federal laws that govern their existence and operations"), *aff'd*, 985 F.3d 309 (4th Cir. 2021).

## <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction and enjoin Defendants' actions dismantling the Department.

45

Dated: July 1, 2025

Joseph M. Sellers (D. Md. Bar No. 06284)
Ethan Judd*
Ryan Wheeler*
Jenna Waldman*
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue, NW, Suite 800
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699
jsellers@cohenmilstein.com
ejudd@cohenmilstein.com
rwheeler@cohenmilstein.com
jwaldman@cohenmilstein.com

Robert Kim*
Jessica Levin*
Wendy Lecker*
Theresa Luhm*
**Education Law Center**
60 Park Place, Suite 300
Newark, NJ 07102
Tel. (973) 624-1815
Fax (973) 624-7339
rkim@edlawcenter.org
jlevin@edlawcenter.org
wlecker@edlawcenter.org
tluhm@edlawcenter.org

*Attorneys for NAACP, NAACP South Carolina
State Conference, NAACP Florence Branch,
NAACP Texas State Conference, NAACP
Lubbock Branch, Mara Greengrass, and Jane
Does 1 & 2*

Aaron S. Ament*
Daniel A. Zibel (D. Md. Bar No. 31554)
Eric Rothschild*
**National Student Legal Defense Network**
1701 Rhode Island Avenue N.W.
Washington, D.C. 20036
Tel. (202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org

Respectfully submitted,

*/s/ Abigail V. Carter*
Leon Dayan**
Abigail V. Carter (D. Md. Bar No. 20952)
John Pellettieri*
Kara A. Naseef**
Grace Rybak**
Lane Shadgett (D. Md. Bar No. 31686)
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
jpellettieri@bredhoff.com
knaseef@bredhoff.com
grybak@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for National Education Association,
Prince George's County Educators
Association, AFSCME Council 3*

Alice O'Brien*
Marissa Marandola*
Kristin Garcia*
**National Education Association**
1201 16th Street NW
Washington, D.C. 20036
Tel. (202) 822-7035
aobrien@nea.org
mmarandola@nea.org
krgarcia@nea.org

*Attorneys for National Education Association
and Prince George's County Educators
Association*

46

eric@defendstudents.org

*Attorneys for National Education Association*

*\*Admitted Pro Hac Vice*
*\*\*Admission Pro Hac Vice pending*