# Exhibit A-21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; AND STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, IN HER OFFICIAL CAPACITY AS FORMER ACTING SECRETARY OF EDUCATION AND CURRENT ACTING CHIEF OPERATING OFFICER, FEDERAL STUDENT AID; LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS SECRETARY OF EDUCATION,<br><br>Defendants. | No. 1:25-cv-10548-MJJ |

**DECLARATION OF RACHEL OGLESBY**

1. My name is Rachel Oglesby. The following is based on my personal knowledge or information provided to me in the course of performing my duties at the United States Department of Education ("Department").

2. I am currently employed at the Department as Chief of Staff. I began my service at the Department on January 20, 2025.

3. Before joining the Department, I worked at America First Policy Institute as the Chief State Action Officer and Director of the Center for the American Worker.

4. In my role at the Department, I have the following responsibilities:

1

    a. I assist the Secretary of Education with all of her responsibilities running the Department.

    b. I advise the Secretary on significant matters within and affecting the Department.

    c. I performed the same functions for the Acting Secretary of Education.

5. On February 5, 2025, Denise Carter, Acting Secretary of Education, issued a Directive on Department Grant Priorities. According to that Directive, "Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of [diversity, equity, and inclusion ("DEI")]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication."

6. The Department implemented that Directive by individually reviewing every grant issued under the Teacher Quality Partnership ("TQP") Program and the Supporting Effective Educator Development ("SEED") Program. The review process involved seven personnel over one week.

7. As part of this individualized review process, the Department reviewed the language of each grant application, including the grant applications at issue here. The Department also reviewed publicly available information about what the grantees used federal funds to teach. Finally, the Department reviewed the terms and conditions of each grant agreement.

8. All of the grants at issue were awarded before October 1, 2024. The invitations for all of these grants, which were published in the Federal Register, are considered part of the "terms and conditions" of the Department's grant awards. Those invitations permitted the Department to "[t]erminat[e] agreements in whole or in part to the greatest extent authorized by law if an award no longer effectuates the program goals or agency priorities (2 CFR 200.340)."

9. The Department did not merely terminate any program that mentioned "diversity." Rather, the Department reviewed applications to determine whether they included objectionable material associated with DEI, such as cultural responsiveness, systemic privilege, racial justice, social justice, and anti-racism.

10. Based on that initial review, the Department compiled a database of all projects in TQP and SEED flagged as incorporating DEI. The database connected specific grant applications to DEI language in the grant applications and to publicly available material that indicated the projects taught DEI.

11. For example, one grant funded a project that involved a "racial and ethnic autobiography" that asked whether individuals ever "felt threatened? marginalized? privileged?" and how they would "seek to challenge power imbalances and ensure all individuals and communities, particularly those that experienced marginalization are included." That grant was flagged as funding DEI contrary to the Secretary's directive.

12. Another grant funded a project that proposed to address "equity and culturally responsive practices and [would] cover the following possible topics: Building Cultural Competence, Dismantling Racial Bias, Centering Equity in the Classroom, Family and Community in the Classroom, and Culturally Inclusive Teaching." That grant was likewise flagged.

13. Another project promised to prepare "JEDI teachers focused on justice, equity, diversity, and inclusion." That grant was likewise flagged.

14. Another grant funded a project "centered around social-emotional learning (SEL) and diversity, equity, and inclusion (DEI) practices, embedded throughout the teacher preparation curricula and foundational courses. The result will be educators who are purposeful in implementing cultural and SEL/DEI practices with fidelity." That grant was likewise flagged.

15. Another grant funded a project to "develop informational sessions for entering prospective residents[,] teachers[,] and university supervisors to include bias training and social emotional learning and social justice curriculum." That grant was also flagged.

16. Still another grant was flagged that funded a project about "anchoring programs and practices in culturally responsive-sustaining pedagogies, enacting anti-racist pedagogies, and modeling inclusive practices."

17. Using the database, the Department confirmed on a grant-by-grant basis that termination was permitted under the terms and conditions of the grant agreement.

18. The Department's senior leadership, including those appointed by the President and Secretary, reviewed every entry in the database and, pursuant to the Acting Secretary's Directive, confirmed each Department grant "fund[ed] discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives."

19. The Department determined that the programs at issue here incorporated DEI, reviewed the terms and conditions of the grants at issue to ensure they permitted termination, and concluded that funding for these grants must cease based on the Acting Secretary's Directive.

20. Department leadership then ordered responsible officials to terminate grants—including the grants at issue here—that incorporated DEI in violation of the Acting Secretary's Directive.

21. Accordingly, the Department's Deputy Assistant Secretary for the Office of Management and Planning signed termination letters notifying grantees that their awards had been terminated, effective between February 7 and February 12, 2025.

22. The letters were individually addressed to each recipient and identified the individual federal award number.

23. The letters explained that "[i]llegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." In addition, the letters stated "it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States."

24. The letters reasoned that the funded programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; … violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; … are not free from fraud, abuse, or duplication; or … otherwise fail to serve the best interests of the United States."

25. Because the grants were "inconsistent with, and no longer effectuate[], Department priorities," they were canceled "pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in" the awards.

26. The termination letters informed grantees of their ability to take an administrative appeal to the Acting Assistant Secretary for the Office of Elementary and Secondary Education.

27. The Department terminated 104 grants awarded under the TQP and SEED programs. Five grants remain in place.

28. To comply with the district court's Order issued in the above-captioned action on March 10, 2025, the Department has restored access to funds and lifted payment restrictions for grantees who received a grant termination letter.

29. While the Order is in effect, grantees could, and will be strongly incentivized to, quickly draw down the $65 million still outstanding under their awards.

30. Payments go out from the Department to grantees within one to three days.

31. In general, grantees can draw money from their accounts with no internal checks or corroboration. Grantees typically draw funds on a regular schedule that matches the lifecycle of the grant, but that schedule is customary rather than mandatory. Indeed, the Department must permit grantees to submit payment requests as often as they like. And there are only limited safeguards against early withdrawals.

32. Grantees have every incentive to quickly draw down the remaining funds here. Under the Order, grantees have a minimum of 14 days—and potentially much longer under any preliminary injunction—to pull down every dollar they can get.

33. Absent emergency relief, there is a significant risk of grantees attempting to withdraw tens of millions of dollars on canceled grants.

34. No grantees have provided assurances to the Department that they will refrain from attempting large withdrawals that deplete most or all of the remaining grant funds.

35. On the contrary, since the district court entered the Order, multiple grantees have initiated payment requests on their canceled grants.

36. Grantees have little to lose by rapidly drawing down funds. Once funds leave the Department and go to grantees, the Department has limited ability to recover those disbursed funds. Nor has any grantee promised to return withdrawn funds should its grant termination be reinstated—exacerbating the significant risk that substantial taxpayer dollars will be lost forever due to the Court's order absent emergency relief.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 12th day of March.

*Rachel Oglesby*
Rachel Oglesby

5