# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF COLLEEN CAMPBELL

I, Colleen Campbell, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I began working at the Department of Education's office of Federal Student Aid ("FSA") in November 2019. From December 2021 until February 2025, I served as a Program Manager responsible for drafting, procuring, and implementing new loan servicing contracts, ultimately called the Unified Servicing and Data Solution ("USDS").[1] From February 2025 through my resignation in March 2025, I served as the Executive Director of FSA's Office of Loan Portfolio Management.

---

[1] Prior to a large-scale reorganization that was completed in February 2025, the office I was assigned to was known as the "NextGen FSA Program Office."

3. The four divisions I oversaw as Executive Director of FSA's Office of Loan Portfolio Management were the following:

a. The Loan Operations Division provides day-to-day operations support, contract management, and oversight of current Direct and Perkins loan servicers, the debt collection system, and the guaranty agencies that are part of the Federal Family Education Loan Program ("FFELP"). Groups within this division manage data and reporting for servicing operations, support changes to servicer and debt collector IT systems, and manage some of the service-level agreements and day-to-day performance of servicers and other student loan program vendors.

b. The Program Management Division facilitates the implementation and operations associated with program benefits available to student loan borrowers, oversees audits and implementation of audit findings associated with servicing and collections, and is home to a group of Contracting Officer Representatives ("CORs") who manage the administrative and financial aspects of servicing and collections contracts;

c. The Borrower Processing Division performs hands-on management work related to student loan accounts, including inherently governmental functions like validating eligibility for forgiveness and discharge, determining employer eligibility for Public Service Loan Forgiveness (PSLF), and responding to escalated cases; and

d. The Vendor Performance Division provided oversight over all student loan servicing and collections, including validating servicer data reporting to ensure accuracy of borrower account and student loan portfolio data, measuring some of the service-level agreements to incentivize servicer timeliness and accuracy, and

2

ensuring compliance with federal and state law and federal contract requirements. A majority of the 60 employees who formerly worked in the Vendor Oversight Group (hereinafter referred to collectively as "vendor oversight employees"), were assigned to this Division as of February 2025. The USDS contracts were solicited in April 2022, awarded in April 2023, and implemented throughout 2024. While the procurement was in progress, a small team made up from staff in the Technology Directorate and Next Gen Program Office implemented technology that that was not part of the USDS contract implementation but was related to how loan servicing was previously performed. One of these teams reengineered the process for administering Public Service Loan Forgiveness ("PSLF"), Total and Permanent Disability (TPD) discharges, and Teacher Education Assistance for College and Higher Education ("TEACH") Grants.

4. The goals of the USDS contracts include increasing consistency across servicers, bolstering oversight and operations, and providing better support and outcomes for student loan borrowers. We sought to do this by consolidating management of PSLF, TPD, and TEACH Grants on StudentAid.gov (as opposed to requiring borrowers to be managed by a specialty servicer); incentivizing more servicer support for borrowers at risk of delinquency and default via account allocations and quarterly performance bonuses; and increasing accountability for servicers via clear, measurable service-level agreements ("SLAs").[2]

5. SLAs are a way of holding federal contractors accountable for meeting the terms of their contract. Under USDS, the SLAs focused on six key areas aligned to the goals of USDS:

---

[2] *See* Federal Student Aid, *The Next Generation of Loan Servicing*, https://studentaid.gov/sites/default/files/usds-fact-sheet.pdf.

3

"Customer Satisfaction," "Interaction Quality," "Processing Accuracy," "Timeliness," "Call Center Abandon Rates," and "Financial Reporting."

6. As an example, the Timeliness metric is how long a servicer takes to process various forms and applications, each of which has a different SLA requirement. For PSLF forgiveness, for instance, the SLA requires servicers to discharge loans within 15 days of being directed to do so by FSA.

