# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

    *Plaintiffs*,

    v.

THE UNITED STATES OF AMERICA, et al.,

    *Defendants*.

Civil Action No. 25-965-JRR

**DECLARATION OF MIGUEL CARDONA**

I, Miguel Cardona, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

    1.    I am a resident of the State of Connecticut. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

    2.    I hold a Bachelor of Science in education from Central Connecticut State University, a Master of Science in bilingual and bicultural education from the University of Connecticut, and a Doctorate in Education from the University of Connecticut.

    3.    From March 2, 2021 until January 20, 2025, I had the honor of serving as the Secretary of the U.S. Department of Education ("the Department"). During my tenure, I led the nation's efforts to safely reopen and support schools negatively impacted by the COVD-19 pandemic, oversaw the distribution of a historic $239 billion in federal education funding for FY 2022–FY 2024 for pre-K to 12 schools and colleges, worked to increase higher education access, affordability, and student success, and led unprecedented efforts to transform the country's student loan system. In this role, I oversaw the operations of the Department, including its fiscal and

personnel needs. I also understood the limitations on my authority as Secretary—namely, the limitations established by the federal statutes adopted by Congress to govern the Department's operations and by the appropriations Congress approved to fund the Department.

4. Prior to serving as Secretary, I worked for two decades in education in several different positions, including as an elementary school teacher, an elementary school principal, a school district administrator and the Connecticut Commissioner of Education. Throughout my career it has been my experience that the Department plays a critical and irreplaceable role in protecting and advancing educational opportunity, particularly for lower income and historically disadvantaged students and communities.

5. I submit this declaration in response to numerous actions taken by the Trump Administration, the Department, and the Secretary of Education to dismantle the Department, such that the Department has been incapacitated and is now unable to meet statutory obligations that are central to its fundamental and irreplaceable role in securing and advancing educational opportunity.

6. The Department implements scores of federally mandated education statutes and programs, including:

   a. enforcing civil rights in schools and colleges in order to prevent and remedy discrimination and harassment and ensure educational opportunity through the Department's Office for Civil Rights;

   b. administering, in accordance with Congressional mandates, $21.8 billion in formula funding under Title I, II, and III of the Elementary and Secondary Education Act of 1965 ("ESEA") (FY 24) through the Department's Office of Elementary and Secondary Education, the Office of English Language Acquisition

        ("OELA"), the Office of Planning, Evaluation, and Policy Development, and the Office of General Counsel, as supported with critical data analysis from the Institute of Education Sciences ("IES");

   c.  administering, in accordance with statutory mandates, $15.5 billion in formula funding under the Individuals with Disabilities Education Act ("IDEA") (FY 24) through the Office of Special Education and Rehabilitative Services, the Office of General Counsel, and the Office of Planning, Evaluation, and Policy Development.

   d.  awarding and administering, in accordance with Congressional mandates, thousands of competitive grants totaling over $22.2 billion annually through the Office of Elementary and Secondary Education, OELA, the Office of Special Education and Rehabilitative Services, the Office of Postsecondary Education, the Office of Career, Technical, and Adult Education, and the Office of General Counsel.

   e.  managing the approximately $1.7 trillion in student loans as required by Title IV of the Higher Education Act through the Federal Student Aid Office.

   7.    Despite managing the third largest discretionary budget of federal cabinet level agencies, the Department is staffed the most leanly. As of its March 2025 press release regarding its massive reduction in force, the Department reports having 4,133 employees as of January 2025. *U.S. Department of Education Initiates Reduction in Force*, U.S. Dep't of Educ. (March 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force. Since then, the Department has cut its staff dramatically including, according to that same release, by implementing the mass reduction in force on March 11, 2025 impacting nearly half of the Department's workforce and reducing the Department's staff to 2,183

3

employees. Even the Department recognizes that the level of staffing reductions imposed will necessitate "significant reorganization." Based on my experience, the only way in which the Department can continue to function given the massive staff reductions is to fundamentally reorganize its activities in ways that Congress has not approved and would not recognize as consistent in any way with the level of funding it has appropriated for the Department and the responsibilities it has charged the Department with implementing through multiple and historic legislative acts.

