# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

**DECLARATION OF R. JASON COTTRELL**

I, R. Jason Cottrell, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Data Coordinator in the Management Support Unit of the Office of Postsecondary Education ("OPE") at the U.S. Department of Education ("the Department"). I have held that role since November 2024. As Data Coordinator, my role is to ensure that OPE is complying with the requirements of the Evidence Act, which requires, among other things, that agencies have plans in place to use evidence to support their programs.

3. Prior to that, I held the position of Lead Research Analyst from March 2016 through November 2024. In that position, I served as the principal research advisor to the Deputy Assistant Secretary for Higher Education Programs.

4. Before working at the Department of Education, I spent nearly 16 years working in higher education. I also hold a Master of Education with a focus on Administration and Supervision

from the Virginia Commonwealth University and a Ph.D. in Higher Education Policy and Leadership from the University of Virginia.

5. On March 11, I received notice that my position was to be eliminated due to a "Reduction in Force" ("RIF") through an email from the Department's Chief Human Capital Officer, Jacqueline Clay, stating, "your organizational unit is being abolished along with all positions within the unit—including yours." Once I received this email, I had no meaningful opportunity to transition my work to anyone else in the Department.

6. Even though my work is statutorily required by the Evidence Act, my position as well as all other data coordinators in the Department whose work is statutorily required under the Evidence Act were identified as being subject to the RIF.

7. OPE has responsibility for providing financial assistance to eligible students enrolled in postsecondary educational institutions; improving postsecondary educational facilities and programs through the provision of financial support to eligible institutions; recruiting and preparing disadvantaged students for the successful completion of postsecondary educational programs; promoting the domestic study of foreign languages and international affairs and supporting international educational research and exchange activities.

8. In my roles at the Department, I have worked most closely with the Higher Education Programs within OPE, which administers over $3 billion in grant funding for institutions of higher education under the Higher Education Act ("HEA"). These grant programs include the following:

- Child Care Access Means Parents in School
- Federal TRIO Programs
    - Educational Opportunity Centers

- - Ronald E. McNair Post Baccalaureate Achievement
  - Training Program for Federal TRIO Programs
  - Student Support Services
  - Talent Search
  - Upward Bound
  - Upward Bound Math/Science
  - Upward Bound/Veterans
- Gaining Early Awareness and Readiness for Undergraduate Programs ("GEAR UP")
- Graduate Assistance in Areas of National Need Program
- Asian American and Native American Pacific Islander-Serving Institutions Program (Title III, Parts A & F)
- Historically Black Colleges and Universities Capital Finance Program
- Hispanic-Serving Institutions Stem and Articulation Program (Title III, Part F)
- Native American-Serving Non-Tribal Institutions Program (Title III, Parts A & F)
- Tribally Controlled Colleges and Universities (Title III, Parts A & F)
- Alaska Native and Native Hawaiian (Title III, Parts A & F)
- Promoting Postbaccalaureate Opportunities for Hispanic Americans (Title V, Part B)
- Strengthening Historically Black Colleges and Universities Program, (Title III, Part B)
- Strengthening Historically Black Graduate Institutions Program (Title III, Part B)
- Minority Science and Engineering Improvement (Title III, Part E)
- College Housing and Academic Facilities Loan Program
- Predominantly Black Institutions Undergraduate Discretionary Grant Program (Title III, Part A)

3

- Predominantly Black Institutions Undergraduate Formula Grant Program (Title III, Part F)

- Predominantly Black Institutions Master's Degree Program (Title VII, Part A)

- Historically Black Colleges and Universities Master's Degree Programs (Title VII, Part A)

- Fund for the Improvement of Postsecondary Education

- National Center for Information and Technical Support for Postsecondary Students with Disabilities

9. The Higher Education Programs ("HEP") within OPE perform planning, program development, and grant administration functions related to the programs listed above. HEP is responsible for defining and articulating program goals and objectives; evaluating program effectiveness; developing and updating policy manuals, program regulations, and proposed legislative amendments; preparing program budget requests; and preparing an annual funding schedule and funding strategy; developing funding criteria and funding priorities for publication in the Federal Register, and managing the eligibility, application, review, and awards process for new HEP grants and continuation HEP awards. Since the beginning of my time at the Department through the time that I became the OPE Data Coordinator, my work has been to manage the eligibility, application, review, and awards processes for HEP Institutional Service grants as well as to develop the processes for determining eligibility for grants that are awarded under Titles III and V to institutions. Even after I became the Data Coordinator in November 2024, I remained involved in ensuring that the processes for determining eligibility ran smoothly and I continued to provide guidance and advice to the person who took over my previous role.

