# Exhibit K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF DOE DECLARANT #2

I, Doe Declarant #2, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein based either on my own experiences or on conversations I have had with other current and former employees of the U.S. Department of Education ("the Department"). If called as a witness, I could and would testify competently to the matters set forth below.

2. I have worked for the federal government for over 16 years and for the Department for over 5 years.

3. While working at the Department, I served in the office of Federal Student Aid ("FSA") in what were formerly known as the Office of Student Experience and Aid Delivery and the Vendor Oversight and Program Accountability Directorate.

### Vendor Oversight

4. The Department has historically employed approximately 60 full-time employees (hereinafter referred to collectively as "vendor oversight employees") who were responsible for

ensuring that the Department's student-facing vendors (e.g., loan servicers and debt collectors) complied with all statutory, regulatory, and contractual requirements. As a result of a recent, large-scale reorganization effort, as of February 2025, the vendor oversight employees were distributed across two offices and three teams: within the Office of Loan Portfolio Management, the Vendor Performance Division has approximately 47 vendor oversight employees, and the Program Management Division has approximately nine such employees; and the Vendor Oversight Division within the Office of Strategic Acquisition Planning has the remaining approximately fourteen vendor oversight employees.[1]

5. President Trump recently noted that,

> "[t]he Department of Education currently manages a student loan debt portfolio of more than $1.6 trillion. This means the Federal student aid program is roughly the size of one of the Nation's largest banks, Wells Fargo. But although Wells Fargo has more than 200,000 employees, the Department of Education has fewer than 1,500 in its Office of Federal Student Aid."[2]

6. To service that incredibly large loan portfolio, the Department spends approximately $2 billion a year on federal student loan servicers for the approximately 35 million non-defaulted borrowers and spends even more to collect on the approximately 7 million defaulted borrowers.

7. Those non-default loan servicers are responsible for:

   a. Sending borrowers timely and accurate billing statements;

   b. Answering tens of millions of borrower questions about their student loans;

   c. Posting borrower payments in the correct amounts to the correct accounts;

---

[1] Prior to a large-scale reorganization of FSA that took effect in February 2025, all vendor oversight employees were assigned to what was known as the Vendor Oversight Group ("VOG") within the Vendor Oversight and Program Accountability Directorate.

[2] "Improving Education Outcomes by Empowering Parents, States, and Communities," Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025).

  d. Processing refunds for overpayments;

  e. Reporting to the national credit reporting agencies; and

  f. Processing borrower applications (e.g., requests to change repayment plans, be placed on forbearance or deferment, or have loans discharged or forgiven).

 8. FSA is obligated to comply with its founding statutory requirements as a "Performance-Based Organization" in the Higher Education Act ("HEA") of 1965, as amended. 20 U.S.C. § 1018. Pursuant to that statute, FSA "shall be . . . responsible for managing the administrative and oversight functions supporting" Title IV programs. *Id.* § 1018(a)(1). Those statutorily mandated functions for which FSA "shall be responsible" include "[t]he administrative, accounting, and financial management functions for" Title IV programs,

> including . . . the collection, processing, and transmission of data to students, institutions, lenders, State agencies, and other authorized parties; . . . all aspects of contracting for the information and financial systems supporting the Federal student financial assistance programs authorized under subchapter IV; . . . providing all customer service, training, and user support related to the administration of [Title IV programs]; and . . . ensuring the integrity of the Federal student financial assistance programs authorized under subchapter IV.

28 U.S.C.§ 1018(b)(2).

 9. FSA worked closely with vendors to ensure that over $1.5 trillion in student loans is properly serviced in accordance with its statutory obligations for 42.7 million borrowers. For one, vendors create and operate many of the systems that allow FSA to fulfill its basic functions, including the E-App, which schools use to apply for approval to participate in Title IV student aid programs, and the Common Origination and Disbursement system, which facilitates origination, disbursement, and reporting for Title IV student aid programs. FSA also contracts with vendors to perform loan servicing, debt collection, and some customer service operations.

