# Exhibit M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

**DECLARATION OF DOE DECLARANT #4**

I, Doe Declarant #4, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of New York, New York. I am over the age of 18 and have personal knowledge of all facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I have worked at the office of Federal Student Aid ("FSA"), in the U.S. Department of Education ("the Department"), for 19 years. I began working at FSA in September 2005, as an Institutional Review Specialist in the New York/Boston School Participation Section of the School Eligibility and Oversight Service Branch ("SEOS").[1] My work in that role was to resolve compliance audits of colleges and universities receiving student financial aid under Title IV of the Higher Education Act of 1965 ("Title IV"). I also assisted with and conducted program reviews.

---

[1] This office has had different titles throughout my career.

3. In the fall of 2014, FSA created an office now known as the Multi-Region & Foreign Schools Participation Section of SEOS. Since November 2014, I have held the position of Case Manager in that Section.

4. SEOS is responsible for administering eligibility certification, financial analysis, and oversight of the over 5,500 schools participating in FSA programs under Title IV, including the Federal Pell Grant program, the Federal Direct Loan program, the Federal Supplemental Educational Opportunity Grant, the Federal Work-Study program, and the TEACH Grant program. These programs were designed to provide critical financial assistance to prospective and current students and expand access to higher education to students who could not otherwise afford to pursue an education, degree, or certificate. The schools administer this aid, but FSA provides oversight to make sure schools manage Title IV funds properly and comply with statutory and regulatory requirements, especially to root out fraud and abuse of program funds and to protect student borrowers from harmful or misleading practices.

5. SEOS is divided into School Participation or Oversight Sections. Before the March 11 mass Reduction in Force ("RIF") and Executive Order 14242 ("the EO"), there were eight Sections: Atlanta School Oversight Section, New York/Boston School Participation Section, Philadelphia School Participation Division, Chicago/Denver School Oversight Section, Kansas City School Oversight Section, San Francisco/Seattle School Participation Section, Dallas School Oversight Section, and the Multi-Region & Foreign School Participation Section.

6. Each of the sections within SEOS had a variety of responsibilities for schools assigned to the section, including the following:

   a. Examine, analyze, and make determinations on the initial and renewal eligibility applications submitted by schools for participation in Title IV programs;

b. Collaborate with FSA subdivisions Partner Participation and Oversight and the Office of General Counsel regarding decisions to place schools that are under review or investigation on heightened cash monitoring or to impose other necessary restrictions on their participation in FSA programs;

c. Collaborate and assist with school closures and disaster responses;

d. Process and maintain records of schools' Program Participation Agreements and notices of eligibility to participate in Title IV programs;

e. Conduct program reviews;

f. Monitor schools and their agents through on-site and off-site reviews and analysis of various audits and reports to provide early warning of program compliance problems and take appropriate actions;

g. Conduct heightened cash monitoring actions and monitor schools' payment to students of their financial aid;

h. Manage and monitor missing/late audits and financial submissions;

i. Perform audit resolution;

j. Identify closed, bankrupt, and troubled schools and notify appropriate Department offices;

k. Work with state agencies and accrediting agencies on closed schools and other issues;

l. Identify requirements for tuition recovery programs and coordinate the fulfillment of these requirements;

m. Evaluate and act upon the findings, conclusions, and recommendations produced by other FSA units, such as negative cash and compliance referrals;

    n. Issue final audit determination and final program review determination to establish liabilities;

    o. Review school appeals of liability assessments; Work closely with and refer matters to the Office of Inspector General, the PPO Partner Enforcement and Consumer Protection Directorate, and other offices; and

    p. Review and update pertinent databases.

Some of these responsibilities and their role in safeguarding Title IV funding for students are described in further detail below.

    7. In addition to the responsibilities described in paragraph 6, my section within SEOS, the Multi-Region & Foreign School Participation Section, was uniquely responsible for the holistic oversight and management of publicly traded schools, large distance-education schools, many private-equity owned schools that have locations in more than one region, and foreign schools that receive or seek to receive Title IV funds.

    8. The functions described in paragraph 6 ensured that schools accurately disburse federal student aid; did not inappropriately overcharge or fail to refund student borrowers; maintained their accreditations; and practiced statutorily and regulatorily mandated financial responsibility so as to remain open and viable to provide borrowers the valuable education they were promised when they took out their federal student loans.

    9. Within the Multi-Region & Foreign School Participation Section, I was one of four Case Managers. Each of us had our own portfolio of companies and schools for which we were responsible.

    10. As of December 2024, I was responsible for approximately 130 locations of approximately 20 proprietary schools owned by approximately 13 corporations. Given frequent

changes in ownership and closures of proprietary schools, however, these numbers frequently changed.

