# Exhibit N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF DOE DECLARANT #5

I, Doe Declarant #5, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated below.

2. I was until recently a Senior Attorney in the Office for Civil Rights ("OCR") of the United States Department of Education ("the Department"), in one of the five field offices which remained open after the March 11 Reduction in Force ("RIF"). I worked in OCR, first as a General Attorney and then as a Senior Attorney, for more than five years. I have a J.D. and a bachelor's degree.

3. OCR is required by law to exist within the Department and has the core statutory responsibility to resolve complaints of civil rights violations in education. 20 U.S.C. §§ 3413(a), 3441(a)(3).

4. OCR is responsible for enforcing and investigating alleged violations of civil rights laws that protect students and other individuals in K-12 and higher education, including Title VI of the Civil Rights Act of 1964 ("Title VI"), Title IX of the Education Amendments of 1972 ("Title

IX"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990 ("Title II"), and the Boy Scouts of America Equal Access Act of 2002. A large portion of the complaints OCR receives alleged discrimination on the basis of disability. We also handled claims of discrimination, including harassment and bullying, on the basis of race, color, national origin, sex, and age.

5. As a General Attorney in an OCR field office, my job responsibilities included investigating and resolving complaints of possible violations of civil rights laws in K-12 and higher education. I reviewed complaints; interviewed complainants, determined if we had jurisdiction over the complaint; prepared for and conducted witness interviews, including of employees at the relevant school district; performed site visits when necessary; drafted data and document requests; reviewed documents; and made determinations as to whether a violation of civil rights laws had taken place. I drafted internal memos and external correspondence; negotiated resolution agreements; and monitored compliance with those resolutions.

6. I also provided technical assistance to members of the public. My field office had a public phone number and email address which members of the public could call or write to ask questions. These questions were assigned to attorneys or investigators, and we would answer them directly.

7. The investigations, resolutions, monitoring, information and technical assistance that OCR provides are free to parents and students. In my experience, the civil rights enforcement and information that our regional office provided filled a void in civil rights enforcement in many of the states in which our office operated. Many states, including several in which our office operated, do not have a comparable education and civil rights enforcement office. And families often lack the resources that would be required to litigate civil rights claims themselves.

8. When I was a Senior Attorney, my responsibilities were similar, and I also supervised and mentored other attorneys in my office.

9. Pursuant to the Government Performance and Results Act, OCR's policy is to resolve 80% of complaints within 180 days. However, for several years all OCR regional offices have struggled to achieve that goal due to budget cuts and understaffing. This has resulted in an increasing backlog of complaints for years. The number of complaints filed with OCR has also increased dramatically in recent years. In my experience, the higher an attorney's caseload, the smaller percentage of cases they are able to resolve within 180 days.

10. Before the RIF, in my field office, each attorney had at least 50 cases on their docket. This was too many cases for one person to handle in a timely and responsible way. Each attorney handled each case start to finish. Some were simple, but others were large and complex. We have some tools, including mediation and a "rapid resolution process," to try to resolve as many cases as possible within the 180-day timeframe. However, it was not possible to resolve all of our cases within 180 days or even 80% of cases within that time.

11. On March 11, the Department of Education initiated a RIF which impacted nearly 50% of the Department's workforce. As part of the RIF, seven of the Department's 12 OCR field offices were closed. All the staff who worked in those seven field offices were placed on administrative leave, and then their positions were eliminated. Overall, nearly half of OCR's field office staff were terminated under the RIF.

12. The OCR field office in which I worked was one of the five which was not closed pursuant to the RIF.

13. In January 2025 my field office had approximately 40 employees (including attorneys and others). Even though we were not closed by the RIF, by April 2025 we had lost about

25% of this number, due to employees electing to take the "fork in the road" deferred resignation programs, retirements and early retirements, and people simply choosing to leave.

