# Exhibit O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

## **DECLARATION OF DOE DECLARANT #6**

I, Doe Declarant #6, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. I am a senior attorney at the Office for Civil Rights ("OCR"), of the United States Department of Education ("the Department"), Cleveland field office. I have been in this position for over 18 years. Before this position, I worked at a non-profit and was an attorney at the U.S. Department of Justice, Antitrust Division. I have a J.D. and a bachelor's degree.

3. In 2021, I took a 10-month data science training program with the Department's Office of the Chief Data Officer and as part of the Department's implementation of the Foundation for Evidence-based Policymaking Act of 2018.

4. As a senior attorney, I was the lead attorney on 36 active investigations into complaints regarding civil rights violations at K-12 and institutions of higher education in Ohio and Michigan. During active investigations, my tasks included reviewing complaints, making determinations regarding whether the complaints were appropriate for investigation, drafting data

and document requests, reviewing documents, preparing for and conducting witness interviews, analyzing and synthesizing facts, drafting internal memos and external correspondence, and negotiating resolution agreements.

5. I was also responsible for monitoring 12 resolution agreements and their implementation. In addition, I provided technical assistance to public entities, parents and guardians, students, and the public on civil rights issues.

6. In addition to my legal work as a senior attorney, as part of my regular day-to-day duties, I was responsible for creating, maintaining, obtaining data for, analyzing, and internally publishing nationwide OCR data dashboards.

7. I regularly obtained data for and published the following data categories on the dashboards, including:

   a. the total number of investigators at each field office;

   b. the total number of active cases (disaggregated by type of claim);

   c. the number of active cases per investigator;

   d. the number of monitoring cases per field office;

   e. average number of active cases per investigator at each field office;

   f. the number of cases closed at each field office; and

   g. the percentage of cases that were closed by day 180 in a field office.

8. I last refreshed the dashboards on March 11, 2025.

9. Additionally, I and others throughout OCR were provided with a report generated by headquarters containing various metrics on a monthly and fiscal year ("FY") basis. This report is known as the CMS Report. The CMS Report includes metrics around investigative staff, complaints, resolutions, and Government Performance and Results Act ("GPRA") standards, both

in total for OCR and by regional office. I received the FY 2024 CMS Report. A true and accurate copy is attached to this Declaration as **Exhibit 1**.

10. I am providing this declaration in connection with the drastic downsizing of OCR and closing of more than half of its enforcement offices, including the announcement on March 11, 2025, that the Department would be reducing its staff by 50% and that this was a "significant step" towards the Department's "final mission." *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release").

11. On March 11, 2025, I received an email stating that my position was eliminated and that I had until March 21, 2025, to close out my job. However, the only tasks I could perform from March 12 through 21 were to enter my timesheets and send and receive emails internally. I did not have access to the OCR Case Management System, or Document Management System, nor could I email anyone outside of OCR after March 11, even though I received emails from complainants and recipients asking about the status of cases, trying to respond to data requests, and regarding other case-related activity. I will be employed by the Department through June 9, 2025, but have been unable to do any work on my cases since the March 11 notice.

12. I have received emails from colleagues informing me that many across OCR received similar notices and that the Department closed the Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco OCR regional offices (collectively, the "Closed Offices"), and left open the Atlanta, Denver, Kansas City, DC Metro ("Metro"), and Seattle OCR regional offices (collectively, the "Open Offices"). I also read press accounts reporting these actions.

13. As of the date of this declaration, the Department "Contact OCR" website confirms that complaints and inquiries from states once served by the Boston and New York regional offices are now routed to the Metro office; states once served by the Chicago and Cleveland offices are now routed to Denver; states once served by the Dallas office are now routed to Kansas City; states once served by the Philadelphia office are now routed to Atlanta; and states once served by the San Francisco office are now routed to Seattle. *See* OCR, *2024 FY Annual Report* 7, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf; *Contact OCR*, https://ocrcas.ed.gov/contact-ocr (last visited June 5, 2025). The chart below shows which states, districts, and territories are currently being served by the Open Offices.

