# Exhibit P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

**DECLARATION OF DOE DECLARANT #7**

I, Doe Declarant #7, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated below. If called as a witness, I could and would testify competently to the matters set forth below.

2. I have worked at the U.S. Department of Education ("the Department") for 14 years, nearly all of my professional career, until the March 11, 2025 Reduction in Force ("RIF"). For the first approximately four years, I worked in the Office of Elementary and Secondary Education. For the last ten years, I have worked in the Office of English Language Acquisition ("OELA") as a Team Leader on the National Professional Development ("NPD") Program. Before joining the Department, I taught Spanish through the Teach for America program. I hold a Bachelor's Degree in Spanish and a Master of Science degree in Education.

3. OELA is required to exist by statute. In 1979, Congress passed the Department of Education Organization Act, a law establishing the Department of Education, which created an

"Office of Bilingual Education and Minority Languages Affairs," to be administered by a Director. Pub. L. No. 96-88, § 210, 93 Stat. 669, 675 (1979). The 2002 No Child Left Behind Act established an "Office of English Language Acquisition, Language Enhancement, and Academic Achievement for Limited English Proficient Students" in place of the Office of Bilingual Education. 20 U.S.C. § 3420.

   4.  OELA was designed to serve the five million English Language Learners ("ELLs") and Multilingual Language Learners ("MLLs") who comprise about 10 percent of all public school students in the United States. The Office provides national leadership and support to local and state school systems to ensure that ELLs/MLLs become proficient in English. We help to set policy relevant to ELLs/MLLs and provide research and data resources through the National Clearinghouse for English Language Acquisition ("NCELA"), as required by 20 U.S.C. § 7013. OELA also administers three grant programs, all authorized by Title III of the Elementary and Secondary Education Act ("ESEA") of 1965, as amended by the Every Student Succeeds Act of 2015 ("ESSA"):

  a. Title III English Language Acquisition State Grants. These are formula grants to states and local education agencies to help ensure that ELLs/MLLs attain English language proficiency and meet state academic standards. Congress appropriated $890 million for these grants in fiscal year 2024.[1] (The Department's Office of Elementary and Secondary Education ("OESE") manages the Title III formula distribution, but OELA had the responsibility for post-award activities, including monitoring and policy.)

  b. National Professional Development Program. These are competitive grants to support institutions of higher education or public or private entities to provide training for teachers to become certified as ELL/MLL instructors; to provide in-service training to already certified teachers, and to provide family and community involvement activities. Congress appropriated $59.4

---

[1] *English Language Acquisition State Grants; Title III, Part A*, *Funding Status & Awards*, U.S. Dep't of Educ., https://www.ed.gov/grants-and-programs/formula-grants/formula-grants-special-populations/english-language-acquisition-state-grants-mdash-title-iii-part-a#funding-status-awards (last reviewed by publisher on Jan. 17, 2025).

2

million for these grants in fiscal year 2024.[2]

    c. Native American and Alaska Native Children in School ("NAM") Program. These are competitive grants of $5M per year to support the learning of Native American languages and to increase the English language proficiency of ELLs/MLLs from Native American, Alaska Native, Native Hawaiian, and Pacific Islander backgrounds.[3]

5. I am the Team Leader for the NPD Program, which is aimed at providing assistance to ELLs/MLLs in accessing academic content. The grants go mostly to institutions of higher education, plus some public and private entities with relevant experience. Grantees work in consortia with state or local educational agencies to train ELL/MLL teachers and other educators, including through degree programs and professional development. The grants pay for tuition reimbursement for undergraduates seeking ELL/MLL certifications; professional development for current teachers, administrators, and counselors; parental involvement activities; after-school programs; curricular development; and language-education software.

6. As the NPD Team Lead, I was in charge of overseeing grant administration for all NPD grants to ensure the grantees were using funds in allowable ways and meeting their performance goals and objectives and to prevent waste, fraud, and abuse. Currently, there are 107 active NPD grants. I led a team of 7 Education Program Specialists ("EPS"), or program officers, each of whom was assigned to approximately 15 grants.

7. NPD Program grants follow an annual cycle. Grant years run from September 1 to August 31. When Congress appropriates money for new grants, OELA begins planning the grant

---

[2] *National Professional Development Program*, Awarding & Legislation, U.S. Dep't Educ., https://www.ed.gov/grants-and-programs/teacher-prep/national-professional-development-program#awarding-legislation (last reviewed by publisher on Mar. 13, 2025).

[3] *Native American and Alaska Native Children in School (NAM) Program*, Home, U.S. Dep't of Educ., https://www.ed.gov/grants-and-programs/grants-special-populations/grants-native-alaskan-pacific/native-american-and-alaska-native-children-school-program#home (last reviewed by publisher on Dec. 31, 2024); *Id.*, Funding Status, U.S. Dep't of Educ., https://www.ed.gov/grants-and-programs/grants-special-populations/grants-native-alaskan-pacific/native-american-and-alaska-native-children-school-program#funding-status.

3

competition in the spring. That plan goes through a number of approvals. The goal is to publish notices of new grant availability in the Federal Register by December 1. Applications are due on February 1 of the following year. In the following spring, we bring in experts who rate and rank applications as part of a peer review process. The experts make recommendations as to which grants should be awarded. My team prepares a slate memo of proposed awardees, and the Secretary makes the final decisions. We then prepare and distribute grant award notifications, informing awardees of their selection and the terms and conditions of the grants. Money for new grants is released on or by September 1, and most grants are awarded for a period of five years.

