# Exhibit R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF DOE DECLARANT #9

I, Doe Declarant #9, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a Statistician in the National Center for Education Statistics ("NCES") within the Institute of Education Sciences ("IES"), a semi-independent division of the U.S. Department of Education ("the Department"). NCES is the primary statistical agency of the Department and one of thirteen principal federal statistical agencies focused on the collection, compilation, processing, or analysis of information for statistical purposes. *See* 44 U.S.C. § 3563(a)(1). I have worked at NCES for approximately 5 years and have knowledge about its responsibilities.

3. The Education Sciences Reform Act of 2002 ("ESRA") organized NCES as a division within IES with specific data collection and research responsibilities. To fulfill these

duties, NCES administers approximately 30 data collections, including the National Assessment of Educational Progress ("NAEP"). Educators, policymakers, researchers, advocates, parents, and the Department rely on NCES data to make informed decisions about prekindergarten through postsecondary education. NCES staff ensure that agency statistics meet the highest standards of accuracy and reliability, are timely and objective, and are free of political influence and bias.

4. NCES's data collections and reporting accounts for about $300 million in budget line items each year.[1] But because this funding cannot be used for salaries and other personnel expenses, NCES depends on receiving a portion of IES's program administration budget to hire staff. As a result, in January 2025, NCES had fewer than 100 full-time equivalent employees—a budget-to-staff ratio roughly ten times the median of the other federal statistical agencies[2]—and was heavily reliant on external contractors and interagency agreements to carry out its statutory responsibilities, subject to close oversight and monitoring by NCES personnel.

5. As of March 2025, NCES consisted of the Office of the Commissioner and five divisions: the Annual Report & Information Staff Division, the Statistical Standards and Data Confidentiality Division, the Assessments Division, the Administrative Data Division, and the Sample Surveys Division. Each of these subunits has its own statutorily delineated responsibilities.

### The Sample Surveys Division

6. I work in the Sample Surveys Division, which manages cross-sectional and longitudinal studies that collected person-level data from parents, students, and education staff through collections such as:

---

[1] American Statistical Association ("ASA"), *The Nation's Data at Risk: Meeting America's Information Needs for the 21st Century* 22 (2024), https://www.amstat.org/docs/default-source/amstat-documents/the-nation's-data-at-risk---report.pdf?v=0321.

[2] ASA, *Supporting Materials: NCES Agency Profile* 2 (2024), https://www.amstat.org/docs/default-source/amstat-documents/the-nation's-data-at-risk-supporting-materials/national-center-for-education-statistics.pdf?v=1024.

a. The **National Teacher and Principal Survey ("NTPS")**, a nationwide sample survey that collects descriptive data from teachers and principals and statistics on the condition of education in the United States and topics including teacher and principal preparation, classes taught, and demographics of the teacher and principal workforce. This survey fulfills NCES's obligation to collect, report, analyze, and disseminate statistical data on teaching (including in-service professional development and certification requirements), instruction, the conditions of the education workplace, and the educator workforce. 20 U.S.C. § 9543(a)(1)(F)–(G).

b. The **National Postsecondary Student Aid Study ("NPSAS")**, a cross-sectional, comprehensive sample study of student financial aid that collects data about how students and their families pay for postsecondary education. It includes nationally representative samples of undergraduate and graduate students, as well as students attending public and private less-than-two-year postsecondary institutions, community colleges, four-year colleges, and major universities and students who receive and do not receive financial aid. NPSAS is used by the federal government, researchers, and higher education associations to analyze student financial aid and inform public policy on programs such as Pell Grants and federal direct loans. The survey fulfills the Higher Education Act's requirements for postsecondary institutions eligible to distribute federal student aid to report certain data to the Department and for NCES to "conduct, on a State-by-State basis, a survey of recipients of Federal student financial aid." 20 U.S.C. § 1015a(j)–(k)(1).

c. The **School Crime Supplement ("SCS")** to the National Crime Victimization Survey led by the U.S. Department of Justice, which surveys students aged 12–18

3

        in grades 6 through 12 about crime and safety at school and in the surrounding neighborhood; fighting, bullying, and hate-related behavior; and the prevalence of gangs, guns, alcohol, and drugs at school. In addition to contributing to the National Crime Victimization Survey, the SCS carries out NCES's responsibility to collect, report, analyze, and disseminate statistical data on "the incidence, frequency, seriousness, and nature of violence affecting students, school personnel, and other individuals participating in school activities, as well as other indices of school safety." 20 U.S.C. § 9543(a)(1)(H).

