# Exhibit S

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA, et al.,

*Defendants.*

Civil Action No. 25-965-JRR

## DECLARATION OF DOE DECLARANT #10

I, Doe Declarant #10, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. I am an attorney at the Office for Civil Rights ("OCR") of the United States Department of Education ("the Department"). I have been an attorney at OCR for over 20 years. I have worked in the Cleveland regional office throughout my career at the Department. I have a J.D. and a bachelor's degree.

3. From the time of my hire until early this year, Cleveland was one of 12 regional enforcement offices for OCR. The region served by the Cleveland office covered all of Ohio and all of Michigan.

4. For several years I served as a team leader, one of five in the Cleveland regional office as of December 2024. As team leader, I supervised the work of a group of lawyers that varied from as few as five to as many as eight. As of December 2024, our team included seven lawyers.

5. The Cleveland office was busy, receiving over 1000 complaints per year. While our case receipts varied, we typically received about 80–90 per month. As team leader, I typically assigned approximately five cases per week to members of my team.

6. As of March 2025, the lawyers on my team were handling approximately 200 cases in evaluation or investigation. We were processing approximately 40 additional cases in monitoring.

7. As a team leader, I worked toward the OCR goal of resolving 80 percent of cases within 180 days of filing. Much of our success on that goal depended on quickly evaluating cases, which allowed us to dismiss complaints that did not meet requirements for timeliness, jurisdiction, or stating a claim. Efficient evaluation allowed us to conduct priority investigations.

8. Perennially understaffed and overwhelmed with complaints, our team could not reach the goal of resolving 80 percent of complaints within 180 days before the start of this year. However, the team was one of the top producers nationally with respect to substantive resolutions during the 2024 fiscal year. Substantive resolutions included cases where the investigation was completed and insufficient evidence or violation findings were issued or where the case was resolved voluntarily with an agreement prior to the conclusion of the investigation.

9. In January 2025, immediately after the inauguration of the new President, the Trump Administration instituted a "pause" on nearly all of our work. I have been through several presidential transitions and anticipated that certain types of cases would be paused, but the general freeze on work was unprecedented in my experience.

10. Also in January 2025, my colleagues and I received the "fork in the road" email offering deferred resignation to federal employees. That memo gave federal employees the option to cease work in the near future but retain pay and benefits through September 2025. One lawyer

on my team took the offer, causing me to reassign that lawyer's cases to the remining members of the team.

11. On January 31, 2025, I learned that our Regional Director ("RD") and two others in the office had been placed on administrative leave. These actions undermined the work of our office in many ways, exacerbating the negative impact of the "pause" and the resignation offer. We lost the leadership, strategic vision, and practical assistance of our RD, who was highly engaged in the work of the office. Losing the RD also meant we lost an important level of review; we missed opportunities to consult with him on the most difficult cases.

12. In addition, it was terrifying that our RD could lose his job in this way. Our RD was a veteran of multiple administrations, a West Point graduate, and had earned a reputation for excellence and efficiency. I heard rumors that OCR employees put on administrative leave at this time were connected in some manner to diversity, equity, and inclusion ("DEI") work in the Department. But our RD did not play a leading role in DEI work, apart from serving on a committee he joined at the invitation of the Department during the first Trump Administration.

13. The first month of the second Trump Administration was a time of chaos in the Cleveland office. People were afraid of losing their colleagues and their jobs. We could not plan while wondering who would take the deferred resignation offer or leave for other reasons. At that time, another attorney on my team departed, leaving because of the climate of fear and concern over actions to come. Again, I had to reassign cases to the remaining lawyers on our team.

14. On Tuesday, March 11, 2025, I received an email instructing me not to come to the office the following day, Wednesday, because of a security problem in the building. We were told we could work from home on Wednesday and that the office would reopen on Thursday.

3

15. Later, on the night of March 11, I received a Reduction in Force ("RIF") notice through email. The email informed me that my PIV card that allows me to access the building had been disabled. Twice I emailed the facilities manager about things I needed in my office, including medication; I received no response.

16. Although I could use my work computer from home, I was locked out of the systems necessary to process my cases. I could not look at case files or the case management system. I could only send internal emails; I could not send emails to anyone outside of the Department, including complainants, witnesses, and school personnel. Staff that sent emails to themselves at their work email address got an out-of-office response stating that they were "transitioning cases."

17. Due to the restrictions immediately placed on our work, however, my colleagues and I could not transition cases. Our acting RD attempted to assemble a list of priority cases and information for the lawyers receiving our cases in the Denver regional office, but without access to the case management system and case files, this was impossible, and the most we could do was compile and send some limited information based on information we still had on our desktops and from memory.

18. The lack of email access proved devastating to pending cases. We could receive—but not respond to—emails from outside of the Department; we could learn about problems but not address them. For example, a member of my team was scheduled to interview a parent in the days following the RIF notice. She could not contact that parent; she could not ensure that another OCR lawyer would contact that parent. After the missed appointment, the parent emailed in anger, stating that he felt disrespected, believed his child with a disability had not had an education in three years, and essentially accused the attorney of getting paid but not doing her job.

19. Unable to get a response any other way, an attorney reached out to me on Facebook about an upcoming OCR mediation. That attorney wanted to know what was going on. I could only refer the attorney to Denver, not even to a particular investigator.

20. At the time of the RIF, OCR Cleveland had a backlog of work that would require years to get through. Each member of my team had more cases than they could possibly handle. And working on the backlog often took second place to evaluating new complaints. Our office was among the most productive in the country; we were also one of the top offices in the nation for producing substantive resolutions of cases. As an OCR team leader, I know that a tripled caseload would make it impossible to timely evaluate new complaints, much less reach substantive resolutions that deliver the relief the law promises.

21. Based on my years as an OCR attorney, I do not see how the Denver office, which took on OCR Cleveland's and OCR Chicago's cases due to the RIF, could meaningfully handle its new case load. My understanding is that at the time of the RIF, Denver had about 20 investigative staff and about 700 cases. My understanding is that due to the RIF, Denver received over 1100 active cases and well over 100 cases in monitoring from Cleveland, and approximately 1400 cases from Chicago. That burden, coupled with processing new complaints from three busy, large regions, in my opinion, cannot be met. In my experience, even the best, most experienced staff started falling behind when assigned 30 cases. Each investigative staff member in Denver could be responsible for five times that number, with more cases coming in every day. With these staffing levels, filing an OCR complaint would be meaningless for most complainants. Thus, in my opinion, OCR is unable to fulfill its function of promptly investigating and resolving civil rights concerns in our country's schools and colleges and universities.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 12, 2025.

/s/ Doe Declarant #10*<br>Doe Declarant #10

\* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.