# Exhibit T

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants.* | Civil Action No. 25-965-JRR |

**DECLARATION OF DOE DECLARANT #11**

I, Doe Declarant #11, hereby declare as follows:

1. I am over the age of 18 and have personal knowledge of all the facts stated below. If called as a witness, I could and would testify competently as to the matters set forth below.

2. I worked in the U.S. Department of Education ("the Department") for more than 10 years. Most recently, I held a position in the Department's Office of Special Education and Rehabilitative Services ("OSERS")'s Office of the Assistant Secretary ("OAS").

3. OSERS is under the supervision of the Assistant Secretary for Special Education and Rehabilitative Services, and, above that person, the Deputy Secretary of Education and Secretary of Education. Prior to March 11, 2025, OSERS consisted of three offices:

   a. Office of the Assistant Secretary ("OAS")

   b. Office of Special Education Programs ("OSEP"), and

   c. Rehabilitation Services Administration ("RSA").

4. OSERS supports programs that serve millions of children, youth, and adults with disabilities. Its purpose is to improve educational and employment outcomes for all people with disabilities and their families and communities.

5. OAS was responsible for leading policy development work coming out of OSEP and RSA, advancing the priorities of the Assistant Secretary for OSERS, advising senior leadership on legislation, regulations, and strategic direction for programs under the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, the Randolph-Sheppard Act, the Education of the Deaf Act, the Helen Keller National Center Act, and An Act to Promote the Education of the Blind, in addition to providing the shared business and communications services for OSERS. OAS supported the implementation and oversight of $20.6 billion in annual grant funding under these statutes, mostly formula grants under the IDEA and the Rehabilitation Act. Of the $20.6 billion, $500M was for competitive discretionary grants under a variety of programs. OAS was directly responsible for managing the process for developing and publishing Notices Inviting Applications ("NIAs") about the availability of discretionary grants. OAS also managed the development, publication, and approval of information collections under the Paperwork Reduction Act. OAS responded to requests for review of proposed legislation, ensured that formula and discretionary grants were closed out on time so that funds did not revert to the Department of the Treasury, and responded to investigations by the Government Accountability Office ("GAO") in response to questions by members of Congress. OAS also served as the primary point of contact for FOIA requests, GAO, and the Department's Inspector General.

6. At least two of the competitive grant programs OAS worked on were cancelled under the Trump administration separate from the Reduction in Force ("RIF"). On January 15, 2025, the Department published an NIA in the Federal Register for Fiscal Year 2025 for a National

Technical Assistance Center on Transition for Students and Youth with Disabilities (Department of Education Grant Assistance Listing Number 84.326E).[1] This grant opportunity was to fund a National Technical Assistance Center on Transition for Students and Youth with Disabilities to improve transition services. Transition services are a structured process for helping students with disabilities transition from high school to their lives beyond high school. The deadline for applications was March 17. On March 4, the Department published a withdrawal of the NIA.[2] Federal law requires that OSEP fund a transition center. 20 U.S.C. § 1463(b)(4)(A).

7. My position was eliminated in the March 11, 2025 RIF, along with all but one of the employees in OAS. There were approximately twenty-five people in OAS at the beginning of 2025. Two of those people took the "fork in the road" deferred resignation program; the rest, except one, were eliminated in the RIF.

8. I received notice about the RIF by email on March 11, 2025. The email stated that my office had been eliminated, that I was subject to the RIF, that I should keep working for another week and a half, that I would be placed on administrative leave from March 21 until June 10, and after that my position would be terminated. The email stated that we should transition my work to our colleagues who remained in the Department of Education.

---

[1] *Applications for New Awards; Technical Assistance and Dissemination To Improve Services and Results for Children With Disabilities and Demonstration and Training Programs-National Technical Assistance Center on Transition for Students and Youth With Disabilities*, 90 Fed. Reg. 3809 (Jan. 15, 2025), https://www.federalregister.gov/documents/2025/01/15/2025-00691/applications-for-new-awards-technical-assistance-and-dissemination-to-improve-services-and-results.

[2] *Withdrawal of Notice Inviting Applications and Cancellation of the Competition for Technical Assistance and Dissemination To Improve Services and Results for Children With Disabilities and Demonstration and Training Programs-National Technical Assistance Center on Transition for Students and Youth With Disabilities (NTACT)*, 90 Fed. Reg. 14814 (March 4, 2025), https://www federalregister.gov/documents/2025/04/04/2025-05826/withdrawal-of-notice-inviting-applications-and-cancellation-of-the-competition-for-technical.

9. However, my colleagues and I were very limited in our ability to transition my work because as soon as the RIF was announced, I and the other RIF'd employees were cut off from access to nearly all of the electronic systems we used for our work. We could send emails only internally, not to anyone outside the Department. We were blocked from using Teams, the software we used to join virtual meetings, on our government-furnished equipment. My colleagues who were responsible for uploading documents to the Federal Register had lost access to do that.

