# Exhibit U

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA, et al.,

*Defendants*.

Civil Action No. 25-965-JRR

## DECLARATION OF DOE DECLARANT #12

I, Doe Declarant #12, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am providing this declaration pursuant to 5 U.S.C. §§ 2302(b)(8)–(9).

2. Until March 31, 2025, I served at the Office for Civil Rights ("OCR"), of the United States Department of Education ("the Department") for over fifteen years. For over eight years, I served as a senior management attorney in multiple positions. As a senior management attorney, I oversaw the case work of OCR regional investigative staff. Part of my responsibility was to ensure OCR met its statutory and regulatory mandate to vigorously enforce the civil rights laws prohibiting discrimination in education programs and activities that receive federal funding and to ensure that complaints filed with OCR by students, families, and other members of the public were thoroughly evaluated, investigated, and resolved in a prompt, impartial, and effective manner. As part of my responsibilities, I also tracked monthly data generated by the agency regarding OCR complaint receipts, complaint volume, the types of resolutions being obtained by staff, and the volume and timeliness of the agency's complaint resolutions. Before serving in management positions, I worked for approximately six years as an investigative attorney in one of the twelve regional OCR

enforcement offices. I have a J.D. and a bachelor's degree.

3. Throughout my tenure at OCR, we were governed by an overriding obligation to provide prompt and effective responses to OCR complaints. Promptness in responding to complaints of discrimination in the context of a student's education is of the utmost importance. I witnessed first hand the consequences for students and families when OCR did not take prompt action to resolve a complaint. When OCR's response was substantially delayed, it was not uncommon to find that families had been forced to move to another district, students had transferred to another school or dropped out, or the harm suffered by the student had compounded since the time the complaint was filed. A delay in obtaining redress for a harmed student, often rendered that redress meaningless.

4. Whether OCR is meeting its obligation for prompt and effective case processing is measured by the performance targets set by the Department for OCR under the Government Performance and Results Act of 1993 ("GPRA"). I understood the GPRA standards to be the measure that the Department reported to Congress to demonstrate whether OCR was fulfilling its statutory obligations.

5. There were two key metrics that OCR repeatedly measured and reported out for each regional enforcement office—namely, whether the office had resolved 80% of cases within 180 days and the percentage of cases over 365 days old. If more than 25% of cases were over 365 days old, that was a red flag and triggered intensive efforts to resolve those cases and provide complainants with a resolution. These measures of OCR performance have been in place for at least the last two decades.

6. For years the regional enforcement offices of OCR generally met both of these GPRA metrics. During that time period, the average case load for each investigative staff

fluctuated, but generally offices met the GPRA metrics if the average caseload for staff hovered around ten to fifteen cases at any one time, not including each staff person's docket of resolved cases that required monitoring.

7. For approximately the last ten years, the regional offices have struggled to meet the GPRA metrics because OCR has experienced a sharp and steady increase in the number of complaints received, without a corresponding increase in staff. For example, in fiscal year ("FY") 2024, OCR received 22,687 new complaints from parents, families, and other members of the public. This represented an 118% increase in complaint receipts from FY 2015 when OCR received 10,392 complaints. During this same time frame, the number of OCR staff members handling complaints increased only 11%, from 540 investigative staff in 2015, to approximately 600 at the close of FY 2024.

8. In FY 2024, only two of the twelve regional offices met the GPRA standard of resolving 80% of cases within 180 days. The inability of the remaining offices to meet that GPRA standard was due to the burden of the case load carried by OCR staff.

9. In the face of these escalating caseloads and backlogs, OCR managers and staff continuously explored and implemented a range of case processing efficiencies, including a robust mediation program and a rapid resolution process for certain segments of our cases. These and other efficiencies were in place for years prior to the March 2025 reduction in force ("RIF").

