# Exhibit Y

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA, et al.,

*Defendants.*

Civil Action No. 25-965-JRR

## <u>DECLARATION OF DAVID DOWNEY</u>

I, David Downey, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a resident of Arlington, Virginia. I am over the age of 18 and have personal knowledge of all facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I have worked for the U.S. Department of Education ("the Department") in various roles for more than 30 years. Consequently, I have developed extensive expertise regarding the management of federal education grants, including expertise with respect to the laws, regulations, and policies that govern and inform such grants.

3.      Since 2000, I have provided training and policy for the Department. Most recently I have held the position of Management Analyst in the Grants Management Policy Division ("GMPD"), one of three divisions in the Office of Grants Management ("OGM"), within the Office of Finance and Operations, which develops, manages, and provides policy guidance and oversight of the Department's grant management activities and operations. Among other responsibilities,

OGM oversees the Department's compliance with grant policies and procedures; develops and conducts grant management trainings for Department staff and the public; develops and implements the Department's policies regarding external audits; oversees external audit resolution operations; resolves and closes competitive and formula grant audits; and develops and implements indirect cost policies and negotiates indirect cost rates. OGM also ensures that research conducted by grantees complies with the protection of human-subject regulations pursuant to 34 C.F.R. pt. 97.

4.     My responsibilities in GMPD have included developing and conducting instructor-led grants and administration adult learning engagements for staff at the Department and other federal agencies, coordinating training sessions, leading curriculum development for in person and computer-based training, and editing policy information for Department staff and the grantee community. I have trained grantees from state and local governments, school districts, tribal governments, non-profit organizations, and universities.

5.     Until the events at issue in this lawsuit, OGM was comprised of three divisions: the Risk Management Services Division ("RMSD"), the Indirect Cost Division, and the GMPD.

6.     The RMSD was responsible for conducting audits of grant recipients and working with high-risk grantees. High-risk grantees are those that may have experienced instances of fraud, are struggling and at risk of financial mismanagement, or otherwise have systemic challenges that undermine their ability to fully comply with federal regulations and law. Though high-risk grantees qualify to receive grants, they require additional oversight, guidance, and support to ensure compliance with grant requirements as well as federal laws and regulations. Employees in this division have extensive experience in this specialized area.

7.    The Indirect Cost Division establishes and approves negotiated indirect cost rate agreements and other cost allocation plans used to charge costs under Federal awards; assigns the Department delegations to State Education Agencies for local oversight after approving methodologies; negotiates and settles liabilities resulting from excessive indirect cost reimbursements; consults on indirect cost audits; and provides policy guidance, technical advice, and support.

8.    My division, GMPD, provides support to the Department program offices to a) streamline procedures that reduce administrative burden and increase efficiency; b) ensure uniform and fair processes for grant competitions; c) provide clear standards for grant monitoring and performance reporting; d) promote accountability and transparency, and valuable risk management tools; and e) enable proactive identification and mitigation of potential issues. In my role as a senior policy analyst, I was responsible for overseeing GMPD activities concerning the training and dissemination of the policies in each of these areas.

9.    Of particular note, GMPD fulfilled the statutory and regulatory requirements, under the Office of Management and Budget's ("OMB") Uniform Guidance and other authorities, that the Department train and license a limited subset of its employees to obligate and commit grant funds awarded to states, tribal governments, school districts, non-profits, and institutions of higher education. *See* Chief Financial Officers Act of 1990 ("CFO Act"), 31 U.S.C. §§ 501, *et seq.*; Federal Grant and Cooperative Agreement Act of 1977 ("FGCA"), 41 U.S.C. §§ 501, *et seq.*; 34 C.F.R. pts. 75 & 76; 2 C.F.R. § 200.405 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Administrative Requirement")); Federal Financial Assistance Management Improvement Act of 1999 ("FFAMIA"), 31 U.S.C. §§ 6101, *et*

*seq*.; Grant Reporting Efficiency and Agreements Transparency Act of 2019, 31 U.S.C. § 6404 (data standards for grantees).

10.     Beyond this required training and oversight for warrant and license holders, GMPD also created and disseminated training, technical assistance, and other resources on the full grant lifecycle for competitive and formula grants and the RMDS's Directive on audit resolution and follow-up, among other topics. These resources were disseminated across multiple platforms, both internal and external, to the Department staff, grantees, and potential grant applicants. For example, I developed online training modules available on ed.gov for state and school district grantees to support their compliance with grant requirements and restrictions.

