# Exhibit AA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
AVANCEMENT OF COLORED PEOPLE, et
al.,

     *Plaintiffs,*

v.

UNITED STATES OF AMERICA, et al.,

     *Defendants.*

Civil Action No. 25-965-JRR

## DECLARATION OF MONTSERRAT GARIBAY

I, Montserrat Garibay, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    From April 2023 until January 20, 2025, I served as Assistant Deputy Secretary and Director for the Office of English Language Acquisition ("OELA") in the U.S. Department of Education ("the Department"). OELA began as an office within the Department's Office of Elementary and Secondary Education ("OESE") but was established by Congress as an independent office in 2002 as part of the No Child Left Behind Act reauthorizing the Elementary and Secondary Education Act ("ESEA"). This law also created Title III-A of the ESEA, which provides federal financial assistance to states and districts to support effective language acquisition programs for English learner students, 20 U.S.C. §§ 6801–71, and directed OELA to administer Title III-A programs.

3.      According to the National Center for Education Statistics, in 2021 approximately 5.3 million students in U.S. public schools were classified as English learners ("Els"), representing 10.6% of the total K–12 enrollment. To succeed academically, English learners benefit from many supports including language assistance programs, professional development for educators and extended learning opportunities.

4.      The purposes of Title III-A are to ensure that English learners, including immigrant students, "attain English proficiency and develop high levels of academic achievement in English" and to assist educators, state education agencies ("SEAs"), local education agencies ("LEAs"), and schools with professional development and other support so that they can provide effective instructional programs to these students. *Id.* § 6812.

5.      Under Title III-A, the Department administers and oversees three major grant programs. First, the Department distributes Title III-A formula grants to every state, the District of Columbia, and Puerto Rico, which then subgrant much of that funding to school districts. 20 U.S.C. §§ 6821, 6824. In FY 2024 the appropriation for these formula grants was $890 million.

6.      Second, the Department administers the Native American and Alaska Native Children in School ("NAM") competitive grants program. 20 U.S.C. § 6822. The annual allocation for NAM grants is $5 million. As of January 2025, when I left OELA, there were 15 open NAM grants awarded through at least the end of the 2025 fiscal year.

7.      Third, the Department administers the National Professional Development ("NPD") competitive grants program for educators of English learners. 20 U.S.C. § 6861. Pursuant to the NPD program, the Secretary must award competitive grants to eligible entities to operate professional development activities and training meant to "improve classroom instruction for English learners." *Id.* Activities under this program assist educators who work with English

learners by "improv[ing] [their] qualifications and skills" and providing financial support for certified staff and paraprofessionals to obtain certification and licensure to serve such students. *Id.* § 6861(1), (5). In the 2024 fiscal year, the NPD Program distributed $8.4 million for pre-service training activities for teachers, paraprofessionals, administrators, and aspiring educators seeking certification in bilingual or multilingual education. In FY 2024, Congress appropriated approximately $59 million for NPD. As of January 2025, when I left OELA, there were 107 open NPD grants awarded through at least the end of the 2025 fiscal year, 13 of which are in their first year of a five-year grant period.

8.     ESEA also requires the Secretary of Education to "establish and support the operation of a National Clearinghouse for English Language Acquisition and Language Instruction Educational Programs" ("NCELA"), which must "collect, analyze, synthesize, and disseminate information about language instruction educational programs for English learners, and related programs." 20 U.S.C. § 7013. This website is essential for professional development and other activities to support the instruction of English learners and the educators who serve them.

9.     Since its formation as an independent office in 2002, OELA has administered the NAM grants, the NPD grants, and NCELA. In 2023, OELA also resumed administration of the Title III-A formula grant program, which had originated in OELA but moved to OESE in 2008.

10.     As of November 2024, there were approximately 16 staff members working in OELA.

11.     Between November 2024 and March 11, 2025, three OLEA employees left the office. In January 2025, one new employee began working in OELA, but resigned a short time later.

3

12.     As part of the March 11, 2025 Reduction in Force ("RIF"), 12 additional OELA employees were terminated. On information and belief, the RIF notices they received stated that the office had been abolished, leaving one single employee to carry out the entirety of OELA's work and eliminating the office as an independent entity within the Department.

13.     On or around March 14, 2025, state education officials received a letter from the Department stating that OELA had been relocated into OESE as a sub-unit of that office and the Department was still fulfilling its statutory obligations. Based on my experience in OELA, I do not believe that this was the correct process by which to move OELA back into OESE. It is my understanding that by statute, the Department must give 90 days' notice to Congress of its intention to abolish OELA as an independent office and reallocate its functions to OESE *before* it eliminates OELA. *See* 20 U.S.C. § 3473(b).

