# Exhibit BB

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

### DECLARATION OF RACHEL GITTLEMAN

I, Rachel Gittleman, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein based either on my own experiences and conversations I have had with other current and former employees of the U.S. Department of Education ("the Department") as well as relevant stakeholders. If called as a witness, I could and would testify competently to the matters set forth below.

2. I serve as a Management and Program Analyst in the Community Support Division[1] of the Office of the Ombudsman, in the Department's office of Federal Student Aid ("FSA"). I have held this role since July 30, 2023. During this time, I received the highest ratings on my performance reviews and received "spot awards" for specific, exceptional work conduct.

3. On March 11, 2025, I received a notice from the Department's Chief Human Capitol Officer notifying me that my position was to be abolished pursuant to an agency-wide

---

[1] Prior to a large-scale reorganization that took effect in February 2025, this office was known as "Stakeholder Engagement."

reduction-in-force ("RIF") in which the entire Community Support Division was being eliminated. I was immediately placed on administrative leave and was not given time to effectively transition my work.

4. To my knowledge, as of February 2025, the Ombudsman's Office had approximately 63 employees. Today, only approximately 25 employees remain in the office and were not affected by the mass RIF. Three full teams have been abolished—the Community Support Division, and both the Operations and Quality Branches of the Intake Division. I understand that the Ombudsman's Office continues to lose employees as the working conditions deteriorate and it becomes increasingly difficult to serve the public in accordance with the obligations of the Ombudsman's Office.

5. In my role, I resolved complaints submitted by student loan borrowers as required by 20 U.S.C. § 1018(f)(3)(A). In fiscal year 2024, I managed nearly 400 complaints. As of March 11, 2025, I had an open caseload of 322 complaints, and the Ombudsman's Office had a backlog of thousands of complaints from borrowers awaiting resolution.

6. Federal law requires that the Ombudsman provide "timely assistance" to student loan borrowers, by "attempt[ing] to resolve [borrowers'] complaints within the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in" Title IV loan programs. 20 U.S.C. § 1018(f)(1), (f)(3)(A).

7. The Ombudsman's Office served as a final resource for borrowers to seek complaint resolution after they have exhausted traditional customer service avenues like reaching out to their servicer or one of FSA's contracted front-line customer service centers. In that way, the Ombudsman's Office fulfilled FSA's statutorily mandated purpose of "improv[ing] service to students and other" Title IV student financial aid recipients, "including making those programs

more understandable to students and their parents," as well as FSA's statutorily mandated function of "providing . . . customer service . . . and user support related to the administration of" Title IV student financial aid programs. 20 U.S.C. § 1018(a)(2)(A), (b)(2)(A)(v). In other words, without the Ombudsman's Office fulfilling its own statutory mandate of "receiv[ing], review[ing], and attempt[ing] to resolve informally complaints from borrowers," *id.* § 1018(f)(3)(A), the Department cannot fulfill its own overarching statutory obligations to borrowers.

8. This work is not only statutorily required, it is also critical to the proper functioning of FSA and to protecting student borrowers. FSA's vendors, including servicers and the business process operations agents who provide the front-line customer service, make mistakes. For example, the Ombudsman's research team found that, when it came to handling Public Service Loan Forgiveness ("PSLF") buy-backs, vendors would summarily close a borrower's case if the borrower did not use a particular set of key words identified by the vendor. The work of the Ombudsman's Office helps to catch, correct, and resolve these types of errors, which fundamentally impact borrowers' financial well-being. But now that the Ombudsman's Office has been so deeply cut, the resources to help and protect borrowers and make corrections to these types of practices do not exist.

9. Since April 2024, the Ombudsman's Office has been responsible for administering borrower defense applications that are pending and required to be processed pursuant to the settlement agreement in *Sweet v. McMahon*, No. 3:19-cv-3674 (N.D. Cal.). *See* FSA, *Sweet v. McMahon Settlement*, https://studentaid.gov/announcements-events/sweet-settlement (last visited June 21, 2025). My understanding is that after the mass RIF, and with the volume of *Sweet* compliance work, there is little capacity in the Ombudsman's Office to fulfill any of their statutorily mandated obligations.

