# Exhibit CC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| |
|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants.* |

Civil Action No. 25-965-JRR

## DECLARATION OF TERRI GONZALES

I, Terri Gonzales, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a resident of the State of Texas. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I was the Chief Attorney at the U.S. Department of Education's Office for Civil Rights ("OCR") regional enforcement office based in Dallas, Texas. I have been employed at OCR for nearly fifteen years and spent the last three years as Chief Attorney. As Chief Attorney, I was the legal advisor for the office and responsible for ensuring the legal sufficiency and factual accuracy of all of the work relating to complaints, investigations, compliance reviews, and technical assistance. Before I became Chief Attorney, I was a Team Leader and Staff Attorney with OCR.

3.    I hold a bachelor's degree in English, with a minor in Women's Studies, from the University of Louisville in Kentucky; and a Juris Doctor from the University of Denver College of Law.

4.     I submit this declaration in response to numerous actions taken by the Trump Administration, Department of Education ("the Department"), and Secretary of Education to dismantle the Department, such that the Department has been incapacitated and is now unable to meet statutory obligations that are critical to the implementation and enforcement of civil rights laws across hundreds of thousands of schools, colleges, and universities in all fifty states.

### The Office of Civil Rights

5.     When I accepted my position at OCR, I took an oath to "well and faithfully discharge the duties of the office." 5 U.S.C. § 3331. Since on or about January 21, 2025, the Trump Administration has taken actions that prevent me from fulfilling my obligations.

6.     As set forth in its *2024 Annual Report to the President and the Secretary of Education*:

> [OCR] safeguards the rights of students through the investigation of possible violations of civil rights laws, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990 (Title II), the Age Discrimination Act of 1975, and the Boy Scouts of America Equal Access Act of 2001. In addition, OCR safeguards students' rights by developing policy guidance to assist schools and other educational institutions receiving federal financial assistance in understanding how OCR interprets and enforces federal civil rights laws, by disseminating information and technical assistance about students' rights and schools' responsibilities, and by collecting and reporting data on key education and civil rights issues in our nation's public schools.

https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf (last accessed May 3, 2025).

7.     From my experience at OCR, I know that many students in America's schools continue to suffer the injuries of race, national origin, sex, and disability discrimination, in violation of the civil rights statutes that Congress tasked OCR with enforcing.

8.      OCR is made up of nonpartisan, neutral factfinders whose work enforces federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department.

9.      OCR investigates individual and class complaints of discrimination, conducts compliance investigations and directed investigations, mediates and monitors resolution agreements, conducts compliance reviews, initiates enforcement action, and provides technical assistance to help recipients of federal funds achieve voluntary compliance with the civil rights laws within OCR's jurisdiction.

10.     Most of OCR's activities were conducted by its twelve regional enforcement offices throughout the country so that OCR can effectively and efficiently serve all Americans. The regional enforcement offices carry out OCR's core work—preventing, identifying, ending, and remedying discrimination against America's students. Staff in regional offices get to know the relevant schools in their respective jurisdictions and build relationships with recipients, which is critical to identifying and addressing trends particular to the region.

11.     OCR investigates individual and class complaints in the context of elementary and secondary education, as well as post-secondary education. Most commonly, these cases involve complaints of discrimination based on race, color, and national origin, including shared ancestry, in violation of Title VI; disability discrimination in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990; and discrimination on the basis of sex in violation of Title IX of the Education Amendments Act of 1972. OCR resolves complaints alleging different treatment, harassment, and retaliation arising under each of these laws. OCR also has jurisdiction to investigate complaints based on age discrimination. In addition to service complaints involving students, OCR also has jurisdiction over some complaints alleging

3

discrimination in employment, in conjunction with the U.S. Equal Employment Opportunity Commission.

