# Exhibit DD

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

## <u>DECLARATION OF BLONDIE GORDON</u>

I, Blondie Gordon, declare as follows:

1.      I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am a resident of Florence County, South Carolina. I am a current member of the Florence Branch of the National Association for the Advancement of Colored People ("NAACP") and have been since approximately 2020.

3.      I have three children. My oldest daughter, J.C., and my son, H.J., both attend public school in Florence County. My youngest daughter, J.T., is two years old.

4.      All three of my children have disabilities. J.C. has ADHD; H.J. has autism spectrum disorder and is non-verbal; and J.T. has developmental delays resulting from health issues at her birth.

5.      J.C. has an Individualized Education Program ("IEP") to help address her ADHD. Through this program, she receives specialized assistance in her math and reading classes, as well as mental health counseling from school therapists. If J.C. lost access to these specialists, J.C.'s grades would drop, her participation in class would fall off, and her anxiety and stress would increase precipitously. Indeed, while J.C.'s GPA was low at the beginning of her high school career, it has steadily improved in large part due to the services she receives through her IEP.

6.      H.J. also has an IEP. Because H.J.'s autism requires significant treatment and assistance, his IEP is extremely thorough. When H.J. goes to school, he attends an insular classroom where he is the only student and receives full attention from his providers. At school, he receives occupational therapy; speech therapy; life skills classes (for things such as folding clothes or taking care of his hygiene); and job training classes for basic service-type careers.

7.      It takes a team of employees at the school district to help H.J. learn and grow in his classes. In particular, H.J. receives daily services from a licensed special education teacher, a specialized occupational therapist, a specialized speech therapist, and three full-time teaching assistants. Other district staff also help H.J. when needed, including by visiting him upon my request to assess his development and any changes to his needs.

8.      H.J. cannot function at school without this team of people. He is dependent on these staff not only to help him learn, but also to provide for his safety. Without people watching him at all times, H.J. is at risk of "eloping," meaning that he could run away from school and become lost. H.J. is unable to care for himself if he hurts himself. Indeed, because of his non-verbal disability, H.J. is unable to communicate his basic needs to people unless those people already understand him and his mannerisms.

9.      H.J.'s team of six personnel is already struggling to provide the services he needs. This is due in large part to the school district reducing the size of his team by terminating "shadowers" who were responsible for following and helping H.J. throughout the entire day, everywhere he goes. With those aides gone, the other members of H.J.'s team have had to pick up the slack by taking responsibility for his well-being at every minute of the school day.

10.     If H.J. lost the other members of his team, the harm it would cause to him and my family would be unimaginable. Keeping H.J. in school might not be doable—it would be simply impossible for H.J. to receive the services he needs from a single teacher who is responsible not just for him but for an entire class. But at the same time, I would be completely unequipped to provide for H.J. at home and by myself. I cannot do the work of six people all by myself, while also trying to give H.J. an education, while also taking care of my baby daughter, and while also trying to provide for my family. H.J. would not learn, and the health and safety of us both would be at risk.

11.     Even if H.J.'s team was reduced in size by one person, that would cause serious harm. The occupational and speech therapists who work with H.J. are licensed professionals whose skills cannot be replicated by myself or by schoolteachers; thus, if they could no longer provide for H.J., his ability to function independently (a skill gained through occupational therapy) and to communicate (a skill gained through speech therapy) would be stymied. Further, if any of the teaching assistants was no longer able to provide service to H.J., H.J. would be at increased risk of eloping, since those assistants are now taking on the responsibilities that H.J.'s shadowers had previously done.

12.     The services that both J.C. and H.J. receive through their IEPs are dependent on federal funding. That's because J.C. and H.J. attend public school in Florence County, and a

substantial amount of the Florence County schools' budget for things like disability services comes from the federal government.

13.    Although my youngest daughter J.T. is not yet in school, she also benefits from a federally-funded program called "BabyNet." BabyNet is a South Carolina program that obtains federal dollars for the purpose of treating babies and toddlers who have developmental delays, like my daughter.

14.    Through the BabyNet program, J.T. receives in-home and daycare treatment from trained therapists from the state. These therapists help J.T. learn how to speak, how to identify colors and shapes, and more. J.T. has not been able to learn these fundamental skills because of her developmental delays, and she is reliant on these therapists to help her understand how to communicate.

15.    The BabyNet therapists who work with J.T. at her daycare create reports at the end of each session and provide those reports to me. Those reports help me understand how and what J.T. is learning and what I need to do at home to help her continue to grow. I would not know how to address J.T.'s developmental delays without the aid of these professionals.

16.    If J.T. did not have these specialists to help work with her, her intellectual growth would become stunted and she would continue to fall behind a child's typical rate of development. This would have lifelong consequences for her educational attainment opportunities.

17.    I do everything I can as a mother to provide for my three children, who mean everything to me. But each of my children has unique educational needs which require the help and attention of not just one mother, but a whole village of specialists, therapists, counselors, and teachers. I am not wealthy; if my children lost out on any of these people, I would not be able to hire private replacements. The loss of any of these professionals due to funding cuts would

therefore seriously and perhaps permanently harm the learning, development, and even safety of my children.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 16, 2025.

Blondie Gordon