# Exhibit LL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

### DECLARATION OF EMMA LEHENY

I, Emma Leheny, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated below. If called as a witness, I could and would testify competently as to the matters set forth below.

2. I served as Acting General Counsel and Principal Deputy General Counsel in the Office of the General Counsel ("OGC") at the U.S. Department of Education ("the Department"). I served in both of those positions from January 20, 2021 to October 6, 2021, and then as Principal Deputy General Counsel through May 2022.

3. OGC's statutory mission is to "provide legal assistance to the Secretary concerning the programs and policies of the Department."[1]

### The Department of Education

4. As Acting General Counsel, I was familiar with the breadth of legal requirements the Department administered. The Department is charged by Congress with administering seven

---

[1] *Office of the General Counsel*, U.S. Dep't of Educ. (June 26, 2025), https://www.ed.gov/about/ed-offices/ogc.

categories of major federal education statutes, which contain more than 100 formula and competitive grant programs, and thousands of individual grants, totaling $150 billion in fiscal year 2024;[2] several civil rights laws that protect against discrimination in education and other programs that receive federal financial assistance; and two laws that protect student privacy rights.

  5. The seven categories of major federal education statutes are:[3]

   a. The Elementary and Secondary Education Act ("ESEA"), the main source of federal financial assistance for elementary and secondary education.

   b. The Individuals with Disabilities Education Act ("IDEA"), which requires states to provide a free appropriate public education to all students with disabilities and funds early intervention and special education programs.

   c. The Higher Education Act of 1965 ("HEA"), which authorizes financial aid programs for students pursuing postsecondary education and training and creates the Office of Federal Student Aid ("FSA"), a quasi-independent entity responsible for managing these programs.

   d. The Carl D. Perkins Career and Technical Education Act ("Perkins V"), which supports career and technical education programs for secondary and postsecondary students through grant funding to states and career and technical institutions.

   e. The Education Sciences Reform Act of 2002 ("ESRA"), which established the Institute of Education Sciences ("IES") as an independent research arm of the

---

[2] U.S. Dep't of Educ., *Fiscal Year 2024 Agency Financial Report* 38 (2024), https://www.ed.gov/media/document/fy24-afr-108470.pdf.

[3] Cong. Rsch. Serv., IF10551, *A Summary of Federal Education Laws Administered by the U.S. Department of Education* (2024), https://www.congress.gov/crs-product/IF10551.

        Department and authorized grants for student assessments and statewide longitudinal data systems.

    f.   The Adult Education and Family Literacy Act ("AEFLA"), the primary federal law supporting basic education for out-of-school adults, which provides educational services at the secondary level and below, and English-language instruction.

    g.   The Rehabilitation Act of 1973 ("RA"), which provides grants to support vocational rehabilitation to help individuals with disabilities prepare for and engage in employment.

6.    The civil rights laws that the Department is charged with enforcing in education include Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Americans with Disabilities Act of 1990.

7.    The Department also enforces two laws that protect student privacy rights: the Family Educational Rights and Privacy Act ("FERPA"), and the Protection of Pupil Rights Amendment ("PPRA").

8.    All of these statutes are governed by regulatory requirements, including the Education Department General Administrative Regulations ("EDGAR"), 34 C.F.R. pts. 75–79, 81–86, & 97–99, the Federal Acquisition Regulation ("FAR"), 48 C.F.R. pts. 1–99, and the Office of Management and Budget's Uniform Guidance, 2 C.F.R. pt. 200 & § 3474.1. EDGAR is the foundational set of regulations for the Department and was last updated by notice and comment rulemaking in August 2024. FAR is the principal set of rules regarding government procurement across the federal government. The Uniform Guidance establishes rules for administrative requirements, cost principles, and audit requirements for federal grants.

## The Office of The General Counsel

9.  As Acting General Counsel, I was responsible for overseeing OGC at the Department in every respect. I worked directly with the staff and managing counsel in each of OGC's divisions. Those attorneys regularly briefed me on specific projects, presenting recommendations for decisions I made. In addition, I would frequently reach out to individual career attorneys to assist me in providing advice to other agencies or offices on issues within the attorneys' specialty. In most cases, I could not have made a fully informed decision without the input of career counsel. Specializing in complex areas of law unique to the Department and drawing from deep experience, career attorneys provided essential advice that I could not have replicated by hiring or consulting attorneys outside of OGC. In addition to the briefings specific to a particular project or case, I received daily briefings to keep me current on the work of OGC generally. Then as Principal Deputy General Counsel, I assisted the General Counsel in carrying out the duties described above. This included participating in many of the same briefings and maintaining a familiarity with the work of all attorneys in OGC.

