# Exhibit MM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants.* | Civil Action No. 25-965-JRR |

### **DECLARATION OF CATHERINE E. LHAMON**

I, Catherine E. Lhamon, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I twice served as Assistant Secretary for the United States Department of Education ("the Department"), Office for Civil Rights ("OCR"). In that role, I served as the principal advisor to the United States Secretary of Education on civil rights matters. I was first nominated to the position in 2013 by President Obama and unanimously confirmed by the Senate. I remained in this position until January 2017. In 2021, I was again nominated to the position by President Biden and confirmed by the Senate, serving until January 2025.

3. As Assistant Secretary for Civil Rights, I enforced federal civil rights laws in schools nationwide, supervised and reviewed the generation of regulations, published policy guidance, and oversaw the Civil Rights Data Collection, a mandatory survey of the nation's Pre K-12 schools that collects civil rights data about students' experiences. I oversaw a full-time staff

of approximately 600 employees in OCR's headquarters in Washington D.C., and OCR's 12 regional enforcement offices around the country.

4. I have spent my career of nearly three decades litigating and enforcing civil rights. I have a B.A. in American Studies from Amherst College and a J.D. from Yale Law School. Prior to my second appointment as Assistant Secretary for Civil Rights, I was Deputy Assistant to the President for Racial Justice and Equity from January to October 2021. Before that, I served as Chair of the United States Commission on Civil Rights from December 2016 to January 2021. Prior to that I was Legal Affairs Secretary to California Governor Gavin Newsom from January 2019 to January 2021. I have spent over 15 years as a civil rights litigator at offices including National Center for Youth Law, Public Counsel, and ACLU Foundation of Southern California. I began my career as a Law Clerk to the Honorable William A. Norris in the United States Court of Appeals for the Ninth Circuit.

5. I am providing this declaration in response to numerous actions taken by the Trump Administration, the Department, and Secretary of Education to dismantle the Department, such that the Department has been incapacitated and is now unable to meet statutory obligations that are critical to the implementation and enforcement of civil rights laws across hundreds of thousands of schools, colleges, and universities in all fifty states.

6. Those actions include the announcement by the Department on March 11, 2025 that it would be reducing its staff by 50%, *U.S. Department of Education Initiates Reduction in Force*, Press Release, U.S. Dep't of Educ. (Mar. 11, 2025), https://www.ed.gov/ about /news /press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"), as well as the comments that same evening by Secretary of Education Linda McMahon that this reduction in force ("RIF") marks the "first step" toward implementing President Trump's directive that she

"shut down" the Department. Filip Timotija, *Education Secretary: Mass Layoffs First Step Toward Total Shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass- layoffs/.

7. I understand from reviewing the March 11, 2025 Press Release, that the Department initiated this RIF impacting nearly 50% of the Department's workforce; that the RIF affected all offices within the Department, with some offices undergoing significant reorganization; and that impacted Department staff were placed on administrative leave beginning Friday, March 21, 2025 and will be terminated effective June 9, 2025.

**Background on OCR**

8. OCR enforces several federal civil rights laws that prohibit discrimination in programs or activities that received federal financial assistance from the Department. OCR protects the civil rights of more than 49 million students in public pre-K-12 schools in more than 18,000 public school districts and over 19 million students in over 6,000 colleges and universities. *Protecting Civil Rights: Highlights of Activities, Office for Civil Rights (2021-2025)*, U.S. Dep't of Educ. (Jan. 2025), https://www.ed.gov/media/document/protecting-civil-rights-109409.pdf.

9. OCR enforces and investigates complaints related to federal civil rights laws including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972 ("Title IX"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and Boy Scouts of America Equal Access Act. During my tenure, OCR employed about 400 investigators across 12 regional offices to process complaints and take on proactive investigations.

10. OCR investigates claims of discrimination based on disability, sex, race and national origin, and age as well as claims of retaliation discrimination. For example, past investigations have covered claims that schools have failed to address harassment based on race,

3

claims that schools have failed to provide physically accessible facilities to students with mobility disabilities, and claims that schools have failed to adequately respond to allegations of sexual harassment. OCR has an obligation to "make a prompt investigation whenever . . . information indicates a possible failure to comply with" the civil rights laws that OCR enforces. 34 C.F.R. § 100.7(c).

11.     Most of OCR's staff, approximately two thirds of the just over 600 staff in place at the outset of January of 2025, worked out of OCR's twelve regional field offices. The staff in these regional offices stand sentry in civil rights defense for students in schools and colleges throughout the country. Although students often have civil rights protections under both state and local laws, and may enforce these rights and their federal civil rights in court if their parents can retain legal representation to do so (most often at significant legal expense, which is not at issue in administrative enforcement through OCR), most students lack access to legal representation and have no viable state or local option for enforcing these rights through governmental offices. OCR not only plays a critical role in ensuring access to civil rights enforcement for these students; it effectively is the only available avenue for most students to enforce these rights.

