# Exhibit OO

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF CHRIS MILLER

I, Chris Miller, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Section Chief of the Atlanta School Participation and Analysis Section, which is part of the School Eligibility and Oversight Service Branch within the Office of Institutions of Higher Education ("IHE") Oversight & Enforcement, a subdivision of the Federal Student Aid ("FSA") office in the U.S. Department of Education ("the Department"). I have worked for FSA for almost 30 years and served in a managerial role for about 25 years.

3. IHE Oversight is responsible for administering eligibility certification, financial analysis, and oversight of schools participating in FSA programs under Title IV of the Higher Education Act of 1965 ("Title IV"), including the Federal Pell Grant program, the Federal Direct Loan program, the Federal Supplemental Educational Opportunity Grant, and the Federal Work-Study program. IHE Oversight includes School Participation Sections ("SPS") that specialize in the business processes necessary for managing accountability in campus administration of the

Federal student financial aid programs. There are eight School Participation Sections: Atlanta School Participation & Financial Analysis Section, New York/Boston SPS, Philadelphia SPS, Chicago/Denver SPS, Kansas City SPS, San Francisco/Seattle SPS, Dallas School Participation & Critical Response Section, and the Multi-regional & Foreign Schools Participation Section.

4. Each of these sections have the following responsibilities for the schools that are assigned to their region ("SPS Responsibilities"):

   a. Examine, analyze, and make determinations on the initial and renewal eligibility applications submitted by schools for participation in Title IV programs;

   b. Collaborate with Partner Participation and Oversight ("PPO") a subdivision of FSA and the Office of General Counsel ("OGC") regarding decisions to place schools that are under review or investigation on heightened cash monitoring or to impose other necessary restrictions on their participation in FSA programs;

   c. Collaborate and assist with school closures and disaster responses;

   d. Process and maintain records of schools' Program Participation Agreements ("PPAs") and notices of eligibility to participate in Title IV programs;

   e. Monitor schools and their agents through on-site and off-site reviews and analysis of various reports to provide early warning of program compliance problems and take appropriate actions;

   f. Conduct heightened cash monitoring actions and monitor schools' method of payment;

   g. Manage and monitor missing/late audits and financial submissions;

   h. Schedule and conduct risk assessment reviews, as needed;

   i. Perform audit resolution;

j. Identify closed, bankrupt, and troubled schools and notify appropriate Department offices;

k. Work with state agencies and accrediting agencies on closed schools and other issues;

l. Evaluate and act upon the findings, conclusions, and recommendations produced by other FSA units, such as negative cash and compliance referrals;

m. Determine liabilities owed by schools and/or recommend administrative actions against schools as necessary;

n. Work closely with and/or refer matters to the Office of Inspector General ("OIG"), the PPO Partner Enforcement and Consumer Protection Directorate, and other offices; and

o. Review and update pertinent databases.

5. My section within IHE Oversight & Enforcement, the Atlanta School Participation & Financial Analysis Section, has the following additional responsibilities ("the Financial Analysis Responsibilities"):

a. Assess the financial responsibility of schools through financial analysis;

b. Complete detailed analysis of schools' 90/10 reporting, as required under 34 C.F.R. § 668.28;

c. Coordinate consistent review of schools' financial responsibilities for all other SPSs; and

d. Coordinate analysis outcomes with IHE Oversight & Enforcement's decision-making framework.

6. I oversee all of the responsibilities described above for the Atlanta School Participation & Financial Analysis Section, which includes the Financial Analysis Responsibilities for all SPSs, as well as the SPS Responsibilities for the schools in the Southeast region. All financial analysts are under my oversight, as a certified public accountant ("CPA"), to ensure consistency and accuracy throughout the School Eligibility and Oversight team ("SEOS") across the regions. Sixteen financial analysts and 1 forensic accountant reported to me as of January 20, 2025. Only five of these financial analysts are not located within the Atlanta School Participation & Financial Analysis Section, though management had planned a reorganization to place them in my section.

7. The work that the Atlanta School Participation & Financial Analysis Section performs is required under statute and regulation, including 20 U.S.C. § 1099c-(c)(1) and 34 C.F.R. Part 668 Subpart L.

