# Exhibit TT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

### DECLARATION OF SARAH NEWMAN

I, Sarah Newman, declare as follows:

1. I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. I joined the U.S. Department of Education ("the Department") in April 2012 and remained there for approximately 13 years in various data collection and management positions. I was hired as a Management and Program Analyst, first in the Office of Policy, Evaluation, Planning, and Development ("OPEPD"), and then in the National Center for Education Statistics ("NCES"), a federal statistical agency within the Institute of Education Sciences ("IES").

3. When I joined OPEPD and later moved to NCES, these offices managed the data collection for EDFacts, a Department initiative to collect, analyze, and promote the use of high-quality pre-kindergarten through grade 12 data. EDFacts fulfills the Department's data collection and reporting obligations under myriad statutes, including the Elementary and Secondary

Education Act of 1965 ("ESEA"), as amended by the Every Student Succeeds Act, the Individuals with Disabilities Education Act ("IDEA"), the Privacy Act, the Foundations for Evidence-Based Policymaking Act ("Evidence Act"), and the Government Performance and Results Act ("GPRA"), among many others. As a Management and Program Analyst, I worked closely with program office and NCES staff to ensure that EDFacts collected data as required by law, such as the data needed to administer formula grant programs and fulfill monitoring requirements, on an annual or other mandated basis. I also cleaned and processed the data to guarantee its quality and disseminated it to the public.

4. Around 2015, I moved to the Office of Elementary and Secondary Education ("OESE") to manage the office's data collection and analysis portfolio and worked there for the next ten years. Throughout that time, I continued to work with EDFacts, focusing specifically on the EDFacts data stewarded by OESE. These collections include graduation rates, statewide assessments, chronic absenteeism, and other data.

5. Eventually, I took on a leadership role in OESE's data management and analytics work. In particular, I redeveloped ED Data Express, an online platform that provides public access to funding, participation, and performance data from the 2010–2011 school year onward related to the formula grant programs OESE administers. In 2020, I became the Group Leader of a six-employee data team that managed OESE's EDFacts collections as well as ED Data Express and its daily operations. Despite our small size, my team handled more than 500,000,000 data records per year. I held this position until March 2025.

6. My team was housed within OESE's Office of Administration, the unit with primary oversight over areas like budget formulation, grants, contracts, personnel, procurement, FOIA requests, travel, and management of technology and other assets. Office of Administration

staff are the process and operations experts within OESE, who facilitate and coordinate the various steps in the formula and competitive grantmaking processes and implement internal controls to guard against waste, fraud, and abuse, while staff within OESE's program offices are the subject matter experts on the different grant programs OESE administers.

### Uses of NCES and EDFacts Data in ESEA Administration

7. As the Group Leader of OESE's data team, I was aware of the various data used to calculate grantees' annual funding allocations under the ESEA's various formula grant programs and collaborated with program office staff and NCES personnel as needed for OESE to accurately administer them. Most of the front-end data required for grantmaking—like student counts, average daily attendance, poverty estimates, and average per-pupil expenditures—are collected through various NCES collections, some of which are conducted through interagency agreements with the U.S. Census Bureau. Multiple formula grants, including aid for low-income school districts under the ESEA's Title I-A and impact aid programs, rely on data collected or computed by NCES. For example, the expenditure data collected by NCES in the Fiscal Common Core of Data is used to calculate average state per-pupil expenditures ("SPPE"), a direct input into the Title I-A formulas. Likewise, the Small Area Income and Poverty Estimates ("SAIPE" estimates) collected by Census and aligned to school district boundaries via NCES drive the formula-eligible child counts for Title I-A allocations and are used, directly or indirectly, in various other programs.

8. NCES would transmit these inputs to the allocations team within OESE's Office of School Support and Accountability, which is primarily responsible for administering the ESEA formula grant programs. This team of program officers would perform the formula calculations, but worked closely with my team and the relevant NCES staff to resolve any questions about the data that might arise in the allocations process.

9. After formula allocations were made, my team collected grantees' post-award performance and reporting data through EDFacts. This was a critical component of OESE's consolidated monitoring protocol for ESEA grant programs. We supported the quantitative side of this process by providing the data needed for program officers to assess grantees' performance and compliance with various conditions of grant awards. Beyond the data required to be collected by statute, my team worked closely with program office staff to analyze and review data in order to identify additional factors that should be incorporated into monitoring. In collaboration with our program office colleagues, we would determine what information was necessary to ensure that OESE carried out its responsibility to prevent the Department from making competitive or formula grant awards to recipients that are out of compliance with funding conditions. My team would coordinate this feedback loop and add metrics to the annual EDFacts collection to help the Department avoid waste, fraud, and abuse.

