# Exhibit VV

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF JOSE ORTIZ

I, Jose Ortiz, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of the State of Texas. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I hold a bachelor's degree in finance from the University of Texas at Austin; and a juris doctor from St. Mary's University.

3. For 25 years, I have been employed as an Attorney at the U.S. Department of Education's Office for Civil Rights ("OCR") regional enforcement office based in Dallas, Texas. Most recently, before the office was abolished as discussed in more detail below, the Dallas office served Texas, Louisiana, and Mississippi, a region with one of the highest rates of racial discrimination complaints.

4. I submit this declaration in response to numerous actions taken by the Trump Administration, the Department of Education ("the Department"), and the Secretary of Education to dismantle the Department, such that the Department has been incapacitated and is now unable

to meet statutory obligations that are critical to the implementation and enforcement of civil rights laws across hundreds of thousands of schools, colleges, and universities in all fifty states.

## The Office of Civil Rights

5.      As a senior attorney at OCR my primary responsibility is to investigate complaints of discrimination at universities and within school districts that receive federal financial assistance from the Department. The purpose of the investigations is to resolve individual and class complaints of discrimination under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, or the Boy Scouts of America Equal Access Act, and to ensure compliance with those laws.

6.      I conduct compliance reviews, as authorized by regulations, and which are intended to assess the practices of recipients of federal funding to determine whether the recipient is in compliance with civil rights laws. *See* 34 C.F.R. § 100.7(a) (Title VI); 34 C.F.R. § 106.71 (Title IX), 34 C.F.R. § 104.61 (Section 504); 34 C.F.R. § 110.30 (Age Discrimination Act); 28 C.F.R. § 35.172(a) (Title II).

7.      During my career at OCR, the Department has occasionally initiated "Directed Investigations" based on administration priorities. Historically, such Directed Investigations are not widely used, and they make up a small fraction of my overall caseload.

8.      My work requires making information requests to schools and universities, interviewing relevant individuals, and visiting campuses as necessary to gather additional information. If an investigation reveals a violation of a civil rights law or a compliance issue, I worked with the parties to negotiate a resolution agreement and then monitored compliance with those agreements. In some cases, it takes years of investigation and negotiation to reach an agreement. For example, resolving complaints of sexual harassment often requires review and

revision of school or campus policies on reporting and remedying such conduct. It can take months to fully resolve such concerns. OCR then monitors for compliance for a few months up to a few years, depending on the complexity of the case, to ensure that the remedies agreed upon are effectively put in place and remain in place. During monitoring, I set schedules for the schools to submit evidence of compliance, review the evidence submitted to verify that the violations are being corrected, and communicate with complainants.

9. From about 2019 until January 2025, the bulk of my cases have involved claims of sexual harassment. Those cases are typically handled by the more experienced attorneys in the office because they are complex cases. The Title IX regulations were amended in 2020 to include broader protections and definitions, leading to a dramatically higher number of complaints.

10. Earlier in my career, about 15 years ago, I would be assigned to about 10 active cases at one time. As of March 2025, I had approximately 60 active cases that required evaluations and investigations, plus two additional cases for which I was monitoring the implementation of negotiated agreements.

11. The cases I handle are resolved without any monetary charge to the parents or students who filed the complaint. In my long tenure as an OCR attorney, my experience was that OCR played a unique and valuable role in civil rights enforcement because it had the resources to investigate, evaluate, resolve, and monitor cases that otherwise would not have been addressed due to a family's inability to retain an attorney as well as the limited resources available for civil rights enforcement at the state and local level.

12. As an OCR attorney, I also provide technical assistance, which includes training teachers and administrators on how to respond to student complaints of discrimination and

harassment. For example, I traveled to a college in Arkansas (at the time, Arkansas was also within the jurisdiction of the Dallas office) to train the disability office staff on student rights.

13. About monthly, I am assigned to answer calls from the public. The calls often came from parents who could not afford an attorney and needed advice about anti-discrimination laws and the process for ensuring that their child received the protections to which they were entitled. When I am on call, I generally receive about six calls per week. I also process FOIA requests.

