# Exhibit WW

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA, et al.,

*Defendants.*

Civil Action No. 25-965-JRR

## <u>DECLARATION OF RONALD PETRACCA</u>

I, Ronald Petracca, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.　　I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.　　For nearly 45 years, from October 5, 1980 through February 8, 2025, I worked in the Office of General Counsel ("OGC") in the U.S. Department of Education ("the Department"). From around 2010 through my retirement earlier this year, I helped lead OGC's Discretionary Grants Practice Team. The Discretionary Grants Practice Team served as a central point within OGC for identifying and working through novel, complex, and cross-cutting grant issues. As such, it functioned as a forum for on-going professional development and problem solving that helped ensure a consistent approach across OGC to resolving discretionary grant legal issues.

3.　　I hold a bachelor's degree from the State University of New York at Cortland; and a juris doctor from the Catholic University of America, Columbus School of Law.

4. I submit this declaration in response to actions taken by the Trump Administration, the Department, and the Secretary of Education ("the Secretary") to dismantle the Department, such that the Department, on information and belief, has been incapacitated and is now unable to meet statutory obligations that are critical to the implementation of federal education and civil rights laws.

### Appropriations for Competitive Grants

5. As a former lead for OGC's Discretionary Grants Practice Team, I am familiar with the relevant statutes and regulations that govern the Department's competitive (or discretionary) grant programs.

6. Congress, through multiple statutes, has required or authorized the Department to award competitive grants. A competitive grant "is one that permits the Secretary to use discretionary judgment in selecting applications for funding." 34 C.F.R. § 75.1(b).

7. The Elementary and Secondary Education Act ("ESEA"), Pub. L. No. 89-10, 79 Stat. 27 (1965), as amended by the Every Student Succeeds Act ("ESSA"), Pub. L. No. 114-95, 129 Stat. 1802 (2015), creates 20 overarching competitive grant programs, many of which consist of multiple competitive awards that provide support in areas ranging from school safety to educator recruitment and training.[1]

8. For example, the Supporting Effective Educator Development ("SEED") Program provides funding to increase the number of highly effective educators in elementary and secondary schools. The statutory provision creating this program directs that the Secretary "shall award grants, on a competitive basis," to eligible entities seeking to create pathways for educators with

---

[1] *See Assistance Listing for U.S. Department of Education Project Grants*, last updated November 2024, www.SAM.gov (click on "search" tab; then filter by Federal Organizations: "091 – Education, Department of").

nontraditional preparation and certification routes to serve in traditionally underserved school districts; provide professional development activities focused on literacy, numeracy, and remedial instruction; support educators in making dual enrollment or early college programs available to students; or fund professional development activities that may lead educators to obtain an advanced credential. 20 U.S.C. § 6672.

9. Similarly, the Teacher and School Leader Incentive ("TSL") Grant Program helps eligible entities develop, implement, improve, or expand human capital management systems (the mechanisms that local education agencies use to make decisions on hiring, professional development, dismissal, tenure, promotion, and other human capital matters) or performance-based compensation systems (systems of compensation for teachers, principals, and other school leaders that differentiate compensation based on increases in student academic achievement, assignment to a hard-to-staff school or subject area, or skills and knowledge demonstrated through additional responsibilities and professional achievement). 20 U.S.C. §§ 6631–33. The Secretary "shall award" these grants and "shall give priority" to applicants with a focus on high-need schools and equitable distribution between urban and rural areas. *Id.* § 6632(a), (d).

10. Congress enacted the Higher Education Act ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219 (1965) (codified as amended at 20 U.S.C. §§ 1001–1161aa-1), "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." 79 Stat. at 1219. Accordingly, the law provides billions of dollars in support each year to both institutions of higher education and individuals pursuing postsecondary education.

### Competitive Grant Application & Eligibility

11. The determination of which entities are eligible to apply for a competitive grant "is governed by the applicable statutes and regulations," 34 C.F.R. § 75.50, namely the statutory

authorization for the program under which the competition is being held, any relevant language in the annual Appropriation Act for the program in question, any program-specific regulations or other requirements established through rulemaking or under a valid exemption to rulemaking, the Education Department General Administrative Regulations ("EDGAR"), and the General Education Provisions Act ("GEPA").

