# Exhibit XX

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
et al.,

     *Plaintiffs*,

     v.

THE UNITED STATES OF AMERICA, et al.,

     *Defendants*.

Civil Action No. 25-965-JRR

**DECLARATION OF ALYSSA PICARD**

I, Alyssa Picard, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I began working at the U.S. Department of Education's ("the Department") office of Federal Student Aid ("FSA") in July of 2023. From then until February 2024, I served as a caseworker in the Dispute Resolution Division of the Office of the Ombudsman, resolving complaints brought by borrowers of student loans issued under Title IV of the Higher Education Act, as amended, 20 U.S.C. §§ 1070–1099d. In February 2024, I was promoted to a supervisory role, in which I supervised caseworkers doing complaint resolution work and continued to resolve my own slate of borrower complaints. I also headed a program of proactive outreach to Congressional offices to assist with priority constituent casework.

3. In early February 2025, a group of Federal Student Aid employees, including seven of my colleagues in the Dispute Resolution Division, were terminated as "probationary." In a

February 18, 2025 all-staff meeting, FSA's Principal Deputy Chief Operating Officer addressed this reduction in staffing, telling told those present that FSA would be "not be doing more with less—we will be doing less with less." One month later, on March 11, 2025, many more of my colleagues were notified that they were to be terminated pursuant to an agency-wide reduction in force ("RIF") in which entire divisions and branches of FSA were being eliminated. While my division was not eliminated, the office's entire Community Support Division—whose five employees had also done dispute resolution casework in the course of their outreach duties—was RIF'd. My separated colleagues—whether probationary or RIF'd—were not given any time to transition their work, and no one is doing the work that they previously did. This resulted in a dramatic reduction in the office's ability to resolve borrower disputes. I felt I could no longer perform my obligation to serve the public, and I resigned from the Department on May 21, 2025.

   4.  The Ombudsman's Office is an independent office within FSA, created by statute "to provide timely assistance to borrowers of loans made, insured, or guaranteed under" Title IV by "attempt[ing] to resolve [borrowers'] complaints within the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in" Title IV loan programs. 20 U.S.C. § 1018(f)(1), (f)(3)(A).

   5.  During most of my time in the Dispute Resolution Division, the core mission was to resolve borrowers' problems with their student loan accounts.

   6.  Borrower disputes include resolving escalated "feedback" cases, in which the borrower complains directly to FSA, is not satisfied with the initial resolution, and escalates the case to the Ombudsman's Office for close review. Borrower dispute inquiries also come in via members of Congress, the White House, and the Office of the Secretary of Education these cases were known as "control mail." In addition, we handled disputes that came from Congressional

offices as the result of proactive outreach by the group I headed in the Ombudsman's Office between May 2024 and January 2025. These were known as "Congressional" cases.

7. The Dispute Resolution Division resolved cases by liaising with a borrower's servicer and other staff within FSA--such as the servicer liaisons and staff on the vendor oversight employees--to get to the bottom of a given problem, ensure that the borrower's account information is accurate, and that the borrower had the information they needed to access federal programs of loan repayment and relief. This ensured that servicers are not, for instance, overcharging borrowers, giving them insufficient refunds, or interfering with their ability to obtain statutorily mandated loan forgiveness or discharge. Many employees on these teams have also been impacted by the RIFs and the Department's efforts to get employees to leave the Department, making it nearly impossible to do the type of coordination and cross-functional work necessary to resolve borrower complaints.

8. The Dispute Resolution Division works with other offices within FSA to resolve specific borrowers' issues in areas where those offices have more specialized experience or direct control or oversight. For instance, in the summer of 2024, FSA took over the administration of Public Service Loan Forgiveness ("PSLF") from the Missouri Higher Education Loan Authority ("MOHELA"), which had previously been the primary loan servicer for PSLF applicants. Since then, the Dispute Resolution Division has received many borrower complaints about incorrect monthly payment counts and credits for PSLF eligibility. According to FSA employees with whom I consulted, those problems were due to errors in the automation between the National Student Loan Data System and the Salesforce-based system that maintains PSLF employment certification information. Resolving those errors was the responsibility of a special team within FSA. After the mass RIF, the team that previously handled PSLF transfer issues was reassigned to do other work

within FSA. After the mass RIF, no one was identified who could resolve complaints relating to errors in the PSLF payment count system. This persisted until the date of my separation from federal service.

