# Exhibit BBB

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

### DECLARATION OF HANNAH SECKA

I, Hannah Secka, declare as follows:

1. I am over the age of 18 and competent to testify to the matters described below. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a resident of Florence County, South Carolina. I am a current member of the Florence Branch of the National Association for the Advancement of Colored People ("NAACP") and have been for several years.

3. My adult son, Moudou-Yasen, graduated from public school in Florence in June 2022. Moudou-Yasen suffered a traumatic head injury as a child and is disabled. He has cerebral palsy, autism spectrum disorder, epilepsy, narcolepsy, sleep apnea, and multiple other disabilities. These disabilities affected his educational development in school.

4. Moudou-Yasen was given an Individualized Educational Program ("IEP") while he was in school. This IEP provided him with a number of resources that helped him to navigate his

education as a disabled student. In particular, Moudou-Yasen's IEP provided him with specially-designed education resources; physical and behavioral therapy from trained professionals; speech language therapy for a pragmatic speech delay; and a one-on-one paraprofessional who assisted and accompanied him to every one of his classes every single school day.

5. The staff who worked with Moudou-Yasen were critically important for his educational growth and development. They understood his needs and his learning styles and advocated for him even when other teachers did not. It is largely because of them that Moudou-Yasen was able to graduate high school and is now a successful adult who holds a well-paying job, even though many people had long predicted that his disabilities would be an absolute barrier to his life goals and accomplishments.

6. Sadly, while Moudou-Yasen was in school, he was repeatedly subjected to horrific and heartbreaking discrimination on the basis of his race and his disability status. This discrimination came both from other students and from school employees, and on multiple occasions, rose to the level of serious physical or sexual harm.

7. I have always taken it upon myself to be Moudou-Yasen's advocate. Consequently, whenever Moudou-Yasen was subjected to unlawful discrimination at his school, I sought to communicate with school officials to remedy the harm Moudou-Yasen suffered. If informal methods of resolution proved unsuccessful, I regularly turned to the Department of Education's Office for Civil Rights ("OCR") to find relief.

8. I first filed a case with OCR in approximately 2014, seeking to address serious abuse that was directed at my son. In the decade since then, I have filed approximately ten other OCR complaints. Over the years, some of these OCR complaints have resulted in changes to

practices in Moudou-Yasen's school district, such as the institution of new discrimination-related training requirements for school staff.

9. In 2021, I was sued by Moudou-Yasen's school district. I believe that this litigation was meant as retaliation against my son and me for our efforts to hold Moudou-Yasen's district accountable for discrimination my son suffered at school. I have defended myself in those litigation proceedings, which are still ongoing; however, as a separate measure, I filed an OCR complaint against the school district, alleging retaliation.

10. I have been diligent about staying up-to-date on the status of this OCR complaint, as well as other ones that remain pending on Moudou-Yasen's behalf. I regularly email or call the investigators that are assigned to my case.

11. On July 11, 2024, I reached out to OCR to get an update on my complaints. On July 12, 2024, I was connected with an OCR attorney. That attorney and I scheduled a call for July 15, 2024.

12. On that July 15 call, the OCR attorney asked whether I would be amenable to having a mediation to attempt to resolve my complaint. I told the attorney that I would be happy to mediate the case, and he indicated that he would seek to facilitate a mediation as soon as practicable.

13. On that occasion and on other occasions, I have told OCR attorneys that a prompt mediation is critical for my case. That is because I am still embroiled in expensive, time-consuming, and stressful litigation against the district, all of which I believe to be retaliatory. An OCR-facilitated mediation would help to resolve both my complaint and the district's litigation and would greatly improve my wellbeing.

3

14. I continued to communicate with OCR after that. On December 5, 2024, I was contacted by OCR to facilitate Moudou-Yasen's signing of a consent form. I replied that same day and exchanged more emails with OCR until December 9.

15. Beginning in January of 2025, I reached out to OCR attorneys multiple times to forward evidence related to my cases or to seek updates. I sent OCR multiple emails on January 15 and January 16; an email on January 20; an email on January 22; an email on January 24; and an email on February 12. I did not receive responses to any of these emails, even to acknowledge receipt.

16. I emailed OCR attorneys again on May 3, 2025, to seek an update. No one responded, but I did receive an auto-reply email from one of the attorneys which indicated that she was away on "extended leave." Her auto-reply directed me to reach out to a different OCR attorney.

17. I emailed that other OCR attorney on May 6, 2025, with several other OCR investigators copied. On May 9, I received a three-sentence reply indicating that OCR could provide no updates to my case. That reply made no mention of the mediation which had been offered to me nearly a year ago now.

18. I replied to that email that same day to ask about the current status of the investigation, and about the current status of my other OCR cases which remain open. As of the date of signing this declaration, I have received no response to that message, and have heard nothing else from OCR at all, despite multiple OCR employees being listed on my emails.

19. Ultimately, despite sending a multitude of emails to OCR since January 2025, I have received only a single reply which contained no substantive updates and no indication that my case is still being processed. This experience differs from my previous interactions with OCR.

4

Indeed, when I interacted with OCR in July and December of 2024, I received prompt replies via email and phone and was explicitly told that a mediation would be forthcoming.

20.     This continued delay in my case has proved to be a serious burden to me. I had expected that the mediation which was first proffered to me nearly a year ago would have taken place by now, but it has not, and there is no indication that it will be scheduled soon. While I wait for the mediation, I must continue to defend myself pro se from retaliatory litigation, all while continuing to provide for myself and my family.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 10, 2025.

_Hannah L. Secka_

Hannah Secka