# Exhibit DDD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR |

**DECLARATION OF DEBORAH SPITZ**

I, Deborah Spitz, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of Virginia. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I was employed by the U.S. Department of Education ("the Department") from September 1996 to May 1999 and from February 2006 until my retirement effective March 31, 2025.

3. I hold a Master of Science in education psychology from George Mason University, a juris doctor from Stanford Law School, and a Bachelor of Arts in English from the University of Arizona.

4. I spent most of my entire career at the Department in the Office of Elementary and Secondary Education ("OESE"). OESE's mission is to empower states, districts, and other organizations to meet the diverse needs of every student by providing leadership, technical

assistance, and financial support. OESE is responsible for directing, coordinating, and recommending policy for programs designed to:

    a. Help State and local educational agencies ("LEAs") improve the achievement of preschool, elementary, and secondary school students;

    b. Support equal access to services to help every child achieve;

    c. Advance academic achievement at the State and local levels, so that every child receives an education that meets their unique needs regardless of income, zip code, or ability; and

    d. Provide financial assistance to LEAs whose local revenues are affected by Federal activities.

    5.    When I returned to the Department in 2006, my work focused on early childhood and literacy programs. In 2016, I took on a new role in OESE's Office of School Support and Accountability ("SSA"), which is responsible for managing formula grants to states on behalf of K-12 schools under the Elementary and Secondary Education Act of 1965 ("ESEA"), as amended by the Every Student Succeeds Act. SSA is committed to supporting States as they implement Federal grant programs. Key SSA activities include:

    a. Reviewing and approving Consolidated State Plans (the applications states submit to receive ESEA formula funds) and any proposed amendments to each State's plan;

    b. Reviewing and resolving states' requests for waivers of ESEA requirements;

    c. Overseeing Department peer review of State assessment systems; and

    d. Reviewing and responding to states' annual performance reports regarding their implementation of ESEA programs and other monitoring functions.

6.  From September 2016 until August 2020, I held the position of senior member of SSA's assessment team. In this role, I provided support to state agencies in the implementation of Titles I, II, and III, including facilitating assessment peer reviews, managing the Enhanced Assessment Instrument Grants program, and supporting the creation of the Innovative Assessment Demonstration Authority and Competitive Grants for State Assessment. I managed the team reviewing legal and policy questions regarding assessment, including assessment of students with disabilities and English learners.

7.  In August 2020, I became a Group Leader in SSA and remained in this role until March 31, 2025. My group members were the program officers for formula grants awarded to states under ESEA Title I-A for students in foster care, I-D, for neglected and delinquent youth, ESEA Title II, for professional development, and Title VII-B of the McKinney-Vento Homeless Assistance Act, for students experiencing homelessness. I also managed Title III, English Language Acquisition, until this program was moved to another office in 2024.

8.  As Group Leader, I managed between 8 and 10 Department employees who administered these programs after grant allocations were made to states according to the statutorily mandated formulas. In this post-award phase, my team provided technical assistance to recipient states regarding permissible uses of formula dollars and program implementation, reviewed grant recipients' expenditures and compliance with grant conditions, collected and analyzed the data submitted by SEAs to the Department's EDFacts platform, as required by law, and reviewed SEA requests for waivers of requirements under the statutes we administered. To complete these tasks, we collaborated closely with 5-6 program attorneys in the Department's Office of General Counsel ("OGC"), who provided advice and counsel on how to respond to states' inquiries about statutory grant requirements and allowable expenditures of program funds.

9. My team was also responsible for carrying out the Department's required monitoring and oversight of grantees. This work involved informal and formal monitoring of 3-4 states each year to ensure their compliance with required protocols, including timely submission of progress reports and data collected from LEAs, and other statutory conditions of continued funding. When we found grantees to be out of compliance with statutory requirements, we would write reports describing the alleged violation. States were required to respond to these reports. An insufficient response and subsequent failure to come into compliance could result in the imposition of grant conditions or placement on high-risk status, and potentially the loss of grant funding. The loss of funding was an extremely rare occurrence.

10. Our team's work came to a halt soon after January 20, 2025, when OESE offices were directed to cease all communications with SEAs. This order ended nearly all technical assistance and office hours we had previously offered states, which had included creating power points and distributing guidance materials. The office hours provided grantees the opportunity to ask questions of members of our team about the various grants we oversaw. Prior to January 2025, members of my team would interact on a daily basis with grantees.

11. After January 20, 2025, our unit was not allowed to provide materials or hold webinars for SEAs to support their compliance with statutory requirements and conditions for the grants they received. We were only able to hold very limited office hours during which we could not provide materials or provide legal or policy answers. We could only answer simple questions or point the grantee to the existing guidance.

12. As of March 11, 2025, numerous OESE roles related to supporting administration of the ESEA formula grants were abolished as part of the mass Reduction in Force ("RIF"), and the employees in those positions were placed on administrative leave. Supporting staff who were

4

put on leave included staff working on contracts, personnel, attorneys, risk management, communications, monitoring, and the entire State and Grantee Relations team, which was the team that worked on COVID recovery programs.

13. Within the OESE Executive Office, the staff who handled Freedom of Information Act ("FOIA") requests, publications staff, and data analysts were placed on administrative leave and received RIF notices to be effective in June 2025. Based on my expertise, these changes may mean that FOIA requests are not receiving responses, and Department publications providing guidance to SEAs on statutory compliance, among other topics, are not being created or disseminated.

14. Likewise, due to the elimination of OESE's data group, and the data experts formerly employed in the Department's Institute of Education Sciences, the grant-related data states submitted to EDFacts as required by statute and regulations is not being analyzed. ESEA formula allocations are calculated using data from Census and the National Center for Education Statistics, data provided by SEAs and LEAs, including student assessment data, and LEA student counts. Under the Paperwork Reduction Act, OESE must request clearance from the Office of Management and Budget to collect this statutorily required data through a survey. But this year, the clearance process was halted, preventing the distribution of the updated EDFacts surveys as of March 31, 2025.

15. Also among the employees placed on leave were all of the OGC program attorneys who had been responsible for reviewing legally compliant answers to SEAs' technical questions regarding the statutory conditions and restrictions on grants and permissible uses of funds. Based on information and belief, these program attorneys received reduction in force notices as of April 11, 2025, and will be terminated as of June 12, 2025.

16. It is my understanding that SSA is severely limited in its ability to respond to any SEA questions that might have legal implications, in the absence of legal advice. Without responses from the Department, SEAs may be overly cautious in approving LEAs' grant fund expenditures or may fall out of compliance with grant requirements. These violations could be revealed in later audits or monitoring and could lead to consequences including the loss of grant funding. Our OGC colleagues also reviewed information my team gathered during state monitoring to assess whether the SEA under review was in compliance with statutory requirements. Without this legal advice, the Department may not be able to conclusively determine whether an SEA is in violation of statutory requirements.

17. Based on my extensive experience within SSA and OESE, the termination of OESE and OGC employees who supported SSA's performance of mandatory monitoring, accountability, and implementation functions under the ESEA will prevent SSA from fulfilling its statutorily required roles of monitoring formula grant recipients' compliance with all applicable conditions and reporting needs, including mandatory data collections.

I declare under penalty of perjury under the laws of the United State that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 13, 2025.

_____
Deborah Spitz