# Exhibit EEE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF LISA TESSITORE

I, Lisa Tessitore, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a resident of Florida. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I began working at the U.S. Department of Education's ("the Department") office of Federal Student Aid ("FSA") in November 2011, serving in supervisory roles beginning in 2014. Prior to working at FSA, I worked in the private sector with guarantors, lenders, and servicers to enhance and build products and services for borrowers and schools.

3. From February 2020 through January 2025, I oversaw 60 full-time employees (hereinafter referred to collectively as "vendor oversight employees") who were responsible for ensuring that the Department's student-facing vendors (e.g., loan servicers and debt collectors)

complied with all statutory, regulatory, and contractual requirements.[1] During that time, I served as Director of the Vendor Oversight Group within the Office of Student Eligibility and Aid Delivery.

4. In February 2025, the Department conducted a reorganization, and I became the director of the Vendor Oversight Division. The 60 vendor oversight employees were reassigned to three different offices:

　　a. The Vendor Oversight Division, under the Office of Strategic Acquisitions Planning, was tasked with holistically monitoring FSA's portfolio of vendors, servicers, Business Process Operations ("BPOs"), and the National Student Loan Data System ("NSLDS"), to make sure these groups were meeting their contractual and regulatory requirements. My position and a small number of vendor oversight employees are assigned to this division.

　　b. The Vendor Performance Division, under the Office of Loan Portfolio Management, was where a majority of the vendor oversight employees are assigned and was responsible for monitoring service-level agreements ("SLAs"), which are discussed in more detail below.

　　c. The Program Management Division, also under the Office of Loan Portfolio Management, is responsible for ensuring that servicers' internal controls comply with federal agency obligations under Office of Management and Budget Circular A-123.

5. FSA's statutory obligations vis-à-vis loan servicers are codified in the statute creating FSA as a "Performance-Based Organization," or "PBO." *See* 20 U.S.C. § 1018. Pursuant

---

[1] Prior to a recent, large-scale reorganization effort that took effect in February 2025, all vendor oversight employees were assigned to what was known as the Vendor Oversight Group ("VOG"), of which I was the Director.

to that statute, FSA "shall be . . . responsible for managing the administrative and oversight functions supporting" Title IV programs. *Id.* § 1018(a)(1). Those statutorily mandated functions for which FSA "shall be responsible" include "[t]he administrative, accounting, and financial management functions for" Title IV programs,

> including . . . the collection, processing, and transmission of data to students, institutions, lenders, State agencies, and other authorized parties; . . . all aspects of contracting for the information and financial systems supporting the Federal student financial assistance programs authorized under subchapter IV; . . . providing all customer service, training, and user support related to the administration of [Title IV programs]; and . . . ensuring the integrity of the Federal student financial assistance programs authorized under subchapter IV.

*Id.* § 1018(b)(2).

6. Further, the statutorily designated "purposes" of FSA are:

> (A) to improve service to students and other participants in the student financial assistance programs authorized under subchapter IV, including making those programs more understandable to students and their parents;
>
> (B) to reduce the costs of administering those programs;
>
> (C) to increase the accountability of the officials responsible for administering the operational aspects of these programs;
>
> (D) to provide greater flexibility in the management and administration of the Federal student financial assistance programs;
>
> (E) to integrate the information systems supporting the Federal student financial assistance programs;
>
> (F) to implement an open, common, integrated system for the delivery of student financial assistance under subchapter IV; and
>
> (G) to develop and maintain a student financial assistance system that contains complete, accurate, and timely data to ensure program integrity.

*Id.* § 1018(a)(2).

7. As the Director of the office that included FSA's vendor oversight employees until February 2025, I worked to fulfill the aforementioned statutory functions and purposes in oversight of FSA's vendors (i.e., loan servicers). To that end, one of the responsibilities of vendor oversight

3

employees was to regularly track data on the processing of various statutorily mandated Title IV programs. For instance, the statutes and regulations speak about borrowers' rights to choose their loan repayment plan in mandatory terms. *See id.* § 1087e(d) (emphasis added) (stating that "the Secretary *shall* offer" federal direct loan borrowers "a variety of plans for repayment of such loan, including principal and interest on the loan," and that "[t]he borrower may choose" among a statutorily mandated set of plans, to the extent that they are eligible); 34 C.F.R. §§ 685.209–210 (establishing income driven repayment plans and describing borrowers' prerogative to choose an eligible repayment plan).

