# Exhibit GGG

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br>    *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br>    *Defendants*. | Civil Action No. 25-965-JRR |

## DECLARATION OF MARY WALL

I, Mary Wall, declare pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. From March 2023 to January 2025, I served as the Deputy Assistant Secretary for P-12 Education in the Office of Planning, Evaluation, and Policy Development at the U.S. Department of Education ("OPEPD"). OPEPD is the policy clearinghouse for the Department of Education ("the Department"). OPEPD has three primary responsibilities: preparing the annual budget request for the Department (including engaging with members of Congress and the public to promote and defend it), and implementing the final enacted budget; overseeing the Department's discretionary grantmaking functions, to ensure timely distribution of all competitive funding allocated by Congress, and in alignment with the administration's priorities; and leading policy decision-making across Pre-K–12 and higher education that impact a variety of agency components. In my experience, nearly all agency actions that contained substantive policy implications—including on budget, personnel, and beyond—was led or reviewed by OPEPD to ensure the action was aligned with the Department's other work and with the administration's

priorities. As the Deputy Assistant Secretary for Pre-K–12 Education, I served on the leadership team of OPEPD, reporting to the Assistant Secretary. From late 2023 onward, I simultaneously performed duties and responsibilities of the higher education equivalent of my position in an informal capacity, following leave and departure of the incumbent.

### **Grantmaking**

3. Congress typically establishes grant programs and funding streams through authorizing statutes, and funds them through appropriations statutes.

4. The Department manages two types of direct grant programs: formula and competitive. Formula grants are noncompetitive awards allocated based on formulas set by statute. Competitive grants (also known as discretionary grants) allow the Secretary to use discretion, within the bounds of the statutes, regulations, appropriations language, and other provisions governing the programs, to run funding competitions using peer review processes to select recipients based on established criteria, generally regulated by the Department. For competitive grants, the Department generally sets priorities through rulemaking, then runs competitions based on those priorities, alongside other parameters established in statute or regulation. After grant notices are issued, program offices forge ahead with administration of the funding competition, with OPEPD components only re-engaging if and as issues present or when it is time to announce grantees. Potential grantees have a defined period of time (e.g., 30–90 days) to apply. The Department receives applications, and Department career staff facilitate a peer review process, by which parties external to the Department review submissions and evaluate quality based on the grant notice and statutory and regulatory criteria and then provide a score for each application. The outputs of the peer review process are then delivered back to Department career staff, who generally provide funding in rank order to as many applicants as possible within that year's appropriation.

5.  OPEPD has an important oversight role for successful implementation of competitive grants, helping to establish consensus across the agency and with agency leadership on priorities for grant competitions, as well as to ensure all grantmaking functions successfully occur on required timelines and within available budget, providing adequate time for prospective applicants to apply, and apprising parties external to the Department of the Department's intended direction (e.g., White House policy colleagues and Congressional authorizing and appropriating staff). My team partnered closely with colleagues in program offices to make sure competitions were being run on time so that obligations could be made prior to statutory deadlines (e.g., the end of the federal fiscal year ("FY")). We were particularly involved with competitive grants because the rulemaking process involves many policy decisions as the administration sets its priorities.

6.  On the formula grant side, the office that administers a grant, called a program office, would run the process, while continuing to closely engage OPEPD budget and grantmaking colleagues to ensure timely and accurate allocations. My team would stay informed to make sure all the steps were moving to get the money to grantees on time and following applicable requirements or directions.

7.  In my experience with the Department, the process of allocating and disbursing grants involves multiple offices. Many teams, including political and career leaders across offices, come together to finalize priorities and language for grant notices. After peer review processes generated scores for prospective grantees, the program office prepared funding slates, which are lists of grantees recommended for funding and the level of funding recommended for each grantee, based on both the applications as well as available funding. The Department's Budget Service, working in partnership with program offices, ensured that funding was correctly obligated and accounted for. Data arms, including the National Center for Education Statistics ("NCES") and in-

house data leads within program offices, helped to calculate inputs for formula funding. Attorneys in the Office of General Counsel ("OGC") were engaged throughout the process to help ensure statutory and regulatory compliance. The Office of the Secretary gave the final signoff for initial grants to be disbursed, and Assistant Secretaries for program offices provided final signoff for continuation awards.

