# Exhibit JJJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, et al.,<br><br>*Defendants*. | Civil Action No. 25-965-JRR |

## **DECLARATION OF ELIZABETH WITT**

I, Elizabeth Witt, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Virginia. I am over the age of 18 and have personal knowledge of all facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I hold a Ph.D. in English from the University of Rochester, a master's degree in public affairs from the University of Texas at Austin, and a Bachelor of Arts in English from Agnes Scott College.

3. I worked for the U.S. Department of Education from July 2000 until my retirement in January 2024. For the last 20 years of my career in the Department, from November 2004 until January 2024, I was employed in the Office of Elementary and Secondary Education (OESE), School Support and Accountability Unit (SSA). SSA is responsible for managing formula grants awarded to states on behalf of K-12 schools under various provisions of the Elementary and Secondary Education Act of 1965 (ESEA), as amended by the Every

Student Succeeds Act. The formula grant programs within SSA's portfolio include ESEA Title I, for socioeconomically disadvantaged students, and Title II, for educator professional development, and Title VII of the McKinney-Vento Homeless Assistance Act, for students experiencing homelessness.

4. My most recent title at the Department was Education Program Specialist, GS-14. In this role, I led a team of program officers managing program administration and monitoring for ESEA Title II-A formula grant awards and wrote and edited policy and program documents related to Title II-A, including revisions of non-regulatory guidance, policy letters, and monitoring protocols. I also served as a program officer for ESEA Titles I-D and II-A, providing extensive technical assistance and advice to grantees on program implementation and grant fund expenditures and accounting.

5. In addition to my responsibilities as a team leader and program officer, I was a member of the OESE grant team responsible for calculating annual allocations for formula grants awarded under ESEA Titles I, II-A, III-A, and IV, and the McKinney-Vento Act. To prepare the allocations, I worked with one other staff member from OESE and staff from the Budget Services Office, in the Department's Office of Planning, Evaluation and Policy Development. We would input data into the formulas established by the legislation creating the grants using data submitted by states to the Department's EDFacts system, generated by the National Center for Education Statistics (NCES), or available from other sources . We would then run the formulas with the data inputs to calculate individual grantees' allocations under each of the grant programs.

6. Formula grant funds are distributed on July 1; most formula programs receive all their funds for the fiscal year on that date. A small number of formula programs, including Title

I-A and Title II, receive a second allotment of funds distributed on October 1. This distribution schedule is essential for budget planning of states and school districts, whose fiscal years typically begin July 1. To ensure that we could meet this timeline, my allocations team typically began preliminary calculations in January, after receiving data from NCES and Census and finalized appropriations numbers for the year; the Department cannot provide States with preliminary allocations until a budget is approved, which means that if a final budget is not passed by early January, provision of preliminary allocation information is delayed . Starting tin January whenever possible left us enough time to verify the accuracy of the allocations and to provide states with the preliminary allocation estimates before the first round of formula grant funds were distributed by July 1 each year.

      7.      For the July 1 distribution, my allocations team typically used State Per Pupil Expenditure (SPPE) data from the previous school year (e.g., the upcoming July 2025 distribution would use 2023-2024 data), but the second distribution, on October 1, would be adjusted based on more recent SPPE data (e.g., 2024-2025 school year). In my experience, OESE would typically receive the new SPPE data from NCES in August or September. After my colleagues agreed on the appropriate allocations for the formula grants we oversaw, the Assistant Secretary for Elementary & Secondary Education would provide final approval for the allocations, based on our calculations. Based on my experience, in past years, SSA prepared a joint slate memo for the seven formula programs it administered to go to the Assistant Secretary in mid-June to enable distribution of funds by July 1. The allocations team also completed calculations for Titles I-C and IV-A, and the slates for those grants would also go to the Assistant Secretary in mid-June to allow for distribution by July 1. A second slate was provided to the Assistant Secretary in mid-September for distribution by October 1, for the two programs that

provide a second allotment. Once the Assistant Secretary signed off on the allocations, Congress and the states were notified, and allocations were posted on the OESE and OPEPD websites.

8. Once funds are disbursed, states can make some adjustments to the Department's estimates for individual school districts' allocations based on criteria outside the formula (for example, the number of charter schools in the state or the amount of money the state reserves for program administrative costs), if allowed under the program statute. Districts, in turn, may adjust allocations to their different schools based on certain factors, like the number of students at each school who receive free or reduced price lunch. Otherwise, the states are required to sub-allocate grant funds to school districts based on the Department's calculations under the relevant statute's formula. States and districts both draw down their allocated funds over the course of the school year through a Department grants management platform.

