# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
*et al.*,

                    Plaintiffs,

      v.

THE UNITED STATES OF AMERICA, *et al.*,

                  Defendants.

Civil Action No. 25-965-JRR

## BRIEF OF MEMBERS OF CONGRESS
## AS *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina Henry
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
miriam@theusconstitution.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Members of Congress state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .......................................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ............................................................................................................... 3

I.  The Authority to Create, Restructure, and Abolish Federal Departments and
    Agencies Belongs to Congress........................................................................... 3

II.  When Congress Wants to Give the President Authority to Reorganize the
     Executive Branch, It Does So Through Legislation ....................................... 7

III.  The Department of Education Is Statutorily Mandated, and President Trump
      Does Not Have the Power to Abolish It Unilaterally ..................................... 11

CONCLUSION............................................................................................................ 15

APPENDIX.................................................................................................................. 1A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................................................ 3

*Free Ent. Fund v. PCAOB*,
    561 U.S. 477 (2010) ..................................................................................... 1, 3

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................................... 7, 11

*Myers v. United States*,
    272 U.S. 52 (1926) .......................................................................................... 4

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*,
    462 U.S. 810 (1983) ........................................................................................ 6

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ..................................................................................... 4, 5

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ........................................................................................ 7

*The Pocket Veto Case*,
    279 U.S. 655 (1929) ........................................................................................ 7

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ........................................................................................ 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................ 3, 7, 14


CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1 .......................................................................................... 1, 3

U.S. Const. art. I, § 8 ............................................................................................... 3

U.S. Const. art. II, § 2 ............................................................................................. 3

U.S. Const. art. II, § 3 ............................................................................................. 2

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

STATUTES AND LEGISLATIVE MATERIALS

Act of July 27, 1789, ch. 4, 1 Stat. 28.................................................................... 4

Act of Aug. 7, 1789, ch. 7, 1 Stat. 49 .................................................................... 4

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ................................................................. 4

Act of Sept. 15, 1789, ch. 14, 1 Stat. 68 ............................................................... 6

Act of Apr. 25, 1812, ch. 68, 2 Stat. 716 .............................................................. 5

Act of July 4, 1836, ch. 352, 5 Stat. 107 .............................................................. 5

Act of July 4, 1836, ch. 357, 5 Stat. 117............................................................... 5

Act of Mar. 3, 1849, ch. 108, 9 Stat. 395.............................................................. 4

Act of July 20, 1868, 15 Stat. 92........................................................................... 12

Act of March 3, 1869, 15 Stat. 291........................................................................ 12

Act of June 30, 1932, Pub. L. No. 72-212, 47 Stat. 382 ....................................... 9, 11

Act of Mar. 3, 1933, Pub. L. No. 72-428, 47 Stat. 1489........................................ 9, 11

Act of Oct. 19, 1984, Pub. L. No. 98-532, 98 Stat. 2705....................................... 11

Act to Establish a Department of Education, Pub. L. No. 39-73, 14 Stat. 434 (1867) .......... 12

Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) ..................................... 5

Cong. Globe, 39th Cong., 1st Sess. (1866)............................................................ 12

75 Cong. Rec. (1932).............................................................................................. 8

83 Cong. Rec. (1938).............................................................................................. 10

Department of the Interior Appropriation Act for Fiscal Year 1931, Pub. L. No. 71-217, 46 Stat. 279 (1930) ............................................................................................ 12

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1520 (2010) ........................................................................................ 7

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 ..................................... 12

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012) ......................................... 8-11

Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* (2024) .................................................................... 6,

Henry B. Hogue & Rebecca R. Skinner, Cong. Rsch. Serv., R48425, *U.S. Department of Education: Background and Statutorily Established Officers, Positions, and Offices* (2025) .................................................................................................................................... 13

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ............................... 7

H.R. Doc. No. 95-296 (1978) ............................................................................................... 2

H.R. Rep. No. 91-1104 (1970) .............................................................................................. 6

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903 ...................................... 6

Pub. L. No. 91-375, 84 Stat. 719 (1970) .............................................................................. 6

Pub. L. No. 96-88, 93 Stat. 669 (1979) ............................................................................ 2, 13

Pub. L. No. 107-110, 115 Stat. 1425 (2002) ........................................................................ 15

Pub. L. No. 107-279, 116 Stat. 1940 (2002) ........................................................................ 15

Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561 ........................................ 10, 11

Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 ........................................ 10, 11

Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 ........................................ 11, 13

Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 ............................................... 11

Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192.................... 11

S. Rep. No. 95-1078 (1978) ............................................................................................ 12, 13

S. Rep. No. 96-49 (1979) ...................................................................................................... 12

5 U.S.C. §§ 901-12 ........................................................................................................... 2, 11

