UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al. *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al. *Defendants*. | Civil Action No. 25-965 <br><br> **AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

## INTRODUCTION

Ensuring equal access, opportunity, and treatment in education has long been the focus of federal civil rights laws, and the U.S. Department of Education's Office for Civil Rights ("OCR") has been the key driver of civil rights enforcement in schools, colleges, and universities nationwide. While many court cases and presidential directives paved the way for our nation's civil rights protections, Congress recognized OCR's unique and necessary role in combating discrimination in education and providing for its enforcement. By enacting Title VI of the Civil Rights Act of 1964 ("Title VI"), Title IX of the Education Amendments of 1972 ("Title IX"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), Congress not only mandated a ban on discrimination in education based on race, color, national origin, sex, and disability, it also legislated requirements for active enforcement, monitoring, policy guidance, and technical assistance. These congressional mandates led to the creation of OCR and its current scope of activities.

OCR, a statutorily created office, is tasked by Congress with enforcing federal civil rights laws that ban discrimination based on race, color, national origin, sex, disability, and age in elementary and secondary public schools and by other recipients of federal financial assistance,

1

including postsecondary schools. For over 50 years, students facing discrimination have relied on OCR to investigate their civil rights claims, obtain resolutions, and monitor compliance, and schools and institutions have relied on OCR to provide guidance and technical assistance to ensure effective compliance with federal civil rights laws.

The amici, a group of 75 former OCR career staff whose service in OCR spans from 1971 to 2025 and covers ten presidential administrations, are uniquely positioned and qualified to explain the important and congressionally mandated roles of OCR. The amici submit this brief in support of the Plaintiffs' Motion for a Preliminary Injunction. Appendix A contains a full list of signatories. This Amicus Brief outlines OCR's critical role by examining: the history of the critical statutes that OCR enforces, including Title VI, Title IX, and Section 504; the operationalization of the statutorily mandated role of OCR staff to enforce the civil rights of our nation's students; and how the dismantling of OCR violates these mandates, which, in turn, harms students and denies them equal opportunity in their education.

## HISTORICAL BASIS FOR THE U.S. DEPARTMENT OF EDUCATION'S OFFICE FOR CIVIL RIGHTS

The need for Congress to mandate the existence of OCR arose from the unfortunately long history of state-sanctioned discrimination in the United States. Below, amici provide a brief history of the enactment of the three most significant civil rights laws that Congress has mandated that OCR enforces: Title VI, Title IX, and Section 504. By describing the legislative history and critical functions of these laws, the need for OCR's continued enforcement, policy, and technical assistance, as mandated by Congress, is better understood.

A.   **Title VI of the Civil Rights Act of 1964 and the Creation of OCR**

In the decades before *Brown v. Board of Education*, 347 U.S. 483 (1954) ("*Brown I*"), U.S. presidents sought to address the problem of federal funds being used to further discrimination.

President Truman's Committee on Civil Rights described the basic parameters of Title VI, calling for the "establishment by act of Congress or executive order" of a federal office to review "the expenditures of all government funds" for "compliance with the policy of nondiscrimination" based on "race, color, creed, or national origin."[1] When speaking to that Committee on January 15, 1947, President Truman stated, "I want our Bill of Rights implemented in fact . . . I don't want to see any race discrimination."[2] And to Congress, he stated that "we must strengthen the organization of the Federal Government in order to enforce civil rights legislation more adequately and to watch over the state of our traditional liberties."[3]

On March 12, 1953, President Eisenhower transmitted to Congress Reorganization Plan No. 1, creating the Department of Health, Education, and Welfare ("HEW").[4] At the same time, he expressed consternation with the "discrimination in expenditure of [federal] funds as among our citizens."[5] Then, in 1954, the Supreme Court in *Brown I* rejected the "separate but equal" doctrine that the Court had espoused in *Plessy v. Ferguson* in 1896, holding that the Fourteenth Amendment prohibited such racial discrimination in public education. *Brown*, 347 U.S. at 494-95. In 1955, witnessing much resistance to *Brown I*, the Court unanimously ordered states to begin desegregation plans "with all deliberate speed." *Brown v. Board of Educ.*, 349 U.S. 294, 301 (1955).

As the press for civil rights continued, bipartisan commissions found persistent issues of racial segregation and discrimination, and segregationists continued to resist court orders and

---

[1] The Report of the President's Committee on Civil Rights, *To Secure These Rights* (1947), https://www.trumanlibrary.gov/library/to-secure-these-rights.
[2] Michael R. Gardner, *Harry Truman and Civil Rights: Moral Courage and Political Risks* (2002).
[3] Harry S. Truman, *Special Message to the Congress on Civil Rights* (1948), https://www.trumanlibrary.gov/library/public-papers/20/special-message-congress-civil-rights.
[4] Dwight D. Eisenhower, *Special Message to the Congress Transmitting Reorganization Plan of 1953 Creating the Department of Health, Education, and Welfare* (March 12, 1953), https://www.presidency.ucsb.edu/documents/special-message-the-congress-transmitting-reorganization-plan-1953-creating-the-department.
[5] Stephen C. Halpern, *On the Limits of the Law: The Ironic Legacy of Title VI of the 1964 Civil Rights Act* (1995).

