# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NAACP, et al.,

  Plaintiffs,

      v.

UNITED STATES, et al.,

  Defendants.

Case No. 1:25-cv-00965-JRR

Judge Julie Rubin

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.    Statutory Background ............................................................................... 2

II.    Factual Background ................................................................................. 2

          1.    The Department's Support for Higher Education ................................ 5

          2.    Department's Support for Birth to Grade 12 Education .................... 6

          3.    Department's Support for Vocational Education and Rehabilitation .............. 7

          4.    Department's Enforcement of Civil Rights Laws in Education ....................... 8

          5.    Department's Responsibility to Study Education in the U.S. and Maintain Data ......................................................................................... 8

III.    Procedural History ................................................................................. 8

LEGAL STANDARDS ....................................................................................... 9

ARGUMENT .................................................................................................... 10

I.    Courts Across the Country Have Denied Narrower Relief Than That Sought By Plaintiffs. ............................................................................................. 10

    A.    The Supreme Court Has Already Granted a Stay of a Preliminary Injunction Regarding the Department's RIFs. ......................................... 11

    B.    The Supreme Court Has Already Granted a Stay of a Preliminary Injunction Regarding the Department's Grant Terminations. ................... 12

    C.    A Court in the District of Maryland Denied a Request for a Preliminary Injunction Regarding RIFs and Contract Cancellations Within the Department's Institute for Educational Sciences. ............................ 13

    D.    A Court in the District of Columbia Denied a Request for a Preliminary Injunction Regarding RIFs and Contract Cancellations Within IES. ............ 15

    E.    A Different Court in the District of Columbia Denied a Request for a Preliminary Injunction Regarding RIFs Within the Department's Office for Civil Rights. ...................................................................................... 17

II.     Plaintiffs are Unlikely to Succeed on the Merits of Their Claims, Which Should Be
        Dismissed for Lack of Jurisdiction or Failure to State a Claim.....................................17

        A.      Plaintiffs Lack Standing .......................................................................................18

        B.      The CSRA Provides the Exclusive Remedy for Plaintiffs' RIF-Related Claims..........20

        C.      The Court Lacks Jurisdiction Over Plaintiff's Challenge to the Cancellation
                of the Department's Contracts or Competitive Grants....................................24

        D.      Claims Relating to any "Closure" of the Department of Education Are Not
                Ripe............................................................................................................26

        E.      Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a
                Discrete Final Agency Action...................................................................27

        F.      Plaintiffs' Constitutional Claims are Unlikely to Succeed...............................31

        G.      Because the Executive Order Expressly Directs the Department to Continue
                All Actions Required by Law, the Executive Order Does Not Infringe on the
                Department's Statutory Obligations. ...................................................36

        H.      Defendants Are Making Reasonable Judgments that Are Committed to
                Agency Discretion by Law...................................................................37

III.    Plaintiffs Cannot Demonstrate Irreparable Harm Justifying Extraordinary Relief................42

IV.     The Equities and the Public Interest Weigh Against a Preliminary Injunction. ....................43

V.      Plaintiffs' Motion for a Preliminary Injunction Should Be Denied the Remedy
        Sought is Improper. ...................................................................................44

VI.     Any Injunction Should Be Stayed, and Plaintiffs Should Be Required to Post a Bond
        If an Injunction is Entered..........................................................................45

CONCLUSION........................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*A & S Council Oil Co. v. Lader*,
   56 F.3d 234 (D.C. Cir. 1995) .................................................................................. 41

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967) *abrogated by*,
   *Califano v. Sanders*, 430 U.S. 99 (1977) ............................................................ 27

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) .................................................................................. 28

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) .................................................................................. 25

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
   No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) .................................... 26

*Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*,
   No. 25-CV-2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025) ................ 20

*Am. Educ. Rsch. Ass'n v. Dep't of Educ.*,
   No. CV SAG-25-1230, 2025 WL 1665401 (D. Md. June 12, 2025) .................. 14, 15

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
   716 F.3d 633 (D.C. Cir. 2013) ................................................................................ 23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) .............................................................. 20, 21, 22, 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................ 10

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
   No. 1:25-CV-00999 (TNM), 2025 WL 1568301 (D.D.C. June 3, 2025) .......... 15, 16, 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................ 10

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................................ 30

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ........................................................................................ 23, 24

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ............................................................................................... 26

*Brown v. Mass Transit Admin.*,
  No. ELH-12-3705, 2013 WL 1428527 (D. Md. Apr. 8, 2013) ............................... 9

*Buchanan v. Consol. Stores Corp.*,
  125 F. Supp. 2d 730 (D. Md. 2001) ........................................................................ 9

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................................... 45

*California v. U.S. Dep't of Educ.*,
  769 F. Supp. 3d 72 (D. Mass  2025) ................................................................. 12, 13

*Carter v. United States Department of Education*,
  No. 25-0744, 2025 WL 1453562 (D.D.C. May 21, 2025) ..................................... 17

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ........................................................................................ 31, 34

*Child Trends, Inc. v. U.S. Dep't of Educ.*,
  --- F. Supp. 3d ----, 2025 WL 1651148 (D. Md. June 11, 2025) ............................ 10

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) .......................................................................... 27, 28

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................... 19

*Clinton v. Jones*,
  520 U.S. 681 (1997) ............................................................................................... 35

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ............................................................................... 28

*Connor v. Md. Dep't of Health*,
  No. CV MJM-24-1423, 2025 WL 1167846 (D. Md. Apr. 22, 2025) ...................... 44

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................................ 32, 34

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) ................................................................................. 42

*Doe v. Va. Dep't of State Police*,
   713 F.3d 745 (4th Cir. 2013) ............................................................. 27

*Drake v. FAA*,
   291 F.3d 59 (D.C. Cir. 2002) .............................................................. 39

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ................................................................. 21, 22, 23

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
   45 F.3d 530 (1st Cir. 1995) ............................................................... 27

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) .......................................................................... 37

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................... 33

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
   423 U.S. 326 (1976) .......................................................................... 38

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980) .......................................................................... 27

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .......................................................................... 40

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ............................................................. 22

*Fort Sumter Tours, Inc. v. Babbitt*,
   66 F.3d 1324 (4th Cir. 1995) ............................................................. 38

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .......................................................................... 34

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ...................................................................... 44

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ........................................................... 20

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) .......................................................................... 26

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................... 33, 39, 40, 43

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010) ................................................................................................ 12

*In re James R. Jones, House of Representatives*,
  B-203057 L/M,1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ................................ 33

*Kerns v. United States*,
  585 F.3d 187 (4th Cir. 2009) ................................................................................... 9

*Kim v. Fin. Indus. Regul. Auth., Inc.*,
  698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*,
  No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) ...................................... 43

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949) ................................................................................................ 36

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ...................................................................................... 37, 39, 40

*Louisiana v. Biden*,
  45 F.4th 841 (5th Cir. 2022) ................................................................................... 44

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 34

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................................... 28, 29

*Mahoney v. Donovan*,
  721 F.3d 633 (D.C. Cir. 2013) ................................................................................ 22

*Markland v. Off. of Pers. Mgmt.*,
  140 F.3d 1031 (Fed. Cir. 1998) .............................................................................. 38

*Maryland  v. U.S. Dept. of Agric.*,
  No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025) ................................. 22, 43

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................ 10

*McMahon v. New York*,
  606 U.S. ----, 2025 WL 1922626 (U.S. July 14, 2025) .................................... 11, 12

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ................................................................................ 24

*Mississippi v. Johnson*,
 71 U.S. (4 Wall.) 475 (1866) ..................................................................................... 34

*Morrison v. Olson*,
 487 U.S. 654 (1988) ............................................................................................... 35

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
 915 F.3d 197 (4th Cir. 2019) ................................................................................... 42

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ................................................................................................. 18

*Nat'l Ass'n of Agric. Emps. v. Trump*,
 462 F. Supp. 3d 572 (D. Md. 2020) ..................................................................... 21, 23

*Nat'l Treasury Emps. Union v. Trump*,
 770 F. Supp. 3d 1 ................................................................................................... 23

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
 287 F.3d 1 (1st Cir. 2002) ...................................................................................... 41

*New York City Transit Auth. v. Beazer*,
 440 U.S. 568 (1979) ............................................................................................... 33

*New York v. McMahon*,
 --- F. Supp. 3d ----, 2025 WL 1463009 (D. Mass. May 22, 2025) .................... 3, 11, 15

*Nken v. Holder*,
 556 U.S. 418 (2009) ............................................................................................... 43

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004) ........................................................................................ 17, 28, 30

*Nyunt v. Chairman, Broad. Bd. of Governors*,
 589 F.3d 445 (D.C. Cir. 2009) ................................................................................ 22

