# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants.* | Civil Action No. 25-965-JRR |

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.    This Case Stands on Its Own Merits .......................................................................... 2

        A.    The Supreme Court's Stays in Two Different Cases Do Not Weigh
             Against a Preliminary Injunction in This Case ............................................. 2

        B.    The Decisions by District Courts in Other Cases Do Not Weigh Against a
             Preliminary Injunction in This Case ............................................................. 6

    II.    This Court Has Jurisdiction ....................................................................................... 8

        A.    Plaintiffs Have Standing ............................................................................... 8

        B.    The Claims are Ripe ..................................................................................... 19

        C.    No Claims Are Channeled ............................................................................ 21

        D.    The Tucker Act Does Not Divest This Court of Jurisdiction Over
             Any Claims ................................................................................................... 27

    III.    Plaintiffs Are Likely to Succeed on the Merits ........................................................ 34

        A.    The Constitutional Claims Are Likely to Succeed ....................................... 34

             1.    The Constitutional Claims Do Not Challenge Discretionary Conduct ........... 34

             2.    The Proviso in the Executive Order Does Not Insulate the Closure
                 Department from Constitutional Challenge ..................................... 38

        B.    The Administrative Procedure Act Claims Are Likely to Succeed ..................... 39

             1.    Plaintiffs Challenge Discrete Final Agency Actions ...................................... 39

             2.    Plaintiffs Do Not Challenge Agency Actions Committed to Agency
                 Discretion by Law ............................................................................. 42

    IV.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction .................... 46

    V.    The Balance of Equities Supports Preliminary Relief ................................................ 46

    VI.    The Proposed Injunction is Tailored to Provide Complete Relief to Plaintiffs ............ 47

    VII.    If the Court Grants a Preliminary Injunction, the Court Should Not Preemptively
        Stay Its Order Pending Appeal, But a Nominal Bond is Appropriate ........................ 49

CONCLUSION .................................................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967)................................................................................42

*AFGE v. Trump*,
   139 F.4th 1020 (9th Cir. 2025), *injunction stayed on other grounds*,
   2025 WL 1873449 (U.S. July 8, 2025)...........................................................21, 26

*AFGE v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019)...................................................................25

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013)................................................................34, 38

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
   770 F. Supp. 3d 822 (D. Md. 2025)..............................................................50

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
   No. 25-cv-702, 2025 WL 863319 (D. Md. Mar. 19, 2025).....................................44

*Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*,
   No. 25-cv-2429, 2025 WL 1684817 (S.D.N.Y. June 16, 2025).........................14, 19

*Am. Educ. Rsch. Ass'n v. Dep't of Educ.*,
   No. 25-cv-1230, 2025 WL 1665401 (D. Md. June 12, 2025)....................................7

*Am. Pub. Health Ass'n v. NIH*,
   No. 25-1611, 2025 WL 2017106 (1st Cir. 2025)................................................33

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
   No. 25-cv-999, 2025 WL 1568301 (D.D.C. June 3, 2025).......................................7

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)...........................................................................25, 26

*Bennett v. Spear*,
   520 U.S. 154 (1997)...........................................................................39, 40

*Biden v. Nebraska*,
   600 U.S. 477 (2023)................................................................................43

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984)...........................................................................23, 24

ii

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)..................................................................................................31, 32

*Cabrera v. U.S. Dep't of Labor*,
   No. 25-cv-1909, 2025 WL 2092026 (D.D.C. July 25, 2025) ...................................................19

*California v. U.S. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025)......................................................................................5, 31

*California v. U.S. Dep't of Educ.*,
   769 F. Supp. 3d 72 (D. Mass. 2025) ...............................................................................5, 33

*Carr v. Saul*,
   593 U.S. 83 (2021).......................................................................................................26

*Carter v. U.S. Dep't of Educ.*,
   No. 25-cv-744, 2025 WL 1453562 (D.D.C. May 21, 2025)..........................................................7, 8

*Casa de Maryland v. DHS*,
   924 F.3d 684 (4th Cir. 2019) .........................................................................................30

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ........................................................................................36

*Chi. & S. Air Lines Co. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948).....................................................................................................37

*Cienega Gardens v. United States*,
   194 F.3d 1231 (Fed. Cir. 1998).......................................................................................30

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ........................................................................................38

*City of New York v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) .........................................................................................39

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
   137 F.4th 932 (9th Cir. 2025) ............................................................................28, 30, 33

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017).....................................................................................................13

*Dalton v. Specter*,
   511 U.S. 462 (1994)..................................................................................................35, 36

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019).....................................................................................................14

*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025) ............................................................................................ *passim*

*Diamond Alt. Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025) ........................................................................................ 9, 13

*DiCocco v. Garland,*
    52 F.4th 588 (4th Cir. 2022) .............................................................................. 13, 19

*Elecs. of N.C., Inc. v. Se. Power Admin.,*
    774 F.2d 1262 (4th Cir. 1985) .................................................................................. 43

*Elev8 Baltimore, Inc., v. Corp. for Nat'l & Cmty. Serv.,*
    No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025) .......................... *passim*

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ..................................................................................................... 23

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ............................................................................................ 9, 10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................................................. 35

*Garcia v. Neagle,*
    660 F.2d 983 (4th Cir. 1981) .................................................................................... 43

*Green & Healthy Home Initiatives, Inc. v. EPA,*
    No. 25-cv-1096, 2025 WL 1697463 (D. Md. June 17, 2025) ...................... 28, 29, 33

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................................ 37, 42

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) .................................................................................... 38

*Holbrook v. Tenn. Valley Auth.,*
    48 F.4th 282 (4th Cir. 2022) ..................................................................................... 42

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .................................................................................................. 10

*Kendall v. U.S. ex rel. Stokes,*
    37 U.S. 524 (1838) ................................................................................................... 35

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
    No. 25-cv-946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) .................................... 39

*Long Island Power Auth. v. FERC*,
    27 F.4th 705 (D.C. Cir. 2022) ..............................................................................48

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .................................................................................40, 41

*Maryland v. Corp for Nat'l & Cmty. Serv.*,
    No. 25-cv-1363, 2025 WL 1585051 (D. Md. June 5, 2025)..........................33, 50

*Maryland v. USDA*,
    No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025).................................26

*Massachusetts v. Trump*,
    No. 25-cv-11221, 2025 WL 1836592 (D. Mass. July 3, 2025) ..........................19

*McMahon v. New York*,
    606 U.S. __, 2025 WL 1922626 (July 14, 2025)......................................2, 3, 22

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ...............................................................27, 28, 30

*Mississippi v. Johnson*,
    71 U.S. 475 (1866)..................................................................................37

*Myers v. United States*,
    272 U.S. 52 (1926)...............................................................................34, 35

*NAACP v. Bureau of the Census*,
    945 F.3d 183 (4th Cir. 2019) .................................................................20

*In re Naranjo*,
    768 F.3d 332 (4th Cir. 2014) .................................................................20

*Nat'l Ass'n of Immigr. Judges v. Owen*,
    139 F.4th 293 (4th Cir. 2025) ...............................................................22, 25

*NEA v. U.S. Dep't of Educ.*,
    No. 25-cv-91, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) ...........................15

*New York v. McMahon*,
    No. 25-cv-10601, 2025 WL 1463009 (D. Mass. May 22, 2025)....................3, 4

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025)..................................................................41

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................49

*Ortiz v. United States*,
    585 U.S. 427 (2018) .................................................................................................35

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) .................................................................................50

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) .................................................................................47

*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025) ..............................................................36, 38

*Pharm. Coal. for Patient Access v. United States*,
    126 F.4th 947 (4th Cir. 2025) ............................................................................42, 43

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) .................................................................................10

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) .................................................................................10

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) .................................................................................................35

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
    No. 20-cv-3060, 2024 WL 3860211 (D. Md. Aug. 19, 2024) ...............................48

*Sols. in Hometown Connections v. Noem*,
    No. 25-cv-885, 2025 WL 1530318 (D. Md. May 29, 2025) ..................................31

*Somerville Pub. Schs. v. McMahon*,
    139 F.4th 63 (1st Cir. 2025) .............................................................................3, 22–25

*South Carolina v. United States*,
    912 F.3d 720 (4th Cir. 2019) .................................................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) .................................................................................................10

*Sustainability Institute v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ................................32, 33

*Thakur v. Trump*,
    No. 25-cv-4737, 2025 WL 1734471 (N.D. Cal. June 23, 2025) ......................14, 30

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ..........................................................................................21, 25

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) ...................................................................30

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................9

*Trump v. United States*,
    603 U.S. 593 (2024) ..........................................................................34, 35

*United States v. Fausto*,
    484 U.S. 439 (1988) ..........................................................................23, 24

*United States v. J&E Salvage Co.*,
    55 F.3d 985 (4th Cir. 1995) ...................................................................27

*Valentine v. Collier*,
    978 F.3d 154 (5th Cir. 2020) ...................................................................2

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
    No. 25-cv-11042, 2025 WL 1704311 (D. Mass. June 18, 2025).....................8, 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................10

*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................31

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ............................33

*Wild Va. v. Council on Env't Quality*,
    56 F.4th 281 (4th Cir. 2022) ..................................................................20

*Wiley v. Kennedy*,
    No. 2:25-cv-227, 2025 WL 1384768 (S.D.W.V. May 13, 2025) ...............23, 26, 27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................34, 35, 36

**Statutes**

5 U.S.C. § 701 ...........................................................................................37, 42

5 U.S.C. § 702 ...............................................................................................39

5 U.S.C. § 704 ...............................................................................................39

5 U.S.C. § 706 .................................................................................................48, 49

5 U.S.C. § 1204 ........................................................................................................22

5 U.S.C. § 7117 ........................................................................................................22

5 U.S.C. § 7118 ........................................................................................................22

5 U.S.C. § 7122 ........................................................................................................22

20 U.S.C. § 1018 ......................................................................................................34

20 U.S.C. § 3411 ......................................................................................................34

20 U.S.C. § 3413 ......................................................................................................34

20 U.S.C. § 3419 ......................................................................................................34

20 U.S.C. § 9511 ......................................................................................................34

20 U.S.C. § 9512 ......................................................................................................29

20 U.S.C. § 9543 ......................................................................................................34

2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159,
    136 Stat. 1342 ....................................................................................................38

Further Consolidated Appropriations Act, Pub. L. No. 118-47,
    138 Stat. 690 (2024) ..........................................................................................38

**Other Authorities**

Federal Rules of Civil Procedure Rule 65(c) ..............................................................49

*Recommendation that the Department of Justice Not Defend the Constitutionality
    of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship
    Act of 1984,*
    8 Op. Off. Legal Counsel 183 (1984) ................................................................35

Trevor N. McFadden & Vetan Kapoor,
    *The Precedential Effects of the Supreme Court's Emergency Stays* ...........................2

U.S. Const. art. II, § 3 ..............................................................................................35

## INTRODUCTION

The government argues that Plaintiffs seek too much, too late, but responds with too little, too late to defeat Plaintiffs' unrebutted showing that preliminary relief is necessary in this case. The government does not dispute the more than 1,000 pages of record evidence, including declarations from over 60 witnesses, establishing that Defendants have taken a series of escalating actions to terminate the statutorily mandated programs and functions of the U.S. Department of Education (the "Department"), which have harmed students, communities, and educators across the country. Instead, the government seeks dismissal based on stay rulings with no precedential weight in distinguishable cases, and preliminary injunction rulings in three other district court cases raising different claims on different records. The government also trots through the standard defenses it has mounted in many of these cases, including that the Department is not completely closed (yet), only streamlined for the sake of efficiency, and that Plaintiffs' claims are barred by various jurisdictional doctrines. These superficial arguments are unpersuasive. Defendants cannot gut the Department and its statutorily created offices—and leave them unable to perform statutorily mandated functions—merely because some functions of the Department remain ongoing. Far from reflecting efforts to streamline discretionary functions, the undisputed record before the Court establishes that Defendants have cut into the Department's muscle and bones—indeed, they have removed limbs—by shutting down mandatory offices and functions within the Department, terminating competitive grants en masse, and destroying the infrastructure for administering formula grants. The Court need not, and should not, stay its hand until Defendants complete their planned elimination of the Department. The record before the Court calls for preliminary relief now, to halt Defendants' unlawful decimation of the Department.

