IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, | |
| *Plaintiffs,* | Civil No. 8:25-cv-00965-JRR |
| v. | |
| THE UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants.* | |

**MEMORANDUM OPINION**

This matter comes before the court on Plaintiffs' Motion for Preliminary Injunction (ECF No. 61; the "PI Motion") and Defendants' Motion to Dismiss (ECF No. 77). Following briefing by the parties, the court convened a hearing on the Motions on August 15, 2025. For the reasons that follow, by accompanying order, Plaintiffs' PI Motion will be denied on the merits without prejudice, and Defendants' Motion to Dismiss will be administratively denied without prejudice.

I.   **BACKGROUND**

"[E]ducation is fundamental to the development of individual citizens and the progress of the Nation." 20 U.S.C. § 3401(1). It is on that basis that Congress established the Department of Education (the "Department") in 1979. Plaintiffs, a group of civil rights organizations, labor unions, and individuals, urge that, since January 20, 2025, President Donald J. Trump and his administration have sought, as he campaigned, to close the Department in contravention of the Executive's constitutional authority. The instant case challenges those actions.

Plaintiffs National Association for the Advancement of Colored People ("NAACP"), NAACP South Carolina State Conference ("South Carolina NAACP"), NAACP Florence Branch

("Florence NAACP"), NAACP Texas State Conference ("Texas NAACP"), NAACP Lubbock Branch ("Lubbock NAACP"), Mara Greengrass on behalf of minor child B.F., Jane Doe 1 on behalf of minor child C.E., Jane Doe 2 on behalf of minor child C.C., National Education Association ("NEA"), Prince George's County Educators Association ("PGCEA"), and AFSCME Council 3 ("AFSCME") initiated this action on March 24, 2025. (ECF No. 1; the "Complaint.") Plaintiffs name the United States of America, the Department, and Secretary of Education Linda McMahon (the "Secretary") as Defendants. *Id.*

Months later, on July 1, 2025, Plaintiffs filed the operative Amended Complaint (ECF No. 58) and the PI Motion (ECF Nos. 58, 61.) Plaintiffs contend that "Defendants' *ultra vires* destruction of the Department violates the separation of powers and the Constitution's Take Care, Spending, and Appropriations Clauses," as well as the Administrative Procedure Act ("APA"). (ECF No. 58 ¶ 10.) Plaintiffs assert five claims:

> <u>Count One</u>: Take Care Clause, U.S. CONST. art. II, § 3 against the Secretary;
>
> <u>Count Two</u>: Appropriations and Spending Clauses, U.S. CONST. art. I, § 8, cl. 1; art. I, § 9, cl. 7 against the Secretary;
>
> <u>Count Three</u>: Violation of the Separation of Powers against the Secretary;
>
> <u>Count Four</u>: Violation of the APA, 5 U.S.C. § 706(2)(A)–(C) against all Defendants; and
>
> <u>Count Five</u>: *Ultra Vires* Action against all Defendants.

*Id.* ¶¶ 149–71. The Government opposes the PI Motion; with its opposition response to the PI Motion, the Government also moves to dismiss the Amended Complaint. (ECF Nos. 77, 78.)

### A. About Plaintiffs

Plaintiffs generally fall into three categories: NAACP and its branches (NAACP, South Carolina NAACP, Florence NAACP, Texas NAACP, and Lubbock NAACP); individuals

(Greengrass, Doe 1, and Doe 2); and labor unions and a council of labor unions (NEA, PGCEA, and AFSCME). *Id.* ¶¶ 13–20.

### 1. NAACP Plaintiffs

Plaintiff NAACP, headquartered in Baltimore, Maryland, is the "the oldest and largest civil rights organization in the United States." (ECF No. 58 ¶ 13.) "Its mission is to ensure the educational, political, social, and economic equality of all persons and eliminate race-based discrimination." *Id.* Its members include parents of school-age children, high school and college students, and educators that are organized in units across the United States. *Id.*

South Carolina NAACP, Texas NAACP, Florence NAACP, and Lubbock NAACP (collectively, the "NAACP Branches") are "nonprofit, nonpartisan membership organizations" based in South Carolina and Texas that work to "ensure educational equality and eliminate racial hatred and discrimination." *Id.* ¶ 14. The NAACP Branches' pursuit of their missions "rel[ies]" upon the work of the Department, and in particular, the Department's Office for Civil Rights ("OCR"). *Id.*

### 2. Individual Plaintiffs

All individual Plaintiffs are residents of Maryland and parents of minor children in public schools in Maryland. (ECF No. 58 ¶¶ 15–17.) Plaintiff Mara Greengrass is a resident of Rockville, Maryland; her minor child, B.F., is a high school sophomore in Montgomery County Public Schools. *Id.* ¶ 15. B.F. has an Individualized Education Program ("IEP") that ensures he "receives daily paraeducator support, specialized educational programming, a dedicated counselor, and a class on executive function skills." *Id.*

Plaintiffs Jane Doe 1 and Jane Doe 2 are also residents of Montgomery County, Maryland, with children in the Montgomery County Public Schools. *Id.* ¶¶ 16–17. Doe 1's minor child, C.E.,

is a high school senior and has an IEP. *Id.* ¶ 16. Doe 1 filed a complaint of disability discrimination and retaliation of C.E. with OCR's Philadelphia office. *Id.* Doe 2's minor child, C.C., is in elementary school and receives Emergent Language Development Services under the Elementary and Secondary Education Act. *Id.* ¶ 17.

### 3. Labor Union Plaintiffs

Plaintiff NEA, headquartered in Washington, D.C., is "the nation's largest union of educational professionals with some three million members who work at every level of education." (ECF No. 58 ¶ 18.) It has "some three million members who work at every level of education, from preschool to university graduate programs, and serve some 50 million students." *Id.* NEA "advocate[s] for education professionals and to unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world." *Id.*

Plaintiff PGCEA is an affiliate of NEA and a labor union headquartered in Forestville, Maryland. *Id.* ¶ 19. "It represents certified staff, including teachers and specialized support personnel, in Prince George's County Public Schools." *Id.*

Plaintiff AFSCME, headquartered in Baltimore, Maryland, is a council of labor unions in Maryland. *Id.* ¶ 20. "It represents over 300 public-school employees, including paraprofessionals, instructional assistants, counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff, and thousands of employees in the University System of Maryland." *Id.* Grants from the Department "pay many [AFSCME] member salaries." *Id.*

**B.  About the Department**

In 1979, Congress created the Department through the Department of Education Organization Act ("DEOA"), codified, as amended, at 20 U.S.C. §§ 3401–3510.  Pub. L. No. 96-88, 93 Stat. 669 (1979).  Congress declared:

> [T]hat the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive proper treatment at the Federal level, and will enable the Federal Government to coordinate its education activities more effectively.  Therefore, the purposes of this chapter are—
>
> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;
>
> (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education;
>
> (3) to encourage the increased involvement of the public, parents, and students in Federal education programs;
>
> (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information;
>
> (5) to improve the coordination of Federal education programs;
>
> (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and
>
> (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

The Department is administered "under the supervision and direction" of the Secretary.  *Id.* § 3411.  It must have an Office of General Counsel ("OGC") and an Office of the Inspector

General, as well as five principal offices: OCR, the Office of Elementary and Secondary Education ("OESE"), the Office of Special Education and Rehabilitative Services ("OSERS"), the Office of Postsecondary Education ("OPE"), and the Office of Career, Technical, and Adult Education ("OCTAE"). *Id.* §§ 3412–3417. *See also* ECF No. 58 ¶ 26. Congress has enacted additional laws that have created "new, mandatory divisions" within the Department, including: the Office of Federal Student Aid ("FSA"), 20 U.S.C. § 1018; the Institute of Education Sciences ("IES"), 20 U.S.C. § 9511; the Office for Special Education Programs ("OSEP") within OSERS, 20 U.S.C. § 1402(a); and the Office of English Language Acquisition ("OELA"), 20 U.S.C. § 3420. (ECF No. 58 ¶ 27.) As of January 2025, the Department totaled 4,133 staff members, with 1,444 employees in FSA,[1] 557 employees in OCR,[2] and 190 employees in IES. (ECF No. 58 ¶ 42; Ex. A-11, March 11 Press Release, ECF No. 61-15.)

