**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, et al., <br><br> *Defendants*. | Civil Action No. 25-965-JRR <br><br> Oral Argument Requested |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

    I.    Defendants Take Steps to Close the Department of Education ..................................... 2

    II.   Procedural History ..................................................................................................... 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ..................................................................................................................... 5

    I.    The Complaint States a Claim Under the Administrative Procedure Act (Count 4) ....... 7

        A.    The Allegations in the Complaint Regarding the Department's Cancellation of Mental-Health Grants State a Claim Under the APA and Sustain Count 4 ............7

            1.    The Complaint Adequately Alleges Standing to Challenge the Cancellation of Mental-Health Grants ............................................................................... 8

            2.    The Tucker Act Does Not Divest This Court of Jurisdiction Over the Challenge to the Cancellation of Mental-Health Grants ................................. 10

            3.    The Cancellation of Mental-Health Grants is a Discrete Final Agency Action under the APA .................................................................................. 13

            4.    The Cancellation of Mental-Health Grants is Not Committed to Agency Discretion by Law .................................................................................... 14

        B.    The Allegations in the Complaint Regarding the Department's Reduction in Force State a Claim Under the APA and Sustain Count 4 ...................................15

            1.    The Complaint Adequately Alleges Standing to Challenge the RIF ............. 15

            2.    The Challenge to the RIF is Ripe .............................................................. 20

            3.    The Challenge to the RIF is Not Channeled to Administrative Agencies ...... 21

            4.    The RIF is a Discrete Final Agency Action under the APA .......................... 23

            5.    The RIF is Not Committed to Agency Discretion by Law ............................ 25

    II.   The Allegations in the Complaint State Constitutional Claims (Counts 1-3, 5) ........... 26

        A.    This Court Has Jurisdiction Over the Constitutional Claims ...............................28

        B.    The Amended Complaint States Valid Constitutional Claims .............................29

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) .......................................................................................17

*AFGE v. Trump*,
    139 F.4th 1020 (9th Cir. 2025), *stay granted*, 145 S. Ct. 2635 (2025)...................................23

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) .......................................................................................27

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    770 F. Supp. 3d. 822 (D. Md. 2025) ..........................................................................12, 13

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) .....................................................12

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
    No. 25-cv-702, 2025 WL 863319 (D. Md. Mar. 19, 2025) ...............................................11, 15

*Am. Educ. Rsch. Ass'n v. Dep't of Educ.*,
    No. 25-cv-1230, 2025 WL 1665401 (D. Md. June 12, 2025)..................................................25

*Am. Fed'n of Tchrs. v. Bessent*,
    152 F.4th 162 (4th Cir. 2025) .........................................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................................5

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
    786 F. Supp. 3d 13 (D.D.C. 2025) ...................................................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................................6

*Bennett v. Spear*,
    520 U.S. 154 (1997).....................................................................................................13

*Biden v. Nebraska*,
    600 U.S. 477 (2023).....................................................................................................17

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988).....................................................................................................12

*California v. U.S. Dep't of Educ.*,
    769 F. Supp. 3d (D. Mass. 2025) ....................................................................................12

ii

*Casa de Md. v. DHS,*
   924 F.3d 684 (4th Cir. 2019) ...................................................................................11

*Chamber of Com. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................................29

*Chi. & S. Air Lines Co. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) .................................................................................................30

*Child Trends, Inc. v. U.S. Dep't of Educ.,*
   No. 25-cv-1154, 2025 WL 2379688 (D. Md. Aug. 15, 2025) ..........................28, 29

*Cienega Gardens v. United States,*
   194 F.3d 1231 (Fed. Cir. 1998) ...............................................................................11

*City of N.Y. v. U.S. Dep't of Def.,*
   913 F.3d 423 (4th Cir. 2019) ...................................................................................13

*Cmty. Legal Servs. in E. Palo Alto v. HHS,*
   137 F.4th 932 (9th Cir. 2025) ..................................................................................11

*Cmty. Legal Servs. in E. Palo Alto v. HHS,*
   No. 25-2808, 2025 WL 2884805 (9th Cir. Oct. 10, 2025) ......................................11

*Dalton v. Specter,*
   511 U.S. 462 (1994) .................................................................................................29

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) .................................................................................................19

*Dep't of Educ. v. California,*
   604 U.S. 650 (2025) .................................................................................................12

*Diamond Alt. Energy, LLC v. EPA,*
   145 S. Ct. 2121 (2025) ...................................................................................8, 10, 19

*DiCocco v. Garland,*
   52 F.4th 588 (4th Cir. 2022) ......................................................................................9

*Does 4, 7, 22, 27, 28, & 29 v. Musk,*
   No. 25-cv-462, 2025 WL 2346258 (D. Md. Aug. 13, 2025) ...................................29

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.,*
   No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025) ........................... *passim*

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024).....................................................................................................8

*Green & Healthy Home Initiative, Inc. v. EPA,*
No. 25-cv-1096, 2025 WL 1697463 (D. Md. June 17, 2025)..........................................11, 13

*Harris Cnty. v. Kennedy,*
786 F. Supp. 3d 194 (D.D.C. 2025) ...........................................................................................9

*Heckler v. Chaney,*
470 U.S. 821 (1985)..................................................................................................................30

*Hi–Tech Furnace Sys., Inc. v. FCC,*
224 F.3d 781 (D.C. Cir. 2000) ...........................................................................................14, 26

*Holbrook v. Tenn. Valley Auth.,*
48 F.4th 282 (4th Cir. 2022) .....................................................................................................14

*Jenner & Block LLP v. U.S. Dept. of Just.,*
784 F. Supp. 3d 76 (D.D.C. 2025) ............................................................................................10

*Kendall v. U.S. ex rel. Stokes,*
37 U.S. 524 (1838)....................................................................................................................27

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990)..................................................................................................................24

*Mach Mining, LLC v. EEOC,*
575 U.S. 480 (2015)..................................................................................................................12

*Markland v. Off. of Pers. Mgmt.,*
140 F.3d 1031 (Fed. Cir. 1998).................................................................................................26

*Maryland v. Corp. for Nat'l & Cmty. Serv.,*
785 F. Supp. 3d 68 (D. Md. 2025) ............................................................................................13

*McMahon v. New York,*
145 S. Ct. 2643 (2025)................................................................................................................6

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) ..................................................................................................10

*Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.,*
No. 25-cv-1407, 2025 WL 2158340 (D.D.C. July 30, 2025) ...................................................13

*Mississippi v. Johnson,*
71 U.S. 475 (1866)....................................................................................................................30

*Myers v. United States,*
272 U.S. 52 (1926)....................................................................................................................26

*N.A.A.C.P., Bos. Chapter v. Sec'y of Hous. & Urb. Dev.*,
817 F.2d 149 (1st Cir. 1987) ................................................................17

*Nanni v. Aberdeen Marketplace, Inc.*,
878 F.3d 447 (4th Cir. 2017) .................................................................5

*In re Naranjo*,
768 F.3d 332 (4th Cir. 2014) ...............................................................20

*Nat'l Ass'n of Immigr. Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025) ..............................................................21

*New York v. Kennedy*,
No. 25-1780, 2025 WL 2658233 (1st Cir. Sept. 17, 2025)..............10, 23

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025).................................................................24

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025).........................................................................12

*NTEU v. Vought*,
149 F.4th 762 (D.C. Cir. 2025)..............................................22, 24, 25

*Or. Council for Humans. v. U.S. DOGE Serv.*,
No. 25-cv-829, 2025 WL 2237478 (D. Or. Aug. 6, 2025) ....................13

*Ortiz v. United States*,
585 U.S. 427 (2018).............................................................................28

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025) ......................................................10

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I. 2025), *stay denied*, 2025 WL 2621593 (1st Cir.
Sept. 11, 2025) .....................................................................................23

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ................................................................14

*S. Educ. Found. v. U.S. Dep't of Educ.*,
784 F. Supp. 3d 50 (D.D.C. 2025) ........................................................13

*Somerville Pub. Schs. v. McMahon*,
139 F.4th 63 (1st Cir. 2025)..................................................................22