7. A servicer's failure to meet an SLA metric results in a negative performance incentive ("NPI"), which is a five percent decrease in payment to the servicer for a given quarter. A servicer's repeated failure to meet the same SLA metric increases the NPI by 50% for each additional failure. SLAs are measured and NPIs are calculated quarterly.

8. One reason SLAs and NPIs are necessary is because the legacy loan servicing contracts did not have any SLAs associated with servicer performance; instead, the government had to prove a servicer substantially mismanaged loan servicing requirements in order to hold the vendor in any way accountable. This was a difficult bar for the government to clear and resulted in servicers rarely being held accountable from the time the legacy contracts were made in 2009 through the transition to USDS in April 2024.

9. The SLAs were almost immediately responsible for taking action against servicers who were not performing in alignment with contract requirements. For instance, in October 2024, the Department "temporarily halted assigning new borrower accounts to MOHELA, citing significant mismanagement, including failing to process over 460,000 applications for income-driven repayment plans," within their Timeliness SLA, failing to process forgiveness for PSLF

borrowers within the timeliness SLA, and requiring MOHELA to comply with a corrective action plan or experience further consequences, including an increasing negative NPI.[3]

## Dismantling of the Office of Federal Student Aid

10. Since the beginning of the current Administration, leadership in the Department repeatedly stated that FSA needed to "do less with less." They have also said we need to lower the quality of the work that we are offering the public, with the head of contracts stating that, in regards to service offered to students, parents, and borrowers, FSA needed to "stop offering the Cadillac and start offering the Toyota instead." This was stated in an email to staff who were being asked to develop significant cuts to contracts across all major FSA operations and was repeated in a meeting the following day. These directives reflect a fundamental misunderstanding and lack of respect for the complexity of the work that FSA needs to perform to administer and oversee aid to students and schools.

11. During the first two months of the Administration, I was involved in several exercises in which the Department discussed, and in some instances made, cuts to major contracts at the direction of the Department of Governmental Efficiency ("DOGE"). We were asked to make substantial cuts to specific vendors that it seemed DOGE had specifically targeted, without legitimate justification of which I was aware. Notably, we cut aspects of FSA's Digital and Customer Care contract, which is held by Accenture Federal Services. This contract is responsible for all content and functionality on StudentAid.gov; the system operations that support StudentAid.gov processes (such as the Income Driven Repayment Form online application

---

[3] Student Loan Professor, *Student Loan Servicer MOHELA Is in Trouble Again* (Oct. 21, 2024), https://www.studentloanprofessor.com/mohela-is-in-trouble-again/#:~:text=The%20Biden%20Administration%20placed%20new,have%20stretched%20its%20resources%20thin.

5

and Free Application for Federal Student Aid (FAFSA)); the customer relationship management tool used by the Business Process Operations (BPO) vendors, who provide phone and back-office support to students, parents, and borrowers who call 800-4-FEDAID; and oversight of the BPO vendors. We were also told to provide options for cutting FSA and servicer call centers. The cuts that were considered, some of which were ultimately made, undermine the functionality of FSA's complicated student aid application and disbursement systems, which harms borrowers by making it more difficult to apply for aid and access income-driven repayment, PSLF, and other statutorily created and mandated Title IV programs. On February 28, 2025, I received an email from the Department offering a separation incentive or a payment to leave the Department. I decided to take the offer on March 3, 2025. However, on March 4, 2025, members of the leadership team at FSA and the Department approached me and convinced me to rescind my acceptance.

12. One week later, on March 11, 2025, the Department announced large-scale reductions-in-force ("RIFs") of the Department, including the entire Vendor Performance Division of approximately fifty employees. As described above, the Vendor Performance Division performed critical oversight functions including oversight over student loan servicers and collections, validation of servicer data, measurement of certain service-level agreements, and support for compliance with federal and state law and USDS contract requirements.

13. The loss of these 50 staff was in addition to losing approximately 50 other staff to the Deferred Resignation Program, the Voluntary Early Retirement Annuity ("VERA"), the Voluntary Separation Incentive Program ("VSIP"), and other attrition. The staff who voluntarily chose to leave were largely in the Loan Operations division, which hampered FSA's ability to perform day-to-day management and oversight of loan servicers and the debt collection system.