8. Rather than approving massive cutbacks in the Department or fundamental reorganization, Congress has done the opposite. For Fiscal Year 2024, as is reflected in the Department's 2024 fiscal report, Congress increased funding for the Department under Title I of the ESEA, the IDEA, and in other areas. *FY 2024 Agency Financial Report, Management's Discussion and Analysis (Unaudited), Financial Highlights*, U.S. Dep't of Educ. (Nov. 14, 2024), https://www.ed.gov/media/document/2c-mda-financial-highlights-108830.pdf. While Congress did not grant the Department the full increases that the Department sought, it did not slash the Department's budget or otherwise indicate its approval for halving the Department's workforce and work.

9. The inevitable result of the massive reduction in force and fundamental reorganization that the Department is undertaking is to prevent the Department from fulfilling its statutory obligations and the significant reduction of educational opportunity throughout the country—particularly for the most disadvantaged students. This result will follow even if the current Secretary does not continue to follow through on her self-proclaimed "final mission" of fully shuttering the Department, as the actions the current Secretary has already taken to hollow out the Department cannot be reconciled with the statutory obligations Congress has charged the

Department with implementing and the funds Congress has appropriated to the Department to implement those obligations.

10. To give an example, the current Secretary has slashed the staff of investigators and attorneys who enforce educational opportunity through the Department's Office for Civil Rights ("OCR"). OCR is unique in the scope of administrative enforcement of civil rights laws it provides; no other government entity provides students and parents with the same ability to seek redress, through agency administrative enforcement, for violations of federal civil rights laws by K-12 schools and colleges. And OCR is relied on by students and parents as reflected by, among other things, the fact that its workload in terms of complaints has more than tripled since Fiscal Year 2009. Because of that workload, I repeatedly urged Congress to provide funding for additional staff for OCR in order to allow it to meet the rising demand for civil rights enforcement and training. While Congress did not approve substantial funding increases for additional staff, it did moderately increase OCR's budget during my tenure (with a 7% increase between FY 21 and FY 24). That Congressional action negates rather than approves the Secretary's decision to cut the staff of OCR in half, shutter seven of the twelve regional enforcement offices, and arbitrarily remove investigators and attorneys from cases they had worked on for months, if not years, without giving the departing and remaining staff any reasonable opportunity to plan for the transition of cases and other assignments in a manner that would fulfill the office's civil rights enforcement obligations set forth by Congress.

11. Similarly, the multitude of formula and competitive grant programs that the Department administers are not self-executing, nor can they be implemented in a manner that respects Congressional mandates by simply cutting checks to distribute to schools and colleges. As a threshold matter, many state and local school officers, including state superintendents of

5

instruction and school district superintendents, do not know all of the programs available from the Department or the requirements of those programs. State superintendents and school district superintendents often serve for limited time periods and necessarily rely on the Department for information about what funding is available and the conditions on that funding. My experience serving in those roles and at the Department is that those positions have a high rate of turnover. One recent report found that "more than 40 percent of districts experienced at least one change in superintendent between the 2019-20 and 2023-24 school years, and 8 percent experienced at least two changes." Caitlynn Peetz, *Do Students Suffer When a Superintendent Leaves? A New Study Has an Answer*, Education Week (Feb. 7, 2025), https://www.edweek.org/leadership/do-students-suffer-when-a-superintendent-leaves-a-new-study-has-an-answer/2025/02. That same report revealed that, in 2023-24 alone, a fifth of the nation's 500 largest school districts replaced their superintendent. Evie Blad, *Has Superintendent Turnover Gotten Any Better? What New Data Show*, Education Week (Sept. 10, 2024), https://www.edweek.org/leadership/has-superintendent-turnover-gotten-any-better-what-new-data-show/2024/09. Turnover among college and university presidents has also increased in recent years. According to the American Council on Education ("ACE"), the average tenure of college presidents has dropped from 8.5 years in 2006 to 5.9 years in 2023. Danielle Melidona, et al., *The American College President* 8 (2023), https://www.acenet.edu/Documents/American-College-President-IX-2023.pdf. In my experience, new or inexperienced school and college leaders rely heavily on Department employees to advise them and their staff of federal funding programs and the requirements or conditions attached to such programs.