10. In order to apply for competitive grants, institutions of higher education must demonstrate that they meet the program's eligibility requirements under Title III and Title V of the Higher Education Act ("HEA"). Prior to 2016, institutional grants under Title III and Title V of the Higher Education Act were administered by requiring potential grantees to submit data to demonstrate their eligibility for the grant. In 2016, the Department streamlined the process for determining eligibility by relying on data required to be submitted by institutions of higher education as a condition of participation in Title IV to the National Center for Educational Statistics' Integrated Postsecondary Education Data System ("IPEDS"). As Lead Research Analyst, I implemented the process of using IPEDS data for the first time in 2016. After the initial transition, it was my job to oversee and administer this annual process by working with the IPEDS team from the National Center for Education Statistics to ensure that we had the data necessary to make eligibility determinations. I then used these eligibility determinations to create a public-facing product called the Eligibility Matrix that could be used by institutions of higher education to determine whether they were eligible to apply for Title III and Title V grants.

11. In order to construct the Eligibility Matrix, experts from National Center for Education Statistics ("NCES") send OPE data that has been culled from colleges' and universities' mandatory IPEDS reporting under Title IV. Some of the data that the experts at NCES share are not publicly available, and staff with detailed knowledge of the data submitted by colleges and universities to IPEDS are needed to pull the reports.

12. Eligibility for Title III and Title V generally consisted of three core criteria: (1) the percentage of low-income students who attend the college or university;[1] (2) the core expenses of

---

[1] This is referred to as the "needy student calculation."

the institution; and (3) depending on the grant, the percentage of students from a particular demographic group who attend the college or university.

13. In order to determine whether schools meet the low-income eligibility requirement, OPE works with the NCES to pull data from IPEDS to determine whether the statutory eligibility standards are met. This requires examining data to determine that at least 50 percent of an institution's degree-seeking students received financial assistance under the Federal Pell Grant, Federal Supplemental Opportunity Grant, Federal Work Study, or the Federal Perkins Loan Programs or that the percentage of the institution's undergraduate degree seeking students who were enrolled at least half-time and received Federal Pell Grants exceeds the average percentage of the same at similar institutions. The staff I worked with at the National Center of Educational Statistics are integral to this annual process, and OPE could not perform the eligibility analysis without their expertise and collaboration.

14. The core expenses requirement analyzes whether the institution's regular operational expenditures per full-time student are lower than average for other similar institutions. This is determined by first computing the regular operational expenditures of the institution excluding auxiliary enterprises, independent operations, and hospital expenses. These expenses are then divided by the number of full-time students based on the 12-month undergraduate enrollment for the academic year. This measure is then compared to the average value for other similar institutions. As with the low-income eligibility requirement, the staff I worked with at the NCES are critical to obtaining this information so that OPE can make the necessary calculations and determine institutional eligibility.

15. The final demographic requirement is determined by statute and differs depending on the particular grant. I worked with staff at the NCES to obtain demographic information about student populations to determine whether a school met the requirements for a particular grant.

16. The information that is used to calculate these eligibility requirements comes from IPEDS data for the year preceding the most recently completed academic year. For example, in October 2024, we made eligibility determinations based on data from the 2022-2023 school year.

17. I understand that after the March 11 RIF, only a few NCES employees remain who have not been placed on administrative leave. There is no one left to do the work of obtaining the data, ensuring its accuracy, and coordinating with OPE so that institutional eligibility can be determined for postsecondary grants within Titles III and V or those programs that use the designation in their competitions. This work is essential to administering higher education grants, including programs in the division for Historically Black Colleges and Universities ("HBCUs"), formula and competitive Predominantly Black Institutions, and the other competitive grants under Titles III and V. Indeed, even though OPE's eligibility work had begun prior to the RIF, the publicly available eligibility matrix, which is routinely published in February or March, was not published until June this year.

18. The loss of NCES staff will have compounding effects over time. This is because there is a lag between the point in time that the data is completed and its use for eligibility determinations. NCES staff work to identify data anomalies and improve accuracy and completeness. Institutions sometimes need to submit corrected data, late data, or even multiple years of data, and NCES provides technical assistance to institutions and makes necessary changes so that the IPEDS data and the reports used by OPE are correct and accurate. This work is critical to ensuring the smooth operation and accuracy of the eligibility determination process.

19. Without NCES staff to perform this work, the quality of the data will deteriorate over time, making it impossible for OPE to properly determine eligibility in accordance with Congress's express requirements for administration of the grants. *See*, e.g., 20 U.S.C. § 1058(b) (Strengthening Institutions); *see id.* § 1101a(a)(2) (Hispanic-Serving Institutions). I understand that the impacts of the loss of NCES staff are being felt now, as the delayed publication of the eligibility matrix demonstrates, but these impacts will inevitably become even more severe when the Department attempts to administer the grants in 2027 based on this school year's data, when NCES employees have been unable to ensure that the data has been properly collected and computed in the first place due to the RIF.