 10. FSA was created to fulfill the following statutorily designated "purposes":

3

    (A) to improve service to students and other participants in the student financial assistance programs authorized under subchapter IV, including making those programs more understandable to students and their parents;

    (B) to reduce the costs of administering those programs;

    (C) to increase the accountability of the officials responsible for administering the operational aspects of these programs;

    (D) to provide greater flexibility in the management and administration of the Federal student financial assistance programs;

    (E) to integrate the information systems supporting the Federal student financial assistance programs;

    (F) to implement an open, common, integrated system for the delivery of student financial assistance under subchapter IV; and

    (G) to develop and maintain a student financial assistance system that contains complete, accurate, and timely data to ensure program integrity.

20 U.S.C. § 1018(a)(2).

    11.    FSA's vendor oversight employees were the primary staff who oversaw vendors to "ensur[e] the integrity" of the student loan repayment system. *Id.* § 1018(b)(2)(A)(vi). As FSA works closely with vendors to disburse aid, service loans, and collect debt, vendor oversight is critical to ensuring compliance with the many statutory requirements of Title IV and the Performance-Based Organization statute.

    12.    In response to several recommendations from the Government Accountability Office ("GAO") that the Department strengthen its oversight of its student loan servicers[3] and the Department's failure to comply with a court order in *Manriquez v. Devos* (a class action suit that resulted in the Secretary of Education being held in contempt of court and fined $100,000 in 2019),[4] FSA adopted a management best practice called the Three Lines of Defense model.

---

[3] *See e.g.*, July 27, 2018 GAO Letter to Congress, https://www.gao.gov/assets/gao-18-587r.pdf (last accessed June 6, 2025) (attached as **Exhibit 1** to this Declaration).

[4] Order Regarding Sanctions, *Manriquez v. Devos*, No. 17-cv-07210-SK (N.D. Cal. Oct. 24, 2019), ECF No. 130.

13. The Three Lines of Defense model is a framework for managing risk and ensuring compliance by defining distinct roles and responsibilities across three levels: operational management (first line), risk and compliance functions (second line), and audit (third line). The first-line operations team—the Loan Operations Division[5]—told vendors what they need to do. The second-line oversight team, the vendor oversight employees, made sure the servicers actually did what they are told. And the third-line audit team—which, depending on the context, includes FSA's independent auditor, the Department's Office of the Inspector General, or the Government Accountability Office—checked the internal controls on those processes.

14. Through the Three Lines of Defense model, the vendor oversight employees greatly "improve[d] service to student[]" borrowers, 20 U.S.C. § 1018(a)(2)(A), by regularly identifying loan servicing errors and ensuring FSA's vendors both correct those errors and institute proper controls to prevent the errors from happening again.

15. These servicing errors ranged from billing borrowers for the wrong amount, unexpectedly auto debiting a borrower's account, losing payments, and having duplicate student loans showing up on a borrower's credit report, among others.

16. During the historic and unprecedented return to repayment after the COVID payment pause, vendor oversight employees identified millions of borrowers affected by servicing errors and proactively rectified the accounts of harmed borrowers, preventing lasting borrower harm and staving off countless borrower lawsuits.[6]

---

[5] Prior to the reorganization that was completed in early 2025, the office that completed this work was known as the Loan Operations Division's Delivery Systems & Extended Workforce Directorate.

[6] *See e.g.*, October 29, 2023 Department of Education Decision Memorandum Requesting Approval for the Use of the Secretary's Compromise Authority for Remediating Potential Harm to Borrowers Caused by Return to Repayment Servicing Errors, https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/decision-memorandum-return-to-repayment-servicing-errors-10-29-23-signed-redacted.pdf (last accessed June 6, 2025) (attached hereto as **Exhibit 2**).

17. Vendor oversight employees regularly "reduce[d] the costs of administering" the student loan programs, 20 U.S.C. § 1018(a)(2)(B), by identifying improper billing (e.g., when MOHELA double-billed FSA by $12 million for processing Public Service Loan Forgiveness applications) and improper servicing (e.g., charging borrowers the wrong interest rates), saving taxpayers tens of millions of dollars each year.

18. Vendor oversight employees also regularly "reduce[d] the costs of administering" the student loan programs, *id.*, by rigorously enforcing contractually required service level agreements ("SLAs") or performance metrics that save taxpayers millions of dollars and have the potential to save taxpayers many millions more.

19. Two years ago, the Department negotiated new servicing contracts for non-defaulted loans called the Unified Servicing and Data Solution ("USDS") contract. Non-default servicers under the USDS contract are required to meet basic levels for SLA metrics, in six areas: "Customer Satisfaction," "Interaction Quality," "Processing Accuracy," "Timeliness," "Call Center Abandon Rates," and "Financial Reporting."