11. For the schools under our purview, the responsibilities described in paragraph 7 were directly undertaken by eligibility analysts and audit resolution specialists in coordination with the assigned Case Manager to ensure compliance with statutory and regulatory requirements that uniquely affect publicly traded schools, large distance-education schools, private-equity owned schools that have locations in more than one region, and foreign schools. Part of my role was to become an expert on the schools in my portfolio.

12. Schools must apply to FSA to be certified as eligible to participate in Title IV student aid programs. 20 U.S.C. § 1099c(a). The certification procedure requires that FSA make determinations, in accordance with the relevant statutes and regulations, as to the school's legal authority to operate within a State, accreditation status, administrative capability, and financial responsibility. 20 U.S.C. § 1099c(a). This certification must be renewed at least every six years, sooner in certain circumstances. *See id.* § 1099c(g). SEOS eligibility analysts made eligibility determinations for each of the over 5,500 schools participating in Title IV programs. Case Managers oversaw and managed determinations for the proprietary schools, large school groups, and foreign schools in their respective portfolios.

13. In particular, the determination of financial responsibility is especially thorough. *See* 20 U.S.C. § 1099c(c); 34 C.F.R. Part 668, Subpart L. As a Case Manager, I was responsible for ensuring that all schools in my portfolio had either satisfied the statutory and regulatory requirements for showing financial responsibility or provided an appropriate irrevocable letter of credit. This process sought to protect students and taxpayers from the precipitous closure of financially precarious schools.

14. Additionally, to be certified as eligible to participate in Title IV student aid programs, a school must enter into a Program Participation Agreement with the Department. These agreements are statutorily required to condition initial and continuing eligibility on compliance with a set of requirements determined by statute and regulation, including that the school will use Title IV funds for their correct purpose; that the school will comply with statutory and regulatory financial responsibility requirements; that the school will furnish upon request and in a timely fashion information related to its administrative capability and financial responsibility to the Secretary of Education ("the Secretary"), the appropriate guaranty agency, or the appropriate accrediting agency or association; and that if the school advertises job placement rates, it does so accurately. *See generally* 20 U.S.C. § 1094(a), (c); 34 C.F.R. § 668.14. As a Case Manager, I was responsible for ensuring that the schools in my portfolio comply with the statutorily mandated requirements in their Program Participation Agreements, which help ensure that students both are protected from fraudulent, unscrupulous, or misleading conduct and can reasonably rely on the fact that they are taking on debt to attend an institution that has met minimum requirements of administrative capability and financial responsibility.

15. As a Case Manager, I was also responsible for performing program reviews, which are statutorily required. 20 U.S.C. § 1099c-1. In relevant part, the Higher Education Act requires that "the Secretary . . . shall give priority for program review to institutions of higher education that are" in one of six categories that indicate the institution may be at a significant risk of failure to comply with the administrative capability or financial responsibility requirements.[2] *See id*.

---

[2] The six categories are:

> (A) institutions with a cohort default rate for loans under part B of this subchapter in excess of 25 percent or which places such institutions in the highest 25 percent of such institutions;

§ 1099c-1(a)(2). The schools that I oversaw and managed—particularly proprietary schools, especially those in large school groups—are likely to come within one of those categories. Accordingly, I spent a considerable amount of my time conducting program reviews.

16. Program reviews were a mechanism to start the process through which the Department could eventually assert liability due from a school. Program reviews can be a general review of the entire school's Title IV operations or a more narrow review of any aspect of the school's Title IV operations. Sometimes, program reviews were undertaken based on a complaint or a series of complaints that SEOS received. Program reviews ensured that each school complies with all Title IV statutory and regulatory requirements. This often entailed visiting an institution to review files on site. A negative performance review could result in an institution's future ineligibility for Title IV funds, collection of funds from that institution back to the Department, or an enforcement action by the Department resulting in civil monetary penalties.

17. I also have experience in the statutes and regulations that specifically govern the conduct of proprietary schools, large school groups, and foreign schools, knowledge of the idiosyncrasies of the application of general eligibility requirements to those schools, and an

---

(B) institutions with a default rate in dollar volume for loans under part B of this subchapter which places the institutions in the highest 25 percent of such institutions;
(C) institutions with a significant fluctuation in Federal Stafford Loan volume, Federal Direct Stafford/Ford Loan volume, or Federal Pell Grant award volume, or any combination thereof, in the year for which the determination is made, compared to the year prior to such year, that are not accounted for by changes in the Federal Stafford Loan program, the Federal Direct Stafford/Ford Loan program, or the Pell Grant program, or any combination thereof;
(D) institutions reported to have deficiencies or financial aid problems by the State licensing or authorizing agency, or by the appropriate accrediting agency or association;
(E) institutions with high annual dropout rates; and
(F) such other institutions that the Secretary determines may pose a significant risk of failure to comply with the administrative capability or financial responsibility provisions of this subchapter[.]