14. When the seven OCR field offices were closed, their cases were supposed to be absorbed by the five offices that remained open. The assignments are supposed to be:

    a. Washington, DC to receive Boston's and New York's cases;

    b. Atlanta to receive Philadelphia's cases;

    c. Denver to receive Cleveland and Chicago's cases;

    d. Kansas City to receive Dallas's cases; and

    e. Seattle to receive San Francisco's cases

15. The RIF was carried out in an abrupt and chaotic way. I know from speaking with colleagues in the closed field offices that shortly after the RIF was announced, people in the closed offices were cut off from their access to the electronic systems we use for our work, including the Case Management System ("CMS") and their ability to email anyone outside the Department. Attorneys often keep notes on their cases outside of the CMS and only upload final documents into the system. Due to the lack of access, however, attorneys and investigators were unable to upload many of their working files on their cases into the CMS, write transfer memos about their cases, or even notify parties that they had been terminated.

16. Thousands of complaints were left in limbo because of the RIF. I know colleagues in closed OCR field offices who were in the middle of resolving a complaint and then were suddenly unable to access their files or reach out to the complainant or the school district to let them know what had happened. This means that resolution agreements that would have provided students with relief from civil rights violations that deprive them of equal educational opportunities, were not executed in a timely way.

17. By the time I left my position more than a month after the RIF, I had not gotten a list of the cases I was supposed to be assigned from the closed field office(s) whose cases were supposed to be absorbed by my field office. I do not know exactly how much my caseload would have increased. Since OCR lost nearly 50% of its field staff nationwide due to the March RIF, on top of the losses that had occurred earlier this year due to retirements, people terminated for DEI activity, and the mass termination of probationary employees, I understood that my caseload would more than double.

18. By the time I left my position, employees in my field office still could not access the closed field offices' cases on our CMS. Only a person who is assigned to a particular case within CMS can fully access and make changes to the case files. The cases from the closed field offices had not been reassigned within CMS, so we could not access them or make any changes.

19. To my knowledge, no-one had reached out to complainants or parties for the cases from the closed field offices to let them know that the attorneys handling their cases were fired, or who would be handling their complaints going forward.

20. The more time passes, the more difficult it becomes to investigate a complaint, since memories fade and documents are deleted or lost. If complaints are not resolved in a timely manner, the harm to students increases, and an eventual resolution may come too late to be meaningful to the complainant. For example, a student with a disability is unable to participate equally in class because they are not receiving their approved IEP accommodations or they are excluded from a field trip because of their disability. Similarly, students who are being harassed based on their race, color, national origin, sex, or disability need timely intervention. When schools do not respond or do not respond appropriately, this can lead to the denial of equal educational opportunity.

21. Some investigations require in-person investigatory visits, for instance to see if facilities are accessible to children with disabilities, and to interview witnesses. In-person visits will become even more difficult or impossible with only five field offices nationwide and more than doubled caseloads.

22. Based on my experience with our already heavy caseloads, if my caseload more than doubled I would not be able to fairly review and investigate all of those complaints. Some complaints would need to go unaddressed for months, others I would need to handle in a cursory way simply to manage the volume of work. Based on my experience within OCR, the same would be true of my colleagues. As a result, meritorious complaints will languish and not be resolved as a result of the RIF, and students will be denied equal educational opportunities in violation of the law.

23. To my knowledge, the closed field offices' phone numbers and email addresses which members of the public could use to ask questions and seek technical assistance from OCR staff were not shifted to the remaining open offices.

24. OCR staff had been told during meetings that the Department would be drafting new performance review plans that would focus on whether you had resolved cases that were consistent with the Administration's policy priorities. Those policy priorities were described as antisemitism, transgender athlete and bathroom cases, and "DEI" cases. This had not occurred yet when I left.

25. I decided to leave my position with OCR after the RIF because I knew it would have been impossible for me to responsibly handle the immensely increased number of cases for which I would have been responsible, and because I did not trust that the current Administration

would allow us to do our jobs by processing and resolving civil rights complaints that were inconsistent with the Administration's policy priorities.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 17, 2025.

/s/ Doe Declarant #5*<br>Doe Declarant #5

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.