| OCR Regional Office | State, District, or Territory served prior to March 21, 2025 | Additional States and Territories served by the Open Offices after March 21 |
|---|---|---|
| **Open Offices** | | |
| WASHINGTON, DC (METRO) | DC, VA, NC, SC | MA, ME, VT, NH, RI, CT, NY, NJ, PUERTO RICO, U.S. VIRGIN ISLANDS |
| ATLANTA, GA | GA, TN, AL, FL | PA, DE, MD, WV, KY |
| DENVER, CO | CO, WY, UT, AZ, NM | IL, IN, IA, WI, MN, ND, OH, MI |
| KANSAS CITY, MO | MO, SD, NE, KS, OK, AR | TX, LA, MS |
| SEATTLE, WA | WA, OR, ID, MT, NV, AK, HI, AMERICAN SAMOA, GUAM, NORTHERN MARIANA ISLANDS | CA |
| **Closed Offices** | | |
| NEW YORK, NY | NY, NJ, PUERTO RICO, U.S. VIRGIN ISLANDS | |
| PHILADELPHIA, PA | PA, DE, MD, WV, KY | |

| OCR Regional Office | State, District, or Territory served prior to March 21, 2025 | Additional States and Territories served by the Open Offices after March 21 |
|---|---|---|
| SAN FRANCISCO, CA | CA | |
| BOSTON, MA | MA, ME, VT, NH, RI, CT | |
| CHICAGO, IL | IL, IN, IA, WI, MN, ND | |
| CLEVELAND, OH | OH, MI | |
| DALLAS, TX | TX, LA, MS | |

14. I have heard that the Secretary of Education explained that the administration chose to close the lowest performing offices, and that the Open Offices can and will absorb the additional work. This is not true.

15. I know that my hardworking colleagues in all the regional offices did their very best with the resources OCR gave them. But caseloads were too high even prior to March 11, 2025, which is evidenced by the fact that, for FY 2024, ten of the twelve regional offices failed to meet the GPRA goal of resolving 80% of cases received during that FY within 180 days. In addition to the GPRA percentages, the CMS Report also details the number of cases resolved and number of investigators in each office. The chart below shows both the GPRA percentage by office and evidence that the office closure decisions do not correlate with success in resolving cases. For example, Chicago and Cleveland, two offices with relatively high average number of cases resolved per investigator during FY 2024, were closed, while Atlanta and Seattle, two offices with low average closure rates per investigator, remain open. By these measures, some of the most effective, efficient offices were closed, and some less productive offices remain open.

5

| OCR: Regional Office Productivity Measures (FY 2024) | | |
|---|---|---|
| **Closed Offices** | **% Cases Resolved in 180 Days** | **# of Cases Resolved / # of Full Time Investigators = Average # of Cases Resolved per Investigator** |
| Boston | 70% | 868 / 20:     43 cases per investigator |
| Chicago | 74% | 1176 / 33:   36 cases per investigator |
| Cleveland | 73% | 1104 / 25:   44 cases per investigator |
| Dallas | 71% | 1526 / 40:   38 cases per investigator |
| New York | 66% | 916 / 32:     29 cases per investigator |
| Philadelphia | 63% | 713 / 24.5:  29 cases per investigator |
| San Francisco | 65% | 1419 / 35:   41 cases per investigator |
| **Open Offices** | | |
| Atlanta | 55% | 880 / 42:     21 cases per investigator |
| Denver | 83% | 1154/ 22.5:  51 cases per investigator |
| DC Metro | 71% | 1167/ 29.5:  40 cases per investigator |
| Kansas City | 81% | 815 / 26:     31 cases per investigator |
| Seattle | 64% | 626 / 24:     26 cases per investigator |

16. All of the Open Offices are facing an influx of cases from the Closed Offices that will further burden the ability of investigators to meet the 180-day goal. It is impossible for the remaining investigative staff to absorb the additional cases in a way that will allow for any meaningful enforcement of civil rights laws in the education systems of this country. In January 2025, offices reported that there were 375.5 (372 full time and 7 part time) total investigators at OCR across the country. (Compare this to the 353.5 investigators at the end of FY 2024 (September 30, 2024), shown in the chart above; OCR had hired around 22 additional investigators to start addressing the high case load.) Since then, due to both the March 11th RIF as well as the other efforts by the Trump Administration to reduce the size of the federal workforce, the number of staff has been drastically reduced. The dashboards show that, as of March 11, 2025, the investigators at the Closed Offices were investigating a total of 9,181 active cases, 57% of the total number of active OCR cases (16,022). At least 7,037 of the active cases that were being investigated by staff at a Closed Office as of March 11, 2025, included an allegation or claim of noncompliance

6

with Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act of 1990.

17. The Closed Offices had an aggregate of 224.5 investigators, approximately 60% of the total number of OCR investigators (375.5), leaving only 151 investigators at the Open Offices.