8. Once grants are awarded, grantees must submit quarterly reports, plus an annual performance report, which must include a budget for the following year. Annual performance reports are due in May. Program officers reviewed all 107 annual performance reports each June. They would communicate with grantees to make sure the reports were complete and contained all the required budget information, and review the reports to determine whether grantees were making progress towards the goals provided in their grant applications. Goals might include, for instance, recruiting a certain number of teachers. In the summer, program officers (in OELA and across the Department) prepare memos to justify either continuing grant awards or cutting grant funding for ongoing grants. Those memos go through a clearance process, in which they move from my office, to career and political leaders of OELA, to the obligating office, which in the case of NPD grants is OESE. The clearance process takes about six weeks. The grants must be renewed, modified, or discontinued, by September 1.

9. The EPS on my team were the people grantees came to with questions about how they could spend their grant funding. They also reviewed grantees' quarterly and annual reports from grantees to ensure money was spent in accordance with federal law and regulations under 2

C.F.R. pt. 200, EDGAR, and the program rules. Each program officer was in touch with the grantees to which they were assigned at least once per quarter. For new grantees or those that needed more help, they would be in touch more often to get the grantees acquainted with rules and reporting requirements and to answer questions. Grantees would reach out to their EPS with questions about, for instance, permissible uses of grant funds; challenges to daily grant operations around teacher recruitment and retention; Government Performance and Results Act ("GPRA") measures and project goal attainment; knowledge on navigating varying ELL/MLL state and local requirements to line up with NPD grants; grant audit resolutions; and managing spending and drawdown patterns to align with Department rules.

10. At the end of 2024, there were approximately 7 employees on my NPD team. This number had declined to 3 by March, because of a retirement in December 2024, two NPD employees being put on administrative leave in February because they had attended a workshop in the past that touched on DEI, and one person retiring in March under an early retirement incentive program. These departures brought the overall number of OELA employees down from 16 in December 2024 to 12 by March 2025.

11. Everyone remaining in OELA, including me, was terminated in the March 11, 2025 RIF, except for one person, the Director. The RIF notice I received said "your organizational unit is being abolished" and that I was being placed on administrative leave as of March 21, with my employment to terminate as of June 10, 2025. However, after receiving the RIF notice we were not given any opportunity to transfer our work to anyone else in the Department. If you send an email to my Department email address, you now get a bounce-back message that goes to a generic transition email address. I do not know if anyone is monitoring that email address or responding to questions sent to it.

5

12. On June 6, 2025, I received an email that I would not be separated on June 10 based on recent court orders. According to the email, the Department is "actively assessing how to reintegrate [employees] back to the office in the most seamless way possible. This includes evaluating necessary updates to security access, technology, and workspaces to ensure full operability."

13. Based on my experience, if the RIF is carried out it will have a severe impact on the Department's ability to carry out its obligations to administer Title III grants. The one person left in OELA is now supposed to be in charge of all of the $890M in grants OELA administers. It is impossible for one person to administer all of those grants. OELA staff have unique subject matter expertise in the ELL/MLL landscape. While Department colleagues in other areas may be familiar with the grant award process in general, OELA staff are uniquely positioned to guide the actual day-to-day implementation of the NPD grants. OELA staff assist grantees in establishing and revisiting project goals, addressing unforeseen challenges to ELL/MLL educator recruitment and retention, and answering questions from evaluators, for example. If OELA's work is reassigned to other staff remaining in the Department, they will not have the experience and familiarity with the NPD program, or any of the other grant programs in OELA, to be able to administer it effectively, especially while also doing other jobs.

14. For example, without their OELA program officers, grantees will not be able to raise questions and receive timely monitoring guidance and technical assistance. This will leave grantees significantly hampered in their ability to plan and budget for next year.

15. When the RIF occurred, my team was in the middle of reviewing grantees' second quarterly update for Fiscal Year 2025. Half of the grantees had not yet gotten a response from OELA about whether their activities for that quarter were aligned with the grant requirements and

6

were approved. I have personal knowledge of several grantees that cannot take action or make decisions on their budgets for next year because they do not have a program officer to approve their activities or guide them on next steps.

16. Without program officers to contact, and in light of the RIF and other actions taken to dismantle the Department, grantees also face uncertainty about whether they will get funding for next year. Unless they can be sure that they will receive continued grant funding next year, institutions may not feel confident enough to, for instance, recruit current high school students to enter ELL/MLL teacher training programs in the fall.

17. Likewise, potential ELL/MLL teachers may decide not to enter a teacher training program because of uncertainty about whether they can depend on Department programs for scholarships or tuition reimbursement. Ultimately, ELL/MLL students will be harmed if fewer teachers are trained in ELL/MLL education, an area in which there are already significant teacher shortages.

18. A lack of oversight and technical assistance could lead grantees to spend grant money in violation of the law and regulations, or to engage in waste, fraud, or abuse which would go undetected. Grantees have tried to spend money inappropriately in the past, but OELA served as a guardrail to ensure that the law was followed.

19. At the time of the RIF, my office was already in the process of preparing for a 2026 NPD competition, in order to be ready if and when Congress appropriates money for those grants in the FY2026 budget bill. Because the process for planning grant competitions from inception to award stretches anywhere from 12-18 months, OELA has had to begin planning for awards before Congress appropriates. If OELA waits until there is appropriation, it runs the risk of not awarding on time for that fiscal year given the layers of approval from other offices and political leadership.

Now, there will not be program staff to write the needed Federal Register notices and to shepherd them through the internal approval process so they can be published by December 1.

20. The one person remaining in OELA will also need to be responsible for overseeing the $900M contract between the Department and Manhattan Strategies, which runs the statutorily-mandated NCELA. It is not feasible for one person to administer that contract, let alone while running the rest of OELA. The contractor needs OELA staff to sign off on its work in order for it to be able to carry out the NCELA functions.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 18, 2025.

/s/ Doe Declarant #7*<br>Doe Declarant #7

\* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.