    d. The **Career and Technical Education Statistics ("CTE Statistics") System**, which relies on existing NCES surveys to provide data on CTE from students, faculty, and schools at the secondary and postsecondary levels, as well as on adults' work-related education, training, and skills. This system fulfills the mandate under the Carl D. Perkins Career and Technical Education Act of 2006, as amended by the Strengthening Career and Technical Education for the 21st Century Act (Perkins V), for NCES to "collect and report information on career and technical education for a nationally representative sample of students." 20 U.S.C. § 2324(a)(3).

    7.    Since 2022, I have been the Survey Director and contracting officer for a survey within the Sample Survey Division, which collects nationally representative descriptive data on access to early childhood education, state and local reform activities, and parents' view of the general state of their children's schooling, in accordance with ESRA's requirement that NCES collect, report, analyze, and disseminate statistical data related to education issues that cannot be adequately studied through institution-based data collection efforts. 20 U.S.C. § 9543(a)(1)(A)–

(B), (L). The most recent collection for this survey occurred in 2023. It focused on early childhood care and education, and family involvement in school including homeschooling.

8. This survey has been conducted every three to four years since the 1990s, and its administration lifecycle lasts four to five years. The cycle begins with planning for a collection and ends with the publication of public-use and restricted-use datafiles. The most recent collection for this survey occurred in 2023, but work on this administration began more than two years prior, in early 2021, with planning the size and composition of the cross-sectional sample of households that would be invited to respond to the survey and designing the methodology for the survey.

9. In 2022, I became Survey Director for this program. In this role, I lead the process of obtaining approvals for the surveys from the Office of Information and Regulatory Affairs, within the Office of Management and Budget, as required by the Paperwork Reduction Act. I also shepherded the 2023 administration through the Act's mandatory publication and notice-and-comment procedures, oversaw the building of online data collection tools, and checked specifications for the survey design and sample and data collection period.

10. Because NCES is so leanly staffed, I relied on an external contractor and an interagency agreement with the U.S. Census Bureau ("Census") to successfully administer the survey. Census assisted with data collection, and the contractor focused on survey design and data processing and analysis. I directed and supervised the work of both the contractor and Census personnel. As Survey Director, I gave instructions about the parameters for the survey sample, design, and methodology; reviewed all contractor and Census work product for quality, consistency, and accuracy; and resolved any issues that arose across the survey administration lifecycle. I was also the Contracting Officer's Representative ("COR") for the external contract and interagency agreement with Census. My primary obligation in this role was to represent

taxpayer interests by ensuring that the surveys administered aligned with Department priorities and IES's research agenda and guarding against contractor waste, fraud, abuse, and malfeasance.

11.     Due to the insufficient level of staffing at NCES,[3] I am the only full-time employee assigned to work on my survey. It would not be feasible for me to direct another survey, or manage additional contracts, while both completing the 2023 survey administration at a level consistent with NCES statistical standards and planning the 2026 administration.

12.     From January to August 2023, I oversaw the data collection period for the survey. Over this eight-month period, a team at Census collected responses to the approved surveys, and the contractor team tracked and checked the initial data.

13.     Following the end of data collection in August 2023, I began overseeing work to produce initial estimates (known as a "first look report") of the resulting data, allowing for additional time to produce a report explaining the collection methodology (the "datafile user manual") and the final public and restricted use data files. This is a lengthy process because the first look report must be reviewed by six different reviewers within NCES. As Survey Director, I would conduct an initial review of all three deliverables before passing them on to my branch and division managers. After the division manager's review, an NCES representative would complete a technical review, followed by the Chief Statistician's review for accuracy, reliability, and compliance with NCES's statistical standards. The first look reports are then reviewed by the Commissioner for Education Statistics or her delegee, and finally by the Deputy Director of Science at IES or a delegee. The data user manual and data files go through the first four levels of review (branch manager, division manager, NCES technical reviewer, and Chief Statistician) as

---

[3] *See* ASA, *The Nation's Data at Risk* 53 tbl.4 (2024), https://www.amstat.org/docs/default-source/amstat-documents/the-nation's-data-at-risk---report.pdf?v=0321.

well as an additional disclosure board review conducted by the Statistician's office to ensure datafiles protect the privacy of respondents.