10. As an illustration of the chaotic and poorly planned nature of the RIF, I know because the OSERS Executive Office was eliminated in the RIF, OSERS was left without a Master Timekeeper who was responsible for making sure everyone in OSERS was paid correctly. The Department's payroll system is built with the requirement that there has to be one Master Timekeeper for each organizational code, i.e., a uniform alpha-numeric system that is used to identify each office and sub-office in the Department's payroll system; to eliminate this requirement, the Department would have to significantly redesign the system to allow for central timekeeping. People in other roles were then assigned to also serve as Master Timekeepers while retaining their prior responsibilities, even though they were not experienced in performing that function, and their reassignment harmed their ability to do their existing jobs.

11. On information and belief, since the RIF, the single employee left in OAS is not able to do all of the work that OAS used to do, with severely negative consequences for carrying out OSERS' statutory functions, and for the education of students with disabilities. For example, the Paperwork Reduction Act requires the federal government to seek public comment on any proposal to collect information from the public prior to receiving approval from the Office of Management and Budget ("OMB"). OSERS has twenty-seven OMB-approved information collections which collect data on a variety of information, including students with disabilities,

individuals with disabilities, and fiscal information. The OAS staff member who manages OSERS information collection processes was fired. Equally as concerning, the Department's Office of Planning, Evaluation, and Policy Development ("OPEPD") Strategic Collections Clearance ("SCC") office, the Department's cognizant office for the Paperwork Reduction Act, supervising the OMB approval process for all Department information collections, including the 27 OSERS information collections, was eliminated and all employees fired. Some OSERS information collections are about to expire, and on information and belief, unless they are renewed, OSERS will not be able to collect the information because no information that meets the definition of an information collection under the Paperwork Reduction Act may be collected without completing a statutorily-defined period of public comment and subsequent review and approval from OMB. The data collected through information collections provides the information the Department requires to ensure implementation of statutes and regulations and to make grant awards.

12. The RIF and earlier cuts to the Department contracts by the Department of Government Efficiency ("DOGE") will also harm the actual collection of data that were important to OAS's work. The Department is required by statute to collect data about special education. 20 U.S.C. § 1400 et. seq. The National Center for Education Statistics ("NCES"), a small statistical agency which was the most trusted source of information on the American education system, collected this statutorily mandated special education data through EDFacts, a comprehensive data collection system. Special education data collected through EDFacts are used for many purposes, including to complete the statutorily required process of making annual determinations of each state's performance in implementing IDEA requirements. *Id*. § 1416(d)(1) (IDEA Part B); *see also id*. § 1442 (making § 1416 applicable to IDEA Part C). If the Department determines a state is not meeting the IDEA's requirements, the IDEA requires the Department to take steps to improve

states' compliance, which can include directing the state as to how to use its IDEA funds, recovering funds, and withholding further payments to the state. In February, the Administration, through DOGE, cancelled the contract for the entity that managed EDFacts. They then resurrected that contract at a higher cost. But then, as part of the RIF, almost all the staff of NCES were fired. Assuming that states are still submitting their required data to EDFacts, without NCES staff to evaluate that data and prepare reports, the data will not be useful or reliable. This in turn will mean that annual IDEA determinations and the enforcement steps that result from them, which are supposed to be based on these data, may be incorrect.

13. The Education of the Deaf Act, 20 U.S.C. § 4356, requires the Secretary of Education to designate an individual in OSERS who has experience in the education of people who are deaf, to serve as liaison between the Department and Gallaudet, the National Technical Institute for the Deaf, and other postsecondary educational programs for people who are deaf. That Liaison to the Special Institutions position was eliminated as part of the RIF.

14. In addition, there are active GAO investigations in which the Department of Education's responses were due soon after the RIF. With only one employee in OAS left to respond to them while also attempting to do the rest of OAS's work, on information and belief, there will be no responses, or responses will be delayed or contain errors.

15. Based on my experience in OAS and what I have observed since the RIF, the RIF is also causing delays in the competitive grant process and may prevent those grants from being awarded in a timely manner or consistent with the law. For instance, at this time of year OAS would normally be getting notices for competitive grant opportunities published in the Federal Register for Fiscal Year 2025. These must be published in a timely manner because if the grants are not awarded by September 30, the funds revert to the Department of the Treasury. These were

delayed because of the RIF. Delaying the notice publication date means that applicants may have less time to respond to the notice. Allowing less time has a negative impact on the quality of the applications and all but ensures that novice applicants are less likely to be funded.

16. Based on my experience within OSERS, and my other experience within the Department of Education, the RIF will have negative impacts on education and outcomes for students with disabilities. First, an understaffed Department will lead to delays and errors in the administration of vital grant programs, which will harm students with disabilities. For example, delays in the grant process for the competitive personnel training grants that OAS managed will mean states and other grantees will not be able to recruit people to become highly-trained special education teachers, counselors, therapists and administrators. This will mean that students with disabilities will not have access to highly-trained teachers and service providers.

17. A lack of consistent, coherent policy coming out of the Department will mean that states, education agencies, and schools will be less able to plan and budget for the future, because they will not be able to rely on funding from the Department as they did in the past. This in turn will negatively impact education for students with disabilities.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 9, 2025.

/s/ Doe Declarant #11*
Doe Declarant #11

* Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.