10. At the time of the March 2025 RIF, the average caseload per investigative staff had climbed to approximately twenty, with some offices carrying as many as thirty to forty cases per investigative staff and some individual staff members carrying up to or more than 50 cases. This resulted in a significant backlog of cases over 365 days old, including many cases that were pending in OCR in excess of five years. In some instances, regional offices were so short staffed

that these overage cases had not even reached the stage of being evaluated to determine if OCR would open them for investigation.

11. The March 2025 RIF resulted in the closure of seven of OCR's twelve regional enforcement offices and their entire staff. These closures resulted in shuttering some of the largest, most productive, and efficient regional enforcement offices, while leaving open some of the smallest regional enforcement offices and/or offices with some of the highest existing volume of cases per staff. The shuttered offices also contained the staff with the most expertise handling complaints of anti-Semitism, an area identified as a priority by the current administration.

12. As a manager familiar with the operations of the regional enforcement offices, the implementation of the RIF did not appear related to any effort to improve OCR's performance or its ability to resolve civil rights complaints. Rather, the drastic scaling back of civil rights enforcement seemed to be specifically designed to dismantle OCR's ability to fulfill its mission to vigorously enforce civil rights laws and to provide prompt investigations and resolutions of civil rights complaints.

13. As a result of the March 2025 RIF, the caseload for the remaining investigative staff has more than doubled. The remaining offices report that many staff now have caseloads ranging from approximately 100 to 300 cases per staff. Despite their determined efforts, given these untenable caseloads and a limited number of hours in the day, the remaining OCR staff cannot possibly provide timely or effective resolutions of complaints. Prior to the March 2025 RIF, OCR staffing was already stretched beyond its capacity to promptly resolve complaints; now it is altogether broken.

14. By way of example, before the March 2025 RIF, one of the now closed regional enforcement offices had approximately 1,400 complaints pending with approximately thirty-five

4

investigative staff, six team leaders, and four senior managers devoted to processing those complaints. All of those staff were cut under the March RIF, and all of that office's pending complaints were transferred to one of the five remaining regional offices. That office now has just fifteen to seventeen investigative staff and two managers. There is no possibility that the limited number of staff in this remaining office can provide prompt and effective responses to the deluge of complaints that have been transferred to it from the much larger closed office, on top of its own backlog of pending cases and the new complaints continuing to flow in from its own region and the region for the closed office. This same crisis is playing out to varying degrees in each of the remaining five offices.

15. The remaining staff are also hamstrung by OCR's failure to provide for the responsible transfer of complaints from the seven closed offices to the five open offices. The Department made no assessment and developed no strategic plan for how the open offices would handle the influx of cases. There was also no plan for communicating to complainants about what had happened to their cases, including no plan to provide notice to complainants who had mediations or interviews scheduled with the closed offices that were canceled without notice. When the RIF was announced, staff subject to the RIF could not access their work files in order to make provisions to effectively transfer their cases. They had no effective way to create transition memoranda for the receiving offices, and they were unable to update case files with the most current information such as recent interview notes, negotiation status reports, or mediation progress notes. This has significantly hampered the receiving offices' ability to triage and process the thousands of cases transferred onto their dockets as a result of the March RIF.

16. The ability of the receiving offices to process complaints consistent with their statutory and regulatory obligations is further obstructed by OCR's refusal to replace any staff or

5

manager who left those offices since January of 2025. The March 2025 RIF created a backlog that guaranteed OCR would not be able to process all of the complaints it receives, and the failure to backfill staff and managers who have departed the remaining offices worsens the situation.

17. Based on my years of experience in OCR, the March 2025 RIF has unquestionably denied thousands of students access to OCR's complaint resolution process and will continue to do so until OCR's investigative staffing levels are, at a minimum, returned to the level that existed before the RIF. Otherwise, the staffing cuts and elimination of seven offices will have made a nullity out of the OCR's obligation to promptly and effectively investigate civil rights complaints filed with the agency.

I declare under penalty of perjury under the laws of the United States, to the best of my knowledge, the foregoing is true and correct.

Executed June 26, 2025.

<u>/s/ Doe Declarant #12*</u>
Doe Declarant #12

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.