11.     The information shared through GMPD trainings and guidance supported the Department's compliance with the Uniform Administrative Requirements, fostered a culture of compliance, promoted effective grant administration, and ensured grantees' responsible stewardship of federal funds. Similarly, the technical assistance we provided informed grantees about allowable uses of grant funds within the statutory restrictions for formula grants and within the mandatory program parameters for competitive grants.

12.     I, along with my team, personally provided most of this training and technical assistance and developed GMPD resources. Our products and courses were utilized by thousands of grantees and program officers: in 2024 alone, we trained more than 5,000 trainees, ensuring their understanding of, and promoting compliance with, statutory and regulatory requirements for competent grant management. This broad reach was crucial to the success of the Department's oversight and monitoring of grantees' use of federal funds.

13.     OGM is charged with producing the schedules each year, typically by February, in coordination with the Office of Business Support Services ("OBSS"). OGM asked program

4

officers to put their schedules in G5, generally by the end of December 30. The schedule would be locked in early January, meaning that no more changes could be made by program officers without additional justification such as a change in appropriations. Generally, the Forecast is then posted by OBSS and lists grants that are committed and awarded in the current fiscal year for use by grantees in the summer of the same fiscal year or for the upcoming school year. For example, in 2024, the Forecast of Department Grant Opportunities was posted on February 2, 2024. U.S. Dep't of Educ., *Forecast of ED Contract Opportunities*, https://www.ed.gov/about/doing-business-ed/forecast-of-ed-contract-opportunities (last visited June 27, 2025). This yearly schedule helps institutions plan applications and understand what funds might be available to them in the coming school year, which is critical for the budgeting of both elementary and secondary institutions and institutions of higher education. As of the date of this declaration, few if any grant competitions have been announced and a full and complete Forecast of Department Grant Opportunities has not been posted in 2025, which harms the ability of elementary and secondary schools, institutions of higher education, and other grantees to plan and budget for the 2025-2026 school year.

14.    OGM has the responsibility for monitoring compliance with the scheduling for competitive grant programs. Generally, the Department must obligate competitive grant funds to specific awardees by September 30 of each fiscal year because all funds that are appropriated for a particular fiscal year are required by law to be obligated with that fiscal year or the funds are required to go back to the Treasury. My office was charged with investigating why program officers were sending funds back to the Treasury.

15.    Once a Notice Inviting Applicants ("NIA") is approved, the notice is published in the Federal Register to inform potential applicants of any new grant competition. The Federal Funding Accountability and Transparency Act ("FFATA"), 31 U.S.C. §§ 6101, e*t seq.* (2006),

requires that information about opportunities to apply for Federal awards to be posted on a single, searchable website that is open for public access. The NIA includes the deadline for applications and provides guidelines for the competition. In accordance with the regulations at 2 C.F.R. § 200.204, the Department requires grant applicants to use grants.gov to apply for a competitive grant, unless a grant program cannot use grants.gov. Typically, competitive grants are posted on grants.gov between February and June of each calendar year. Announcements for new and competitive awards generally must be posted for no less than 60 days and announcements of continuing awards should be posted for at least 30 days, as required by 2 C.F.R. §§ 200.203-200.204 and Executive Order 12372, 24 C.F.R. § 570.612.

16.     Since January 20, 2025, only one NIA for a higher education-related competitive grant has been published in the Federal Register out of the many that should have been published in the Federal Register and posted by the Department in grants.gov by now.[1] It is my understanding that since March 2025, the Department employees have not had direct access to grants.gov to post the competitive grants for which Congress has already appropriated funds to be disbursed by September 2025. Without the proper time to announce competitions, organize peer review, review applications, and make funding decisions, the Department cannot award and obligate funds by September 30, 2025, in a manner consistent with the Cash Management Improvement Act, 31 U.S.C. § 6501, and the Department regulations and longstanding policies and procedures.

17.     Under 34 C.F.R. § 75.217, the selection of grantees for competitive grants must be based on applicable statutes and regulations, the selection criteria identified by the program office and included in the application package, and any priorities or other requirements that have been published in the Federal Register. When and if a heightened evidence review is required on a case-

---

[1] *See* SAM.gov, *Search*, https://sam.gov/search.

by-case basis, program offices would also coordinate with the Institute of Education Sciences ("IES") to select reviewers of grant applications.