14.     Before President Trump came into office, OELA was already short-handed, and OESE was also leanly staffed. The dramatic recent reduction in staff assigned to work on Title III programs, particularly due to the March 11 RIF, will make it virtually impossible for the Department to carry out its mandatory functions under Title III. This will have detrimental impacts on English learner students and educators across the country.

15.     For example, SEAs' and LEAs' use of Title III-A formula grant funds and the Department's oversight of the formula grant program will be immediately disrupted. Before a state can receive Title III-A formula funds, the Department must review and approve the state's plan for educating English learners, which ensure states will use Title III-A formula funds effectively and in accordance with statute. *See* 20 U.S.C. §§ 6821, 6823. OELA staff did this work. After OELA staff determined that state plans were in compliance, OESE staff calculated each state's allocation under the Title III-A formula. OELA staff would then prepare a memorandum of the

4

proposed slate of funding recipients for approval and notifications to the states of their estimated
Title III-A formula awards.

16.     After formula funds were disbursed, OELA staff monitored states' compliance with
their approved state plans, ensured that states submitted required reports and data, and
implemented safeguards to hold states accountable, like supplemental reporting requirements or
designation as a high-risk grantee.

17.     Department staff collaborate with SEAs to revise their plans to meet statutory
requirements, monitor states' implementation of the plans, and hold states accountable for
compliance. With almost no Department staff overseeing Title III, it is reasonable to expect that
these processes of fund distribution and monitoring of proper fund usage will be disrupted.

18.     State officials always have many questions about how Title III funds can be used.
These questions currently include numerous inquiries with regard to immigration actions in
schools, in addition to the normal flow of questions for which the Department provides technical
assistance. But the staff who provided this technical assistance are no longer employed by the
Department.

19.     In addition, OELA held monthly calls with the National Association of English
Learner Program Administrators ("NAELPA"), a group of state Title III administrators, to provide
updates and technical assistance and answer questions about how to manage Title III funds. Most
questions related to proper use of Title III awards, especially around how to comply with Title III's
unusually strict "supplement not supplant" requirements.

20.     States also raised questions about how to submit information to fulfill Title III's
extensive data reporting requirements. OELA staff worked with state Title III administrators to try
to improve the quality of the data they reported, keep them informed of changes in the data

5

requested, and provide technical support in using the Department's Ed*Facts* system to upload submissions. During the data reporting period, staff offered weekly office hours to respond to these and other concerns. This support was especially important because the Title III-A formula bases states' allocations on the number of English learners attending schools in each SEA. The Department uses Census Bureau data at the state level for 75% percent of that calculation, but the remaining 25% is based on the numbers of English learners enrolled at the time of the annual English Language Proficiency assessment, as reported by SEAs on Ed*Facts*. Inaccurate data submissions can therefore change a state's Title III-A award.

21.    The last time OELA spoke to the NAELPA group of state Title III administrators was January 2025 (before President Trump took office). On information and belief, a meeting of state Title III directors and their OELA project managers was scheduled to take place in April 2025 but was cancelled. Eliminating these services results in insufficient information and delayed responses for SEAs requesting assistance, as well as reduced accountability and oversight of state grantees. This, in turn, results in states being unable to provide districts with accurate help and direction on the proper use of Title III funds.

22.    Upon information and belief, all the attorneys within the Department's Office of General Counsel who were working on Title III issues were also subject to the March 11 RIF. Prior to the RIF, specific OELA staff members were assigned to provide technical assistance and counsel to State Title III administrators. Those staff members were subject to the RIF. This further impedes the Department's ability to properly administer Title III grant funds and states and districts' ability to properly and effectively utilize them. State Title III administrators have no dedicated staff to provide them with direct counsel and assistance from the Department.

23.     Another example of likely disruption to Title III-A grants from the recent dramatic OELA staff reductions is related to the NPD grants. Grantees have lost their project managers and their ability to receive technical assistance and other information. This will cause massive uncertainty and disruption, particularly for those grantees in the first year of the five-year grants. Likewise, on information and belief, the 107 NPD grant recipients and 15 NAM grantees have received no communication regarding continuation of their grants since March 11, 2025.

24.     Outside of its technical assistance to grantees, OELA also offered supports for educators and other practitioners. For example, OELA provided webinars and podcasts for educators, which averaged about 800 attendees per session, and made available infographics, research, fact sheets, biannual reports, and other products through NCELA, the hub managed by OELA staff for information and resources. Staff would share out NCELA resources through a monthly newsletter, social media, and other channels. The monthly newsletter alone went to over 38,000 contacts.

25.     Upon information and belief, the Department has not released any NCELA resources since January 20, 2025 except the biannual report, which is statutorily required and was prepared by Biden Administration staff.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed June 19, 2025.

Montserrat Garibay