3

10. My understanding is that as of March 20, 2025, there was a backlog of more than 3,000 dispute complaints brought by borrowers about problems with their student loans—i.e. not receiving proper credit towards or forgiveness under PSLF or Income-Driven Repayment ("IDR") plans, interest being calculated or charged incorrectly, payments being processed incorrectly, loans being errantly reported as delinquent, etc. The backlog of cases would previously have been managed by the Community Support Division and the Loan Management and Customer Care Branch (which, save for one person, has been detailed to work exclusively on *Sweet* compliance work). Because the entire Community Support Division was RIF'ed, the Ombudsman's backlog of thousands of borrower complaint cases is being managed by one Loan Management and Customer Care Branch employee. It is inconceivable that one person can effectively resolve anywhere near that number of complaints.

11. The Community Support Division was the primary office in FSA responsible for executing stakeholder consultation as required by 20 U.S.C. § 1018(c)(3). To fulfill that statutory mandate, Community Support Division staff consulted with government, advocacy, industry, and higher education stakeholders regarding the degree of satisfaction with the Title IV delivery system and sought suggestions on means to improve the delivery system. In 2019, the Congressional Research Service reported that stakeholders considered the Department's efforts to solicit feedback as "perfunctory." Cong. Res. Serv., *The Office of Federal Student Aid as a Performance-Based Organization* (Dec. 30, 2019), https://www.congress.gov/crs-product/R46143. Since the establishment of the Community Support Division, stakeholders routinely expressed appreciation for greater access to FSA and described how they considered FSA to be more responsive to their concerns. Without the Community Support Division, I do not believe the Department has either the capacity or a plan to solicit stakeholder feedback as required by 20 U.S.C. § 1018(c)(3).

12. The Community Support Division was also the sole business unit responsible for maintaining the Department's compliance with key provisions of the Stop Student Debt Relief Scams of 2019 ("STOP Act"). The statute requires, in part, that the Department develop a third-party data system for authorized people or entities, such as legal aid attorneys and state government entities, to access borrower records. 20 U.S.C. § 1092b(e). As of March 20, 2025, the Department has been unable to develop and implement such a system. In lieu of this system, in July 2021, Department leadership directed Community Support Division staff to work directly with authorized representatives as defined in the STOP Act to provide borrower records.

13. In my time at FSA, I was the sole staff member responsible for providing these records to state student loan ombudsman offices, state regulators, state attorneys general, and state higher education offices. Each of these entities offer complaint resolution channels to their constituents. The borrower records that I provided in this capacity before I was placed on administrative leave enabled timely and effective complaint resolution, as required by statute. *See* 20 U.S.C. § 1018(f)(1), (f)(3)(A). Moreover, these interactions were one of the "appropriate means" by which states, as stakeholders, provided feedback on the effectiveness of the federal aid system. *See* 20 U.S.C.§ 1018(c)(3). Given the loss of staff experienced with STOP Act compliance as a result of the mass RIF, there is no way that the Department remains in compliance with the STOP Act. Indeed, I have heard from multiple state stakeholders that they have been directed to submit their requests to a universal inbox [ombudsman@ed.gov]. This inbox currently has hundreds of emails that have yet to be entered into the system, which is likely to cause massive delays in resolving those complaints. State stakeholders have shared that they have received responses to their emails stating that these cases are now being assigned to servicers rather than being worked by Department staff.