12.    The Government Performance and Results Act of 1993 ("GPRA") requires that federal agencies publicly publish a strategic plan that includes "general goals and objections, including outcome-oriented goals, for the major functions and operations of the agency." 5 U.S.C. § 306(a)(2). The Government Performance and Results Act Modernization Act of 2010 (GPRAMA) (Pub. L. No. 111-352) is an update to the GPRA (Pub. L. No. 103-62) and provides overall goals and objectives for OCR.

13.    Since at least 1997, pursuant to the GPRA, OCR has set a benchmark of resolving 80% of its cases in 180 days or less and making significant progress toward having no more than 25% of all pending complaints that are over 180 days old. Dep't of Educ., *GPRA*, https://www.ed.gov/about/ed-offices/ocr/gpra#:~:text=Goal%3A%20To%20ensure%20equal%20access,enforces%20federal%20civil%20rights%20laws (last updated Jan. 15, 2025).

14.    The GPRA also requires that "[w]hen developing or making adjustments to a strategic plan, the agency shall consult periodically with the Congress, including majority and minority views from the appropriate authorizing, appropriations, and oversight committees, and shall solicit and consider the views and suggestions of those entities potentially affected by or interested in such a plan." 5 U.S.C. § 306(d).

15.    In my experience, given the volume of cases, it had already become almost impossible to meet the Department's stated goals, especially for the most complex cases. In an attempt to resolve complaints as efficiently as possible, we tried to mediate more cases, but not all cases are appropriate for mediation.

16.     Regulations make clear that "any program or activity receiving Federal financial assistance" from the Department risks suspension or termination of that assistance if they violate anti-discrimination laws. 34 C.F.R. § 100.1. The Department is obligated to provide assistance and guidance so that recipients can voluntarily comply with anti-discrimination law and demonstrate that compliance. 34 C.F.R. § 100.6. Pursuant to this regulatory requirement, OCR attorneys provide technical assistance to schools and universities across their assigned region.

17.     If a recipient of federal financial assistance will not voluntarily comply with civil rights law, there are several steps that the Department must take before suspending, terminating, or refusing to grant or continue financial assistance, including filing a written report with Congress. 34 C.F.R. § 100.8; *see also* 42 U.S.C. § 2000d-1 (Title VI) ("In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report."); 20 U.S.C. § 1682 (Title IX).

## Dallas Enforcement Office

18.     The Dallas office has jurisdiction over the States of Texas, Louisiana, and Mississippi. Staff travels throughout the region to conduct on-site investigations and provide training to recipients of Department funds.

19.     As of January 20, 2025, the Dallas enforcement office had approximately fifty-five employees, including about forty-five investigative staff. The office was led by a Regional Director. The Program Manager and I worked closely with the Regional Director, and supervised seven teams of six or seven attorneys and investigators, respectively, as well as their team leaders.

20. The Dallas enforcement office, which was already grossly understaffed, had a very large caseload that has increased dramatically, particularly in the last seven years. As of January 14, 2025, there were approximately 2,000 pending complaints, involving 1,180 pending investigations in Texas alone, plus 200 open investigations in Louisiana, and 125 open investigations in Mississippi. OCR, *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, https://ocrcas.ed.gov/open-investigations (last updated Jan. 14, 2025). This meant that each team leader was responsible for supervising between 280 and 300 complaints, and each team member had 50-80 complaints depending on the complexity of their work. This was impractical and untenable, especially since OCR was expected to continue to meet Department goals developed pursuant to the GPRA.

21. Approximately 60% of the caseload involved complaints of disability discrimination. As of January 14, 2025, we were investigating 797 cases alleging disability discrimination at elementary, secondary, and post-secondary schools. Cases in our region include complaints alleging school districts' failure to respond to students who need accommodations for a full range of disabilities including mobility and learning disabilities, severe allergies, and diabetes; complaints alleging that school districts failed to properly evaluate and implement Individualized Education Plans for disabled students pursuant to Section 504; complaints of school districts not responding to students facing harassment because of a disability; and restraint and seclusion cases involving disabled elementary and secondary school students. In the post-secondary context, our office investigates the responsiveness to college students who need academic adjustments due to a disability, such as extended time on exams because of a learning disability.