10. During my tenure as Acting General Counsel and Principal Deputy General Counsel, OGC consisted of approximately 120 full-time career employees and was organized into seven divisions. Each division reported to a career Assistant General Counsel; the Assistant General Counsels then reported to one of three Deputy General Counsel, who reported directly to the General Counsel or Acting General Counsel. In both of my roles, I interacted daily with counsel at all levels in OGC. The OGC divisions were:

   a. The Division of Elementary, Secondary, Adult, and Vocational Education ("DESAVE")

   b. The Division of Educational Equity ("DEE")

   c. The Division of Legislative Counsel ("DLC')

4

    d. The Ethics Division ("Ethics")

    e. The Division of Regulatory Services ("DRS")

    f. The Division of Business and Administrative Law ("DBAL")

    g. The Division of Postsecondary Education ("DPE")

11. During my tenure, the attorneys in these divisions performed the following types of work:

    a. <u>The Division of Elementary, Secondary, Adult and Vocational Education</u> advised on all matters related to elementary and secondary education, including Title I of the ESEA and Perkins V. This work included consulting on a daily basis (or multiple times per day) with the staff across the Department who operated these programs via phone, email, and in person; reviewing emails from the program staff to states and school districts (and other grantees and subgrantees); reviewing and revising published Frequently Asked Questions documents or other informal, written guidance documents; reviewing and revising scripts or talking points for webinars; advising on the wide range of legal requirements for states and school districts; reviewing Notices Inviting Applications ("NIAs"), which provide grant application requirements and guidance; and reviewing grant applications, grant award letters, and all other formal communication with grantees. In addition, this division worked with the Department of Justice ("DOJ") to represent the Department in any administrative proceedings related to K–12 issues, especially grants (such as administrative challenges to withholding or terminating grants), and to advise on any litigation involving the Department regarding K–12 matters.

    b. <u>The Division of Educational Equity</u> advised on all matters related to student civil

5

  rights and equitable access to education services, including rights arising under the IDEA, all IDEA grant programs implementing the IDEA, and all statutes enforced by OCR, including Title VI of the Civil Rights Act, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and the Age Discrimination Act. This work included consulting with the relevant staff across the Department on a daily basis (or multiple times per day basis) on the phone, over email, or in person regarding ongoing civil rights enforcement matters; reviewing and revising all civil rights regulations in all stages of the drafting process; reviewing and revising all informal guidance regarding civil rights in all stages of the drafting process; coordinating with OCR and DOJ to advise on issues that could become subject to litigation or were subject to litigation; and advising on civil rights related grant matters—such as reviewing grant applications and reviewing grant award letters—including all aspects of IDEA grant making as well as other grants across the Department that implicated civil rights issues.

c. <u>The Division of Legislative Counsel</u> reviewed education-related legislation pending in Congress and coordinated with Department staff to provide written formal and verbal advice to the Department's Office of Legislation and Congressional Affairs ("OLCA") and the government-wide Office of Management and Budget on legislation related to education.

d. <u>The Ethics Division</u> ran the Department-wide ethics program. This involved advising individual officials across the Department on their ethics obligations, through phone calls, emails, in-person meetings, individual consultations, guidance

documents, webinars, and similar means. This included advice to the most senior officials at the Department, including the Secretary, on their ethical obligations. Ethics Division attorneys, under the supervision of the Designated Agency Ethics Official (who was the Assistant General Counsel of the Ethics Division), were the only officials authorized to grant particular kinds of ethics waivers, approval for outside activities, and other such permissions. The Ethics Division attorneys also reviewed all mandated public ethics disclosures (such as Office of Government Ethics 278 forms for officials at certain levels of seniority) and private ethics disclosures, and individually advised all personnel across the Department on these disclosures.

e. <u>The Division of Regulatory Services</u> advised on and reviewed all regulations across the Department and all related legal guidance (such as Dear Colleague Letters and Frequently Asked Questions documents), was responsible for all documents published in the Federal Register (for both rulemaking and grants), and advised on all other regulatory issues. This included advising program staff across the entire Department through phone calls, emails, and in-person meetings; reviewing and revising multiple drafts of all documents; consulting with DOJ on regulatory issues likely to arise in litigation (such as Administrative Procedure Act challenges to regulations and informal guidance) and such issues raised in active litigation.