12.     OCR's enforcement work has been accomplished through twelve regional offices for several decades. During my entire tenure, OCR had twelve regional offices in Boston, New York, Philadelphia, Washington, D.C., Atlanta, Dallas, Cleveland, Chicago, Kansas City, Denver, San Francisco, and Seattle. OCR is statutorily required to annually report on its overall work and structure to Congress and these offices and their work have been a consistent feature of those reports (the last eight years of which are available here: https://www.ed.gov/about/ed-offices/ocr/serial-reports-regarding-ocr-activities). OCR investigators in the regional offices review complaints filed to determine whether OCR has jurisdiction, whether the complaint was

filed timely, and whether OCR needs consent to proceed with investigation. When OCR opens a case for investigation the investigation typically includes requests for, and review of, documents and relevant information from various parties, interviews with school staff, witnesses, and others, and follow-up for additional documents and interviews as necessary. Once the investigative work is complete, OCR investigative staff determine if the law as applied to the facts confirms a violation.

13. OCR may begin negotiations with recipients of federal funds to resolve violations or concerns that it identifies during the course of an investigation. OCR's Case Processing Manual specifies time periods for conducting these negotiations. OCR investigators follow a rigorous process upholding statutory requirements to provide schools with the opportunity to remedy any violation or concerns. The Case Processing Manual provides that schools and colleges are to be notified when OCR opens a complaint, that OCR is a neutral factfinder, and provides information about the mediation process for resolving the complaint. During my tenure at OCR, OCR followed these requirements. The majority of OCR investigations resulted in voluntary agreements, and fund termination was extremely rare.

14. Following resolution by agreement, OCR monitors to ensure the recipient of federal funds implements the terms of the agreement. In this monitoring phase, OCR often analyzes data and reviews whether policy changes were effective and legally compliant. If they are not, OCR continues working to secure more fulsome compliance. OCR does not cease monitoring until the resolution agreement is satisfied. In my experience, continued monitoring is essential to secure and maintain effective remedies.

15. OCR's practice is to record the complaints it receives, the investigation and disposition of each whether by dismissal, resolution or referral, and any continued monitoring, in

the OCR Case Management System ("CMS"). That system is used by investigators to manage their caseload, by OCR leadership to track and manage OCR's workload, and by OCR to ensure transparency and accountability as to its work by publicly reporting on the number and type of complaints that OCR has received, how those complaints have been resolved, and how long complaints took to resolve. Throughout my tenure at OCR, OCR publicly reported the number of investigations it had open at any time and the names of the institutions involved, as well as the resolutions of its cases. Since January 20, 2025, that information has not been publicly reported.

16. The public announcements of OCR's work since January 20, 2025 generally concern directed investigations, meaning investigations that OCR initiates on its own.

17. OCR also conducts compliance reviews, 34 C.F.R. § 100.7(a), which are proactive investigations initiated by OCR when it has reason to believe that the law may have been violated.

18. OCR also provides training and technical assistance to state and local education agencies nationwide. OCR answers questions from schools, community organizations, and parent associations on topics including the laws in OCR's jurisdiction, OCR process, and types of civil rights harms. The office frequently receives questions about the law, and regional staff respond to these inquiries. It is very common, for example, to offer trainings on Section 504 focused on access to school for students with disabilities. During my second tenure, regional office staff provided hundreds of legal trainings.

19. OCR issues policy guidance and drafts regulations related to the laws that OCR enforces. During the Biden administration, I oversaw the issuance of 65 policy guidance documents that explained the law to schools and communities. We also worked for years to develop the most comprehensive regulations to Title IX issued since 1975. We were working to update regulations to Section 504 of the Rehabilitation Act, which would have been the first update

6

in nearly five decades.

20.     OCR administers the Civil Rights Data Collection and publishes summaries of the data. OCR also maintains a public website with the data so the data is available to the community. The public website includes data snapshots and reports related to equity indicators. Any individual can look at data for any single school, district, or state and pull indicators that are visually available on the website. These data are available to anyone, including researchers, parents, school principals and superintendents, and OCR investigators.

21.     During my second tenure at OCR, I oversaw an update to the Case Processing Manual to create for first time an option for complainants to request at the time of filing for OCR to mediate their concerns. Mediation was an option prior to that, but until this update OCR did not invite complainants to indicate their request for mediation in the complaint form. Following this update, OCR was able to resolve hundreds more cases through mediation, sometimes in as few as 12 days.