8. Financial responsibility is the bedrock of the work that my team oversees. The Higher Education Act and regulations require that schools must meet certain numeric tests and have audited financial statements to begin and continue participation in Title IV programs. Analysts on my team are charged with applying the regulations to determine a school's composite score based on its annual audited financials. These composite scores determine the level of financial risk to taxpayers and students posed by an institution's use of Title IV funds and the subsequent measures that should be taken to mitigate this risk. These steps could include requiring the institution to submit an irrevocable letter of credit or possibly placing an institution on Heightened Cash Monitoring, which places restrictions on how institutions can draw down their Title IV funds, or on reimbursement-only payment, all based upon risk analysis. *See* 34 C.F.R. Part 668. At its heart, the Financial Analysis Responsibilities ensure that these highly complex

calculations are completed correctly, which requires staff who are highly skilled and trained in accounting and auditing.

9. Our work ensures that schools are financially sound and responsible, which is correlated to the quality of the education they provide. Schools that cannot make their payroll often cannot retain qualified and talented instructors, and if students are not receiving quality education, they are likely not able to repay their loans. These measures also help ensure that schools have sufficient funds to either payout student loan discharges or help facilitate students' graduation should a closure or financial failure occur. In some extreme instances, the School Participation Section will take action, consistent with the regulations, to revoke Title IV eligibility to ensure that more students are not harmed by the school's participation.

10. Violations of the Title IV requirements for schools are common, so the system of eligibility, oversight, and accountability performed by the School Participation Sections is critical to ensure that schools comply with the statutory requirements and to avoid harm to taxpayers and students from non-compliance.

11. My team conducts a comprehensive review every time a school first completes the eligibility process for Title IV programs and then again when they are recertified every one to six years. We also look closely when schools add new programs or locations. Part of our work is to resolve compliance audit findings of noncompliance by either requiring that schools improve their internal controls or repay any ineligible funds. Periodically, we will send staff onsite at schools to conduct comprehensive program reviews, which test a variety of metrics, including institutional eligibility requirements for aid. Whenever schools go through changes in ownership, consolidations, or mergers, which happens frequently, they must go through us as well for approval.

12. Another function performed by the School Participation Sections is to do school closure outreach to help students understand their rights and get assistance from FSA in the event that a school closes. School closures are frequent, and several dozen can occur each month. These closures can cause a great deal of confusion for students who have taken out federal loans, and they are often unaware of their options and rights under the law. The School Participant Sections' outreach helps ensure that students know their rights to a discharge, among other things.

13. On March 11, 2025 around 6:30 PM, I received an email from the Chief Human Capital Officer, Jacqueline Clay, stating, "your organizational unit is being abolished along with all positions within the unit—including yours." The email further informed me that I would be placed on administrative leave beginning March 21, 2025 and that I would receive an "official RIF notice" no earlier than 30 days after March 11, 2025. As a result of this notice, I understand that my entire unit, the Atlanta School Participation & Financial Analysis Section, is being abolished. The Atlanta SPS was staffed by analysts with expertise in accounting, auditing, and financial analysis. To my knowledge, very few, if any, staff with the accounting, auditing, and financial analysis expertise remain to perform the work that was previously performed by the Atlanta School Participation Section.

14. I understand that every SPS within IHE Oversight is also being abolished except for the Chicago/Denver SPS and the Philadelphia SPS. This includes every financial analyst trained in the Financial Analysis Responsibilities described above except for one financial analyst who is located within the Denver SPS. Shortly after the RIF notice, I spoke to the Philadelphia SPS and learned that they had no plan at the time to ensure that the Financial Analysis Responsibilities would be accomplished in our absence. Overall, this means that less than 20% of

the staff remain, or around 30 employees, to perform the SPS responsibilities for approximately 6,000 schools.

15. Since March 11, 2025, I have been locked out of my work systems and documents. I was able to see emails that came into my work email account between March 11, 2025 and March 21, 2025, but I could not send any emails externally. I was instructed that anything in my inbox that was unresolved should be forwarded to a "case teams" email address, so my Atlanta SPS colleagues and I forwarded a couple hundred emails from external stakeholders seeking technical assistance or help with things as simple as accessing FSA systems. There was nothing we could do to respond to them or to resolve any necessary work.