10. My team also offered technical assistance to states to help them navigate the process of uploading required data to the EDFacts platform. Even before logging on to the EDFacts platform, states frequently asked questions about how to collect and tabulate data requested on the component surveys. My team, in collaboration with NCES and program office staff, guided them through the data collection process and shared best practices and advice, in an effort to promote consistency, reliability, and usability across all state-provided data. This work increased the uniformity of EDFacts inputs and thus improved the accuracy of the data reported. We also provided assistance to states as they created and uploaded data files to ensure technically compliant submissions.

11. It is essential that EDFacts data be as precise and verifiable as possible because information submitted to the system is used not only to monitor program compliance and

implementation, but also to generate formula inputs for the next school year's formula grant allocations. For example, states report on EDFacts the number of students who completed the annual English Language Proficiency exam. That figure is a mandatory input for the formula to allocate funds to states under Title III-A of the ESEA, which provides support for English learners.

12. Post-grant data is also a mandatory component of ESEA monitoring and reporting requirements. For example, my team managed the Consolidated State Performance Report ("CSPR"), the required annual reporting tool for each SEA under Section 8303 of the ESEA, 20 U.S.C. § 7843. The ESEA mandates that the Secretary establish procedures through which states may submit a consolidated annual progress report for all ESEA programs through which they receive funds. This report—the CSPR—must include information about the state's performance under each ESEA program and information related to monitoring and other activities. The EDFacts collection satisfies many of the consolidated reporting requirements, but my team also collected some CSPR data, such as narrative information, separate from EDFacts. The Department uses information derived from states' CSPRs to (1) assess and report individual program performance; (2) monitor states' implementation of the ESEA and progress towards program and accountability goals; (3) identify areas for technical assistance to states and overall program improvement; (4) inform policy and program improvement; (5) monitor and report the Department's progress in meeting its strategic goals; and (6) inform other reporting and program evaluation requirements.

## **Obligation to Regularly Update Formula Grant Data**

13. Based on my experience and training within the Department, it is my understanding that Congress expects the Department to use the most recent, most accurate data possible to calculate formula grant allocations. The statutes creating some formula grant programs point to specific data that the Department must use. For example, Title V-B of the ESEA explicitly directs

5

the Secretary to look to NCES "locale code[s]" to determine eligibility for the Rural Education Achievement Program ("REAP"). 20 U.S.C. § 7345(b)(1)(A)(i)(II), 7351(b)(1)(A)(ii).

14.     Other formula grant programs require the Department to use the "best available" or "most recent" data to calculate allocations. Title I-A is one such program: the relevant ESEA provisions direct the Secretary to use "the most recent satisfactory data . . . available from the [Census Bureau]" to determine the number of formula-eligible children in each local education agency ("LEA"). 20 U.S.C. § 6333(c)(2). The law further specifies that the "satisfactory data" the Department must use is "updated data on the number of children, aged 5 to 17, inclusive, from families below the poverty level for counties or local educational agencies, published by [the Census Bureau]." *Id.* § 6333(c)(3)(A). And the ESEA operates with the assumption that the Department will collect this data, tailored to match LEA boundaries, "annually": only if "appropriate and reliable data are *not* available annually" can "the Secretary . . . use data which are updated every two years." *Id.* (emphasis added).

15.     In my experience, OESE, NCES, and the Department as a whole have long understood this and similar language in the ESEA to limit the Department's ability to use old data in administering the formula grant programs, except in emergencies. One such situation arose during the COVID-19 pandemic, when we had concerns about the reliability of data collected and submitted in the midst of a national health emergency. Given the once-in-a-generation circumstances, we elected to use the prior year's SAIPE estimates, SPPE, and child counts to calculate formula grant allocations. That unique case is the only time in my tenure at the Department that I recall prior-year data being used in the formula grant process. Ordinarily, to comply with the Department's statutory obligations, my team in OESE, NCES staff, and other data

groups throughout the agency collected the data used in the formula grants annually, on either a school year or a fiscal year schedule.