### **Dismantling of the Dallas Regional Office**

14. On or about January 20, 2025, I received an email directive to discontinue work with the public. I understood this to mean that I could not open new cases, complete evaluations, conduct mediation, close investigations, respond to calls or emails from the public, or conduct training for schools and universities. During that time, I did what work I could using data I had already collected in my active cases. I later received an email directive that I could resume work on disability rights cases only.

15. On information and belief, based on emails I received from Department leadership, the priority cases since January 20, 2025, have been those involving "DEI" and antisemitism. We did not receive a Dear Colleague Letter explaining how to identify "DEI" cases, as we typically would when priorities changed. I observed that DEI and antisemitism cases were being initiated by OCR as Directed Investigations and were proceeding at a much faster pace than a typical case, without undergoing the usual OCR assessments and process. For example, under the OCR Case Processing Manual at the outset of a case, the parties are to be notified of the complaint, told that OCR functions as a "neutral fact-finder," and provided information on the mediation process for resolving the complaint. But none of that seems to be happening with the Directed Investigations that the Department is currently pursuing.

16. On March 11, 2025, my colleagues and I received an email directing us not to come into the office on March 12 for "security reasons." We were told to leave the office by "5 p.m." At around 4 p.m. Central Time (5 p.m. Eastern Standard Time), without notice, our computers went offline. After my computer came back online, I could receive email and send emails internally to colleagues, but I was not able to send emails externally and no longer had access to the internal Case Management System ("CMS").

17. When my computer went offline, I was in the middle of opening an investigation based on a complaint of sexual harassment. My supervisor had approved a letter opening the investigation, but when I tried to email the letter to the parties, it bounced back.

18. I left the office at 5 p.m. Central Time, as instructed. Around 6:30 p.m., I received an email from Jacqueline Clay at the Department notifying me that my position was being abolished. The email stated that the Department would be eliminating the Dallas office, including my position, as part of the agency's "restructuring process" and to "support" Executive Order 14210 ("Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative"), dated February 11, 2025.

19. The March 11 email also stated: "To provide you with the maximum opportunity to focus on your transition, you will be placed on paid administrative leave stating Friday, March 21, 2025." But between March 11 and March 21, I was not able to meaningfully transition my open cases because I could not communicate with the parties or access the case management system to update the case record, upload related emails or communications, update the status of my cases, or effectuate any changes at all in the system. I have not had access to my Department email since March 21, 2025. On information and belief, all of my active cases have been

5

transferred to the Kansas City enforcement office, but the Department has not worked on those cases.

20. Between March 11 and March 21, I received an email from Baylor University regarding an important resolution agreement. Since 2016, I investigated alleged Title IX violations and compliance concerns at Baylor University in response to sexual harassment complaints, particularly those involving student athletes. Under a negotiated agreement reached in December 2024, Baylor University was obligated to submit its first report proving compliance by the end of March 2025. A representative from Baylor University emailed me to ask about their upcoming submission, but I was not able to respond.

21. On March 19, I received an email with instructions for retrieving my personal items from the office and returning government property. The email stated that I would have 30 minutes, starting at 10 a.m. on April 1, to collect my personal belongings. Before I could collect my personal belongings, I was required to return my Department badge, credit card, ID, and computer.

22. On April 10, I received formal notice of a reduction in force ("RIF"). The notice stated that I would be terminated effective June 10, 2025.

23. On June 6, 2025, I received an email that I would not be separated on June 10 based on recent court orders. According to the email, the Department is "actively assessing how to reintegrate [employees] back to the office in the most seamless way possible. This includes evaluating necessary updates to security access, technology, and workspaces to ensure full operability."

24. On June 7, 2025, a complainant whose case I was investigating called me and left a message at my private law office. I do not know how they obtained that phone number. On

information and belief, the complainant has been unable to reach anyone at the Department to inquire about her complaint. I did not respond to the complainant.

25. Based on my 25 years of experience investigating complaints submitted to OCR and monitoring negotiated resolution agreements, I do not believe that it is possible for all pending cases to be processed now that the Dallas office is closed. It was already really difficult to timely resolve all cases. I expect that many of the pending cases will be closed and that others will remain open until it is too late for the complainant(s) to benefit from any form of relief.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 13, 2025.

_____
Jose Ortiz