12.    Under EDGAR, priorities for a competitive grant program must be announced in the Federal Register, usually in the Notice Inviting Applications ("NIA"). *Id.* § 75.105(b)(1). Those priorities must be established through Notice and Comment rulemaking unless the priorities are invitational, that is to say confer no competitive advantage if addressed, authorized by statutory language, or exempt from rulemaking. *Id.* § 75.105(b). The process set forth in the Department's regulations generally requires the Secretary to select funding recipients "on the basis of applicable statutes and regulations, the selection criteria, and any priorities or other requirements that have been published in the Federal Register." *Id.* § 75.217(a).

13.    To open grant competitions, the Secretary must "publish[] application notices"— the NIA referenced *supra* ¶ 12—in the Federal Register, explaining, among other things the type of assistance that is available, how to apply, any application requirements, competitive or absolute priorities, and the selection criteria (chosen from a list of options enumerated in Department rules) that will be used to evaluate applications. *Id.* §§ 75.100, 75.200, 75.209, 75.210. These requirements—other than certain procedural rules—are drawn from applicable statutory provisions, regulations, or another Federal Register Notice, such as a Notice of Final Administrative or Secretarial Priorities, that have been through Notice and Comment rulemaking unless, as noted above, an applicable exception applies.

14.    The Secretary may award competitive grants "only to an eligible party that submits an application." *Id.* § 75.104(a). "Eligible parties" are the entities defined by the relevant program statute.

15.    Application notices are typically published in the Federal Register at least 45 to 60 days in advance of the deadline for submissions and approximately four to six months before funds must be awarded before lapsing. Applicants need time to coordinate with partners and institutional stakeholders, to create a budget, and to draft a narrative. It is not possible to have a meaningful application period of less than 30 days. U.S. Department of Education, *Handbook for the Discretionary Grant Process* ("Handbook") § 2.5.6(C)(2) (2024).

16.    After applications are received by the Department, program office staff do a preliminary review of the applications to ensure that they were received in a timely manner, were submitted by an eligible party, and propose activities that are allowable under the authorizing legislation for the program and any competition specific priorities. *Id.* § 3.4.4. The applications are then mailed to outside peer reviewers. Peer reviewers are selected based on their subject matter expertise, any available information concerning their prior performance as peer reviewers, and their availability during the peer review process. *Id.* § 3.5.4. The process, from the Department's receipt of the application to their transmission to peer reviewers, generally takes about two weeks.

17.    For most discretionary grant competitions, peer review panels consist of three to five members. Once the peer reviewers receive the applications, they must initially ensure that they do not have any conflicts of interest with respect to the applications that they have been assigned to review. They must then read the applications, rate the applications based on the selection criteria, competitive priorities (if applicable), provide comments that justify their scores, and meet with other peer review panel members to discuss the applications for the purpose of

ensuring that each peer reviewer has as complete an understanding of the application as possible before finalizing their scores. This process has, in my experience, generally taken about three weeks. Handbook ch. 3.

18.     After the peer review process is complete, the Secretary first "prepares a rank order of the applications based on" the selection criteria, feedback from the peer review process if applicable, and any competitive preference points. 34 C.F.R. § 75.217(c). She next "determines the order in which applications will be selected for grants." *Id.* § 75.217(d). To select applicants for funding, the regulations require the Secretary to consider the information in the applications, the rank ordering of the applications, and other relevant information, including information about an applicant's use of funds, performance, and compliance with conditions under a previous Department award. *Id.*

19.     After identifying applications that fall within the funding range based on the rank order, but before making awards, the Secretary must conduct a "cost analysis of the project," which is the "basis for determining the amount of the grant to the applicant." *Id.* § 75.232. The Secretary has discretion to "fund up to 100 percent" of the applicant's allowable costs. Id. § 75.233. This cost analysis, described in Section 4.9.1 of the Handbook, involves determining if the costs the applicant has proposed to charge to its potential grant are consistent with applicable statutory and regulatory requirements, in particular the provisions in 2 C.F.R. Part 200 concerning the allowability of costs. Specifically, the Uniform Guidance requires that costs charged to federal grants be reasonable, necessary, and allocable. 2 C.F.R. pt. 200 subpart E. This review must be done in a thorough and contentious manner to ensure that grants, once they are awarded, do not use funds for unallowable or excessive costs. Any unresolved issues about an applicant's eligibility for an award must be resolved. In addition, a Slate Memorandum, which, among other things,

documents the competitive process and the results of the risk review, including any recommended specific conditions to address concerns about a particular applicant and a description of any novel issues that arose during the competitive process. For some competitions, determinations must be made on whether the applicant has documented that it will meet an applicable matching requirement, has met a requirement for having its proposed intervention supported by a required level evidence, or met another program requirement. These issues are all addressed in the Slate Memorandum, which is subject to Department clearance. Handbook chs. 4 and 5.