9. A different team within the Ombudsman's Office, which was initially assigned to the Intake Division, was responsible for implementing relief owed to borrowers consistent with the settlement in *Sweet v. McMahon*, No. 3:19-cv-3674 (N.D. Cal.), in which approximately 200,000 borrowers who had been denied access to borrower defense to repayment discharge during the first Trump administration sought and have been promised relief. *See Sweet v. McMahon Settlement*, FSA, https://studentaid.gov/announcements-events/sweet-settlement (last visited June 21, 2025). Because providing the relief required by the *Sweet* settlement involves many of the same tools and skills as used by Dispute Resolution Division caseworkers, the Dispute Resolution Division regularly had between four and six of its caseworkers exclusively working on *Sweet* relief. However, the mass RIFs hollowed out the intake team doing *Sweet* work. As of the first week of May 2025, dispute resolution casework responsibilities were also formally removed from supervisors' performance metrics. As of the date I separated from the Department, one Dispute Resolution Division caseworker was working on disputes, and all other caseworkers had been shifted to *Sweet* work.

10. There is a substantial backlog of *Sweet* work. As of May 13, 2025, there had been a total of 12,800 *Sweet* complaints received by the Office of the Ombudsman. Of these, approximately 3,400 (27%) had been resolved.

11. Any suggestions made by caseworkers or supervisors to expedite the processing of *Sweet* relief were rejected by the current Executive Director of the Office of the Ombudsman. The

4

Executive Director acknowledged that we would be doing our work in a way that was "more painful" and "slower" and in a way that "won't work as well."

12. Dispute resolution case closures have precipitously declined since the mass RIF and up to my departure. In the months preceding the RIF, case closures by the Dispute Resolution Division ranged from approximately 250 to 430 cases closed per month. In March, the month of the mass RIF, 156 cases were closed. In April, the month after the mass RIF, only 20 cases were closed. And from May 1 through May 20, just before I left the Department, 67 cases were closed, due to the efforts that I and another departing supervisor made to close cases where possible before our separation dates. This means that the cuts to the Ombudsman's Office have resulted in several hundred fewer people getting assistance and getting their cases resolved just in the months of March, April, and May.

13. As of May 21, 2025, new dispute resolution cases continued to flow from borrowers and Congressional offices into queues maintained by Federal Student Aid—including four queues that Dispute supervisors had historically been responsible for keeping empty via the assignment of cases to caseworkers. However, on management's direction, new dispute resolution cases have not been allocated to individual caseworkers. As a result, as of May 21, 2025, there were 1,121 cases sitting in queues that had not been assigned to any caseworker. Combining those cases with cases assigned to caseworkers who have separated from service or been reassigned to other tasks, as of May 21, 2025, there were a total of 3,078 cases sitting in queues in the Ombudsman's Office and not being worked by any member of the staff.

14. Based on my experience as a caseworker and supervisor, after the mass RIF and reassignment of Dispute Resolution Division employees to other tasks, the Ombudsman's Office

has not been fulfilling and cannot fulfill its statutory mandate "to provide timely assistance to borrowers of loans made, insured, or guaranteed under" Title IV. 20 U.S.C. § 1018(f)(1).

15. Also based on my experience as a caseworker and supervisor, after the mass RIF and reassignment of Dispute Resolution Division employees to other tasks, the Ombudsman's Office has not been fulfilling and cannot fulfill its statutory mandate to "receive, review, and attempt to resolve informally complaints from borrowers of [Title IV] loans . . . , including, as appropriate, attempt[ ] to resolve such complaints within the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in" Title IV loan programs. *Id.* § 1018(f)(3)(A).

16. Additionally, it is my understanding that as of April or early May 2025, federal student loan borrowers who are eligible for income-based repayment cancellation were still not having their loans cancelled—a process that has been paused since July 2024—despite the statutory obligation to do so. Federal student loan borrowers who are enrolled in an income-based repayment plan are statutorily entitled to cancellation of the outstanding balance of their loans once they have made 20 or 25 years of payments on those loans, depending on when they took those loans out. *See* 20 U.S.C. § 1098e(b)(7) (stating that "the Secretary *shall repay or cancel* any outstanding balance of principal and interest due on" eligible loans for eligible borrowers (emphasis added)). Without Dispute Resolution Division staff focused on dispute resolution cases, it is unclear who will resolve borrower complaints about these statutory failures on the part of FSA.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 17, 2025.

Alyssa Picard