8. To ensure that servicers were implementing and operating those Title IV programs in accordance with statutory mandates, vendor oversight employees were responsible for analyzing servicers' processes in fine-grained detail: i.e., how many applications are coming in, how long it takes to process them, the status of applications, whether the servicer properly processes the application and communicates accordingly with the borrower, and why there may have been anomalies or slowdowns in any of the steps of that process. The vendor oversight employees who I oversaw also performed these detailed analyses for servicers' implementation and operation of other statutorily mandated Title IV programs, such as Public Service Loan Forgiveness ("PSLF") and Loan Discharge for Total and Permanent Disability. *See* 20 U.S.C. § 1087e(m)(1) (emphasis added) ("Secretary *shall* cancel the balance of interest and principal due" for people who have satisfied the conditions of PSLF.); 34 C.F.R. § 685.219 (emphasis added) (lays out, *inter alia*, criteria under which "[a] borrower *will be considered to have made*" a qualifying monthly payment towards PSLF); 20 U.S.C. § 1087(a) (emphasis added) ("If a student borrower . . . dies or becomes permanently and totally disabled . . . the Secretary *shall* discharge the borrower's liability on the loan . . . .").

9. When vendor oversight employees identified irregularities in servicer processing of statutorily mandated Title IV programs, they communicated with the servicer and identify the underlying problem. That often resulted in the vendor having to change their processes or update their systems to align with program regulations, resulting in potentially righting a wrong with a borrower or set of borrowers that were harmed.

10. Sometimes those close reviews were initiated by vendor oversight employees, based on regular, periodic, or system-specific reviews. Other times, they were responsive to complaints that come through the Ombudsman's Office. And other times they were based on borrower complaints reported to FSA by the vendors' front-line customer service representatives. The vendor oversight employees' ability to record and advise of corrections to servicer processes based on their own detailed analyses, customer service reports, and Ombudsman complaints was critical to ensuring that the Department complies with its obligations to student borrowers under the law.

11. Additionally, under the Unified Servicing and Data Solution ("USDS") contracts with servicers that went into effect in 2024, there is a mechanism by which FSA can reduce payments to servicers based on poor performance and incentivize them to fulfill FSA's statutory and regulatory obligations to borrowers. USDS contracts with servicers contain Service Level Agreements ("SLAs"), which are specific, basic performance metrics that servicers must meet in six areas: "Customer Satisfaction," "Interaction Quality," "Processing Accuracy," "Timeliness," "Call Center Abandon Rates," and "Financial Reporting." If a servicer fails to meet a given SLA metric, it receives a negative performance incentive, which is a financial penalty reducing the amount of FSA's bill to that servicer. The worse the performance, the more negative performance incentives, and the less money FSA pays.

12. Vendor oversight employees measured two SLAs—interaction quality and processing accuracy—and work with servicers to develop and implement plans to improve their performance across five of the six SLAs. To measure interaction quality, those employees reviewed thousands of hours of recorded phone calls between borrowers and servicers. They also conducted secret shopper calls with servicers. To measure processing accuracy, vendor oversight employees reviewed servicer processing data to determine whether there were any areas in loan processing and servicing in which the servicers were failing to satisfy contractual or statutory obligations to FSA or to borrowers. Absent a specific borrower complaint, vendor oversight employees were the only staff within FSA that reviewed accounts at this granular level. My understanding is that no employees are currently assigned to measure the SLAs for interaction quality or processing accuracy.

13. In late February, FSA directors were asked to submit lists to our supervisors describing which of our functions are statutorily required, which we understood were being considered in the planning for a Reduction in Force ("RIF"). To the best of my recollection, the entire process of identifying these statutory functions for review took place over the course of about two weeks and was due on Friday, March 14th. However, the process was cut short by the March 11 mass RIF.

14. Even though I never received a mission statement for the Vendor Oversight Division, I worked with my director, Calvin Mitchell, on multiple drafts of the list of statutorily required functions, which included my division's responsibility for the PBO Statute and Title IV's oversight functions.

15. I also assisted the Office of Loan Portfolio Management with a list of statutory duties for the responsibilities that had been under my oversight before the February reorganization.

6

At the time, I felt confident that because the vendor oversight employees performed vital oversight work mandated by statute, they would all be safe from the RIF.

16. Despite the fact that the Vendor Oversight Division and the Vendor Performance Division were both responsible for statutorily required functions, I learned on March 11, 2025, that both divisions were abolished in the RIF. That day, I received an email from the Department's Chief Human Capital Officer, Jacqueline Clay, stating, "your organizational unit is being abolished along with all positions within the unit—including yours."

17. Following the March 11th RIF email, I was immediately incapacitated from completing my work functions. My work cell phone was shut down. I had no ability to send emails outside of the Department. I could no longer access Microsoft Teams, which we used for staff meetings, or SharePoint, which we used to save and share documents. I needed to call into meetings using my personal cell phone. At that point, we did not know who had been subject to the RIF and who remained, so I had no way of knowing to whom to transfer my work, if anyone. I asked how I should transition my work and did not receive a response before March 21, 2025, when I was placed on administrative leave. My administrative leave started the day after the President issued Executive Order 14242 (the "EO"), directing the Secretary of Education to take all necessary steps to facilitate the closure of the Department of Education.