8. At the Department, for formula funding, program offices publish notices of state plan requirements on the Department's website and in the Federal Register so that State Education Agencies ("SEAs") may submit required materials to demonstrate alignment with statutory and regulatory requirements to access funds. Program offices review state plans for satisfaction of applicable requirements, and notify states of specific conditions, including high-risk conditions, if they are not sufficiently meeting requirements. Where statutes or regulations require an application for formula grant funds, program offices develop applications and publish them in the Federal Register.

9. For substantive changes surrounding the allocation of formula grants, including changes to state plan requirements, the program office coordinates with OPEPD to discuss proposed changes and ensure alignment with the Secretary's and administration's priorities, while maintaining alignment with statutory and regulatory requirements.

10. Throughout the process of allocating formula grants, program office leadership generally kept me and my team informed on relevant steps, especially those that entailed substantive policy changes or updates. We resolved any problems that arose and addressed questions about any new issues. Because there is less discretion in the allocation process, those issues tended not to come up as often as for competitive grants.

11. My primary involvement with formula grants was in the grant administration process. Appropriators and authorizers in Congress were very focused on monitoring and implementation of the formula grant programs and associated requirements regarding accountability, assessment, and school improvement to ensure funds were used as Congress intended in Every Student Succeeds Act ("ESSA"). My team worked closely with the Office of Elementary and Secondary Education ("OESE") team to respond to those concerns and ensure funding and oversight were being implemented aligned to their prescribed purposes.

12. For competitive grants, the Department generally sets priorities, selection criteria, and other grant parameters by notice and comment. My team in OPEPD was involved in setting these parameters for each grant program as they came through the competitive process and signing off on all priorities. The Grants Policy Office, which reported to me, would shepherd the notices through those review processes.

13. Following notice and comment on regulation of priorities and selection criteria for a given grant program, a Notice Inviting Applications is published in the Federal Register. Grantees have a set period of time (e.g., 30–90 days) to apply, then funding recipients are selected through a peer review process. Peer review involves panels of external education professionals and practitioners who provide feedback on and score applications using criteria specific to each grant program. Using feedback and results from the peer review process, the Department ranks applications based on the selection criteria, following Education Department General Administrative Regulations ("EDGAR") requirements. The Department then funds as many applicants as possible, subject to level of appropriations and ongoing financial obligation (e.g., prior cohorts of grantees).

14.     In my experience as a political appointee, I was not involved in any part of the peer review or scoring processes, nor did I review the slates of proposed grantees. Career staff within OPEPD would keep regular contact with program offices to ensure progress of the competitive process. If needed, OPEPD would provide guidance on operational decisions, without knowing the identities of the actual applicants. Political appointees generally had the most active participation in the grantmaking process as priorities were developed and finalized through Notices of Proposed Rulemaking, Notices of Final Rulemaking, and Notices Inviting Applications. Political appointees again were involved as slates were approved through the Departmental clearance and lifted up in Department communications, so we could share news with the public about where Congressionally appropriated funds are going and how they advanced administration priorities. The Grants Policy Office within OPEPD ran point on ensuring slates were timely cleared in order to be obligated on time. Program teams created slates, cleared the slates through their program team leadership, and then the Grants Policy Office facilitated clearance with the Office of the General Counsel, Budget Service, and others to review for statutory compliance, budget, and other required provisions. They also reviewed to make sure that we were not awarding funds to applicants that are high risk. The process culminated with the Office of the Secretary for final approval.

**School Based Mental Health Services and Mental Health Service Professionals Grants**

15.     The 2022 Bipartisan Safer Communities Act appropriated $1,000,000,000 to fund two existing programs to address mental health needs of students: the School-Based Mental Health Services Grants Program ("SBMH") and the Mental Health Service Professional Demonstration Grants ("MHSP").