9. Based on my experience at the Department and specifically as a member of the allocations team, I believe that the elimination of critical staff in OESE and NCES in the March 11 Reduction in Force leaves the Department unable to successfully administer the formula grant programs in compliance with the laws creating them. Even if the Department has access to the data and other resources needed to make this year's July 1 distributions, which normally would have been compiled and shared with OESE before the mass RIF, the removal of key staff and contracts will inevitably cause problems with future distributions, for several reasons.

10. First, the elimination of essentially all NCES staff and contracts will make it difficult, if not impossible, for the Department to update the data inputs required to run each formula on an annual basis. The necessary data inputs differ according to the terms of the relevant statute and come from a variety of sources. States submit data used for both program monitoring and allocations through the Department's EDFacts system. For example, state-

4

reported data on the number of students participating in the annual English Language Proficiency exam is one component of the formula to allocate Title III-A funds for English language acquisition services. Similarly, the Office of Migrant Education , which is part of OESE, provides data on the number of migrant school-age people that is used to calculate Title I-C allocations.

11.     Some of the most significant formula inputs come from the U.S. Census Bureau and NCES. The Census Bureau's American Community Survey (ACS) collects data on various social, economic, and housing conditions; data from this survey is used in allocating Title III-A funds. Other Census data are used directly in the grant formulas.  Small Area Income and Poverty Estimates (SAIPE) of the numbers of school-aged residents and school-aged residents who live in poverty in each school district are used to calculate allocations for several programs SAIPE estimates are used in all four Title I-A formulas, the Rural Low-Income Schools Program (RLIS) in Title V, and numerous other grant programs.

12.     NCES also calculates average state per-pupil expenditures (SPPE), as defined in the ESEA, which is a direct input in the allocation formulas set by statute for Titles I-A, I-D, and IV. In addition, SAIPE estimates and SPPE data both indirectly inform other grant programs, like Title VII of the McKinney-Vento Act, whose formulas are based in whole or in part on states' Title I-A allocations.

13.     All of the data used to calculate allocations must be as up-to-date and accurate as possible for the resulting award amounts to be compliant with the statutory formulas. But this is especially true for SPPE because of its importance in the Title I, IV, and McKinney-Vento formulas. The SPPE data must be the most current and reliable available, because a small change in SPPE can have a significant effect on grant allocations to states and to school districts as sub-

grantees. . As a result, if the calculations use prior-year SPPE data, states and school districts will not receive the amounts required by the Title I-A formulas. SPPE plays a similar role in the other formulas, meaning that inaccurate or outdated inputs will have similar impacts.

14. On information and belief, are few if any staff left in NCES or elsewhere in the Department to receive and review the financial data submitted by states and then calculate new SPPE figures for the 2024-2025 school year. In addition, the RIF eliminated all of the NCES contracting officers who would coordinate with Census and external contractors to facilitate the distribution of surveys, collect information from respondents, and analyze the data required for the formula grant allocation calculations. This means that the Department may have to use the 2023-2024 SPPE data for the October 1 distributions, which will almost certainly result in some states and school districts receiving less money than they are entitled to under Title I and other formulas.

15. Second, the loss of accurate data will impact OESE's ability to ensure that allocations are compliant with statutes and to respond to grantees' questions. In my experience, the Assistant Secretary, a political appointee who does not necessarily have a background in statistics or education finance, lacked the expertise and access to the data to determine if the allocations were correct and relied on the allocation team and data units to ensure smooth and error-free formula grant administration. As an example, if a state grantee had a question about an allocation, the Assistant Secretary would ask the allocation team to provide an explanation. But if the data on which the calculations are based is out-of-date, the allocation team will not be able to confidently determine whether the allocations are accurate or consistent with the formula.

16. Federal agencies are required to ensure that their programs are audited in line with the OMB Circular No. A-123, under the authority of the Federal Managers' Financial Integrity

Act of 1982, 31 U.S.C. § 3512. These audits are required to be carried out on a regular basis. Without an adequate number of program officers to perform monitoring and technical assistance, these audits (if they happen) are more likely to result in audit findings, which could result in a requirement that the funds be returned by the recipient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 29, 2025

Elizabeth Witt