## TABLE OF AUTHORITIES – cont'd

Page(s)

6 U.S.C. § 291 ................................................................................................................ 7

12 U.S.C. § 5413 ............................................................................................................ 7

20 U.S.C. § 3411 ....................................................................................................... 5, 13

20 U.S.C. §§ 3401-3510 ...................................................................................... 2, 13, 14

EXECUTIVE BRANCH MATERIALS

Exec. Order No. 13,781, 82 Fed. Reg. 13959 (Mar. 13, 2017) ............................................ 11

Reorganization Plan No. 1 of 1939, *in* 53 Stat. 1423 ....................................................... 12

Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631 .................................................... 12, 13

Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 ........................................................ 8

Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 ........................................................ 8

Ronald Reagan, *Address Before a Joint Session of the Congress Reporting on the State of the Union*, 1 Pub. Papers 72 (Jan. 26, 1982) .................................................................. 3, 14

Statement About Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* (U.S. Gov't Printing Off., Wash. 1977) .......................................................................... 8

Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* (U.S. Gov't Printing Off., Wash. 1977) ............................................................................................................................ 9

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Tortuous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151 (2012) ........................................................................................ 5, 6

Patrick McGuinn, *Schooling the State: ESEA and the Evolution of the U.S. Department of Education*, 1 Russell Sage Found. J. Soc. Scis. 77 (2015) ............................................... 13, 15

Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189 (1986) ............................................................................................. 5

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Reagan Says He Won't Seek End to Education Dept. Now*, N.Y. Times, Jan. 30, 1985 ....... 3, 14

2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911) .............................. 4

Gerard Robinson, *A Federal Role in Education: Encouragement as a Guiding Philosophy*
   *for the Advancement of Learning in America*,
   50 U. Rich. L. Rev. 919 (2016)......................................................................... 12-14

## INTEREST OF *AMICI CURIAE*

*Amici* are members of Congress who are familiar with the Department of Education and the important work that it does for their constituents. *Amici* have a strong interest in the continued existence of the Department and its ability to perform its statutorily mandated responsibilities. *Amici* also have a strong interest in the separation of powers issues at the heart of this case. The Constitution empowers Congress—not the executive—to determine the structure of the federal government. In the past, when the executive has sought to eliminate or restructure a department or agency, it has always asked Congress for the authority to do so. Because Congress alone has the power to abolish the Department of Education, *amici* have a strong interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Departments and agencies established by Congress are required by law to exist. The Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const. art. I, § 1, and Congress has "plenary control over the . . . existence of executive offices," *Free Ent. Fund v. PCAOB*, 561 U.S. 477, 500 (2010). Thus, any action to create, restructure, or eliminate a department or agency must stem from an act of Congress. Though Congress may temporarily delegate this authority to the President—subject to appropriate restraints—in the absence of such a delegation, the President lacks the power to unilaterally dismantle a statutorily mandated government entity.

Indeed, Congress has created and restructured executive departments and agencies since the Founding. And in response to changing conditions, Congress, often in partnership with the President, has eliminated departments and agencies to help the executive branch best meet the needs of the American people. Critically, all of these actions have been accomplished through legislation passed by Congress and signed into law by the President.

That the power to reorganize the executive branch belongs to Congress is underscored by the fact that when Presidents have reorganized the executive branch, they have always done so

1

pursuant to congressional delegations of that power—delegations made through legislation and subject to appropriate restraints. Indeed, throughout the twentieth century, Congress passed laws called Reorganization Acts. *See, e.g.*, 5 U.S.C. §§ 901-12. These Acts, which always had expiration dates, authorized the President to make substantial changes to the executive branch (absent congressional disapproval), ranging from creating to consolidating to abolishing certain agencies. The history of the Reorganization Acts demonstrates that when Congress wants to give the President the power to reorganize the executive branch or abolish agencies, it knows how to do so. But absent such authorization, that power remains solely with Congress. And notably, Congress has *never* delegated the power to abolish an executive *department* to the President.

The creation of the Department of Education is a quintessential example of Congress and the Executive working together in their respective constitutional lanes to structure the federal government so that it best serves the American people. When President Carter saw the need for a new agency to consolidate the many federal education functions, he knew he could not create that new agency unilaterally. Instead, he exercised his authority to "recommend" to Congress that it pass a law creating such an agency. U.S. Const. art. II, § 3; *see* H.R. Doc. No. 95-296 (1978) (message from the President of the United States transmitting his proposals to strengthen the major elementary and secondary education programs). Congress ultimately agreed that a new Department of Education would "help ensure that education issues receive proper treatment at the Federal level, and . . . enable the Federal Government to coordinate its education activities more effectively." 20 U.S.C. § 3402. Congress therefore passed the Department of Education Organization Act of 1979, creating the modern Department of Education, Pub. L. No. 96-88, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3401-3510), and mandating that it carry out a number of core functions, *id*. Since the Department was created, Presidents have taken different views of the Department

2

and the role the federal government should play in education policy, but none has attempted what President Trump is attempting here: to unilaterally shutter the Department.  Indeed, even though President Reagan campaigned on eliminating the Department, he recognized that he could not do so without congressional support and relented when he lacked that support.  *See Reagan Says He Won't Seek End to Education Dept. Now*, N.Y. Times, Jan. 30, 1985.