presidential decrees.[6] It became clear that *Congress* needed to prohibit recipients of federal financial assistance from discriminating and to create corresponding enforcement mechanisms.[7] In the 1950s and 1960s, Representative Adam Clayton Powell Jr. began adding non-discrimination clauses to individual federal legislation.[8] But both political parties recognized that a more comprehensive approach was necessary, and these "Powell Amendments" thus served as precursors to Title VI of the Civil Rights Act of 1964. On January 31, 1963, several Republicans introduced a comprehensive civil rights bill. The proposed legislation included authorizing the U.S. Attorney General to enforce school desegregation by civil actions and mandated non-discrimination requirements for recipients of federal financial assistance.[9]

On June 19, 1963, President Kennedy introduced the legislation that would become the Civil Rights Act of 1964. HEW Secretary Anthony Celebrezze testified before Congress that he endorsed passage of the bill because of ample evidence that recipients of federal financial assistance around the country were engaging in racial discrimination.[10] He urged Congress to end grants that supported discrimination, and to do so in one broad stroke, rather than by piecemeal amendments to program legislation, in order to prevent inconsistencies and delay.

Leaders in both the House and Senate understood the importance of an omnibus bill that tied non-discrimination provisions to federal financial assistance. Doing so would end a piecemeal approach in specific legislation. As Representative Emanuel Celler, Chairman of the House Judiciary Committee and floor manager for the Civil Rights Act in the House of Representatives,

---

[6] *See, e.g.*, U.S. Commission on Civil Rights, *Civil Rights '63: 1963 Report United States Commission on Civil Rights*, U.S. Government Printing Office (1964), https://www.crmvet.org/docs/ccr_63_civil_rights.pdf.
[7] *See id.* (calling for legislative action to address racial injustices).
[8] *See* 110 Cong. Rec. 2465 (1964) (Statement by Rep. Powell), https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf.
[9] David A. Nichols, *A Matter of Justice: Eisenhower and the Beginnings of the Civil Rights Revolution*, p. 268 (2007).
[10] Hearings on H.R. 7152 Before a Subcomm. of the House Comm. on the Judiciary, 88th Cong., 1st Sess., ser. 4, pt. 2, at 1506 (1963) (statement of Anthony J. Celebrezze) (referenced at https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=3252&context=vlr).

noted: "it seems rather anomalous that the Federal Government should aid and abet discrimination based on race, color, or national origin by granting money and other kinds of financial aid. . . . The enactment of title VI will serve to override specific provisions of law which contemplate Federal assistance to racially segregated institutions."[11] Senator Humphrey, the Senate manager of the Civil Rights Act of 1964, stated that because federal financial assistance statutes enacted before *Brown* expressly provided for "separate but equal," it was necessary to enact a law that applied across the board "to make sure that the funds of the United States are not used to support racial discrimination."[12] Moreover, the Supreme Court has made clear that Congress—through the Spending Clause of the Constitution—unambiguously has the right to condition the receipt of congressionally appropriated funds on the terms of its choosing (including terms mandating non-discrimination). *See Oklahoma v. U.S. Civil Service Comm'n*, 330 U.S. 127, 143-44 (1947).

On July 2, 1964, President Johnson signed the Civil Rights Act of 1964 into law, with Title VI as its centerpiece. Due to the breadth of Title VI's applicability, the administrative methods Congress enacted for its enforcement, and the array of departments and agencies disbursing funding to an extremely broad range of recipients, Title VI required significant efforts to fulfill its mandate. Section 601 of Title VI prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Section 602 is both a source of authority and a command, directing "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity" to "effectuate the provisions of section 601 . . . by issuing rules, regulations, or orders of general applicability[.]" *Id.* § 2000d-1. HEW became responsible for enforcing civil rights laws in

---

[11] 110 Cong. Rec. 2467 (1964), https://www.congress.gov/88/crecb/1964/02/07/GPO-CRECB-1964-pt2-8-2.pdf, (quoted in *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 330-31 (1978) (opinion of Marshall, J.)).
[12] 110 Cong. Rec. 6544 (1964) (statement of Sen. Humphrey), https://www.congress.gov/88/crecb/1964/03/30/GPO-CRECB-1964-pt5-8-1.pdf.

education and health programs that received federal financial assistance. HEW's Title VI regulations were issued in December 1965, and became the template for other federal agencies to issue such regulations.[13]

Later, Congress directed that the civil rights functions of HEW be consolidated into "a centralized operation," effectively legislating the creation and authority of OCR.[14] In 1966, the House Appropriations Committee curtailed funds for civil rights activities from HEW's constituent offices and centralized the funding to one departmental office overseeing all Title VI enforcement responsibilities.[15] Consequently, HEW Secretary John W. Gardner consolidated all of HEW's civil rights enforcement power into OCR. By 1968, nine regional offices with OCR staff were established.[16] An OCR "Compliance Officer's Manual" was developed in 1966.[17]