*Perry v. Judd*,
 471 F. App'x 219 (4th Cir. 2012) ............................................................................ 43

*Potomac Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*,
 No. CV DLB-22-2482, 2022 WL 7051160 (D. Md. Oct. 11, 2022) ........................ 42

*Printz v. United States*,
 521 U.S. 898 (1997) ............................................................................................... 34

*Pub. Citizen Health Rsch. Grp. v. Acosta*,
 363 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................... 42

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ............................................................................ 42

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ...................................................................................... 27

*Roe v. U.S. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ........................................................................ 42

*Roswell v. Mayor & City Council of Baltimore*,
    671 F. Supp. 3d 607 (D. Md. 2023) ........................................................... 42, 43

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ..................................................................... 37

*Sols. in Hometown Connections v. Noem*,
    No. 25-CV-00885-LKG, 2025 WL 1530318 (D. Md. May 29, 2025) ...................... 26

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ..................................................................... 35

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................ 9

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................................... 19

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ............................... 26, 35

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................................. 21, 23

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..................................................................................... 18

*Trump v. CASA, Inc.*,
    606 U.S. ----, 2025 WL 1773631 (U.S. June 27, 2025) ..................................... 12

*United States v. Fausto*,
    484 U.S. 439 (1988) .......................................................................... 21, 22, 23, 24

*United States v. J & E Salvage Co.*,
    55 F.3d 985 (4th Cir. 1995) .......................................................................... 24

*United States v. Nixon*,
    418 U.S. 683 (1974) ..................................................................................... 33

*U.S. Dep't of Educ. v. Cal.*,
    145 S. Ct. 966 (2025) ................................................................................. 13, 26

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) ................................................................................. 35

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
    --- F. Supp. 3d ----,  2025 WL 1704311 (D. Mass. June 18, 2025) ...................................... 3, 12

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ................................................................................. 28

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................. 38, 39

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................. 10

**Statutes**

5 U.S.C. § 701 ................................................................................. 38, 40

5 U.S.C. § 702 ................................................................................. 26

5 U.S.C. § 704 ................................................................................. 30, 31

5 U.S.C. § 1204 ................................................................................. 21

5 U.S.C. § 7105 ................................................................................. 21

5 U.S.C. § 7123 ................................................................................. 21

5 U.S.C. § 7512 ................................................................................. 21

5 U.S.C. § 7703 ................................................................................. 21

7 U.S.C. § 608c ................................................................................. 23, 24

20 U.S.C. § 1018 ................................................................................. 6

20 U.S.C. § 1057 ................................................................................. 6

20 U.S.C. § 1070 ................................................................................. 6

20 U.S.C. § 1101 ................................................................................................ 6

20 U.S.C. § 1400 ................................................................................................ 7

20 U.S.C. § 1402 ................................................................................................ 7

20 U.S.C. § 2301 ................................................................................................ 7

20 U.S.C. § 3413 ................................................................................................ 8

20 U.S.C. § 3416 ............................................................................................. 6, 7

20 U.S.C. § 6301 ............................................................................................. 6, 7

20 U.S.C. § 6302 ................................................................................................ 7

20 U.S.C. § 6303 ................................................................................................ 7

20 U.S.C. § 6311 ................................................................................................ 7

20 U.S.C. § 6361 ................................................................................................ 7

20 U.S.C. § 9511 ................................................................................................ 8

20 U.S.C. § 9512 .............................................................................................. 25

28 U.S.C. § 1295 .............................................................................................. 21

28 U.S.C. § 1331 .............................................................................................. 20

28 U.S.C. § 1491 ................................................................................... 13, 24, 26

29 U.S.C. § 3271 ................................................................................................ 7

Further Consolidated Appropriations Act, 2024,
    Pub. L. 118-47, 138 Stat. 460, 690 (Mar. 23, 2024) ................................... 40

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. 119-4 (Mar. 15, 2025). ..................................................................... 40

Department of Education Organization Act,
    Pub. L. No. 96-88, 93 Stat. 668 (1979)........................................................... 2

**Rules**

Fed. R. Civ. P. 65...................................................................................... 44, 45

x

Fed. R. Civ. P. 12 ................................................................................................... 9

**Regulations**

5 C.F.R. § 2423.22 ............................................................................................... 21

34 C.F.R. § 75.1 .................................................................................................. 41

34 C.F.R. § 100.7 ................................................................................................. 8

**Other Authorities**

Filip Timotija, *Education secretary: Mass layoffs first
    step toward total shutdown*, The Hill (Mar. 12, 2025),
    https://thehill.com/homenews/education/5190161-
    linda-mcmahon-education-department-mass-layoffs/ ................................................ 3

Ingraham Angle, *Education secretary says department
    took first steps to eliminate 'bureaucratic bloat'*, at 2:04
    (Fox News, aired Mar. 11, 2025, at 7:22 ET),
    https://www.foxnews.com/video/6369901522112 ...................................................... 5

Implementing the President's 'Department of Government Efficiency'
    Workforce Optimization Initiative Executive Order,
    Exec. Order No. 14,210 ......................................................................................... 3

Improving Education Outcomes by Empowering Parents,
    States, and Communities Executive Order,
    Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ........................... 4, 37

Lexi Lonas Cochran, *Linda McMahon gives Education
    staffers their 'final mission'*, The Hill (Mar. 4, 2025),
    https://thehill.com/homenews/education/5175086-
    linda-mcmahon-education-department-trump-musk/ ................................................ 5

Press Release, U.S. Dep't of Educ., *U.S. Department of
    Education Initiates Reduction in Force* (Mar. 11, 2025),
    https://www.ed.gov/about/news/press-release/us-
    department-of-education-initiates-reduction-force ................................................... 3

U.S. Dep't of Educ., *Secretary McMahon: Our
    Department's Final Mission* (Mar. 3, 2025),
    https://www.ed.gov/about/news/speech/secretary-
    mcmahon-our-departments-final-mission ............................................................... 4

## INTRODUCTION

Plaintiffs seek too much, too late. They seek an extraordinarily broad injunction that would enjoin reductions in force (RIFs), contract cancellations, and grant terminations, all while challenging virtually every policy change made at the Department of Education (Department) since President Trump was inaugurated. But numerous other courts have already had the opportunity to review these same changes at the Department and, in so doing, most have concluded that preliminary injunctive relief is not available. And when given the opportunity, the Supreme Court has subsequently stayed injunctions on two separate occasions where a district court has entered preliminary injunctions regarding RIFs and grant terminations at the Department.

Even without this background, this Court should deny Plaintiffs' motion for a preliminary injunction and instead dismiss this lawsuit. President Trump and Secretary of Education McMahon have been unequivocal that it will take an act of Congress to ultimately shutter the Department. In the meantime, Secretary McMahon has used her Article II discretion to reduce the headcount at the Department, cancel grants that do not advance Department priorities, and streamline its operations. Yet in seeking a preliminary injunction, Plaintiffs would have this Court superintend the United States' education system and the Executive Branch's authority as an employer. There is no legal basis justifying the extraordinary relief Plaintiffs seek. Instead of the Executive Branch faithfully executing the laws of Congress, a cabinet-level agency would instead be put under the control of this Court.

Plaintiffs fail to meet the standard for the extraordinary relief they seek. They cannot demonstrate a likelihood of success on the merits of their claims, which also justifies dismissal of this lawsuit either for lack of jurisdiction or for failure to state a claim. Nor can Plaintiffs show irreparable harm. Finally, the balance of the equities and public interest tip in Defendants' favor.

This Court should deny Plaintiffs' motion for a preliminary injunction and instead dismiss this lawsuit.

## BACKGROUND

### I.    Statutory Background

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979).

### II.    Factual Background

On February 5, 2025, the Acting Secretary of Education issued a Directive on Department Grant Priorities. This began an internal review to ensure that grants do not fund "discriminatory practices—including in the form of [diversity, equity, and inclusion ('DEI')]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication." Ex. A-21 at 2, ECF No. 61-25. In a multi-step process involving seven personnel over the course of a week, the Department reviewed each TQP and SEED grant individually and decided, after consulting each grant document and available information about the program, to terminate 104 grants. *Id*. at 2-4. Five grants remained in place. *Id*. at 4.

On February 11, 2025, President Trump signed the "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" Executive Order, Exec. Order No. 14,210. Section 3(c) of that Executive Order directed that agencies

> shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFS, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing

functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations . . . .

The Department then began implementing a RIF, which impacts "[a]ll divisions within the Department," with some divisions requiring a "significant reorganization to better serve students, parents, educators, and taxpayers." Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The purpose of the RIF is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"). The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* (omission in original). As part of the RIF, any staff that may be separated will first be put on administrative leave. RIF Press Release.