## ARGUMENT

## I.    This Case Stands on Its Own Merits

Defendants argue, ECF No. 78, at 10–17, that this Court should not grant a preliminary injunction because the Supreme Court has granted stays of preliminary injunctions in other cases and district courts in other cases have denied preliminary injunctions. But this case is factually and legally distinct, and those cases are neither binding precedent nor persuasive authority that undermine Plaintiffs' claims here.

### A.    The Supreme Court's Stays in Two Different Cases Do Not Weigh Against a Preliminary Injunction in This Case

Defendants contend, ECF No. 78, at 11–12, that this Court should "adopt" the arguments that the government presented in a stay application to the Supreme Court in *McMahon v. New York*, 606 U.S. __, 2025 WL 1922626 (July 14, 2025) (per curiam), because the Supreme Court granted the application. Defendants further argue, ECF No. 78, at 12–13, that a stay the Supreme Court ordered in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), requires partial denial of a preliminary injunction here and "counsels in favor" of partial dismissal. These arguments do not withstand scrutiny. Stay orders as a general matter have limited value as binding authority even for the parties to the case. *See, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 161 (5th Cir. 2020) (court of appeals stay determination not regarded as law of the case). Although Supreme Court stay orders may, in certain circumstances, be entitled to deference and may guide lower courts, given the lack of reasoning and the significant distinctions with this case, the two stay orders in *McMahon v. New York* and *Department of Education v. California* lack precedential and persuasive value here. *See generally* Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 Harv. J.L. Pub. Pol'y 827 (2021) (discussing factors that counsel for and against treating Supreme Court stay orders as precedential or

2

persuasive authority).

1.     The first case that Defendants invoke challenged the March 11, 2025, massive reduction in force (RIF) at the Department, which was challenged immediately by a group of states in the District of Massachusetts. A second group of plaintiffs consisting of public-school districts and unions filed suit on March 24, 2025, raising similar claims, and the two cases were consolidated. *See New York v. McMahon*, No. 25-cv-10601, 2025 WL 1463009, at *2 (D. Mass. May 22, 2025). The plaintiffs in those cases moved quickly for preliminary relief, alleging that they anticipated delays in federal funding due to the RIF, and the district court granted a preliminary injunction on May 22, 2025. *Id.* at *1.

After the First Circuit denied the government's motion for a stay pending appeal, *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63 (1st Cir. 2025), the government filed an emergency stay application in the Supreme Court, *see* Stay Application, *McMahon v. New York*, No. 24A1203 (Sup. Ct.) ("*McMahon* Stay Application"). The government argued that it was likely to succeed on appeal because (1) the plaintiffs failed to establish standing, (2) the district court lacked jurisdiction because the Civil Service Reform Act of 1978 (CSRA) channeled claims challenging the RIF to specialized administrative agencies, and (3) the remedy ordered by the district court—the reinstatement of about 1,400 Department employees—was unlawful. *Id.* at 14–34. The government also emphasized the irreparable harm it would allegedly suffer if it had to reinstate 1,400 workers. *Id.* at 35–37. On July 14, 2025, the Supreme Court granted the stay without providing any explanation, while Justice Sotomayor, joined by Justices Kagan and Jackson, wrote a dissenting opinion. *McMahon v. New York*, 2025 WL 1922626, at *1–9.

The Supreme Court's unexplained stay order, which does not indicate the basis for the stay or the Court's views on the merits in that case, lacks precedential and persuasive value. Defendants

presumptuously suggest, ECF No. 78, at 11–12, that the Supreme Court necessarily accepted all the government's arguments in support of a stay, as well as all the arguments that the government raised but were rejected in the district court. But the Supreme Court's order, which contains no reasoning or explanation, does not support that sweeping interpretation. It is not clear, for example, whether the Court granted a stay based on the government's likelihood of success on the merits of its appeal, including on jurisdictional grounds, or based solely on the equities. And even assuming the Court issued a stay based on likelihood of success, the order provides no indication as to which of the government's three arguments it found convincing, let alone why. That is significant here because there are material differences between this case and the RIF cases.

The argument the government presented to the Supreme Court on remedy, for example, does not apply here because Plaintiffs do not seek reinstatement of the workers terminated in the RIF. *Compare New York v. McMahon*, 2025 WL 1463009, at *40 (preliminary injunction in Massachusetts case), *with* ECF No. 61-2 (proposed order in this case). With respect to standing, in the Supreme Court, the government emphasized at length that the harm alleged by the plaintiffs was speculative because they filed suit too soon after the RIF was announced to know its effects. *See McMahon* Stay Application at 3 (arguing that the plaintiffs' declarations in support of standing "all employ speculation and were largely made only three days after the RIF took effect"); *id.* at 17–18 (arguing that the "failure to demonstrate standing should be unsurprising given the timing of this litigation," which the states commenced "a mere two days after the RIF's announcement, before any affected employee had even begun administrative leave"); *id.* at 18 (noting that the preliminary injunction motions and supporting declarations were filed "on March 24 and April 1— a mere 3 and 11 days, respectively, after the first employees began leave"); *id.* ("The district court thus cannot have conceivably or credibly found that the Department has ceased functions on which

4

respondents rely because the record was largely submitted before the effects of the RIF could have even been apparent."); *id.* (arguing that the plaintiffs "alleged only a handful of actual effects on Department services in the extremely short window between the RIF's announcement and the preliminary-injunction briefing"). Defendants cannot level those criticisms here given that Plaintiffs have submitted dozens of declarations documenting the impact of the RIF, including from Department employees describing the chaotic implementation. *See, e.g.*, ECF No. 61-52 (Doe Decl. 3) ¶¶ 11–14; ECF No. 61-54 (Doe Decl. 5) ¶¶ 11–17; ECF No. 61-55 (Doe Decl. 6) ¶¶ 11–22; ECF No. 61-52 (Doe Decl. 10) ¶¶ 15–20. Similarly, while the Massachusetts cases, because of the timing of the lawsuits, focused solely on the RIF, Plaintiffs here have documented Defendants' multi-faceted actions to close the Department and terminate its mandatory functions. Plaintiffs' challenge to those unlawful actions confirms that this dispute is not an employment action that should be channeled to specialized employment and labor agencies under the CSRA. *See infra* pp. 21–27. In short, given these distinctions and the lack of explanation by the Court, the Supreme Court's order does not provide persuasive guidance in this case.

3.      The second stay order that Defendants invoke is likewise unpersuasive here. That stay order arose in another lawsuit, filed in the District of Massachusetts on March 6, 2025, by a group of states challenging the Department's mass termination of three types of competitive grants (SEED, TQP, and TSL) awarded to improve educator effectiveness, recruitment, and retention. ECF No. 61-1, at 6, 20–21. The district court entered a preliminary injunction ordering the Department to resume payments under the terminated grant agreements on March 10, 2025. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass. 2025).

After the First Circuit denied the government's motion for a stay pending appeal, *California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025), the government filed an emergency

application for a stay in the Supreme Court, which the Court granted on April 4, 2025. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). In a short opinion accompanying the stay, the Court stated that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered" and instead "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States." *Id.* at 968 (internal citations and quotation marks omitted).

As discussed in more detail below, *infra* pp. 31–33, this stay order is not persuasive as to the appropriate resolution of the materially different claims here. In contrast to Plaintiffs here, the state plaintiffs in *California* relied in part on the language in the grant contracts between the government and grant recipients as a basis for their legal claims; they sought relief that carried the hallmarks of remedies in contract; and they were in privity with the government through their public instrumentalities and therefore their access to the Court of Federal Claims was not categorically foreclosed. As a result of these differences, the short stay opinion in *California* does not govern or guide the resolution of the grant-termination claims in this case.

## B.    The Decisions by District Courts in Other Cases Do Not Weigh Against a Preliminary Injunction in This Case

Defendants next contend, ECF No. 78, at 13–17, that three district court opinions denying various preliminary injunction motions also support their position. But those decisions, which of course are not precedential or binding, do not counsel against preliminary relief here. Even assuming those cases were correctly decided, each involved different plaintiffs who alleged different harms and sought different relief based on different legal theories and different factual records. Those differences distinguish those cases and render the decisions of little if any help in

adjudicating Plaintiffs' request for relief, based on different claims and a different record.

Two of the three cases on which Defendants rely addressed claims pertaining to IES, *see Am. Educ. Rsch. Ass'n v. Dep't of Educ.*, No. 25-cv-1230, 2025 WL 1665401 (D. Md. June 12, 2025); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 25-cv-999, 2025 WL 1568301 (D.D.C. June 3, 2025), but both are distinguishable from this case. As Plaintiffs have explained, ECF No. 61-1, at 9, 16–17, IES plays a critical role in administering statutorily mandated formula grants, and the effective closure of IES prevents the Department of Education from carrying out those statutorily mandated responsibilities. Yet neither of the cases cited by Defendants raised or resolved any factual or legal claims related to IES's mandatory role in formula grant administration. Moreover, the scope of relief requested in both cases cited by Defendants is distinct from the relief Plaintiffs request here. In the Maryland case, for example, the plaintiffs requested a preliminary injunction ordering the government to "reinstate 84 different contracts," 2025 WL 1665401, at *5, and ordering "everyone reinstated," *id.* at *6. In the D.C. case, the plaintiffs sought an "order that 'reinstate[s] any . . . research, data collection, or dissemination activity that was terminated, halted, or paused' and imposes tight restrictions on when and how [IES] can terminate any program in the future." 2025 WL 1568301, at *6. Plaintiffs here seek none of those remedies. *See* ECF No. 61-2 (proposed order); *infra* pp. 47–49 (discussing scope of requested relief). The absence of claims pertaining to formula grants and the differences in relief requested are only two of a litany of distinctions with these cases.

The third case that Defendants cite, *Carter v. United States Department of Education*, No. 25-cv-744, 2025 WL 1453562 (D.D.C. May 21, 2025), likewise differs from this case. In *Carter*, the court concluded that the plaintiffs' claim that "OCR will be unable to perform its duties" was "not cognizable under the APA." *Id.* at *6. Plaintiffs here, however, do not raise any such claims

under the APA, *see* ECF No. 61-1, at 32–44, and the *Carter* plaintiffs did not raise the equitable constitutional claims that Plaintiffs have alleged. In addition, the *Carter* court concluded the plaintiffs "ha[d] not offered sufficient evidence demonstrating that OCR has failed to perform its statutory and regulatory duties." 2025 WL 1453562, at *6. Regardless of the evidence that the *Carter* court considered in reaching that finding, or the merits of that finding, the record in this case establishes that Defendants have effectively closed OCR. Indeed, a different district judge, considering the record in a different case, concluded that the March 11 RIF made it "impossible for OCR to comply with its statutory and regulatory obligations." *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, No. 25-cv-11042, 2025 WL 1704311, at *5 (D. Mass. June 18, 2025). Just as Plaintiffs do not urge the Court to grant preliminary relief simply because a district court in Massachusetts ordered relief, neither should the Court deny preliminary relief simply because the *Carter* court denied relief. Instead of relying on the three district court cases cited by Defendants, each of which arose in its own unique posture and was decided on the facts and law as presented by the parties, or relying on cases granting relief along the lines that the Plaintiffs seek, the Court should evaluate this case on its own merits. The Court should consider the specific legal claims raised by Plaintiffs, find facts based on the record evidence before the Court, and apply governing law to those facts.

## II.    This Court Has Jurisdiction

### A.    Plaintiffs Have Standing

Defendants assert, ECF No. 78, at 18–20, that Plaintiffs have failed to demonstrate that they have suffered or will imminently suffer any concrete injury to support Article III standing, but they cherry-pick language from non-party declarations and ignore the declarations from

Plaintiffs themselves.[1] Plaintiffs' declarations and the amended complaint set out in detail the grave harms that they and their members already have suffered—and will continue to suffer—as a result of Defendants' actions to close the Department. These facts, which Defendants do not dispute or attempt to rebut, amply establish standing.