The Department is tasked with administering a number of federal statutes, including, relevant here:

i. The Elementary and Secondary Education Act ("ESEA"): Enacted in 1965 and last reauthorized in 2015, Pub. L. No. 114-95, 129 Stat. 1802, codified as amended at 20 U.S.C. § 6301 *et seq.*, the ESEA serves as "the main source of federal financial assistance for K-12 schools." In Fiscal Year 2024, Congress appropriated $18.8 billion to the ESEA's Title I-A program, "which supports elementary and secondary schools with a relatively high concentration of students from low-income families."[3] The Department's administration of ESEA also includes formula grants under same.

ii. The Individuals with Disabilities Education Act ("IDEA"): Enacted in 1975 and last reauthorized in 2004, Pub. L. No. 108-446, 118 Stat. 2647, codified as amended at 20 U.S.C. §§ 1400–82, the IDEA mandates states provide students with disabilities ages 3 to 21 with a "free appropriate public education" in exchange for federal funding to states for early intervention and special education programs. In administering the IDEA, the Department awards funds through formula and competitive grant programs. In FY 2024, pursuant to the IDEA, the Department awarded 15.5 billion in grants to support the educational needs of about 7.5 million children.[4]

---

[1] U.S. DEP'T OF EDUC., *Fiscal Year [("FY")] 2024 Annual Report* 11 (2024), https://perma.cc/P3E4-VPN7.
[2] U.S. DEP'T OF EDUC., *FY 2025 Budget Request* 8–9 (2024), https://perma.cc/566K-4ACB.
[3] U.S. DEP'T OF EDUC., *FY 2024 Agency Financial Report* 38 (2024), https://perma.cc/3TCH-9ERB.
[4] NCES, U.S. DEP'T OF EDUC., *Students With Disabilities* (May 2024), https://perma.cc/2Y3D-4F6W.

iii. <u>The Higher Education Act ("HEA")</u>: Enacted in 1965 and last comprehensively reauthorized in 2008, Pub. L. No. 110-315, 122 Stat. 3083, codified as amended at 20 U.S.C. § 1001 *et seq.*, the HEA establishes grants to support higher education institutions and related financial aid programs, awarding about 120.8 billion in aid each year to 9.9 million students in postsecondary education and training programs.[5]  It created the FSA to manage the financial aid programs.  *See* 20 U.S.C. § 1018.

iv. <u>The Carl D. Perkins Career and Technical Act ("Perkins V")</u>: Enacted in 2006 and last reauthorized in 2018, Pub. L. 115-225, 132 Stat. 1565, codified as amended at 20 U.S.C. § 2301 *et seq.*, Perkins V "supports secondary and postsecondary career and technical education [] programs through grants (about $1.46 billion in FY 2024) to states and schools."

v. <u>The Education Sciences Reform Act ("ESRA")</u>: Enacted in 2002, Pub. L. 114-95, 116 Stat. 1941, codified as amended at 20 U.S.C. §§ 9501 *et seq.*, the ESRA "reconstituted the research office created by the DEOA as IES, a nonpartisan, semi-independent research division within the Department, consisting of four centers with specific responsibilities under the statute."

vi. <u>Federal Civil Rights Laws</u>: These laws prohibit discrimination on protected bases in schools and colleges that receive federal financial assistance.  They include Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d (race); Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–89 (sex); Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, 20 U.S.C. § 3441(a)(3) (disability); and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65 (disability).

(ECF No. 58 ¶ 27.)

### 1. *Statutory Offices*

As discussed above, Congress has statutorily mandated the Department maintain certain offices, including, relevant here, IES, 20 U.S.C. § 3419, FSA, 20 U.S.C. § 1018, and OCR, 20 U.S.C. § 3413.

Turning first to IES, Congress enacted a law that "[t]here shall be in the Department of Education the Institute of Education Sciences, which shall be administered in accordance with the Education Sciences Reform Act of 2002."  20 U.S.C. § 3419.  It further requires that IES "shall

---

[5] FSA, U.S. Dep't of Educ., *FY2024 Annual Report* 8, 15 (2024), https://perma.cc/P3E4-VPN7.

compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need" and "shall" consist of four National Education Centers.  20 U.S.C. § 9511(b)(2), (c).

Each National Education Center carries with it its own statutorily mandated functions.  (ECF No. 58 ¶ 62.)  For example, the National Center for Education Statistics ("NCES") "shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations."  20 U.S.C. § 9543.  Pursuant to this work, NCES "plays an essential role in the Department's administration of grants created by Congress, including a major category known as 'formula' grants," as it collects, updates, and supplies the underlying data necessary to assign values to the formula factors and determine eligibility.  (ECF No. 61-1 at p. 9; Ex. Q, Doe 8 Decl., ECF No. 61-58 ¶¶ 10–24, 27.)

For its part, the National Center for Education Evaluation and Regional Assistance ("NCEE") "shall" provide "technical assistance," "conduct evaluations of Federal education programs administered by the Secretary . . . to determine the impact of such programs," "support synthesis and wide dissemination of results of evaluation, research, and products developed," and "encourage the use of scientifically valid education research and evaluation."  20 U.S.C. § 9561.  It also "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories [("RELs")] that serve the needs of each region of the United States" by providing support for "applied research, development, wide dissemination, and technical assistance activities."[6]  20 U.S.C. § 9564.

---

[6] The other two IES centers include the National Center for Education Research ("NCER"), 20 U.S.C. § 9531, and the National Center for Special Education Research, which sponsors research topics including the educational "needs of infants, toddlers, and children with disabilities."  20 U.S.C. § 9567(b)(1).  (ECF No. 58 ¶ 44(a); *id.* at p. 19 n.44.)

Regarding FSA, "Congress created FSA as a quasi-independent entity responsible for managing the Title IV [of the HEA] programs, with a statutory focus on 'performance' and limited Secretarial oversight." (ECF No. 58 ¶ 76.) It undertakes a number of functions under the HEA, including certifying colleges for participation in Title IV programs, overseeing third-party loan servicers' day-to-day operation of the student loan programs, and ensuring that Title IV programs operate with integrity (including appointment of an Ombudsman to provide assistance to borrowers by processing and informally resolving borrower complaints). *Id.* ¶¶ 79–84. FSA also manages the Federal Pell Grant Program, the Teacher Education Assistance for College and Higher Education Grant Program, and the William D. Ford Direct Loan Program. *Id.* ¶ 76. The Direct Loan Program, in particular, accounts for most federal student loans. *Id.* ¶ 77. In FY 2024, "FSA directly managed or oversaw a loan portfolio of more than $1.6 trillion, consisting of 217.2 million student loans to more than 45 million borrowers."[7] *Id.* FSA also oversees the HEA mandates of income-driven loan repayment plans, the Public Service Loan Forgiveness Program, and the Teacher Loan Forgiveness Program. *Id.* ¶ 78.

Finally, OCR carries out "'all functions' related to the enforcement of federal civil rights laws (including Title VI, Title IX, Section 504, and the ADA) that prohibit discrimination in federally funded education programs" and effectuates their anti-discrimination provisions. *Id.* ¶ 92. *See* 20 U.S.C. §§ 3413(a), 3441(a)(3). Historically, OCR has relied on its 12 regional offices to carry out this duty—at these offices, staff "review incoming complaints to confirm OCR's jurisdiction; conduct document review, interviews, and site visits; and determine whether a violation has occurred." (ECF No. 58 ¶ 93.) Where it finds unlawful discrimination, OCR is

---

[7] FSA, U.S. DEP'T OF EDUC., *FY2024 Annual Report* 16 (2024), https://perma.cc/P3E4-VPN7.

empowered to "enter[] a voluntary resolution agreement, in which the recipient consents to implement system-wide remedies, and OCR monitors its compliance." *Id.* ¶ 94.

### 2.  *Grant Administration*

"The Department also administers formula grant programs that distribute billions of dollars in federal financial assistance to states, school districts, colleges, and universities each year. Grantees' awards under these programs are calculated according to the formula set forth in the governing statute."  (ECF No. 58 ¶ 100.)  *See, e.g.*, 34 C.F.R. §§ 75.1(c)(1), 76.1.  To administer formula grant programs, the Department must "determine applicants' eligibility, allocate formula funds accurately, distribute awards in a timely manner, and monitor their use by recipients to prevent waste, fraud, and abuse."  (ECF No. 58 ¶ 102.)

The Department's formula grants programs include congressionally-mandated programs. Through ESEA, the formula grants provide aid for school districts with large populations of economically disadvantaged students (Title I-A), English learners (Title III-A), and rural schools (Title V-B).  (ECF No. 58 ¶ 101.)  Through IDEA, the formula grants support special education, preschool, and early intervention services for children with disabilities.  *Id.*  Through  Perkins V, the formula grants provide career and technical education programs.  *Id.*  And through HEA, the formula grants support Historically Black Colleges and Universities ("HBCUs") and Minority Serving Institutions ("MSIs").  (ECF No. 58 ¶ 101; ECF No. 61-1 at pp. 15–16.)  Grant-making offices within OESE, OELA, OSERS, OCTAE, and OPE "have primary responsibility for eligibility determinations, allocation calculations, and policy, monitoring, and accountability functions with respect to formula grant programs under the ESEA, IDEA, Perkins V, and HEA, respectively."  (ECF No. 58 ¶ 103.)