*South Carolina v. United States*,
912 F.3d 720 (4th Cir. 2019) ................................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ................................................................................................ 8

*Thakur v. Trump*,
  787 F. Supp. 3d 955 (N.D. Cal. 2025), *stay denied*, 148 F.4th 1096 (9th Cir.
  2025) ............................................................................................................... 9, 11, 13

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .............................................................................................. 21

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ............................................................................. 11

*Trump v. AFGE*,
  145 S. Ct. 2635 (2025) .......................................................................................... 23

*Trump v. United States*,
  603 U.S. 593 (2024) .............................................................................................. 27

*United States v. J&E Salvage Co.*,
  55 F.3d 985 (4th Cir. 1995) .................................................................................. 10

*Urb. Sustainability Dirs. Network v. U.S. Dept. of Agric.*,
  No. 25-cv-1775, 2025 WL 2374528 (D.D.C. Aug. 14, 2025) .......................... 13, 15

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,
  No. 25-1787, 2025 WL 2753708 (1st Cir. Sept. 29, 2025) .................................. 6

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................. 8, 9

*Wiley v. Kennedy*,
  No. 25-cv-227, 2025 WL 1384768 (S.D. W. Va. May 13, 2025) ...................... 22

*Williams v. Kincaid*,
  45 F.4th 759 (4th Cir. 2022) ................................................................................. 6

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................................................... 27, 29

**Statutes**

5 U.S.C. § 702 .......................................................................................................... 13

5 U.S.C. § 704 .......................................................................................................... 13

5 U.S.C. § 1204 ........................................................................................................ 21

5 U.S.C. § 7117 ........................................................................................................ 21

5 U.S.C. § 7118 ..............................................................................................................21

5 U.S.C. § 7122 ..............................................................................................................21

20 U.S.C. § 1018(a) ...................................................................................................2, 27

20 U.S.C. § 1234 ............................................................................................................14

20 U.S.C. § 3411 ............................................................................................................27

20 U.S.C. § 3413 .......................................................................................................2, 27

20 U.S.C. § 3419 .......................................................................................................2, 27

20 U.S.C. § 3473 ............................................................................................................26

20 U.S.C. § 9511 .......................................................................................................2, 27

20 U.S.C. § 9543(a) .......................................................................................................27

**Other Authorities**

2 C.F.R. § 200.342 .........................................................................................................14

34 C.F.R. § 75.1(b) ........................................................................................................14

34 C.F.R. § 75.253 .........................................................................................................14

Recommendation That the Department of Justice Not Defend the
    Constitutionality of Certain Provisions of the Bankruptcy Amendments and
    Federal Judgeship Act of 1984, 8 Op. O.L.C. 183 (1984) ......................................28

U.S. Const. art. II, § 3 ....................................................................................................28

## INTRODUCTION

The President and his subordinate officers in the Executive Branch cannot lawfully close by fiat the U.S. Department of Education (the "Department")—or congressionally created offices within the Department—without the consent of Congress through legislation. The government concedes, as it must, that Defendants cannot close the Department "without congressional action." Dkt. 92-1, at 20. Yet the government takes the position that absent congressional action, the Executive Branch can functionally close the Department, including by terminating every Department employee, *see* Dkt. 95, at 62, because "[t]he only thing that would signify the closure of the department would be an act of Congress," *id.* at 63. Moreover, according to the government, a challenge to the functional closure of the Department is not justiciable in federal court.

The government's arguments blink reality and—if accepted—would give the Executive Branch unchecked authority that is incompatible with the separation of powers central to our system of government. The facts, as alleged in the amended complaint, establish that Defendants have taken actions that collectively "amount to an effort to close the Department." Dkt. 86, at 28. Although the government has not yet formally or fully closed the Department, it has functionally closed congressionally created subagencies and terminated their mandatory statutory functions. This Court has the authority to adjudicate the legality of those actions. Several of the actions Defendants have taken to close the Department—including a massive reduction in force that gutted the Department's workforce and the en masse cancellation of grants to states and school districts—are discrete final agency actions that are each separately reviewable under the Administrative Procedure Act. And since at least the Supreme Court's rejection of President Truman's seizure of steel mills during the Korean War, the Supreme Court has recognized the ability of federal courts to adjudicate equitable claims that the Executive Branch has exceeded its Article II authority.

This case is in a different posture after the Court's denial of Plaintiffs' motion for a preliminary injunction. The Court need not determine whether Plaintiffs made an extraordinary showing for preliminary relief and instead must determine whether the amended complaint alleges facts that plausibly state a claim for relief. The amended complaint readily meets that standard.

<u>**BACKGROUND**</u>

## I.    Defendants Take Steps to Close the Department of Education

Congress created the U.S. Department of Education and its subagencies and charged them with broad statutory responsibilities to ensure that all Americans from all backgrounds have equal access to high-quality educational opportunities. Am. Compl. ("AC") ¶¶ 1–2, 24–27 (Dkt. 58). Those congressionally created subagencies include the Institute of Education Sciences ("IES"), the Office for Civil Rights ("OCR"), and the Office of Federal Student Aid ("FSA"). AC ¶¶ 26–27. IES is a non-partisan, semi-independent division within the Department that Congress created to collect data and conduct research and evaluations. AC ¶¶ 27(f), 62–66; *see* 20 U.S.C. §§ 3419, 9511(b)(2). Among other things, IES collects and computes key data inputs that are required to administer formula grants, which are discussed in more detail below. *See infra* pp. 3, 17-18. Congress created OCR to enforce statutory prohibitions against discrimination in any program or activity receiving financial assistance from the Department. AC ¶¶ 92–94; *see* 20 U.S.C. § 3413. Among other things, OCR must make a prompt investigation of any potential violation of the civil rights laws in Department-funded programs. AC ¶ 92. FSA is a quasi-independent subagency within the Department that Congress created to manage federal student financial aid programs. AC ¶¶ 76–82; *see* 20 U.S.C. § 1018(a)(1).

Congress has also tasked the Department with administering an array of grant programs that distribute billions of dollars in grants to states, colleges and universities, and school districts

throughout the country. AC ¶¶ 100–102, 122–24. Formula grants require the Department to distribute federal funds appropriated by Congress according to a pre-defined formula set by statute that is based on factors that change over time, such as population, poverty rate, and other demographic information. *See* AC ¶¶ 100–102. Most of the Department's signature programs are formula grants. AC ¶ 101. A second type of grants, competitive grants, do not automatically go to every applicant that meets specified eligibility criteria; rather, Congress appropriates funds for the Department to disburse and gives the Department some leeway to select who will receive those funds. AC ¶ 122. For instance, Congress appropriated funds, including $1 billion appropriated in the 2022 Bipartisan Safer Communities Act, for two mental-health grant programs: the School-Based Mental Health Services ("SBMH") Program and the Mental Health Service Professional Demonstration ("MHSP") Program. AC ¶ 134. The Department ran a competition—including by giving public notice of the grant criteria and evaluating applicants based on those criteria—and awarded the appropriated funds to recipients, with the awards spread out over multiple fiscal years.

Despite Congress's statutory mandates that the Department and its subagencies carry out these and other important statutory functions, President Trump and his administration have resolved to close the Department, and they have taken actions to carry out that decision. Among other things, Defendants announced a massive reduction in force ("RIF") on March 11, 2025, and cancelled several categories of competitive grants en masse—including the SBMH and MHSP grants—in decisions announced in February 2025 and April 2025. AC ¶¶ 30–60.

Through these actions, Defendants have effectively closed congressionally created subagencies within the Department and have caused the Department to cease statutory functions

mandated by Congress. AC ¶¶ 61–148.[1] IES has been stripped of about 90% of its employees, going from nearly 200 employees to fewer than 20. AC ¶ 44(a). The Department also cancelled most of IES's external contracts. AC ¶¶ 37–39. As a result, IES cannot carry out its statutorily mandated functions, including the collection and computation of data inputs needed to administer formula grants. AC ¶¶ 62–70. OCR's staff was cut nearly in half, as Defendants shuttered 7 of its 12 regional offices. AC ¶ 44(c). As a result, OCR is unable to carry out its statutory functions, including the timely investigation and resolution of complaints. AC ¶¶ 92–96. FSA lost about 25% of its staff, including the entire Vendor Oversight Division, the entire Vendor Performance Division, and 80% of the School Eligibility and Oversight Service Group. AC ¶ 44(b). FSA consequently is unable to perform its statutory oversight and certification functions. AC ¶¶ 79–86.