6

14. Despite my senior leadership role in FSA, I only received notice of the RIF announcement in a meeting that started at 5:50pm on March 11, 10 minutes before announcements were sent out to staff. I only learned which of my staff were cut through word of mouth later that night.

15. As RIF notices were going out in the evening of March 11, I received a call from then-acting Chief Operating Officer of FSA and Acting Secretary of Education, Denise Carter, informing me of the scope of the mass RIF, particularly the Office of Loan Portfolio Management, which I oversaw. She stated that more cuts were coming, and asked if I could stick it out or if I wanted to get back on the list to accept the separation incentive. Given that my office would be cut in half between voluntary separations and the RIF, I felt like my office could no longer satisfy its statutorily mandated functions or provide statutorily mandated services to student loan borrowers, and I accepted her offer to take the separation incentive.

16. I did not learn exactly which divisions across FSA were subject to the mass RIF until the next day, March 12, when the list of divisions that were cut were discussed by Denise Carter and Phillip Juengst, the deputy chief operating officer, during a senior leadership team meeting.

17. At that March 12 post-RIF meeting of senior FSA leadership, the Chief Operating Officer asked senior leadership to flag if any divisions were RIFed that were mission critical, in particular in relation to the FAFSA.. Prior to March 12, I was not consulted on which divisions or branches could be eliminated, nor was I able to provide input on how eliminating each individual, position, and division would affect FSA's ability to fulfill its statutorily-mandated functions. To my knowledge, my peers on the senior leadership team were also not asked for this information before the RIF occurred.

18. Also at that March 12 post-RIF meeting, the senior leadership team, including Denise Carter, was made aware for the first time that the VSIP, VERA, and RIF'ed FSA employees had lost access to Microsoft Teams, Sharepoint and other shared drives, and the ability to email anyone outside of the Department from their work email. Those limitations precluded employees from being able to effectively transition their critical work to other staff, including work impacting contracts, court orders, and other mandated activities.

19. During the March 12 meeting, Denise Carter would also verbally "switch hats" stating that she would put her "acting COO hat" on for some statements and her "acting Secretary hat" on for others. Other senior leaders, such as the Head of Acquisitions, Calvin Mitchell, were also "dual hatted" in roles at ED and FSA.

20. The performance-based organization (PBO) statute that governs FSA's mission states that FSA "shall exercise independent control of its budget allocations and expenditures, personnel decisions and processes, procurements, and other administrative and management functions. Given the fact that there were multiple senior individuals serving roles in both ED and FSA, and that FSA leadership were taking direction from DOGE on budget expenditures and staffing reductions, I believe the PBO statute was violated.

21. Aside from the Vendor Performance Division, the three other divisions that report to me did not face RIFs. However, we lost substantial numbers of employes due to the pressure to separate based on the possibility of future RIFs, the promise to shut down the Department, and the various incentives that the Department offered to encourage employees to leave federal service (known as "VSIP" and "VERA"). I had about 200 employees who reported to me when I officially started my role in early February 2025. As of March 19, 2025, that number was reduced by half, down to about 110 employees. Fifty out of ninety former employees were cut by the mass RIF,

8

while others left through the separation incentive offers, including a significant number from the Loan Operations Division.

22. Since we had just reorganized as of February 2025, it had already been challenging to ensure adequate transfer of institutional knowledge to the newly formed Office of Loan Portfolio Management. This was exacerbated when the Department immediately disabled RIF'ed staff's access to shared documents, to the Microsoft Teams application used to conduct meetings and communicate with one another, and to send emails outside of the Department. Some staff who were RIFed were on leave when the notice was sent and, thus, never got the notice because they had left their government-issued devices in the office. RIFed employees in the Denver regional office were not allowed into the building to collect their items. These restrictions meant that FSA staff could not meaningfully participate in their work or transfer their knowledge to other staff before being placed on administrative leave.