12.     In addition, the conditions that Congress places on funding under the educational statutes are complex and necessitate relying on experienced and sufficient staff at the Department

6

to develop and administer formula and competitive grant programs consistent with legal requirements and Congressional intent in creating and funding those programs. For example, at the pre-K to 12 level, the distribution of roughly $15 billion annually in funding for students with disabilities under the IDEA requires complying with several statutory requirements set by Congress. IDEA Part B grants are to help states and preschool programs provide special education and related services. IDEA Part C grants support early intervention services for infants and toddlers with disabilities. IDEA Part D grants help hire and train special education educators—which is so critical at a time when many states and districts are experiencing a shortage of well-trained special education educators. Without sufficient Department staff to distribute and enforce the required uses of IDEA funds, the approximately 7.5 million children—15 percent of the student population—who receive special education or related services in U.S. public schools will fall behind. Students with dyslexia will not receive the specialized instruction they need to help them succeed academically. Students who are blind or deaf will not receive the assistive technology they need to participate in school. And students with autism won't get the tutoring or therapy they need to learn with their peers.

13. Similarly, Title I of the ESEA supports the education of approximately 26 million children in schools with high concentrations of students in poverty—nearly 36 percent of all public education students in the U.S. Title I, Part A provides $18 billion annually to school districts to provide economically disadvantaged children with a high-quality education and to help close achievement gaps. This part is allocated through several complex statutory formulas. Title I, Part B provides funding to help states develop and implement state assessment systems that align with Title I standards. Title I, Part C funding supports efforts to ensure that migratory children receive appropriate educational services and meet the same high academic standards as other students in

the state. And Title I, Part D supports programs that address the educational needs of students who are neglected, delinquent, or at-risk. Department monitoring, grant administration, and data collection and analysis are critical to ensure the accurate and timely distribution of Title I funds and the enforcement of numerous accountability requirements attached to those funds that have been set forth by Congress under the Every Student Succeeds Act ("ESSA") to help states and districts close achievement gaps and foster student success.

14. I cannot stress enough the importance of Department functions and programs to support students in rural communities. In addition to Title I, which supports both urban and rural high-poverty districts, Part B of Title V of the ESEA establishes the Rural Education Achievement Program ("REAP"), which is designed to help rural districts access and participate more fully and effectively in other ESEA federal grant programs and provide better educational services for students. Without sufficient Department resources to accurately determine schools' eligibility for REAP funds, schools in rural communities may be improperly barred from access to these and other programs upon which they rely to hire teachers, offer afterschool or summer learning programs, or ensure reading and literacy services for children.

15. Given the cuts that the current Secretary has implemented, in some cases there is literally no one left to pick up the phone or respond to the email about how to comply with these Congressional mandates. The result is a devastating loss of capacity in the Department to ensure that states and school districts understand both the conditions on federal funding and how to comply with those conditions.

16. Similarly, at the higher education level, the drastic cuts that the Secretary has implemented in the Federal Student Aid office ("FSA"), which oversees approximately $1.7 trillion in student loans under various programs, will cripple the capacity of that office to ensure