20. Apart from the impact the gutting of NCES will have on the administration of Title III and Title V grants, the dismantling of the Department has brought OPE's grantmaking work to a standstill due to the loss of key front office, program, and grant support staff. Program officers are required to obligate the funds, and then an executive officer must commit the funds. Both functions may be performed only by individuals with the required training, which can take a year to complete for individuals with committing authority and must be conducted annually for staff with obligation authority. Few, if any, officers with committing authority and training remain, and far fewer program staff with obligation authority remain.

21. Program staff in the Higher Education Programs are split between two components: Institutional Service, which administers grants for HBCUs, Hispanic Serving Institutions, and Minority Serving Institutions, among others, and Student Service, which administers grants like the Federal TRIO programs that aim to increase higher education access and support for low-income and first-generation students and students with disabilities. Around 17 staff members

8

remain in the Institutional Service area, and very few remain in the Student Service area to administer the $3 billion appropriated by Congress for higher education grants.

22. Many of the grants administered by Higher Education Programs are competitive grants. Every year the process for awarding these competitive grants requires all-hands-on-deck with the participation of every member of OPE. The process requires many complicated steps, specialized training to ensure the integrity of the process and to prevent fraud, the selection, organization, and supervision of panels of external reviewers to evaluate and score the grant applications, the submission and approval of the slates by the OPE executive team, and finally the obligation and committing of the funds to grantees. The competition process can take up to six months to complete, and the Office ordinarily works to stagger the competition schedules to ensure an appropriate number of staff and resources to accomplish the project. For nearly all grants, these steps have to be completed by September 30, the end of the fiscal year, in order to ensure that the funds that have been appropriated by Congress are spent prior to their expiration.[2]

23. Prior to starting my most recent role, I helped to develop an annual schedule for Institutional Service grants that included dates for each step of the process for new grants, non-competitive continuation grants, and grants for which we would "fund down the slate," meaning grants awarded to past applicants who met the criteria but did not receive the highest scores in the original competition. I am also familiar with the schedules that were created for Student Service grants because both components would combine their schedules into a single spreadsheet that was used by OPE to ensure that we were staying on track to commit and obligate funds by the end of the fiscal year.

---

[2] The exception to this is the Fund for the Improvement of Postsecondary Education, which Congress ordinarily appropriates through December 31, after the end of the fiscal year.

24. For example, the Notice Inviting Applications for the Strengthening Institutions Program was ordinarily posted in the Federal Register in the middle of March. The best practice was to give applicants 60 days from the posting of the Notice Inviting Applications to develop and submit applications, so historically, the deadline for the submission of applications for the Strengthening Institutions Program was the middle of May. But now – nearly three months after the notice is ordinarily posted – the Notice Inviting Applications for the Strengthening Institutions Program has not been posted in the Federal Register. Even when we had more staff, we struggled to meet the deadlines for these competitions. Many fewer staff remain because of the dismantling of the Department, and I do not believe that OPE has the capacity to announce, compete, approve, obligate, and commit this grant or any of the other remaining competitive Institutional Service grants by September 30, 2025.

25. OPE ordinarily posts the notice inviting applications in the Federal Register for Child Care Access Means Parents in Schools program in May, but to date, no notice has been posted. The program supports the participation of low-income parents in postsecondary education through the provision of campus-based childcare services. With the amount of time remaining in the fiscal year, I do not believe that the competition process for this grant can be concluded by September 30, 2025.

26. As of March, OPE was scheduled to announce more than a dozen grant competitions from March through early May 2025. Since March, however, only one new competition has been announced for the Hispanic Serving Institutions program, and that grant was immediately challenged in court. It will be nearly impossible to announce and hold these competitions by the September 30 expiration of appropriations authority, even though Congress

10

continued appropriations for these programs in the same amount and manner as it did in Fiscal Year 2024.

27.     I also understand that many non-competitive continuation grants are not being approved by Department leadership despite the fact that career staff have submitted slates and reviewed these grantees for "substantial progress," the ordinary standard applied to continuing grantees. The lack of forward progress and the fact that some Upward Bound continuation grants have already been canceled creates significant uncertainty for recipients of these grants, who have already competed for and been awarded these grants.[3]

28.     Prior to coming to the Department, I supported a Strengthening Institutions Program grant at the Virginia Commonwealth University when I was hired as the Coordinator for Supplemental Instruction within the Campus Learning Center. The grant helped us to completely rethink how we worked with students and allowed us to rebuild our undergraduate curriculum and academic advising resources, develop learning support, and increased student persistence. I know firsthand the importance of the grants administered by OPE and their transformative impact on students and schools.

---

[3] *See* Kimberly Jones, *Federal Cancellations of Upward Bound Grants Signal Broader Threat to College Access Programs* (May 30, 2025), https://coenet.org/news-impact/advocacy-update/federal-cancellations-of-upward-bound-grants-signal-broader-threat-to-college-access-programs.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 26, 2025

R. Jason Cottrell