20. "Failure to meet an SLA Metric will result in a negative performance incentive ("NPI") of up to 5% per SLA metric from the USDS Servicer's invoice . . . . If a USDS Servicer fails to meet multiple SLA metrics the cumulative NPI will not exceed 20% . . . . In the event a USDS Servicer repeatedly fails to meet SLA metrics, consecutively fails to meet the same SLA Metric for at least two periods, the NPI shall be increased by fifty percent (50%) upon each additional failure . . . ."[7]

---

[7] USDS Award Notice Attachments, Attachment 08: Service Level Methodology Performance Metrics at 1, 6, https://sam.gov/opp/9696795fb4c7469c97ff7b4dff36490b/view (last accessed June 6, 2025) (attached hereto as **Exhibit 3**).

21. Per the USDS contract, SLAs are measured and NPIs are calculated on a quarterly basis.

22. SLAs and NPIs incentivize servicers to provide adequate customer service to student loan borrowers because failure to meet identified performance metrics will result in reduced payments to servicers.

23. Vendor oversight employees were directly responsible for measuring the "interaction quality" and "processing accuracy" of SLAs. Those employees listened to and scored thousands of servicer interactions with student loan borrowers to ensure servicers were giving borrowers accurate and timely information. They also reviewed thousands of back-office processing tasks and data reporting to FSA's National Student Loan Database System ("NSLDS") to check for accuracy. Whenever vendor oversight employees identified interaction or accuracy performance issues, they flagged those issues directly to the relevant servicer(s). The servicer(s) then had an opportunity to dispute the findings before any SLA or NPI calculations are finalized.

24. While most servicers passed the SLA for "interaction quality," many failed the "processing accuracy" SLA requirement. That means borrowers face inaccurately processed requests for statutorily mandated programs like income-driven repayment and Public Service Loan Forgiveness.

25. Vendor oversight employees "ensure[d] program integrity" through "complete, accurate, and timely data" maintained in NSLDS, "a centralized, integrated view of federal student aid loans and grants that are tracked through their entire lifecycle from aid approval through disbursement and repayment."[8] 20 U.S.C. § 1018(a)(2)(G).

---

[8] FSAPartners.ed.gov, *National Student Loan Data System (NSLDS)*, https://fsapartners.ed.gov/financial-aid-delivery/nslds (last accessed June 6, 2025).

26. In Fiscal Year ("FY") 2023, the Department's "independent auditor issued a disclaimer of opinion as it was not able to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion because of unresolved errors identified in the underlying [student loan] data . . . ."[9]

27. In FY 2024, the Department's independent auditors issued another disclaimer of opinion "because of errors identified in the underlying [student loan] data . . . ."[10]

28. Underlying both of the "disclaimers of opinion" was the fact that the independent auditor found significant discrepancies between the loan servicers' data and NSLDS's data. Inaccurate data in the NSLDS results in student borrowers having their student loan balances, monthly payments, interest rates, and eligibility and credits for income-driven repayment plans and Public Service Loan Forgiveness calculated incorrectly.

29. The Government Accountability Office said these "disclaimers of opinion were based on errors identified in underlying data the Department used to develop assumptions to estimate the cost of its student loan programs. The Department's auditor also reported a material weakness in internal control over financial reporting in FYs 2024 and 2023 related to loans receivable and loan guarantees."[11]

30. As part of an FSA-wide effort to comply with FSA's statutory requirement to "maintain a student financial assistance system that contains complete, accurate, and timely data," 20 U.S.C. § 1018(a)(2)(G), so as to obtain a clean audit for the Department, audit oversight

---

[9] U.S. Dep't of Educ. Off. Inspector Gen., *FY 2023 Federal Student Aid Financial Statemen Audit: Report Information* (Nov. 16, 2023), https://oig.ed.gov/reports/audit/fy-2023-federal-student-aid-financial-statement-audit.

[10] U.S. Dep't of Educ. Off. of Inspector Gen., *FY 2024 Financial Statement Audit – Federal Student Aid: Report Information* (Nov. 15, 2024), https://oig.ed.gov/reports/audit/fy-2024-financial-statement-audit-federal-student-aid.