20 U.S.C. § 1099c-1(a)(2).

understanding of what goes on across a given large school group or set of schools owned by a given corporation.

18.     For instance, as proprietary schools change ownership with considerable frequency, I am especially familiar with, and responsible for overseeing the schools in my portfolio's compliance with, the statutory and regulatory requirements schools must satisfy after a change in ownership in order to qualify to participate in Title IV programs. *See*, e.g., 20 U.S.C. § 1099c(i); 34 C.F.R. § 600.31. These statutes and regulations help ensure that changes in ownership are conducted in a financially responsible manner that minimizes the risk of school closures and protects students and taxpayers alike.

19.     Another example of a statutory requirement that applies only to proprietary schools, and with which I am especially familiar, is the "90/10 rule." For proprietary schools, the financial responsibility requirements include determining whether the institution receives at least 90% of its revenue from sources other than Title IV. 20 U.S.C. § 1094(a)(24), (d); 34 C.F.R. § 668.28; *id.* § Part 668, Subpart B, Appendix C. If an institution does not meet these criteria, a case manager would implement the "sanctions" detailed by regulation, 34 C.F.R. § 668.28(c), including that the school become "provisionally certified." *See id.* §§ 668.28(c)(2), 668.13(c)(1)(iii); *see also* 20 U.S.C. § 1094(d)(2).[3] The case manager also determined whether the school's method of payment for Title IV funds should be restricted. For example, an institution considered to be a high risk for administering financial aid might be placed in the category for heightened cash monitoring. *See* 34 C.F.R. § 688.162(d). Case managers did this work and decided on the appropriate course of action in collaboration with financial analysts.

---

[3] Provisional certification is a form of certification of eligibility to participate in Title IV student aid programs that provides a shorter timeline for recertification and greater departmental scrutiny. *See* 20 U.S.C. § 1099c(h); 34 C.F.R. § 668.13(c) & (d).

8

20. Additionally, the Department must make determinations regarding institutional compliance with the 90/10 Rule in order to meet its statutory obligations to publicly disclose the identity of each institution that fails to comply with the rule and report this information annually to Congress. 20 U.S.C. § 1094(d)(3)–(4).

21. In making these 90/10 determinations, it was necessary to work closely with financial analysts, who were all assigned to the Atlanta School Oversight Section. Financial analysts had the following responsibilities:

   a. Assess the financial responsibility of schools through financial analysis, pursuant to 20 U.S.C. §§ 1094(c), 1099c(c), 1099c-1, and 34 C.F.R. §§ 668.13(a)(1), 668.14(b)(5), and Part 668, Subpart L;

   b. Coordinate consistent review of schools' financial responsibilities for all other SPDs pursuant to the financial responsibility statutes and regulations;

   c. Conduct detailed analysis of proprietary schools' revenue reporting as required under the "90/10 rule and reporting requirements" pursuant to 20 U.S.C. § 1094(a)(24), (d), and 34 C.F.R. § 668.28; and

   d. Coordinate analysis outcomes with FSA's oversight and enforcement decision-making framework in order to ensure that any findings are acted upon appropriately.

22. One statutorily and regulatorily mandated universal eligibility requirement that often raised idiosyncratic issues for proprietary institutions was the compliance audit. Institutions receiving Title IV funds are required to submit annual compliance audits of all Title IV funds received by an institution. *See* 20 U.S.C. § 1094(c)(1); 34 C.F.R. § 668.23. These compliance audits are conducted by third parties contracted by Title IV institutions and were reviewed by

SEOS personnel. Generally, audit analysts within SEOS performed the first line of review; however, when a school was under the purview of the Multi-Region and Foreign School Participation Section, a Case Manager, such as myself, oversaw the review to identify issues specifically relevant to foreign and proprietary institutions.