18. After the mass terminations and office closures, OCR has no more than 151 investigators assigned to 16,022 cases, an average of 106 cases per investigator. However, the true estimate is likely higher, given the number of OCR investigators that I personally know who have left OCR since January because of communications from the Trump administration. For example, on May 22, 2025, I communicated with a current employee at the Denver office, which is an Open Office, and learned that Denver had only 16 investigators. On March 11, Denver had 773 open cases. As shown above, Cleveland and Chicago's cases went to Denver; Cleveland had 1,151 cases and Chicago had 1,407 cases. This means that beginning March 22, Denver had 3,331 open cases; with 16 investigators, this is an average case load of 208 cases per investigator.

19. This is a completely untenable caseload and will necessarily prevent OCR from fulfilling its mandate of promptly investigating and resolving civil rights complaints. The data supports this conclusion. According to the FY 2024 CMS Report, Denver, the office with the highest percentage of cases resolved within 180 days (83%), also had one of the lowest caseloads per investigator (665 pending cases, 22.5 investigators = 30 cases per investigator). Atlanta, the office with the highest caseload per investigator (1,972 pending cases, 42 investigators = 47 cases per investigator), also had the lowest number of cases resolved within 180 days (55%).

20. The 16,022 cases do not even include the number of cases in monitoring. Cases in monitoring are cases where OCR found a violation or had a cause for concern, and the school signed a resolution agreement requiring it to take action to come back into compliance with the

civil rights laws. Cases in monitoring demand considerable time and action to make sure the school fulfills the actions and deadlines set out in the Resolution Agreement; often the assigned attorney must review and edit complex documents and policies. As of March 11, 2025, OCR had 2,765 cases in monitoring, 902 of which (33%) had been handled by the Closed Offices. (The National Digital Accessibility Team, with staff who had specialized expertise in website and online accessibility, had 870 cases in monitoring. I do not know what happened to that team.)

21. The failure to institute any kind of procedure for transitioning cases only magnifies the harm. I am employed by the Department until June 9, 2025, but have not been afforded any opportunity to update or assist in transferring the cases I worked until March 11, 2025. I could not do this work even from March 12-21, before I was shut out from accessing any OCR facilities and my computer. My Cleveland Office colleagues and I could not update our cases in the Case Management System, or upload documents or emails to the Document Management System, nor could we respond to emails from outside the Department, including from parents, witnesses, or schools engaged in investigations, mediations, or monitoring. I know that our Acting Director asked if we could get the access needed to take these steps but was told no.

22. To provide one example of how the failure to transition cases harmed one of my 12 cases in monitoring: I was the senior attorney monitoring a Resolution Agreement reached with a large university regarding multiple complaints of discrimination against students on the basis of national origin (Jewish Ancestry / Israeli) in violation of Title VI. The Resolution Agreement required the university to take several actions, including revising its Title VI policies and the process for handling these complaints. I was responsible for ensuring the university fully complied with the Agreement, including reviewing and editing draft documents and policies and approving required actions under the Agreement. Despite the critical work underway on this case, after March

8

11, 2025, I had no way to contact the university on behalf of OCR. I did not know when any attorney would take over the case, and I had no ability to access and make updates or flag priorities for fulfilling the terms of the Resolution Agreement.

23. As a senior attorney with 18 years of experience at OCR, if I were assigned 106 active cases, I would either be forced to conduct cursory investigations that are investigations in name only in order to resolve the cases in a timely fashion or allow cases to languish for an unreasonably long time. And it would be impossible for me to do comprehensive monitoring on additional cases.

24. In addition to the burden of an unmanageable docket of existing cases, the Open Offices will be overwhelmed by new complaints. To take two examples: Metro (Open Office) must now find a way to process incoming complaints from states formerly served by Boston and New York (Closed Offices); similarly, Denver (Open Office) now receives new complaints from states formerly served by Cleveland and Chicago (Closed Offices).

25. The more time passes, the more difficult it is to investigate a complaint and the less effective a remedy can be. Witness memories fade. Documents are lost or destroyed. Complaining victims move on with their lives and do not want to be retraumatized. And the damage done by a lost year of educational opportunities due to discrimination or harassment is not readily undone. As a result, meritorious complaints, and the students affected by those complaints, will necessarily be denied the access to educational opportunities they are due because of the Department's radical downsizing of OCR and closing of more than half of its enforcement offices.

I declare under penalty of perjury under the laws of the United States, that, to the best of my knowledge, the foregoing is true and correct.

Executed June 9, 2025.

/s/Doe Declarant #6*
Doe Declarant #6

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.

10