14. The first look reports for my survey were published in the fall of 2024, and the restricted-use and public use datafiles had passed through three levels of review (branch manager, division manager, NCES technical reviewer) as of February 2025. I believe that the datafiles were about one month away from being able to be published following the last levels of review (review by the statistician and disclosure board review).

15. The scope and complexity of cross-sectional and longitudinal surveys means that a Survey Director is always working on at least two administrations simultaneously to ensure the timely collection, review, and publication of data on the survey's schedule. Thus, even before the first look estimates for the 2023 administration were published 2024, I had already begun work on planning the 2026 administration.

16. Based on my knowledge and experience, all of the major data collections carried out by NCES are at least as involved and rigorous as this survey, regardless of which Division administers them, and require as much attention and care, if not more so. For example, while the institutional collections carried out by the Administrative Data Division may not require as much sample or survey design, their annual production cycles and use in Department functions such as formula grant administration and NAEP operations mean that the staffing needs remain constant, if not greater. And many, if not all, NCES data collections require staff to diligently manage multiple contracts and interagency agreements for successful completion.

## The Assessment Division

17. I am also familiar with the work of NCES's Assessment Division, which handles large-scale educational assessments to measure the activities and outcomes of educational systems and institutions in states, counties, and school districts; generate comparative data; and gather

7

contextual data from participating students on topics including demographics and curricular, instructional, and resource-related factors that can impact the teaching and learning process.

18. The Assessment Division's biggest task is administering NAEP, commonly known as the Nation's Report Card. First administered in 1969, NAEP is the largest continuing, nationally representative assessment of what students in U.S. public schools know and can do in subjects like math, reading, science, and writing. ESRA mandates that NCES develop and administer NAEP and report the results. 20 U.S.C. § 9622(a).

19. The Assessments Division also facilitates the administration of international assessments, like the Program for International Student Assessment ("PISA"), a triennial assessment that measures 15-year-old students' reading, mathematics, and science literacy, and the Program for the International Assessment of Adult Competencies ("PIACC"), a large-scale assessment that evaluates and compares the foundational literacy, numeracy, and problem solving skills of working-age adults in the United States compared to their peers in other countries.

20. These and other assessments are administered to meet NCES's obligation under ESRA to "acquir[e] and disseminat[e] data on educational activities and student achievement . . . in the United States compared with foreign nations." 20 U.S.C. § 9543(a)(6).

### Loss of NCES Contracts and Staff

21. On February 10, 2025, my colleagues and I were called into a division-wide meeting by my division supervisor, who reported that NCES supervisors had been informed that the Department of Government Efficiency ("DOGE") was cancelling nearly all IES contracts, including nearly all contracts related to NCES generally and the Sample Surveys Division in particular. We were not provided a list of the cancelled contracts and were instructed not to reach out to contractors. I learned that the main contract supporting my survey had been cancelled later,

when an employee in the Department's Contracts and Acquisition Management Office ("CAM") copied me on an email informing the contractor that their contract had been cancelled.

22. Nobody from DOGE or the Department discussed the consequences of cancelling the contract I oversaw or requested my input prior to this meeting. As far as I am aware, none of my NCES or IES colleagues had the opportunity to speak with DOGE or agency leadership before contracts were terminated. It is my understanding that DOGE had already identified contracts for cancellation before they arrived at IES on February 10.

23. In my experience over four years at IES, the manner in which DOGE terminated the majority of IES contracts was highly unusual. The email from the CAM employee who cancelled my contract stated that the agreement was being terminated "for convenience." Based on my training as a COR, I understand that under the Federal Acquisition Regulation, a termination "for convenience" indicates that the federal government has determined it no longer has a need for a particular contract. But all IES contracts supported statutorily required functions, programs, and activities that the Department has a clear "need" to perform or provided operational support for those statutorily required functions. I am unaware of any changes to the laws mandating the work.

24. For example, DOGE initially terminated NCES's contract for EDFacts maintenance and operation, threatening the data system through which NCES and Department program offices collect data that is required by law to administer grant programs. And contracts for the NTPS, the NPSAS, the Early Childhood Longitudinal Study, Kindergarten: 2024, the NAEP Research and Development Program, and the National Assessment of Adult Education were all cancelled, meaning that these programs effectively ceased to exist.