18.     Before formula or competitive grants are obligated, the principal responsible officer must ensure that program staff have met the following steps:

a.  review materials in grant file/award data in G5 to confirm Grant Award Notification ("GAN") is accurate, including plan, applications, certifications, documentation showing that program staff have reviewed the budget/planned spending for compliance with law on allowable costs and activities, GANs etc.; and

b.  review award data on G5 and GAN to ensure allocation by Budget Service is entered correctly, ensure high-risk/specific conditions are entered and record the obligation.

19.     OGM ensures that grant making offices in the Department develop Application Technical Review Plans ("ATRPs") to establish the process for selection of competitive grantees. The ATRPs are required by the guidance for competitive grants, which is based on the statutes and regulations related to grant making. The ATRPs should be based on any legal requirements and policy decisions related to grantee selection, reviewed by their program attorney, and approved by the Principal Officer or their designee by the application closing date. ATRPs should specify that applications should only be reviewed if the program officer, in consultation with the program attorney, determines that the applicant is eligible, pursuant to 34 C.F.R. § 75.216. Plans should identify the process for choosing reviewers and assigning applications to members of the review panel, the standards and evaluation criteria to be applied, and the process to resolve potential conflicts of interest.

20.    OGM, along with grant making offices, ensure that any Department employee who acts as a grant competition manager has completed the grant competition manager course and that the competition managers meet the qualifications and are able to fulfill the duties of a competition manager, including ensuring that the grant review process adheres to the ATRP and all other governing procedures, addressing conflicts of interest, ensuring quality control during the review process, and assessing the performance of peer reviewers.

21.    Competitive grant competitions managers in each of the grant making offices arrange for peer review of grant applications, which typically occurs in June and July to allow for the award of those grants for fiscal year ("FY") 2026. Some grant competitions receive thousands of applications to be reviewed and evaluated. Because many of the Department program staff have been on administrative leave since March 12, 2025, and they were scheduled to be terminated in June 2025 due to the March reduction in force ("RIF"), grant-making offices lack the capacity to arrange for peer reviews and otherwise carryout the many steps to evaluate and fund grant applications for FY 2026. Without the necessary time and expert staff to conduct grant competitions, applicants will not receive a fair merit-based review, which will very likely result in taxpayer funds not being maximized.

22.    OGM ensures that program officers review the recommendations for funding resulting from the panel review as well as the budgets of the applicants to ensure that any cost sharing requirements are met, under 2 C.F.R. § 200.306, the budgeted cost items are related to specific project activities and are allowable under 2 C.F.R. § 200.403, allocable under 2 C.F.R. § 200.405 and reasonable, under 2 C.F.R. § 200.404, as well as compliance with the requirements of Section 427 of the General Education Provisions Act, 20 U.S.C. §§ 1221, *et seq.* and any limitations on including administrative costs or indirect costs, under 2 C.F.R. § 200.414 and

appendices III, IV, V, VI, and VII to Uniform Guidance. This work helps ensure that fraud, waste, and abuse are minimized in the administration of the Department grants.

23.    OGM is responsible for overseeing compliance with the minimum requirements for issuing any grant award, including determining the risk associated with any grantee, as required by 2 C.F.R. § 200.206, the CFO Act, and the FFATA. OGM, along with other the Department offices, has also been responsible for establishing and maintaining policies and procedures for conducting a risk assessment.

24.    Under 2 C.F.R. § 200.208, OGM is responsible for assuring that agreements with high-risk grantees include special terms and conditions to mitigate fraud, risk and abuse. If a grant is awarded to a high-risk grantee, OGM, on a case-by-case basis, has required that a third-party fiduciary agent be used to handle grant payments to a grantee, to prevent additional fraud, risk and abuse.

25.    OGM ensures that the Department program offices do not make an award to an applicant that fails to demonstrate a satisfactory record of executing programs or activities under Federal grants, cooperative agreements, and procurement awards, or integrity and good business ethics under 2 C.F.R. § 200.206, or any applicant that is debarred or suspended as required by 2 C.F.R. pt. 180, unless it has received an exception under 2 C.F.R. § 3485.137.