14. I was also the primary staff member responsible for maintaining the inbox established to receive alerts of suspected fraud from FSA's servicing vendors, as required by 20 U.S.C. § 1018(b)(2)(C)(ii). The statute requires the Department to "maintain[] a reporting system for contractors" to alert the Department of suspected scams *Id.* § 1018(b)(2)(C)(vi). The Department directs its servicing vendors to report suspected scams to Fraud.Risk@ed.gov. Before I was placed on administrative leave, I monitored this inbox for trends in scam activity and made recommendations within the Department about taking appropriate action. Given the loss of staff experienced with monitoring for trends in suspected fraud, there is no way that the Department is fulfilling its statutory mandate to "maintain[] a reporting system for contractors" to alert the Department to suspected scams, *id.*, nor its statutory obligation to "ensur[e] the integrity of the" Title IV student aid programs. *Id.* § 1018(b)(2)(A)(vi).

15. I was also the sole staff member responsible for coordinating with state and federal law enforcement agencies on third-party student loan debt relief scams, which often target borrowers with false promises of assistance, debt relief, or loan cancellation in exchange for up-front or monthly fees. Before I was placed on administrative leave, I managed all complaint referrals about scam activity and referred these complaints to state and federal law enforcement partners. In fiscal year 2024, I shared 3,504 student debt relief scam complaints with attorneys general in 41 states and the District of Columbia, as well as the Federal Communications Commission ("FCC"), Consumer Financial Protection Bureau ("CFPB"), and the Federal Trade Commission ("FTC"). These referrals led to two enforcement actions taken by the FTC, one taken by the FCC, four investigations by state attorneys general, and multiple consumer alerts with educational materials about third-party debt relief scams. FSA does not have any enforcement authority over third-party debt relief companies, so without these referrals, victims are highly unlikely to receive restitution. It is my understanding that no one is doing this work now and given the loss of staff experienced with this inter-jurisdictional coordination,

there is no way that the Department can fulfill its statutory obligation to "ensur[e] the integrity of the" Title IV student aid programs. 20 U.S.C. § 1018(b)(2)(A)(vi).

16. Before I was placed on administrative leave, I led FSA's engagement and coordination with Veteran and Military Service Organizations. I resolved complaints from and managed outreach to military and veteran borrowers through partnership with veterans and military service organizations. Military and veteran borrowers disproportionately struggle to access critical statutory protections like PSLF, Total and Permanent Disability Discharge, and military service deferment. The provision of those protections to eligible borrowers is mandatory under the Higher Education Act of 1965, as amended. *See* 20 U.S.C. § 1087e(m) ("The Secretary *shall* cancel the balance of interest and principal due" for borrowers eligible for PSLF (emphasis added)); *id.* §§ 1087, 1087e(a)(1) (same for totally disabled borrowers); *id.* § 1087e(f)(2)(C) (describing eligibility for military service deferment). Given the loss of FSA staff experienced with engaging and coordinating with Veteran and Military Service Organizations and experienced in the particular protections available to service members and veterans, there is no way that the Department will be able to fulfill its statutory borrower protection obligations to military and veteran borrowers.

17. Without the Community Support Division, the Department will be unable to satisfy many of its statutory obligations, including those expressly and statutorily vested in the Ombudsman's Office.

18. The impact of the RIFs and the President's Executive Order shutting down the Department extends beyond the specific work performed by the Community Support Division. The work of the Ombudsman—and FSA's work as a whole—to address issues raised by student borrowers has been hobbled. The Ombudsman's Office worked closely with other offices within

FSA to address problems with servicers. For example, the Ombudsman's office worked with the Office of Loan Portfolio Management (including the Vendor Performance and Borrower Processing Divisions), the Vendor Oversight Division, and the IT Department's Product Management Division to resolve issues for student borrowers and identify and correct systemic errors that affect large numbers of borrowers. But after the RIF and the President's Executive Order, many staff who do this work are gone or on administrative leave, making it impossible to do the cross-functional work needed to resolve individual borrower issues, let alone make necessary changes across a servicers' portfolio or across a population. As a result, borrowers are certain to face financially harmful errors—such as incorrectly calculated interest rates, monthly payments, and loan amounts, as well as incorrectly processed loan payment plan and forgiveness applications—and are certain to have little to no assistance from the Department in providing them with statutorily mandated recourse.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 27, 2025.

Rachel Gittleman

9