22. The region also confronts significant issues related to Title VI (race and national origin discrimination) and Title IX (sex discrimination). As of January 14, 2025, we were investigating 375 Title VI cases and 323 Title IX cases. The Dallas enforcement office still had jurisdiction over school districts that are operating under court-mandated desegregation orders. We refer cases involving desegregation orders to the Department of Justice whenever possible, but that office was also understaffed and could not take on every such complaint that came to OCR.

23. The Dallas enforcement office was one of the highest performing offices with the highest quality of work in the country. The Dallas enforcement office handles large-scale, OCR directed compliance reviews, where complaints and/or media coverage prompts investigations into systemic problems.

24. The Dallas enforcement office consistently reaches Resolution Agreements that provide robust remedies for students after large-scale investigations of systemic problems. For example, the Dallas enforcement office recently reached two separate Resolution Agreements after large-scale investigations found and resolved systemic civil rights compliance concerns and violations arising in two large suburbs of Dallas. In one suburb there were civil rights compliance concerns related to the physical restraint of elementary and secondary school students. In the other district, we found violations in the district's responses to claims of sexual harassment, including sexual violence. Because of their knowledge of the area, including the school districts and regions, and the Dallas office's proximity to the suburbs in question, the office was successful in gathering vital information through witness interviews and data collection. After reaching these Resolution Agreements, the Dallas office-initiated monitoring of both districts to ensure compliance with the terms set forth in each Resolution Agreement as well as the statutes and regulations that were at issue. Our office was monitoring these two districts' compliance with the Resolution Agreements.

7

Before we can release the districts from the monitoring, we must determine that they are in compliance with both the law and the Agreements.

25.    The success of the Resolution Agreements with the two school districts is an example of how regional enforcement offices, including the Dallas office, enable staff at those offices to develop regional expertise. Because their work is focused on a specific region, staff within regional enforcement offices are well-aware and familiar with the educational institutions and the communities in their jurisdictions and can better identify systemic issues.

26.    In addition to investigations and monitoring, the staff provides technical assistance to the public and to private organizations in the form of quick and thorough responses to inquiries, consistent with regulatory requirements to provide assistance and guidance so that recipients can voluntarily comply with anti-discrimination law and demonstrate that compliance. 34 C.F.R. § 100.6. Anyone could contact the Dallas enforcement office via phone call or email and receive a response from a team member. We frequently received inquiries from parents and students who could not afford an attorney as well as from school administrators regarding their obligations under Title IX. This is an invaluable public resource to individuals and families regardless of socio-economic status. Team members also offer presentations at conferences and assist organizations with policy decisions and compliance under all the civil rights laws OCR enforces.

## Dismantling of the Department's Office of Civil Rights

27.    Almost all Dallas office employees were impacted by a reduction in force ("RIF") announced on March 11.

28.    On January 31, 2025, approximately four staff members, including myself, were placed on or went on leave due to President Donald Trump's executive order banning "DEI programs" in the federal government. Ending Radical and Wasteful Government DEI Programs and      Preferencing,      Executive      Order      14151      (Jan.      20,      2025),

8

https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/. Three of the employees that were placed on administrative leave in January, again including myself, were terminated as a result of the RIF. The fourth employee who was placed on administrative leave, plus another three employees, committed to the new deferred resignation program in response to a "Fork in the Road" email and are not covered by the RIF.

29.    I have been informed by my colleagues that on March 11, 2025, all Dallas employees who were not on administrative leave and had not committed to the deferred resignation program received an email notifying them that their positions, along with the entire unit (the Dallas office) was being eliminated.