f. <u>The Division of Business and Administrative Law</u> provided legal services to Department officials concerning all business management and administrative activities throughout the Department. This included reviewing draft contracts between the Department and a wide range of parties for any services used by the

7

Department. DBAL also represented the Department in administrative proceedings challenging contract matters. DBAL was also the division that advised on internal human resources matters, such as employment and labor issues, including individual advising to managers, advising Department-wide Human Resources on appropriate employment labor practices, drafting and reviewing internal Department policies on hiring, interns, Equal Employment Opportunities complaint processes, and other employment and labor policies, as well as representing the Department in all administrative proceedings related to labor and employment, including before the Federal Labor Relations Authority ("FLRA") and other administrative bodies. This division also advised program staff across the Department through phone calls, emails, and in-person meetings on matters related to intellectual property, including copyrights, trademarks, and public-private partnerships. This division also advised on privacy matters, including the Privacy Act and the Family Educational Rights and Privacy Act ("FERPA"). The privacy attorneys advised the Department's Student Privacy Policy Office, which enforces FERPA, on all enforcement matters; and reviewed and revised all regulations, informal guidance, and letters regarding FERPA. The privacy attorneys also advised the entire Department on compliance with privacy laws with respect to any data collection and storage, especially when sharing any information with other agencies and protecting student loan data held by FSA as well as data held by OCR.

g. <u>The Division of Postsecondary Education</u> provided legal services for postsecondary education programs, including but not limited to the FSA, the Office of Postsecondary Education, and the Office of the Undersecretary.

8

12. Based on my experience as Acting General Counsel and Principal Deputy General Counsel, attorneys performed their work by providing direct legal advice to the teams around the Department operating each program. This advice was often given live on the phone, during in-person meetings, over email, or through the process of reviewing and collaboratively revising documents. In my experience, this legal advice was typically applied to specific questions, concerns, or scenarios that arose in the context of a particular grant program, regulation, questions from a state or school district, or similar matters. Those specific questions were handled by attorneys with the corresponding expertise. Each division of OGC required expertise in a distinct legal specialty such that attorneys from different divisions could not easily accomplish one another's work. No handbook or guide could replace the work, or even a type of work, performed by any of the OGC divisions.

13. In my experience, the attorneys in OGC had deep subject matter expertise and institutional knowledge that allowed them to do their job well. For instance, most of the career Assistant General Counsels in OGC had served at the Department for over a decade. They had deep subject matter expertise in areas of law specific to the Department and the many programs it operates, all of which are authorized under different and complex statutory schemes. This knowledge is not easily replaceable by generalist attorneys, nor can the knowledge of the legal framework for specific Department programs easily be learned by attorneys in other parts of OGC or in other federal agencies. For example, in my experience, an attorney who advises on privacy issues related to the Free Application for Federal Student Aid ("FAFSA") does not have the expertise to advise on grant programs under the ESEA, nor could they quickly acquire that expertise.

14. In my experience when I served as Acting General Counsel and Principal Deputy

9

General Counsel, the OGC career attorneys' work was essential to the Department performing its statutorily required functions. For example, the Department is charged by Congress with the distribution of federal education funds to states, for the purpose of supporting local districts and schools. This is not a discretionary function or a broadly defined mandate to the Department. It is set forth in statutory and regulatory terms that are highly specific and not easily interpreted using general legal principles. In addition to deep experience interpreting these authorities, OGC attorneys have established lines of communication with state administrators, an understanding of states' expectations and knowledge base, and familiarity with longtime Department practices with respect to all education grants.

15. Without the technical assistance provided by OGC lawyers, these state agencies will be impeded in their ability to deliver federal funds, including funds appropriated in accordance with IDEA and ESEA, to local schools efficiently and on the correct bases. State educational agencies rely on the continuous, nuanced, and expert advice of OGC attorneys to efficiently manage federal education funds. Without OGC attorneys, states will come to varied, contradictory, and in some cases, inaccurate interpretations of the terms of federal education funding, creating a natural basis for litigation by students and school districts.