22.     As part of this update, OCR provided mediation training to staff in every office to ensure they were prepared to accommodate mediation requests. OCR also trained staff about the various legal issues relevant to OCR's work to ensure every staff member was ready to respond.

23.     OCR has a rapid resolution procedure that could be used at any stage of investigation. For example, if staff found a legal violation during the evaluation stage, they could invoke the rapid response procedure and immediately start negotiating a resolution.

24.     The rapid resolution procedure led to fast, effective resolutions for heartbreaking issues. For example, a parent of a kindergartener who used a wheelchair reached out when the school refused to allow the student to bring their wheelchair on campus unless and until an Individualized Education Program meeting could be held. This type of meeting could take months

7

to schedule, meaning the student would miss the start of the school year. OCR contacted the school to explain the legal violation and outline the remedy. Due to the rapid response, not only was the student able to start school on time, but the school also changed the way it interacted with students with disabilities. OCR's efficient process was immensely consequential in the life of that five-year-old and future students.

25.     I also worked directly with staff discussing issues and questions. As one example, I met twice a week with regional staff and the relevant Enforcement Director and the Deputy Assistant for Enforcement to talk through cases and move investigations efficiently. During my second tenure in OCR, OCR had four Enforcement Directors, each of whom oversaw cases in three different regional offices. I understand that there is now a single Enforcement Director for the entire country.

26.     On information and belief, OCR staff has been cut by approximately 50% due primarily to the massive RIF but also other staff reductions since January of 2025.

27.     On information and belief, seven of the twelve regional offices—Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia—were effectively closed as of March 11, 2025. The states served by each office are accurately listed in OCR's Annual Reports to Congress noted above. Notwithstanding the fact that these regional offices had been in place for decades and served over half of the country, on March 11, 2025, on information and belief, all staff in those offices received notice that they were subject to the Department's RIF and would shortly cease access to OCR's case management system or access to their offices. Those staff were further instructed that they would be placed on administrative leave as of March 21, 2025, and laid off as of June 9, 2025.

28.     The seven regional offices that have been abolished were, compared as a group to

8

the five regional offices kept open, more productive and efficient regional offices as measured by the number of matters they handled, the complexity of those matters, and the time period in which they substantively resolved these matters (as distinct from closing cases by simply dismissing them). All three of those metrics were regularly collected and reported on during my tenure with OCR to assess the work of the various regional offices, identify best practices to spread to other offices, and identify offices that were struggling with caseload. The regional offices that remain open include offices that have struggled to resolve cases in a timely, substantive, and thorough manner.

29.     On information and belief, these remaining offices have taken on open matters from closed offices and are responsible for processing new complaints and investigations from those regions. Given that OCR already was substantially understaffed, operating at many hundreds fewer staff than it had when it was first created and when complaint volumes were much lower, the reassignment of cases to already overworked investigators will frustrate effective civil rights enforcement through OCR.

30.     At the time I left OCR, the average caseload was approximately 50 cases per OCR investigator. That average was a historic high for the office and was too high for staff to resolve 80% of cases within 180 days, which is the metric established pursuant to the Government Performance and Results Act. In the relatively recent past, caseloads have been as low as 10 or fewer cases per attorney.

31.     In my experience, 50 cases per investigator was already an untenable caseload. President Biden made budget requests to Congress every year that he was in office to appropriate additional funds for hundreds more investigators. Despite instituting many efficiencies, including those described herein, many more investigators were still needed to bring caseloads back to

9

reasonable levels.

32. Given that 50 cases per investigator already was untenable, any increase in case load above that level denies families and schools that rely on OCR, the answers that they need within any reasonable timeline. Doubling the caseload of investigators cannot be squared with any effort to operate OCR to fulfill its statutory mission of vigorously enforcing the five civil rights laws within OCR's jurisdiction.

33. I expect that investigators having more cases to handle will also result in investigations and resolutions becoming slower and less comprehensive or thorough. Staff members will be swamped with a deluge of cases on their dockets, which will impede the efficiency and effectiveness of their work.

34. Congress guarantees in the civil rights laws OCR enforces that no person shall experience discrimination in schools funded by the Department. Congress created OCR to be a federal backstop against discriminatory harm to ensure we do not cross that line. What is happening now is the Department is erasing that line and creating a situation where students who experience discrimination will have no federal redress.

35. Given my experience, I believe the Department's RIF will render the Department unable to fulfill its statutory functions. There are no extraneous functions in OCR. To remove seven of twelve regional offices and approximately half of OCR's enforcement personnel means the office will exist in name but not in actual function.

36. The Department claims it updated the OCR Case Processing Manual in February 2025. I reviewed the latest version and found minimal changes that will not make up for losing half the staff. With the complaint volume, complaint processing changes could not make up for the significant loss of the investigators who do the work.