16. In my opinion, it is not possible for the few remaining staff to perform the statutory duties of the IHE Oversight, and especially the Financial Responsibilities that my team oversaw. Due to inadequate staffing even prior to March 2025, we already had a backlog of over 800 financial reviews before these cuts took place.

17. In fact, in responding to a January 28, 2025, Office of Inspector General (OIG) audit of the Department's Assessment and Recoupment of Liabilities from Closed Schools, FSA leadership acknowledged repeatedly that shortcomings in the school closure process were due to severe understaffing. FSA leadership emphasized that the SEOS team had lost 150 staff without replacement in the past 5–7 years, which made it difficult to follow established practices and protocols. The OIG recommended that FSA evaluate SEOS staffing levels, and FSA agreed with this recommendation in its response.[1]

---

[1] U.S. Department of Education, Office of Inspector General, *Assessment and Recoupment of Liabilities from Closed Institutions of Higher Education* (2025), https://oig.ed.gov/sites/default/files/reports/2025-06/FY25%2520I24 GA0163%2520%25281.28.2025%2529v100_508_SECURED.pdf.

7

18. The impact of the Department's decision to cut School Eligibility and Oversight will be severe and have implications to programs throughout the Department. In addition to the core functions of performing financial analysis and determining school eligibility, schools often need assistance in navigating the eligibility process. When schools have an issue with their account or need to draw down funds and have trouble, there is practically no one left to assist them. This will inevitably lead to delays in students receiving their Title IV funds, and schools and higher education advocates have already begun to report that they are experiencing these delays.[2]

19. Partner Connect is a web platform for school partners, financial institution partners, FSA staff, and contractors involved in the administration of Title IV financial aid for postsecondary education. The FAFSA system and the Treasury Department systems that distribute funding to schools interface with FSA's Partner Connect databases to make sure that schools have met eligibility requirements. Because of the interplay of these systems, schools could face issues in accessing their funds when there is no staff to oversee the eligibility procedures.

20. Another impact will be that almost no one remains who has the experience, training, and expertise to identify schools that are failing financially and thereby mitigate the risk to both Department funds and students by ensuring financial protection is in place, including heightened cash monitoring, requiring an irrevocable letter of credit, requiring cash in escrow accounts, or limiting schools' ability to draw down funds from the Treasury Department. These are critical tools to ensure that Title IV requirements are complied with and to help safeguard these funds for taxpayers and students. For example, if a school is financially insolvent and closes, the Department

---

[2] National Association of Student Financial Aid Administrat, *Impact of Workforce Reductions and Potential Closure of the Department of Education on Financial Aid Offices* (2025), https://www.nasfaa.org/uploads/documents/Survey_Results_Impact_ED_FSA_Cuts.pdf.

may be liable for providing students with Closed School Discharges and unpaid refunds of Title IV funds. Some schools may take advantage of the lack of accountability and not resolve the issues.

21. Once a school closes, the School Participation Section's work is integral to the work of loan servicers and can have significant impacts on student borrowers. Loan servicers cannot perform the statutorily required discharge of school loans when a school closes without information regarding which schools have closed. School closure specialists in the School Participation Sections have specialized expertise in dealing with school closures and identifying the last date of instruction and whether the school is actually closed. The School Participation Sections collect and report this information and ensure it is sent to the loan servicers. The servicers cannot perform their duty to discharge loans without this information from the School Participation Section, but this process is now in jeopardy because there are not sufficient staff necessary to perform this work.

22. Additionally, Title IV requires that schools enter into a program participation agreement, which includes an agreement that schools will participate with the information collection for the Integrated Postsecondary Education System ("IPEDS"). 20 U.S.C. § 1094(a)(17). IPEDS, in turn, is used to determine eligibility for grants under Title III and Title V and to create tools for students and families like the College Navigator and the College Scorecard. If schools fail to comply with their IPEDS reporting requirements, this impacts the assessment of whether the school is administratively capable, and the School Participation Sections can take action including revoking a school's program participation agreement. Without the staff necessary to do this work, schools will not have the same incentive to ensure compliance with these reporting requirements, harming other functions within the Department.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 25, 2025

_____
Chris Miller