16. Likewise, OESE and the Department interpret the ESEA mandate that the Secretary establish a procedure for "consolidated State annual report[s]," 20 U.S.C. § 7843(a), as requiring regular, annual EDFacts and CSPR collections to inform ESEA monitoring and accountability. In this context, up-to-date data is needed for OESE to accurately evaluate states' performance, assess their compliance with funding conditions, and evaluate their uses of grant funds.

17. In the data sciences, regular collection and analysis does not mean that information completely up to date. The "data life cycle," the months-long, highly intensive process through which data is collected, cleaned, processed, and produced in a usable format, introduces a delay between the collection of information in real time and its dissemination to end users. As a result, the formula grant programs have always relied, to some extent, on lagged data. Lags of up to two years are commonplace; the formula allocations for the 2025–2026 school year will in many cases use data inputs from the 2023–2024 school year.

18. The data life cycle makes annual collection and publication of new formula grant inputs even more important, as it introduces an unavoidable gap between the numbers available and the reality on the ground in the best of circumstances. To minimize the gap, at any given time, my team worked simultaneously on collections for three or four school years. In March 2025, my team was in the end stages of releasing information from the 2022–2023 school year on EDFacts and ensuring compliance with the Evidence Act's open data requirements for that cycle. At the same time, we were in the process of cleaning and collecting data reported for the 2023–2024 school year and clearing upcoming data collections, for the 2025–2026, 2026–2027, and 2027–2028 school years, with the Office of Management and Budget. This was a typical workflow. We

were always planning and developing our future collections while actively collecting data and wrapping up the publication stages of previous life cycles.

19.     Updating the formula grant inputs on a less than annual basis would mean that allocations under Title I and other programs would be based on data collected three or more school years ago, which may not accurately reflect the current conditions in a particular state or LEA. Based on my experience and training, I believe that a failure by the Department to generate new allocation formula inputs on an annual basis would violate the terms and design of the ESEA formulas.

### Effects of Contract Cancellations

20.     Starting in February 2025, the Department took steps to cut the contracts and personnel that supported effective administration of the ESEA formula grant programs. First, on February 10, 2025, the Department of Government Efficiency ("DOGE") announced the termination of scores of Department contracts, including many IES contracts. It is my understanding that this mass cancellation initially swept up NCES's interagency agreements with Census to collect and compute much of the data required to run formula grant allocations. As of March 2025, at least one of these interagency agreements had not yet been reinstated; these weeks of interruption had already introduced delays in the data life cycle.

21.     Likewise, DOGE cancelled the EDFacts contract managed by NCES. The contract was eventually reinstated, but with drastically reduced services that will undermine EDFacts' ability to collect accurate and responsive data in the future. The re-scoped contract is essentially a maintenance-only contract that provides enough support to keep the EDFacts platform running but prevents the Department from making any changes to the system. That includes changes to the information requested from states in the EDFacts collection. When the contract was cancelled, my team was in the process of getting approval for proposed revisions to the EDFacts collection for

8

the 2025–2026, 2026–2027, and 2027–2028 school year collections. To align the scope of the contractor's work with the scaled-back contract, we were required to roll back those changes and revert to the old, unrevised surveys. It is my understanding that under the current contract, the Department is not able to add, remove, or modify EDFacts data and therefore will be unable to respond to new data needs that emerge or to new statutory data collection requirements.

22. In addition, the EDFacts contract previously included a partner support center, which was staffed by twelve contracted personnel who, along with members of my team, were available to answer states' questions and troubleshoot issues that might arise during the data submission process. The reinstated contract allowed for only two support staff.

23. My team oversaw two large contracts, one for the management and maintenance of the ED Data Express platform and the other for data collection activities and support for various mandatory accountability measures, like writing reports for submission to Congress and tracking OESE performance metrics under the GPRA. This second contract was put on hold on February 28, 2025, and the contractor received a stop-work order. At that time, the contractor was in the midst of producing Consolidated State Performance Reports required by the ESEA, collecting data on the Stronger Connections Grant Program mandated under the Bipartisan Safer Communities Act, and conducting a survey on the use of funds under ESEA Title II. To the best of my knowledge, the statutorily required performance reports have not been completed, and the Title II and Stronger Connections data collections remain on hold.

24. Around the same time as the contract cancellations, the Department put all data releases on hold while they reviewed Department contracts (both cancelled and active) in pursuit of cost savings. My team had new data on chronic absenteeism and the national high school graduation rate, as well as not-yet-released Title I accountability data from the 2022–2023 school

year, prepared for dissemination. These datasets were in the final stages of clearance for publication but remained on ice. To the best of my knowledge, they still have not been posted to ED Data Express, EDFacts, or any other Department website.