20.     Finally, before awards are made, Congressional notification (usually two business days) is provided; the final paperwork needed to issue a grant is prepared, most importantly preparation of a Grant Award Notice, is completed; and the awards are issued. The steps described in this and the prior paragraph, in my experience, generally took about 30 days. Handbook ch. 5.

21.     This full process described in paragraphs 15 through 20 above, from the date of publication of an NIA in the Federal Register until issuing of awards, generally takes between 110 and 125 days. A competition with few applicants and comparatively simple requirements could take less time. This estimate is based on staffing levels that existed in the agency prior to my retirement, and the changes in available personnel within the agency to perform this complex and difficult work could lead to longer time periods if concerns about quality control and legal sufficiency are to be properly addressed.

22.     "The Secretary may approve a project period of up to 60 months to perform the substantive work of a grant unless an applicable statute provides otherwise." 34 C.F.R. § 75.250. But "[t]he Secretary usually approves a budget period of not more than 12 months, even if the project has a multi-year project period." *Id.* § 75.251(a). "If the Secretary approves a multi-year project period, the Secretary: (1) Makes a grant to the project for the initial budget period; and (2)

Indicates his or her intention to make contination [sic] awards to fund the remainder of the project period." § 75.251(b).

23.     The Department is required to make most of its discretionary grants in the fiscal year ("FY") for which the funds in question were appropriated. Thus, for FY 2025, most discretionary awards will need to be awarded by September 30, 2025. There are some programs which allow for extended availability until December 31, 2025. And, in some cases, discretionary grants are funded with appropriated funds that have two-year availability. As a general matter, the Department will need to make its discretionary grant awards and continuation awards by either September 30th or December 31st of this year, or the funds in question will lapse and no longer be available for award.

24.     In recent years, and before the reduction in force that occurred after my retirement, approximately 60 attorneys in OGC provided legal support to program and other offices in executing the various tasks described in the preceding paragraphs. This legal support included reviewing the text for all NIAs before they were published to ensure compliance with the formatting requirements of the Federal Register and that the NIAs contained all required information; accurately and thoroughly conveyed the substance of application requirements, selection criteria, eligibility requirements, and priorities; and met rulemaking requirements. After the NIAs are issued, OGC assists program offices in conducting pre-application webinars for potential applicants, answering applicant questions, reviewing peer review orientation presentations, reviewing the Application Technical Review Plan, and dealing with issues that arise if an applicant is having difficulty submitting its electronic application. Once the peer review process begins, OGC assists program offices in answering peer reviewer questions and questions concerning peer reviewer conflicts of interest and replacements. Once the peer review process is

complete, OGC attorneys review the Slate Memorandum; review any specific conditions being imposed on grantees; answer questions about the risk review process, eligibility issues, and allowable costs in proposed budgets; and, where applicable, answer questions about matching and evidence requirements. Last year, FY 2024, the Department published about 70 competition notices as was typical (This number can vary from year-to-year). I believe there are serious questions about the capacity of OGC to provide the support needed to the rest of the agency in conducting a legally sufficient and timely discretionary grant award process when only a handful of attorneys remain in the office and those attorneys are responsible for dealing with all agency legal issues, not just those related to discretionary grants.

### Discontinuing Competitive Grants

25.    The Department regulations provide that in order to receive a continuation award, the grantee must demonstrate progress in achieving the project's goals and objectives or that it can modify its project in a way that will allow it to meet those goals and objectives, submit all required reports, continue to meet all eligibility requirements, maintain the requisite financial and administrative management systems, and "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5); *see id.* § 75.253(a). The Secretary "may decide not to make a continuation award" if the "grantee fails to meet any of" these requirements. *Id.* § 75.253(f)(1). The Secretary must "notify the grantee of that decision" and "the grounds on which it is based." *Id.* § 75.253(g). The Secretary must also "provide the grantee with an opportunity to request reconsideration of the decision" as required by 2 C.F.R. § 200.342. 34 C.F.R. § 74.253(g)

26.    The Department's Handbook for the Discretionary Grant Process states that discontinuation determinations are made "no earlier than 90 days before the end of a grantees budget period." Handbook § 6.7.4(B)(4). This timeline makes sense, because the Department is

unable to meaningfully assess whether there has been progress on a project and whether continuation is in the best interest of the government before reviewing a grantee's annual report.