18. After I was placed on administrative leave, an automatic reply was set up for my work email address falsely claiming the following: "Tessitore, Lisa is currently engaged in closing out their work activities and responsibilities as part of a planned transition. They are working to ensure a smooth handover of key matters." I received this message when I emailed my work email address from my personal one on April 1, 2025. A true and accurate copy of this automatic reply is attached hereto as **Exhibit 1.** Because I regularly speak to my colleagues who were also subject

to the mass RIF, I understand that the same automatic reply message was applied to their work email addresses as well.

19. On April 10, 2025, I received an "official reduction in force (RIF) notice" to my personal email address.

20. Because the RIF was administered by eliminating entire units, like the Vendor Oversight and Vendor Performance Divisions, the Department has lost critical institutional knowledge for ensuring proper oversight of Title IV programs. It is my understanding that no employees are currently assigned to do the statutorily required functions assigned to the Vendor Oversight and Vendor Performance Divisions.

21. I do not believe it is possible for the Department to fulfill its statutory vendor oversight functions after abolishing the Vendor Oversight Division and the Vendor Performance Division and eliminating approximately 50% of the staff across FSA. Furthermore, because the Department has lost all individuals with knowledge and experience in performing specific statutorily mandated FSA oversight duties and failed to transition our work, I doubt that FSA is equipped to access the nearly 60 systems that we use to monitor vendors and servicers. Nor do they have the capacity, in skills or size, to maintain the rigorous pace of oversight needed.

22. Even before the mass RIF, vendor oversight efforts had been long understaffed. When we had insufficient capacity, we were required to reduce the number of reviews we could complete of each vendor. We also were required to increase the margin of error of our reviews by either reducing our sample size or raising the percentage value of our margin of error.

23. In prior planning and staffing exercises conducted across FSA with the Boston Consulting Group, it was calculated that FSA needed between 90 and 100 vendor oversight employees to attain optimal oversight based on applicable regulations and contractual obligations.

Thus, before the RIF and the EO, we were already operating from a disadvantage with 60 employees.

24. I am concerned that without the Vendor Oversight Division and Vendor Performance Division, borrowers and taxpayers will be harmed in several ways. Servicers will, as they have in the past, ignore requirements and regulations. An understaffed FSA is likely to instruct servicers incorrectly.

25. The SLAs in the USDS contract were designed to achieve better outcomes on performance. It makes no sense to eliminate divisions like the Vendor Oversight and Vendor Performance Divisions that have saved the government, in a short time, tens of millions of dollars. As just one example, we identified one of our servicers who had conducted improper FSA invoicing because a vendor had charged too much per item, amounting to over $12 million in overcharges.

26. In other cases, our oversight work has uncovered vendors that improperly billed consumers, sent improper notices or incorrect dollar amounts, set up accounts for automatic withdrawal when they should not have, put borrowers in the wrong repayment programs, and simply never notified a borrower of information as required. When we found these errors, we set up corrective action plans and worked with the contracting officer to stop payments for improper services under the SLAs and USDS contract. We also monitored contracts to ensure that they were meeting their benchmark timeframes for completing conditions in their SLAs.

27. If errors are not caught quickly, it costs more to correct the problem down the road, as the error grows in both number of impacted borrowers and loans, as well as time to unwind the errors and reset the loans. Additionally, if errors exist but are not caught at all, servicers will not receive deserved negative performance incentives, and FSA will pay more than it should. Without

this work, borrowers will be left to fend for themselves, and no one is left to enforce the terms of FSA contracts.

28.	The Vendor Oversight Division is also responsible for overseeing the NSLDS, which is the main database through which critical data about borrowers' loans are kept, including data from schools and servicers that control new award amounts, loan balances, and repayment information. NSLDS is used to perform various functions for the Free Application for Federal Student Aid, loan processing, payment plan eligibility, and loan forgiveness and discharge. NSLDS is used by the Department, auditors, schools, and servicers. We have found incorrect data in NSLDS, which could be the result of vendor error. We bridged the gap in identifying the correct data and ensuring it was used to prevent problems for servicers and borrowers.

29.	If this oversight does not occur, it could result in myriad malfunctions in the student aid system, including listing incorrect balances, incorrectly preventing borrowers from taking out loans they should have access to, or incorrectly failing to properly cancel loans and credit payment counts. Those errors can affect borrowers' credit reports and prevent them from receiving refunds they are owed. Without the work of the experienced oversight staff in the Vendor Oversight and Vendor Performance Divisions, FSA will be unable to ensure that Title IV student financial aid programs function with integrity.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 11, 2025.

_Lisa Tessitore_
Lisa Tessitore