16.     Using the funds appropriated in the 2022 Bipartisan Safer Communities Act, as well as funding from annual appropriations in FY 2022 through 2024, the Department ran

6

competitions for both MHSP and SBMH. From the first competitions under the Biden-Harris administration, the Department made grant awards to more than 260 entities under the SBMH and MHSP programs in 2022 and 2023. As multiyear grant programs, the funding is delivered in installments over five years, with over $280 million delivered to grantees across both programs in the first year. Based on the applications received through grantmaking, the funding was projected to prepare and place about 14,000 mental health professionals in K-12 schools across the U.S. While this predates my service at the Department, for both programs, the Department proposed priorities, requirements, and definitions, and invited public comment. Proposed Priorities, Requirements, and Definitions—School-Based Mental Health Services Grant Program, 87 Fed. Reg. 47,152 (Aug. 2, 2022) (to be codified at 34 C.F.R. ch. II); Proposed Priorities, Requirements, and Definitions—Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 47,159 (Aug. 2, 2022) (to be codified at 34 C.F.R. ch. II). The Department considered the comments, then finalized those priorities, requirements and definitions. Department of Education, Final Priorities, Requirements, and Definitions—School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60,092 (Oct. 4, 2022) (to be codified at 34 C.F.R. ch. II); Final Priorities, Requirements, and Definitions—Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 60,083 (Oct. 4, 2022) (to be codified at 34 C.F.R. ch. II).

17. The Department then issued notices inviting applications for new awards in FY 2022, FY 2023, and FY 2024. *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60,137 (Oct. 4, 2022); *see also* Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 60,144 (Oct. 4, 2022); *see also* Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. 72,976 (Nov. 28, 2022); *see also* Applications for

New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173 (Mar. 1, 2024); *see also* Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 89 Fed. Reg. 15,180 (Mar. 1, 2024); *see also* Extension of the Application Deadline Dates; Applications for New Awards; School-Based Mental Health Services Grant Program and Mental Health Service Professional Demonstration Grant Program, 89 Fed. Reg. 34,225 (Apr. 30, 2024). The programs were significantly bolstered through the provision of BSCA funding, enabling the Department to reach significantly more students and schools with mental health supports through this landmark funding. Based on significant demand for the programs in 2022 and 2023, the Department supplemented funding through annual appropriations in the School Safety National Activities account, running additional competitions in later fiscal years.

18. As with all competitive grants, my team oversaw the grantmaking process for the SBMH and MHSP programs. For these grants, my team had an additional layer of oversight because the program was a signature initiative for President Biden and the administration's push to eradicate the dire effects of gun violence on young people, schools, and communities. I prepared memoranda for the Secretary and the President to keep them informed throughout the grantmaking process.

19. Following the peer review process of applications for the SBMH and MHSP competitions initiated in 2022 and 2023, over 260 grantees across 49 states were selected for funding. The grantees were SEAs, local education agencies ("LEAs"), and institutions of higher education. The first awards went out in December 2022; additional money was awarded for MHSP in March 2023. In FY 2024, the Department ran further competitions and made 69 awards in both the SBMH and MHSP programs through annual School Safety National Activities appropriations, with awards going out in October 2024. Department of Education, *School-Based Mental Health*

8

*Services Grant Program: Prior Year Awards*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/school-based-mental-health-services-grant-program#prior-year-awards. Department of Education, *School-Based Mental Health Services Grant Program: Current Year Awards*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/school-based-mental-health-services-grant-program#current-year-awards; Department of Education, *Mental Health Service Professional Demonstration Grant Program: Current Year Awards*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/mental-health-service-professional-demonstration-grant-program#current-year-awards; Department of Education, *Mental Health Service Professional Demonstration Grant Program: Prior Year Awards*, https://www.ed.gov/grants-and-programs/grants-birth-grade-12/safe-supportive-schools/mental-health-service-professional-demonstration-grant-program#prior-year-awards. The 2024 awards were funded through regular annual appropriations through the School Safety National Activities account.

20. On April 29, 2025, multiple news outlets reported that the Department provided notice of non-continuation of SBMH and MHSP grants to grantees. Michael C. Bender, *Trump Administration Cancels $1 Billion in Grants for Student Mental Health*, N.Y. Times (May 1, 2025), https://www.nytimes.com/2025/05/01/us/politics/trump-mental-health-grants.html; Cory Turner, *Education Department Stops $1 Billion in Funding for School Mental Health*, NPR (May 1, 2025), https://www.npr.org/2025/05/01/nx-s1-5382582/trump-school-mental-health.