In short, the "President's power, if any, to issue [an] order" abolishing the Education Department "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  And "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring).  Here, President Trump's effort to unilaterally dismantle the Education Department defies the express will of Congress.  Defendants lack the power to do what only Congress can do—restructure the federal government by shuttering a government department.

## ARGUMENT

### I.    The Authority to Create, Restructure, and Abolish Federal Departments and Agencies Belongs to Congress.

**A.**  The Constitution provides that "[a]ll legislative Powers," U.S. Const. art. I, § 1, including "plenary control over the . . . existence of executive offices," *Free Ent. Fund*, 561 U.S. at 500, "shall be vested in a Congress of the United States," U.S. Const. art. I, § 1.  It also grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power "undoubtedly" authorizes Congress to pass laws creating executive departments, agencies, and offices.  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam); *see* U.S. Const. art. II, § 2, cl. 2

3

(granting Congress the authority to establish offices "by Law"); *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction."). Departments and agencies are thus "creatures of statute," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam), and Congress has plenary authority over the structure of the federal government.

With that plenary authority comes substantial flexibility. Indeed, the Framers rejected a plan to delineate in the Constitution the specific departments of the executive branch and their duties, choosing instead to give Congress the power to create those departments through the legislative process. *See 2 Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). The First Congress promptly exercised that power. *See, e.g.*, Act of Sept. 2, 1789, ch. 12, § 1, 1 Stat. 65, 65; Act of Aug. 7, 1789, ch. 7, § 1, 1 Stat. 49, 49-50.

To ensure that these departments functioned as envisioned, the First Congress gave some of them specifically delineated responsibilities, while it instructed others simply to execute the duties the President assigned them. *Compare* Act of Sept. 2, 1789, § 2, 1 Stat. at 65-66 (requiring the Treasury Secretary to "digest and prepare plans for the improvement and management of the revenue . . . ; to prepare and report estimates of the public revenue, and the public expenditures . . . and generally to perform all such services relative to . . . finances"), *with* Act of July 27, 1789, § 1, 1 Stat. at 29 (authorizing the Secretaries of War and Foreign Affairs to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President"). Over the next several decades, Congress created additional executive departments to meet the fledgling nation's needs. *See, e.g.*, Act of Mar. 3, 1849, ch. 108, § 1, 9 Stat. 395, 395.

Congress has exercised its power over the structure of the federal government to establish other types of agencies as well. In 1887, Congress created the first regulatory agency: the Interstate

Commerce Commission (ICC).  *See* Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887).  Railroads were "central[] . . . to the national economy in the post-Civil War period," Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189, 1197 (1986), but with this booming industry came considerable challenges, Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Tortuous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151, 1155-56, 1159 (2012).  Because states were unable to address these problems themselves, a national solution was needed, *see* Rabin, *supra*, at 1206, and Congress created the ICC.

In the years since, Congress has repeatedly created other departments and agencies, including the Department of Education, 20 U.S.C. § 3411.  The creation of each of these governmental entities reflects Congress's judgment about the proper means to respond to a unique moment in history, provide a public service, or effectuate a policy.  Each agency's powers are prescribed by "the authority that Congress has provided" through statute.  *NFIB*, 595 U.S. at 665.

**B.**  Congress also has the power to restructure and abolish departments and agencies as it finds necessary, including by renaming them, subsuming one federal agency or office within another, changing an agency's functions, or eliminating an agency altogether.  For instance, in the early nineteenth century, Congress began creating new offices that were housed within executive departments and, as necessary, began reassigning and reorganizing their functions and supervision. *See, e.g.*, Act of Apr. 25, 1812, ch. 68, § 1, 2 Stat. 716, 716 (establishing the General Land Office (GLO) within the Treasury Department); Act of July 4, 1836, ch. 352, §§ 1-5, 5 Stat. 107, 107-11 ("reorganiz[ing]" the GLO); Act of July 4, 1836, ch. 357, § 1, 5 Stat. 117, 117-18 (establishing the Patent Office within the State Department).  Indeed, Congress has exercised this reorganization

power since its earliest days.  *See, e.g.*, Act of Sept. 15, 1789, ch. 14, § 1, 1 Stat. 68, 68 (renaming the Department of Foreign Affairs the Department of State).