While some enforcement of Title VI was occurring, the need for enforcement exceeded the capacity of HEW's OCR and, in some cases, the willingness of the Administration. Federal courts, however, found that this was no excuse. HEW's role to address violations of Title VI was held to be congressionally mandated, not optional. See, *Adams v. Richardson*, 356 F. Supp. 92, 94 (D.D.C. 1973) (mandating that HEW begin enforcement proceedings against ten states that were violating Title VI in their administration of higher education). The court in *Adams v. Richardson* ordered HEW to meet its congressional mandate and enforce Title VI (*Id.*); this led to a significant expansion of OCR to fulfill its congressional obligations.

---

[13] *See* U.S. Commission on Civil Rights, *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs*, p. 191, https://www.usccr.gov/files/historical/1996/96-031.pdf.
[14] *HEW Department Consolidates Civil Rights Enforcement*, CQ Almanac (1967), https://library.cqpress.com/cqalmanac/document.php?id=cqal67-1312905.
[15] *Id.*
[16] U.S. Commission on Civil Rights, *HEW and Title VI: A Report on the Development of the Organization, Policies, and Compliance Procedures of the Department of Health, Education, and Welfare Under Title VI of the Civil Rights Act of 1964* (1970), https://www2.law.umaryland.edu/marshall/usccr/documents/CR11022.PDF.
[17] *Compliance Officer's Manual: A Handbook of Compliance Procedures Under Title VI of the Civil Rights Act of 1964*, U.S. Commission on Civil Rights (1966), https://books.google.com/books?id=gcq7AAAAIAAJ&printsec=frontcover#v=onepage&q&f=false.

B.    **Title IX of the Education Amendments Act of 1972 and OCR's Expanded Mandate**

In the years following Title VI's passage, it became clear that executive and court orders could not fully address pervasive sex discrimination, particularly in education and the workplace.

In 1967, President Johnson issued Executive Order 11375 banning sex discrimination in Federal employment and by federal contractors. Proponents of sex equality, however, argued that more needed to be done than can be accomplished by executive order to strengthen and expand protections for women. In 1970, Congress held hearings before a special House Subcommittee on Education chaired by Representative Edith Green on sex bias in education. Representatives Green and Patsy Mink worked for several years to introduce legislation banning sex discrimination. In 1971, Representative Green introduced a higher education bill that prohibited sex discrimination, but it was not included in the Education Amendments of 1971. At the same time, Congress debated the Equal Rights Amendment to the U.S. Constitution and proposals to bar sex discrimination in other areas.[18]

Then, in 1972, Title IX was crafted and passed, largely through the efforts of Representatives Green and Mink. When Senator Birch Bayh introduced Title IX in the Senate, he described the need to combat "the continuation of corrosive and unjustified discrimination against women in the American educational system" and emphasized the economic and employment inequities suffered by women that were traceable to educational inequities.[19] Title IX of the Education Amendments Act of 1972 mirrored Title VI's language, but it was limited to educational programs or activities. It states that "No person in the United States shall, on the basis of sex, be

---

[18] *See, e.g. Joint Resolution Proposing an Amendment to the Constitution of the United States Relative to Equal Rights for Men and Women*, 86 Stat. 1523 (1972), https://www.govinfo.gov/app/details/STATUTE-86/STATUTE-86-Pg1523.
[19] 118 Cong. Rec. 5803 (1972), https://www.congress.gov/92/crecb/1972/02/28/GPO-CRECB-1972-pt5-4-2.pdf.

excluded from participation, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

With language nearly identical to Title VI's, Title IX "direct[s]" "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability[,]" and similarly mandates procedures for fund termination. *Id.* § 1682. The statute was amended in 1974 to require HEW to publish implementing regulations. Sex Discrimination Act of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974). Moreover, the Title IX regulations adopt the same enforcement procedures as Title VI. *See* 34 C.F.R. § 106.81. Title IX, like all civil rights laws applicable to educational institutions, was assigned to OCR.

C.     **Section 504 of the Rehabilitation Act and OCR's Expanded Mandate**

As part of the nation's evolving understanding of civil rights and equal opportunity, the disability rights movement arose, fueled by the recognition that many Americans with disabilities were being discriminated against in the provision of access, benefits, and services, including in education. Many children with disabilities were institutionalized, excluded from attending public schools, or struggled in schools without the services they needed because there was no mandate to educate them. Before the passage of Section 504, about "1.75 million children with disabilities were completely excluded from public schools. And of the three million children with disabilities who went to school, many did not receive an education that was appropriate to their needs."[20] These conditions led to the passage of Section 504 of the Rehabilitation Act of 1973, prohibiting