These RIFs were preliminarily enjoined by the court in *New York v. McMahon*, --- F. Supp. 3d ----, 2025 WL 1463009, at *2 (D. Mass. May 22, 2025). The Supreme Court stayed this injunction on July 14, 2025. The current effective date of the RIF for all employees other than those within OCR is August 1, 2025. A preliminary injunction enjoining the RIF within OCR remains in place. *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1704311, at *20 (D. Mass. June 18, 2025).

After the March 11 RIF was announced, President Trump signed on March 20 the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive

Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive Order found that, for instance, "American reading and math scores are near historical lows" and the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.* Under the Department Executive Order, the Secretary of Education was ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679. The "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).Secretary McMahon is tasked with carrying out President Trump's policy to "eliminat[e] [the] bureaucratic bloat [] at the Department of Education—a momentous final mission—quickly and responsibly." U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. The Secretary has described this mission as "an overhaul" of the Department of Education. *Id.* After the overhaul, the Department "will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." RIF Press Release. The Secretary stated that she planned to keep 50% of the

Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, at 2:04 (Fox News, aired Mar. 11, 2025, at 7:22 ET), https://www.foxnews.com/video/6369901522112.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. To implement that longer-term goal, the Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/.

On June 30, the Department paused the distribution of formula grants under Title I-C (migrant education), Title II-A (professional development), Title III-A (English learner services), Title IV-A (academic enrichment), and Title IV-B (school enrichment programs). Ex. A-31 at 3, ECF No. 61-35. The Department stated it has paused its distribution of these funds to complete review of the grants. *Id.*

1.     The Department's Support for Higher Education

The Department is committed to fulfilling its statutory requirements with respect to higher education. The Department is authorized by Title IV of the Higher Education Act to implement programs for the following:

> (1) [P]roviding Federal Pell Grants to all eligible students; (2) providing supplemental educational opportunity grants to those students who demonstrate financial need; (3) providing for payments to the States to assist them in making financial aid available to such students; (4) providing for special programs and projects designed (A) to identify and encourage qualified youths with financial or

> cultural need with a potential for postsecondary education, (B) to prepare students
> from low-income families for postsecondary education, and (C) to provide
> remedial (including remedial language study) and other services to students; and
> (5) providing assistance to institutions of higher education.

20 U.S.C. § 1070. The funds for these programs are appropriated annually by Congress.

With respect to financial aid, the Secretary is vested with "responsibility for the development and promulgation of policy and regulations relating to the programs of student financial assistance under subchapter IV." *Id.* § 1018(b)(1). Under Title III of the Higher Education Act, the Secretary "shall carry out a program, in accordance with this part, to improve the academic quality, institutional management, and fiscal stability of eligible institutions, in order to increase their self-sufficiency and strengthen their capacity to make a substantial contribution to the higher education resources of the Nation." *Id.* § 1057(a). And under Title V of that Act, the Secretary "shall provide grants and related assistance to Hispanic-serving institutions to enable such institutions to improve and expand their capacity to serve Hispanic students and other low-income individuals" *Id.* § 1101(c).

The Secretary has wide discretion in determining how to accomplish these statutory goals. Federal law does not require the Department to dedicate a particular number of employees to doing so. Nor does federal law require the Department to devote a particular threshold of resources to doing so.

2.    Department's Support for Birth to Grade 12 Education

The Department is committed to fulfilling its statutory functions in supporting Title I of the Elementary and Secondary Education Act and Individuals with Disabilities Education Act (IDEA) funds. The purpose of Title I funding is to "provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20

U.S.C. § 6301. Title I also makes available funds for state assessments. *Id.* § 6361. Congress appropriates the funding for Title I. *Id.* § 6302. The statutes place strict requirements on States' use of such funds. *Id.* § 6303. States are also required to develop and submit plans for the use of the funds. *Id.* § 6311. The statutes invest the Secretary with significant discretion on the administration of those funds.

The IDEA is meant to improve the educational outcomes of children with disabilities. *Id.* § 1400. The Act mandates the presence of the Office of Special Education and Rehabilitative Services (OSERS) in the Department of Education. *Id.* § 1402. It also mandates an Office of Special Education Programs (OSEP) within OSERS. *Id.* Congress appropriates funds for IDEA programs. *Id.* § 1407. The statutory scheme for IDEA vests the Secretary with significant discretion on what programs to implement and how those programs are staffed to achieve the purposes of IDEA.

3.     Department's Support for Vocational Education and Rehabilitation

The Department is committed to fulfilling its statutory functions with respect to support for vocational education and rehabilitation under the Perkins V Act. The Perkins V Act is intended to "develop more fully the academic knowledge and technical and employability skills of secondary education students and postsecondary education students who elect to enroll in career and technical education programs and programs of study." 20 U.S.C. § 2301. To that end, Congress created an Office of Career, Technical, and Adult Education (OCTAE) in the Department of Education. *Id.* § 3416. Congress also passed a statute to "create a partnership among the Federal Government, States, and localities to provide, on a voluntary basis, adult education and literacy activities." 29 U.S.C. § 3271.

4.    Department's Enforcement of Civil Rights Laws in Education

Congress established an Office for Civil Rights (OCR) within the Department of Education. 20 U.S.C. § 3413. As is typical with an executive enforcement function, the Secretary has wide discretion over the activities of OCR. OCR is required by regulations to review the practices of recipients of federal aid from time to time to determine compliance with applicable law. 34 C.F.R. § 100.7(a). OCR also receives complaints of prohibited discrimination according to its regulations. *Id.* § 100.7(b). The regulations require a "prompt" investigation whenever there is an indication of a possible failure of compliance. *Id.* § 100.7(c).

5.    Department's Responsibility to Study Education in the U.S. and Maintain Data

The Department is committed to fulfilling its statutory requirements with respect to collecting and maintaining data. Congress requires the Department to establish an Institute which will:

> [C]ompile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need (including in technology areas) that are supported by Federal funds appropriated to the Institute and ensure that such activities-- (A) conform to high standards of quality, integrity, and accuracy; and (B) are objective, secular, neutral, and nonideological and are free of partisan political influence and racial, cultural, gender, or regional bias.

20 U.S.C. § 9511(b)(2). The way these statistics are collected, researched, and disseminated is left to the Secretary's discretion.

## III.    Procedural History

Plaintiffs filed a Complaint on March 24, 2025, and then filed an Amended Complaint on July 1, 2025. The Amended Complaint includes five counts. Count One requests a declaratory judgment and a permanent injunction regarding the March 20 Executive Order, based on an alleged

violation of the Take Care clause. Am. Compl. ¶¶ 149-53. Count Two requests the same relief and alleges that Secretary McMahon "unlawful[ly] impound[ed] [] the Department's congressionally appropriated funds" in violation of the Appropriations Clause. *Id*. ¶¶ 154-58. Count Three also requests the same relief, alleging a violation of the Separation of Powers based on the March 20 Executive Order and Secretary McMahon's implementation of that same Order. *Id*. ¶¶ 159-61. Count Four invokes the APA and claims that "Defendants' dismantling of the Department" is contrary to law and is arbitrary and capricious. *Id*. ¶¶ 162-67. Finally, in Count Five, Plaintiffs seek *ultra vires* review of "Defendants' dismantling of the Department." *Id*. ¶¶ 168-71.

Plaintiffs filed a motion for a preliminary injunction and memorandum in support on July 1, 2025. Pls.' Mot. for Prelim. Inj., ECF No. 61; Pls.' Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 61-1 ("PI"); Proposed Order, ECF No. 61-2.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs bear the burden to establish subject matter jurisdiction, and the Court must determine whether it has jurisdiction before addressing the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998). A test of subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": (i) a facial challenge, "asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction"; or (ii) a factual challenge, "asserting that the jurisdictional allegations of the complaint [are] not true, or that other facts, outside the four corners of the complaint, preclude the exercise of subject matter jurisdiction." *Brown v. Mass Transit Admin.*, No. ELH-12-3705, 2013 WL 1428527, at *2 (D. Md. Apr. 8, 2013) (Hollander, J.) (citing *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009), and *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 736 (D. Md. 2001)).

Under Rule 12(b)(6), a court should grant a motion to dismiss if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

### I.  Courts Across the Country Have Denied Narrower Relief Than That Sought By Plaintiffs.

This case is in an unusual posture. There have been multiple lawsuits seeking preliminary injunctions regarding the restructuring and related activities at the Department. In cases in which district courts have granted the sweeping, preliminary relief that Plaintiffs seek here, the Supreme Court has had to step in to stay those preliminary injunctions. And in cases in which plaintiffs have sought narrower, more targeted relief regarding specific activities at the Department, many district courts have denied preliminary injunctions—including a court in this same judicial district. *Infra* II.C-E; *see also Child Trends, Inc. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1651148, at *1 (D. Md. June 11, 2025). Taken together, these decisions demonstrate that preliminary injunctive relief is not warranted here, and instead this Court should dismiss this lawsuit.