Under Article III of the Constitution, "the plaintiff must have standing to sue," which requires plaintiffs to "show that they possess 'a personal stake in the dispute' and are not mere bystanders." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)). Standing contains three elements: "injury in fact, causation, and redressability." *Id.* A plaintiff shows injury in fact by "demonstrat[ing] an injury that is 'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 381). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Causation and redressability are "usually 'flip sides of the same coin'" because "'[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.'" *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 380–81). At the preliminary injunction stage, plaintiffs must demonstrate that they are

---

[1] Ten of the sixteen declarations cited by Defendants, ECF No. 78, at 18–19 n.2, are from current or former employees of the Department whose declarations provide details about Defendants' actions to close the Department and their likely consequences on a national scale; those declarants do not purport to have personal knowledge of Plaintiffs' harms. *See* ECF No. 61-39 (Ex. E, Cardona Decl.); ECF No. 61-54 (Ex. N, Doe Decl. 5); ECF No. 61-57 (Ex. P, Doe Decl. 7); ECF No. 61-59 (Ex. R, Doe Decl. 9); ECF No. 61-63 (Ex. T, Doe Decl. 11); ECF No. 61-65 (Ex. V, Doe Decl. 13); ECF No. 61-88 (Ex. OO, Miller Decl.); ECF No. 61-103 (Ex. DDD, Spitz Decl.); ECF No. 61-111 (Ex. JJJ, Witt Decl.); ECF No. 61-112 (Ex. LLL, Young Decl.). Another is from a non-plaintiff professor explaining how a particular formula grant program to support rural schools operates and is used by districts. *See* ECF No. 61-80 (Ex. HH, Johnson Decl.). And in citing five declarations from members of Plaintiffs NEA and NAACP, Defendants selectively quote the declarations in a manner that does not represent the full scope of harms alleged. *See* ECF No. 61-46 (Ex. J, Doe Decl. 1); ECF No. 61-89 (Ex. PP, Mills Decl.); ECF No. 61-99 (Ex. ZZ, Rosier Decl.); ECF No. 61-100 (Ex. AAA, Scott Decl.); ECF No. 61-102 (Ex. CCC, Shaner Decl.).

"likely" to establish standing. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008).

Organizational plaintiffs like Plaintiffs NAACP, NEA, PGCEA, and AFSCME Council 3 have two alternative paths to establishing standing. First, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin,* 422 U.S. 490, 511 (1975). The organization must "satisfy the usual standards for injury in fact, causation, and redressability." *All. for Hippocratic Med.*, 602 U.S. at 393–94; *see Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (holding that national and state political parties established standing where they had "already spent significant resources and seen their mission frustrated by the inaction of the State [Election] Board"). Second, in what is sometimes called "representational or organizational standing," an organizational plaintiff can also establish standing if it "demonstrate[s] 'that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (explaining that an "association must allege that its members, *or any one of them*, are suffering immediate or threatened injury") (quoting *Warth*, 422 U.S. at 511).

Plaintiffs include national organizations that depend on the functions of the Department of Education and that represent millions of individuals throughout the country who rely on the services and funding provided by the Department. Plaintiff NEA, for example, is the Nation's largest union of educational professionals, with approximately three million members nationwide

who work at every level of the educational system, from preschool to post-graduate education. NEA's core objectives include improving the quality of teaching, increasing student achievement, making schools safer and better places to learn, and ensuring fair compensation for educators. ECF No. 61-98 (Pringle Decl.) ¶ 6. NEA's work to advance these objectives is highly integrated with the work of the Department of Education. Indeed, NEA advocated for the creation of the Department at its inception and has advocated for the adoption and implementation of the Department's signature programs. *Id.* ¶¶ 7, 11–13; ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 3–4; ECF No. 58 (Am. Compl.) ¶ 18. Plaintiffs AFSCME Council 3 and PGCEA are unions that similarly represent thousands of workers in Maryland public schools. ECF No. 58 (Am. Compl.) ¶¶ 19–20. Likewise, Plaintiff NAACP has hundreds of thousands of members throughout the Nation who depend on Department functions, including the enforcement of civil rights laws at schools that receive federal funding. ECF No. 58 (Am. Compl.) ¶ 13.

The dozens of declarations Plaintiffs provided in support of their motion for a preliminary injunction confirm the commonsense conclusion that the decision by Defendants to close the Department and the actions they have taken to carry out that decision have concretely injured Plaintiffs and their members—and will continue to injure them as the effects of those actions accumulate. Defendants' unlawful actions, for example, have caused NEA members to lose jobs, professional development and educational opportunities, mentorship and professional supports, tuition stipends and other financial supports, as well as access to student loan relief services and civil rights review due to Defendants' unlawful actions. ECF No. 61-98 (Pringle Decl.) ¶¶ 8, 14, 27, 30–32, 36–38; ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 26–32, 39–44, 48–49; ECF No. 61-40 (Christy Decl.) ¶¶ 22–24, 33–34; ECF No. 61-43 (Curley Decl.) ¶¶ 17–22; ECF No. 61-89 (Mills Decl.) ¶¶ 27–31. Nonetheless, repeating almost verbatim its arguments in opposition to a

11

preliminary injunction in the Massachusetts cases, the government contends, ECF No. 78, at 18, that "Plaintiffs do not profess to know any details about the reorganization within the Department" and therefore "provide numerous declarations hypothesizing harms that *may* befall them *if* the Department is unable to perform a particular service or function." *Compare* ECF No. 78, at 18, *with* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at 9–10, *New York v. McMahon*, 2025 WL 1463009 (D. Mass. May 22, 2025) (No. 25-cv-10601), ECF No. 95. But the declarations submitted in *this* case directly refute those contentions. Indeed, in the Massachusetts cases, the government argued that the plaintiffs filed their suits and sought preliminary injunctions so soon after the reduction in force was announced that, as a result, they could not possibly have felt or reasonably known the effects of the reduction in force, including which of the Department's mandatory functions would cease. *See supra* pp. 4–5. The declarations Plaintiffs have submitted in this case are not subject to those criticisms, and they set forth concrete, particularized injuries that Plaintiffs and their members have suffered or will imminently suffer as a result of Defendants' actions to close the Department.

Specifically, as Plaintiffs explained, ECF No. 61-1, at 4–21, 25–31, Defendants' efforts to close the Department have shut down multiple statutorily mandated offices of the Department and terminated many of its statutorily mandated functions. Defendants have effectively closed and terminated the functions of IES, FSA, and OCR; they have disabled the infrastructure for administering formula grants; and they have terminated large swaths of competitive grants. The declarations submitted with the preliminary-injunction motion document the harms that Plaintiffs and their members have suffered and will continue to suffer from these actions.

1.      Plaintiffs explained in their motion, *id.* at 18, that Defendants have gutted components throughout the Department that are essential to administering formula grants.

12

Plaintiffs further explained, *id.* at 9–10, 17, that, among other mandatory responsibilities, IES performs functions that are essential for administering formula grants by collecting, updating, and supplying the data needed to run the formulas for administering those grants, and IES can no longer provide those essential functions now that it is effectively closed.

These actions have harmed Plaintiffs and their members by causing school districts to eliminate member job positions. Defendants' dismantlement of the Department's formula grant administration infrastructure, and the resulting likelihood that the Department will have to rely on outdated data to calculate allocations under Title I-A and other formula grants, creates uncertainty as to whether school districts will timely receive the formula grant funds to which they are entitled. ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 15–22. This uncertainty has already led to reductions in force in school districts that employ Plaintiffs' members. For example, twenty-nine NEA member positions have been eliminated in Edwardsville, Illinois, due to the school district's concerns about the stability of federal funding. ECF No. 61-98 (Pringle Decl.) ¶ 14. Similarly, Barrow County School System in Georgia eliminated all its Title I-funded positions for the upcoming school year, including positions held by NEA members, because of uncertainty over formula funding. *Id.*

Loss of employment and the corresponding loss of salary and benefits "are classic and paradigmatic injuries for standing purposes." *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (citation and quotation marks omitted); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Diamond Alt. Energy*, 145 S. Ct. at 2133 (explaining that "monetary costs are of course an injury") (citation and quotation marks omitted). Nor are the harms to Plaintiffs' members limited to loss of positions: when two school districts scaled back previously agreed-upon wage increases due in part to anticipated reductions in Department grant funding, AFSCME Council 3

and its members suffered injuries from the lost wages and the additional resources that AFSCME Council 3 had to devote to renegotiations. ECF No. 61-91 (Moran Decl.) ¶¶ 18–19.[2]

In addition to these actual injuries already suffered by Plaintiffs' members, additional injuries are imminent. The salaries of over a hundred thousand of Plaintiffs' members are funded in whole or in part by formula grants. *See* ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 9–13, 25; ECF No. 61-40 (Christy Decl.) ¶ 19. Cuts to these funds due to the Department's inability to properly administer the funding formulas will inevitably result in the elimination of member positions. ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 16–24; ECF No. 61-40 (Christy Decl.) ¶ 27. Plaintiffs need not wait for those inevitable events to transpire to possess standing. *See Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (holding that "primarily future injuries," including "loss of federal funds," established standing).[3]

The organizational Plaintiffs have also experienced direct harms in their own right. Unions like NEA and PGCEA suffer pocketbook injury from the actual and imminent elimination of member positions because of lost membership dues. *See* ECF No. 61-91 (Moran Decl.) ¶¶ 23–24. And Defendants' actions have directly interfered with Plaintiffs NEA and NAACP's core activities of engaging in advocacy, education, and training to promote equal educational opportunity, federal education funding to expand access to those opportunities, and oversight of states' and school

---

[2] The case cited by Defendants, ECF No. 78, at 20, *American Association of University Professors v. United States Department of Justice*, No. 25-cv-2429, 2025 WL 1684817, at *12–13 (S.D.N.Y. June 16, 2025), is inapposite because the organizational plaintiffs in that case did not establish pocketbook injury to themselves or their members due to the undisputed availability of alternative funding. *See Thakur v. Trump*, No. 25-cv-4737, 2025 WL 1734471, at *21–23 & n.27 (N.D. Cal. June 23, 2025) (holding that researchers affected by cancelled grants had standing and distinguishing *American Association of University Professors v. United States Department of Justice* on the ground that "Columbia, unlike the UC system here, had completely covered the shortfall through its private resources").

[3] In addition to the harm resulting from the inability to administer formula grants, NEA and its members have suffered other concrete harms from the closure of IES and the termination of its mandatory functions. For example, when the Department abruptly terminated an IES-contracted study researching different models of providing transitional services for students with disabilities, NEA members, including three in Newton, Massachusetts, suffered pay cuts and lost stipends. ECF No. 61-43 (Curley Decl.) ¶ 20; ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 29–30.

districts' use of federal dollars to further that aim. *See* ECF No. 61-98 (Pringle Decl.) ¶¶ 6–7, 11; ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 9, 16–18, 22, 34; ECF 61-36 (Ashton Decl.) ¶¶ 5, 18; ECF No. 61-41 (Cole Decl.) ¶¶ 6–7, 20. NEA, for example, routinely provides information, resources, and trainings for affiliates, members and other stakeholders on the availability and permissible uses of federal grant funding, among other funding-related issues. *See* ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 4–5, 33–35, 45–46. Defendants' destruction of the formula grant infrastructure, and the consequent uncertainty surrounding formula grant programs, "impair[s] the plaintiffs' ability" to offer these programs. *NEA v. U.S. Dep't of Educ.*, No. 25-cv-91, 2025 WL 1188160, at *9–10 (D.N.H. Apr. 24, 2025) (NEA had organizational standing under *Hippocratic Medicine* based in part on impairment to its ability to offer trainings and professional development).

2.    Plaintiffs explained, ECF No. 61-1, at 10–12, that Congress established FSA and assigned it mandatory functions to manage congressionally required financial aid programs. Defendants have effectively closed the key offices within FSA that perform certain of these mandatory functions, including the office that certifies and monitors institutions for eligibility to access financial aid (the School Eligibility and Oversight Service Branch, or SEOS) and the units that timely assist financial aid recipients and student loan borrowers in resolving disputes and concerns (the Vendor Oversight and Vendor Performance Divisions and the Ombudsman's Office). ECF No. 61-1, at 12–13, 26.