Moreover, prior to Defendants' complained-of actions, "NCES played a critical role in formula grant-making." *Id.* ¶ 104. For instance, NCES "created custom school district poverty estimates used in formulas under Title I, Perkins V, and many other grant programs and the locale code framework that decides whether a district is 'rural' and therefore eligible for REAP funds, among other uses"; "collected key data inputs required by the formulas"; and "maintained EDFacts, the online platform used by OESE, OELA, and OSERS to collect program data that states are required to submit as a condition of formula grant funding." (ECF No. 58 ¶¶ 104–105.) NCES also "worked with OCTAE to complete the mandatory state-reported data collection for Perkins V programs," *id.* ¶ 107, and completed the Integrated Postsecondary Education Data System ("IPEDS") collection mandated by HEA that provides student demographic data used to determine college and university eligibility for HBCU and MSI formula and competitive grants, *id.* ¶ 108.

In addition to formula grants, the Department is also required to administer multiple statutory-related competitive grant programs under ESEA, IDEA, Perkins V, HEA, ESRA, and other laws. *Id.* ¶ 122. The Secretary retains discretion to determine which applicants receive awards, and the Department sets funding priorities for the competitive grant programs by notice and comment. *Id.* In particular, ESEA mandates the Department award competitive grants through the Supporting Effective Educator Development ("SEED") Grants Program for growing "highly effective educators" and the "Teacher and School Leader Incentive Grants ("TSL") Program for improving systems of "educator hiring, training, and professional development." *Id.* ¶ 123. 20 U.S.C. §§ 6632, 6672(a). The HEA's Teacher Quality Partnership ("TQP") Program also provides competitive grant awards "to fund partnerships between high-need school districts and colleges for teacher preparation, teacher residency, and school leader preparation programs." (ECF No. 58

¶ 123.)  "The Department made scores of SEED, TQP, and TSL awards in FY 2022, 2023, and 2024, after setting competitive priorities by notice and comment."  *Id.* ¶ 124.

Relatedly, School-Based Mental Health Services ("SBMH") and Mental Health Service Professional Demonstration ("MHSP") are programs established under Title VI of the ESEA, 20 U.S.C. § 7281(a)(1)(B), and the 2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159. *Id.* ¶ 134.  "These programs support efforts to recruit, hire, and train school-based mental health professionals in underserved communities."  *Id.* Congress appropriated more than $1 billion to fund these program awards.  *Id.*

## C.  Change of Administration

On January 20, 2025, President Trump was sworn in, for the second time, as President of the United States. During his preceding presidential campaign, he openly stated his intention to close the Department.[8]  (Ex. A-4, ECF No. 61-8 at p. 2; Ex. A-6, ECF No. 61-10; Ex. A-7, ECF No. 61-11 at p. 9.)  Plaintiffs urge that Defendants have taken increasingly escalating and devastating steps to realize that goal – to incapacitate the Department and effectuate its closure in violation of law.  (ECF No. 58 ¶ 1.)

Of particular import here, on March 11, 2025, the Department initiated a reduction in force ("RIF") "impacting nearly 50% of the Department's workforce," leaving about 2,183 workers remaining (accounting for about 600 employees who accepted offers of voluntary resignation and retirement opportunities).  (ECF 58 ¶ 43; Ex. A-11, March 11 Press Release, ECF No. 61-14.)  Those subject to the RIF were placed on administrative leave on March 21, 2025.  (ECF No. 58 ¶

---

[8] The court takes note of the brief from Amici Members of Congress, which provides an apt discussion of the creation of the Department, as well as the history of Congress's exercise of its power in education, the "'[l]ong settled and established practice' of Congress using the lawmaking process to reorganize or eliminate agencies, and receiving due deference from the President." (ECF No. 69.)  Like Plaintiffs, the signatory Members of Congress provide: "Presidents can leave their stamp on federal education policy consistent with the separation of powers, but they plainly cannot do what President Trump has attempted here: to unilaterally shutter the Department of Education.  The power to abolish executive departments belongs to Congress through the legislative process."  *Id.* at p. 15.

43.)  Plaintiffs allege that the terminated workers "were immediately locked out of Department systems and could not send external emails or transition their work." *Id.*  In addition to announcing the RIF, the March 11 Press Release further provides:

> The Department of Education will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking.  All divisions within the Department are impacted by the reduction, with some divisions requiring significant reorganization to better serve students, parents, educators, and taxpayers.

(March 11 Press Release, ECF No. 61-14.)

In a same-day interview, Secretary McMahon confirmed the March 11 RIF was the first step to closing the Department, before acknowledging she will "have to work with Congress to get that accomplished."[9]  Defendants note the Secretary has also publicly acknowledged "that shutting down the Department will require 'work with Congress.'"  (ECF No. 78 at p. 5) (citations omitted).

Discussed at greater length as to specific programs below, Plaintiffs assert the RIF caused the following deleterious effects to Department components:

i.  <u>IES</u>: Defendants cut about 90% of IES's 200-person staff, leaving fewer than 20 employees.  Two of its four subdivisions were reduced to a single employee (the Commissioners), and one was left with only three of its 100 employees.

ii.  <u>FSA</u>: Defendants cut about 25% of FSA's staff, including the entirety of its Vendor Oversight  and Vendor Performance Divisions, 80% of its School Eligibility and Oversight Service Group, and half of its Ombudsman's Office.

iii.  <u>OCR</u>: Defendants cut about 50% of OCR's staff.  It also closed seven of its 12 regional offices—Philadelphia, New York City, Dallas, San Francisco, Boston, Cleveland, and Chicago.

iv.  <u>OESE, OSERS, OCTAE, and OPE</u>: Defendants cut almost all or all staff in the executive offices and management support units of these offices that administer the ESEA, IDEA, Perkins V, and HEA.

v.  <u>OELA</u>: Defendants abolished OELA, cutting 14 of its 15 employees.

---

[9] The Ingraham Angle, *Education Secretary Says Department Took First Steps to Eliminate 'Bureaucratic Bloat' at 1:12*, Fox News (Mar. 11, 2025), https://perma.cc/Z22U-L548.

vi.  <u>OGC</u>: Defendants cut OGC's attorney staff by 75%.

(ECF No. 58 ¶ 44.)

On March 20, 2025, the President signed Executive Order 14242, titled "Improving Education Outcomes by Empowering Parents, States, and Communities." Exec. Order No. 14,242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, 90 Fed. Reg. 13679 (Mar. 20, 2025). In the Executive Order, President Trump declares: "the experiment of controlling American education through Federal programs and dollars—and the unaccountable bureaucracy those programs and dollars support—has plainly failed our children, our teachers, and our families." *Id.* It details myriad ways in which "[c]losing the Department of Education" would be beneficial, including providing "children and their families the opportunity to escape a system that is failing them" and "drastically improv[ing] program implementation in higher education." *Id.* Ultimately, the Executive Order mandates the following:

> The Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely.

*Id.*

In effectuating the directive, the Executive Order calls on the Secretary to "ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law and Administration policy." *Id.* at 13680. Finally, it also provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.*

Plaintiffs' claims arise from the collective actions of Defendants to close the Department by gutting its staff and terminating many of its statutorily mandated functions. (ECF No. 61-1 at p. 8.)  While Plaintiffs' claims identify a range of actions and impacts, their specific challenges

14

fall into the following general categories: effects of the March 11 RIF, cancellation of contracts the Department relied upon to complete its congressionally mandated functions, and grant award terminations or non-disbursement.  The court addresses each below.

### 1. Impact on IES

On February 10, 2025, the Department "terminated 89 contracts," which totaled $881 million. (Ex. A-15, ECF No. 61-19; Ex. LLL, Young Decl., ECF No. 61-112 ¶ 15.)  In so doing, the Department cancelled most of the contracts IES used to carry out its research, data collection, and evaluation functions.[10]  (ECF No. 58 ¶ 67.)  Three days later, the Department cancelled 10 contracts, totaling $336 million, that had been awarded for RELs operation and staff, which the Department characterized as "woke spending;" these cancellations resulted in the closure of all 10 RELs.  (ECF No. 58 ¶ 67; Ex. A-16, February 13 Press Release, ECF No. 61-20; Young Decl., ECF No. 61-112 ¶ 23.)  "Because IES relies on external contractors and interagency agreements to complete much of its statutorily required work, the mass termination of IES contracts brought many statutorily mandated functions and programs to a halt."  (ECF No. 61-1 at p. 10; Ex. Z, Easton Decl., ECF No. 61-69 ¶ 18.)