## II.    Procedural History

Plaintiffs filed a complaint on March 24, 2025, Dkt. 1, and an amended complaint on July 1, 2025, Dkt. 58. Counts 1–3 and 5 of the amended complaint allege that the closure of subagencies within the Department and the termination of statutorily mandated functions violate the Constitution because they violate the Take Care Clause, the Separation of Powers, and the Appropriations and Spending Clauses and also are *ultra vires*. AC ¶¶ 149–61, 168–71. Count 4 alleges that the steps Defendants have taken toward closing the Department include certain discrete, final agency actions that are each independently reviewable under the Administrative Procedure Act and are both contrary to law and arbitrary and capricious. AC ¶¶ 162–67.

Along with the amended complaint, Plaintiffs filed a motion for a preliminary injunction. Dkt. 61. The government opposed the motion and filed a motion to dismiss the amended complaint.

---

[1] Defendants' efforts to close the Department continue. During the present government shutdown, Defendants have notified hundreds of Department employees—including many additional employees in OCR and in offices critical to administering formula grants—that they will be terminated in an additional reduction in force.

Dkt. 78. This Court denied the motion for a preliminary injunction and administratively denied the motion to dismiss, giving the government 30 days to file a new motion to dismiss. Dkt. 86.

## LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), a court considers whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the sufficiency of a complaint, [a court] assume[s] as true all its well-pleaded facts and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* "Facial plausibility is established once the complaint's factual allegations produce an inference strong enough to nudge the plaintiff's claims across the line from conceivable to plausible." *Id.* (citation modified).

## ARGUMENT

The amended complaint alleges that Defendants have decided to close the Department, and while Defendants have not yet fully achieved that goal, they have taken steps toward a closure that are unlawful in their own right. In particular, they have effectively closed Department subagencies created by Congress—including IES, OCR, and components within FSA—and terminated the statutory functions that Congress vested in those subagencies. As alleged in Counts 1–3 and 5 of the amended complaint, those actions violate the Constitution and are *ultra vires*. Defendants lack the constitutional and statutory authority to close congressionally created offices and to halt statutorily mandated functions. In doing so, Defendants have exceeded their authority under Article II, arrogated power that the Constitution allocates to Congress, and violated their obligation to take care that the laws are faithfully executed. In addition, as alleged in Count 4, some of the constituent actions Defendants have taken toward closing the Department—including mass grant

cancellations and the RIF—are final agency actions, each of which is separately reviewable under the Administrative Procedure Act ("APA") and both contrary to law and arbitrary and capricious.

This Court's denial of a preliminary injunction does not support dismissal of the amended complaint. As the Court noted, "[a] preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." Dkt. 86, at 27 (citation modified). Courts considering a preliminary injunction must make a probabilistic determination about the merits, typically on an expedited timeframe, which "creates a probabilistic structure that stacks the deck against a plaintiff who must prevail on multiple independent issues to prevail overall." *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 166 (4th Cir. 2025). In contrast, the Rule 12(b)(6) standard for dismissal "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the cause of action alleged. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). At the dismissal stage, "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (citation omitted). The amended complaint readily clears those hurdles.

The Supreme Court's stay order in *McMahon v. New York*, 145 S. Ct. 2643 (2025), similarly does not support dismissal of the amended complaint. That stay order also resulted from a probabilistic determination, and while it may govern a similar probabilistic determination by a lower court considering similar preliminary relief, *see, e.g.*, *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, No. 25-1787, 2025 WL 2753708, at *3 (1st Cir. Sept. 29, 2025), it cannot—given that it came with no reasoning—govern a determination whether a complaint states a claim for relief, *see id.* at *5 (Aframe, J., concurring) ("[W]hile the unreasoned order in *McMahon* was essential to

resolving the government's stay appeal, that order's import will be limited as this case moves ahead."). That is particularly true where, as here, the cases raise distinct legal and factual issues.

As this Court recognized, even if the Supreme Court's stay orders "present a significant barrier to finding that Plaintiffs have made a clear showing of likelihood of success" when seeking preliminary relief, they do not "foreclose (or support dismissal of) all of Plaintiffs' claims." Dkt. 86, at 33. The allegations in the amended complaint state claims warranting further adjudication.

## I.      The Complaint States a Claim Under the Administrative Procedure Act (Count 4)

The amended complaint alleges multiple discrete final agency actions that are reviewable under the APA and are either arbitrary and capricious or contrary to law. AC ¶¶ 164–66. Any one of those discrete final agency actions is sufficient to sustain Count 4. We focus here on some of the most glaring examples of final discrete unlawful agency actions, which include the en masse cancellation of mental-health grants in April 2025 and the RIF on March 11, 2025.

### A.      The Allegations in the Complaint Regarding the Department's Cancellation of Mental-Health Grants State a Claim Under the APA and Sustain Count 4

On April 29, 2025, Defendants informed hundreds of states, school districts, and higher education institutions that the Department would discontinue their grants under the SBMH and MHSP programs, which support efforts to recruit, hire, and train school-based mental-health professionals. AC ¶ 134. The Department sent boilerplate letters to more than 200 (of about 260) SBMH and MHSP grant recipients, claiming that the awards were being discontinued, effective December 31, 2025, because the grants funded "race-based actions" and therefore "conflict[ed] with [the priorities] of the current Administration" and were "inconsistent with . . . the best interest of the Federal Government." AC ¶ 135. The amended complaint alleges that the Department did not undertake an individualized analysis before discontinuing the grants. *Id.* The amended complaint further alleges that the notice-and-comment procedures required under applicable law

did not permit the Department to retroactively change the criteria for awarding the grants. AC ¶¶ 136–37. The amended complaint accordingly alleges that the discontinuation of SBMH and MHSP grants was contrary to law and arbitrary and capricious. AC ¶¶ 138, 165–67.

The allegations in the complaint regarding the discontinuation of the SBMH and MHSP grants support a claim under the APA in Count 4. Defendants nonetheless contend that various procedural hurdles require dismissal of Count 4. Those arguments do not withstand scrutiny.

### 1. The Complaint Adequately Alleges Standing to Challenge the Cancellation of Mental-Health Grants

Defendants contend (Dkt. 92-1, at 6–8) that the complaint fails to allege standing and therefore this Court lacks Article III jurisdiction. According to Defendants, the injuries alleged in the complaint are "speculative" and "overly attenuated." Dkt. 92-1, at 6.

Article III standing contains three elements: "injury in fact, causation, and redressability." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025). The injury in fact must be "concrete" and "particularized," not "abstract." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury must also be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* An organizational plaintiff—such as Plaintiffs NAACP, NEA, PGCEA, and AFSCME Council 3—can demonstrate standing "in its own right to seek judicial relief from injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization with members may also establish what is sometimes called "representational or organizational standing" if it "demonstrate[s] that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted).

The amended complaint alleges that the cancellation of SBMH and MHSP grants concretely injured NEA members. *See* AC ¶¶ 140, 145–46. SBMH and MHSP grants funded positions filled by NEA members, the grant cancellations caused school districts to cut positions that the grants would have funded, and NEA members lost and continue to lose their jobs and work opportunities. AC ¶¶ 134, 145–46; *see* Dkt. 61-37 ¶¶ 48–49; Dkt. 61-40 ¶¶ 21, 33; Dkt. 61-106 ¶¶ 28–30, 35.[2] Loss of employment and the corresponding loss of salary and benefits "are classic and paradigmatic injuries for standing purposes." *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (citation and internal quotation marks omitted).