23. Based on my knowledge and experience, it is not feasible for other units in the Department to take over the work of the Vendor Performance Division, which was entirely eliminated in the March 11 RIF.

24. Based on my knowledge and experience, FSA will not be able to comply with its statutory obligations after the RIF Announcement. It had already been difficult for us to fulfill our obligations before the RIF because FSA has been nearly flat funded since fiscal year 2022.

25. As an example of the complexity of FSA's work, last year, the Department needed to pause PSLF processing because we were transitioning the administration of PSLF from an external process run by MOHELA to an internal process run by FSA. We were delayed in this transfer because our servicers were late in implementing the income-driven repayment Account Adjustment, which required servicers to confirm or provide information about whether each month

9

of a borrower's repayment history was eligible or ineligible for income-driven repayment forgiveness, PSLF, and Temporary Expanded PSLF. It took FSA several months of validating and requiring servicers to re-report data before we felt confident that borrowers' payment counts were accurate and consistent. Going forward, servicers are responsible for reporting borrowers' monthly payment data correctly, but the vast majority of people who implemented this policy and performed verification of servicer data have left the department through either the Separation Incentive Offers or through the RIF. Without those RIF'ed employees, servicers' inaccuracies will go uncorrected and leave borrowers on the hook for escalating cases in which they have inaccurately calculated payment counts .

26. Additionally, the team that performed oversight of borrower account transfers between servicers was subject to the RIF. Going forward, the onus will largely be on students, parents, borrowers, and schools to identify and advocate for resolution of their issues, rather than FSA finding and fixing them proactively. It was stated in the March 12 senior leadership meeting, that the mass RIF eliminated the "oversight and audit" areas of FSA. That wide-scale elimination introduced risk not only for the 43 million student loan borrowers whose loans are managed by FSA, but the entirety of the aid system, including oversight of contractors managing other mission-critical systems.

27. As another example of units that were cut without understanding of the impact, three units within the Office of the Chief Technology Officer were originally cut entirely in the RIF Announcement. I worked closely with this office in my role as Executive Director of the Office of Loan Portfolio Management and with individuals from these divisions in my previous roles. As a result of the cuts to the Office of the Chief Technology Officer, many staff responsible for overseeing the complex network of technology infrastructure used by FSA and FSA vendors

were gone. Additionally, individuals who managed various StudentAid.gov tools, such as the PSLF Help Tool, which provides an online PSLF Application, and Income Driven Repayment Application, were eliminated via the RIF. During the March 12 meeting, the acting Chief Technology Officer at FSA reiterated concern about the loss of these teams and Denise Carter noted that that day's priority was to reinstate some (but not all) of those individuals, which occurred over the course of the next week.

28. As time goes on with FSA operating at half its normal headcount, I expect we will see issues wherein these complex, intertwined technology systems cannot be adequately managed because so many of the people experienced in identifying and resolving incidents will have left the Department. This puts critical functions, like the Free Application for Federal Student Aid, aid disbursement, and loan repayment at risk.

29. For instance, as of my departure from FSA, MOHELA had considerable backlogs for processing income-driven repayment applications and PSLF forgiveness, as well as resolving issues noted in their corrective action plan. The FSA employees monitoring the corrective action plan were in the Loan Operations Division and Vendor Performance Division of the Office of Loan Portfolio Management, which were under my purview. After the separations and the RIFs, few, if any of those employees monitoring the corrective action plan will remain. Additionally, with the reduced staffing in the Office of Loan Portfolio Management, I believe that FSA does not have the capability to validate some of the easier to measure SLAs, like call abandon rate, and does not have the capability to measure SLAs associated with quality or accuracy. Lack of staffing in this area undermines the accountability provisions added in the USDS contracts to better serve student loan borrowers.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 28, 2025.

_____
Colleen Campbell