8

that colleges meet the criteria in the Higher Education Act ("HEA") to be approved for offering student loans and to ensure as well that loan processors and servicers are not improperly profiting off of students and their student loan debt. When I was sworn in as Secretary in 2021, FSA was not operating effectively as the prior administration had postponed needed improvements in technology and was not effectively policing for-profit colleges and institutions or financial institutions servicing student debt. Over my tenure in office, the Department, with the knowledge and approval of Congress, made substantial progress in fixing both of those problems. We reinstated an enforcement team to enhance oversight over for-profit postsecondary and financial institutions to guard against the defrauding of students and support student loan borrowers who were misled by for-profit colleges offering inadequate educational programs. We improved our internal infrastructure within FSA and developed a system of checks and balances to ensure that our major contractors and vendors were accountable for meeting Department goals and acting in coordinated fashion. And by increasing our oversight of loan servicers, and our responsiveness to borrower concerns, we provided debt relief for more than one million student loan borrowers under the Public Service Loan Forgiveness program during my tenure, compared to only some 7,000 during the first Trump Administration. This progress was only possible due to the staff in FSA who worked to impose accountability on colleges and universities and financial institutions receiving or processing federal student aid for students and borrowers, and to oversee the work done by the many vendors who service student loan debt and process student loan debt forgiveness requests under the many different programs Congress has enacted.

17.    Not once during my tenure did Congress cut the funding for FSA (on the contrary, annual funding for Student Aid Administration rose $205 million from FY 21 to FY 24) or suggest that a Secretary of Education has the broad authority to restructure FSA operations or programs,

9

much less slash the staff almost in half and leave loan servicers unmonitored, students without assistance, and for-profit colleges unchecked. To the contrary, some in Congress pointedly reminded me of the limitations on my authority to restructure the operations of FSA by way of forgiving student debt. When I sought to do just that by exercising my authority as Secretary to cancel $430 billion in student debt, by way of exercising what I believed was my authority as Secretary under the 2023 HEROES Act, I was challenged in court by various states and members of Congress. That challenge was ultimately accepted by the Supreme Court, which ruled that I lacked the authority to implement sweeping student debt relief under the HEROES Act because that authority had not been expressly given to me by Congress.

18.     The reality is that the actions the Secretary has taken amount to a wholesale reorganization and downsizing of the Department in a way that prevents the Department from fulfilling its statutory obligations. The Secretary has significantly cut staff in more than a dozen units and offices within the Department; the impact of cuts in staffing to particular offices within the Department cannot be assessed in isolation of cuts to other units upon which those offices rely to execute their work. For example, it is my understanding that the Office of the General Counsel ("OGC") has been drastically downsized. As the Department's legal department, OGC quite literally had its eyes on every significant document related to Departmental programs or operations. It was responsible for ensuring that all communications to states, districts, institutions of higher education, and the public were consistent with federal law and any legal, policy, and programmatic requirements specified by Congress. The loss of this legal expertise and review thus increases the likelihood that the Department will carry out its responsibilities without adhering to all statutory and regulatory requirements.

19. Funding for higher education under Title III and Title V of the HEA, which is administered by the Office of Postsecondary Education ("OPE"), is also at risk. Title III and Title V funding provide critical support to colleges and universities to strengthen academic quality, improve institutional management, and provide financial assistance to students. OPE as well as the Office of Grants Management, which supports OPE in its efforts to disburse grants to institutions of higher education, have faced significant reductions since President Trump issued Executive Order 14242, directing the Secretary to dismantle the Department of Education. Ordinarily grants under Title III and Title V are announced in the Federal Register throughout the spring, beginning as early as February, for the following school year. This staggered scheduling spreads OPE's vast project of evaluating grant applications throughout the spring and summer. But as of the signing of this declaration, no Notices Inviting Applications have been posted in the Federal Register, which are needed to kick off the process of awarding many Title III and Title V grants. This delay puts the funding that has been appropriated for Title III and Title V in jeopardy for the coming school year.

20. Rather than running a Cabinet agency that ensures educational opportunity for students across the country, the current Secretary is turning back the clock to usher in a Wild, Wild West era of block federal funding to states, school districts, and educational companies with no accountability and no timely or adequate enforcement of civil rights or other legal requirements. Congress never intended for the Department to be run in such a manner.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 12, 2025.

/s/ Miguel Cardona*  
Miguel Cardona

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.