[11] GAO, *FY 2024 U.S. Government Accountability Office Independent Auditor's Report* 226, *available at* https://www.fiscal.treasury.gov/files/reports-statements/financial-report/2024/gao-audit-report-2024.pdf.

8

employees were tasked with spearheading an NSLDS data quality assurance effort. Quarterly, vendor oversight employees compared tens of thousands of data points between the loan servicers' systems and what was reported to NSLDS. Vendor oversight employees' quarterly NSLDS data quality reports significantly improved the quality of NSLDS's data and improved the Department's chances of obtaining a clean audit opinion.

### Dismantling of Vendor Oversight

31. Around February 2025, FSA employees were hit by successive waves of layoffs and dubious buyout offers, often with little to no advanced warning.

32. For instance, shortly after the new administration entered office, employees throughout the Department were placed on administrative leave with no advance warning and little explanation beyond their participation in a DEI training. Shortly thereafter, we learned that probationary employees would be terminated; two rounds of probationary-employee terminations followed.

33. In February 2025, Department leadership demanded that senior managers identify statutory functions that their groups performed. My understanding is that the Director of the Vendor Oversight Division identified all vendor oversight employees as performing statutorily mandated functions pursuant to 20 U.S.C. § 1018.

34. Based on my experience and conversations with former vendor oversight employees, my understanding is that on March 11, 2025, almost all vendor oversight employees were summarily subject to a reduction in force ("RIF") announcement. My understanding is that the RIF included the entire Vendor Performance Division and Vendor Oversight Division, where a majority of vendor oversight employees are assigned. My understanding is that most of the remaining vendor oversight employees, who are currently assigned to the Program Management

9

Division, took a separation incentive offer (known as "VERA" or "VSIP"), leaving only a handful of vendor oversight employees left at FSA.

35. My understanding is that all of the remaining vendor oversight employees specialize in pulling data and providing validation artifacts showing that FSA has internal controls in place, primarily for the purposes of responding to independent auditor, OIG, and GAO information requests. While that work is necessary for identifying financial and operational irregularities within FSA at the audit stage (i.e. after the fact), it is not sufficient to ensure adequate vendor oversight and borrower protection, which requires identifying—and *rectifying*—vendor performance issues as they are happening.

36. Despite the current administration's statements to the contrary, it is my belief that the March 11, 2025 RIF did not get rid of "bureaucratic bloat," as said by Secretary McMahon,[12] or "keep the best people" and "cut the people who [were]n't working," as said by President Trump.[13]

37. Based on my understanding of the scope and effect of the RIF, the RIF cut hard-working, dedicated civil servants who are subject-matter experts in their respective fields, fulfill vital statutory functions, and ensure that loan servicers accurately and timely provide borrowers statutorily mandated information and loan processing services.

38. It is my understanding that immediately after the RIFs were announced, but over a week before the RIF'd employees were to be put on administrative leave per their RIF notices, the RIF'd employees—including vendor oversight employees—were locked out of any shared files

---

[12] Linda McMahon, *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[13] Brian Bennett, *Amid Education Department Layoffs, Trump Says Many of the Fired Workers "Don't Work at All,"* Time Magazine (Mar. 12, 2025), https://time.com/7267383/donald-trump-department-education/.

(which housed almost all of their work), were prevented from communicating with any non-Department employees (e.g. vendors they were working with), and were effectively prevented from transitioning their critical, statutorily required work to their remaining colleagues.

39. In the short-term, my understanding is that the mass RIF immediately halted all of FSA's SLA work for the past quarter, and all of the vendor oversight employees' work since the beginning of the current Administration has effectively been lost. This work stoppage likely means that FSA's contracting officer will be forced to waive the SLA requirements for "interaction quality" and "processing accuracy" for the previous quarter—meaning servicers will have no incentive to provide adequate customer service to student borrowers.

40. Going forward, FSA will no longer have the administrative capacity to measure these two SLAs. That lack of capacity will result in declining customer service to borrowers and increasing costs to administer the student loan program—both of which are contrary to the agency's core statutory purposes and functions.