23. In reviewing a typical compliance audit, an audit analyst within SEOS reviewed the auditor's findings of Title IV disbursement and related data to ensure compliance with Title IV requirements. If there was an error in compliance—for instance, a student who was not paid a refund correctly—but that error only happens in less than a certain threshold percentage of the sample (say 10%), the SEOS audit analyst may not normally escalate to a more thorough and complete file review. However, if there was an error of just one or two students in a school that is part of a large school group, my experience allows me to recognize that the error may be due to a problem programmed in the institution's backend software. In that case, it could add up to a number that does not cross the 10% threshold but is much larger in the aggregate across the very large number of students at the entire school group compared to an aggregate number of students that is far smaller but crosses the 10% threshold at a much smaller school. I was able to recognize that although the threshold has not been crossed, the aggregate amount of money was potentially far higher than it would be at a typical non-profit school. In that situation, I would tell the SEOS audit analyst to escalate to a more searching file review, potentially saving FSA or students millions of misspent dollars. I am only able to do that due to my experience working in the Multi-Region and Foreign School Participation Section.

24. On January 31, 2025, I was placed on administrative leave from my position at the Department. The notice placing me on leave stated that my leave was pursuant to the President's executive order on Diversity, Equity, Inclusion, and Accessibility and further guidance from the

10

Office of Personnel Management. I thought that must be in error because my work has nothing to do with Diversity, Equity, Inclusion, and Accessibility.

25. The morning after I was notified that I was put on administrative leave, my work identification and personal identity verification card was disabled, meaning I could not access any of my work files or emails. I thus have not been able to finish any work I had in process or transition my work to others. I believe that this work could not have been effectively transitioned without my input.

26. On April 10, 2025, I received notice that my employment would be terminated, and the position would eventually be eliminated as part of a RIF at the Department.

27. It is my understanding that as of March 11, 2025, all of the positions in the Multi-Region and Foreign School Participation Section and the vast majority of the positions in SEOS are slated to be abolished. As of the signing of this declaration, employees in those positions remain on administrative leave and have received RIF notices. Of the eight sections within SEOS, my understanding is that only two will be kept open.

28. When I began working in SEOS, approximately 450 employees performed the review work described above, for over 5,500 institutions. After March 11, approximately 30 employees remain unaffected by the RIF to perform that work for over 5,500 institutions.

29. There is no way that the 30 remaining SEOS employees can fulfill the statutorily mandated responsibilities described above for over 5,500 schools. This is particularly troubling because SEOS's work reveals frequent violations of the Title IV requirements, and diminished oversight will mean many fewer instances of these problems being caught and addressed and less overall compliance with the Title IV requirements.

30. Additionally, it is my understanding that the entirety of the Multi-Region and Foreign School Participation Section and the Atlanta School Oversight Section—as well as the vast majority of their specialized, experienced staff[4]—will be eliminated by the mass RIF and the President's EO directing the Secretary of Education to shut down the Department. Without the Multi-Region and Foreign School Participation Section, there is no way that the Department can satisfy its statutorily and regulatorily required oversight of proprietary schools and large school groups. Without the Atlanta office, there is no way that the Department can conduct any meaningful financial analysis of the more than 5,500 participating schools, as is statutorily and regulatorily required.

31. Since March 11, 2025, it is my understanding that the statutorily required reviews described above are not occurring, including audits and review of financial statements. I understand that institutions that were scheduled for program reviews as of March 11 were removed from that list without the completion of the reviews required under Title IV.

32. Without anyone conducting the requisite oversight over institutions of higher education, no one will identify schools that are failing financially and mitigate risk to Department funds by ensuring financial protection is in place, including heightened cash monitoring, providing an irrevocable letter of credit, putting cash in escrow accounts, or limiting their ability to draw down funds from the Treasury Department. Schools will become financially insolvent and close, leaving the Department liable for providing student borrowers with Closed School Discharges[5]

---

[4] It is my understanding that one of the approximately twenty-seven Atlanta office staff members, who was located in another regional office, remains unaffected by FSA after the mass RIF.

[5] The Department is required to discharge the loans of certain borrowers when their school closes. *See* 20 U.S.C. § 1087(c)(1); 34 C.F.R. § 685.214.

and unpaid refunds of Title IV funds.[6] Without sufficient SEOS oversight, student borrowers will face substantially increased risks of their schools losing accreditation or closing, which will cause those student borrowers not only financial harm, but also the major life interruptions that are substantially likely to result from one's school closing or losing its accreditation: loss of housing, the time and expense of finding a new job, vocation, or educational program to attend, the need to uproot oneself and move to find that new opportunity, and the loss of value in the degree that one borrowed money to obtain, among other possible impacts.

---

[6] The Department is required to discharge a portion of the loans of certain borrowers when their school closes and fails to refund any portion of the loan that should have been refunded under applicable law and regulations. *See* 20 U.S.C. § 1087(c)(1); 34 C.F.R. § 685.216.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 23, 2025.

/s/ Doe Declarant #4*<br>
Doe Declarant #4

* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.

14