25. My colleagues and I attempted to persuade them to resuscitate essential contracts and ensure the continuation of NCES's statutory functions. It was made clear to me by my

9

supervisors that contracts needed to cut costs in order to be considered for resuscitation. From February 10, 2025 through early March, I personally drafted multiple memoranda explaining how my survey implemented NCES's statutory duties and proposing various cuts to the terminated contract that would trim down costs, at CAM's request. I submitted multiple iterations of this memorandum, cutting more and more out of the contract each time, until it was down to the lowest possible level of functions to complete the 2023 administration. My colleagues, and NCES leadership, undertook similar efforts to save other NCES programs, like the School Pulse Survey and IPEDS.

26.  In addition, I explained in the memoranda that the public-use and restricted-use datafiles were still under review in accordance with NCES statistical standards and that the cancellation of the contract could leave these datafiles, which are the most important deliverables in the contract, unpublished. These datafiles were the culmination of millions of dollars of taxpayer funds, but as of my last day before being put on administrative leave, I received no direction as to who, if anyone, would be responsible for publication of the datafiles given my termination and the cancellation of the contract. As a result, to the best of my knowledge, the data files are sitting with the contractor, who did not transmit the necessary deliverables or have the opportunity to go through an appropriate close-out process before I was placed on administrative leave. I do not know who at the Department would be responsible for receiving and reviewing that deliverable in my absence.

27.  Based on conversations with colleagues, it is my understanding that the Department eventually reinstated the contract for EDFacts, but with significant cuts. In particular, the re-scoped contract eliminates all technical assistance for states (to help them to submit quality data inputs),

all services to provide review and analysis support to component units, all services to assist in writing surveys for the next data collections, and all ability to modify or update surveys.

28. In my experience at NCES and based on my training as a COR, it is highly unusual for the Department to determine whether certain contracts should operate, and at what funding level, *after* terminating them. This type of review and analysis, including consultation with the COR and other relevant personnel, is usually completed *before* the Department decides whether it needs a particular contract, so that the information gathered can inform the Department's thinking.

29. By March 11, 2025, I was conferring with CAM about the Department's review of my request to reinstate my contract. On that day, I received an internal email advising me all three Department buildings in the Washington, D.C. area would be closed on March 12 due to an undisclosed "security threat." Later that evening, I was notified by email that "your organizational unit is being abolished along with all positions within the unit—including yours." The email said that I would be placed on administrative leave beginning March 21, 2025. A true and correct copy of that email is attached as **Exhibit 1**. On April 10, 2025, I received a "Notice of Separation Due to Reduction in Force" that indicated my position, and the entire Sample Surveys Division, was being abolished. A true and correct copy of that email is attached as **Exhibit 2**.

30. My understanding is that as a result of this Reduction in Force, only three of NCES's approximately 100 employees remain, all of whom work in the Office of the Commissioner rather than one of the divisions. As far as I am aware, only one of these three employees is trained and certified as a COR, meaning that this individual is the only remaining employee qualified to manage any (or all) of the contracts within NCES. None have managed an administrative data collection or sample survey or worked on the data resources used for the formula grant programs.

31. Reductions to IES's IT contract will also take a toll: tens of millions of users access NCES's online databases each year. These platforms require regular maintenance to stay up and running, but IES's remaining IT contract is not sufficient in scope to troubleshoot and address technical problems that may arise, much less respond to a security breach or other threat.

32. Likewise, NCES's sample surveys and assessments work will deteriorate without skilled personnel to guide the conceptual and methodological foundations of these studies and supervise contractors' and data collectors' work to guarantee accuracy and usability.

33. Based on my knowledge and experience, I do not believe that the Department can meet its statutory obligations under ESRA to collect, maintain, and disseminate data that is high-quality, nonpartisan, and useful. With only three employees remaining at NCES, there is no one to review the quality of the work being done on the surviving contracts or ensure that it conforms to statutorily required statistical and privacy standards. NCES previously managed over $300 million in contracts each year; three people cannot carry that workload. Even if NCES's annual contracts have been reduced by half, the workload would be untenable, as the three remaining employees each would need to be experts in testing, surveying, sampling, dissemination and outreach, IT, and contracting for even basic oversight. Nor can three employees fulfill NCES's publication, reporting, and dissemination duties. Quite simply, more staff and expertise are required to ensure that the Department fulfills the statutory responsibilities assigned to NCES.

      I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

      Executed on June 23, 2025.

/s/ Doe Declarant #9*  
Doe Declarant #9

* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.