26.    To my knowledge, since March 12, 2025, there is no one within the Department with the expertise or assigned to ensure that specific terms and conditions are included in grant documents for high risk grantees, to oversee the requirement for a third-party fiduciary agent for high risk grantees, or to ensure that awards are not provided to applicants who have been debarred or suspended.

**Issuing Grant Awards Warrant/License Holder Authority**

27.    Once the eligible grant applications have been evaluated on their merit, assessed for any potential risk factors that would significantly reduce the likelihood of project success, a ranked listing of the applications to be funded are ready to be issued. To ensure the integrity of the grant process for competitive awards, one program office staff member is charged with first committing grant funds and a second person is charged with then obligating the funds to the grantee. This internal control verifies that the correct applicant is receiving the correct amount of funding based on the merit review. The commitment function reserves a recommended allocation of the appropriation for each grant project to be funded based on statutory guidelines and budget estimates provided by the applicant and approved by the Department. The next step is the actual obligation of the grant award. It is known as an obligation or warrant authority for competitive grant license holders. The term warrant holder was previously used, and many Department staff use the term license or warrant interchangeably. OGM issues grant award licenses to program staff that meet the OGM knowledge and training certification requirements. This control is essential to reduce the risk of the Department disbursing funds inappropriately.

28.    My duties included managing the Department's competitive license and formula obligation program, which ensures federal statutory and regulatory compliance and proper use of federal funds distributed by the Department. Through the program, GMPD conducted mandatory annual training for new and existing license holders tasked with obligating funds for competitive grant awards and formula grant awards. This training taught program officers throughout the Department how to identify any activity by grantees that would violate statutory and regulatory restrictions on the use of federal funds. Each year we prepared approximately 120 Department employees to exercise this authority in a manner compliant with applicable statutes and regulations and granted qualified employees "warrants" or "licenses" allowing them to obligate federal funds.

This step is a key internal control that ensures that taxpayer funds are distributed according to statutory and regulatory requirements. Special authority to obligate funds is required by the CFO Act.

29.     To comply with Grant Competitive Grant License Authority and Formula Grant Obligation Authority, Pub. L. No. 95-224, 91 Stat. 1504 (1977), CFO Act, Direct Grant Programs, 34 C.F.R. pts. 75 & 76, Uniform Administrative Requirements; FFAMIA, and FGCA, FGCA, the GMPD has responsibility for managing the competitive license and formula obligation program, including overseeing approval of and mandatory annual training for new and existing license holders who will be tasked with committing funds and making obligations for grants. The training for individuals to commit the funds takes about one year to complete from beginning to end, and the authority and license to obligate funds is usually the Executive Officers in the Office of the Assistant Secretary at a minimum GS-12 level. The training and approval process reinforces the Department's commitment to federal regulatory compliance and safeguarding Federal funds. The training requirement was never waived for staff with the authority to obligate funds.

30.     OGM has the responsibility for ensuring that each program office identifies formula grant obligators, who should be the principal officers or delegates who have been granted the authority to obligate funds. Principal officers must identify all staff who will obligate funds by June 1 of each year, and certify that these individuals have met the qualifications, training and skills requirements monitored by my office.

31.     GMPD ensures that all program office staff with authority to obligate funds in G5, the system used by the Department to disburse funds to grantees, have the requisite amount of experience – at one year of grant experience for competitive grant license holders and two years for formula obligators with their respective programs -- and complete the annual, mandatory

training. All staff engaged in those functions must be certified by the GMPD staff annually to be authorized to obligate federal funds to grantees.

32.    As of March 2025, OGM had not completed the annual mandatory training for current or existing competitive grant license holders. With the removal of the staff responsible for licensure on March 12, 2025, Department employees who require licensure to obligate grant funds in 2025 are unable to receive that licensing authority. Additionally, the reduction in force efforts, the offering of early retirement for certain employees, and the placement of roughly 1,400 Department staff on administrative leave greatly reduced the Department's pool of qualified candidates to obligate grant awards. Even though this licensing is necessary for Department employees to fulfill their grant-making responsibilities, to my knowledge, the necessary staff have not been reinstated and are scheduled to be RIF'd in June 2025.