30.    On March 12, 2025, I received an email from Jacqueline Clay at the Department notifying me that my position was being abolished. The email stated that the elimination of my unit (the Dallas office) and my position was part of the agency's "restructuring process" and to "support" Executive Order 14158 ("Implementing the President's 'Department of Government Efficiency'"), dated February 11, 2025. A true and correct copy of the March 12, 2025 email is attached hereto as **Exhibit 1**.

31.    On April 10, 2025, I received via email a notice of separation due to the RIF. The notice stated that my termination from the Department would be effective on June 10, 2025. A true and correct copy of the RIF notice is attached hereto as **Exhibit 2**.

**Imminent and Irreparable Harm**

32.    The experienced OCR staff—career attorneys, investigators, and managers— and their institutional knowledge are irreplaceable. It takes years of experiential training to develop the knowledge base to efficiently investigate a complaint, develop an effective remedy, and provide technical assistance to recipients of Department funding.

33. Now that the Dallas office has been eliminated, an American who seeks assistance with a civil rights concern in Texas, Louisiana, or Mississippi, will find on the OCR website that the Kansas City Office is the assigned enforcement office. OCR, *Contact OCR*, https://ocrcas.ed.gov/contact-ocr?field_state_value= (last visited June 5, 2025).

34. It is my understanding that all of the cases from the Dallas office were transferred to the Kansas City office, which already had a high volume of cases.

35. On information and belief, through at least April 11, 2025, the Kansas City office was unable to access the Dallas email box (OCR.Dallas@ed.gov), meaning that, after March 21, 2025, any incoming complaints or other communications seeking technical assistance were not seen and did not receive prompt attention. During that time, the Department was failing to meet its obligations to Americans in Texas, Louisiana, and Mississippi.

36. Based on my nearly fifteen years of experience at OCR, the RIFs will cause OCR to monitor fewer cases, since monitoring is one of the first things to be impacted during busy periods. News reporting demonstrates that monitoring has already been negatively impacted. Jennifer S. Richards and Jodi S. Cohen, *A Gutted Education Department's New Agenda: Roll Back Civil Rights Cases, Target Transgender Students*, ProPublica (May 2, 2025), https://www.propublica.org/article/education-department-civil-rights-donald-trump-discrimination. Without active monitoring, OCR investigations have no teeth. It will be as if the Department has vacated a resolution agreement because there will be no one checking to make sure that the violation has, in fact, been addressed. I do not believe that Kansas City has the bandwidth, let alone regional expertise and institutional knowledge, to monitor all of the open monitoring that has been transferred from the Dallas office.

10

37.    Without a functional OCR, there is one less avenue for students, parents, and school staff to pursue to seek investigation or advice on compliance with civil rights laws. The free legal assistance that OCR Dallas has provided and the access to an effective forum to remedy civil rights violations is functionally not available to residents of the three states (Texas, Louisiana and Mississippi) that the Dallas office served. None of those states provide such assistance to residents.

38.    Given my experience, I do not think that the Department can meet its obligations to address complaints, complete investigations, and ultimately enforce civil rights laws. It is physically impossible to resolve the 12,079 open cases within the remaining offices.

39.    High school students with complaints pending are likely to graduate before getting any relief. Right now, students who are suffering harassment are experiencing a perpetuated hostile environment in districts that are not complying with the law. Right now, students with disabilities are effectively barred from education because they are not receiving the resources to which they are entitled. I know from my experience over many years that students who are the victims of civil rights violations including discrimination and harassment often suffer significantly both in terms of lost educational opportunity and physical and mental harm. If OCR cannot respond to student concerns within 180 days – which is the length of a school year – students and their families are likely to both lose faith and suffer terribly. Given that OCR even now cannot resolve many cases within 180 days, the drastic downsizing of OCR will leave many students without any relief at all. As a result, I have a real concern that some students are currently suffering serious emotional and/or physical harm, and that suicide rates among these students will increase.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 11, 2025.

Terri Gonzales