16. For instance, attorneys in DESAVE were integral to the Department's role in allocating federal education funds to states and local education agencies (LEAs), particularly to the distribution of the more than $150 billion in grant funding each year. Those amounts are appropriated by Congress and the Department is charged with ensuring they are distributed in accordance with Congressional requirements. A Notice Inviting Applications ("NIA") is published in the Federal Register by the Department, setting forth the requirements and guidance on eligibility for each grant or grant type. States and LEAs maintained communication with the

Department as they worked to submit grant applications in accordance with the appropriations bill and the terms of the NIA. DESAVE attorneys were directly involved in the drafting, editing, reviewing, and approving NIAs for publication. Once submitted, the grant applications were reviewed by the Department to ensure compliance with those standards. DESAVE attorneys were essential to every aspect of this iterative process, from the development of the grant terms in the NIA to the solicitation of the correct information from applicants to the selection of awardees and the issuance of grant award letters. Department program staff charged with state and grantee relations conferred regularly with DESAVE attorneys due to the legal expertise needed to ensure that funds are used for the purpose intended by Congress.

17. As another example, attorneys in DEE advised on all aspects of the IDEA grant cycle, including applications, applying the statutory formula to determine grant amounts, monitoring, reporting, evaluation, and compliance. Specifically:

   a. DEE attorneys played a large role in reviewing the detailed applications that states are required to submit to receive IDEA Part B and C.

   b. DEE attorneys also provided legal advice and answered numerous legal questions on the complex formula for determining how much money states receive under IDEA.

   c. Once funds are awarded, states are required to submit a State Performance Plan ("SPP"), which the Department must approve or disapprove, including giving the State notice and opportunity for a hearing, and an Annual Performance Report ("APR") evaluating the state's efforts to improve its implementation of IDEA requirements and reporting on the progress it has made towards the targets set in its SPPs.

    d. The IDEA requires the Department to annually review states' SPPs and APRs and make a determination, which is akin to a grade, of each state's performance in implementing IDEA requirements. This determination process consists of reviewing data and information submitted by the state as part of the APR and SPP. The IDEA provides four possible "determinations": a state "meets" the requirements and purposes of the IDEA, or needs "assistance," "intervention," or "substantial intervention" in implementing the requirements of IDEA Part B or Part C. If a state's determination is "needs intervention" or "needs substantial intervention," the Department must provide notice and opportunity for a hearing.

    e. If the Department determines that a state does not meet IDEA requirements, the IDEA requires it to take steps to improve the state's compliance. For example, if a state's determination is "needs substantial intervention," the Department must either recover funds under section 452 of the General Education Provisions Act ("GEPA"), withhold further payments to the state, refer the case to the Department's Office of the Inspector General, or refer the case for enforcement action, which may include referral to DOJ. Attorneys in DEE advised program staff throughout the determination process to ensure that the determinations were well-supported in law and fact. Especially for a state that was in a potentially lower determination level, with appeal rights and negative consequences for the state, attorneys ensured that the Department was showing sufficient reasons for its decisions, and helped prepare for the possibility of a hearing and/or litigation.

18. The work of attorneys in each of the OGC divisions was equally crucial. Without legal advice from specialized OGC attorneys, for example, FSA will be impeded in its ability to

effectively manage the contracts for the FAFSA and loan servicers, which must operate in accordance with highly specific federal authorities. Without the support of expert OGC attorneys, individual Department officials will be impeded in their ability to comply with detailed disclosure requirements. In my experience, OGC attorneys assisted the Department in virtually all aspects of the Department's work. OGC's legal work is not performed mainly for the purpose of minimizing legal exposure, as is true of some general counsel work in the private sector. Nor is it performed only occasionally or under unusual circumstances. The Department's key mandates, at their core, require legal analysis and ongoing legal support and advice.

19. As Acting General Counsel and Principal Deputy General Counsel, I also relied on the institutional knowledge and subject matter expertise of experienced OGC attorneys to be able to provide legal advice to the Secretary of Education and senior officials across the Department.

20. My understanding is that every single person in every division in OGC was notified on March 11, 2025 that they would be fired en masse, except for one Deputy General Counsel, attorneys in the Division of Postsecondary Education, and possibly a couple of other attorneys.

21. In other words, my understanding is that every single employee in each of the following divisions was notified that they would be fired: the Division of Elementary, Secondary, Adult, and Vocational Education; the Division of Educational Equity; the Division of Legislative Counsel; the Ethics Division; the Division of Regulatory Services; and the Division of Business and Administrative Law.

22. Without staff to fulfill the wide variety of functions that OGC performed, it is my view based on my experience that the Department will not be able to fulfill its statutory obligations.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 28, 2025.

/s/ Emma Leheny
Emma Leheny

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.