37. The massive downscaling of OCR's operations will cause great harm to school communities.

38. Civil rights enforcement staff in OCR have the most concentrated expertise in the country when it comes to civil rights in the education context. There is no other entity that has the expertise that OCR does because OCR has been doing this work for decades in every state and as applied to the very wide variety of kinds of civil rights harms that could and do occur in schools. Even the newest investigators have the benefit of robust training materials and are able to work on their cases with experienced and knowledgeable staff. There is no other entity at the federal or state level or in the private sector with the expertise and capacity to enforce these civil rights laws in the education context or the mandate to respond to every complaint it receives alleging violations of federal civil rights laws through the administrative enforcement process.

39. Often school communities may not understand the application of a particular law, but OCR does. And OCR has the benefit of institutional knowledge and experience, having often seen fact patterns or issues that may be novel to a particular school community. In those situations, what is new and unfamiliar to that community often is an issue that someone on the OCR staff has seen before and knows how to investigate, address, and resolve. Losing this expertise by indiscriminately terminating half of the workforce is guaranteed to slow down justice for students and families.

40. The RIFs will not only result in the loss of institutional knowledge but also in the loss of community relationships built over decades. In theory and practice, the regional offices know the school communities they serve. They often know school administrators as well as the specific state and local laws and requirements. These relationships and knowledge allow them to more effectively navigate investigations. School mores and practices are different in different

states. Regional staff familiarity with these mores and practices allows the office to negotiate resolutions more quickly. That familiarity also means people in the community are often willing to reach out to OCR based on established relationships. It is dangerous and counterproductive not to have people with those relationships at OCR.

41. For example, regional office expertise and relationship building helped resolve an investigation in a school district regarding whether Native American students were subject to discriminatory discipline and lacked access to rigorous coursework in comparison to their white peers. During an investigative interview, the superintendent repeatedly said that Native American families operated on "Indian time" and that's why their kids had higher truancy rates and experienced greater discipline. OCR worked with local Tribes to confirm that the superintendent's characterization was untrue and based on stereotypes. It matters that regional office staff have local relationships.

42. Cutting staff means cutting expertise and relationships. That seems to me designed to result in insufficient relief for kids.

43. OCR promises that it will investigate every case within its jurisdiction that is timely filed. It is an exceptionally beautiful promise to fulfill Congress's charge that no person shall experience discrimination in school. Families are entitled to timely answers to their civil rights questions and concerns.

44. Likewise, there is little evidence that states have the capacity to absorb the loss of the civil rights enforcement function handled by OCR, which received nearly 23,000 complaints in 2024 alone. When I chaired the U.S. Commission on Civil Rights during the prior Trump Administration, the Commission received testimony from 17 state attorneys general that "without the genuine partnership of the federal government, the tools we have to conduct that [civil rights]

enforcement are limited." U.S. Comm'n on C.R., *Are Rights a Reality?: Evaluating Civil Rights Enforcement* 59 (2019), https://www.usccr.gov/files/pubs/2019/11-21-Are-Rights-a-Reality.pdf. That frank assessment from state attorneys general about their limited capacity to meet the volume of need to ensure civil rights satisfaction in their jurisdictions haunts me now as I witness the deep cutbacks to OCR's operational capacity, especially knowing the intense volume of persisting need in school communities.

45. During my tenure as Assistant Secretary, OCR got lean, effective, and efficient. During my second stint in the job, I had the particular benefit of having served in the role before, so I was not learning about OCR's work and processes for the first time. And yet, I cannot think of anything else we could have done to make the work move more quickly with the resources we had.

46. During my second term as Assistant Secretary, OCR managed the highest caseload in its history and resolved the second, third, and fourth highest number of cases per year during fiscal years 2022, 2023, and 2024. U.S. Dep't of Educ., cited *supra* ¶ 8.

47. Even though OCR saw a 64% increase in complaint volume during the Biden-Harris Administration compared to the prior Trump Administration, OCR resolved 14% more cases during the Biden-Harris Administration than OCR resolved during the prior Trump Administration. In fact, during the four years of the Biden-Harris Administration OCR resolved fully 80% of the total number of cases OCR had resolved during all eight years of the Obama Administration. *Id.*

48. But despite these successes, OCR strained to meet the volume of need. It was heartbreaking to OCR staff not to be able to answer every question in the most timely fashion.

49. The massive downsizing of OCR renders it unable to meet the existing need for its

13

services. Given the downsizing, it is impossible to conceive how OCR can service its function and fulfill Congress's promise for the nation's families.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 17, 2025.

                                                                                                                        Catherine E. Lhamon