25. After the February 10 contract cancellations and February 28 stop work order, my colleagues and I were in the process of making difficult decisions about how to preserve essential contracts and which data to collect for the current school year. In March 2025, I was considering how to "descope" the ED Data Express contract, consistent with DOGE's direction for the Department to strip its contracts down as much as possible and include only "mission critical" work. Of course, because ED Data Express is designed for the purpose of releasing and disseminating data, the Department's hold on data releases made it almost impossible for the contractor to carry out its existing work. I was not given approval to release any data between February and March 2025.

26. Even setting this obstacle aside, my colleagues and I were trying to balance statutory requirements and other OESE needs against the possibility of stretching our limited resources too thin and undermining our ability to successfully complete next year's mandatory collections. Our conversations considered the problems of delay presented by the data life cycle—at some point, data is too far lagged behind real-time events to be relevant for present-day uses. When the disconnect between the moment in time represented by data and the current time is too large, the data loses its intrinsic value, except as a historical reference point. This is especially true in the education context, where time is of the essence.

### March 11 Reduction in Force

27. Our internal deliberations came to a sudden halt on March 11, 2025, when the Department initiated a large-scale Reduction in Force ("RIF"). About 90% of the approximately 75 employees working in OESE's Office of Administration were eliminated in the RIF. My entire

data team was notified that we would be placed on administrative leave effective March 21, 2025, and terminated effective June 10, 2025. One of the laid-off employees was the finance manager for OESE, who was responsible for requesting grant funds from the Department of the Treasury in coordination with the Department's Budget Services Office, verifying the funds and award amounts, depositing funds into grantees' accounts on G5 (the online platform through which grantees access funds from the Department) for OESE, and processing obligations.

28.     The RIF also terminated all but one certified Contracting Officer's Representative ("COR") in OESE, meaning that this single person is, to the best of my knowledge, the only OESE employee with the credentials to manage the Office's 80+ external contracts. Likewise, the team responsible for consolidated monitoring of states' compliance with ESEA and staff who answered inquiries from the Department's Office of Inspector General and the Government Accountability Office and handled FOIA requests were all eliminated. In other words, the RIF eliminated all of the grant support and administrative functions within OESE, gutting the Office's capacity to facilitate formula and competitive grant administration. Based on my experience in the Department, I believe that the loss of these administrative systems leaves the Department unable to successfully carry out its statutory grantmaking and oversight responsibilities under the ESEA and other laws.

29.     After being notified of the RIF in the evening of March 11, I immediately lost access to all shared files, databases, and data systems. I was also blocked from sending any external messages from my Department email account. This meant that I was not able to communicate with contractors, states, or other stakeholders and could not transition any of the work my team and I had in progress at the time of the RIF to any remaining OESE personnel.

30. It is my understanding that some OESE program office staff were not terminated in the March 11 RIF. But none of these employees have the training or expertise to carry out the data collection and analysis processes previously done by my team of data specialists and NCES staff.

31. Without data experts in NCES or OESE available to collect SEA and LEA fiscal data, process data submitted to EDFacts, or work with Census on developing SAIPE estimates, I do not know how the Department can carry out the steps in the data life cycle that made the required annual updates of these formula grant inputs possible. Even if the Department restored external contracts for some of these services at full capacity, it does not have the expert personnel needed to manage contractors or facilitate interagency agreements with Census. As a result, based on my experience as leader of OESE's data team and in NCES, I do not believe that the Department will be able to generate accurate, reliable SPPE figures, SAIPE estimates, and other inputs for use in future formula grant allocations on an annual basis. This will force the Department to rely on error-prone and/or outdated data in making future formula grant allocations, contrary to the requirements in the formula grant statutes that it use the most recent, best available data to distribute funds. States and school districts' federal formula grant awards thus will be directly impacted by the Department's decision to gut its data infrastructure.

32. Likewise, without OESE and NCES data specialists, the Department will struggle to maintain annual collection of Consolidated State Performance Report data and EDFacts. As a result, I expect that the data will either not be collected on a yearly basis or will be of poor quality because the Department cannot update the platform or collection items and cannot offer technical assistance to ensure uniform, reliable data submissions from states. Consequently, CSPR data will be rendered useless for preventing waste, fraud, and abuse by OESE grantees.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, that the foregoing is true and correct.

Executed on June 10, 2025.

*Sarah Newman*
Sarah Newman