27.    In my 45 years at the Department, I witnessed six changes in administration, and I am not aware of a single competitive grant that was discontinued simply because the new administration disagreed with the priorities addressed in that grant. Although the governing regulations permit discontinuation when a grantee does not "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government," 34 C.F.R. § 75.253(a)(5), to my knowledge, that provision has never been used to discontinue an entire cohort of grants awarded under a particular program without a project-specific assessment of each grant being discontinued. As a Senior Counsel within OGC, if I had become aware that program staff intended to send a notice of non-continuation based on a change in political priorities, I would have advised the Department that doing so would not be legally defensible.

## Ending Competitive Grants in the Middle of a Budget Period

28.    Under 20 U.S.C. 1234i, all programs not authorized under the HEA, which would include SEED, TSL, School-Based Mental Health ("SBMH"), and Mental Health Service Professional Demonstration Grant Program ("MHSPD"), are covered by the enforcement procedures of Part D of GEPA, which provides for administrative and judicial review when the Department ends a grant in the middle of a budget period by withholding payments from recipients. Specifically, under 20 U.S.C. § 1234d, the Department can only end a discretionary grant in the middle of a budget period if it provides the grantee with written notice of the basis for its belief that the grantee "has failed to comply substantially with a requirement of law." In addition, the grantee must be offered an opportunity for a hearing before the Department's Office of Administrative Law Judges. *See* 20 U.S.C. § 1234d(c). A grantee that is dissatisfied with any final agency action taken under 20 U.S.C. 1234d can seek judicial review by "within 60 days of that

action, fil[ing] with the United States Court of Appeals for the circuit in which that recipient is located, a petition for review of such action" *Id.* § 1234g(b). The Department must submit the record for the court to determine whether its findings of fact are supported by substantial evidence. *Id.* The court may remand to the secretary to make new or modified findings. *Id.* § 1234g(c).

29.     Where the GEPA process is inapplicable (e.g. programs authorized by the HEA, 20 U.S.C. § 1234i(2), there are separate termination provisions set forth in the Department's regulations that apply to discretionary grants awarded under the Higher Education Act (e.g. Teacher Quality Partnership Program ("TQP") grants). *See* 2 C.F.R. pt. 200. "Termination" refers to agency action "to discontinue a Federal award, in whole or in part, at any time before the planned end date of the period of performance. Termination does not include discontinuing a Federal award due to a lack of available funds." 2 C.F.R. § 200.1. Under the regulations, the Department can terminate a grant if the grantee fails to comply with the terms and conditions of the award, the grantee consents to termination, or "pursuant to the terms and conditions" of the award, "including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). Termination triggers notice and reporting requirements. *Id.* §§ 200.340(b)–(c), 200.341. EDGAR provides that the Secretary "may use the Office of Administrative Law Judges to resolve disputes" over termination. 34 C.F.R. § 75.901.

30.     The GEPA standard for initiating a withholding action, defined as when a grantee has "failed to comply substantially with law," is much narrower than the grounds for termination of a grant under 2 C.F.R. § 200.340 and does not provide for ending a grant because it no longer effectuates agency priorities. In addition, the administrative and judicial due process provisions under Part D of GEPA are different than is provided for under 2 C.F.R. 200.340.

31.    During my tenure at the Department, termination of any type of competitive grant was exceedingly rare. For programs covered by Part D of GEPA, a competitive grant could only be ended in the middle of a budget period through a withholding procedure initiated under 20 U.S.C. 1234d. That this was the understanding that prevailed during my tenure with the agency is made clear in the Handbook, which provides that—for programs subject to Part D of GEPA—the Department "may . . . initiate proceedings to withhold grant funds from a grantee if it concludes that the grantee has substantially failed to comply with an applicable legal requirement." Handbook §§ 6.14.1(B)(5)(a), (A)(2)(f). With respect to programs not covered by GEPA, the Handbook provides that:

> "[p]rogram officials act to suspend or terminate a grant only under egregious circumstances (e.g., previous action taken by [the Department] has not resulted in resolution of a problem or risk; a grant, grantee, or an employee of the grant has been debarred or suspended; or there is evidence of illegal conduct), and consult with their program attorney to determine if suspension or termination actions are appropriate."

Handbook § 6.14.1 (B)(6)(b)(1).

32.    I am aware that the Department distributed boilerplate letters to recipients of SEED, TQP, and TSL grants terminating those awards. I am also aware that the Department distributed boilerplate letters to recipients of SBMH and MHSP grants providing notice of non-continuation of those awards. It is my opinion that these terminations and discontinuations are not legally defensible and that the law requires the Department to make individualized determinations prior to terminating or discontinuing a competitive grant.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 21, 2025.

Ronald Petracca