21. The Department has discretion to not make a continuation award, but it is exceptionally rare for the Department to exercise that authority, particularly when appropriations for the grant program are already in hand. The most frequently occurring reason why the Department may not grant a continuation would be if the program received a cut in appropriations

9

from Congress. For example, in 2024, Congress imposed a $113 million cut on the Teacher and School Leader Incentive Program ("TSLI"), so the Department was not able to issue Non-Competing Continuation ("NCC") grants for the full amounts that grantees in the program expected that year, because appropriations were so severely reduced. But there was no such appropriations issue for the SBMH and MHSP programs. Congress had authorized and appropriated one billion dollars in BSCA in 2022, and the Department had been doing its duty by putting it out in installments over the five years following standard procedures for completing these grants.

22.  In my experience, aside from an appropriations issue, there are generally two reasons why the Department would not grant a continuation. First, a grantee carrying a large balance may not always receive their full next installment of funding on the standard schedule. In that situation, the Department might award $1 in continuation awards and still plan to provide additional funding and support to the grantee in the future but would wait for the grantee to spend down the balance it had in hand first. If at the end of the grant period the grantee had not made sufficient progress, it is possible overall grant funding could be reduced but only following repeated technical assistance with the grantee to understand and address causes of slowed spending. Second, if there were funding administration issues at hand with the grantee, such as a grantee not following a requirement of the program, that could justify the Department not granting a continuation in a given year. That would be a rare circumstance, and it was always preceded by the Department providing technical assistance to the grantee to address the issue in advance of taking any cancelation action. In either of those two circumstances, the decision not to grant a continuation would be individualized, not a blanket decision. Additionally, it is the exception, rather than the norm, that grantees would not receive their next installment of funding over a

multiyear grant cycle. Most Department grantees dutifully spend down the funding that was committed to them over time based on the project objective and plans they submitted and had evaluated through peer review in the grant competition. While some may need de minimis continuations (e.g., $1) in reflection of large available balances, most grantees show annual progress in advancing project activities and spending down their multi-year grant funding over time.

23. In my time at the Department and to my knowledge and recollection, the Department never terminated a grant because of disagreement with the underlying priorities of the grant program or with activities performed using competitive funding once awarded. Once Congress has authorized a grant program and appropriated funding for that program, the Department's responsibility is to faithfully implement the program, and we utilized peer reviewers to ensure that applications were evaluated and scored in alignment with program priorities and requirements. Accordingly, during my time at the Department, we implemented and administered grants that were initially awarded through competitions run during the first Trump administration. While we did not always agree with the premise or priorities of the programs as promulgated under the first Trump administration, we dutifully continued to implement them—in fulfillment both of Congressional intent of multiyear competitive funding as well as the grantees' expectations for multiyear support. Congress had appropriated funds for the programs, so the Department was obligated to implement the program.

24. To award the SBMH and MHSP grants, we followed the process required by regulations, in alignment with standard administrative grants procedures in both General Education Provisions Act legislation and EDGAR regulations. We set up competitions, regulated priorities, and gave an opportunity for public comment based on those priorities. Potential grantees

11

could choose whether to compete with those priorities. The current administration has claimed that the grant was terminated because grantees were using the funds to implement race-based actions. Bender, *supra*. That claim is entirely inaccurate. We lawfully regulated the priorities for the competition, including an optional priority in the MHSP competition to "increase the number of qualified school-based mental health services providers in high-need LEAs who are from diverse backgrounds or from communities served by the high-need LEAs." Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 87 Fed. Reg. at 60,146. "Diverse backgrounds" was defined flexibly in the notice: "backgrounds that reflect the communities, identities, races, ethnicities, abilities, and cultures of the students in the high-need LEA, including underserved students." *Id.* Despite the Trump administration's insistence to the contrary, that priority was evidence-based. It was also completely voluntary for grantees to respond to: it was not positioned as an absolute priority that applicants must respond to in order to compete for funding; it was positioned as a competitive priority that applicants could optionally write to for additional consideration. One way diversity could be considered in this priority was race, but it was not a requirement. Indeed, many applicants expressed plans related to other aspects of diversity, in efforts to better provide mental health supports for students. The grant also required that "[a]ll strategies to increase the diversity of providers must comply with applicable federal civil rights laws, including Title VI of the Civil Rights Act of 1964." *Id.* at 60,146 n.2. There is no truth to the idea that the program involved racial quotas. Grantees were invited to optionally provide plans to increase diversity of providers; those that chose to provide them had flexibility in how they defined diversity.