And even when past Presidents have called for agencies to be abolished, they have always recognized that Congress retains the ultimate power to eliminate agencies.  Consider again the ICC.  Beginning in the 1970s, as the importance of railways waned due to cars and interstate highways, railroads became less profitable, and "regulation . . . took the blame."  Dempsey, *supra*, at 1172.  In a series of statutes, Congress began limiting the ICC's powers, *see id.* at 1173, and Presidents Carter and Reagan appointed ICC Commissioners "fervently dedicated to deregulation," *id.* at 1183.  Notably, Reagan pushed to abolish the ICC and proposed legislation to do so, but Congress did not pass it, so the ICC remained.  Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* 18 (2024).  Then, in 1995, President Clinton and Congress agreed to abolish the ICC.  *See id.* at 19.  Congress eliminated the agency by enacting the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903.

The creation of today's Postal Service is another example of a past President recognizing that the proper means to seek elimination of an agency is through legislation.  In 1970, postal service reform was urgently needed, and after extensive negotiations about how to change the postal system, "President Nixon transmitted the proposed legislation to" Congress, H.R. Rep. No. 91-1104, at 3652 (1970).  Reorganization was not implemented, however, until "Congress enacted the Postal Reorganization Act."  *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813 (1983) (citing Pub. L. No. 91-375, 84 Stat. 719 (1970)).

Congress has abolished agencies through legislation more recently as well.  For instance, when Congress created the Department of Homeland Security in response to 9/11, it abolished the Immigration and Naturalization Service and transferred its functions to the new Department.  *See*

Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291).  And when Congress reformed federal oversight of financial institutions in the wake of the 2008 recession and sought to "streamline and rationalize the supervision of depository institutions and [their] holding companies," Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, tit. III, § 301, 124 Stat. 1520, 1520 (2010), it abolished the Office of Thrift Supervision, *id.* § 313, 124 Stat. at 1523 (codified at 12 U.S.C. § 5413).

**C.**  This "[l]ong settled and established practice" of Congress using the lawmaking process to reorganize or eliminate agencies, and receiving due deference from the President, underscores that the authority to restructure and abolish agencies and departments lies with Congress.  *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice" is entitled to "great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))).  And that lawmaking process must "be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment the Framers selected.  *INS v. Chadha*, 462 U.S. 919, 951 (1983).  Pursuant to that process, the President can recommend that Congress create a new department, and he can veto a congressional effort to create one, but he has no power to create or destroy a department on his own.  *See Youngstown*, 343 U.S. at 587.  The Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts."  *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915).

**II.    When Congress Wants to Give the President Authority to Reorganize the Executive Branch, It Does So Through Legislation.**

From 1932 to 1984, Congress gave the President reorganization authority by passing and renewing a series of laws known as Reorganization Acts.  As the history of these laws demonstrates, when Congress believes that delegating its reorganization power to the President will

promote efficiency in government, it knows how to make such a delegation while at the same time limiting the scope of that delegation to protect against presidential overreach. One such limitation is that Congress has *never* delegated the authority to abolish executive *departments*.

Broadly speaking, the Reorganization Acts authorized the President to reorganize executive agencies by submitting a Reorganization Plan to Congress. Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 1 (2012) [hereinafter Hogue, *Reorganization*]. If Congress consented to the plan (by either inaction or express approval), then the plan became law. *Id.* at 1-2.

Some of today's major agencies were created by Reorganization Plans. For example, the Environmental Protection Agency (EPA) was established by President Nixon through a Reorganization Plan. *See* Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086. That Reorganization Plan both created the EPA and also specified which authorities were being transferred to the new EPA Administrator from existing Departments like the Department of the Interior and the Department of Health, Education, and Welfare. *Id.* § 2. Similarly, the Federal Emergency Management Agency (FEMA) was established by President Carter through a Reorganization Plan. Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 (creating FEMA).

Congress passed the first iteration of expressly delegated reorganization authority in 1932 at the urging of President Hoover. In a statement to Congress on "[t]he need for reorganization," President Hoover emphasized that the "gradual growth" of the executive branch had led to "overlapping and waste," and he believed that "the number of agencies can be reduced." 75 Cong. Rec. 4181 (1932). He recommended that the "[a]uthority under proper safeguards . . . to effect these transfers and consolidations" should "be lodged in the President" via executive orders subject to Congress's review. *Id.* at 4182; *see* Statement About Congressional Action on Reorganization of

8

the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States:*
*Herbert Hoover* 74, 74 (U.S. Gov't Printing Off., Wash. 1977) ("It is a most unpleasant task to
abolish boards and bureaus and to consolidate others. . . . [Reorganization] should be lodged with
the Executive with the right of Congress to review the actions taken.").