---

[20] Jean Crockett, *How Children with Disabilities Came to be Accepted in Public Schools*, The Conversation (Nov. 29, 2015), https://theconversation.com/how-children-with-disabilities-came-to-be-accepted-in-public-schools-50820; *see also* Peter W.D. Wright and Pamela Darr Wright, *The History of Special Education Law in the United States*, Wrightslaw (Oct. 18, 2021), https://www.wrightslaw.com/law/art/history.spec.ed.law.htm.

discrimination based on disability by recipients of federal financial assistance with language parallel to that of Title VI. One of the Rehabilitation Act's purposes was "to establish special responsibilities in the secretary of health, education, and welfare for coordination of all programs with respect to handicapped individuals within the department of health, education, and welfare[.]" Rehabilitation Act of 1973, P.L. 93-112 (1973).[21] Section 504's statutory language also provides that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.)… shall be available to any person aggrieved[,]" 29 U.S.C. § 794a, and Section 504's regulations, like Title IX, adopt the procedures established by the Title VI regulations. *See* 34 C.F.R. § 104.61.

Within HEW, OCR was assigned to enforce Section 504. Under the law, HEW was charged with drafting implementing regulations. Since it was a civil rights law, rather than sending this task to HEW's office that worked on rehabilitation issues, the task—like all civil rights education enforcement—was turned over to OCR.[22]

### THE U.S. DEPARTMENT OF EDUCATION'S OCR OPERATIONS

In 1979, through the Department of Education Organization Act, Congress established the U.S. Department of Education, separating HEW into two agencies: the Department of Education and the Department of Health and Human Services. The Act also transferred all education-related civil rights functions to the Department of Education and established within the Department an Office for Civil Rights. It stated, "There shall be in the Department an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights appointed under section 202(b)," and "the Secretary shall delegate to the Assistant Secretary for Civil Rights all functions, other than

---

[21] This sets forth the original Act with its purposes: https://www.eeoc.gov/rehabilitation-act-1973-original-text.
[22] Dr. Richard K. Scotch, *Transcript: Beyond Compliance: The History of Section 504 and its Impact on Higher Education*, Georgia Tech, https://eoc.gatech.edu/ada-compliance/50-years-section-504/beyond-compliance-podcast-history-section-504-and-its-impact-higher-education.

administrative and support functions, transferred to the Secretary under section 301(a)(3)." 20 U.S.C. § 3413. President Carter signed the Act into law on October 17, 1979, and the Department of Education began operating on May 4, 1980.

As noted above, Section 602 of Title VI requires the promulgation of "rules, regulations, or orders" to implement Section 601. 42 U.S.C. § 2000d-1. Section 602 also requires enforcement of the prohibition against discrimination through the termination of federal financial assistance, but only after notice to the recipient of the failure to comply and a determination that compliance cannot be obtained by voluntary means. *Id.* It further specifies that such a determination must include an "express finding on the record" and an opportunity for a hearing. *Id.*

Under this provision, the Department of Education issued regulations at 34 C.F.R. Part 100, with § 100.7 providing for enforcement through periodic compliance reviews and complaints. The regulations further specify that the agency "will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part." 34 C.F.R. § 100.7(c). This enforcement is not discretionary—the agency *must* investigate and make a determination whenever a compliance review is initiated, and for *all* complaints. Other laws and regulations that OCR enforces, including Section 504 and Title IX, all require the use of Title VI's enforcement procedures. *See, e.g.*, 34 C.F.R. § 106.81(stating under Title IX, "[t]he procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein"). The Department of Education Organization Act provides that the Assistant Secretary for Civil Rights must "employ

10

such officers and employees, including staff attorneys, as may be necessary to carry out the functions of such Office." 20 U.S.C. § 3413(c)(2).[23]

A.  **OCR Complaint Investigations and Compliance Reviews**

OCR's Compliance Processing Manual ("CPM") instructs OCR investigators and attorneys on how to carry out these statutory and regulatory mandates. While we believe that OCR's procedures have been consistent for decades, there is public access to CPMs dating back only to 2010. The following is the consistent methodology outlined in the CPMs for OCR to conduct its investigations and compliance reviews:[24]

**Intake:** OCR clarifies the allegations in a complaint, evaluates the complaint to determine whether it is timely and whether the agency has jurisdiction, and determines whether the complaint provides enough facts from which to infer that discrimination may have occurred.

**Investigation:** OCR issues informational and notification letters to both the complainant and the recipient, notifying them of the allegations and resolution options. Depending on the complaint, these can include some form of facilitated resolution process in which OCR staff assists the parties to informally resolve the allegations before a full investigation, or a voluntary resolution

---

[23] In addition to Title VI, Title IX, and Section 504, OCR is charged with the enforcement of many additional civil rights provisions. Title II of the Americans with Disabilities Act of 1990 designated the Department of Education for disability civil rights enforcement for all programs, services, and activities relating to elementary and secondary education systems and institutions, public institutions of higher education and vocational education, and libraries. 28 C.F.R. § 35.190(b)(2) (2000). OCR also implements the civil rights provisions of several Department of Education programs, including the Individuals with Disabilities Education, 20 U.S.C. § 1400 *et seq*. (1994), the Carl D. Perkins Vocational Education Act, 20 U.S.C. § 2301 *et seq.* (1994 & Supp. IV 1998), and the Magnet Schools Assistance Program, 20 U.S.C. § 7201 (1994). OCR also enforces the non-discrimination provisions of the Boy Scouts of America Equal Access Act, 20 U.S.C. § 7905 (2002), and the Age Discrimination Act of 1975, 42 U.S.C. § 610.