A.    **The Supreme Court Has Already Granted a Stay of a Preliminary Injunction Regarding the Department's RIFs.**

First up are two consolidated cases challenging RIFs across the entire Department. Plaintiffs in *New York v. McMahon* and *Somerville Public Schools v. Trump* consist of states, school districts, and unions representing teachers and school employees. Like the Plaintiffs here, the plaintiffs in those cases alleged that the RIFs across the entire Department were not only unlawful, but were also so severe and sweeping that they were an impermissible step toward dismantling the Department in its entirety. *New York v. McMahon*, --- F. Supp. 3d ----,  2025 WL 1463009, at *2 (D. Mass. May 22, 2025). And much like the Plaintiffs here, the plaintiffs in those cases alleged the RIFs violated the Constitution's Separation of Powers doctrine, violated the Take Care Clause of the Constitution, was ultra vires, and violated the Administrative Procedure Act ("APA") because they were contrary to law and arbitrary and capricious. *Id.*

The district court granted a preliminary injunction enjoining the RIFs and requiring the reinstatement of Department employees to their work functions in order to ensure that the Department was carrying out its statutory functions. *Id.* at *40. The Supreme Court, however, granted the Government's application for a stay. *McMahon v. New York,*  606 U.S. ----, 2025 WL 1922626, at *1 (U.S. July 14, 2025) (mem.). In granting the stay, the Supreme Court determined that the Government was likely to succeed on the merits, and that the other equitable considerations also militated against preliminary relief. In support of its request for a stay, the Government presented both threshold jurisdictional arguments as well as merits arguments to the Supreme Court. Specifically, the Government argued that plaintiffs lacked any non-speculative harm to support Article III standing, that the Civil Service Reform Act ("CSRA") is the exclusive means for challenging federal personnel actions, that the injunction exceeds courts' traditional remedial authority, and that the court-ordered the reinstatement of nearly 1400 employees is not a remedy

traditionally available in equity. Stay Application at 14, *McMahon v. New York*, No. 24A1203 (U.S. filed June 6, 2025). As to the remaining injunction factors, the Government argued that the district court's preliminary relief irreparably harmed the Executive Branch and that the balance of the equities and the public interest both cut in Defendants' favor. *Id.*

By granting Defendants' stay request, the Supreme Court necessarily accepted Defendants' arguments that the *New York* court had previously rejected when it issued a preliminary injunction. *See, e.g.,*, *Trump v. CASA, Inc.*, 606 U.S. ----, 2025 WL 1773631, at *6 (U.S. June 27, 2025) (citing Nken factors and noting for a stay application to be granted, the applicant must make "a strong showing that [it] is likely to succeed on the merits") (internal quotations omitted); *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (weighing injunctive factors and granting stay pending appeal). The arguments the Supreme Court accepted are the same arguments presented here to dismiss this Plaintiffs' claims and oppose Plaintiffs' request for a broader preliminary injunction. Those arguments should be adopted by this Court in dismissing Plaintiffs' lawsuit and denying their request for a preliminary injunction.[1]

### B.    The Supreme Court Has Already Granted a Stay of a Preliminary Injunction Regarding the Department's Grant Terminations.

Next up is *California v. Department of Education*, which addressed the Department's termination of grants. There, a group of states challenged the cancellations of TQP and SEED grants from the Department to various organizations within the states. Complaint, *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass 2025) (No. 25-10548-MJJ), ECF No. 1. Plaintiffs claimed that the terminations were arbitrary and capricious and were "not in accordance with law." *Id.* ¶ 14. The district court—the same court as in *New York v. McMahon* and *Somerville Public*

---

[1] The same district court judge in *New York v. McMahon* issued a preliminary injunction enjoining RIFs within OCR in *Victim Rts. L. Ctr.*, 2025 WL 1704311, at *20, but Defendants have moved to vacate based on the Supreme Court's stay in *New York v. McMahon.*

*Schools v. Trump*—granted a temporary restraining order against the cancellation of these grants. Memo. & Order on Pl. States' Mot. for TRO, *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass  2025) (No. 25-10548-MJJ), ECF No. 41.

The Supreme Court treated the temporary restraining order as a preliminary injunction and entered a stay of the preliminary injunction. *U.S. Dep't of Educ. v. California*, 145 S. Ct. 966 (2025). In so doing, the Court found that "the Government is likely to succeed in showing the District Court lack[s] jurisdiction to order the payment of money under the APA" because the APA's waiver of immunity does not apply to claims for money damages or where another statute forbids the relief sought. *Id.* at 968. While the Court acknowledged that an APA claim "is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds," it nonetheless found that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what" Plaintiffs requested. *Id.* (citations omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (citing 28 U.S.C. § 1491(a)(1)).

Plaintiffs here challenge the termination of many of the same competitive grants; if anything, their standing interests are even more attenuated than those in *California*. Simply put, the Supreme Court's stay leaves no room for this Court to grant a preliminary injunction regarding grants and counsels in favor of dismissal of those claims.

### C.    A Court in the District of Maryland Denied a Request for a Preliminary Injunction Regarding RIFs and Contract Cancellations Within the Department's Institute for Educational Sciences.

Closer to home, *American Education Research Association v. Department of Education* is a lawsuit pending in this district regarding both RIFs and contract cancellations at the Department's Institute for Educational Sciences (IES). The plaintiffs, two professional organizations, sought a

preliminary injunction which the court construed to be "challenges to the dismantling of IES." *Am. Educ. Rsch. Ass'n v. Dep't of Educ.*, No. CV SAG-25-1230, 2025 WL 1665401, at *1 (D. Md. June 12, 2025).

Even though the Court concluded that IES "is not doing a number of tasks Congress requires of it" and "is unlikely to fulfill many of its statutory functions in the future," the Court nonetheless denied the preliminary injunction. *Id.* at *1, *6. In so doing, the Court noted that the plaintiffs had alternatively framed their contract-termination arguments both broadly and narrowly. *Id.* at *1. The broad reading was to lump together all contract terminations as one final agency action. The Court found that this approach "struggle[d] to demonstrate a singular final agency action," made "the kind of programmatic challenge the APA disfavors," and "lump[ed] in swaths of individual terminations that likely were within the government's discretion." *Id.* But the narrow approach had its own problem: the Plaintiffs ran into Tucker Act problems and standing problems. *Id.*

The Court also found that the Plaintiffs would not have standing to sue based on any contractual right as third-party beneficiaries. *Id.* at *5. Nor could Plaintiffs ask the court to order IES to fulfill any of its statutory duties through a specific contract. *Id.* The court concluded it could not order IES to fulfill its statutory duties through specific contracts because 1) it would intrude on the autonomy of the contractor because the contractor is the most directly affected and did not ask for the relief, 2) reinstating specific contracts when IES could fulfill its duties in other ways would be "impermissible micromanagement" of the agency, and 3) intervening on any specific contract might raise Tucker Act issues. *Id.*

As for the RIFs, the Court held "[p]laintiffs run into many of the same problems" as the contract terminations. *Id.* IES was not congressionally mandated to "maintain a certain number of

staff members, and [p]laintiffs are not entitled to work with particular IES employees." *Id*. The Court explicitly departed from the district court's (stayed) preliminary injunction in *New York v. McMahon,* No. 25-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025). *Id.* at *6. In fact, the court criticized the *New York* injunction as being "even broader" than the one before it, noting that the *New York* injunction did not have *any* parsing of what the DOE's statutory mandates are and what employees are necessary to accomplish them. *Id*. The Court found that reinstating every employee would be overly broad and that Plaintiffs would not have standing for that relief. *Id.* at *1-2.

The Court also noted the Plaintiffs had a "steep hill" to climb to receive a preliminary injunction, as they had waited to request a preliminary injunction until May for actions that took place in February. *Id.* at *1.

Here, Plaintiffs challenge the same contract cancellations and RIFs within IES. But they are even more attenuated as alleged beneficiaries from the statute than the Plaintiffs in *AERA* where the court found there were significant standing problems. For the same reasons as in *AERA*, this Court should deny Plaintiffs' preliminary injunction and dismiss Plaintiffs' claims.

### D.    A Court in the District of Columbia Denied a Request for a Preliminary Injunction Regarding RIFs and Contract Cancellations Within IES.

Two nearly identical cases pending before the United States District Court for the District of Columbia challenged the IES contract cancellations and RIFs. And in each, the district court denied the plaintiffs' preliminary injunction motions, which sought reinstatement of the cancelled contracts and employees subject to the RIF. *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-CV-00999 (TNM), 2025 WL 1568301, at *2 (D.D.C. June 3, 2025); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 25-cv-999 (D.D.C. filed Apr. 4, 2025).