These actions have directly harmed the organizational Plaintiffs. "NEA has devoted substantial resources for many years to advancing [its] core work of supporting educators by seeking and securing relief from the Department for their student loan debt," including through advocacy for reforms that improved educators' ability to obtain Public Service Loan Forgiveness and to seek recourse from FSA to address disputes with, or mistakes made by, loan servicers. ECF

No. 61-98 (Pringle Decl.) ¶ 27; *see also id.* ¶¶ 28–32. But the key offices charged with oversight of the student loan forgiveness programs and resolution of borrower compliance have been decimated by Defendants. ECF No. 61-1, at 12–13. To fill these gaps in Department oversight and dispute resolution, NEA will have to divert and expend resources, ECF No. 61-98 (Pringle Decl.) ¶¶ 36–37. Plaintiff NAACP is similarly harmed by Defendants' actions. For years, NAACP has dedicated resources to advocating for student debt relief and advising members of their repayment options. ECF No. 61-41 (Cole Decl.) ¶¶ 3–4. These advocacy efforts relied on updated information and tools from the Department, which are no longer provided. *Id.* ¶¶ 6, 12–15, 19–20.

The closures within FSA have also harmed NEA members who are in the process of pursuing Public Service Loan Forgiveness or who are currently enrolled in postsecondary education and receive federal student financial aid. Defendants' gutting of FSA's oversight functions means that these members are deprived of assistance in navigating the Public Service Loan Forgiveness Process and subjected to increased risk as student borrowers. *See* ECF No. 61-89 (Mills Decl.) ¶¶ 8, 29, 32–33; ECF No. 61-110 (Williams Decl.) ¶¶ 11–13, 16–17; ECF No. 61-98 (Pringle Decl.) ¶ 40; *see also* ECF No. 61-53 (Doe 4 Decl.) ¶ 32.

3.      Plaintiffs explained, ECF No. 61-1, at 13–14, 27, that Congress created OCR and mandated that it investigate and resolve complaints alleging violations of the civil rights laws. Defendants have effectively closed OCR by decimating its regional offices and staff, foreclosing it from performing its statutory functions. *Id.* at 14–15, 27–28.

These actions have directly harmed Plaintiff organizations, including NAACP and Lubbock NAACP. NAACP and its state conferences and local branches work "to accelerate the well-being, education, and economic security of Black people and all persons of color." ECF No. 61-36 (Ashton Decl.) ¶ 5. Lubbock NAACP has pending complaints challenging two Texas school

districts' continuing failure to prevent bullying, harassment, and inappropriate discipline against Black students. *Id.* ¶ 11. The complaints were assigned to OCR's Dallas Office, which is now closed. *Id.* Although communications with OCR were ongoing throughout fall 2024, none of the complainants has received any communication since December 2024. *See id.* The closure of OCR interferes with a core activity of Plaintiffs NAACP and Lubbock NAACP, namely, "us[ing] the OCR process to advance educational equity through resolution agreements that address racial disparities in school discipline, special education services, and access to advanced coursework." ECF No. 58 (Am. Compl.) ¶ 97; *see also* ECF No. 61-36 (Ashton Decl.) ¶ 11.

The closure of OCR has similarly directly harmed members of Plaintiff NAACP whose pending complaints with OCR have stalled and whose communications with OCR have ceased. *See Victim Rights L. Ctr.*, 2025 WL 1704311, at *8 (concluding that individual complainants have standing to challenge RIF at OCR). NAACP member Hannah Secka, for example, has not received any substantive updates on her pending OCR complaint since December 2024. ECF No. 61-101 (Secka Decl.) ¶¶ 15–20. Similarly, a parent who is seeking redress for the involuntary transfer of her son to a different school, causing him to lose a year of academic progress, had an active OCR complaint prior to January of 2025 but since then has been unable to obtain any substantive response from OCR. ECF No. 61-66 (Pl. Jane Doe No. 1) ¶¶ 5, 8–14. The lack of response from OCR is unsurprising given the uniform assessment by multiple former OCR staffers that it is "impossible" for OCR to resolve the staggering number of open cases "within the remaining offices." ECF No. 61-72 (Gonzales Decl.) ¶ 38; *see also* ECF No. 61-86 (Lhamon Decl.) ¶ 49; ECF No. 61-54 (Doe 5 Decl.) ¶¶ 16–25; ECF No. 61-55 (Doe 6 Decl.) ¶¶ 15–25; ECF No. 61-62 (Doe 10 Decl.) ¶¶ 20–21; ECF No. 61-64 (Doe 12 Decl.) ¶¶ 9–17.

4.    The blanket cancellations of competitive grants, *see* ECF No. 61-1, at 19–21, 29–

30, have also inflicted concrete harm on Plaintiffs' members. The Department's competitive grants fund jobs and training for over a hundred thousand NEA members. *See* ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 35–39, 45, 47. Defendants' mass termination of SEED, TQP, and TSL grant awards led to the loss of jobs, stipends, professional development and training opportunities, and other supports for NEA members across the country. *Id.* ¶¶ 39–44. For example, six master teacher positions, including positions held by NEA members, were eliminated due to the cancellation of a TSL grant in Arizona's Osborne School District, which had been a "god send" for the district's efforts to recruit and retain effective educators. ECF No. 61-78 (Hermes Decl.) ¶¶ 22, 29; ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 41–42. An NEA member in Clay County, Florida had to indefinitely pause her graduate studies because she could not afford tuition after the Department terminated a TQP grant through which she received funding and access to a leadership program. *Id.* at ¶ 43. The termination of a SEED grant in Monroe, Michigan, caused the cancellation of planned teacher trainings to implement a new literacy curriculum. *Id.* at ¶ 39.

Similarly, the Department's mass termination of critical funding for school-based mental health services through the SBMH and MHSP grants has harmed NEA members across the country. ECF No. 61-37 (Bilal-Threats Decl.) ¶¶ 48–49. The cancellation of a SBMH grant to Prince George's County Public Schools, for example, eliminated funding for critically needed mental health staff as well as tuition payments and mentoring support for PGCEA members. ECF No. 61-40 (Christy Decl.) ¶¶ 21, 33. Likewise, the Lemon Grove School District in California had used its discontinued SBMH grant to fund new certified mental health professional positions in the district. ECF No. 61-106 (Vinson Decl.) ¶¶ 28–30. While the district will attempt to divert other resources to fund some of these positions in the short term, the loss of SBMH grant funding forced the district to eliminate two full-time social worker positions in a bargaining unit

represented by an NEA affiliate for the 2025–2026 school year and will require an additional three positions to be cut for the 2026–2027 school year. *Id.* ¶ 35.

As discussed, it is well established that the loss of employment, salary, and benefits is an injury for standing. *See, e.g.*, *DiCocco*, 52 F.4th at 592. So too are "loss of training" and "vocational services." *Cabrera v. U.S. Dep't of Labor*, No. 25-cv-1909, 2025 WL 2092026, at *4 (D.D.C. July 25, 2025) (holding that plaintiffs had standing to challenge shutdown of vocational training program); *see also Massachusetts v. Trump*, No. 25-cv-11221, 2025 WL 1836592, at *5 (D. Mass. July 3, 2025) (holding that organization established associational standing "with declarations pointing to specific projects" whose delays harmed members).[4]

*    *    *

Each of the actions Defendants have taken to close the Department—by closing offices in the Department and terminating their mandatory functions—have caused concrete harm to Plaintiffs and their members. Injunctive relief will ensure that Defendants operate those offices and carry out those mandatory functions and therefore will remedy that harm. Plaintiffs have a strong stake in this case and have amply demonstrated injury, causation, and redressability for establishing Article III jurisdiction.

**B.    The Claims are Ripe**

Defendants contend that all but one of Plaintiffs' claims are unripe for review because "the Department of Education is not closed" and "will not be closing without congressional action." ECF No. 78, at 26–27. But Plaintiffs need not wait until Defendants have successfully closed the Department in its entirety before challenging the decision to close the Department and the discrete,

---

[4] For the same reasons discussed above in the context of formula grants, *see supra* p. 14 n.2, the government's reliance, *see* ECF No. 78, at 20, on *Am. Ass'n of Univ. Professors v. United States Dep't of Just.*, No. 25-cv-2429, 2025 WL 1684817 (S.D.N.Y. June 16, 2025), is misplaced.

illegal actions Defendants have taken to eliminate Department programs and functions.

Like standing, ripeness derives from the case-or-controversy requirement of Article III. "While standing involves the question[] of *who* may sue, ripeness involves *when* they [may] sue." *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 295 (4th Cir. 2022) (citation and internal quotation marks omitted). "The question of whether a claim is ripe turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (citation and internal quotation marks omitted). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties; conversely, a claim is not ripe when it rests upon contingent future events that may not occur as anticipated." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014) (citation and internal quotation marks omitted). "The hardship prong, on the other hand, is measured by the immediacy of the threat and the burden imposed on the [parties]," *id.* (citation and internal quotation marks omitted), including whether "a pause would result in extreme—possibly irremediable—hardship," *NAACP v. Bureau of the Census*, 945 F.3d 183, 193 (4th Cir. 2019) (citation and internal quotation marks omitted).

Plaintiffs' constitutional and APA claims are fit for adjudication. As Plaintiffs have explained, Defendants have repeatedly and publicly stated their intent to abolish the Department, and since January 2025, they have taken a series of concrete final agency actions to implement this decision, including a massive reduction in force and en masse cancellations of grants awarded through statutorily required programs. *See* ECF No. 61-1, at 1, 4–7, 24–30. Even if Defendants have not completed the Department's so-called "Final Mission," ECF No. 61-1, at 4, they have already effectively shut down multiple statutorily mandated offices of the Department and terminated many of its statutorily mandated functions, *see id.* at 8–21, 25–30. These actions are

both certain and final; they do not depend on any future contingencies; and the Court need only apply settled law to adjudicate their legality.

Plaintiffs would also suffer severe hardship if the Court were to withhold consideration of their claims. Plaintiffs have been—and continue to be—harmed by the actions Defendants have taken to date to close the Department. Those harms range from job losses to lost educational and professional opportunities. The ripeness doctrine does not require Plaintiffs to wait until Defendants get closer to achieving their goal of closing the Department and terminate more statutorily mandated offices and their functions, let alone until the Department ceases to exist in its entirety, before they may challenge Defendants' decision to unilaterally abolish the Department and the actions Defendants have taken to carry out that decision to date.

### C.    No Claims Are Channeled

Defendants contend that the Civil Service Reform Act (CSRA) strips this Court of jurisdiction over "the claims brought by Plaintiffs challenging the Department's RIFs." ECF No. 78, at 20. Under the test set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), however, a claim is exclusively channeled to an administrative agency, depriving district courts of jurisdiction, only when (1) "such intent is fairly discernible in the statutory scheme," and (2) the claim is "of the type Congress intended to be reviewed within this statutory structure." *Id.* at 207, 212 (internal quotations omitted). Congress's establishment of an administrative scheme through which federal employees and their unions can contest individual employment actions and labor disputes does not evidence an intent to prevent non-employee, non-federal-union plaintiffs from challenging in federal district court an unlawful effort to close down a statutorily created agency simply because it is advanced through a "large-scale reduction[] in force." *AFGE v. Trump*, 139 F.4th 1020, 1031 (9th Cir. 2025), *injunction stayed on other grounds*, 2025 WL 1873449 (U.S.

July 8, 2025); *see Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025) (rejecting channeling argument in case challenging efforts to close the Department of Education), *injunction stayed without opinion*, 2025 WL 1922626 (U.S. July 14, 2025). And even if it were necessary to reach the second step of the *Thunder Basin* framework, each of the factors used to determine whether Congress intended to channel a particular claim to an administrative agency confirms that channeling is not appropriate here.

To begin with the first step of the analysis, no intent to channel Plaintiffs' claims regarding the closure of the Department—through a large-scale RIF and other actions—is discernible from the CSRA. The CSRA "sets forth the protections and remedies available to [federal] employees as well as the procedural process they must follow." *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 299 (4th Cir. 2025).[5] Plaintiffs are neither federal employees nor unions representing Department employees, they do not challenge individual employment decisions, and they do not seek to vindicate the protections available to federal employees or their unions. Rather, Plaintiffs challenge Defendants' efforts to close the Department of Education by closing its statutory offices and terminating its statutory functions. Plaintiffs' claims raise fundamental issues about our structure of government and the scope of executive authority, which do not turn on any aspect of the employment relationship between the government and its workers or the government's relationship and interactions with unions representing federal workers.