Further, according to Plaintiffs, the March 11 RIF "functionally dismantled" IES, by "slash[ing] its staff by about 90%, from nearly 200 to fewer than 20 employees," reducing two subdivisions (NCEE and NCER) to a single employee (their Commissioner), and reducing one subdivision (NCES) to three of its employees. (ECF No. 58 ¶ 44(a); Doe 8 Decl., ECF No. 61-58 ¶ 34; Ex. R, Doe 9 Decl., ECF No. 61-59 ¶ 30; Young Decl., ECF No. 61-112 ¶¶ 25–26.)

---

[10] Department employees attempted to persuade leadership "to resuscitate essential contracts and ensure the continuation of NCES's statutory functions," and the Department did "eventually reinstate[] the contract for EDFacts, but with significant cuts."  (Ex. R, Doe 9 Decl., ECF No. 61-59 ¶¶ 25–27.)

### 2. *Impact on FSA*

Similarly, according to Plaintiffs, the Department's termination of employees in FSA "gutted FSA's ability to carry out [its] statutorily mandated functions." (ECF No. 61-1 at pp. 12–13.) As part of the March 11 RIF, the Department eliminated "the entire Vendor Performance Division of approximately fifty employees" (ECF No. 58 ¶ 44(b); Ex. D, Campbell Decl., ECF No. 61-38 ¶ 12); and cut approximately 80% of employees from its School Eligibility & Oversight Service Branch ("SEOS"), including all but two of its eight branches (ECF No. 58 ¶ 44(b); Ex. M., Doe 4 Decl., ECF No. 61-53 ¶ 27–28.) As a former employee declared, "[t]here is no way that the 30 remaining SEOS employees can fulfill the statutorily mandated responsibilities described above for over 5,500 schools." (Doe 4 Decl., ECF No. 61-53 ¶ 29.) Finally, the Department also cut more than half of its Ombudsman's Office (of approximately 63 staff), abolishing its Community Support Division, and the Operation and Quality Branches of the Intake Division. (ECF No. 58 ¶ 85; Ex. BB, Gittleman Decl., ECF No. 61-71 ¶ 4.)

### 3. *Impact on OCR*[11]

As part of the March 11 RIF, the Department closed seven regional OCR offices, serving 25 states, which handled about 50% of OCR's open cases. (ECF No. 58 ¶ 95; Ex. MM, Lhamon Decl., ECF No. 61-86 ¶ 27; Ex. O, Doe 6 Decl., ECF No. 61-55 ¶ 13; Ex. U, Doe 12 Decl., ECF No. 61-64 ¶ 11.) Plaintiffs urge that, in so doing, Defendants "gutted OCR's ability to enforce federal civil rights laws by decimating its regional offices, slashing its staff, and saddling the remaining offices and staff with impossible caseloads that are double or even triple prior loads, all

---

[11] The court takes note of the Amici brief of a group of 75 former OCR career staff whose collective careers spanned 1971 to 2025. Their brief details "the history of the critical statutes that OCR enforces, including Title VI, Title IX, and Section 504; the operationalization of the statutorily mandated role of OCR staff to enforce the civil rights of our nation's students; and how the dismantling of OCR violates these mandates, which, in turn, harms students and denies them equal opportunity in their education." (ECF No. 74.)

of which has left complainants without any redress." (ECF No. 61-1 at p. 14.) Plaintiffs assert that shifting responsibility of OCR cases to remaining enforcement staff will result in high caseloads and intake burdens. (ECF No. 58 ¶ 95; Doe 6 Decl., ECF No. 61-55 ¶ 18; Doe 12 Decl., ECF No. 61-64 ¶¶ 10, 13.) These cuts have, in Plaintiffs' estimation, destroyed OCR's ability to fulfill its statutory obligations. (ECF No. 61-1 at p. 15; Ex. N, Doe 5 Decl., ECF No. 61-54 ¶¶ 18, 20; Doe 10 Decl., ECF No. 61-62 ¶ 21; Doe 12 Decl., ECF No. 61-64 ¶ 17; Ex. CC, Gonzales Decl., ECF No. 61-72 ¶ 36; Lhamon Decl., ECF No. 61-86 ¶ 32; Ex. VV, Ortiz Decl., ECF No. 61-95 ¶ 25.)

### 4. Impact on Formula and Competitive Grants

Finally, Plaintiffs describe how Defendants' actions have affected formula and competitive grants—specifically by disabling formula and competitive grant programs. (ECF No. 61-1 at pp. 17, 20.) As discussed above, IES programs "collect the data necessary to study education systems, provide guidance to states and school districts, develop and implement policy initiatives, and distribute federal formula grants, among other mandatory functions." (ECF No. 58 ¶ 63.) Thus, "[b]y gutting the Department's data infrastructure, Defendants have left the agency unable to collect the necessary data for future formula grant allocations and performance monitoring." *Id.* ¶ 109.

As an example, Plaintiffs point to Title I-A of the ESEA, which "distributes $18.4 billion per year to serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools." (ECF No. 58 ¶ 27(b); ECF No. 61-1 at p. 17; Ex. A-28, ECF No. 61-32 at 11.) Minor changes to the formula inputs, poverty estimates, and formula-eligible child counts can significantly shift fund distribution.[12] (ECF No. 61-1 at p. 17; Doe 8 Decl., ECF No. 61-58 ¶

---

[12] Plaintiffs also contend that "Defendants have abolished at least one program office outright—[OELA], which administers the congressionally mandated program to support English learners, *see* 20 U.S.C. §§ 6801–71 (ESEA

11.)  Defendants acknowledge that on June 30, 2025, the Department "paused the distribution of formula grants under Title I-C (migrant education), Title II-A (professional development), Title III-A (English learner services), Title IV-A (academic enrichment), and Title IV-B (school enrichment programs)" "to complete review of the grants."  (ECF No. 78 at p. 5; Ex. A-31, ECF No. 61-35.)

With respect to competitive grant programs, Plaintiffs contend that "Defendants have effectively shut down the SEED, TQP, TSL, SBMH, and MHSP competitive grant programs for elementary and secondary educator recruitment and retention and have not moved to implement some $2 billion in higher education competitive grants."  (ECF No. 61-1 at p. 20.)  In the beginning of February 2025, Defendants terminated 104 of 109 recipients of open SEED and TQP awards, noting that the projects related to diversity, equity, and inclusion ("DEI") initiatives and were no longer consistent with Department priorities.  (ECF No. 58 ¶ 124; Ex. A-21, Oglesby Decl., ECF No. 61-25 ¶ 27.)  Defendants similarly terminated 200 of about 260 SBMH and MHSP grant awards on April 29, 2025.  (ECF No. 58 ¶ 135; Ex. GGG, Wall Decl., ECF No. 61-108 ¶¶ 19–21.)  According to Plaintiffs, these grant awards were terminated without required individualized analysis and otherwise contrary to law.  (ECF No. 58 ¶¶ 125, 129, 138; ECF No. 61-1 at p. 21.)

### 5.  *Resulting Harm to Plaintiffs*[13]

Plaintiffs contend they and (in the case of organizational Plaintiffs) their members have been harmed, and face additional imminent harm, by Defendants' actions.  First, they allege budgetary and funding-related harm.  Defendants' actions have "caus[ed] school districts to

---

Title III-A)—and cut essential staff from program offices and other units involved in grant administration," including the Office of Grants Management, OGC, and executive office staff of OESE and OSERS. (ECF No. 61-1 at p. 18; Ex. P, Doe 7 Decl., ECF No. 61-57 ¶¶ 4–9, 11; Ex. DDD, Spitz Decl., ECF No. 61-103 ¶¶ 12–15; Ex. T, Doe 11 Decl., ECF No. 61-63 ¶¶ 5–7.)

[13] The court does not reach Plaintiffs' argument as to irreparable harm, and will administratively deny Defendants' Motion to Dismiss.  Nonetheless, for completeness, the court provides a brief overview of the asserted harms.

eliminate member job positions" or to "scale[] back previously agreed-upon wage increases due in part to anticipated reductions in Department grant funding." (ECF No. 81 at p. 13.) The "mass termination of SEED, TQP, and TSL grant awards led to the loss of jobs, stipends, professional development and training opportunities, and other supports for NEA members across the country." *Id.* at p. 18. Similarly, elimination of SBMH and MHSP grants has harmed members by eliminating funding for staff, tuition payments, and mentoring support. *Id.* Plaintiffs further assert additional imminent injuries to members, specifically—"[t]he salaries of over a hundred thousand of Plaintiffs' members are funded in whole or in part by formula grants. . . . Cuts to these funds due to the Department's inability to properly administer the funding formulas will inevitably result in the elimination of member positions." *Id.* at p. 14 (record citations omitted). Organizational Plaintiffs also allege direct harms in the form of "pocketbook injury from the actual and imminent elimination of member positions because of lost membership dues." *Id.*

Organizational Plaintiffs assert other harms in the form of interference with their core activities: "Defendants' actions have directly interfered with Plaintiffs NEA and NAACP's core activities of engaging in advocacy, education, and training to promote equal educational opportunity, federal education funding to expand access to those opportunities, and oversight of states' and school districts' use of federal dollars to further that aim." *Id.* at pp. 14–15. Defendants' actions with respect to FSA have also caused NEA "to divert and expend resources" to address "gaps in the Department's oversight and dispute resolution." (ECF No. 81 at p. 16.) Finally, specifically with respect to OCR, Plaintiffs assert that its alleged closure has harmed NAACP members "whose pending complaints with OCR have stalled and whose communications with OCR have ceased." *Id.* at p. 17. Similarly, Defendants' actions interfere with Plaintiffs

NAACP and Lubbock NAACP's core activity of using the OCR process to advance educational equity. *Id.* at pp. 14–17 (record citations omitted).