Defendants incorrectly claim that Plaintiffs seek "to enforce the rights of nonparties." Dkt. 92-1, at 8. Plaintiffs challenge unlawful agency action that has injured them and their members, including through loss of employment and professional opportunities, which are "invasions of traditionally cognizable interests sufficient to confer standing." *Thakur v. Trump*, 787 F. Supp. 3d 955, 992 (N.D. Cal. 2025), *stay denied*, 148 F.4th 1096, 1104–05 (9th Cir. 2025). "[T]he traditional Article III standing rules do not change simply because the alleged harm occurred through the termination of a contract with a third party." *Id.* at 933. Where individual NEA members "were employed by grant recipients and were let go because their employers lost grant funding," those members have standing to challenge the grant cancellation. *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 204 (D.D.C. 2025). And "[t]hose employees' interests in continued employment are plainly germane to [NEA's] purpose as a labor union advocating on its members' behalf." *Id.*

Courts have also repeatedly rejected Defendants' related argument that Plaintiffs' harms do not support standing because they purportedly flow from "choice[s] made by [a] third party." Dkt. 92-1, at 7. Where a third party's response to government action is "predictable" rather than

---

[2] When evaluating standing, a court can consider declarations submitted by plaintiffs that provide additional details to the allegations in the complaint. *See Warth*, 422 U.S. at 501–02.

"speculative," that response can be sufficient to confer standing. *Diamond Alt. Energy*, 145 S. Ct. at 2134. "Whether plaintiff itself is directly a signatory to a federal government contract is immaterial," provided that the plaintiff has sufficiently alleged a concrete injury that is both traceable to the government action and redressable by injunctive relief. *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 146 (D.D.C. 2025) (holding that plaintiffs had standing to challenge order imposing constraints on third-party clients); *Jenner & Block LLP v. U.S. Dept. of Just.*, 784 F. Supp. 3d 76, 104–05 (D.D.C. 2025) (same); *New York v. Kennedy*, No. 25-1780, 2025 WL 2658233, at *3 (1st Cir. Sept. 17, 2025) (holding that states had standing to challenge federal government cuts that increased burden on state resources). Here, Plaintiffs' members lost concrete jobs and services, and it was entirely predictable that school districts would cut those jobs and services after learning they would not receive federal money awarded for the very purpose of funding those types of jobs and services. Those concrete, redressable harms establish standing.

**2.    The Tucker Act Does Not Divest This Court of Jurisdiction Over the Challenge to the Cancellation of Mental-Health Grants**

Defendants contend (Dkt. 92-1, at 12–16) that the Tucker Act divests this Court of jurisdiction over the APA claim challenging the cancellation of mental-health grants. Those arguments are without merit.

The Tucker Act does not divest district courts of jurisdiction over every APA action "requiring some reference to or incorporation of a contract" but only over those claims that are "essentially contractual." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982). To determine if a claim is essentially contractual, a court must examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." *Id.* at 968; *see United States v. J&E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995) (adopting *Megapulse* rights and remedies test). Plaintiffs' claim challenging the en masse cancellation of the mental-health grants

is not essentially contractual for many of the same reasons this Court enumerated in *American Association of Colleges for Teacher Education v. McMahon (AACTE)*, No. 25-cv-702, 2025 WL 863319, at *2–5 (D. Md. Mar. 19, 2025). *See Green & Healthy Home Initiative, Inc. v. EPA*, No. 25-cv-1096, 2025 WL 1697463, at *12–15 (D. Md. June 17, 2025). But the challenge in this case is also not essentially contractual for the additional, fundamental reason that "no contract exists between plaintiffs and the Government." *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 937–38 (9th Cir. 2025); *see also Cmty. Legal Servs. in E. Palo Alto v. HHS*, No. 25-2808, 2025 WL 2884805, at *7–8 (9th Cir. Oct. 10, 2025) (Fletcher & Koh, JJ., respecting the denial of rehearing en banc); *Thakur*, 787 F. Supp. 3d at 988 (asserting jurisdiction over grant termination claims brought by non-parties to grants). For the Tucker Act to apply and confer jurisdiction in the Court of Federal Claims, "there must be privity of contract between the plaintiff and the United States." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). Because "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act," courts have "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction . . . when no jurisdiction lies in the Court of Federal Claims." *Cmty. Legal Servs.*, 137 F.4th at 939 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006)).[3]

If Defendants' jurisdictional argument were accepted, Plaintiffs would have no court in which to bring their APA claim challenging the grant cancellations. This is untenable in light of both the "strong presumption in favor of judicial review of agency action," *Casa de Md. v. DHS*, 924 F.3d 684, 697 (4th Cir. 2019) (citation and internal quotations omitted), and the Supreme Court's recognition that when considering a conflict between the APA and Tucker Act,

---

[3] For the same reasons, and the reasons set forth below regarding the absence of channeling to administrative agencies, *see infra* pp. 21-23, there is no merit to Defendants' argument that the APA claims must be dismissed pursuant to 5 U.S.C. § 704 because "there are [administrative] and Tucker Act remedies available." Dkt. 92-1, at 28.

"established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act." *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988) (citation modified). Defendants do not point to anything in the Tucker Act or elsewhere to satisfy their "heavy burden" of rebutting the presumption favoring judicial review of administrative action. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (citation omitted).

Relying on Justice Gorsuch's admonition that the Supreme Court's stay orders "must inform how a [lower] court proceeds in like cases," *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J., concurring) (citation and internal quotation marks omitted), the government contends (Dkt. 92-1, at 4–5, 15–16) that the Supreme Court's per curiam stay decision in *Department of Education v. California*, 604 U.S. 650 (2025) (*California*), is controlling and compels the conclusion that the Tucker Act divests this Court of jurisdiction. But this case and *California* are not like cases in at least one respect that is dispositive on the Tucker Act issue: the plaintiffs who sought preliminary relief in that case brought suit on behalf of grant recipients, *see California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d, 72, 76 n.2 (D. Mass. 2025), and thus, in contrast to Plaintiffs here, would be in privity with the United States and not foreclosed from suing in the Court of Federal Claims. The same is true of the plaintiffs in *American Association of Colleges for Teacher Education v. McMahon (AACTE)*, 770 F. Supp. 3d. 822, 833–34 (D. Md. 2025)*, where the Fourth Circuit stayed the preliminary injunction on the basis of *California*, *see AACTE v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025). Given that significant difference between this case and both *California* and *AACTE*, the stay orders entered by the Supreme Court and Fourth Circuit in those cases should not govern here.

**3.    The Cancellation of Mental-Health Grants is a Discrete Final Agency Action under the APA**

Defendants contend (Dkt. 92-1, at 17–20) that Plaintiffs do not seek review of a discrete final agency action, as required by the APA. These arguments are without merit.

The APA provides for judicial review of "agency action," 5 U.S.C. § 702, which must consist of "specific and discrete governmental conduct," *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019), and must also be "final," 5 U.S.C. § 704; *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Courts have correctly concluded that individual or en masse grant cancellations are final agency actions reviewable under the APA. *See, e.g.*, *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, No. 25-cv-1407, 2025 WL 2158340, at *14–15 (D.D.C. July 30, 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72–73 (D.D.C. 2025); *Or. Council for Humans. v. U.S. DOGE Serv.*, No. 25-cv-829, 2025 WL 2237478, at *24 (D. Or. Aug. 6, 2025); *Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458, 2025 WL 1865971, at *19 (D. Md. July 7, 2025); *Thakur*, 787 F. Supp. 3d at 985–86; *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 92 (D. Md. 2025); *Urb. Sustainability Dirs. Network v. U.S. Dept. of Agric.*, No. 25-cv-1775, 2025 WL 2374528, at *26 (D.D.C. Aug. 14, 2025).[4] Courts have also rejected the contention that challenges to grant cancellations are unreviewable programmatic challenges rather than challenges to discrete agency actions. *See, e.g.*, *Urb. Sustainability Dirs. Network*, 2025 WL 2374528, at *26–27; *Or. Council for Humans.*, 2025 WL 2237478, at *24.