41. In the medium-term, outstanding servicing issues will continue to fester, and new issues will go unidentified until they become outsized and extremely costly. It is my understanding that at the time of the RIF, the vendor oversight employees were tracking approximately 183 open servicing issues that are no longer being effectively monitored or tracked to resolution. These outstanding issues include: MOHELA's abysmal call center performance (MOHELA recently disclosed in federal court that their "average wait time during [the] last 30 days" was "3 hours: 26 minutes: 29 seconds");[14] hundreds of thousands of borrowers currently missing eligible qualifying monthly credits towards Public Service Loan Forgiveness and Income Driven Repayment

---

[14] April 14, 2025 Letter from Thompson Coburn LLP to Judge William H. Alsup, United States District Judge, *Sweet v. Cardona*, No. 19-cv-03674-WHA, at 1 (N.D. Cal. Apr. 14, 2025), ECF No. 468-2.

11

forgiveness, and over ten thousand borrowers still owed refunds due to late adjustments to their student loan accounts.

42. In the longer term, FSA is now like a house of cards. In my opinion, based on my significant experience with the Department, the mass RIF completely destabilized the Department's ability to handle any coming shocks to the federal student loan system. I believe that it is virtually guaranteed that the Department and its vendors will regularly be in violation of the federal and state student loan, consumer protection, and privacy laws with which they are required to comply.

43. The largest tidal wave heading towards FSA's shore is the coming student-loan default cliff in October 2025. Nearly 45% of borrowers who owe a payment on their student loans are behind on payments. Approximately 9.5 million borrowers are delinquent. Many have missed multiple payments and are quickly heading toward default later this year. In my experience, a 45% delinquency rate would be considered a 5-alarm fire within FSA and spur a government-wide response to encourage borrowers to avoid default by enrolling in an affordable repayment plan. Without vendor oversight employees, the government cannot ensure that servicers fulfill borrower requests to enroll in such plans, nor can it adequately address the onslaught of defaults to come.

44. FSA previously suspended its debt collection process by dismissing its primary debt collection vendors and allowing its contract to manage the Debt Management and Collection System, which houses FSA's data about defaulted loans, to expire.

45. It is folly to believe that FSA can successfully stand up a brand new, statutorily compliant debt collection regime for millions of newly defaulted borrowers without any oversight team rigorously and consistently testing the new vendors and systems. Yet by dismantling vendor oversight, that is exactly what the Department appears to be attempting to do.

46. Non-default loan servicers are contractually required, under the USDS contract, to "comply with all Federal, State, and local laws, rules, and regulations applicable to [their] performance under this [USDS] contract."[15]

47. These statutory and regulatory requirements extend well beyond the Higher Education Act. The USDS contract specifically requires servicers to comply with the following statutory requirements so as to protect borrowers from having their rights violated:

    a. Fair Credit Reporting Act[16]

    b. Telephone Consumer Protection Act[17]

    c. Servicemembers Civil Relief Act[18]

    d. Higher Education Reconciliation Act of 2005[19]

    e. Rehabilitation Act of 1973[20]

    f. Plain Writing Act of 2010[21]

    g. Electronic Signatures in Global and National Commerce Act[22]

    h. Freedom of Information Act[23]

---

[15] FSA, USDS Business Operations Servicing Requirements: Attachment 01, USDS Section 17001.010, at 101 (excerpted copy attached hereto as **Exhibit 4** and accessible online at: https://sam.gov/opp/9696795fb4c7469c97ff7b4dff36490b/view).

[16] *Id.*, USDS Section 30000.050, Ex. 4 at 209.

[17] *Id.*, USDS Section 49001.000, Ex. 4 at 268–69.

[18] *Id.*, USDS Section 25010.000, Ex. 4 at 174.

[19] *Id.*, USDS Section 5000.000, Ex. 4 at 29.

[20] *Id.*, USDS Section 2012.000, Ex. 4 at 8.

[21] *Id.*, USDS Section 3001.010, Ex. 4 at 10.

[22] *Id.*, USDS Section 3006.000, Ex. 4 at 14.

[23] *Id.*, USDS Section 32014.000, Ex. 4 at 228–29.

      i. Privacy Act[24]

48. I understand that the Department no longer has dedicated staff ensuring that its vendors are complying with these various federal and state consumer protection laws. This lack of an oversight team actively monitoring for compliance puts borrowers and taxpayers at significant risk.

---

[24] *Id.*

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 11, 2025.

/s/ Doe Declarant #2*  
Doe Declarant #2

\* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.

15