33.    It is my understanding that of the more than 100 staff with license/warrant authority for competitive grants within the Department, approximately 25 either retired or were put on leave on March 11, 2025, and scheduled for RIF in June 2025. Combined with the lack of staff to complete the recertification this year, the Department lacks the staff with the authority to obligate funds to grantees. This lack of internal controls can very likely lead to improper payments being made to Federal grantees.

**Guidance**

34.    GMPD developed and maintained the Guide for Managing Formula Grant Programs ("Guide") and the Handbook for the Competitive Grant Process ("Handbook"). These documents provide detailed guidance for all the Department employees charged with administering grant awards, as required by the CFO Act of 1990, and the OMB Uniform Guidance, 31 U.S.C. § 501. This statute, along with the Guide and the Handbook, establish administrative and financial management requirements for grants administration efficiency, accountability, and

transparency. The CFO Act provides the objectives and OMB's Uniform Guidance provides the methods OGM's GMPD applies to establish guidance, training, technical assistance, and resources to Department staff and grantees on the rules for managing Federal awards; how funds can be used; and ensuring compliance with all grant administration statutes and regulations for Department's competitive and formula grants.

35.    The Guide and the Handbook provide detailed guidance and outline required processes for grant administration to implement the Department's obligations to ensure efficiency, accountability, and transparency in grants administration under the CFO Act and the Uniform Guidance. Department employees charged with obligating and committing grant funds must follow the policies and procedures in the Guide and Handbook, as well as all the steps in the competitive review process. Principal Operating Components ("POCs"), including the Office of Elementary and Secondary Education and the Office of Postsecondary Education, within the Department are responsible for submitting spending plans for competitive grants, which should include scheduling and funding information for new grant competitions, non-competing continuation ("NCC") grant amounts, and new and continuing national activities. The Handbook for competitive grants created by OGM requires that annual plans be developed by POCs in consultation with the Office of the Secretary ("OS"), Budget Service, the Office of Planning, Evaluation and Policy Development, Grants Policy Office ("OPEPD/GPO"), and the Office of General Counsel ("OGC"). These plans should be submitted by the due date provided in the spending plan memorandum issued by the director of the OBSS, which is typically issued early in the fiscal year and the due date is typically no later than January.

36.    OGM ensures that program offices performed the following functions, typically through program officers:

13

    a.  Identify one or more staff, by position, to work with Budget Service and other offices as applicable to develop allocations;

    b.  Identify applicable statutory and programmatic requirements that affect the allocations;

    c.  Identify all potential grantees and applicability of the requirements to them;

    d.  Develop a process for calculating allocations and ensuring accuracy;

    e.  Develop a process for notifying grantees of potential allocations in a timely manner; and

    f.  Establish reallocation procedures consistent with 34 C.F.R. §§ 76.260-261.

37.    OGM ensures that for grant programs that require a state plan or application, program offices must develop a process to:

    a.  Develop packages and information collection documents with enough time for OMB review and approval; give notice of state plan requirements in the Fed Register or through other appropriate means, with enough time for states to prepare a plan that complies with 34 C.F.R. §§ 76.703-704;

    b.  Establish review procedures based on statutory and regulatory requirements

    c.  Assess performance under an existing state plan/previous grant award, conduct risk assessment consistent with 2 C.F.R. § 200.205(a) and decide appropriate high-risk conditions; and

    d.  Determine effective date of awards.

38.    Prior to January 2025, GMPD was in the process of updating the guidance for formula and competitive grants to be in compliance with 2024 changes to regulations related to federal grants. These changes were intended to improve processes for grantees and to continue to

prevent fraud, waste and abuse of federal funds. For example, prior regulations required that grantees take certain actions if equipment purchased with federal funds of more than $5,000 were not being used. That threshold was raised to $10,000 in 2024, and Department guidance needed to be updated to reflect that change so that program officers and grantees would be aware of when they were required to take those actions to be in compliance with those federal regulations.

39.    GMPD's statutorily required trainings, updating of guidance, and other work began to be delayed and cancelled soon after January 20, 2025. At that time, the Department political appointees determined that all work needed to be approved by the OS before it could move forward. Likewise, starting in February 2025, OGM staff were instructed to end any communications with states and school districts, including technical assistance, without the express approval from political appointees. These instructions made it impossible for my colleagues and I to maintain our typical training schedule.