25. The purpose of these grants was to prepare and hire mental health professionals to serve in schools, a critically important goal to promote overall student health, wellbeing, and

12

academic achievement, and to address the soaring mental health challenges arising from the COVID-19 pandemic, community violence, and other adverse childhood experiences—challenges routinely cited by educators, medical professionals, and parents as the most important concern facing young people today. Taking mental health grant funding away from schools after they lawfully competed for it introduces the risk of harm to both school communities and students, especially in the face of continued violence that the statute where the mental health funding originated sought to address.

## Effects of RIFS

26. In my view, the Reductions in Force ("RIFs") that have taken place at the Department since January 2025 will undeniably impair the Department's ability to disburse and manage formula and competitive grants, fulfill all of its statutory requirements, and advance its mission of promoting student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access. Even for formula grants, for which many staff have remained in some program offices after waves of RIFs, there are myriad challenges to successful implementation of funding—from getting funding successfully out to States, to answering grantee questions about legal uses of funds, to overseeing the important oversight components of State accountability and assessment systems, and more. The reach of the RIFs across the Department will have an impact across funding streams and, more generally speaking, to understanding the true extent of educational progress that States and districts are making across the nation. For instance, the cuts at NCES could impair core data functions, such as the administration and analysis of the NAEP assessment to understand educational outcomes. NCES also historically played a role in calculation of funding allocations for programs like Title I-A, including working with the U.S. Census Bureau to obtain key data on student and family

characteristics like poverty levels, and providing additional input on high-stakes data calculations determining how much funding State and local education agencies would receive.

27. RIFs also decimated the team of attorneys focusing on K-12 issues in OGC. The elimination of that legal support is deeply harmful to the full, lawful, and proper implementation of grants as Congress intended. The primary recipients of the plurality of the Department's funding are State and local education agencies, which are subject to substantial turnover in their staffing and near constant implementation challenges. Without adequate guidance and support from the Department, including clear answers on legal uses of funds through OGC, states and school districts will not have proper understanding of what funding can and cannot do, and/or the requirements they must satisfy to receive (and continue to receive) any grants they are awarded. The result will be inconsistent and likely inequitable distribution of grant funding across states and school districts, the absence of effective oversight of implementation of statutory and regulatory components, and a diminished response to important purposes established by Congress to ensure that schools are making progress over time and demonstrating they are in fact improving achievement and results for all students.

28. Even while more limited than in other parts of the agency, the paring back of staff in the OESE and the Office of Special Education and Rehabilitative Services ("OSERS")—through both RIFs and various voluntary incentive packages—will also make it further challenging for the Department to meet its grantmaking obligations, based on my experience. While the Department is claiming that the RIFs did not affect the core functions in OESE or OSERS, I do not believe that is true. Through repeated culling of staff, of both a forced and a voluntary nature, the remaining team at the Department is running threadbare, experiencing further difficulty in implementing its statutory duties on time and with a level of quality that Congress and the public

14

demand. Reduced staffing will impair the Department's ability to apply uniform guidance across programs with massive dollars in funding and carry out essential grant administration functions on both the competitive and formula sides of grantmaking. Both OESE and OSERS administer very large, significant grant programs that States and school districts rely on. Any threat to their successful implementation represents material harm to these State and local entities and the students they serve, with reduced funding translating to removals of staff, elimination of services, diminutions of program quality, and overall lower service to delivery to families.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 23, 2025.

/s/ Mary Wall*
Mary Wall

*Plaintiffs' counsel hereby certifies that they have a signed copy of the foregoing document available for inspection.