　　　Congress subsequently passed time-limited legislation to permit the President to transfer
one agency's functions to another and consolidate the functions of agencies or departments, but it
did not allow the President to abolish agencies or departments.  *See* An Act of June 30, 1932, Pub.
L. No. 72-212, §§ 403, 406, 47 Stat. 382, 413-15.  Hoover lamented this limit on his authority, *see*
Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents*
*of the United States: Herbert Hoover*, *supra*, at 283, 283 ("the bill is so framed as to render aboli-
tion or consolidation of the most consequential commissions and bureaus impossible"), and thus
continued to push for expanded reorganization authority, Hogue, *Reorganization*, *supra*, at 7-8.

　　　In 1933, with the Act set to expire in two years, Congress acquiesced in part, amending the
Act to allow the President to abolish an executive agency (defined as "any commission, independ-
ent establishment, board, bureau, division, service or office in the executive branch of the Govern-
ment"), but still prohibiting the abolition of an executive *department*.  *See* Act of Mar. 3, 1933,
Pub. L. No. 72-428, tit. IV, §§ 402, 403, 409, 47 Stat. 1489, 1517-19.  At the same time, Congress
explained that it was delegating this power to the President on only a temporary basis due to the
"serious emergency [that] exists by reason of the general economic depression" and an "imperative
to reduce drastically governmental expenditures."  *Id.* § 401, 47 Stat. at 1517.  After Hoover left
office, President Roosevelt used the power to, among other things, consolidate agency functions
into newly-designated agencies such as the Office of National Parks, Buildings, and Reservations,
and the Division of Territories and Insular Possessions, and abolish the United States Shipping

Board and the Board of Indian Commissioners.  *See* Hogue, *Reorganization*, *supra*, at 9.

In 1937, after the 1933 authority expired, Roosevelt requested more robust reorganization authority from Congress.  *Id.* at 10.  One of the proposed bills would have allowed the President to reorganize the executive branch without any involvement from Congress and without an expiration date.  *See id.*  This proposal sparked sharp rebukes from members of Congress who were concerned about giving away their powers over departments and agencies in such a sweeping fashion.  *See, e.g.*, 83 Cong. Rec. 4190 (1938) ("[L]eave final authority for changes in the Congress, where it belongs.") (Sen. Brown); *id.* at 4195 ("If the President could abolish or consolidate these agencies without authority of Congress you may rest assured he would not be here asking for authority.  He cannot act [unless] we give him power which belongs to Congress.") (Sen. Borah); *id.* at 4196 ("The powers which are proposed to be given by the bill . . . are yet the greatest legislative powers which exist in the Congress of the United States.") (Sen. Johnson).

The next year, Congress passed the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561, a narrower version of the bills proposed the year before.  The Act permitted the President to reorganize federal agencies and departments through the submission of a Reorganization Plan (rather than executive order) to Congress, which would become law absent a concurrent resolution rejecting the Plan.  *Id.* §§ 4-5, 57 Stat. at 562-63.  This time, however, Congress prohibited the President from creating or abolishing departments, or abolishing independent agencies in whole or in part.  *See id.* § 3, 57 Stat. at 561-62.  This Act expired in 1941.  *Id.* § 12, 57 Stat. at 564.

Over the ensuing decades, Congress passed additional Reorganization Acts, each with sunset dates, and at times modified the scope of the delegation of its reorganization power.  Hogue, *Reorganization*, *supra*, at 22; *see, e.g.*, Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 (prohibiting the President from limiting the independence of an independent agency);

Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 (allowing the President to create departments); Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (prohibiting the President from creating or abolishing departments or abolishing an independent agency).

Congressionally authorized presidential reorganization power came to an end in the 1980s. President Reagan requested the authority in 1981, but Congress did not renew the Act until 1984. *See* Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 (codified at 5 U.S.C. §§ 901-12).[1]  The 1984 Act expired on December 31, 1984, *see* 5 U.S.C. § 905(b), and since then, the reorganization authority has not been renewed, despite requests from President George W. Bush, President Obama, and even President Trump during his first term, Hogue, *Reorganization*, *supra*, at 31-32, 34; Exec. Order No. 13,781, 82 Fed. Reg. 13959 (Mar. 13, 2017). Notably, throughout the history of the Reorganization Acts from 1932 to 1984, Congress never delegated the authority to abolish an executive *department* like the Education Department.  *See, e.g.*, 47 Stat. at 414; *id.* at 1518; 53 Stat. at 561; 59 Stat. at 615; 63 Stat. at 205; 91 Stat. at 31.

## III.  The Department of Education Is Statutorily Mandated, and President Trump Does Not Have the Power to Abolish It Unilaterally.