[24] The current CPM (revised Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf. Previous versions dating back to 2010 are: CPM (July 2022), https://www.ed.gov/sites/ed/files/2025-02/ocrcpm-202207.pdf; CPM (Aug. 2020), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20202608.pdf; CPM (Nov. 2018), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-20181119.pdf; CPM (Mar. 2018), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-201803.pdf; CPM (Feb. 2016 as "Rev. Feb. 2015(V1.2)") https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-201502-v1-2.pdf; CPM (Nov. 2015 as "Rev. Feb. 2015 (V1.1)"); https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-201502-v1-1.pdf; CPM (Feb. 2015); https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm-201502.pdf; CPM (Jan. 2010), https://www.ed.gov/laws-and-policy/civil-rights-laws/file-complaint/ocr-case-resolution-and-investigation-manual-2010.

without the need for a full investigation. If the complaint is to be investigated, OCR staff will develop an investigative plan and send the recipient a data request. OCR staff will review the recipient's response, determine whether additional data are needed, interview witnesses and other pertinent parties, and, depending on the allegations, conduct an onsite visit. OCR staff analyze, evaluate, and compare the gathered information to the law and regulations, and draw tentative conclusions as to the recipient's compliance with the law. OCR staff then drafts an Investigative Report, which is reviewed internally by the regional, and sometimes national, chain of command.

**Resolution:** On completion of the investigation, OCR staff will determine whether the evidence supports a finding of a violation. If not, staff will prepare a resolution letter to the parties, explaining the evidence supporting a finding of no violation. If a recipient wishes to resolve a matter before the investigation is complete or if there is a violation determination, staff will work with the recipient to develop a resolution agreement that identifies the steps the recipient must take to resolve the allegations, bring the recipient into compliance with the law, and ensure future compliance, followed by a resolution letter that explains the evidence supporting the outcome.

**Monitoring:** If the recipient signs a resolution agreement, OCR staff will monitor the recipient's compliance with the agreement by reviewing periodic reports provided by the recipient, requesting additional information, and conducting additional fact-gathering as needed.  In some instances, OCR staff may amend a resolution agreement based on changed circumstances.

**Enforcement:** If the recipient and OCR fail to reach an agreement after a violation has been determined, OCR staff will issue a "Letter of Impending Enforcement Action" that states that OCR will proceed to enforcement should the recipient continue to refuse to resolve the matter. OCR staff, in conjunction with the Department of Education's Office of General Counsel, might then develop pleadings and supporting documents for an administrative hearing.

**Compliance Reviews:** In addition to complaint investigations, 34 C.F.R. § 100.7 requires the periodic review of recipients to determine compliance with the antidiscrimination laws. The CPM sets out similar investigative and resolution procedures for these compliance reviews as for complaints. Because these reviews are by nature class- and institution-wide, they require more staff time and resources than are necessary for most complaints.

### B.  OCR Data Collection, Regulations and Policy Guidance, and Technical Assistance

In addition to investigating and resolving complaints and conducting compliance reviews, OCR staff engage in the following congressionally mandated activities:

**Data collection:** OCR, through the Department of Education Organization Act, 20 U.S.C. § 3413(c)(1), and the Department's implementing regulations, *see, e.g.*, 34 C.F.R § 100.6(b), is required to collect and publish disaggregated data on key educational equity indicators through the Civil Rights Data Collection. This information is used for various purposes, including as data in complaint investigations and to help choose compliance reviews.

**Regulations and Policy Guidance:** Congress mandates the promulgation of "rules, regulations, or orders of general applicability" 42 U.S.C. § 2000d-1), and agencies provide "interpretive rules . . . to 'advise the public' of how the agency understands, and is likely to apply, its binding statutes and legislative rules." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) (plurality opinion) (quoting *Perez v. Mortgage Bankers Assn.,* 575 U.S. 92, 97 (2015). The Supreme Court and lower courts have regularly given deference to OCR regulations and policy guidance in their rulings. *See, e.g.*, *Lau v. Nichols*, 414 U.S. 563, 567-68 (1974) (expressly upholding OCR's May 1970 Memorandum, *Identification of Discrimination and Denial of Services on the Basis of National Origin,*[25] which mandates the effective provision of language acquisition services by

---

[25] The 1970 Memorandum is available at: 35 Fed.Reg. 11595, https://archives.federalregister.gov/issue_slice/1970/7/18/11593-11596.pdf#page=3).

public schools to students whose primary or home language is other than English). Many of OCR's regulations have existed for almost 50 years, predating some of the evolving issues faced by students and recipients today, such as online harassment and digital access for students with disabilities. OCR staff are charged with updating these regulations, requiring issuance of proposed regulations, reviewing thousands of comments, and finalizing regulations. Similarly, OCR staff regularly develop policy guidance (e.g., Dear Colleague Letters, Fact Sheets) to address complex and timely issues, such as the civil rights implications of using artificial intelligence in schools; the rights of students to be free from discrimination based religious or ancestral identities shared with national origin identity; and guardrails for imposing discipline on students with disabilities.[26]

**Technical Assistance:** OCR Headquarters and Regional staff provide technical assistance to students, parents, and advocates to ensure they understand their rights, and to recipients to understand their obligations and avoid noncompliance. Such assistance includes technical assistance sessions,[27] responding to student and parent inquiries, and conversations with recipients.