The plaintiffs in each case are various professional organizations whose goals are, among

other things, providing a forum for discussion and debate as to what drives effective education and related services for people of all ages, focusing on "research, policy, and advocacy" surrounding access to postsecondary education. advancing high-quality research to improve education policy and practice, and promoting advancement in assessment, evaluation, testing, and other aspects of educational measurement. *Ass'n for Educ. Fin. & Pol'y, Inc.,* 2025 WL 1568301, at *3. These Plaintiffs members relied on data from IES in their activities. *Id.* In both cases, the plaintiffs challenged the decisions to cancel contracts, reduce staffing, and modify data access procedures, asserting that those actions were arbitrary and capricious and violated the IES's statutory mandates. *Id.* at *7.

The district court denied the preliminary injunction motions in each case, finding that the plaintiffs had failed to show a likelihood of success on the merits. In particular, the district court found that "[t]he programmatic nature of the [plaintiffs'] challenge dooms its motion." *Id.* at *6. For the contract cancellations, the court noted that the contracts were cancelled at different times, and others were reinstated, reflecting separate, discrete decisions. *Id.* And the fact that the Plaintiffs asked for research and data dissemination to continue reflected the programmatic focus. *Id.* at *7. With respect to the RIF, the programmatic focus was confirmed because the briefing focused on the effects of the RIF, not the RIF itself. *Id.* The court noted that a challenge to the termination of the remote access program might represent a proper APA claim, but because it was bundled with the programmatic challenge, it too would be unlikely to succeed on the merits. *Id.* at *8.

The court likewise held that the plaintiffs had failed to show a likelihood of success as to their constitutional claims because they were essentially repackaged APA claims. *Id.* at *9. The court further found that the Tucker Act may preclude review, as some of the plaintiffs' members worked pursuant to the cancelled contracts. *Id.* at *11.

Here, Plaintiffs are asking for the same relief as the plaintiffs in *AEFP* and *NAE* but are even more attenuated as alleged beneficiaries from the statute. For the same reasons as in *AEFP* and *NAE*, this Court should deny the preliminary injunction and dismiss Plaintiffs claims

### E.    A Different Court in the District of Columbia Denied a Request for a Preliminary Injunction Regarding RIFs Within the Department's Office for Civil Rights.

In *Carter v. United States Department of Education*, No. 25-0744, 2025 WL 1453562 (D.D.C. May 21, 2025), the plaintiffs—a group of parents and students and an advocacy organization—sought a preliminary injunction enjoining a RIF and closure of regional offices at the Department of Education's Office of Civil Rights (OCR). In denying the plaintiffs' motion, the district court found that they were not likely to succeed on the merits of their Administrative Procedure Act (APA) claims for two reasons: (1) because they had failed to offer sufficient evidence that OCR failed to perform statutory and regulatory duties and (2) because their challenge was a "'broad programmatic attack' on the agency's operations that is not cognizable under the APA." *Id.* at *6 (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)); *see generally id.* at *6-14. The court similarly found that the plaintiffs were unlikely to succeed on their ultra vires claim. *See id.* at *14.

Plaintiffs here challenge the same RIFs within OCR for substantially the same reasons. Thus, this Court should follow the *Carter* court and deny the preliminary injunction and dismiss Plaintiffs' claims.

## II.    Plaintiffs are Unlikely to Succeed on the Merits of Their Claims, Which Should Be Dismissed for Lack of Jurisdiction or Failure to State a Claim.

As the recitation above makes clear, courts that have addressed claims identical to those presented by Plaintiffs here have either denied preliminary injunctions or, if they have granted preliminary injunctions, those orders have consistently been stayed by the Supreme Court when

17

the matter has been presented to that Court by the Government via a stay applications. Applying those principles here, Plaintiffs cannot show they are likely to succeed on the merits of their claims, which have both threshold and substantive flaws.

### A.    Plaintiffs Lack Standing

As a threshold matter, Plaintiffs have failed to demonstrate standing. To establish Article III standing, a plaintiff must show that it has suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431. As the Supreme Court has stressed, "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (internal quotation marks and citation omitted).

Plaintiffs do not profess to know any details about the reorganization within the Department, but nonetheless argue that they have been or will be harmed by this reorganization. In an attempt to prove these speculative harms, Plaintiffs provide numerous declarations hypothesizing harm that *may* befall them *if* the Department is unable to provide a particular service or function.[2]

---

[2] *See, e.g.*, Ex. E ¶ 14, ECF No. 61-39 ("schools in rural communities *may* be improperly barred from access to these and other programs upon which they rely to hire teachers"); Ex. J ¶ 11, ECF No. 61-46 ("He *may* require services from similar personnel in the future"); Ex. N ¶ 20, ECF No. 61-54 ("an eventual resolution *may* come too late to be meaningful to the complainant"); Ex. P ¶ 16, ECF No. 61-57 ("Unless they can be sure that they will receive continued grant funding next year, institutions *may* not feel confident enough to, for instance, recruit current high school students to enter ELL/MLL teacher training programs in the fall."); Ex. R ¶ 31, ECF No. 61-59 ("IES's remaining IT contract is not sufficient in scope to troubleshoot and address technical problems that *may* arise."); Ex. T ¶ 12, ECF No. 61-63 ("This in turn will mean that annual IDEA determinations and the enforcement steps that result from them, which are supposed to be based on these data, *may* be incorrect."); *id.* ¶ 15 ("the RIF is also causing delays in the competitive grant process and

This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same).

Even if Plaintiffs could show an imminent, actual harm—only one part of the chain they must show for standing—in many cases they cannot connect it to a statutory violation rather than an exercise of proper discretion. As described above, the Secretary has discretion over the granting and termination of competitive grants and contracts and over staffing levels. Plaintiffs ask this Court to freeze the Department's programs in amber as they existed when this Administration first took office, notwithstanding the Secretary's differing judgment about how the Department should operate. Having crossed—in Plaintiffs' mind—some threshold for organizational change that is as unarticulated as it is inarticulable, Plaintiffs ask this Court to step in and manage the Department's

---

*may* prevent those grants from being awarded in a timely manner or consistent with the law"); Ex. V ¶ 19, ECF No. 61-65 ("students *may* earn credentials which are not actually valuable or in demand"); Ex. HH ¶ 10, ECF No. 61-80 ("Rural school districts facing funding uncertainty may be forced to lay off staff, which is a particularly acute harm for rural schools."); Ex. OO ¶ 20, ECF No. 61-88 ("Some schools *may* take advantage of the lack of accountability and not resolve the issues."); Ex. PP ¶ 35, ECF No. 61-89 ("If the Department were fully staffed and functional, I would at least *feel like* my case was progressing as opposed to perpetual stagnation."); Ex. ZZ ¶ 11, ECF No. 61-99 ("given uncertainty about Department of Education funds, Howard *may* well make the decision to recoup funding shortfalls via increased tuition"); Ex. AAA ¶ 10, ECF No. 61-100 ("I myself *expect* that I will rely on PSLF in the future."); Ex. CCC ¶ 11, ECF No. 61-102 ("school districts experience budget cuts, they *may* stop sending students to LCTI"); Ex. DDD ¶ 16, ECF No. 61-103 ("Without responses from the Department, SEAs *may* be overly cautious in approving LEAs' grant fund expenditures or *may* fall out of compliance with grant requirements."); Ex. JJJ ¶ 14, ECF No. 61-111 ("This means that the Department may have to use the 2023-2024 SPPE data for the October 1 distributions."); Ex. LLL ¶ 20, ECF No. 61-112 ("the Department *may* not be able to accurately determine whether proposals are evidence-based and may award funds to programs with no evidence of effectiveness"); *id.* ¶ 22 ("As a result, educators, students, and other stakeholders *may* turn to less reliable sources of information, like unvetted blogs or social media platforms.") (emphasis added to all).

programs. That is not the law.

With respect to both competitive grants and formula grants in particular, the principal relief Plaintiffs seek is a judicial order commanding the Department to pay out money to non-party grantees pursuant to grants that were previously awarded by the Department to non-party grantees. *See* Proposed Order at 2-3. However, neither Plaintiffs nor their members were ever the recipients of those grants and contracts. Plaintiffs, who have the burden, fail to demonstrate that they have standing to demand payments to a non-party. *Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*, No. 25-CV-2429 (MKV), 2025 WL 1684817, at *11 (S.D.N.Y. June 16, 2025).

**B.  The CSRA Provides the Exclusive Remedy for Plaintiffs' RIF-Related Claims.**

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate Plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE")*, 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's RIFs.