The implication of Defendants' position demonstrates that Congress could not have intended the CSRA to apply in the manner they propose. Under Defendants' view, even if it were

---

[5] Under the CSRA, certain classes of covered employees may appeal certain adverse employment actions to the Merit Systems Protection Board (MSPB). *See* 5 U.S.C. § 1204. In addition, the Federal Service Labor-Management Relations Statute, found within the CSRA, permits labor unions and federal agencies to bring unfair labor practice claims, negotiability disputes, and appeals of arbitral decisions to the Federal Labor Relations Authority (FLRA). *See* 5 U.S.C. §§ 7117, 7118, 7122.

to close a federal agency without congressional approval in one fell swoop by firing every employee at once—an action that the government concedes is unlawful—the only justiciable challenge to that gravely unconstitutional action would be a claim brought by an employee or a federal union to the MSPB or the FLRA. It defies credulity to believe that Congress intended that to be the exclusive form of review for such a grave constitutional violation. *See Somerville Pub. Schs.*, 139 F.4th at 71; *see also Wiley v. Kennedy*, No. 2:25-cv-227, 2025 WL 1384768, at *11 (S.D.W.V. May 13, 2025) ("It is patently absurd to suggest that an illegal agency action that includes termination of employees is unreviewable.").

This case is different only in timing. Defendants have decided to close the Department, and have made significant strides towards that goal over months, but have yet to complete the closure. Whether accomplished in a single day or over months, however, nothing in the CSRA suggests that Congress intended for constitutional and statutory challenges to the closure of federal agencies to proceed through administrative agencies with expertise in employment and labor matters.

Defendants' reliance on *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), *United States v. Fausto*, 484 U.S. 439 (1988), and *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), is misplaced. In *Elgin*, the Court repeatedly emphasized that the plaintiffs were "covered employees appealing covered agency actions." 567 U.S. at 10, 13, 14, 19, 20, 21. As such, the MSPB had jurisdiction over their claims, with a right of appeal to the Federal Circuit, and the employee plaintiffs challenging their removals were required to bring their constitutional claims to the MSPB. *Id.* at 13–14. *Elgin* is irrelevant where, as here, Plaintiffs are not covered employees and are unable to bring *any* claims before the MSPB or FLRA.[6]

---

[6] Defendants incorrectly claim that the MSPB and FLRA also allow "other interested parties" to bring challenges to adverse employment actions. But "they do not cite to any authority supporting that other interested parties are subject to the CSRA or defin[ing] who these other interested parties are." *Elev8 Baltimore, Inc.*, 2025 WL

*Fausto* likewise involved a federal employee plaintiff challenging an adverse personnel action in federal court. The CSRA carefully articulates the rights and remedies available to various classifications of federal employees. The *Fausto* Court concluded that because the CSRA expressly granted certain rights to the plaintiff's employee class but left that class out of statutory review provisions, Congress intended that "those employees should not be able to demand judicial review for the type of personnel action covered by that chapter." 484 U.S. 439, 448 (1988). Allowing a covered employee to whom Congress intentionally gave *fewer* rights under the CSRA to nevertheless challenge such actions in court would undermine the CSRA structure. *Id.* at 449. But here, both Plaintiffs and their claims are completely outside the scope of the CSRA, so there is no "congressional judgment" that their claims are barred from judicial review.

*Block* is similarly inapplicable. It involved a congressionally established "cooperative venture among the Secretary, handlers, and producers" to set milk product prices that did not permit consumers to "participate in the adoption and retention of market orders." *Block*, 467 U.S. at 346–47. The Court concluded this complex scheme barred consumers from challenging orders in federal court because "Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* at 347. As such, permitting consumers to bring in court "precisely the same exceptions" others must raise administratively would "severely disrupt" the scheme. *Id.* at 348. But here, Plaintiffs are not trying to enforce the "statutory objectives" of the CSRA or stand in the shoes of employees, so there are no indicia that Congress intended to block their access to federal court. This Court has jurisdiction to hear their constitutional and statutory claims. *Block* "did not hold . . . that a comprehensive statutory scheme

---

1865971, at *16 (internal quotations omitted). Their passing reference to FLRA regulations allowing intervention in FLRA proceedings, ECF No. 78 at 21 n.4, does not establish that Plaintiffs could raise their APA and constitutional claims before the FLRA, much less does it speak to *Congress's* intent to preclude federal court jurisdiction.

authorizing review of an agency action by one category of plaintiffs always forecloses claims by other plaintiffs regardless of the nature of those claims." *Somerville Pub. Schs.* 139 F.4th at 71–72.

Second, even if it were necessary to proceed to the second step of the *Thunder Basin* framework, that inquiry only confirms that channeling is not appropriate here. Indeed, although Defendants refer to that framework, ECF No. 78, at 21–22, they do not even attempt to apply its second step, which requires a court to consider: (1) whether precluding district court jurisdiction could "foreclose all meaningful judicial review," (2) whether the claim is "wholly collateral to [the] statute's review provisions," (3) and whether the claim is "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212–14). Because "Congress rarely allows claims about agency action to escape effective judicial review," whether a plaintiff can receive meaningful judicial review of their claim is the "most important factor." *Nat'l Ass'n of Immigr. Judges*, 139 F.4th at 308 (internal quotations omitted).

These factors confirm that Plaintiffs' claims are properly before this Court. Because Plaintiffs are unable to bring their claims before the MSPB or FLRA, no meaningful judicial review would be available if their claims were channeled. This stands in stark contrast to the D.C. Circuit's decision in *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), where the court concluded that meaningful review was available since plaintiff unions had access to "several administrative options for challenging the executive orders before the FLRA, followed by judicial review." *Id.* at 757 (internal quotations omitted). But here, because Plaintiffs "are not covered by the CSRA," and therefore cannot bring claims at the MSPB or FLRA, stripping this Court of jurisdiction would "foreclose all meaningful judicial review." *Elev8 Baltimore, Inc., v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458, 2025 WL 1865971, at *16 (D. Md. July 7, 2025) (internal quotations omitted).

The second and third *Thunder Basin* factors "reflect in related ways the point of special review positions—to give the agency a heightened role in the matters it *customarily handles*, and can apply *distinctive* knowledge to." *Axon*, 598 U.S. at 186 (emphases added). Plaintiffs' constitutional and statutory claims, however, are far afield from the ordinary work of the MSPB and FLRA. As the Ninth Circuit recognized, "[e]ven assuming that the MSPB or FLRA could adjudicate, for example, an *ultra vires* claim within an individual employment dispute, such a constitutional challenge would be collateral to the subject of that proceeding." *AFGE v. Trump*, 139 F.4th 1020, 1031 (9th Cir. 2025) (citation and internal quotation marks omitted). And neither the MSPB nor the FLRA has expertise in the APA and constitutional claims that Plaintiffs bring here. *Id.* at 1032; *cf. Axon*, 598 U.S. at 194 (FTC "knows a good deal about competition policy, but nothing special about the separation of powers."); *Carr v. Saul*, 593 U.S. 83, 92 (2021) ("[A]gency adjudications are generally ill suited to address structural constitutional challenges.").

Finally, Defendants claim the unpublished stay decision in *Maryland v. USDA*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. April 9, 2025), supports their channeling argument, but the sparse reasoning in that decision cited a Supreme Court decision staying similar claims on standing grounds, not due to CSRA channeling. Even assuming the *Maryland* panel concluded that the claims in that case were likely channeled, Plaintiffs' claims—which contend that Defendants violated the Constitution by closing down statutorily created offices within the Department and terminating their mandatory functions—are a far cry from those presented in *Maryland*, where the state plaintiffs claimed that probationary employees were fired en masse in violation of civil service statutes and regulations governing RIFs. *See id.*

As such, it is no surprise that district courts within the Fourth Circuit have since concluded that claims like Plaintiffs' are not precluded by the CSRA. For example, in *Wiley v. Kennedy*, the

plaintiff challenged the dismantling of the Respiratory Health Division of the National Institute for Occupational Safety and Health, arguing that "by sending RIF notices and placing key employees on administrative leave, HHS ceased to fulfill its statutory duties." 2025 WL 1384768, at *9. The court rejected the government's channeling argument because the plaintiff "is not an employee, and he cannot present his claims under the CSRA" and "[u]nlike *Maryland v. United States Dep't of Agriculture*, the central claim in this case is about the services offered to the public." *Id.* at 11. Likewise, the court in *Elev8 Baltimore, Inc.* determined it had jurisdiction to hear plaintiffs' challenges to the "mass termination of more than 600 AmeriCorps employees," despite the government's contention that jurisdiction was foreclosed by the CSRA. 2025 WL 1865971, at *15–18. This Court similarly has jurisdiction "because Plaintiffs' claims are not of the sort Congress intended to channel for review under the CSRA." *Id*. at 15.

### D.     The Tucker Act Does Not Divest This Court of Jurisdiction Over Any Claims

In contending, ECF No. 78, at 24–27, that this Court lacks jurisdiction over Plaintiffs' APA challenges to the effective closure of IES and mass termination of competitive grants, Defendants misconstrue both the source of Plaintiffs' claims and their requested relief. While district courts lack jurisdiction to hear a limited subset of APA claims that are "essentially contractual" and must be brought in the Court of Federal Claims, this does not mean that "any case requiring some reference to or incorporation of a contract" is barred from district court by the Tucker Act. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982). Instead, courts must examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought" to determine if a claim is essentially contractual. *Id.* at 968; *see United States v. J&E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995) (adopting *Megapulse* rights and remedies test for Contract Disputes Act jurisdictional analysis). Because Plaintiffs' claims are not essentially

contract actions, their claims regarding IES and competitive grant programs are properly raised in this Court, not the Court of Federal Claims. Moreover, Plaintiffs are not in privity with the government and therefore cannot bring their claims in the Court of Federal Claims, confirming that this Court retains jurisdiction to hear them.

First, this Court has jurisdiction over Plaintiffs' claims regarding IES. Plaintiffs are challenging actions that functionally eradicated IES and prohibited it and its component offices from carrying out their statutorily mandated activities. ECF No. 61-1, at 8–10, 25–26, 35–39. It is irrelevant that Defendants had previously chosen to meet the statutory mandates in part through contracting. *See Megapulse*, 672 F.2d at 969 (recognizing that "the mere existence of . . . contract-related issues" does not mean a claim is "based on the contract"). The "source of the rights" on which Plaintiffs' claims are based is found in federal law, not any particular contract, none of which are before this Court. And when "claims are not founded on individual contracts, but instead assert constitutional, statutory, and regulatory violations," the Tucker Act does not grant the Court of Federal Claims exclusive jurisdiction. *Elev8 Baltimore, Inc.*, 2025 WL 1865971, at *10–15; *see Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 937-38 (9th Cir. 2025) (when "plaintiffs seek to enforce compliance with statutes and regulations, not any government contract," their claims are "beyond the scope of the Tucker Act's exclusive jurisdiction"); *Green & Healthy Home Initiatives, Inc. v. EPA*, No. 25-cv-1096, 2025 WL 1697463, at *12 (D. Md. June 17, 2025) (asserting jurisdiction when "Plaintiffs are not alleging violations of the terms of the grants, but instead are asserting constitutional, statutory, and regulatory violations").

And as to the "type of relief sought," Defendants are mistaken: Plaintiffs' requested relief does not "seek the reinstatement of specific contracts that had been cancelled" at IES. ECF No. 78, at 25. Indeed, Plaintiffs' proposed order does not mention IES contracts at all, instead requiring

Defendants to "reinstate any statutorily mandated functions in the Department that have been terminated or halted since January 20, 2025, including research, data collection, dissemination activities, and other mandatory functions needed to administer formula grant programs as required by statute." ECF No. 61-2, at 1–2. As Defendants note, by statute, IES may "perform its delineated functions 'directly *or* through grants, contracts, or cooperative agreements.'" ECF No. 78, at 25 (quoting 20 U.S.C. § 9512). Plaintiffs ask for injunctive relief directing the Department to restore these statutorily required functions, not an order reinstating particular contracts, further demonstrating that their claims belong in district court, not the Court of Federal Claims.