### D. Resulting Litigation

Plaintiffs across the country have initiated actions, like this one, based on changes within the Department. The court provides a brief overview below.

#### 1. *New York v. McMahon* and *Sommerville Public Schools v. McMahon*

Like the instant action, *New York v. McMahon* and *Sommerville Public Schools v. McMahon*, filed in the District of Massachusetts, "ar[ose] out of an attempt by Defendants to shut down the Department without Congressional approval." *New York v. McMahon*, — F. Supp. 3d —, No. CV 25-10601-MJJ, 2025 WL 1463009, at *1 (D. Mass. May 22, 2025). In *New York v. McMahon*, 21 plaintiff states "allege[d] that the March 11 [RIF] violates the Constitution's Separation of Powers doctrine (Count I), violates the Take Care Clause of the Constitution (Count II), is *ultra vires* (Count III), and violates the Administrative Procedure Act ("APA") because it is contrary to law (Count IV), and arbitrary & capricious (Count V)." *Id.* at *2. In *Sommerville Public Schools v. McMahon*, the plaintiffs asserted the same causes of action, "as well as additional APA claims alleging that the Agency Defendants' actions are contrary to a constitutional right, . . . and exceed the Secretary's statutory authority" *Id.* (record citations omitted). The cases were ultimately consolidated. *Id.* at *3. Both sets of plaintiffs sought preliminary injunctive relief to enjoin the Government defendants from, *inter alia*, carrying out the March 11 RIF and implementing the President's March 20 Executive Order. *Id.* at *40.

As in the instant action, the plaintiffs argued that "[b]y 'eliminating the staff required to meet Congress's requirements,' . . . the Executive Branch is unlawfully abolishing the Department and its statutorily mandated components." *Id.* at *22. The court agreed, concluding that the

plaintiffs were likely to succeed "in showing that Defendants are effectively disabling the Department from carrying out its statutory duties by firing half of its staff, transferring key programs out of the Department, and eliminating entire offices and programs." The court further concluded the plaintiffs were likely to succeed in showing the Government's actions were *ultra vires*, and that the March 11 RIF was arbitrary and capricious, and contrary to law under the APA. *Id.* at *22–29.

The court entered an order, *inter alia*, enjoining the Government from implementing, giving effect to, or reinstating the March 11 RIF and the March 20 Executive Order, as well as ordering the Government to "reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the reduction-in-force announced on March 11, 2025 to restore the Department to the status quo such that it is able to carry out its statutory functions." *Id.* at *40.

The Government appealed and sought a stay of the preliminary injunction pending appeal, which the First Circuit denied. *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 67 (1st Cir. 2025). On the Government's application to the Supreme Court, however, the Court stayed the preliminary injunction pending appeal and petition for a writ of certiorari, should one be timely filed. *McMahon v. New York*, 145 S. Ct. 2643 (2025). The Supreme Court's stay order is unaccompanied by explanatory discussion, although Justice Sotomayor wrote a fulsome dissent in which Justices Kagan and Jackson joined. *Id.* at 2643-53.

Following the Supreme Court's stay, on August 8, the consolidated plaintiffs filed, and the District of Massachusetts granted, an unopposed motion requesting that the court issue an indicative ruling that it would vacate the preliminary injunction if the First Circuit were to remand the case. *New York v. McMahon*, No. CV 25-10601-MJJ (D. Mass. Aug. 11, 2025), Dkt. Nos.

163–65.  Then, on August 14, 2025, the consolidated plaintiffs informed the First Circuit of the district court's indicative ruling and requested the First Circuit remand the case to the district court to vacate the preliminary injunction.  *Somerville Pub. Sch. v. McMahon*, No. 25-1495, No. 25-1500 (1st Cir. Aug. 14, 2025), Dkt. No. 70-1.  The First Circuit has not yet ruled on the plaintiffs' unopposed request for remand.

### 2.  *Victim Rights Law Center v. U.S. Department of Education* and *Carter v. U.S. Department of Education*

At least two other cases challenge the RIF's impact on OCR; the two courts reached different conclusions on motions for preliminary injunction.  In *Victim Rights Law Center v. U.S. Department of Education*, the District of Massachusetts granted a preliminary injunction on June 18, 2025, concluding that the plaintiffs were likely to succeed in showing the RIF was arbitrary and capricious, and contrary to law under the APA, and on their *ultra vires* claim, because the complained-of Government actions "effectively preventing the OCR from complying with other federal civil rights laws that mandate the OCR to enforce those statutes also demonstrates that Defendants have acted beyond their statutory duties."  — F. Supp. 3d —, No. CV 25-11042-MJJ, 2025 WL 1704311, at *15 (D. Mass. June 18, 2025).  Following, and on the basis of, the Supreme Court's stay in *New York v. McMahon*, the Government moved to vacate the preliminary injunction; the court denied that motion and the matter is now on appeal before the First Circuit.  Case No. 25-cv-11042, Dkt. Nos. 48, 60, 61 (D. Mass).

Conversely, in *Carter v. U.S. Department of Education*, on May 21, 2025, the District of Columbia court denied a motion for preliminary injunction in which the plaintiffs sought an order, *inter alia*, compelling the Government "to restore the investigation and processing capacity of OCR and to process OCR complaints promptly and equitably."  No. CV 25-0744 (PLF), 2025 WL 1453562, at *4 (D.D.C. May 21, 2025).  Ultimately, the court concluded that the plaintiffs were

not likely to succeed on their APA claim because their prediction that OCR's reduced investigatory capacity would render it unable to satisfy its statutory and regulatory duties was not a challenge to a final agency action, but rather "a challenge to OCR's general operations and the speed at which OCR will be able to process civil rights complaints in the future."[14] *Id.* at \*6–14.  The court also concluded the plaintiffs were unlikely to succeed on their *ultra vires* claim because it was an impermissible repackaging of their APA claims.  *Id.* at \*14 (record citation omitted).

Following the district court's denial of the preliminary injunction, the parties jointly moved for a temporarily stay of proceedings pending vacatur or modification of the preliminary injunctions entered in *New York* and *Somerville*.  *Carter*, Case No. 25-744 (D.D.C. May 30, 2025), Dkt. No. 69.  On August 4, the court granted the parties' motion to extend the stay pending exhaustion of the appeal in *New York* and any appeal of the preliminary injunction in *Victim Rights Law Center*.  *Id*. Dkt. No. 71.

### 3.  *American Educational Research Association v. Department of Education* **and** *Association for Education Finance and Policy, Inc. v. McMahon*

A number of cases have similarly challenged Defendants' actions related to IES, specifically the RIF and contract cancellations.  In each of these cases, the courts denied the plaintiffs' preliminary injunction motions.  *See Am. Educ. Rsch. Ass'n v. Dep't of Educ.*, No. CV SAG-25-1230, 2025 WL 1665401, at \*1 (D. Md. June 12, 2025); *Ass'n for Educ. Fin. & Pol'y,*

---

[14] The *Victim Rights Law Center* court acknowledged the *Carter* court's decision, but noted the facts before it were materially distinguishable, because, unlike in *Carter*, "Plaintiffs have provided a record which demonstrates that OCR is not investigating most complaints and have clearly demonstrated irreparable harm with respect to at least two students who are unable to return to public school because their complaints have been forestalled by the OCR." *Victim Rts. L. Ctr. v. United States Dep't of Educ.*, No. CV 25-11042-MJJ, 2025 WL 1704311, at \*11 n.5 (D. Mass. June 18, 2025).