Defendants err insofar as they suggest (Dkt. 92-1, at 17–20) that the challenge to the cancellation of mental-health grants impermissibly lumps together multiple agency actions. On the contrary, the amended complaint identifies several individual agency actions—one of which is the

---

[4] In other cases, the government has appropriately not disputed that grant cancellations are reviewable agency actions. *See Green & Healthy Home Initiative*, 2025 WL 1697463, at *15 n.10; *AACTE*, 770 F. Supp. 3d. at 845–46.

cancellation of mental-health grants—and seeks independent review of each of those agency actions. As discussed in additional detail below in the context of the APA challenge to the RIF, each of those agency actions is a discrete agency action that is separately reviewable under the APA, regardless of whether those agency actions took place in the same period. *See infra* p. 24.

### 4.    The Cancellation of Mental-Health Grants is Not Committed to Agency Discretion by Law

Defendants argue (Dkt. 92-1, at 26–28) that APA review of the cancellation of mental-health grants is unavailable because the decision is committed to agency discretion. The APA "sets up a basic presumption of judicial review of agency action" except "where agency action is committed to agency discretion by law." *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (citations and internal quotation marks omitted). But this exception is "very narrow," *Hi–Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (citation omitted), and does not apply merely because "a statute grants broad discretion to an agency," *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam). The exception does not apply here.

According to Defendants, the cancellation of the mental-health grants is committed to agency discretion because "the Secretary is invested with broad discretion as to whom the grants are delivered." Dkt. 92-1, at 28 (citing 34 C.F.R. § 75.1(b)). But Plaintiffs do not seek review of any decision to award grants; rather, they seek review of the decision to cancel grants based on a single flawed explanation at odds with grant criteria and longstanding Department practice. And regardless of any discretion the Department may possess to award *or* cancel grants, that discretion is bounded by statute, including the General Education Provisions Act; by regulations, including the Education Department General Administrative Regulations; and by the Department's own internal rules, namely its Handbook for the Discretionary Grant Process. *See* 20 U.S.C. §§ 1234d, 1234g; 2 C.F.R. § 200.342; 34 C.F.R. § 75.253; Dkt. 61-96 ¶¶ 25–32. This Court and others have

accordingly rejected the argument that the decision to cancel grants is committed to agency discretion by law. *See Urb. Sustainability Dirs.*, 2025 WL 2374528, at *24; *Elev8 Balt., Inc.*, 2025 WL 1865971, at *21; *AACTE*, 2025 WL 863319, at *6–7.

**B.    The Allegations in the Complaint Regarding the Department's Reduction in Force State a Claim Under the APA and Sustain Count 4**

The amended complaint's claims regarding the en masse cancellation of mental-health grants are sufficient to sustain Count 4 and require denial of the government's motion to dismiss that count, but the amended complaint alleges additional agency actions that are also reviewable under the APA and sufficient to sustain Count 4. Those additional agency actions include the RIF announced on March 11, 2025. As alleged in the amended complaint, the RIF gutted subagencies within the Department that Congress created and charged with carrying out mandatory statutory duties, and the RIF forecloses those subagencies from carrying out those statutory duties. AC ¶¶ 8, 43–44. Defendants admit they did not conduct any analysis—about the effects of the RIF on the Department's ability to carry out mandatory functions or otherwise—before conducting the RIF; they made no plans to transition the work of the terminated employees before locking them out of their positions; and the explanations Defendants have provided for the RIF contradict each other. AC ¶¶ 43–49. The RIF was thus arbitrary and capricious and contrary to law. AC ¶¶ 165–67.

**1.    The Complaint Adequately Alleges Standing to Challenge the RIF**

Defendants contend that the amended complaint fails to establish standing because the alleged harms from the RIF are purportedly "speculative" and "attenuated." Dkt. 92-1, at 6–8. But the Department and the statutory duties it performs benefit Plaintiffs, which include national organizations with millions of members who depend on the statutory functions performed by the Department in myriad ways. *See* AC ¶¶ 13–20. NEA, for example, is the Nation's largest union of educational professionals, with approximately three million members nationwide who work at

every level of the educational system. AC ¶ 18. NEA's core objectives include improving the quality of teaching, increasing student achievement, making schools safer and better places to learn, and ensuring fair compensation for educators. Thousands of NEA members work in positions funded by Department grants, and many more rely on Department resources to learn about and implement evidence-based best practices or benefit from Department-sponsored training and professional development. *Id.*; *see generally* Dkt. 61-98; Dkt. 61-37. AFSCME Council 3 and PGCEA similarly represent thousands of workers in Maryland public schools. AC ¶¶ 19–20. NAACP's hundreds of thousands of members nationwide also depend on Department functions, including the enforcement of civil rights laws at schools that receive federal funding. AC ¶ 13.

The functional closure of subagencies within the Department, including OCR and IES, and cessation of their statutory duties—a direct result of the RIF—have concretely harmed Plaintiffs and their members and will continue to injure them as the effects of those actions accumulate.

a.    The RIF and effective closure of OCR have directly harmed Plaintiffs, including NAACP and Lubbock NAACP, which work to ensure educational quality and eliminate racial discrimination. AC ¶¶ 13–14. One of their core activities is "us[ing] the OCR process to advance educational equity through resolution agreements that address racial disparities in school discipline, special education services, and access to advanced coursework." AC ¶ 97. Lubbock NAACP has pending complaints challenging two Texas school districts' continuing failure to prevent bullying, harassment, and inappropriate discipline against Black students. AC ¶ 97; Dkt. 61-36 ¶ 11. The complaints were assigned to OCR's Dallas Office, which is now closed, and complainants have received no communication from OCR since December 2024. AC ¶ 97; Dkt. 61-36 ¶ 11. The closure of OCR has similarly harmed members of Plaintiff NAACP whose pending complaints with OCR have also stalled. AC ¶ 16; *see* Dkt. 61-101 ¶¶ 15–20 (declaration

from NAACP member Hannah Secka explaining that she has not received any substantive updates on her pending OCR complaint since December 2024); *see also* Dkt. 61-66 ¶¶ 5, 8–15. NEA's members also benefit from the activities of OCR. *See* Dkt. 61-98 ¶¶ 41–44.

Defendants contend that Plaintiffs lack standing because it is speculative "that the OCR investigation would be decided in their favor" or even that "the Executive would use its discretion to investigate their complaints." Dkt. 92-1, at 7. But the Department—through OCR—has a mandatory obligation to evaluate and resolve complaints, and the Department is failing to discharge those obligations, harming Plaintiffs. Regardless of whether the Department has discretion as to how it resolves a complaint—*e.g.*, whether to find a violation and take an enforcement action—it has no discretion to let a complaint lay dormant and not investigate or resolve it at all. *See, e.g.*, *Adams v. Richardson*, 480 F.2d 1159, 1161–62 (D.C. Cir. 1973) (en banc); *N.A.A.C.P., Bos. Chapter v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 158 (1st Cir. 1987). Plaintiffs and their members are harmed because OCR has abdicated its responsibility to exercise discretion, rendering their complaints a nullity. *See* Dkt. 95, at 55–56.

b.      Plaintiffs' standing to challenge the RIF due to their injuries from the effective closure of OCR is sufficient for Count 4 to proceed. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."). Plaintiffs' allegations regarding IES are also independently sufficient to establish standing to challenge the RIF.

IES plays an essential role in administering formula grants. AC ¶¶ 62–63, 104–08. As discussed above, formula grants are distributed to recipients according to formulas established by statute, and in order to distribute the grants as required by law, the Department must use accurate and up-to-date information to run the formulas. AC ¶ 102. IES—in particular the National Center for Education Statistics, the statistics center housed within IES that lost all but three of its 100

employees in the RIF—must collect and compute many key data inputs required by the statutory formulas. AC ¶¶ 44(a), 104–08. The RIF has left IES unable to collect and retrieve the necessary data for formula grant allocations. AC ¶¶ 68–70. Consequently, the Department will have no choice but to contravene congressional commands by plugging outdated and hence inaccurate data into the statutory allocation formulas, improperly underpaying some states and school districts while overpaying others.