40.    Instead of providing training and updating guidance, we were told by Department political appointees to focus on other priorities, including review of the grant-related documents our office published to remove all references to diversity, equity, and inclusion. In early February, our team lead informed my group in GMPD that political appointees were redirecting us to scour our trainings, policy bulletins, manuals, and other internal and external resources to identify instances of "wokeness" and "DEI." These terms were not defined, and my team was forced to identify anything that appeared to implicate diversity or equity considerations. Lacking formal definitions, we were made to engage in internal debates regarding the inclusion of certain terms, like "Tribe" and "tribal government," under the category of "DEI." We were even required to review regulations established to protect human research subjects, *see* 34 C.F.R. pt. 97, for

"wokeness" and "DEI." This review essentially became our full-time work, particularly given the significant delays in getting political sign-off for trainings.

41. Despite these impediments, by March 2025, GMPD was in the midst of conducting advanced grants management training for the Department staff. This training covered risk identification, indirect costs, and audit resolution, all essential topics for preventing fraud, waste, and abuse of federal grant funds. It also instructed Department staff on the process of mitigating grantee compliance issues, including placing grantees on specific conditions outlined in the Uniform Guidance, such as designating them as high-risk grantees and more severe actions such as terminating the award and potentially initiating suspension and debarment procedures. In FY 2024, our staff had received the Department's Innovation Award in recognition of the high quality and value of this training program.

42. This training came to a sudden halt when, on Tuesday, March 11, 2025, I was notified that I was being placed on administrative leave effective March 21, 2025, and that my position would be eliminated under a RIF effective June 10, 2025. At 6:06 p.m. that same day, I learned that I had been locked out of my Department email and computer, as well as the Department systems. All of my colleagues in GMPD were also subject to the RIF and lost access to the Department systems. My understanding is that the RMDS was also entirely abolished, and all employees were locked out of accounts and systems. This team regularly met with representatives from State Education Agencies ("SEAs") concerning high-risk grantees. That team's ability to support and monitor those grantees was completely and abruptly stopped at that time.

43. OGM has provided oversight and support to program officers in the Department to ensure that they engage in programmatic and fiscal monitoring and the promotion of efficient

expenditure of Department grant funds, as required by the CFO Act and the FFAMIA. Monitoring fulfills the Department's responsibility to assess grantees' performance outcomes and the Department's fiduciary responsibility to hold grantees accountable for federal funds through risk-based monitoring strategies that ensure that grantees have the capacity to manage grant funds consistent with Federal requirements. Program officials ensure that monitoring data and results (available in Annual Performance Reports and other data sources) are used to improve grantee performance, financial management, enhance program requirements and purpose, and improve POC monitoring processes. In accordance with the Program Monitoring Plan, OGM assures that program officers develop the most appropriate form of monitoring for each grant.

44.     Program offices collect data on the performance of projects and programs administered by the Department to inform regular program improvements and to provide greater transparency to Congress and members of the public about the Department's management and impact. Program offices collaborate with Budget Service, the program attorney, and OS as needed in developing the performance measures, and Budget Service facilitates OMB approval of the new measures. The Department may establish two types of measures for a grant program:

   a.  Performance measures so that the Department can provide information to OMB, in accordance with the Government Performance and Results Act of 1993 ("GPRA"), Pub. L. No. 103-62, 107 STAT. 285, and the GPRA Modernization Act of 2010 (GPRAMA), Pub. L. No. 111–352, 124 STAT. 3866, about its programs' performance; and

   b.  Performance measurement requirements for a grant competition under 34 C.F.R. § 75.110. These may include requirements for performance measures, baseline data, or performance targets, or a requirement that applicants propose in their

applications one or more of their own performance measures, baseline data, or performance targets.

45.    The GPRA, and the GPRAMA, direct Federal departments and agencies to improve the effectiveness of their programs by engaging in strategic planning, setting outcome-related goals, and measuring results against those goals.

46.    OGM is responsible for ensuring that principal offices develop a monitoring framework for every Department grant, and ensuring that program staff are trained to perform the following activities:

    a.    Assisting grantees to meet performance standards/comply with grant requirements;

    b.    Risk assessment/evaluation;

    c.    Documenting noncompliance through oversight and monitoring; providing written notice of process used to address noncompliance; require grantees to document corrective action;

    d.    Maintaining information to track compliance with grant requirements and progress in meeting performance standards;

    e.    Specify steps to assess and measure timeliness, completeness, and accuracy of data used in performance reporting or funding decisions submitted by a grantee and the actions that office will take if it determines that those data are not accurate; and Develop protocol for obtaining input from attorneys in the Department OGC and obtaining their concurrence before issuing the monitoring report, at a minimum whenever findings raise new, complex, significant, or controversial legal issues.