The Education Department's history reflects this story of the executive branch and Congress working together to restructure the federal government while respecting their constitutional roles.  Between the creation of the first Education Department in 1867 and the modern Department in 1979, it repeatedly changed names and locations within the government, but always pursuant to legislation or authority Congress delegated to the President.  And although Reagan

---

[1] Significantly, in light of the Supreme Court's then-recent decision holding the legislative veto unconstitutional, *Chadha*, 462 U.S. at 959, the 1984 Act changed how reorganization plans became law by requiring a joint resolution by Congress to approve the plans, *see* 5 U.S.C. § 906(a). Congress also passed a law to ratify all the previous reorganization plans that had become law through the previous procedure.  Act of Oct. 19, 1984, Pub. L. No. 98-532, 98 Stat. 2705.

sought to abolish the Department, he recognized he needed congressional authorization to do so.

In 1867, in the aftermath of the Civil War, Representative Garfield spearheaded the creation of a Department of Education in response to high rates of adult illiteracy in the United States, particularly among new immigrants and formerly enslaved people. *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 3049 (1866) (Rep. Garfield) (the issue of education had reached "the full height of national importance"); Act to Establish a Department of Education, Pub. L. No. 39-73, ch. 158, 14 Stat. 434 (1867). But that Department "never really got off the ground," S. Rep. No. 96-49, at 20 (1979), and Congress later transferred it to the Department of the Interior as a bureau focused on vocational training, *id*; Act of July 20, 1868, 15 Stat. 92, 106.

Notwithstanding that setback, the federal role in education continued to grow, and Congress responded accordingly. For the next 110 years, the federal office collecting information about the state of education and coordinating existing federal education programs changed names and location within the government half a dozen times as Congress sought to optimize its functionality. Gerard Robinson, *A Federal Role in Education: Encouragement as a Guiding Philosophy for the Advancement of Learning in America*, 50 U. Rich. L. Rev. 919, 927 (2016). These changes were all made pursuant to statutes or reorganization plans approved by Congress. *See, e.g.*, Act of July 20, 1868, 15 Stat. at 106; Act of March 3, 1869, 15 Stat. 291; Department of the Interior Appropriation Act for Fiscal Year 1931, Pub. L. No. 71-217, 46 Stat. 279, 281 (1930); Reorganization Plan No. 1 of 1939, *in* 53 Stat. 1423, 1424; Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631; Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 327.

During this period, Presidents Harding, Coolidge, Hoover, and Truman all urged Congress to establish a Cabinet-level Department of Education. Robinson, *supra*, at 927-28; S. Rep. No. 95-1078, at 13 (1978). Numerous bills that would have accomplished this were introduced

in Congress between 1908 and 1951, but none passed.  *Id.*  President Eisenhower ultimately suc-

ceeded in creating a Cabinet-level position overseeing education—but again only pursuant to au-

thority delegated by Congress.  In accordance with the Reorganization Act of 1949, Pub. L. No.

109, 63 Stat. 203, President Eisenhower proposed, and Congress approved, a reorganization plan

elevating the Federal Security Agency—the agency established in 1939 to coordinate federal

programs related to education—to a Cabinet-level Department called the Department of Health,

Education, and Welfare (HEW).  Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631.

But as soon as HEW was created, Members of Congress began to advocate for "moving

education out of HEW," and between 1953 and 1980, over eighty bills were introduced to create

a standalone, Cabinet-level Department of Education.  Robinson, *supra*, at 929 (internal quota-

tions omitted).  None ultimately passed, although the federal government continued to become

even more involved in education.  Patrick McGuinn, *Schooling the State: ESEA and the Evolu-*

*tion of the U.S. Department of Education*, 1 Russell Sage Found. J. Soc. Scis. 77, 80 (2015).

President Carter pledged to work with Congress to establish a standalone Department of

Education, Henry B. Hogue & Rebecca R. Skinner, Cong. Rsch. Serv., R48425, *U.S. Department*

*of Education: Background and Statutorily Established Officers, Positions, and Offices* 1-2

(2025).  He did precisely that, and in 1979, Congress passed the Department of Education Organ-

ization Act (DEOA), creating the modern Department of Education, Pub. L. No. 96-88, 93 Stat.

669 (1979) (codified as amended at 20 U.S.C. §§ 3401-3510); *see* 20 U.S.C. § 3411 ("There is

established an executive department to be known as the Department of Education.").