**HUGE CUTS TO OCR'S STAFF WILL PREVENT OCR FROM CARRYING OUT ITS MANDATE TO ENFORCE CIVIL RIGHTS PROTECTIONS IN EDUCATION**

Before the current Administration, OCR staff was stretched thin. Although OCR is obligated to address all complaints, OCR has seen a dramatic rise in complaints while its staffing levels have remained relatively flat, as shown by OCR's congressionally mandated reporting under the Department of Education Organization Act of 1979:[28]

---

[26] During 2021-2024, OCR produced 64 such resources. U.S. Dep't of Educ., Office for Civil Rights, *Protecting Civil Rights: Highlights of Activities, Office of Civil Rights 2021-2025*, p. 5, https://www.ed.gov/media/document/protecting-civil-rights-109409.pdf.

[27] In 2024, OCR provided 211 technical assistance presentations. U.S. Dep't of Educ., Office for Civil Rights, *Report to the President and Secretary of Education Under Section 203(b)(1) of the Department of Education Organization Act, FY 2024*, 2025, p.5, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[28] U.S. Dep't of Educ., Office for Civil Rights, *Report to the President and Secretary of Education Under Section 203(b)(1) of the Department of Education Organization Act, FY 2024*, 2025, pp. 5, 8, https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Report to the President and Secretary of Education Under Section 203(b)(1) of the*

|  | FY 2010 | FY 2012 | FY 2015 | FY 2018 | FY 2022 | FY 2024 |
|---|---|---|---|---|---|---|
| Complaints | 6933 | 7833 | 10,392 | 12,435 | 18,804 | 22,687 |
| Staff Level | 585 | 582 | 540 | 534 | 546 | 588 |

Despite the significant rise in complaints and the many other critical activities conducted by OCR staff, Secretary McMahon recently terminated 40% of OCR's staff and closed 7 of OCR's 12 regional offices.[29] She took these actions with no plan to address the pending or incoming complaints, likely because no feasible plan exists with this arbitrary reduction in force. Her actions also flout the clear mandates of Congress in Title VI, Section 504, and Title IX, as well as the Department of Education Organization Act, which mandates that the Assistant Secretary for Civil Rights "employ such officers and employees, including staff attorneys, as may be necessary to carry out the functions of such Office," (20 U.S.C. § 3413(c)(2), and case law that mandates adequate staffing to enforce civil rights mandates. *E.g.*, *Adams*, 356 F. Supp. at 94.

Based on the experience and expertise of the OCR career staff supporting this Amicus Brief, it is evident that OCR cannot meet its statutory mandates to enforce Title VI, Section 504, Title IX, and other civil rights laws under present circumstances due to cuts in staffing. In the end, this means that OCR will not protect students from discrimination and cannot fulfill its historical role, as mandated by Congress, to expand educational opportunities for all students.

---

*Department of Education Organization Act, FY 2022*, 2023, pp. 5, 8, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2022.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Annual Report to the Secretary, the President, and the Congress Under Section 203(b)(1) of the Department of Education Organization Act, FY 2017-18*, p. 27, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2017-18.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Delivering Justice: Report to the President and Secretary of Education, Under Section 203(b)(1) of the Department of Education Organization Act, FY 2015*, 2016, p. 8, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2015.pdf; U.S. Dep't of Educ., Office for Civil Rights, Helping to Ensure Equal Access to Education: Report to the President and Secretary of Education, Under Section 203(b)(1) of the Department of Education Organization Act, FY 2009 – 12, 2012, pp. 6, 21, https://www.ed.gov/sites/ed/files/about/reports/annual/ocr/report-to-president-2009-12.pdf.

[29] Johanna Alonso, *A Reduced Civil Rights Office Could Leave Students and Institutions in Limbo, Chronicle of Higher Education* (April 15, 2025), https://www.insidehighered.com/news/students/safety/2025/04/15/students-and-institutions-limbo-after-mass-layoffs-ocr?utm_source=Inside+Higher+Ed&utm_campaign=af0a9e0e99-DNU_2021_COPY_03&utm_medium=email&utm_term=0_1fcbc04421-af0a9e0e99-237303025&mc_cid=af0a9e0e99&mc_eid=c13f133d9e.