The CSRA and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth in the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more

broadly). In passing the CSRA, Congress made the Merit Systems Protection Board[3] and Federal Labor Relations Authority ("FLRA")[4] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-15 (2012) (citation omitted); *see also AFGE*, 929 F.3d at 752; *Nat'l Ass'n of Agric. Emps. v. Trump,* 462 F. Supp. 3d 572, 586 (D. Md. 2020) (adopting the reasoning of *AFGE*).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' RIF claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court, but instead must pursue before the FLRA or the MSPB.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the

---

[3] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id*. § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

[4] The FLRA was established by Congress as part of the FSM-LRS to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id*. § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

intent for exclusive review in the court of appeals is "(i) . . . fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* (citations omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455. In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework. As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide' . . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro v. James*, 416 F.3d 63, 67-69 (D.C. Cir. 2005)), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635-36 (D.C. Cir. 2013).

That Plaintiffs have framed their alleged injury in constitutional terms does not allow them to sidestep CSRA's mandatory channeling regime. *See* PI at 22-31. *Cf. Maryland v. U.S. Dept. of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. April 9, 2025) ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims, and the Government is unlikely to recover the funds disbursed to reinstated probationary employees."). Were Plaintiffs' theory correct, downstream users of government services could always go directly to court to raise challenges to agency RIFs notwithstanding Congress's determination that the employees must themselves first pursue relief administratively. Courts have repeatedly rejected these sorts of end runs. In *Elgin*, the Supreme Court held that even if a federal employee was

raising constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" 567 U.S. at 12. Similarly, in *AFGE*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring their claims. *See id*. at 754-61 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-16 (1994)); *Nat'l Ass'n of Agric. Emps. v. Trump,* 462 F. Supp. 3d 572, 586 (D. Md. 2020) (adopting the reasoning of *AFGE v Trump*); *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 636-39 (D.C. Cir. 2013); *Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1,  (D.D.C. 2025) (upholding channeling requirement and denying request for emergency relief).

Indeed, it would be odd if a stranger to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise. In fact, it would upend the entire structured process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding,"

and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* fully apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). Because Congress intentionally foreclosed judicial review by parties other than those to whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions here.

**C.    The Court Lacks Jurisdiction Over Plaintiff's Challenge to the Cancellation of the Department's Contracts or Competitive Grants.**

Any challenges to the cancellation of the Departments' contracts or grants are not subject to this Court's jurisdiction. Under the Tucker Act, any claim based on "an[] express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). To determine whether an action is "at its essence a contract action," this Court "make[s] rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969-70 (D.C. Cir. 1982)). In this case, rational distinctions make clear that this Court lacks jurisdiction over any claims challenging the

cancellation of the Department's contracts or grants.

First, with respect to contracts, the Education Sciences Reform Act permits IES to perform its delineated functions "directly *or* through grants, contracts, or cooperative agreements." 20 U.S.C. § 9512 (emphasis added). While the Act allows the Institute's centers to enter contracts to perform their duties, Plaintiffs do not suggest that the Act required the centers to maintain the particular contracts being challenged. Given that Plaintiffs seek the reinstatement of specific contracts that had been cancelled, *see* Proposed Order, the source of Plaintiffs' challenge then lies within those specific contracts themselves.

Similarly, with respect to competitive grants, Plaintiffs identify no source independent of the grants themselves for the right for non-party grantees to receive that funding. PI at 19-21. Indeed, Plaintiffs declarations identify how they are harmed from the cancellation of specific grants. *See, e.g.,* Ex. C ¶¶ 41-42 , ECF No. 61-37 (describing impact of cancellation of TSL AZ-Prime Grant); *id.* at ¶¶ 39 (describing impact of cancellation of SEED grant). But Plaintiffs do not argue that the Department is obligated to award any one individual grant. Given that Plaintiffs seek reinstatement of these specific grants and their factual allegations are drawn toward specific grants, the source of Plaintiffs' challenge lies within those grants themselves.

Plaintiffs' citation to the APA as barring these cancellations is misplaced, PI at 35-37, 39, as the APA itself does not grant jurisdiction where another statutory scheme (here, the Tucker Act) applies. *See Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004).

As noted above, the Supreme Court recently reaffirmed the impropriety of relying on the APA to challenge contractual matters—including some of the same grants at issue in this case—in *Department of Education v. California*. There, a group of states challenged grant terminations by

the Department of Education under the APA—a gambit that the Supreme Court rejected:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction is "not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

*U.S. Dep't of Educ. v. California*,  145 S. Ct. 966, 968 (2025). Since the Supreme Court issued its decision in *California*, courts have responded by withholding or staying orders that would have required the types of remedies Plaintiffs seek here. *See, e.g., Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025); *Sols. in Hometown Connections v. Noem*, No. 25-CV-00885-LKG, 2025 WL 1530318, at *10 (D. Md. May 29, 2025).

Simply put, the nature of the relief Plaintiffs seek sounds in contract. Plaintiffs, in effect, ask the Court to order Defendants to reinstate all grants and contracts that were terminated. Proposed Order, ECF No. 61-2. In that regard, Plaintiffs seek the classic contractual remedy of specific performance. But this Court cannot order the Government to continue to perform under a contract; that type of specific performance claim can only be resolved by the Court of Federal Claims. *California*, 145 S. Ct. at 968. Thus, this Court lacks jurisdiction over the claims challenging the Departments' cancellation of contracts.

**D.    Claims Relating to any "Closure" of the Department of Education Are Not Ripe.**

Counts I and III-V of the Plaintiffs' claims are not ripe for review. That is because the

Department of Education is not closed. And it will not be closing without congressional action. The ripeness doctrine requires a reviewing court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated by*, *Califano v. Sanders*, 430 U.S. 99 (1977). Usually, a plaintiff must demonstrate both prongs to obtain review. *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995).

The ripeness doctrine reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision." *Abbott Lab'ys*, 387 U.S. at 148. Moreover, in making prong two determinations, courts consider pragmatic issues that would arise from considering the agency action to be reviewable. *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242-43 (1980); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019). A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact "remains wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (citation omitted). As explained above, the Department has not (and will not, without an act of Congress) close, and the impacts to Plaintiffs are wholly speculative.

### E.    Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Final Agency Action.

Plaintiffs fail to satisfy the essential elements of their APA claims in Count Four because they are not petitioning for judicial review of a circumscribed and discrete agency action. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular

'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *Norton*, 542 U.S. at 62 (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *Id.* The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted). The avoidance of such review reflects separation of powers concerns and seeks to prevent the "broad programmatic attack[s]" disfavored in agency review. *Norton*, 542 U.S. at 64; *see also City of New York*, 913 F.3d at 431.

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Defendants' management of the Department of Education. Plaintiffs argue that the "closure" of the Department, the RIFs, the IES contract cancellations, and the grant terminations are all final agency actions. PI at 32. The Department is not closing. *See supra*. The RIFs are in actuality a collection of several ongoing actions—elimination of some non-statutorily required organizational components, reassignments of tasks, transfers of functions, redirection of priorities, and reductions of staff in certain offices. The contract cancellations and grant cancellations were performed over a series of days and were individually motivated. In

*Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93.

Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic challenge to all of these individual actions, including actions yet to be taken when the Amended Complaint was filed. The wholesale nature of the challenge is confirmed by Plaintiffs' pleadings. The APA counts involve claimed statutory violations, but they do not mention a specific statute that forms the basis of the challenge itself. Rather, Plaintiffs allege at the highest level of generality that Defendants lack the "constitutional or statutory authority, as the President's agents, to dismantle the Department; wind down its statutorily mandated programs and activities; or withhold, terminate, or otherwise interfere with funds appropriated to the Department for its programs and operations." Am. Compl. ¶ 165. But addressing that type of claim would require the Court to supervise all of the agency's activities and determine how the Department would accomplish each specific statutorily-mandated function—an even more extreme kind of supervisory claim than what was at issue in *Lujan* itself. But as the Court explained in *Norton*, the purpose of the APA's discrete agency action requirement is:

> to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was

achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67. With those principles in mind, the wholesale nature of Plaintiffs' challenge is also confirmed by the requested injunction, which is breathtaking in scope in that it would require:

- the Court to identify statutorily mandated functions;

- this Court's supervision over whether any decision by the Department impacts those statutorily mandated functions;

- reinstatement of a class of employees whose employment agency leadership does not view as being in the government's interest;

- this court's supervision over any grant termination, personnel action, or contract cancellation, making this Court the day-to-day manager of the Department;

- mechanizing this Court's supervision via reporting requirements

Proposed Order, ECF No. 61-2. This case is many times more intrusive than anything at issue in *Lujan*.