Second, this Court also has jurisdiction over Plaintiffs' claims involving competitive grant programs. Plaintiffs' claims are not based on compliance with grant agreements provisions, but instead on whether Defendants' effective cancellation of the SEED, TQP, TSL, SBMH, and MHSP programs complies with the Constitution, statutory mandates, regulatory requirements for grant termination, and the APA. ECF No. 61-1, at 30–31, 35–37, 39. Regardless of whether the grant awards at issue here provide their recipients "certain contractual rights, those are not the rights that Plaintiffs have brought this case to enforce." *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *12. Instead, because Plaintiffs ask this Court to review Defendants' compliance with constitutional, statutory, and regulatory provisions, the claims do not sound in contract. *See id.*

Again, the requested relief confirms that Plaintiffs' claims are properly before this Court. Seeking to convert Plaintiffs' claims into contractual ones, Defendants incorrectly claim that Plaintiffs have requested an order requiring "the Government to continue to perform under a contract"—"the classic contractual remedy of specific performance." ECF No. 78, at 26. That is not accurate. Plaintiffs only seek to enjoin "mass discontinuation[s]" of competitive grant programs through blanket terminations; their proposed order expressly permits individualized

terminations in compliance with statutory and regulatory requirements. ECF No. 61-2, at 2–3. Eliminating an unlawful barrier to a funding stream is not the same as ordering specific performance: even if "an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting," this "is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate." *Megapulse*, 672 F.2d at 971.

That Plaintiffs' claims are not essentially contractual claims over which this Court lacks jurisdiction is made even clearer by the fact that "no contract exists between plaintiffs and the Government." *Cmty. Legal Servs.*, 137 F.4th at 937; *see also Thakur v. Trump*, No. 25-cv-4737, 2025 WL 1734471, at *19 (N.D. Cal. 2025) (asserting jurisdiction over grant termination claims brought by non-parties to grants), *motion to stay pending* (No. 25-4249) (9th Cir.). Defendants argue that district courts do not have jurisdiction over APA claims "where another statutory scheme (here, the Tucker Act) applies." ECF No. 78, at 25. But the Tucker Act is inapplicable here, even if Plaintiffs *were* trying to enforce contractual provisions, because "there must be privity of contract between the plaintiff and the United States" to bring a claim in the Court of Federal Claims. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). Because "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act," courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction . . . when no jurisdiction lies in the Court of Federal Claims." *Cmty. Legal Servs.*, 137 F.4th at 939 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006)).

Indeed, if Defendants' jurisdictional argument were accepted, Plaintiffs would have no court to which to bring their constitutional, statutory, and regulatory claims. This is untenable in light of both the "strong presumption in favor of judicial review of agency action," *Casa de*

*Maryland v. DHS*, 924 F.3d 684, 697 (4th Cir. 2019) (citation and internal quotations omitted), and the Supreme Court's recognition that when considering a conflict between the APA and Tucker Act, "established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act." *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988) (citation modified). And Defendants can point to no "clear" statement from Congress barring Plaintiffs from raising their constitutional claims, as required "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988).

The Supreme Court's per curiam emergency stay decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (*California*), does not compel a different result. Although the Court's reasoning was sparse, there are at least three material differences here.

First, the plaintiffs in *California* sought relief based in part on the terms of the cancelled grant agreements. Thus, "the terms and conditions of each individual grant award [were] at issue." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025); *see also* Complaint at ¶ 183, *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass 2025) (No. 1:25-cv-10548) ("No term or condition for any TQP or SEED grant award authorizes termination for failure to effectuate agency priorities."); *see also Sols. in Hometown Connections v. Noem*, No. 25-cv-885, 2025 WL 1530318, at *12 (D. Md. May 29, 2025) (denying preliminary injunction where the plaintiffs did not show "that the Court would look to sources beyond their Grant Agreement[s] to resolve these claims"). Here, as discussed, the terms of the underlying grant agreements are entirely irrelevant; indeed, none of the grant contracts are or need be in the record.

Second, the relief the district court granted in *California*—blocking the government "from terminating various education-related grants" and "requir[ing] the Government to pay out past-due

grant obligations and to continue paying obligations" under the terminated grants, *California*, 145 S. Ct. at 968—carried the hallmarks of a contractual remedy. In granting a stay, the Supreme Court contrasted these remedies requiring monetary payments with the order upheld in *Bowen v. Massachusetts. Bowen,* which remains binding precedent, held that, notwithstanding the Tucker Act, a federal district court properly exercised APA jurisdiction to set aside an agency's grounds for disallowing reimbursement of certain costs, even though a likely effect of the district court's decision was that the government would pay out the reimbursement. *Id.* at 909–10. In other words, where, as here, payment will be "a mere by-product" of the relief the plaintiff seeks, *id.*, and is not the specific relief being sought, district courts, and not the Court of Federal Claims, retain jurisdiction under *Bowen*, even if "an order setting aside an agency's action may result in the disbursement of funds," *California*, 145 S. Ct. at 968.

As the Fourth Circuit explained in *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)—a case in which the Fourth Circuit granted a stay in reliance on *California*—the Supreme Court, in *California*, found a "meaningful difference" between the relief granted in *Bowen*—which "t[old] the United States that it may not disallow the reimbursement on the grounds given," *Bowen*, 487 U.S. at 910—and an order to "enforce a contractual obligation to pay money." *Sustainability Inst.* 2025 WL 1587100, at *1. The district court order in *California* specifically required the government to perform under the terminated grant agreements, including by making payments to grantees, and therefore went far beyond the situation in *Bowen*, where reversing an agency decision had the incidental consequence of the government paying out funds. *See* 145 S. Ct. at 968. Similarly, in *Sustainability Institute*, the district court's injunction ordered the government "to restore Plaintiffs['] access to grant funds immediately" and prohibited the government from "freezing, terminating or otherwise interfering

with the funding of [those] Grants . . . without written authorization from the Court." 2025 WL 1587100, at *2. Plaintiffs here, in contrast, seek an order vacating the mass grant terminations as contrary to law and arbitrary and capricious but stating that Defendants may otherwise terminate the grants in a lawful manner. The relief sought in this case is therefore akin to *Bowen*'s reversal of an unlawful agency decision that "may result in the disbursement of funds." *California*, 145 S. Ct. at 968.

Third, the district court in *California* explained that the plaintiffs who sought preliminary relief, and the public instrumentalities on whose behalf they were seeking that relief, were grant recipients. *See California*, 769 F. Supp. 3d at 76 n.2. They therefore would be in privity with the United States and not foreclosed from suing in the Court of Federal Claims. Defendants' other cases, ECF No. 78, at 26, also involved grantees in privity with the government. Plaintiffs here, in contrast, are not parties to cancelled contracts or grants and therefore cannot seek recourse in the Court of Federal Claims. That fundamentally distinguishes this case from *California*.

Since the Supreme Court issued its *California* stay order, other courts considering challenges to grant terminations on statutory, regulatory, and constitutional grounds have considered the particular claims brought and relief sought and rejected the government's Tucker Act arguments. *See, e.g.*, *Am. Pub. Health Ass'n v. NIH*, No. 25-1611, 2025 WL 2017106, at *4–8 (1st Cir. 2025); *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 937-39; *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc); *Green & Healthy Home Initiatives*, 2025 WL 1697463; *Maryland v. Corp for Nat'l & Cmty. Serv.*, No. 25-cv-1363, 2025 WL 1585051, at *22–28 (D. Md. June 5, 2025); *Elev8 Baltimore, Inc.*, 2025 WL 1865971, at *10–14. Because Plaintiffs are not parties to the relevant contracts, their claims are not contractual, and the requested relief does not sound in contract, this Court should follow suit.

33

**III.    Plaintiffs Are Likely to Succeed on the Merits**

    **A.    The Constitutional Claims Are Likely to Succeed**

        **1.    The Constitutional Claims Do Not Challenge Discretionary Conduct**

Defendants contend, ECF No. 78, at 31–32, that Plaintiffs raise "purely statutory" claims, not cognizable constitutional claims. Defendants rely on inapposite cases involving challenges to the President's exercise of a discretionary authority granted by statute. But Plaintiffs do not contend that Defendants have exceeded or abused discretionary authority granted by Congress. Instead, Defendants have violated the Constitution by taking actions that are not authorized by the Constitution or by any statute, let alone a statute granting discretion to the Executive Branch.

As Plaintiffs have explained, ECF No. 61-1, at 2, 22–24, the Constitution gives Congress the power over "the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Exercising that power, Congress established, in mandatory terms, the Department of Education, *see* 20 U.S.C. § 3411, as well as offices within the Department, *see, e.g.*, 20 U.S.C. §§ 3419, 9511(a) (IES); 20 U.S.C. § 1018(a) (FSA); 20 U.S.C. § 3413(a) (OCR), and it provided that the Department and its constituent offices must carry out certain mandatory functions, *see, e.g.*, 20 U.S.C. §§ 9511(b)(2), 9543(a) (describing some of the functions IES "shall" perform). For its part, the Executive Branch may only exercise authority that derives "from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "In the latter case, the President's authority is sometimes 'conclusive and preclusive,'" and "he may act even when the measures he takes are 'incompatible with the expressed or implied will of Congress.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)). Absent that scenario, however, the President and subordinate executive officers and agencies "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken*

*Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). The President has no "dispensing power" under the Constitution by which he can decline to give effect to duly enacted legislation, which would "cloth[e] the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 612–13 (1838). Rather, "[i]f the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump*, 603 U.S. at 608 (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)). In *Youngstown*, for example, the Supreme Court "held that President Truman exceeded his constitutional authority when he seized most of the Nation's steel mills." *Id.*

Plaintiffs assert claims that arise from these bedrock constitutional principles, not statutory claims. The Executive Branch possesses no constitutional authority to abolish a federal agency created by Congress or decline to carry out the mandatory functions assigned to the Department by Congress. Accordingly, by taking actions to close the Department and offices within the Department, and by rendering the Department and its offices unable to carry out their mandatory statutory responsibilities, Defendants have asserted authority that they lack under the Constitution, and have violated both the separation of powers and their constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.[7]

---

[7] The government contends, ECF No. 78, at 34–35, that the Take Care Clause applies only to the President and therefore his subordinates lack a constitutional obligation to take care that the laws enacted by Congress are faithfully executed. But the duty to take care that the laws be faithfully executed is "[t]he most basic duty of the President *and his subordinates*." *Ortiz v. United States*, 585 U.S. 427, 486 (2018) (Alito, J. dissenting) (emphasis added). Indeed, the Office of Legal Counsel, whose opinions bind the Department of Justice, has concluded that "[t]he President *and his subordinates* have a constitutionally imposed duty 'to take Care that the Laws be faithfully executed,'" and thus the Take Care Clause applies to the Attorney General. *Recommendation that the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984*, 8 Op. Off. Legal Counsel 183, 193 (1984) (emphasis added) (quoting U.S. Const, art. II, § 3). At a minimum, the President carries out his obligation to take care that the laws are faithfully executed through his subordinates, *see Myers*, 272 U.S. at 117; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020), and the courts can enjoin those subordinates to redress a constitutional violation by the President, *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992); *Youngstown*, 343 U.S. at 588–89.

Defendants' reliance, ECF No. 78, at 32, 34, on *Dalton v. Specter*, 511 U.S. 462 (1994), is misplaced. In *Dalton*, the plaintiffs challenged the President's decision to close a naval shipyard pursuant to a statute enacted by Congress that authorized the Secretary of Defense to propose shipyard closings to an independent commission, authorized the commission to make a recommendation to the President, and gave the President discretion without "limit" to approve or disapprove the commission's recommendation "for whatever reason he [saw] fit." 511 U.S. at 476; *see id.* at 465–66. The plaintiffs argued that the President exceeded his authority under the statute because the Secretary and the commission did not comply with statutory procedural requirements. *Id.* at 471–72. The Supreme Court concluded that judicial review of a President's actions for compliance with a statute "is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474. The Court contrasted claims alleging the absence of presidential power—such as the claims in *Youngstown*, which "involved the conceded absence of any statutory authority" and "turned on whether the Constitution authorized the President's actions," *id.* at 473—with claims alleging "a mere excess or abuse of discretion in exerting a power given," *id.* at 474 (citation and quotation marks omitted).