*Inc. v. McMahon*, — F. Supp. 3d —, No. 1:25-CV-00999 (TNM), 2025 WL 1568301, at *2 (D.D.C. June 3, 2025).[15]

In *American Educational Research Association v. Department of Education*, two organizations of education researchers filed action based on the threat that they may lose access to education data upon which they rely for their research. 2025 WL 1665401, at *1. They moved for a preliminary injunction to reverse the RIF and contract cancellations as they related to IES. *Id.* The district court (Maryland) characterized both challenges "at their core" as "challenges to the dismantling of IES." *Id.* Although the court acknowledged that "Plaintiffs seem to be right that, today, IES is not doing a number of tasks Congress requires of it" and "they may well be right that IES is unlikely to fulfill many of its statutory functions in the future," the court concluded that the plaintiffs had framed their contract termination arguments too "broadly" and too "narrowly." *Id.*

The District of Maryland reasoned that, by arguing that the decision to terminate 99 distinct contracts was a single agency action, "Plaintiffs ask this Court to act as indiscriminately as they claim the government did when terminating the contracts." *Id.* at *4. The court explained that while the plaintiffs may have lost (or lose) access to key data, they failed to show legal entitlement to the products of all the terminated contracts. *Id.* With respect to their request to reinstate specific contracts, the plaintiffs faced a different issue. While the plaintiffs "likely [did] have standing to challenge the harms they are experiencing because IES is not taking steps necessary to fill its statutory duties," the court nevertheless concluded it could not order "IES to fulfill its duties through a specific contract" for multiple reasons, including that it would "intrude on the autonomy"

---

[15] The District of Columbia court's consideration of *Association for Education Finance and Policy* also included a related case, *National Academy of Education v. Department of Education*, No. 25-cv-1266 (D.D.C. filed Apr. 24, 2025).

of the contract recipients, amount to "impermissible micromanagement of the agency's operations," and possibly "raise Tucker Act issues that are rapidly evolving in this Circuit and nationwide." *Id.* at *5 (citations omitted). The court concluded that the plaintiffs faced many of the same problems with regard to their RIF-based claims. *Id.*[16]

In *Association for Education Finance and Policy, Inc. v. McMahon*, the District of Columbia court similarly denied a preliminary injunction sought by education advocacy groups that use IES data. 2025 WL 1568301, at *1. In identifying the flaws of the plaintiffs' claims there, the court noted that they "pile aboard so many broad complaints that their claims sink underneath the sheer weight of the relief they seek," and that they merely repackaged their APA claims as constitutional claims. *Id.* at *4. The court opined: "[the plaintiffs] cannot contest the Department's process of dismantling the Institute 'by simply identifying specific allegedly improper final agency actions *within* that program," and "[t]o the extent that unilateral dismantlement (or large-scale reorganization) is underway, it is not challengeable as a final agency action." *Id.* (emphasis in original) (citations omitted). The court also recognized that concerns over application of the Tucker Act "loom[ed] large" where members perform work under an IES contract and could likely show harm from cancellation of same. *Id.* at *11.[17]

### 4. *California v. U.S. Department of Education* and *AACTE v. McMahon*

Finally, yet another group of lawsuits has challenged the Department's termination of grants, specifically the SEED, TQP, and TSL grants. In *California v. McMahon*, the District of Massachusetts entered a temporary restraining order upon conclusion that the plaintiffs—a group

---

[16] The parties in *American Educational Research Association v. Department of Education* are now engaging in discovery. *See* Case No. 25-1230-SAG (D. Md. July 2, 2025), Dkt. Nos. 53, 54.

[17] Following denial of the preliminary injunction, Defendants moved to dismiss the Complaint (Case No. 25-999-TNM (D.D.C. July 2, 2025), Dkt. No. 29). Plaintiffs filed an Amended Complaint and later a Second Amended Complaint (*Id*. Dkt. No. 28, 32). Defendants' renewed motion to dismiss is due today, August 19, 2025. (*Id*. Dkt No. 31.)

of states—were likely to succeed in showing that the Department's termination of TQP and SEED grants violated the APA because the Department failed to provide any reasoned explanation. 769 F. Supp. 3d 72, 77–78 (D. Mass. 2025). As part of its order, the court enjoined the Government from "implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States," and "terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order." *Id.* at 80.

Following *California*, the undersigned, too, entered a preliminary injunction, ordering the Department to reinstate TQP, SEED, and TSL grant awards, and enjoining it from terminating same in a manner (as described in detail in the opinion) the court found was likely violative of the APA. *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon* ("*AACTE v. McMahon*"), Case No. 25-702-JRR, ECF No. 33 (D. Md. 2025). In its opinion, this court concluded that the Department's termination of the grants likely violated the APA because the terminations were arbitrary and capricious – specifically "unreasonable, not reasonably explained, based on factors Congress had not intended the Department to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law." *AACTE v. McMahon*, 770 F. Supp. 3d 822, 856 (D. Md. 2025), *reconsideration denied,* No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025).

Following entry of the injunctions in *California* (District of Massachusetts) and *AACTE* (District of Maryland), on the Government's application in *California*, the Supreme Court stayed the *California* TRO pending disposition of the appeal (and a petition for a writ of certiorari, if

applicable).  *Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025).  The Supreme Court, expressly citing application of the Tucker Act, opined that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968.  Citing the Supreme Court's stay in *California*, the Fourth Circuit granted the Government's motion to stay the preliminary injunction in *AACTE* pending appeal.  *AACTE v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025).[18]

## II.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### A.  Legal Standard

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  "A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting that "a preliminary injunction is 'an extraordinary remedy never awarded as of right'").  As such, preliminary injunctive relief is to be "granted only sparingly and in limited circumstances."  *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).

Plaintiffs seeking preliminary injunctive relief "must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors the requested injunctive relief; and 4) that relief is in the public

---

[18] Following the Supreme Court's stay, this court denied the plaintiffs' Rule 60(b) Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Under Rule 62.1.  (Case No. 25-702-JRR (D. Md. May 6, 2025), Dkt. No. 58.)  Accordingly, this court's preliminary injunction remains pending before the Fourth Circuit.

interest." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)). These factors were established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  "[P]laintiff[s] bear[] the burden of establishing that each of these factors supports granting the injunction."[19]  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing cases); *see St. Michael's Media, Inc.*, 566 F. Supp. 3d at 351 (same).

### B.  Analysis

Defendants mount many challenges to Plaintiffs' PI Motion.  As explained in detail below, the court finds that two overarching, material issues weigh against granting preliminary injunctive relief.[20]

#### 1.  *A Developing Legal Landscape*

The court does not doubt that Plaintiffs have made a strong showing that Defendants' collective actions amount to an effort to close the Department.  Of course, this alone is not enough to do what they ask of the court.  To grant a Rule 65 motion, the court must find the movant has made a "*clear showing*" that the "extraordinary and drastic" remedy of a preliminary injunction is warranted.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted).  Plaintiffs' "likelihood of success overall is the product of their probability of success on each of the independent, dispositive issues." *Am. Fed'n of Tchrs. v. Bessent*, — F.4th —, No. 25-

---

[19] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

[20] The court acknowledges the multi-faceted bases for relief presented in the PI Motion.  Because of material, foundational roadblocks Plaintiffs encounter, as explained below, the court does not address all ground Plaintiffs present for their requested relief.

1282, 2025 WL 2313244, at *3 (4th Cir. Aug. 12, 2025). In analyzing that likelihood, this court is obliged to follow the direction of the Supreme Court and Fourth Circuit, and is well-informed by other persuasive authority. In view of the caselaw that has developed on these very topics (including the scope of relief sought), the court is unable to conclude that Plaintiffs are likely to succeed on their asserted claims, which is to say they have not "show[n] an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall." *Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *3.

As noted *supra*, Plaintiffs raise three general (and surely broad-ranging) categories of Defendants' actions that, collectively, amount to an action to terminate the Department—the March 11 RIF, the termination of IES contracts, and the cancellation of certain competitive grant awards. Two of these categories—the March 11 RIF and the cancellation of competitive grant awards (though not all asserted here)—have been challenged in other cases and subject to preliminary injunctions later stayed by the Supreme Court. The remaining category—the termination of IES contracts—also has been challenged in this (and another) court on motions for preliminary injunction; those challenges have failed, in part, due to the ongoing legal development in this area punctuated by Supreme Court stays pending appeal in various circuits, as well as issues that flow from the very relief Plaintiffs seek here. These various cases, including specifically (but not exclusively) the Supreme Court's stays in *New York* and *California*, have resulted in quickly evolving and divergent caselaw that raises material questions, if not doubts, that bear on this court's exercise of jurisdiction, the merits of Plaintiffs' claims, and the court's authority to order the relief sought.

a.  The *New York* and *California* Stays

First, and perhaps most material to the landscape, is the Court's stay of the preliminary injunction in *New York v. McMahon*—a case, like this one, challenging the Government defendants' attempts "to shut down the Department without Congressional approval." *New York v. McMahon*, No. CV 25-10601-MJJ, 2025 WL 1463009, at *1 (D. Mass. May 22, 2025). That case focuses predominantly on the March 11 RIF, and, like the case at bar, the plaintiffs alleged the Government defendants violated the Constitution's Separation of Powers doctrine, the Take Care Clause of the Constitution, and the APA, and that their actions were *ultra vires*. *Id.* at *2. Like Plaintiffs' request of this court, the *New York* court enjoined the Government defendants from "carrying out the reduction-in-force announced on March 11, 2025," "implementing President Trump's March 20, 2025 Executive Order," and "implementing, giving effect to, or reinstating the March 11, 2025, the President's March 20, 2025 Executive Order, or the President's March 21, 2025 Directive under a different name." *Id.* at *40. On July 14, 2025, the Supreme Court stayed, without accompanying reasoned analysis, the court's preliminary injunction pending disposition of the appeal before the First Circuit and, if applicable, a petition for writ of certiorari. *McMahon v. New York*, No. 24A1203, 2025 WL 1922626, at *1 (U.S. July 14, 2025).