Even small changes in data inputs from year to year can significantly shift recipients' formula grant awards by millions of dollars. Consider, for example, the program that Congress mandated in Title I-A of the Elementary and Secondary Education Act ("ESEA") to support districts serving economically disadvantaged students. That program distributes $18.4 billion per year to serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools. Dkt. 61-32, at 1, 11. The distribution of these funds between states and school districts can shift significantly based on even minor changes to the formula inputs: a $1 change in average per-pupil expenditure can alter a state's allocation by more than $1 million. Dkt. 61-58 ¶ 11. The same is true of changes in poverty estimates and formula-eligible child counts. Because school district boundaries and demographics shift each year, these inputs also shift. *Id.* ¶¶ 9, 14, 19–22; Dkt. 61-93 ¶ 19. NEA estimates that, in the five school years from 2016–2020, about 13% of schools' eligibility for Title I funds changed year to year, with at least 10% of ineligible schools moving into eligible status from one year to the next. Dkt. 61-37 ¶¶ 17–18. Had eligibility been determined, and allocations calculated, using previous years' data, these schools would not have received the Title I-A funding to which the statutory formula entitles them. *Id.* ¶ 19.

Plaintiffs and their members will be injured by those misallocations. Consistent with the limited statutorily permissible uses of formula grant awards, states and school districts use the

formula grants to fund services used by Plaintiffs and their members and to fund positions held by Plaintiffs' members. AC ¶¶ 100–01, 116–21. Formula grants fund hundreds of thousands of positions for the members of NEA, PGCEA, and AFSCME Council 3, as well as training and equipment they use on the job. AC ¶ 117, 119–20. And formula grants—including grants under Part B of the Individual with Disabilities Education Act and Titles I, II-A, III-A, and V of ESEA— support essential education services for the children of NAACP members. AC ¶¶ 13, 116. As a result of the closure of IES, state and school district recipients that are entitled to these funds (according to the formula determined by Congress) will not receive them as Congress intended and instead the funds will go to recipients who are not entitled to them (according to statutory formulas). And because the funds will not go to the recipients who most need them, Plaintiffs' members will not receive the jobs or services that those grants are intended to fund. Defendants contend (Dkt. 92-1, at 7–8) that it is speculative Plaintiffs and their members will be harmed by the closure of IES, but the misallocation of funds due to the closure of IES is not speculative—it is imminent and inevitable. Plaintiffs need not wait until the Department misallocates formula grants based on incorrect, outdated data to challenge the actions that will inevitably lead to those misallocations. *See Dep't of Com. v. New York*, 588 U.S. 752, 766–67 (2019) (holding that "primarily future injuries," including "loss of federal funds," established standing).

In addition to the injuries that Plaintiffs and their members will imminently suffer due to the closure of IES, Plaintiffs and their members have already suffered concrete injuries. Because misallocation of formula grants is inevitable, school districts have predictably mitigated risks by cutting positions in anticipation of future misallocations. *See Diamond Alt. Energy*, 145 S. Ct. at 2134 (analyzing standing based on predictable events). For example, twenty-nine NEA member positions were eliminated in Edwardsville, Illinois, due to the school district's concerns about the

stability of federal funding. AC ¶ 117; Dkt. 61-98 ¶ 14. Barrow County School System in Georgia similarly eliminated all its Title I-funded positions for the 2025–2026 school year, including positions held by NEA members, because of the instability of formula funding. AC ¶ 117; Dkt. 61-98 ¶ 14. When two school districts scaled back previously agreed-upon wage increases due in part to anticipated reductions in Department grant funding, AFSCME Council 3 and its members suffered injuries from the lost wages and the additional resources that the union had to devote to renegotiations. Dkt. 61-91 ¶¶ 18–19. Those concrete injuries establish standing.

Defendants contend that Plaintiffs lack standing because they are attempting to enforce the rights of nonparties and because the harms to Plaintiffs from the closure of IES supposedly flow from "choice[s] made by [a] third party" and are therefore speculative. Dkt. 92-1, at 7–8. As discussed above in the context of the cancellation of mental-health grants, those arguments lack merit. *See supra* pp. 9-10. The jobs and services lost by Plaintiffs' members are a predictable— and indeed inevitable—result of the closure of IES and misallocation of formula grants, which Congress created to fund those very types of jobs and services. Plaintiffs therefore have standing to challenge the illegal RIF that produced these concrete, redressable injuries.

### 2. The Challenge to the RIF is Ripe

Defendants suggest that a challenge to the RIF is a "[c]losure-[r]elated claim[]" that is not ripe "because the Department of Education is not closed." Dkt. 92-1, at 20. "The question of whether a claim is ripe turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (citation and internal quotation marks omitted); *see In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014). The RIF—which has resulted in the closure of subagencies within the Department and the termination of statutory functions—is final and certain, and Defendants do not claim otherwise. Plaintiffs' challenge to the RIF is ripe.

**3.**    **The Challenge to the RIF is Not Channeled to Administrative Agencies**

Defendants contend (Dkt. 92-1, at 8–12) that the Civil Service Reform Act of 1978 ("CSRA") channels any challenge to the RIF to specialized administrative agencies—the Merit Systems Protection Board ("MSPB") or the Federal Labor Relations Administration ("FLRA")— and therefore divests this Court of jurisdiction. Under the test set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), however, a claim is exclusively channeled to an administrative agency, depriving district courts of jurisdiction, only when (1) "such intent is fairly discernible in the statutory scheme," and (2) the claim is "of the type Congress intended to be reviewed within this statutory structure." *Id.* at 207, 212 (internal quotations omitted). That is not the case here.

The CSRA evinces no intent to channel Plaintiffs' claims regarding the closure of the Department through a large-scale RIF. The CSRA established the MSPB and permits classes of federal employees to appeal certain adverse employment actions to the MSPB. *See* 5 U.S.C. § 1204. The Federal Service Labor-Management Relations Statute, found within the CSRA, established the FLRA and permits labor unions and federal agencies to bring unfair labor practice claims, negotiability disputes, and appeals of arbitral decisions to the FLRA. *See id.* §§ 7117–18, 7122. The CSRA thus "sets forth the protections and remedies available to [federal] employees as well as the procedural process they must follow." *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 299 (4th Cir. 2025). But Plaintiffs are neither federal employees nor unions representing Department employees, they do not challenge individual employment decisions, and they do not seek to vindicate the protections available to federal employees or their unions. Rather, Plaintiffs challenge Defendants' efforts to close the Department by closing its statutory offices and terminating its statutory functions. Those claims do not turn on any aspect of the employment or labor-management relationship between the government and its workers.

Under Defendants' view, even if they were to close a federal agency without congressional approval in one fell swoop by firing every employee at once, the only justiciable challenge to that unconstitutional action would be a claim brought by an employee or a federal union to the MSPB or the FLRA. It defies credulity to believe that Congress in enacting the CSRA intended that to be the exclusive form of review for such a grave constitutional violation. *See Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025); *see also Wiley v. Kennedy*, No. 25-cv-227, 2025 WL 1384768, at *11 (S.D. W. Va. May 13, 2025) ("It is patently absurd to suggest that an illegal agency action that includes termination of employees is unreviewable."). This case is functionally no different. Defendants have decided to close the Department, and while they have yet to complete the closure, they have nonetheless made significant strides towards that goal over months, including by closing congressionally created subagencies and terminating the mandatory statutory functions performed by those subagencies. But whether accomplished in a single day or over months, nothing in the CSRA suggests that Congress intended for challenges to the closure of a federal agency—or statutorily created subagencies that perform mandatory statutory functions—to proceed through administrative agencies with expertise in employment and labor matters.