47.     GMPD is responsible for ensuring that program officers were trained to identify any activity by grantees that would violate statutory and regulatory restrictions on the use of federal funds.

48.     OGM's GMPD has provided support to Department program offices to:

    a.  streamline procedures that reduce administrative burden and increase efficiency;

    b.  ensure uniform and fair processes for grant competitions,

    c.  provide clear standards for grant monitoring and performance reporting,

    d.  promote accountability and transparency, and valuable risk management tools, and

    e.  enable proactive identification and mitigation of potential issues.

49.     OGM has been responsible for providing training to Department staff and grantees to ensure compliance with audit resolution and follow-up. The training infrastructure supports compliance with OMB's Uniform Guidance on competent grant management, which requires single or program specific audits for entities expending federal funds in excess of a specific amount. 2 C.F.R. § 200.500 *et seq.* This broad reach is crucial for fostering a culture of compliance, promoting effective grant administration, and ensuring the responsible stewardship of federal funds. To my knowledge, since March 12, 2025, there is no one within the Department to provide training to the Department staff and grantees on grant management, including the audit process.

50.     To my knowledge, since March 12, 2025, there is no one within the Department with the expertise and assignment to ensure the Department's compliance with these statutory and regulatory monitoring and reporting requirements.

**Preventing Fraud, Waste & Abuse**

51.     In compliance with the guidance of the Interagency Committee on Debarment and Suspension, 31 U.S.C. § 6101, and 2 C.F.R. pts 180 & 3485, OGM is required to submit data on behalf of the Department and the Office of Federal Student Aid ("FSA") to the Intergovernmental

Suspension and Debarment Committee for the annual report to Congress on the progress and efforts to improve the suspension and debarment processes and a summary of activities and accomplishments in the Department's debarment management.

52.    OGM is required by statute to report annually to Congress regarding the integrity of the Department's grant-making process, including claims of fraud committed by grantees. Under 2 C.F.R. part 3485, OGM is responsible for managing a uniform system of debarment and suspension to ensure the integrity of Department grant programs, including issuance of letters of suspension and debarment to grantees to prevent them from receiving future federal grants and contracts under the following circumstances:

     a.    Grantees that are subject to legal action for crimes associated with the Department funds; and

     b.    Other egregious circumstances; e.g., previous action taken by the Department has not resulted in resolution of a problem or risk.

53.    OGM tracks this information for Department programs and enters the information into sam.gov, a centralized database that is required to be accessed by other federal agencies to prevent them from awarding future federal grants or contracts to these identified organizations.

54.    The Department is required to suspend grants awarded to organizations who have committed fraud or are named in criminal indictments. OGM is responsible for receiving and recording information related to such potential disqualification of grantees. The entry of this information into sam.gov prevents those organizations from receiving grant funds from the Department or other federal agencies in the future.

55.    To my knowledge, since March 12, 2025, there is no one within the Department to receive or record this information regarding Department grantees. Consequently, it is my

understanding that grantees are no longer being suspended or debarred from receiving federal funds.

56.     GRMSD's responsibility for preventing and addressing fraud, waste, and abuse includes issuing program decision letters ("PDLs") for all grantee audit findings that include questioned costs and performing audit resolution to secure repayment. To my knowledge, since March 12, 2025, there is no one within the Department to issue PDLs for questioned costs. Any remaining staff lack experience in performing cooperative audit resolution to inform grantees that they must return funds. In the absence of anyone to issue PDLs, grantees will not be held accountable for fraud, waste, and abuse, and will not be required to return questioned costs.

57.     GRMSD is responsible for ensuring that high-risk grantees comply with special Department-wide conditions, which include monitoring corrective action plans and providing ongoing support to high-risk grantees with third-party fiduciary agents ("TPFAs"). GRMSD performs this role to promote consistency, efficiency, and continuity for grantee accountability developing and addressing corrective action plans across the Department. To my knowledge, since March 12, 2025, there is no one within the Department to ensure that grantees comply with Department-wide special conditions.