While the DEOA authorized the Secretary of Education to "allocate or reallocate func-

tions among the officers of the Department, and to establish, consolidate, alter, or discontinue

such organizational entities within the Department as may be necessary or appropriate," the law

was explicit that this limited authorization did "not extend to—(1) any office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity . . . (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter."  20 U.S.C. § 3473(a); *see also id.* § 3404(7) (defining "office" to include "any office, institute, council, unit, organizational entity, or component thereof").  In other words, under the DEOA, executive branch officials are explicitly barred from eliminating or redelegating statutorily required functions of the Department, and abolishing statutorily established offices within the Department.  Defendants' efforts to unilaterally dismantle the Department are thus "incompatible with the expressed . . . will of Congress," putting their authority "at its lowest ebb."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Prior administrations have abided by that fundamental constitutional principle, even when they were displeased with federal educational policy.  In 1980, Reagan campaigned on the elimination of the Department of Education, but he understood that he could not deliver on that campaign promise without Congress.  *See* Ronald Reagan, *Address Before a Joint Session of the Congress Reporting on the State of the Union*, 1 Pub. Papers 72, 74 (Jan. 26, 1982); Robinson, *supra*, at 933.  Indeed, recognizing that any proposal to eliminate the Department would not have sufficient support in Congress to pass, he ultimately declined to formally recommend that Congress abolish the agency.  *See, e.g.*, *Reagan Says He Won't Seek End to Education Dept. Now*, N.Y. Times, Jan. 30, 1985 (noting that although Reagan "still believed that abolishing the department would be best," because "[t]hat proposal . . .  received very little support in the Congress," he had "no intention of recommending abolition of the department to the Congress at this time").

In the years since, when shifts in educational policy have required changes to statutorily

14

mandated offices within the Department, those changes have been accomplished through legislation. For example, during his first term, President George W. Bush proposed major educational reform—most famously the No Child Left Behind Act (NCLB), which Congress enacted into law, *see* Pub. L. No. 107-110, 115 Stat. 1425 (2002). Because of "[t]he major policy shifts [e]mbedded in NCLB," there needed to be changes in the "structure, staffing, and operations" of the Education Department. McGuinn, *supra*, at 87. Congress thus passed the Education Sciences Reform Act, *id.*, which, among other things, abolished the Office of Educational Research and Improvement and created in its place the Institute of Education Sciences "to provide national leadership in expanding fundamental knowledge and understanding of education from early childhood through postsecondary study." Pub. L. No. 107-279, §§ 111(a), (b), 404, 116 Stat. 1940 (2002).

In short, Presidents can leave their stamp on federal education policy consistent with the separation of powers, but they plainly cannot do what President Trump has attempted here: to unilaterally shutter the Department of Education. The power to abolish executive departments belongs to Congress through the legislative process.

## CONCLUSION

This Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: July 3, 2025

Respectfully submitted,

/s/ Miriam Becker-Cohen
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina Henry
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
miriam@theusconstitution.org

*Counsel for Amici Curiae*

15

## APPENDIX

LIST OF *AMICI CURIAE*

Sen. Elizabeth Warren

Sen. Charles E. Schumer

Sen. Angela Alsobrooks

Sen. Richard Blumenthal

Sen. Lisa Blunt Rochester

Sen. Cory Booker

Sen. John Fetterman

Sen. Ruben Gallego

Sen. Martin Heinrich

Sen. Mazie Hirono

Sen. Tim Kaine

Sen. Andy Kim

Sen. Amy Klobuchar

Sen. Ben Ray Luján

Sen. Ed Markey

Sen. Jeffrey A. Merkley

Sen. Patty Murray

Sen. Jacky Rosen

Sen. Adam B. Schiff

Sen. Jeanne Shaheen

Sen. Chris Van Hollen

Sen. Mark Warner

Sen. Raphael Warnock

1A

Sen. Peter Welch

Sen. Ron Wyden

Rep. Jamie Raskin

Rep. Robert C. "Bobby" Scott

Rep. Rosa L. DeLauro

Rep. Hakeem Jeffries

Rep. Katherine Clark

Rep. Pete Aguilar

Rep. Joe Neguse

Rep. Gabe Amo

Rep. Becca Balint

Rep. Nanette Barragán

Rep. Joyce Beatty

Rep. Wesley Bell

Rep. Donald S. Beyer Jr.

Rep. Sanford D. Bishop, Jr.

Rep. Suzanne Bonamici

Rep. Shontel Brown

Rep. Julia Brownley

Rep. Nikki Budzinski

Rep. Salud O. Carbajal

Rep. André Carson

Rep. Troy A. Carter, Sr.

Rep. Ed Case

Rep. Sean Casten

2A

Rep. Kathy Castor

Rep. Judy Chu

Rep. Yvette Clarke

Rep. Emanuel Cleaver, II

Rep. James E. Clyburn

Rep. Steve Cohen

Rep. Herbert C. Conaway, Jr.