Dated: July 8, 2025

Respectfully submitted,

/s/ Peter Romer-Friedman

| | |
|---|---|
| Amy I. Berman* | Peter Romer-Friedman |
| National Academy of Education | PETER ROMER-FRIEDMAN PLLC |
| 500 Fifth Street, NW | 1629 K Street, NW, Suite 300 |
| Washington, DC 20001 | Washington, DC 20006 |
| Tel. (202) 271-5554 | (202) 355-6364 |
| aberman@naeducation.org | peter@prf-law.com |

*Pro Hac Vice Motion Forthcoming*

**Appendix A: Amici Curiae, Former U.S. Department of Education, Office for Civil Rights Career Staff**

| Name | Office for Civil Rights Position, Office, Years of Employment |
| --- | --- |
| Susan Aitel | Analyst, Headquarters, 1979-2012 |
| Aysha Ames | Attorney, Philadelphia Office, 2015-2019 |
| Stephen Appell | Team Leader, Acting Branch Chief, Special Assist, Equal Opportunity Specialist, 1989-2004 |
| Elizabeth Bagdon | Attorney, Boston Office, 1994-2015; Attorney, Policy Group, Headquarters, 1989-1994 |
| Cynthia Bailey | Investigator, San Francisco Office, 1979-1982 |
| Mariah Baird | Investigator, San Francisco Office, 1977-1983 |
| David W. Berkowitz | Management & Program Analyst, Program Legal Group, Headquarters, 2008-2017; Equal Opportunity Specialist, Washington, DC Office, 2000-2008; Management & Program Analyst, Program Legal Group, Headquarters, 1987-2000 |
| Amy Berman | Enforcement Director, Headquarters, 2011-2012 |
| Kristi Bleyer | Attorney, DC Metro Office, 1998-2002 |
| Diane Blumenthal | Various positions in HQ and in a regional office, 1985-2016 |
| Valerie Bonnette | Program analyst, Headquarters, 1977, 1980-1994 |
| Susan Bowers | Enforcement Director, Headquarters, 1995-2005, Deputy Director, Policy Enforcement Service, Headquarters, 1992-1995, Staff Attorney, Headquarters, Litigation Section, 1980-1986 |
| Dorothy Brady | Supervisory Program Management Analyst, San Francisco Office, 1977-2017 |
| Marc Brenman | Investigator to Division Director, San Francisco, Boston, Headquarters, 1973-1987 |
| Carroll Brownlee | Investigator, Boston Office, 1993-2006 |
| Paul Castillo | Attorney, Cleveland Office, 2010-2011; Attorney, Dallas Office, 2011-2013 |
| Phil Catanzano | Attorney, Boston Office, 2006-2015 |
| Alexander Choi | Attorney - Program Legal Group, 1998-2006, Metro Office, 2007-2010, Seattle Office. 2010-2025 |
| Thomas Ciapusci | Supervisory Equal Opportunity Specialist, Denver Office, 2009-2016; Management/Program Analyst, Headquarters, 1997-2009; Equal Opportunity Specialist, Denver Office, 1991-1997 |

| | |
|---|---|
| Helene Deramond | Technical Assistance Program Specialist, Chicago Regional Office, 1979-1980; Program Analyst, 1980-1983, Washington Office, Special Assistant, Office of Assistant Secretary, 1983-1987; Senior Management Analyst, 1987-1990, including 5-month detail to Philadelphia Regional Office |
| Lilian Sotolongo Dorka | Senior Counsel to Assistant Secretary, Acting Chief of Staff, Litigation Coordinator, Headquarters, 1987-2014 |
| Nicholas F. Dorka | Executive Officer, 1979-2011 |
| Rhasheda Douglas | Team Leader, 2012-2015; Team Attorney, 2007-2012 |
| Frederick Dow | Senior Investigator, Boston Office, 1990-2016 |
| Beth Downs | Attorney, Boston Office, 20 years of service |
| Thomas Esbrook | Investigator/Branch chief, Chicago and Headquarters, 1974-1992 |
| Traci Ext | Regional Chief Attorney, Cleveland Office, 2010-2025; Senior Attorney, Cleveland Office, 2006-2010; Staff Attorney, Cleveland Office, 2001-2006 |
| Rosemary Fennell | Equal Opportunity Specialist, Headquarters Technical Assistance Division, 1979-1997 |
| Richard L. Foster | Supervisory Attorney, Title VI Team, Headquarters, 1998-2022; Chief Attorney, DC Office, 1995-97; Branch Chief, Litigation Division, Headquarters, 1981-94 |
| Wendella P. Fox | Regional Director, Philadelphia office, 1997 - 2021 |
| John Fry | National Attorney, 1998-2013; Chief Attorney, Chicago Office, 1984-1988; Attorney, Chicago,1979-1984 |
| M Carolyn Fuentes | Staff Attorney, New York Regional Office, 1979-1980; Trial Attorney, Litigation Division Washington D.C. Office, 1980-1982; Acting Branch Chief, Litigation Division Washington D.C. office, 1982-1983 |
| Sally Galway | Attorney, San Francisco Office, 1989-2007 |
| Lucy Glasson | Attorney, Philadelphia Office, 2008-2022 |
| Rachel Glickman | Team Leader, DC Metro Office, 2007-2014 |
| Sheralyn Goldbecker | Policy Attorney, Headquarters, Elementary/Secondary Education, 1991-1995; Metro Office, Enforcement Team Leader, 1995-2011 |
| Erin M. Greene | Attorney, New York Office, 2019-2025 |
| Jacob Griffith | Attorney, Metro Office, 2019-2025 |
| Paul Grossman | Chief Regional Attorney, San Franscisco Office; Chair OCR Disability Network, 1971-2014 |
| Judith Halper | Equal Opportunity Assistant, Boston Office, 40 years |
| Eileen Hanrahan | Postsecondary Policy Branch Chief, 1986-2006 |