Because the Amended Complaint raises a wholesale challenge, Plaintiffs are not likely to succeed on the merits in this case. But out of an abundance of caution, Defendants address Plaintiffs' "final agency action" argument. *See* PI at 32-35. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action[.]" 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs claim that the Department's closure, the RIF, the dismantling if IES through RIFs and contract cancellations, and the cancellation of competitive grants[5] are the final agency actions. PI at 32-34. It is telling that Plaintiffs are unable to identify any concrete, final decision by the Department of Education to shut itself down. To the extent that Plaintiffs are relying on the RIF as the final agency action with respect to the reorganization of the Department, the RIF marks the initiation, not the consummation, of the agency's decision-making process. The RIF reflects a decision by Department leadership that agency functions need to be streamlined and reorganized. Similarly, the cancellation of IES contracts reflect a decision by Department leadership that some contracts are not needed, and others need to be descoped. And to the extent the cancellation of grants is meant to reflect a decision not to issue competitive grants at all, Plaintiffs lack any evidence of a decision not to issue grants. These decisions are thus "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the RIFs, grant terminations, and contract cancellations themselves the "consummation of the administrative process" reevaluating the agency's priorities. *Id.* at 113. Moreover, even if it is a final agency action, judicial review for RIFs, contract cancellations, and grant terminations are not available in district court. *See supra* at Section II.B.

## F.    Plaintiffs' Constitutional Claims are Unlikely to Succeed.

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. In Count One, Plaintiffs allege that the President's Directive and the actions of the Secretary "to close the Department or dismantle any of its congressionally mandated functions" violates the

---

[5] Further emphasizing Plaintiffs lack of standing on these claims, Plaintiffs only identify legal consequences for the cancellation of grants on non-parties. PI at 34 ("The cancellations have legal consequences for the recipients who will no longer receive the funds").

Take Care Clause. Am. Compl. ¶ 153.

In Count Two, Plaintiffs allege that the Secretary's "unlawful impoundment of the Department's congressionally appropriated funds" runs afoul of the Appropriations and Spending Clauses. *Id.* ¶ 158.

And in Count Three, Plaintiffs allege that the "directives set forth in the March 20 Executive Order, the prior directives from the President that it memorializes, and Secretary McMahon's actions to implement those directives" violates separation of powers. *Id.* ¶ 161.

These "constitutional" claims are nothing more than Plaintiffs' statutory objections dressed up in constitutional garb. But Plaintiffs cannot turn what is otherwise an amorphous statutory claim into a constitutional issue merely by alleging that Defendants' failure to comply with their statutory obligations (under the Department of Education Organization Act) constitute an unlawful abridgment of Congress's Article I powers, a spending clause violation, or an abdication of the President's constitutional responsibilities under Article II, Section 3. As the Supreme Court explained in *Dalton v. Specter*, permitting a party to assert a separation-of-powers claim like Plaintiffs' would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511 U.S. 462, 474 (1994). The Court in *Dalton* thus rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Plaintiffs therefore cannot prevail on the merits of Counts I-III by equating putative statutory non-compliance with a constitutional infraction.

At any rate, because the Department of Education Organization Act does not foreclose Defendants' decision-making, *infra* Section II.H., Plaintiffs' separation of powers claim would lack merit even if properly pled. The Court should find Plaintiffs' claims unlikely to succeed on

this ground alone. *See New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979) ("Before deciding [a] constitutional question," a court must consider whether other "grounds might be dispositive."). Indeed, Plaintiffs' decision to invoke a non-statutory cause of action to raise these "ultra vires" claims means they must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022) (emphasis omitted).

Moreover, to the extent Plaintiffs take issue with changes to the Office for Civil Rights, the Supreme Court has long recognized that agencies can permissibly decide what enforcement and supervision actions to take, if any, consistent with the statutory duties imposed on the agency by Congress. *See Heckler v. Chaney*, 470 U.S. 821 (1985) (agency enforcement discretion generally not subject to judicial review). Judicial deference to Defendant's decision-making about the priorities of the Department is especially warranted with respect to claims directed at the OCR, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Heckler*, 470 U.S. at 832. As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. 470 U.S. at 831-32.

Plaintiffs' subjective views about how to best implement the statutes governing the Department do not serve as a basis for the Court to reorder those priorities itself. The Government Accountability Office (GAO), itself an entity within the Legislative Branch, has similarly approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981). Defendants' actions are directed toward determining how best to implement programs

consistent with the President's policy objectives and underlying law, and therefore is not violative of separation of powers principles.

The implementation of such policy priorities is plainly within the purview of Defendants, acting on behalf of the President. In cases where the President must "exercise . . . Executive discretion," the duty "imposed on the President is in no just sense ministerial. It is purely executive and political." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866). Thus, "[a]n attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* (citation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (finding it improper for courts "to assume a position of authority over" the President's duty to "take Care that the Laws be faithfully executed" (citations omitted)). To hold otherwise would itself upset the separation of powers by allowing judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *See Dalton*, 511 U.S. at 474-75 (judicial review of discretionary Presidential decisions "is not available"); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"). While Defendants' policy priorities and enforcement decisions may differ from those preferred by Plaintiffs, Plaintiffs are unlikely to succeed in demonstrating that Defendants' decision-making amounts to a violation of the Constitution.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010); *id.* at 495-97; *see also Printz v. United States*, 521

U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the actions of other Federal Defendants, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

Plaintiffs have no cognizable interest in simply policing the Department's compliance with the Constitution. Their ability to bring this case with respect to contracts and grants depends on their claim that specific entities—the non-party grantees—have a legal entitlement to the disputed funds. Yet, neither the Take Care clause, nor the Spending Clause, nor the Constitution's separation of powers remotely confers on these entities a right to federal funds. Rather, "it is the operative grant agreements which entitle any particular [recipient] to receive federal funds." *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). Indeed, "no cause of action would exist" without the grant and contract agreements. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (citation omitted). That Plaintiffs' claims could not "exist[] prior to and apart from rights created under the [agreements]" precludes district court jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

Plaintiffs Spending and Appropriation Clause arguments also fail because Congress merely appropriated funds for broad purposes, including for the expenses of Department operations, and the further delineation of broad purposes does not require that the Government provide specific amount funds to particular contracts, particular grants or employee salaries. *See infra* at II.M. How those funds could best be distributed is not a judicially reviewable question, but instead is left to agency discretion.

With respect to the formula grants, even taking Plaintiffs allegations as true, Defendants

are not withholding the formula grants but rather reviewing them. Indeed, Plaintiffs have provided no evidence that Defendants intend to withhold these formula grants. That Defendants did not make these funds available by July 1 is of no moment (PI at 7)—Plaintiffs do not identify a statutory obligation to make them available on July 1.

Nor do Plaintiffs make any progress by repackaging their APA claims as ultra vires claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is distinct from their APA claims. Indeed, Plaintiffs' *ultra vires* claim in Count V alleges:

> "No statute, constitutional provision, or other source of law authorizes Defendants to dismantle the Department, close any of its statutorily mandated components or offices, or shut down any of its statutorily mandated functions in violation of the DEOA and the statutes the Department administers. To the contrary, the DEOA and statutes such as ESEA, IDEA, HEA, Perkins, and ESRA create clear and mandatory statutory duties for the Department and its subdivisions to execute, and Congress has consistently appropriated funds to enable the Department to fulfill those obligations."

Am. Compl. ¶ 170. This count is merely duplicative of the APA claim in Count IV, which alleges violations of statutory requirements. Thus, Plaintiffs' *ultra vires* claim fails for the same reasons as do the APA claims.

### G. Because the Executive Order Expressly Directs the Department to Continue All Actions Required by Law, the Executive Order Does Not Infringe on the Department's Statutory Obligations.

Even if Plaintiffs could overcome the threshold defects of their claims, they are unlikely to succeed on the substantive merits of their claim that the Education Department's statutes foreclosed the President's Executive Order. Insofar as they are challenging the President's

36

Executive Order, the claims fail because they rely on characterizations of that Order that are inconsistent with its terms. The Executive Order does not require the immediate shutdown of the Department. To the contrary, the Executive Order requires the Secretary of Education only to discontinue activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a).

Definitionally, directing the Secretary to end functions unless required by law cannot be interpreted to violate the law. It is plainly lawful for the President to direct the Secretary to act within the agency's discretion to end programs not required by law. *See, e.g., Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). The notion that the agency is being dissolved is wholly inconsistent with Secretary McMahon's statement that the Department "will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking." RIF Press Release.

## H.    Defendants Are Making Reasonable Judgments that Are Committed to Agency Discretion by Law.

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim, which, as briefed, involves actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id*. Agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to

adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.").