*Dalton* is therefore inapposite. *Dalton* forecloses review of claims only when they challenge the President's exercise of a discretionary authority that a statute entrusts to the President. 511 U.S. at 476. But claims alleging that "presidential action . . . independently violates a statute that delegates no authority to the President to interfere" remain reviewable. *Chamber of Com. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *see PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 427 (D. Md. 2025). So too do claims that presidential action lacks any statutory or constitutional authority. *Dalton*, 511 U.S. at 473 (citing *Youngstown*, 343 U.S. at 587). The constitutional claims in this case fall within that latter category. The claims challenge Defendants'

actions on the ground that Defendants possess no statutory or constitutional authority to close the Department or its constituent offices or dispense with mandatory statutory obligations that Congress has assigned to the Department and its offices. Defendants do not—and cannot—contend that any law grants the President sweeping discretionary authority to shutter a congressionally created and funded cabinet-level agency or to cease its statutorily mandated functions. Plaintiffs do not seek review of Defendants' exercise of some discretionary authority entrusted to the Department to close itself down or terminate its functions because no such authority exists.

The additional authorities cited by Defendants, ECF No. 78, at 34, also involved the President's exercise of discretionary authority granted by statute and are therefore inapposite for the same reasons. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (Reconstruction Acts that authorized the President to "assign generals to command in the several military districts" and "detail sufficient military force to enable such officers to discharge their duties under the law"); *Chi. & S. Air Lines Co. v. Waterman S.S. Corp.*, 333 U.S. 103, 104 (1948) (statute that gave the President discretion to approve or reject "applications by citizen carriers to engage in overseas and foreign air transportation"). Defendants suggest, ECF No. 78, at 33, that *Heckler v. Chaney*, 470 U.S. 821 (1985), forecloses Plaintiffs' claims involving the Office for Civil Rights (OCR), but *Heckler* is inapposite as well. In *Heckler*, the Court determined that the plaintiffs could not obtain APA review of the Food and Drug Administration's discretionary decision not to take enforcement action to prohibit states from using specific drugs to carry out the death penalty, concluding that "an agency's decision not to take enforcement action should be presumed immune from judicial review under" the APA's exception in 5 U.S.C. § 701(a)(2) for actions committed to agency discretion by law. *Id.* at 832. Plaintiffs do not challenge, under the APA or otherwise, any decision not to take enforcement action. Plaintiffs' constitutional claims allege that Defendants have

effectively closed OCR and other offices that Congress established within the Department and have rendered them incapable of carrying out their mandatory statutory functions.

Defendants' defense, ECF No. 78, at 33, 35, of their refusal to expend funds is similarly without merit because Congress has not granted discretion to withhold funds that Congress appropriated to carry out functions of the Department. *See, e.g.*, Pub. L. No. 117-159, 136 Stat. 1342, § 22000 (providing that $1 billion appropriated by Congress "shall be for carrying out" SBMH and MHSP grants); Pub. L. No. 118-47, 138 Stat. 690 (appropriating $793,106,000 "[f]or necessary expenses for" IES); *see also* ECF No. 61-1, at 19–20 & n.2. An agency "does not have unilateral authority to refuse to spend the funds" appropriated by Congress, and absent statutory language that gives an agency discretion to spend less than the appropriated amount, a congressional appropriation presumptively requires that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress."). Defendants' reliance on discretion supposedly granted to the President by Congress is misplaced.

### 2.   The Proviso in the Executive Order Does Not Insulate the Closure of the Department from Constitutional Challenge

Defendants contend, ECF No. 78, at 36–37, that the Executive Order is legal because it directs the Secretary of Education to take steps to close the Department only to the "extent appropriate and permitted by law." ECF No. 61-5 (Exec. Order 14,242) § 2. In the absence of legislation authorizing closure of the Department, however, any concrete steps to implement a closure are necessarily inconsistent with applicable law. The government cannot "attempt to immunize the Order from review through a savings clause which, if operational, would nullify the

'clear and specific' substantive provisions of the Order." *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (quoting *City & Cnty. of San Francisco*, 897 F.3d at 1239); *accord PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-946, 2025 WL 1187730, at *19 (D.D.C. Apr. 24, 2025).

Defendants reiterate, ECF No. 78, at 37, their contention that despite the Executive Order's instruction to close the Department, they are acting as "permitted by law" because they are only terminating discretionary functions in the Department that are not mandated by statute. But as discussed, the record evidence, which Defendants do not attempt to rebut, directly refutes that factual contention. Defendants have made clear, including in public statements, that they wish and intend to close the Department; they have shrunk the Department without regard to its mandatory statutory obligations; and they have closed offices and terminated functions that are mandated by statute. *See* ECF No. 61-1, at 3–4, 7–8, 10–16, 25–30 (discussing statutory obligations). The claim that Defendants are merely trimming the Department's non-mandatory discretionary functions is entirely divorced from the facts.

**B.    The Administrative Procedure Act Claims Are Likely to Succeed**

**1.    Plaintiffs Challenge Discrete Final Agency Actions**

Defendants contend, ECF No. 78, at 27–31, that Plaintiffs' APA claims must be dismissed because Plaintiffs do not challenge "agency action," as that term is defined under the APA, and they do not challenge "final" agency action. These arguments are without merit.

The APA provides for judicial review of "agency action," 5 U.S.C. § 702, which must consist of "specific and discrete governmental conduct," *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). The agency action also must be "final," 5 U.S.C. § 704, which means it must (1) "mark[] the consummation of the agency's decisionmaking process," and (2)

determine "rights or obligations" or generate "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

Plaintiffs seek review, ECF No. 61-1, at 32–35, of the following agency actions: (1) the Secretary's decision to close the Department, (2) the reduction in force announced on March 11, 2025, (3) the functional closure of IES, and (4) the mass cancellations of competitive grants, namely the mass termination of SEED, TSP and TQP grants in February 2025 and the mass discontinuation of SBMH and MHSP grants in April 2025. Each of these actions is specific and discrete governmental conduct that marks the end of the decision-making process and determines rights and obligations or generates legal consequences.

a.    Relying on *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), Defendants contend, ECF No. 78, at 27–30, that Plaintiffs do not challenge discrete agency actions and instead mount an impermissible "programmatic" challenge. But *Lujan* involved a challenge to a raft of activities within the Bureau of Land Management that the plaintiffs aggregated together and attempted to challenge collectively under the moniker "land withdrawal review program," seeking "wholesale improvement" in the "program." *Id.* at 891. *Lujan* explained that the APA does not "permit[] a generic challenge to all aspects of" a program "as though that itself constituted a final agency action." *Id.* at 890 n.2. In contrast, Plaintiffs here challenge four separate, discrete agency actions that are each independently subject to judicial review under the APA: the decision to close the Department, the reduction in force, the closure of IES, and the en masse competitive grant terminations.[8] That Defendants carried out those actions around the same time and for the same general aim (closing the Department) does not render separate challenges to each of those actions

---

[8] Each of these discrete agency actions is both contrary to law and arbitrary and capricious. *See* ECF No. 61-1, at 35–40. Citing the complaint, Defendants contend, ECF No. 78, at 29, that Plaintiffs have not alleged with specificity why these agency actions are contrary to law, but Plaintiffs explained the illegality of each of these discrete agency actions in detail in their motion for a preliminary injunction, *see* ECF No. 61-1, at 35–37.

programmatic under *Lujan*. *See Elev8 Baltimore*, 2025 WL 1865971, at *19 (concluding that multiple actions that "occurred within a singular and brief time frame" were each "sufficiently discrete to constitute a reviewable agency action"); *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

Defendants contend, ECF No. 78, at 30, that the scope of relief needed to redress the illegality of these agency actions reveals that the actions are not discrete and specific. To be sure, these separate actions have far-reaching effects, and the corresponding remedies will need to redress those effects. But as *Lujan* itself explained, judicial review of discrete agency actions "may ultimately have the effect of requiring . . . a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns." 497 U.S. at 894 (internal quotations omitted).[9]

b.      Defendants' arguments, ECF No. 78, at 30–31, that these discrete agency actions are not final do not withstand scrutiny.

Defendants contend, ECF No. 78, at 31, that Plaintiffs cannot identify a decision by Defendants to close the Department. But Plaintiffs have cited at length, ECF No. 61-1, at 4–7, the evidence establishing a decision to close the Department. Among other things, President Trump instructed Secretary McMahon to put herself out of a job and later memorialized that directive in the Executive Order, and the Secretary publicly announced her intent to carry out the Department's "Final Mission." And it is also plain from this evidence that the decision is final.

Defendants assert that the reduction in force "marks the initiation, not the consummation, of the agency's decision-making process." ECF No. 78, at 31. But an agency's termination of a

---

[9] Nonetheless, Defendants misconstrue, ECF No. 78, at 30, the scope of the relief sought by Plaintiffs. Plaintiffs do not request reinstatement of employees; supervision of grant terminations, personnel actions, or contract cancellations; or supervision over "any decision" by the Department. *See* ECF No. 61-2 (proposed order).

group of employees in a reduction in force is a final agency action. *See Elev8 Baltimore, Inc.*, 2025 WL 1865971, at *19 (concluding that a reduction in force at AmeriCorps was a final agency action and citing other cases). Defendants provide no basis to conclude otherwise here.

Defendants argue that Plaintiffs fail to provide evidence "of a decision not to issue grants at all." ECF No. 78, at 31. But Plaintiffs challenge the decision to terminate competitive grants en masse. Plaintiffs do not claim there has been a decision not to issue grants, and therefore Plaintiffs do not seek judicial review of any such decision. Defendants' argument is off base.

### 2. Plaintiffs Do Not Challenge Agency Actions Committed to Agency Discretion by Law

Defendants contend, ECF No. 78, at 39–41, that the discrete agency actions challenged by Plaintiffs are committed to agency discretion and therefore unreviewable under the APA. In the alternative, Defendants assert, ECF No. 78, at 37–38, that they acted within their discretion and therefore their actions are not arbitrary or capricious. These arguments are without merit. None of the challenged actions—the decision to close the Department, the reduction in force, the closure of IES, or the mass cancellations of competitive grants—falls within the narrow category of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And Defendants' cursory defense of their actions does not rebut the showing by Plaintiffs that those actions are arbitrary and capricious.

1.     The APA "sets up a 'basic presumption of judicial review' of agency action" except "where 'agency action is committed to agency discretion by law.'" *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967), and 5 U.S.C. § 701(a)(2)). "Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal. for Patient Access v.*

*United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler*, 470 U.S. at 830–31). "[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations[.]" *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985) (quoting *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981)).

None of the four discrete final agency actions challenged by Plaintiffs is committed to agency discretion by law.

First, the decision to close the Department of Education is not committed to the agency's discretion by law, and Defendants do not, and cannot, argue otherwise. Congress's directives in the laws creating the Department and its subunits, assigning it certain functions, and funding it are clear and mandatory and leave the agency no discretion to countermand those directives. The Constitution thus bars the Executive Branch from unilaterally closing the Department of Education. *See* ECF No. 61-1, at 22–31, 45. The Executive Branch cannot decide to close an agency that was created and funded by Congress, and it cannot lawfully take across-the-board actions designed to cease the agency's work. "A decision of such magnitude and consequence" on a matter of "'earnest and profound debate across the country'" must "res[t] with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) (alterations in original). When the Executive purports to make such significant decisions independently, it "seiz[es] the power of the Legislature." *Id.* at 503.

Second, the decision to close IES is not committed to the Department's discretion. Just as the agency lacks discretion to close itself down, it also has no discretion to close offices within the Department that Congress created and to which Congress assigned mandatory responsibilities. Defendants contend, ECF No. 78, at 40, that they have broad discretion to cancel contracts meant

to fulfill IES's mandatory functions. To be sure, under statute, IES may carry out its functions directly, through Department employees, or through contracts with entities outside the Department. But the Department has not brought IES functions previously carried out through contracts in house but instead has terminated its contracts *and* its employees—leaving no one to do its statutorily required work. It is that decision, not the mere cancellation of contracts, that is arbitrary and capricious and contrary to law.