Similarly, the Court issued a stay of preliminary injunction in a case pertaining to the Department's SEED and TQP grants. As described above, in *California v. Department of Education*, a group of state plaintiffs sought a temporary restraining order, alleging, like Plaintiffs here, that the Department arbitrarily terminated all SEED and TQP grants in violation of the APA. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 (D. Mass. 2025). The court granted the emergency relief, concluding that the state plaintiffs were likely to succeed in showing that the Department's failure to conduct any individualized analysis of programs, and instead terminating

TQP and SEED grants *en masse*, was arbitrary and capricious. *Id.* at 77–78. The court entered an order, similar to what the Plaintiffs seek here, that enjoined the Government from "implementing, giving effect to, maintaining, or reinstating under a different name" the mass termination of any previously awarded TQP or SEED grants, "terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order," and that required the Government to restore matters to "the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States." *Id.* at 80. Ultimately, on the Government's application, the Supreme Court granted the Government a stay of the order, finding the Government was likely "to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."[21] *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025).

Another case related to the Government's mass termination of SEED, TQP, and TSL grants before this court faced a similar fate. Like Plaintiffs here, the *AACTE* plaintiffs contended they were likely to prevail on their APA claim because the Department's actions in terminating the SEED, TQP, and TSL awards were "unreasonable, not reasonably explained, based on factors Congress had not intended the Department to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law." *AACTE v. McMahon*, 770 F. Supp. 3d 822, 856 (D. Md. 2025), *reconsideration denied,* No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025).

---

[21] The Court cites the Tucker Act as the basis for its conclusion. "The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

Again, as Plaintiffs request here,[22] the court ordered the Government to reinstate the TQP, SEED, and TSL grant awards to the plaintiffs' members and enjoined the Government from terminating any TQP, SEED, or TSL grant award in a manner the court determined was likely unlawful as violative of the APA as described in its opinion.  Despite distinctions between the *AACTE* and the *California* injunction opinions (including additional APA arguments), the Fourth Circuit granted the Government's motion to stay the *AACTE* preliminary injunction based expressly on (and only on) the Supreme Court's Tucker Act-based stay in *Department of Education v. California*.  *AACTE v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025).

These stays of orders implementing much of the exact relief sought here, on fundamentally similar claims  raise serious concerns about this court's authority to order the relief Plaintiffs seek. The court is acutely aware that a "stay order is not a ruling on the merits," *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring); however, the Supreme Court's *California* and *New York* stays necessarily called upon the Court to conclude that the Government is likely to prevail in its appellate challenges.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that the factors considered in the issuance of a stay pending appeal, including "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies"  (citation omitted)); *see also, e.g.*, *Dep't of Educ. v. California*, 145 S. Ct. 966, 968–69 (2025) (discussing the Government's likelihood of success and irreparable harm in considering an application to stay a preliminary injunction pending appeal).  To be sure, at this juncture, the court

---

[22] As discussed at greater length below, at the Motions hearing, Plaintiffs alerted the court that the preliminary injunction sought should include an order that the mass terminations of the competitive grants be vacated, which would by definition result in reinstatement of same.

does not unnecessarily extrapolate; the court does not read the stays to foreclose (or support dismissal of) all of Plaintiffs' claims; rather they present a significant barrier to finding that Plaintiffs have made a clear showing of likelihood of success.

b.  Plaintiffs' Unavailing Distinctions

Plaintiffs ask the court to find that material distinctions here render the stays effectively of no moment to this case.  Plaintiffs' arguments are not persuasive for multiple reasons.

First, Plaintiffs make much of the differences in the relief they seek from the relief sought in *New York* and *California* – where the orders mandated reinstatement of staff and payment of grant award funds, respectively.  (ECF No. 81 at pp. 3–6, 31–33.)  Plaintiffs raise a similar argument as to *American Educational Research Association v. Department of Education*, noting that they do not seek reinstatement of terminated IES contracts.  (ECF No. 81 at p. 7.)  These arguments are unavailing.

The entire thrust of Plaintiffs' argument is that Defendants are closing the Department by gutting its staff and impeding its ability to carry out its statutorily mandated functions.  Their proposed order requires the Department to "reinstate" its "statutorily mandated functions . . . that have been terminated or halted since January 20, 2025," and, as discussed at the hearing, to "vacate" the March 11 RIF, as well as the mass competitive grant award terminations.  (ECF No. 61-2.)  The unavoidable, necessary result of Plaintiffs' requested relief, were the court to grant it, is reinstatement of staff subject to the RIF, IES contracts, and the competitive grant awards.  Plaintiffs' efforts to distinguish their requested relief from that sought in the above-described cases is, in the view of the court, semantical not substantive.

Second, Plaintiffs contend this case is materially distinguishable from *New York* for two reasons—first, Plaintiffs' standing here is essentially better established; and second, Plaintiffs do

not seek reinstatement of employees. (ECF No. 81 at pp. 3–5.) Neither asserted distinction is particularly (or sufficiently) compelling on the PI Motion. As Plaintiffs acknowledge, the court cannot discern the basis for the Supreme Court's implicit conclusion (per *Nken*) that the Government is likely to succeed on its challenge. Further, as discussed above, although Plaintiffs do not expressly seek "reinstatement," they do ask the court to vacate the March 11 RIF, which necessarily means reinstatement of those subject to the RIF (or, at the very least, filling the positions of those subject to the RIF).[23]

Third, as to their claims related to *en masse* termination of competitive grants, Plaintiffs argue that the Tucker Act is inapplicable here because the grant funding (payment) would be "a mere by-product" of Plaintiffs' requested relief. (ECF No. 81 at p. 32.) On a similar argument presented by the plaintiffs in *AACTE*, this court concluded, as Plaintiffs argue here, that the Tucker Act did not divest this court of jurisdiction and ordered (some of) the exact relief Plaintiffs seek here. *See AACTE v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 863319, at *4–5 (D. Md. Mar. 19, 2025). Nevertheless, in considering the same argument, the Fourth Circuit stayed the order based on operation of the Supreme Court's *California* stay. *See also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (addressing same). Accordingly, Plaintiffs' argument on this point is unavailing.[24]

Finally, the court appreciates that, unlike in *California* and *AACTE*, Plaintiffs are not in contractual privity with Defendants.[25] On this basis, Plaintiffs urge that the *California* stay based on the Tucker Act (which requires privity) poses no jurisdictional impediment here. The court

---

[23] The legal definition of vacate is "[t]o nullify or cancel; make void; invalidate." *Black's Law Dictionary* (12th ed. 2024).

[24] To be clear, as it did in *AACTE*, this court finds persuasive Plaintiffs' argument that the Tucker Act is not implicated in connection with grant terminations. Nevertheless, in *California*, the Supreme Court held the Government is likely to prevail on its jurisdictional appellate challenge on this precise issue, and the Fourth Circuit of course acted accordingly in *AACTE*.

[25] Nor are they third-party beneficiaries.

agrees that the Tucker Act may not pose a challenge to its jurisdiction given the lack of privity. But, regardless, Plaintiffs' claims face yet another problem, as recognized in *American Educational Research Association v. Department of Education*.  No. CV SAG-25-1230, 2025 WL 1665401, at *5 (D. Md. June 12, 2025).  Plaintiffs are not parties to IES or competitive grant award contracts.  "Usually, people who are not party to a contract (or a third-party beneficiary) do not have standing to sue based on the contract."[26]  *Id.*; *see also Am. Ass'n of Univ. Professors v. United States Dep't of Just.*, No. 25-CV-2429 (MKV), 2025 WL 1684817, at *11 (S.D.N.Y. June 16, 2025) (finding plaintiffs failed to demonstrate standing to demand payment of money to a non-party where "[t]he principal relief [sought] [was] a judicial order commanding executive agencies to pay out money to [a] non-party [] pursuant to grants and contracts that were previously awarded by executive agencies to [that] non-party").