Other courts have rejected the government's channeling arguments. In *NTEU v. Vought*, for example, the court concluded that organizations representing employees at a federal agency could not challenge actions to close the agency in federal court, but an organization (NAACP) that did not represent employees and did not "seek redress for employment-related injuries" was not channeled. 149 F.4th 762, 776 (D.C. Cir. 2025). Plaintiffs are on the same footing as the NAACP was in *NTEU*. And district courts within the Fourth Circuit have likewise concluded that claims like Plaintiffs' are not channeled by the CSRA. *See Wiley*, 2025 WL 1384768, at *11; *Elev8 Balt.,*

*Inc.*, 2025 WL 1865971, at *15–18. Moreover, as the First Circuit has explained, the Supreme Court recently addressed the merits of a claim involving agency restructuring and RIFs despite the government's channeling argument, "indicat[ing] that the Supreme Court concluded that the district court likely had jurisdiction to make that decision." *New York v. Kennedy*, 2025 WL 2658233, at *4 (citing *Trump v. AFGE*, 145 S. Ct. 2635 (2025)). These decisions correctly demonstrate that no intent to channel claims regarding the closure of a statutorily created agency is discernible in the CSRA, especially when the claims are not brought by federal employees or an organization representing them. Defendants' channeling arguments are without merit.

### 4.    The RIF is a Discrete Final Agency Action under the APA

Defendants contend (Dkt. 92-1, at 17–20) that Plaintiffs do not challenge a discrete final agency action reviewable under the APA but rather mount an impermissible programmatic challenge. Defendants misconstrue the amended complaint, which identifies several individual agency actions that are each separately reviewable under the APA. *See supra* pp. 13-14. One of those separate agency actions is the RIF. Courts have correctly concluded that a reduction in force is a final agency action for purposes of the APA. *See, e.g.*, *Elev8 Baltimore*, 2025 WL 1865971, at *18–19; *New York v. Kennedy*, 2025 WL 2658233, at *5; *AFGE v. Trump*, 139 F.4th 1020, 1038–39 (9th Cir. 2025), *stay granted*, 145 S. Ct. 2635 (2025); *see also Rhode Island v. Trump*, 781 F. Supp. 3d 25, 44–45 (D.R.I. 2025) (RIFs at various agencies were reviewable final agency actions along with other discrete actions to implement executive order directing dismantling of agencies), *stay denied*, 2025 WL 2621593 (1st Cir. Sept. 11, 2025). The RIF is similarly a discrete final agency action that is reviewable under the APA, regardless of whether the amended complaint also separately seeks review of additional final agency actions by the Department. *See, e.g.*, *Elev8 Baltimore*, 2025 WL 1865971, at *18–19 (concluding that multiple actions that "occurred within a singular and brief time frame" were each "sufficiently discrete to constitute a reviewable agency

action"); *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

Defendants' reliance on *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), is misplaced. *Lujan* involved a challenge to a collection of individual actions and decisions within the Bureau of Land Management that the plaintiffs lumped together and labeled a "land withdrawal review program." *Id.* at 890. Whereas the plaintiffs in *Lujan* did not separately challenge any individual agency action, the amended complaint here explicitly identifies multiple agency actions that are each independently subject to review under the APA.

*NTEU v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), similarly does not support Defendants' arguments. There, the court concluded that the plaintiffs sought to challenge "a single, overarching decision to shut down the CFPB, which [the plaintiffs] infer[red] from . . . various discrete actions," including the termination of employees, the cancellation of contracts, and a decision to move the agency to smaller headquarters. *Id.* at 777. The court explained that the plaintiffs "could challenge many of these actions in court," but the court found that the case brought by the plaintiffs was "not constructed like that." *Id.* Instead, the plaintiffs sought review of an overarching decision to shut down CFPB, which the court found did not meet the requirements for final agency action. *Id.* at 781–90. This case, however, is constructed in the way that the court in *NTEU v. Vought* said would be permissible. Plaintiffs identify several individual agency actions—including the RIF and grant cancellations—and seek APA review of those actions. To be sure, those actions reflect a decision to close the Department and were taken to carry out that decision, but even if the decision to close

the Department is itself not reviewable, the individual actions by Defendants in service of that larger goal are nonetheless reviewable discrete final agency actions.[5]

Defendants' reliance (Dkt. 92-1, at 20) on *American Educational Research Association v. Department of Education (AERA)*, No. 25-cv-1230, 2025 WL 1665401 (D. Md. June 12, 2025), and *Association for Education Finance & Policy, Inc. v. McMahon (AEFP)*, 786 F. Supp. 3d 13 (D.D.C. 2025), is also unavailing. In *AERA*, the court did not conclude that the reduction in force was not a final agency action but rather found that the plaintiffs failed to justify the scope of requested preliminary relief. *Id.* at *6. And *AEFP* misapplied *Lujan* and did not recognize that the APA permits review of discrete final agency actions even if the actions occurred within the same time and were taken in service of the same policy goals or were otherwise thematically linked. The RIF is a reviewable agency action.

### 5.    The RIF is Not Committed to Agency Discretion by Law

Defendants erroneously contend (Dkt. 92-1, at 26–28) that the RIF was an action that Congress committed to agency discretion and is therefore unreviewable under the APA. Numerous courts have reviewed RIFs aimed at closing an agency under the APA. *See supra* pp. 23-24. And in cases where the government has raised the committed-to-agency-discretion argument, courts have concluded that a RIF that closes a federal agency or subagency is not committed to agency discretion. *See, e.g.*, *Elev8 Baltimore, Inc.,* 2025 WL 1865971, at *20 (concluding that a "decision to RIF the vast majority of [an agency's] workforce" is not committed to agency discretion where it was "part of an effort to eliminate or substantially reduce [the agency's] operations and ability to perform functions mandated by statute"). This case is not one of "those rare instances where

---

[5] The decision to close the Department is also a reviewable agency action for the reasons set forth in the dissent in *NTEU*, 149 F.4th at 804-13 (Pillard, J., dissenting) (petition for rehearing en banc pending). Because the amended complaint alleges other reviewable agency actions, the Court need not reach that issue to deny the motion to dismiss.

statutes are drawn in such broad terms that in a given case there is no law to apply." *Hi-Tech Furnace Sys., Inc.*, 224 F.3d at 788 (citations omitted).

Congress created the Department and its subagencies and gave them mandatory statutory responsibilities. There is no basis to conclude that Congress committed to the Department unreviewable discretion to conduct a RIF that closes those subagencies and terminates their mandatory functions. *See Elev8 Baltimore, Inc.*, 2025 WL 1865971, at *20. To the contrary, Congress expressly limited the Secretary's discretion to reorganize the Department and abolish offices within it, and that discretion does not give the Secretary authority to abolish OCR, IES, or FSA, let alone terminate their statutory functions. *See* 20 U.S.C. § 3473. Defendants suggest (Dkt. 92-1, at 26–27) that the RIF merely reflects a run-of-the-mill "staffing" or "headcount" decision within the Department, but that characterization does not accurately reflect the allegations in the amended complaint, which establish a massive cut to Department staffing that effectively closed three congressionally created subagencies. And even in the normal course, although courts accord agencies wide discretion in conducting a RIF, courts will nonetheless review a RIF for abuse of discretion, "a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like." *Markland v. Off. of Pers. Mgmt.*, 140 F.3d 1031, 1033 (Fed. Cir. 1998); *see* Dkt. 92-1, at 26 (quoting *Markland*). The RIF does not fall within the narrow category of unreviewable agency actions committed to agency discretion by law.

## II.    The Allegations in the Complaint State Constitutional Claims (Counts 1-3, 5)

In addition to the APA claims, the amended complaint states valid claims in Counts 1–3 and 5 that Defendants violated the Constitution and acted in excess of their authority. The Constitution gives Congress the power over "the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). Exercising

that power, Congress established, in mandatory terms, the Department of Education, *see* 20 U.S.C. § 3411, as well as offices within the Department, *see, e.g.*, 20 U.S.C. § 3413(a) (OCR); 20 U.S.C. §§ 3419, 9511(a) (IES); 20 U.S.C. § 1018(a) (FSA), and it provided that the Department and its constituent offices must carry out certain mandatory functions, *see, e.g.*, 20 U.S.C. §§ 9511(b)(2), 9543(a) (describing some of the functions IES "shall" perform).