### Non-Competing Continuation Awards

58.     OGM provides training to the grant making offices regarding grants that were previously competed and awarded for multi-year grant periods. After the completion of the first year of the grant period, the grant is categorized as an NCC award, and a different award process applies. *See* 34 C.F.R. § 75.253. To obtain a non-competing continuation award, a grantee must demonstrate, among other things, that it has made "substantial progress in achieving (A) [t]he goals and objectives of the project; and (B) [t]he performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in

21

the application notice." *Id.* § 75.253(a)(1)(i). Grantees are required to submit Annual Performance Reports that are used by program offices to make substantial progress determinations. *See id.* § 75.118.

59.　　OGM oversees the process under which non-competing continuation grantees seeking a continuation award submit a performance report providing current performance and financial expenditure information to meet the reporting requirements of 2 C.F.R. §§ 200.328, 200.329 and 34 C.F.R. §§ 75.590, 75.720.

60.　　Determinations of substantial progress traditionally are made by grant program officers who have the expertise to make that determination in consultation with their program attorney. Non-competing continuation awards should be approved unless the program staff have conducted thorough reviews of each grantee's annual progress report (U.S. Dep't of Educ. Grant Performance Report Cover Sheet (ED 524B), https://www.ed.gov/media/ document/ed-524b-cover-108179.pdf) and documented that review in the programs Grant Funding Slate memorandum. In determining whether to continue an award, program officers should consider the grantee's fiscal history and performance history, available information about risk, and available funds and planned use for any carry over balance. *See* 34 C.F.R. § 75.253. A grantee that is denied a non-competing continuation award may request reconsideration of that decision under 2 C.F.R. § 200.341, which is reviewed by the designated Department official, who will make the final decision.

61.　　Because of the placement on administrative leave of program officers and staff in the OGC in March 2025, there are not sufficient staff with the expertise to perform these reviews of non-competing continuation awards.

62. The Department has set the following automated email response for my Department email: "Downey, David is currently engaged in closing out their work activities and responsibilities as part of a planned transition. They are working to ensure a smooth handover of key matters. To ensure continuity, please direct any related inquires to OFO-Transition@ed.gov." This response is entirely inaccurate. Since March 11, 2025, I have been unable to close out my work and responsibilities or transition them to another the Department employee at all, let alone as part of a "planned transition" or "smooth handover of key matters." Our access was cut off so abruptly that we had standing Teams meetings scheduled with outside parties that we were unable to cancel; my understanding is that external partners joined these scheduled calls but that there were no Department staff in attendance. And I was forced to leave projects unfinished. For example, my team was in the midst of updating our advanced grant training curriculum but could not finish the project or hand it off to remaining OGM employees.

63. To my knowledge, since my team was placed on administrative leave, there is no one within the Department to provide training to staff and grantees on grant management. This includes the training of our competitive grant license/warrant holders, our formula grant obligators, and even competitive grant competition managers that lead the competitive review of applications. With so many Department staff being placed on administrative leave so abruptly, grant programs are being administered by staff who in many cases lack any experience with those programs or their statutory requirements.

64. Similarly, the online training lessons GMPD made available to states and school districts were scheduled to be updated and have corrections made after March 12, 2025. But since the RIF, there is no one within OGM to update the online training or provide other forms of technical assistance to states or school districts.

64.     Based on my extensive experience working within OGM, the Department cannot meet its statutory obligations with the staff remaining after the RIF. The individuals and divisions cut represent decades of experience, some of which is highly technical and specialized. Even if certain duties performed by GMPD or RMSD could be shifted elsewhere within OGM or the Department, the individuals still working for the Department do not have specialized experience and training, and, due to the loss of experienced employees since January 2025, cannot access the necessary guidance and mentorship to come up to speed.

65.     In particular, due to the abolition of the GMPD, the Department will lack vital training for its staff, particularly grant license holders, to ensure compliance with federal laws, regulations, and policies governing all facets of grant management. The Department will likewise lack the expertise to timely and effectively update its grant management policies and trainings or provide real-time compliance advice in the face of new laws, regulations, or even court orders impacting federal grants. Without qualified staff carrying out these critical functions, the Department will be unable to comply with the statutes and regulations governing grant management.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 26, 2025.

David Downey