Rep. J. Luis Correa

Rep. Joe Courtney

Rep. Angie Craig

Rep. Jasmine Crockett

Rep. Danny K. Davis

Rep. Madeleine Dean

Rep. Diana DeGette

Rep. Suzan K. DelBene

Rep. Chris Deluzio

Rep. Mark DeSaulnier

Rep. Maxine Dexter

Rep. Debbie Dingell

Rep. Lloyd Doggett

Rep. Sarah Elfreth

Rep. Veronica Escobar

Rep. Adriano Espaillat

Rep. Dwight Evans

Rep. Cleo Fields

3A

Rep. Shomari Figures

Rep. Lizzie Fletcher

Rep. Bill Foster

Rep. Lois Frankel

Rep. Laura Friedman

Rep. Maxwell Alejandro Frost

Rep. John Garamendi

Rep. Jesús G. "Chuy" García

Rep. Robert Garcia

Rep. Sylvia Garcia

Rep. Maggie Goodlander

Rep. Josh Gottheimer

Rep. Jahana Hayes

Rep. Pablo José Hernández

Rep. Steven Horsford

Rep. Chrissy Houlahan

Rep. Steny H. Hoyer

Rep. Jared Huffman

Rep. Glenn F. Ivey

Rep. Jonathan L. Jackson

Rep. Sara Jacobs

Rep. Pramila Jayapal

Rep. Henry C. "Hank" Johnson, Jr.

Rep. Julie Johnson

Rep. Sydney Kamlager-Dove

4A

Rep. William Keating

Rep. Robin L. Kelly

Rep. Timothy M. Kennedy

Rep. Ro Khanna

Rep. Greg Landsman

Rep. John B. Larson

Rep. George Latimer

Rep. Summer L. Lee

Rep. Susie Lee

Rep. Teresa Leger Fernández

Rep. Mike Levin

Rep. Sam T. Liccardo

Rep. Ted W. Lieu

Rep. Zoe Lofgren

Rep. Stephen F. Lynch

Rep. Seth Magaziner

Rep. John W. Mannion

Rep. Lucy McBath

Rep. April McClain Delaney

Rep. Jennifer L. McClellan

Rep. Betty McCollum

Rep. Kristen McDonald Rivet

Rep. James P. McGovern

Rep. LaMonica McIver

Rep. Gregory W. Meeks

Rep. Robert J. Menendez

Rep. Grace Meng

Rep. Dave Min

Rep. Joseph D. Morelle

Rep. Kelly Morrison

Rep. Seth Moulton

Rep. Frank J. Mrvan

Rep. Jerrold Nadler

Rep. Richard E. Neal

Rep. Eleanor Holmes Norton

Rep. Johnny Olszewski

Rep. Frank Pallone, Jr.

Rep. Jimmy Panetta

Rep. Chris Pappas

Rep. Nancy Pelosi

Rep. Scott H. Peters

Rep. Brittany Pettersen

Rep. Chellie Pingree

Rep. Nellie Pou

Rep. Mike Quigley

Rep. Delia C. Ramirez

Rep. Emily Randall

Rep. Deborah K. Ross

Rep. Andrea Salinas

Rep. Linda T. Sánchez

Rep. Mary Gay Scanlon

Rep. Jan Schakowsky

Rep. Brad Sherman

Rep. Lateefah Simon

Rep. Adam Smith

Rep. Eric Sorensen

Rep. Melanie A. Stansbury

Rep. Greg Stanton

Rep. Haley Stevens

Rep. Marilyn Strickland

Rep. Suhas Subramanyam

Rep. Eric Swalwell

Rep. Mark Takano

Rep. Shri Thanedar

Rep. Bennie G. Thompson

Rep. Mike Thompson

Rep. Dina Titus

Rep. Rashida Tlaib

Rep. Norma J. Torres

Rep. Ritchie Torres

Rep. Lori Trahan

Rep. Derek T. Tran

Rep. Lauren Underwood

Rep. Juan Vargas

Rep. Nydia M. Velázquez

7A

Rep. Eugene Vindman

Rep. Debbie Wasserman Schultz

Rep. Maxine Waters

Rep. Bonnie Watson Coleman

Rep. Nikema Williams

Rep. Frederica S. Wilson

8A

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 105.12(c) because it does not exceed 15 pages, exclusive of the parts of the brief excluded by Local Rule 105.3.

I further certify that the attached *amicus* brief complies with the requirements of Local Rules 102.2, 105.1, 105.4, and 105.5, because it is double-spaced, in 12-point Times New Roman font, with one-inch margins, on 8 1/2" x 11" paper.

Executed this 3rd day of July, 2025.

/s/ Miriam Becker-Cohen
Miriam Becker-Cohen

*Counsel for Amici Curiae*