2

| Tom Hibino | Regional Director, Boston Office, 1990-2014 |
| --- | --- |
| Trina Ingelfinger | Acting Regional Director, Boston Office, 2014; Chief Attorney, Boston Office, 2011-2015; Compliance Team Leader, Boston Office, 2010-2011; Attorney, Boston Office, 2005-2010 |
| Bridget Joyce | Staff Attorney, Title VI Program Legal Group, 2013-2022; Supervisory Attorney, Title VI Program Legal Group, 2022-2025 |
| Jeff Kaliss | Civil Rights Investigator, San Francisco Office, 1979-1988 |
| Howard Kallem | Supervisory Attorney, Program Legal Group, 1993-1997; Chief Attorney, DC Regional Office, 1997-2013 |
| Richard B. Katskee | Deputy Director, Program Legal Group, 2010-2012 |
| Elizabeth Keenan | Investigator, Denver Regional Office 1973-1976; Investigator, Supervisor, San Francisco Office, 1976-1985 |
| Amy Klosterman | Attorney, Seattle Office, 2007-2018 |
| Brian Larson | Equal Opportunity Specialist, Cleveland Office, 1989-2014 |
| Carolyn Lazaris | Clerical Support, Equal Opportunity Specialist, Program Analyst, Program Manager, Acting Regional Director, Boston Office, 1977-2010 |
| Wilfred Lim | Attorney, San Francisco Regional Office, 1982-2010 |
| Jeanette Lim Esbrook | OCR Acting Assistant Secretary, 1992-1993 and 2000-2001; Director and Attorney, Program Legal Group, 1979-2002 |
| John Lozada | Attorney Advisor, Boston Regional Office, 1989-2006 |
| Joseph Mahoney | Program Manager (2011-2022), Team Leader (1996-2011), Equal Opportunity Specialist (1991-1996), Philadelphia Office. |
| Angela Martinez-Gonzalez | Program Manager, 2021-Mar. 2025, Team Leader, 2006-2021, Attorney, 1991-2006, Denver Office |
| Kelli Medak | Supervisory Attorney, Atlanta and Seattle Offices, 2008-2018 |
| Robin Murphy | Supervisory Attorney, Metro Office, 3 years |
| Lee Nell | Staff Attorney, Philadelphia Office, 1980-1985; Chief Attorney, Philadelphia Office, 1985-2009 |
| Miriam Nunberg | Attorney, New York Office, 1998-2012 |
| Eric Olick | Attorney and Investigator, Boston Regional Office, 1988-2018 |
| Jean Peelen | Regional Director, DC Metro Office, 1980-1998 |
| Mary Rohmiller | Attorney, Title IX Policy Group, Headquarters, 2007-2008 and 2022-2025 |
| Claudette Rushing | Attorney, Seattle Regional Office, 2011-2015 |
| Kelli Schmidt | Attorney and Senior Attorney, Seattle Office, 2009-2015 |

3

| | |
|---|---|
| Barbra Shannon | Staff Attorney Atlanta 0ffice, Chief Regional Attorney Atlanta Office, Senior National Attorney, 1975-2009 |
| Caitlin Stanley Burks | Attorney, Seattle Office, 2014-2018 |
| Mary Lou Starling | Training Specialist and Program Analyst, Headquarters, 1984-2007 |
| Sandra Stephens | Team Leader, Dallas Office, 39 years of service |
| Louie Stewart | Attorney, San Francisco Office, 1976-1981; Chief Regional Attorney, Philadelphia Office, 1981-1983 |
| Elnora Stokes | Supervisor and Investigator, Dallas Office, 40+ years |
| Karla Ussery | Attorney, Team Leader, Senior Attorney, Cleveland Office, 1998-2023 |
| Alice Wender | Regional Director, District of Columbia Office, 1997-2021; Supervisory Equal Opportunity Specialist, Policy and Enforcement and Technical Assistance Divisions, Headquarters, 1979-1997 |
| Dannelle Whiteside | General Attorney, Philadelphia Office, 2014-2016 |
| Donald Yarab | Supervisory Attorney, Cleveland Office, 2007-2021; Attorney, Cleveland Office, 1991-2007 |