As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department of Education. This waste impacted the ability of the Department to perform its underlying mission, which is to support states and localities in providing education to their citizens. Based on these findings, the Secretary has taken the first steps in right-sizing the Department through a RIF and contract cancellations. And as described above, the Secretary cancelled all grants that "are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication." ECF No. 61-25 at 2.

Plaintiffs bear the burden of showing that the Department's RIFs are arbitrary and capricious. *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995). Secretary McMahon has not directed the immediate dissolution of the Department. Indeed, the RIF retains approximately half of the agency, a far cry from a complete shutdown. Moreover, the Department has stated its commitment to performing its statutory obligations. Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staff to ensure that staff is carrying out statutory obligations or otherwise implementing agency leadership's policies would be an extraordinary violation of the separation of powers.

At bottom, the RIFs incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. Off. of Pers. Mgmt.*, 140 F.3d 1031, 1033

(Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a [RIF]; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision.") (cleaned up). "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and the structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' managerial decisions are committed to agency discretion.

First, staffing decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191 (citation omitted). After all, the very point of the RIFs is to improve efficiency, which allows the Department to "meet its statutory responsibilities in what [the new administration] sees as the most effective or desirable way." *Id.* at 192. Similarly, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831. The RIFs reflects the Administration's effort to realign the Department to provide better service to the American people. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, Plaintiffs cannot point to a particular statute limiting the agency's inherent discretion to reduce headcount. Again, agencies generally have broad discretion to determine how to implement a statute. *See Vt. Yankee*, 435 U.S. at 543.

To be sure, the letter from Secretary McMahon includes only a cursory explanation—unsurprising given the traditionally unreviewable nature of the decision it reflects. But even if this

Court were to conclude that the explanation provided is insufficient for judicial review, that would in no way justify a preliminary injunction. Rather, "the proper course" would be "to remand to the [Department of Education] for additional . . . explanation," not any type of injunction. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Any challenge to non-formula funding decisions by the Department are committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). In appropriating funds for the Department, Congress gave the agency broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws.

With respect to the contracts cancelled within IES, in 2024, Congress appropriated funds "[f]or necessary expenses for the Institute of Education Sciences." Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 690 (Mar. 23, 2024); S. Rep. 118-84 at 247 (incorporated into statute by Pub. L. 118-47 § 4 and Explanatory Statement, 170 Cong. Rec. H1501, 1886 (Mar. 22, 2024)). Congress continued funding at this level for 2025. Sec. 1101(a)(8), Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4 (Mar. 15, 2025).

Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler*, 470 U.S. at 830. The agency has unreviewable discretion to make choices on how the appropriations are spent. *Lincoln*, 508 U.S. at 192 ("[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion"). The Department's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831-32).

With respect to the competitive grants, as Plaintiffs concede, the Secretary is invested with broad discretion as to whom the grants are delivered. PI at 19 (stating Congress "allow[s] the Secretary leeway to determine which applicants receive awards"). None of the statutes governing competitive grants directs the Secretary to make any specific grant, nor to grant any specific entity a grant. 34 C.F.R. § 75.1(b) ("A discretionary grant program is one that permits the Secretary to use discretionary judgment in selecting applications for funding").

Plaintiffs invoke statutes authorizing TQP, TSL, SEED, School Based Mental Health Services (SBMH), and Mental Health Service Professional Demonstration (MHSP) programs, which identify goals and criteria for the Department's consideration in awarding grants. PI at 19-20. Plaintiffs also invoke the General Education Provisions Act, which they claim requires notice-and-comment rulemaking before the Department can issue priorities governing the award of competitive grants. *See id*. None of these statutes, however, prevents the Department from terminating grant agreements—understandably, since without the ability to terminate for grantee misconduct or to reflect democratic changes in Administration priorities, one Administration could bind future Administrations to policies and priorities extending well past the term of an Administration. And none of these laws vest grant recipients with a right to the continued performance of their grant agreements—let alone third-party beneficiaries to the continued services of the grant recipients. It is thus "problematic" to suggest that the source of Plaintiffs' claimed rights are these statutes as they "cannot possibly provide the relief sought." *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995).

*     *     *

For the reasons set forth above, Plaintiffs are unlikely to succeed on the merits of their claims, thus warranting the denial of their motion for a preliminary injunction. *New Comm Wireless*

*Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). And for all these same reasons, this Court either lacks jurisdiction over Plaintiffs' claims or, if it has jurisdiction, Plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, this Court should dismiss this lawsuit either pursuant to Rule 12(b)(1) or Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## III.    Plaintiffs Cannot Demonstrate Irreparable Harm Justifying Extraordinary Relief.

To show irreparable injury, a plaintiff must make a "clear showing" that it will suffer harm that is "'neither remote nor speculative, but actual and imminent.'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal citation omitted). In addition, harm is irreparable only when it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal citation omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020) (internal citations omitted). As described above, *supra* Section II.A.1, Plaintiffs' harms are too speculative to establish standing, let alone for making a "credible showing of a likelihood of irreparable harm." *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 23 (D.D.C. 2018).

Because "an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (citation omitted); see also *Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607, 618 (D. Md. 2023), aff'd, No. 23-1567, 2023 WL 8728503 (4th Cir. Dec. 19, 2023); *Potomac Heritage Trail Ass'n, Inc. v. U.S. Dep't of Transp.*, No. CV DLB-22-2482, 2022 WL 7051160, at *18 (D. Md. Oct. 11, 2022) ("The plaintiffs' delay in seeking injunctive relief undermines their

claims of irreparable injury."). Here, Plaintiffs waited almost four months to file its motion for preliminary injunctive relief, which undercuts their arguments that they cannot wait for a final decision to receive relief.

## IV.    The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors cut decisively against granting a preliminary injunction. *See Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023), *appeal dismissed*, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

Plaintiffs' delay weighs against issuing a preliminary injunction. *Roswell,* 671 F. Supp. 3d at 618 ("[A] delay also weighs against Plaintiff in balancing the equities."); *see also Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012).

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Department. A preliminary injunction would displace and frustrate the President's decision about how to best address those issues, and the Court should give deference to the Executive Branch. *Heckler*, 470 U.S. at 831-32. Further, the Government will be harmed should it be forced to compensate employees for unneeded and unnecessary services. *See Maryland v. U.S. Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir.) (Apr. 9, 2025). Indeed, this has already occurred due to the injunction entered by the district court in *New York*, only to be subsequently stayed by the Supreme Court. In light of that, it would be especially inequitable for this Court to enter an injunction that undercuts the stay recently entered by the Supreme Court. Because the public has an interest in the Executive Branch effectuating its policies,

these final factors tip in favor of Defendants.

## V.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied the Remedy Sought is Improper.

Plaintiffs' proposed injunction not only underscores the problems with their merits theory, but is problematic on its own terms. Plaintiffs' Proposed Order would enjoin the Department from terminating grants, contracts, or employees unless the Department "make[s] an individualized determination in compliance with the procedures and requirements" of various statutes. ECF No. 61-2 at 2-3. The Order also would enjoin the Department from taking actions that may interfere wth performing mandated statutory duties and would require the Department to reinstate statutorily mandated functions. These and other vague provisions make this an improper "obey-the-law" injunction that fails to provide notice of the conduct being enjoined. *Connor v. Md. Dep't of Health*, No. CV MJM-24-1423, 2025 WL 1167846, at *13 (D. Md. Apr. 22, 2025). Specifically, it fails to comply with the requirements of Federal Rule of Civil Procedure 65(d), which provides that an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." *See Louisiana v. Biden*, 45 F.4th 841, 844 n.9, 846 (5th Cir. 2022).

Moreover, because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933-34 (2018). Here, Plaintiffs' requested relief goes far beyond that principle. Not only do Plaintiffs fail to "describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d)(1)(C), but their relief is not tailored to remedying any particular harms shown. Instead, and at most, Plaintiffs have attempted to show that they would be injured by the termination of certain grants and the dismissal of certain (unidentified) employees required to perform certain (vaguely identified) functions. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). If the Court enters a preliminary injunction at all, it should limit relief to address injuries specific to these particular Plaintiffs.

## VI. Any Injunction Should Be Stayed, and Plaintiffs Should Be Required to Post a Bond If an Injunction is Entered.

In light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues injunctive relief at all, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

Moreover, if the Court enters a preliminary injunction, Defendants are entitled to a bond pursuant to Fed. R. Civ. P. 65(c). Under that rule, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The proposed preliminary injunction seeks to require the Department to continue paying for services Defendants determined they no longer require. The cost to the United States is the salary and benefits for every employee that would have otherwise been separated and the cost of every competitive grant and contract. Plaintiffs should be required to post a bond in an amount proper to cover those expenses.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction and dismiss this lawsuit.

DATED: July 25, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

BRAD P. ROSENBERG
Special Counsel

*/s/ Michael Bruns*
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*