Third, the mass reduction in force is not committed to agency discretion by law. Defendants contend, ECF No. 78, at 39, that they have discretion to reduce headcount to improve efficiency, but the record refutes that rationale and establishes that it is pretextual. Secretary McMahon herself admitted that the reduction in force was "the first step on the road to a total shutdown" of the Department. ECF No. 61-7, at 1; *see* ECF No. 61-1, at 6–7. And just as the Department lacks discretion to close the agency as a whole or offices within it, the Department also lacks discretion to effectuate a closure by terminating large groups of employees who work within the agency and carry out its mandatory statutory functions. Several courts have concluded that reductions in force are not committed to agency discretion by law "in similar cases." *Elev8 Baltimore, Inc.*, 2025 WL 1865971, at \*20 (concluding that reduction in force at AmeriCorps is not committed to agency discretion by law and citing other cases). The same conclusion is warranted here.

Fourth, the decision to terminate competitive grants en masse is not committed to agency discretion by law. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 25-cv-702, 2025 WL 863319, at \*6 (D. Md. Mar. 19, 2025) (rejecting argument that mass termination of TQP, SEED, and TSL grants is committed to agency discretion by law). Defendants argue, ECF No. 78, at 41, that the APA forecloses judicial review of the terminations because the Department has discretion to decide to whom it will award competitive grants. But Plaintiffs do not seek review of any

decision to award grants; rather, they seek review of the decision to terminate grants with neither explanation nor process. And regardless of any discretion the Department may possess to award or terminate grants, that discretion is bounded by statute, including the General Education Provisions Act; by regulations, including the Education Department General Administrative Regulations; and by the Department's own rules, namely its Handbook for the Discretionary Grant Process. *See* ECF No. 61-1, at 35–37. Defendants contend, ECF No. 78, at 53, that no statute "prevents the Department from terminating grant agreements," but even if a statute does not categorically prohibit termination, the relevant statutes, regulations, and internal rules limit and guide any discretion the Department's exercise of whatever discretion it may possess. And those limits on discretion foreclose the arguments both that grant termination is committed to agency discretion by law and that Defendants can terminate grants for the sole reason that the grants are supposedly contrary to the policy preferences of a new presidential administration.

2.    As Plaintiffs have explained, ECF No. 61–1, at 37-40, the four discrete agency actions that Plaintiffs challenge are each arbitrary and capricious. Defendants largely fail to respond to these arguments and instead make only a cursory attempt, ECF No. 78, at 38, to justify the reduction in force and grant terminations as acceptable exercises of discretion, purportedly aimed at reducing "inefficiency and waste at the Department of Education." Again, extensive record evidence refutes that rationale and demonstrates that it is pretextual. Moreover, the boilerplate rationales Defendants have provided to hundreds of grant recipients is likewise inadequate to justify the mass terminations. Defendants do not identify which of the multiple rationales stated in those letters apply to which grants, let alone explain how or why those rationales justified the termination of each grant, particularly given the significant reliance interests at stake. Nor have Defendants attempted to demonstrate that they complied with the relevant

statutes, regulations, or internal rules that circumscribe the Department's authority to terminate grants and require the Department to provide notice, a hearing, and other procedural safeguards. Defendants acted arbitrarily and capriciously in deciding to close the Department, closing IES, massively reducing the Department's workforce, and terminating competitive grants en masse.

### IV.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction

Plaintiffs have explained, ECF No. 61-1, at 40–44, that absent a preliminary injunction, they and their members will suffer actual and imminent injuries that cannot be remedied on final judgment. Defendants do not respond to any of the arguments presented by Plaintiffs in their motion and instead make the vague and broad assertion that Plaintiffs have not demonstrated irreparable injury for the same reasons that "Plaintiffs' harms are too speculative to establish standing." ECF No. 78, at 42. The harms Plaintiffs identified in their motion for a preliminary injunction are neither remote nor speculative. And to the extent Defendants rely on their standing arguments, for the reasons explained above, *supra* pp. 8–19, Plaintiffs have suffered—and will continue to suffer—concrete, particularized injuries that establish standing under Article III.

Defendants also contend, ECF No. 78, at 42–43, that the four-month period between when Plaintiffs filed a complaint and sought a preliminary injunction "undercuts" a showing of irreparable harm. Defendants should not be permitted to oppose preliminary relief on the grounds that Plaintiffs have waited both too long *and* not long enough. Plaintiffs sought a preliminary injunction after diligently collecting information, in a rapidly developing situation, to demonstrate with sufficient particularity the irreparable injury that they have suffered and will continue to suffer. There has been no delay that undermines a showing of irreparable harm.

### V.    The Balance of Equities Supports Preliminary Relief

Plaintiffs, their members, and the public at large have significant equities in the ongoing

existence of the Department of Education and in the Department's performance of its mandatory functions, including those carried out by IES, FSA, and OCR, as well as the Department's administration of formula and competitive grant programs. Those activities provide critical services and funding to assist educators and students at every level of the education system throughout the Nation and are aimed at achieving the critical twin missions that prompted Congress to create the Department—to improve the quality of public education and ensure educational access for all Americans from all backgrounds. Defendants' actions to close the Department and terminate its functions gravely harm not only Plaintiffs and their members, but students, families, and educational institutions throughout the Nation.

The countervailing equities identified by Defendants, ECF No. 78, at 43–44, pale in comparison. Defendants assert, ECF No. 78, at 43, that an injunction would frustrate the President's ability to set policies and will harm the government "should it be forced to compensate employees for unneeded and unnecessary activities." ECF No. 78, at 43. But the government's mere pocketbook interest in avoiding the payment of employee salaries and its generalized executive interest in setting policy—which would seem to apply in any instance in which a litigant challenges executive action—do not outweigh the concrete, significant interests of Plaintiffs, their members, and the public at large in ensuring the Executive Branch's compliance with the Constitution and faithful implementation of the laws enacted by Congress, as well as the Department's ongoing performance of its statutory responsibilities and the support those activities provide throughout the Nation.

## VI.     The Proposed Injunction is Tailored to Provide Complete Relief to Plaintiffs

Defendants claim, ECF No. 78, at 44–45, that Plaintiffs' proposed order is "problematic." Defendants' arguments are without merit. Equitable relief "should be no more burdensome to the

defendant than necessary to provide complete relief to the plaintiffs." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) (citation and quotation marks omitted). The order proposed by Plaintiffs adheres to these principles. Plaintiffs have shown that Defendants have violated the Constitution by determining to close the Department—contrary to Congress's creation of the Department and assignation of mandatory functions—and have taken discrete acts to carry out that decision by terminating offices within the Department and their mandatory functions, including offices and functions in IES, FSA, and OCR. Plaintiffs—which include nationwide organizations whose members reside in every state and touch virtually every activity of the Department of Education—have further shown that they and their members have been harmed by the termination of those functions. By ordering Defendants to restore the mandatory functions of IES, FSA, and OCR, and prohibiting Defendants from taking any further steps to close the Department and terminate its mandatory functions, Plaintiffs propose a remedy that is tailored to provide relief to them from the harms that flow from Defendants' constitutional violations. Defendants complain that the proposed order "would require the Department to reinstate statutorily mandated functions." ECF No. 78, at 44. But the cessation of mandatory functions violates the Constitution, and Plaintiffs have shown that they have been—and will continue to be—harmed by the cessation of those mandatory functions. An order requiring Defendants to restore those functions is therefore entirely appropriate. Defendants' contention, ECF No. 78, at 44, that the proposed order "is not tailored to remedying any particular harms shown" is simply incorrect.

The proposed order also reflects that "'[v]acatur is the normal remedy under the APA, which provides that a reviewing court "shall . . . set aside" unlawful agency action.'" *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-cv-3060, 2024 WL 3860211, at *36 (D. Md. Aug. 19, 2024) (quoting *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022), and

5 U.S.C. § 706(2)). Prohibiting Defendants from taking further steps to implement or carry out the reduction in force and the mass termination of grants reflects that longstanding principle. Similarly, Defendants' criticism, ECF No. 78, at 44, of the component of the proposed order that instructs Defendants that they may terminate a competitive grant only after making an individualized determination that termination is warranted under applicable statutes and regulations is also unavailing. That part of the order simply clarifies that after vacatur of the unlawful en masse grant terminations, Defendants are not categorically foreclosed from terminating grants, as long as they comport with applicable law in doing so.

The proposed order is tailored to provide complete relief to Plaintiffs and is consistent with the principle that vacatur is the appropriate remedy under the APA. Plaintiffs request that the Court grant the motion for a preliminary injunction and enter the proposed order.

## VII. If the Court Grants a Preliminary Injunction, the Court Should Not Preemptively Stay Its Order Pending Appeal, But a Nominal Bond is Appropriate

Defendants request that the Court stay any preliminary junction the Court may order "pending the disposition of any appeal that is authorized." ECF No. 78, at 57. But a stay pending appeal "is not a matter of right," and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of" the court's discretion. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009) (citation and quotation marks omitted). It would not be appropriate for the Court to preemptively grant a stay before a party has even filed an appeal, let alone attempted to satisfy its burden of making a showing that a stay is appropriate under the circumstances. Nonetheless, if the Court grants a preliminary injunction, Plaintiffs would not object to a limited administrative stay of three days to give Defendants an opportunity to file an appeal and seek a stay.

Defendants also contend, ECF No. 78, at 45, that the Court should require a bond if it grants a preliminary injunction. Rule 65(c) of the Federal Rules of Civil Procedure provides that a court

"may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Defendants contend that the Court should issue a bond in the amount of "the salary and benefits for every employee that would have otherwise been separated and the cost of every competitive grant and contract." ECF No. 78, at 45. But several courts, including this Court, "have imposed a nominal bond" when the government does not request bond in a specific amount and instead provides "such unsupported speculations." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 861 (D. Md. 2025). A nominal bond or no bond at all is particularly warranted in a "quintessential public interest lawsuit" such as this one. *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *39. Accordingly, if the Court grants a preliminary injunction, Plaintiffs request that the Court require a bond of $100 in total or per plaintiff. *See, e.g.*, *Elev8 Baltimore, Inc.*, 2025 WL 1865971, at *29 ($100 per plaintiff).

## CONCLUSION

Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction and deny Defendants' Motion to Dismiss the Amended Complaint.

Dated: August 8, 2025

Respectfully submitted,

*/s/ Abigail V. Carter*

Joseph M. Sellers (D. Md. Bar No. 06284)
Ethan Judd*
Ryan Wheeler*
Jenna Waldman*
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue, NW, Suite 800
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699

Leon Dayan*
Abigail V. Carter (D. Md. Bar No. 20952)
John M. Pellettieri*
Kara A. Naseef*
Grace Rybak*
Lane Shadgett (D. Md. Bar No. 31686)
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005

jsellers@cohenmilstein.com
ejudd@cohenmilstein.com
rwheeler@cohenmilstein.com
jwaldman@cohenmilstein.com

Robert Kim*
Jessica Levin*
Wendy Lecker*
Theresa Luhm*
**Education Law Center**
60 Park Place, Suite 300
Newark, NJ 07102
Tel. (973) 624-1815
Fax (973) 624-7339
rkim@edlawcenter.org
jlevin@edlawcenter.org
wlecker@edlawcenter.org
tluhm@edlawcenter.org

*Attorneys for NAACP, NAACP South Carolina State Conference, NAACP Florence Branch, NAACP Texas State Conference, NAACP Lubbock Branch, Mara Greengrass, and Jane Does 1 & 2*

Aaron S. Ament*
Daniel A. Zibel (D. Md. Bar No. 31554)
Eric Rothschild*
**National Student Legal Defense Network**
1701 Rhode Island Avenue N.W.
Washington, D.C. 20036
Tel. (202) 734-7495
aaron@defendstudents.org
dan@defendstudents.org
eric@defendstudents.org

*Attorneys for National Education Association*

*Admitted Pro Hac Vice*

Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
jpellettieri@bredhoff.com
knaseef@bredhoff.com
grybak@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for National Education Association, Prince George's County Educators Association, AFSCME Council 3*

Alice O'Brien*
Marissa Marandola*
Kristin Garcia*
**National Education Association**
1201 16th Street NW
Washington, D.C. 20036
Tel. (202) 822-7035
aobrien@nea.org
mmarandola@nea.org
krgarcia@nea.org

*Attorneys for National Education Association and Prince George's County Educators Association*