While the court concluded there that the plaintiffs likely did have standing to challenge the harms based on IES's failure to fulfill its statutory duties:

> [Plaintiffs] cannot ask for—and this Court cannot order—IES to fulfill its duties through a specific contract. There are a whole host of reasons why this is so. First, the contract recipients are the most directly impacted, and it would intrude on their autonomy to reinstate their contracts when they have not asked for that outcome and might not want it. *See FDA v. All. for Hippocratic Med*, 602 U.S. 367, 379–80

---

[26] The court acknowledges that other cases challenging administrative actions have concluded that the plaintiffs have standing where they allege harm by termination of a contract with a third party.  *See, e.g.*, *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *22 (N.D. Cal. June 23, 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716, 2025 WL 1276857, at *22–23 (D.D.C. May 2, 2025).  (The Government's motion to stay the *Thakur* preliminary injunction is presently pending before the Ninth Circuit, Case No. 25-4249.)  The court makes no finding regarding the persuasive value of these cases here.  Regardless, the implacable point remains.  Plaintiffs must make a clear showing of likelihood of success – and, against the backdrop of the compare-and-contrast scenery of a rapidly evolving area of law, the court is not persuaded that such a clear showing is cinched.  Moreover, with respect to Plaintiffs' standing to challenge IES contract terminations as it relates to the contracts' roles in formula grant funding in particular, Plaintiffs face additional standing hurdles where their claim is rooted in the fact that states are taking measures to cancel positions based on "uncertainty" of formula grant funding (as opposed to concrete action by the Department).  (Ex. YY, Pringle Decl., ECF No. 61-98 ¶ 14.)  Based on this representation, the court harbors serious concerns regarding, at the very least, causal connection and redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 60-61 (1992) (holding that standing requires, *inter alia*, "a causal connection between the injury and the conduct complained of" and "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' . . . and it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'") (citations omitted).

(2024) (rigorous standing requirements "serve[ ] to protect the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action."). Second, ordering IES to reinstate specific contracts—when all agree that IES could fulfill its statutory mandates in other ways—would be impermissible micromanagement of the agency's operations. *See Lujan*, 497 U.S. at 899. And third, intervening as to any specific contract may raise Tucker Act issues that are rapidly evolving in this Circuit and nationwide.

*Am. Educ. Rsch. Ass'n*, 2025 WL 1665401, at *5. As discussed, these same concerns are present here both as to Plaintiffs' IES-related relief and competitive grant-related relief.

Even approaching Plaintiffs' claims as separate from specific contracts and, instead, more broadly, issues persist. Broad application of Plaintiffs' contract termination arguments, while perhaps sidestepping the above-described standing and Tucker Act concerns, raises "the kind of programmatic challenge the APA disfavors" as well as issues of agency discretion. *Am. Educ. Rsch. Ass'n v. Dep't of Educ.*, 2025 WL 1665401, at *1; *see Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 1:25-CV-00999 (TNM), 2025 WL 1568301, at *10 (D.D.C. June 3, 2025) (stating that, *inter alia*, claims regarding cancellation of IES contracts critical to its function and congressional mandates, and the RIF, amount to "a programmatic challenge in disguise"). Plaintiffs' theory of their case is self-defeating: they claim at once that Defendants' actions, taken together, amount to closure of the Department, and that the Secretary's closure of the Department is a discrete final agency action.

The court's analysis here demonstrates the trouble Plaintiffs face: in place of every weed pulled, another grows. As the Fourth Circuit recently recognized:

> In [preliminary injunction] structure, Plaintiffs face what can be called a "multiplicative problem." Their likelihood of success overall is the product of their probability of success on each of the independent, dispositive issues. And as probabilities are multiplied, their product shrinks rapidly. Even if a plaintiff has good odds to win any one issue, their overall odds crater because they must run the table to ultimately prevail. The plaintiff must therefore show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall—otherwise, the product of the probabilities will be too low.

*Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *3. Plaintiffs have a similar problem here. Further, as addressed, the current fabric of the law, which in one fashion or another, has addressed the same challenge, claims, and relief sought here, as well as the separate and acute issues of causal connection and redressability, impede Plaintiffs' ultimate showing of a likelihood of success in full.

### 2. Scope of Relief

Even were the court to find Plaintiffs met their considerable burdens on the PI Motion as a whole, the court would not be persuaded to order the relief sought. Plaintiffs' proposed order appended to the PI Motion includes the following proposed relief:

> [T]hat Defendants and their officers, agents, employees, attorneys, and other persons who are in active concert or participation with them (hereafter "Defendants") are enjoined from closing the U.S. Department of Education (the "Department") or taking steps to close the Department, including by implementing Executive Order 14242; . . .

> [T]hat Defendants are enjoined from proceeding with, giving effect to, or implementing under a different name the mass Reduction in Force announced on March 11, 2025; . . .

> [T]hat Defendants shall reinstate any statutorily mandated functions in the Department that have been terminated or halted since January 20, 2025, including research, data collection, dissemination activities, and other mandatory functions needed to administer formula grant programs as required by statute; all mandatory certification, eligibility, and oversight functions required for the administration of the federal student financial aid programs created by Title IV of the Higher Education Act; and all civil rights enforcement functions necessary for the Department to effectuate the antidiscrimination provisions applicable to federal funding recipients in Department-administered programs; . . .

> [T]hat Defendants may not terminate any other functions within the Department absent an individualized assessment of the effect on the Department's performance of its statutory obligations; consideration of the effects of any such actions on Plaintiffs, their members, and the public, including any reliance interests; and a plan to continue fulfilling the Department's statutory and regulatory obligations; . . .

> [T]hat Defendants are enjoined from implementing or carrying out the mass terminations of SEED or TSL Grant Program awards. If Defendants wish to terminate any individual SEED or TSL grant, they must make an individualized determination in compliance with the procedures and requirements set forth in the General Education Provisions Act, the Education Department General Administrative Regulations, and the Department's Handbook for the Discretionary Grant Process.

(ECF No. 61-2  pp. 1–2.)

In addition to the myriad problems addressed above regarding the recovery grounds and requested relief,  Plaintiffs' proposed order comes perilously close to an "obey-the-law" injunction.  *See, e.g., Connor v. Maryland Dep't of Health*, No. CV MJM-24-1423, 2025 WL 1167846, at *13 (D. Md. Apr. 22, 2025); *Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 708 (M.D.N.C. 2023).  Similarly, Plaintiffs fail to propose with the requisite specificity the actions Defendants must take to comply (*see* FED. R. CIV. P. 65(b)) – especially in the face of Defendants' contention that the Department is "committed to fulfilling its statutory requirements."  (ECF No. 78 at pp. 5–8.)

Plaintiffs' requested relief would put the court in the ill-advised role of essentially overseeing an agency's compliance with congressional directives and supervising its administrative functions.  Although raised in the context of APA challenges, the Supreme Court's caution in *Norton v. Southern Utah Wilderness Alliance* rings true:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

542 U.S. 55, 66–67 (2004).  Indeed, as the Supreme Court recently reiterated in the context of ongoing challenges to the Executive's exercise of authority: "[F]ederal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with

the authority Congress has given them. When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too." *Trump v. CASA, Inc.*, 606 U.S. —, 145 S. Ct. 2540, 2562 (2025). The relief requested here raises a serious risk of doing precisely what the Court has cautioned the court to avoid. Ultimately, this court may not overreach its authority to order the Executive to act within the confines of its own.[27]

## III.   DEFENDANTS' MOTION TO DISMISS

In view of the material overlap of Defendants' Motion to Dismiss (ECF No. 78) and the PI Motion (ECF No. 61), for efficiency and clarity of the record, and to enable the parties a more fulsome opportunity to hone their arguments against the backdrop of the court's analysis set forth herein, Defendants' Motion to Dismiss will be denied without prejudice for administrative purposes. Within 30 days following entry of the order issued herewith, Defendants may file, should they so choose, a renewed motion to dismiss.

## IV.   CONCLUSION

For the reasons set forth herein, Plaintiffs' PI Motion (ECF No. 61) and Defendants' Motion to Dismiss (ECF No. 77) will be denied without prejudice.


August 19, 2025                                                    /S/

_____
Julie R. Rubin
United States District Judge

---

[27] In *CASA*, the plaintiffs "sought to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160." 145 S. Ct. at 2549. At the PI hearing, in view of Plaintiffs' request that the court enjoin Defendants from "implementing Executive Order 14242," the court *sua sponte* raised debate as to whether the scope of the proposed injunction runs afoul of the *CASA* Court's holding that federal courts "lack authority" to issue universal injunctions under the Judiciary Act. *Id.* at 2560. The court maintains its concerns, but declines to reach the issue as, for the reasons set forth herein, resolution of this question is immaterial to the court's analysis that the PI Motion shall be denied.