The Executive Branch may only exercise authority that derives "from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Absent the exercise of Article II authority that is "conclusive and preclusive," *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)), the President and subordinate executive officers and agencies "may not decline to follow a statutory mandate or prohibition simply because of policy objections," *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). The President has no "dispensing power" under the Constitution by which he can decline to give effect to duly enacted legislation, which would "cloth[e] the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 612–13 (1838). The Executive Branch therefore possesses no constitutional authority to abolish a federal agency or subagency created by Congress and terminate the mandatory functions assigned to them by Congress. The amended complaint alleges that by taking actions to close the Department and subagencies within the Department, and by rendering the Department and its subagencies unable to carry out their mandatory statutory responsibilities, Defendants have asserted authority that they

lack under the Constitution and have violated both the separation of powers and their constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.[6]

Defendants do not dispute these legal precepts but instead trot out (Dkt. 92-1, at 6–12, 20–26) the usual array of jurisdictional and procedural defenses that they claim foreclose judicial review of agency actions that close an agency from within. These arguments lack merit.

### A. This Court Has Jurisdiction Over the Constitutional Claims

Plaintiffs have standing to challenge the closure of subagencies within the Department under the Constitution for the same reasons Plaintiffs have standing to challenge the RIF that caused those closures under the APA. The closure of subagencies and the termination of statutory functions concretely harms Plaintiffs and their members. *See supra* pp. 15-20. And those harms go beyond the cessation of functions caused by the RIF. For example, Defendants unconstitutionally closed the statutorily mandated Regional Educational Laboratories housed in IES, *see Child Trends, Inc. v. U.S. Dep't of Educ.*, No. 25-cv-1154, 2025 WL 2379688, at *16 (D. Md. Aug. 15, 2025) (concluding that closure of RELs violated the Constitution), and terminated contracts for IES to provide resources like ERIC and the What Works Clearinghouse as directed by statute. This directly harmed NEA members who were engaged in professional development, training, and educator support programs offered by the RELs and relied on ERIC, the What Works Clearinghouse, and other IES products. AC ¶¶ 64–68, 73–74. The constitutional challenge to those closures is also ripe for the same reasons the APA challenge to the RIF is ripe. *See supra* p. 20. And just as the APA challenge to the RIF is not channeled to specialized administrative agencies,

---

[6] The government contends (Dkt. 92-1, at 24) that the Take Care Clause applies only to the President, but as the government has recognized elsewhere, "[t]he President *and his subordinates* have a constitutionally imposed duty 'to take Care that the Laws be faithfully executed,'" Recommendation That the Department of Justice Not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, 8 Op. O.L.C. 183, 193 (1984) (emphasis added) (quoting U.S. Const. art. II, § 3); *see also Ortiz v. United States*, 585 U.S. 427, 486 (2018) (Alito, J. dissenting) (stating that the duty to take care that the laws be faithfully executed is "[t]he most basic duty of the President and his subordinates").

neither is the constitutional challenge to the closure of subagencies. *See supra* pp. 21-23; *see also Does 4, 7, 22, 27, 28, & 29 v. Musk*, No. 25-cv-462, 2025 WL 2346258, at *8 (D. Md. Aug. 13, 2025) (CSRA did not channel terminated employees' constitutional claims challenging "wholesale dismantling and abolition of USAID" via RIF and other actions).

**B.    The Amended Complaint States Valid Constitutional Claims**

Defendants contend (Dkt. 92-1, at 21–26) that Plaintiffs raise "purely statutory" claims, not cognizable constitutional claims. But Defendants rely on inapposite cases involving challenges to the President's exercise of discretionary authority. Plaintiffs do not allege that Defendants have exceeded or abused discretionary authority granted by Congress. Instead, Defendants have violated the Constitution by taking actions that are not authorized by the Constitution or by any statute.

Defendants' reliance on *Dalton v. Specter*, 511 U.S. 462 (1994), is therefore misplaced. *Dalton* concluded that judicial review of a President's actions for compliance with a statute "is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474. But claims that presidential action lacks any statutory or constitutional authority remain viable, *Dalton*, 511 U.S. at 473 (citing *Youngstown*, 343 U.S. at 587), as do claims alleging that "presidential action . . . independently violates . . . a statute that delegates no authority to the President to interfere," *Chamber of Com. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *see Child Trends*, 2025 WL 2379688, at *16 (upholding equitable challenge to closure of RELs). *Dalton* accordingly does not foreclose the *ultra vires* claims in the amended complaint. Those claims challenge Defendants' actions on the ground that Defendants possess no statutory or constitutional authority to close the Department or its constituent offices or dispense with mandatory statutory obligations that Congress has assigned to the Department and its offices. Defendants do not—and cannot—contend that any law grants the President sweeping discretionary authority to shutter a

congressionally created and funded cabinet-level agency—or a subagency—or to cease statutorily mandated functions. Defendants have acted in clear excess of their authority.

The additional authorities cited by Defendants (Dkt. 92-1, at 23–25) also involved the President's exercise of discretionary authority granted by statute and are therefore inapposite for the same reasons. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (Reconstruction Acts that authorized the President to "assign generals to command in the several military districts" and "detail sufficient military force to enable such officers to discharge their duties under the law"); *Chi. & S. Air Lines Co. v. Waterman S.S. Corp.*, 333 U.S. 103, 104 (1948) (statute that gave the President discretion to approve or reject "applications by citizen carriers to engage in overseas and foreign air transportation"). Defendants suggest (Dkt. 92-1, at 24) that *Heckler v. Chaney*, 470 U.S. 821 (1985), forecloses constitutional claims premised on the closure of OCR, but *Heckler* is inapposite as well. *Heckler* did not involve a constitutional challenge but instead construed the APA's exception for agency action committed to agency discretion, and regardless, in contrast to *Heckler*, Plaintiffs do not challenge, under the APA or otherwise, any decision not to take enforcement action. Plaintiffs' constitutional claims allege that Defendants have effectively closed OCR and other offices that Congress established within the Department and have rendered them incapable of carrying out their mandatory statutory functions.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

Dated: October 16, 2025

Respectfully submitted,

Joseph M. Sellers (D. Md. Bar No. 06284)
Ethan Judd*
Ryan Wheeler*
Jenna Waldman*
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Avenue, NW, Suite 800
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699
jsellers@cohenmilstein.com
ejudd@cohenmilstein.com
rwheeler@cohenmilstein.com
jwaldman@cohenmilstein.com

Robert Kim*
Jessica Levin*
Wendy Lecker*
Theresa Luhm*
**Education Law Center**
60 Park Place, Suite 300
Newark, NJ 07102
Tel. (973) 624-1815
Fax (973) 624-7339
rkim@edlawcenter.org
jlevin@edlawcenter.org
wlecker@edlawcenter.org
tluhm@edlawcenter.org

*Attorneys for NAACP, NAACP South Carolina State Conference, NAACP Florence Branch, NAACP Texas State Conference, NAACP Lubbock Branch, Mara Greengrass, and Jane Does 1 & 2*

Aaron S. Ament*
Daniel A. Zibel (D. Md. Bar No. 31554)
Eric Rothschild*
**National Student Legal Defense Network**
1701 Rhode Island Avenue N.W.
Washington, D.C. 20036
Tel. (202) 734-7495
aaron@defendstudents.org

*/s/ Abigail V. Carter*
Leon Dayan*
Abigail V. Carter (D. Md. Bar No. 20952)
John M. Pellettieri*
Kara A. Naseef*
Grace Rybak*
Lane Shadgett (D. Md. Bar No. 31686)
**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
jpellettieri@bredhoff.com
knaseef@bredhoff.com
grybak@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for National Education Association, Prince George's County Educators Association, AFSCME Council 3*

Alice O'Brien*
Marissa Marandola*
**National Education Association**
1201 16th Street NW
Washington, D.C. 20036
Tel. (202) 822-7035
aobrien@nea.org
mmarandola@nea.org

*Attorneys for National Education Association and Prince George's County Educators Association*

dan@defendstudents.org
eric@defendstudents.org

*Attorneys for National Education Association*

*\*Admitted Pro Hac Vice*