**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, *et al.*,

    *Plaintiffs,*

      v.

THE UNITED STATES OF AMERICA,
*et al.*,

    *Defendants.*

**Civil No. 8:25-cv-00965-JRR**

**MEMORANDUM OPINION**

Pending before the court is Defendants' Motion to Dismiss at ECF No. 92 (the "Motion").

The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For

the reasons that follow, by accompanying order, the Motion will be denied.

## I.    BACKGROUND[1]

Plaintiffs, a group of civil rights organizations, labor unions, and individuals, urge that,

since January 20, 2025, President Donald J. Trump and his administration have taken action, as he

campaigned, to close the Department of Education (the "Department") in contravention of the

Executive's constitutional authority. The instant case challenges those actions.

Plaintiffs initiated this action on March 24, 2025. (ECF No. 1; the "Complaint.") They

are: National Association for the Advancement of Colored People ("NAACP"), NAACP South

Carolina State Conference ("South Carolina NAACP"), NAACP Florence Branch ("Florence

---

[1] The court largely incorporates the background set forth in its memorandum opinion at ECF No. 86. Unless otherwise specified, the court accepts as true all well-pled facts set forth in the First Amended Complaint (ECF No. 58). *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (providing that the court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff") (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), and *Ashcroft v. Iqbal*, 556 U.S. 662, (2009)).

NAACP"), NAACP Texas State Conference ("Texas NAACP"), NAACP Lubbock Branch ("Lubbock NAACP"), Mara Greengrass on behalf of minor child B.F., Jane Doe 1 on behalf of minor child C.E., Jane Doe 2 on behalf of minor child C.C., National Education Association ("NEA"), Prince George's County Educators Association ("PGCEA"), and AFSCME Council 3 ("AFSCME").  Plaintiffs name the United States of America, the Department, and the Secretary of Education Linda McMahon (the "Secretary") as Defendants.  *Id.*

On July 1, 2025, Plaintiffs filed the operative Amended Complaint.  (ECF No. 58.) Plaintiffs contend that "Defendants' *ultra vires* destruction of the Department violates the separation of powers and the Constitution's Take Care, Spending, and Appropriations Clauses," as well as the Administrative Procedure Act ("APA").  (ECF No. 58 ¶ 10.)  Plaintiffs assert five claims:

> Count One: Violation of the Take Care Clause, U.S. CONST. art. II, § 3, against the Secretary;
>
> Count Two:  Violation of the Appropriations and Spending Clauses, U.S. CONST. art. I, § 8, cl. 1; art. I, § 9, cl. 7, against the Secretary;
>
> Count Three: Violation of the Separation of Powers against the Secretary;
>
> Count Four: Violation of the APA, 5 U.S.C. § 706(2)(A)–(C), against all Defendants; and
>
> Count Five: *Ultra Vires* Action against all Defendants.

*Id.* ¶¶ 149–71.

Plaintiffs request the following relief:

> A. Declare unlawful and set aside the March 20 Executive Order;
>
> B. Issue preliminary and permanent injunctions barring Defendants from continuing their dismantling of the Department and implementing the March 20 Executive Order;

> C. Declare unlawful and set aside Defendants' actions to dismantle the Department as unconstitutional, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and ultra vires.[2]

*Id.* at p. 45.

Plaintiffs then moved for entry of a preliminary injunction (the "PI motion"), which this court denied on August 19, 2025. (ECF Nos. 86, 87.) Incorporated in Defendants' opposition to the PI motion was their initial motion to dismiss. Because the arguments were inextricable from the preliminary injunction matters (and standard), the court denied the motion to dismiss without prejudice. (ECF No. 87.) Defendants filed the instant Motion on September 18, 2025, challenging the court's jurisdiction over Plaintiffs' claims and whether Plaintiffs state a claim. (ECF No. 92.)

### A. About Plaintiffs

Plaintiffs generally fall into three categories: NAACP and its branches (NAACP, South Carolina NAACP, Florence NAACP, Texas NAACP, and Lubbock NAACP); individuals (Greengrass, Doe 1, and Doe 2); and labor unions and a council of labor unions (NEA, PGCEA, and AFSCME). *Id.* ¶¶ 13–20.

#### 1. NAACP Plaintiffs

Plaintiff NAACP, headquartered in Baltimore, Maryland, is the "the oldest and largest civil rights organization in the United States." (ECF No. 58 ¶ 13.) "Its mission is to ensure the educational, political, social, and economic equality of all persons and eliminate race-based discrimination." *Id.* Its members include parents of school-age children, high school and college students, and educators that are organized in units across the United States. *Id.*

---

[2] Plaintiffs also request reasonable attorneys' fees and costs, and any other relief the court deems necessary, just, and proper. (ECF No. 58 at p. 45.)

South Carolina NAACP, Texas NAACP, Florence NAACP, and Lubbock NAACP (collectively, the "NAACP Branches") are "nonprofit, nonpartisan membership organizations" based in South Carolina and Texas that work to "ensure educational equality and eliminate racial hatred and discrimination." *Id.* ¶ 14. To pursue their missions, the NAACP Branches "rely" upon the work of the Department, and in particular, the Department's Office for Civil Rights ("OCR"). *Id.*

### 2. *Individual Plaintiffs*

All individual Plaintiffs are residents of Maryland and parents of minor children who attend public schools in Maryland. (ECF No. 58 ¶¶ 15–17.) Plaintiff Mara Greengrass is a resident of Rockville, Maryland; her minor child, B.F., is a high school sophomore in Montgomery County Public Schools. *Id.* ¶ 15. B.F. has an Individualized Education Program ("IEP") that ensures he "receives daily paraeducator support, specialized educational programming, a dedicated counselor, and a class on executive function skills." *Id.*

Plaintiffs Jane Doe 1 and Jane Doe 2 are also residents of Montgomery County, Maryland, with children in Montgomery County Public Schools. *Id.* ¶¶ 16–17. Doe 1's minor child, C.E., is a high school senior and has an IEP. *Id.* ¶ 16. Doe 1 filed a complaint of disability discrimination and retaliation of C.E. with OCR's Philadelphia office. *Id.* Doe 2's minor child, C.C., is in elementary school and receives Emergent Language Development Services under the Elementary and Secondary Education Act. *Id.* ¶ 17.

### 3. *Labor Union Plaintiffs*

Plaintiff NEA, headquartered in Washington, D.C., is "the nation's largest union of educational professionals." (ECF No. 58 ¶ 18.) It has "some three million members who work at every level of education, from preschool to university graduate programs, and serve some 50

million students." *Id.* NEA "advocate[s] for education professionals and to unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world." *Id.*

Plaintiff PGCEA is an affiliate of NEA and a labor union headquartered in Forestville, Maryland. *Id.* ¶ 19. "It represents certified staff, including teachers and specialized support personnel, in Prince George's County Public Schools." *Id.*

Plaintiff AFSCME is a council of labor unions in Maryland and is headquartered in Baltimore, Maryland. *Id.* ¶ 20. "It represents over 300 public-school employees, including paraprofessionals, instructional assistants, counselors, cafeteria workers, bus drivers, safety officers, and maintenance and administrative staff, and thousands of employees in the University System of Maryland." *Id.* Grants from the Department "pay many [AFSCME] member salaries." *Id.*

## B. About the Department

In 1979, Congress created the Department through the Department of Education Organization Act ("DEOA"), codified, as amended, at 20 U.S.C. §§ 3401–3510. Pub. L. No. 96-88, 93 Stat. 669 (1979). Congress declared:

> [T]hat the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive proper treatment at the Federal level, and will enable the Federal Government to coordinate its education activities more effectively. Therefore, the purposes of this chapter are—
>
> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;
>
> (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education;

(3) to encourage the increased involvement of the public, parents, and students in Federal education programs;

(4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information;

(5) to improve the coordination of Federal education programs;

(6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and

(7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

The Department is administered "under the supervision and direction" of the Secretary. *Id.* § 3411. It must have an Office of General Counsel ("OGC") and an Office of the Inspector General, as well as five principal offices: OCR, the Office of Elementary and Secondary Education ("OESE"), the Office of Special Education and Rehabilitative Services ("OSERS"), the Office of Postsecondary Education ("OPE"), and the Office of Career, Technical, and Adult Education ("OCTAE"). *Id.* §§ 3412–3417. *See also* ECF No. 58 ¶ 26. Congress has enacted additional laws for the creation of "new, mandatory divisions" within the Department, including: the Office of Federal Student Aid ("FSA"), 20 U.S.C. § 1018; the Institute of Education Sciences ("IES"), 20 U.S.C. § 9511; the Office for Special Education Programs ("OSEP") within OSERS, 20 U.S.C. § 1402(a); and the Office of English Language Acquisition ("OELA"), 20 U.S.C. § 3420. (ECF No. 58 ¶ 27.) As of January 2025, the Department totaled 4,133 staff members, with 1,444 employees

in FSA,[3] 557 employees in OCR,[4] and 190 employees in IES.  (ECF No. 58 ¶ 42; Ex. A-11, March 11 Press Release, ECF No. 61-15.)

The Department is tasked with administering a number of federal statutes, including, relevant here:

i. The Elementary and Secondary Education Act ("ESEA"):  Enacted in 1965 and last reauthorized in 2015, Pub. L. No. 114-95, 129 Stat. 1802, codified as amended at 20 U.S.C. § 6301, *et seq.*, the ESEA serves as "the main source of federal financial assistance for K-12 schools."  In Fiscal Year 2024, Congress appropriated $18.8 billion to the ESEA's Title I-A program, "which supports elementary and secondary schools with a relatively high concentration of students from low-income families."[5]  The Department's administration of ESEA also includes formula grants.

ii. The Individuals with Disabilities Education Act ("IDEA"): Enacted in 1975 and last reauthorized in 2004, Pub. L. No. 108-446, 118 Stat. 2647, codified as amended at 20 U.S.C. §§ 1400–82, the IDEA mandates that states shall provide students ages 3 to 21 with disabilities a "free appropriate public education" in exchange for federal funding to states for early intervention and special education programs.  In administering the IDEA, the Department awards funds through formula and competitive grant programs.  In FY 2024, pursuant to the IDEA, the Department awarded $15.5 billion in grants to support the educational needs of about 7.5 million children.[6]

iii. The Higher Education Act ("HEA"): Enacted in 1965 and last comprehensively reauthorized in 2008, Pub. L. No. 110-315, 122 Stat. 3083, codified as amended at 20 U.S.C. § 1001, *et seq.*, the HEA establishes grants to support higher education institutions and related financial aid programs, awarding about $120.8 billion in aid each year to 9.9 million students in postsecondary education and training programs.[7]  It created the FSA to manage the financial aid programs.  *See* 20 U.S.C. § 1018.

iv. The Carl D. Perkins Career and Technical Act ("Perkins V"): Enacted in 2006 and last reauthorized in 2018, Pub. L. 115-225, 132 Stat. 1565, codified as amended at 20 U.S.C. § 2301, *et seq.*, Perkins V "supports secondary and postsecondary career and technical education [] programs through grants (about $1.46 billion in FY 2024) to states and schools."

v. The Education Sciences Reform Act ("ESRA"): Enacted in 2002, Pub. L. 114-95, 116 Stat. 1941, codified as amended at 20 U.S.C. §§ 9501, *et seq.*, the ESRA "reconstituted the

---

[3] U.S. DEP'T OF EDUC., *Fiscal Year [("FY")] 2024 Annual Report* 11 (2024), https://perma.cc/P3E4-VPN7.  *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that courts "routinely take judicial notice of information contained on state and federal government websites").

[4] U.S. DEP'T OF EDUC., *FY 2025 Budget Request* 8–9 (2024), https://perma.cc/566K-4ACB.

[5] U.S. DEP'T OF EDUC., *FY 2024 Agency Financial Report* 38 (2024), https://perma.cc/3TCH-9ERB.

[6] NCES, U.S. DEP'T OF EDUC., *Students With Disabilities* (May 2024), https://perma.cc/2Y3D-4F6W.

[7] FSA, U.S. DEP'T OF EDUC., *FY2024 Annual Report* 8, 15 (2024), https://perma.cc/P3E4-VPN7.

research office created by the DEOA as IES, a nonpartisan, semi-independent research division within the Department, consisting of four centers with specific responsibilities under the statute."

vi.  Federal Civil Rights Laws: These laws prohibit discrimination on protected bases in schools and colleges that receive federal financial assistance.  They include Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d (race); Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–89 (sex); Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, 20 U.S.C. § 3441(a)(3) (disability); and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65 (disability).

(ECF No. 58 ¶ 27.)

### 1. Statutory Offices

As discussed above, Congress has statutorily mandated the Department maintain certain offices, including, relevant here, IES, 20 U.S.C. § 3419, FSA, 20 U.S.C. § 1018, and OCR, 20 U.S.C. § 3413.

Turning first to IES, Congress enacted a law that "[t]here shall be in the Department of Education the Institute of Education Sciences, which shall be administered in accordance with the Education Sciences Reform Act of 2002."  20 U.S.C. § 3419.  It further requires that IES "shall compile statistics, develop products, and conduct research, evaluations, and wide dissemination activities in areas of demonstrated national need," and "shall" consist of four National Education Centers.  20 U.S.C. § 9511(b)(2), (c).

Each National Education Center carries with it its own statutorily-mandated functions. (ECF No. 58 ¶ 62.)  For example, the National Center for Education Statistics ("NCES") "shall collect, report, analyze, and disseminate statistical data related to education in the United States and in other nations."  20 U.S.C. § 9543.  Pursuant to this work, NCES "must administer the National Assessment of Educational Progress ("NAEP") and collect the data necessary to study education systems, provide guidance to states and school districts, develop and

8

implement policy initiatives, and distribute federal formula grants, among other mandatory functions." (ECF No. 58 ¶ 63.) "The Department uses the State Per-Pupil Expenditure data computed by NCES directly in calculating allocations for some of the largest formula grant programs administered by the Department." (Doe 8 Decl., ECF No. 61-58 ¶ 10.)

For its part, the National Center for Education Evaluation and Regional Assistance ("NCEE") "shall" provide "technical assistance," "conduct evaluations of Federal education programs administered by the Secretary . . . to determine the impact of such programs," "support synthesis and wide dissemination of results of evaluation, research, and products developed," and "encourage the use of scientifically valid education research and evaluation." 20 U.S.C. § 9561. It also "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories [("RELs")] that serve the needs of each region of the United States" by providing support for "applied research, development, wide dissemination, and technical assistance activities."[8] 20 U.S.C. § 9564.

Regarding FSA, "Congress created FSA as a quasi-independent entity responsible for managing the Title IV [of the HEA] programs, with a statutory focus on 'performance' and limited Secretarial oversight." (ECF No. 58 ¶ 76.) It undertakes several functions under the HEA, including certifying colleges for participation in Title IV programs, overseeing third-party loan servicers' day-to-day operation of the student loan programs, and ensuring that Title IV programs operate with integrity (including appointment of an Ombudsperson to provide assistance to borrowers by processing and informally resolving borrower complaints). *Id.* ¶¶ 79–84. FSA also manages the Federal Pell Grant Program, the Teacher Education Assistance for College and Higher

---

[8] The other two IES centers include the National Center for Education Research ("NCER"), 20 U.S.C. § 9531, and the National Center for Special Education Research, which sponsors research topics including the educational "needs of infants, toddlers, and children with disabilities." 20 U.S.C. § 9567(b)(1). (ECF No. 58 ¶ 44(a); *id.* at p. 19 n.44.)

Education Grant Program, and the William D. Ford Direct Loan Program. *Id.* ¶ 76. The Direct Loan Program, in particular, accounts for most federal student loans. *Id.* ¶ 77. In FY 2024, "FSA directly managed or oversaw a loan portfolio of more than $1.6 trillion, consisting of 217.2 million student loans to more than 45 million borrowers."[9] *Id.* FSA also oversees the HEA mandates of income-driven loan repayment plans, the Public Service Loan Forgiveness Program, and the Teacher Loan Forgiveness Program. *Id.* ¶ 78.

Finally, OCR carries out "'all functions' related to the enforcement of federal civil rights laws (including Title VI, Title IX, Section 504, and the ADA) that prohibit discrimination in federally funded education programs" and effectuates their anti-discrimination provisions. (ECF No. 58 ¶ 92.) *See* 20 U.S.C. §§ 3413(a), 3441(a)(3). Historically, OCR has relied on its 12 regional offices to carry out this duty—at these offices, staff "review incoming complaints to confirm OCR's jurisdiction; conduct document review, interviews, and site visits; and determine whether a violation has occurred." (ECF No. 58 ¶ 93.) Where it finds unlawful discrimination, OCR is empowered to "enter[] a voluntary resolution agreement, in which the recipient consents to implement system-wide remedies, and OCR monitors its compliance." *Id.* ¶ 94.

### 2. Grant Administration

"The Department also administers formula grant programs that distribute billions of dollars in federal financial assistance to states, school districts, colleges, and universities each year. Grantees' awards under these programs are calculated according to the formula set forth in the governing statute." (ECF No. 58 ¶ 100.) *See, e.g.*, 34 C.F.R. §§ 75.1(c)(1), 76.1. To administer formula grant programs, the Department must "determine applicants' eligibility, allocate formula

---

[9] FSA, U.S. DEP'T OF EDUC., *FY2024 Annual Report* 16 (2024), https://perma.cc/P3E4-VPN7.

funds accurately, distribute awards in a timely manner, and monitor their use by recipients to prevent waste, fraud, and abuse." (ECF No. 58 ¶ 102.)

The Department's formula grants programs include congressionally-mandated programs. Through the ESEA, the formula grants provide aid for school districts with large populations of economically disadvantaged students (Title I-A), English learners (Title III-A), and rural schools (Title V-B). (ECF No. 58 ¶ 101.) Through the IDEA, the formula grants support special education, preschool, and early intervention services for children with disabilities. *Id.* Through Perkins V, the formula grants provide career and technical education programs. *Id.* And through the HEA, the formula grants support Historically Black Colleges and Universities ("HBCUs") and Minority Serving Institutions ("MSIs"). *Id.* Grant-making offices within OESE, OELA, OSERS, OCTAE, and OPE "have primary responsibility for eligibility determinations, allocation calculations, and policy, monitoring, and accountability functions with respect to formula grant programs under the ESEA, IDEA, Perkins V, and HEA, respectively." *Id.* ¶ 103.

Moreover, prior to Defendants' complained-of actions, "NCES played a critical role in formula grant-making." (ECF No. 58 ¶ 104.) For instance, NCES "created custom school district poverty estimates used in formulas under Title I, Perkins V, and many other grant programs and the locale code framework that decides whether a district is 'rural' and therefore eligible for REAP funds, among other uses"; "collected key data inputs required by the formulas"; and "maintained EDFacts, the online platform used by OESE, OELA, and OSERS to collect program data that states are required to submit as a condition of formula grant funding." *Id.* ¶¶ 104–105. NCES also "worked with OCTAE to complete the mandatory state-reported data collection for Perkins V programs," *id.* ¶ 107, and completed the Integrated Postsecondary Education Data System ("IPEDS") collection mandated by the HEA that provides student demographic data used to

determine college and university eligibility for HBCU and MSI formula and competitive grants, *id.* ¶ 108.

In addition to formula grants, the Department is also required to administer multiple statutory-related competitive grant programs under the ESEA, IDEA, Perkins V, HEA, ESRA, and other laws. (ECF No. 58 ¶ 122.) The Secretary retains discretion to determine which applicants receive awards, and the Department sets funding priorities for the competitive grant programs by notice and comment. *Id.* In particular, the ESEA mandates the Department award competitive grants through the Supporting Effective Educator Development ("SEED") Grants Program for growing "highly effective educators," as well as the Teacher and School Leader Incentive ("TSL") Grants Program for improving systems of "educator hiring, training, and professional development." *Id.* ¶ 123. 20 U.S.C. §§ 6632, 6672(a). The HEA's Teacher Quality Partnership ("TQP") Program also provides competitive grant awards "to fund partnerships between high-need school districts and colleges for teacher preparation, teacher residency, and school leader preparation programs." (ECF No. 58 ¶ 123.) "The Department made scores of SEED, TQP, and TSL awards in FY 2022, 2023, and 2024, after setting competitive priorities by notice and comment." *Id.* ¶ 124.

Relatedly, School-Based Mental Health Services ("SBMH") and Mental Health Service Professional Demonstration ("MHSP") are programs established under Title VI of the ESEA, 20 U.S.C. § 7281(a)(1)(B), and the 2022 Bipartisan Safer Communities Act, Pub. L. No. 117-159. *Id.* ¶ 134. "These programs support efforts to recruit, hire, and train school-based mental health professionals in underserved communities." *Id.* Congress appropriated more than $1 billion to fund these program awards. *Id.*

### C. Change of Administration

On January 20, 2025, President Trump was sworn in, for the second time, as President of the United States. During his presidential campaign, he openly stated his intention to close the Department. (ECF No. 58 ¶ 30.) Plaintiffs urge that Defendants have taken increasingly escalating and devastating steps to realize that goal—to incapacitate the Department and effectuate its closure in violation of law. *Id.* ¶¶ 1, 31–35.

Of particular import here, on March 11, 2025, the Department initiated a reduction in force ("RIF") "impacting nearly 50% of the Department's workforce," leaving about 2,183 workers remaining (accounting for about 600 employees who accepted offers of voluntary resignation and retirement opportunities). (ECF 58 ¶ 43; Ex. A-11, March 11 Press Release, ECF No. 61-14.) Those subject to the RIF were placed on administrative leave on March 21, 2025. (ECF No. 58 ¶ 43.) Plaintiffs allege that the terminated workers "were immediately locked out of Department systems and could not send external emails or transition their work." *Id.* In addition to announcing the RIF, the March 11 Press Release further provides:

> The Department of Education will continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking. All divisions within the Department are impacted by the reduction, with some divisions requiring significant reorganization to better serve students, parents, educators, and taxpayers.

(March 11 Press Release, ECF No. 61-14.)

In a same-day interview, Secretary McMahon confirmed the March 11 RIF was the first step to closing the Department, before acknowledging she will "have to work with Congress to get that accomplished."[10]

---

[10] The Ingraham Angle, *Education Secretary Says Department Took First Steps to Eliminate 'Bureaucratic Bloat' at 1:12*, Fox News (Mar. 11, 2025), https://perma.cc/Z22U-L548.

Discussed at greater length as to specific programs below, Plaintiffs assert the RIF caused the following deleterious effects to Department components:

i.     IES: Defendants cut about 90% of IES's 200-person staff, leaving fewer than 20 employees. Two of its four subdivisions were reduced to a single employee (the Commissioners), and one was left with only three of its 100 employees.

ii.    FSA: Defendants cut about 25% of FSA's staff, including the entirety of its Vendor Oversight and Vendor Performance Divisions, 80% of its School Eligibility and Oversight Service Group, and half of its Ombudsman's Office.

iii.   OCR: Defendants cut about 50% of OCR's staff. It also closed seven of its 12 regional offices—Philadelphia, New York City, Dallas, San Francisco, Boston, Cleveland, and Chicago.

iv.   OESE, OSERS, OCTAE, and OPE: Defendants cut almost all or all staff in the executive offices and management support units of these offices that administer the ESEA, IDEA, Perkins V, and HEA.

v.    OELA: Defendants abolished OELA, cutting 14 of its 15 employees.

vi.   OGC: Defendants cut OGC's attorney staff by 75%.

(ECF No. 58 ¶ 44.)

On March 20, 2025, the President signed Executive Order 14242, titled "Improving Education Outcomes by Empowering Parents, States, and Communities." Exec. Order No. 14,242, *Improving Education Outcomes by Empowering Parents, States, and Communities*, 90 Fed. Reg. 13679 (Mar. 20, 2025). In the Executive Order, President Trump declares: "Unfortunately, the experiment of controlling American education through Federal programs and dollars—and the unaccountable bureaucracy those programs and dollars support—has plainly failed our children, our teachers, and our families." *Id.* It details myriad ways in which "[c]losing the Department of Education" would be beneficial, including providing "children and their families the opportunity to escape a system that is failing them" and "drastically improv[ing] program implementation in higher education." *Id.* Ultimately, the Executive Order mandates the following:

14

> The Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely.

*Id.*

In effectuating the directive, the Executive Order calls on the Secretary to "ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law and Administration policy." *Id.* at *13680. Finally, it also provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.*

Plaintiffs' claims arise from the collective actions of Defendants to dismantle the Department by gutting its staff and terminating many of its statutorily mandated functions. (ECF No. 58 ¶ 1.) While Plaintiffs' claims identify a range of actions and impacts, their specific challenges fall into the following general categories: the March 11 RIF, cancellation of contracts the Department relied upon to complete its congressionally mandated functions, and grant award terminations, discontinuation, and non-disbursement. The court addresses each below.

### 1. Impact on IES

On February 10, 2025, the Department cancelled most of the contracts IES used to carry out its research, data collection, and evaluation functions.[11] (ECF No. 58 ¶ 67.) "Employees eventually persuaded Defendants to resuscitate a handful of contracts for required IES functions and save some of the contracts that remained. But to do this, Defendants demanded that each contract's costs be reduced by at least 50%. This re-scoping stripped out many core services." *Id.* ¶ 38. Three days later, the Department cancelled contracts that had been awarded for RELs

---

[11] Department employees attempted to persuade leadership "to resuscitate essential contracts and ensure the continuation of NCES's statutory functions," and the Department did "eventually reinstate[] the contract for EDFacts, but with significant cuts." (Doe 9 Decl., ECF No. 61-59 ¶¶ 25–27.)

operation and staff, which the Department characterized as "woke spending." *Id.* ¶ 67. "Because Congress has restricted IES's use of appropriated funds to pay employee salaries, IES relies on external contractors and interagency agreements to complete its statutorily required work," and thus, "on information and belief, the mass termination of contracts, and the mandatory 're-scoping' of remaining contracts, brought many IES functions and programs, including the RELs and research and development for future NAEP assessments, to a halt." *Id.* ¶ 68.

Further, according to Plaintiffs, the March 11 RIF "functionally dismantled" IES by "slash[ing] its staff by about 90%, from nearly 200 to fewer than 20 employees," reducing two subdivisions (NCEE and NCER) to a single employee (their Commissioner), and reducing one subdivision (NCES) to three of its employees. (ECF No. 58 ¶ 44(a).) "On information and belief, this skeletal staff cannot manage the sheer volume of IES's mandatory functions—at least 30 data collections and assessments, hundreds of competitive research grants, and production of public-facing resources." *Id.* ¶ 70.

### 2. *Impact on FSA*

As part of the March 11 RIF, the Department eliminated "the entire Vendor Performance Division of approximately fifty employees," and cut approximately 80% of employees from its School Eligibility & Oversight Service Branch ("SEOS"), including all but two of its eight branches. (ECF No. 58 ¶ 44(b).) As one former employee declared, "[t]here is no way that the 30 remaining SEOS employees can fulfill the statutorily mandated responsibilities described above for over 5,500 schools." (Doe 4 Decl., ECF No. 61-53 ¶ 29.) Finally, the Department also cut more than half of its Ombudsman's Office (of approximately 63 staff), abolishing its Community Support Division, and the Operation and Quality Branches of the Intake Division. (ECF No. 58 ¶ 85; Gittleman Decl., ECF No. 61-71 ¶ 4.)

### 3.  *Impact on OCR*

As part of the March 11 RIF, the Department closed seven regional OCR offices, which handled about 50% of OCR's open cases.  (ECF No. 58 ¶ 95.)  Plaintiffs urge that, in so doing, Defendants "have gutted the Department's ability to enforce federal civil rights laws by decimating OCR's regional enforcement structure and saddling the remaining offices and staff with untenable caseloads."  *Id.*  Plaintiffs assert that shifting responsibility of OCR cases to remaining enforcement staff will result in high caseloads and intake burdens.  (ECF No. 58 ¶ 95; Doe 6 Decl., ECF No. 61-55 ¶ 18; Doe 12 Decl., ECF No. 61-64 ¶¶ 10, 13.)  These cuts have, in Plaintiffs' (and the offered declarants') estimation, destroyed OCR's ability to fulfill its statutory obligations. (ECF No. 61-1 at p. 15; Doe 5 Decl., ECF No. 61-54 ¶¶ 18, 20; Doe 10 Decl., ECF No. 61-62 ¶ 21; Doe 12 Decl., ECF No. 61-64 ¶ 17; Gonzales Decl., ECF No. 61-72 ¶ 36; Lhamon Decl., ECF No. 61-86 ¶ 32; Ortiz Decl., ECF No. 61-95 ¶ 25.)

### 4.  *Impact on Formula and Competitive Grants*

As discussed above, IES programs "collect the data necessary to study education systems, provide guidance to states and school districts, develop and implement policy initiatives, and distribute federal formula grants, among other mandatory functions."  (ECF No. 58 ¶ 63.)  Thus, "[b]y gutting the Department's data infrastructure, Defendants have left the agency unable to collect the necessary data for future formula grant allocations and performance monitoring."  *Id.* ¶ 109.

As an example, Plaintiffs point to Title I-A of the ESEA, with grants programs funded by Congress that "serve an estimated 26 million students in nearly 90% of school districts and nearly 60% of all public schools, including more than 500 schools in Maryland, where Plaintiffs' members work and learn."  (ECF No. 58 ¶ 27(b).)  Plaintiffs allege:

> By gutting the Department's data infrastructure, Defendants have left the agency unable to collect the necessary data for future formula grant allocations and performance monitoring. On information and belief, Defendants eliminated all of the NCES staff who worked on formula grant data and related collections, all of the data specialists in grant-making offices, and the key contracts and interagency agreements to produce custom data indicators. This will force the Department to use incorrect and outdated inputs in future calculations, with the effects of distorting state and district awards and producing mistaken eligibility determinations.

*Id.* ¶ 109.

With respect to competitive grant programs, in the beginning of February 2025, Defendants terminated 104 of 109 recipients of open SEED and TQP awards, noting that the projects related to diversity, equity, and inclusion ("DEI") initiatives and were no longer consistent with Department priorities. (ECF No. 58 ¶ 125.) "Defendants' blanket cancelation of virtually every SEED, TQP, and TSL grant award in effect shuttered the programs entirely, without any plan to fund program activities." *Id.* ¶ 127. Relatedly, on February 17, 2025, the Department terminated competitive grants, "totaling 'over $600 million,' awarded . . . to support teacher preparation and professional development." *Id.* ¶ 40. "On information and belief, the terminations cut all or nearly all grant awards in the affected programs, such that the programs functionally ceased to exist." *Id.* Defendants similarly terminated 200 of about 260 SBMH and MHSP grant awards on April 29, 2025. (ECF No. 58 ¶ 135; Wall Decl., ECF No. 61-108 ¶¶ 19–21.) According to Plaintiffs, these grant awards were terminated without required individualized analysis and otherwise contrary to law. (ECF No. 58 ¶¶ 125, 129, 138.)

### 5. *Resulting Harm to Plaintiffs*

Plaintiffs allege myriad harms resulting from Defendants' actions. The court addresses here the two general categories of harms Plaintiffs rely upon in their present briefing. Plaintiffs allege harms that have resulted (and will continue to result) from Defendants' actions to

discontinue SBMH and MHSP grant programs and effect the March 11 RIF.  With regard to the

mental health grant programs, Plaintiffs allege:

> 145. NEA members also participated in SBMH and MHSP grant programs nationwide. PGCEA members, and NEA members in Anne Arundel and Montgomery County, Maryland schools, benefited from the STAR Project, an MHSP grant to recruit and retain culturally and linguistically diverse school counselors and school psychologists. The grant funded tuition reimbursement for students, recruitment efforts, and mentoring and practicum programs. Members in all three districts received training, professional development, and compensation for their work as mentors and intern or practicum supervisors in the Project that is now in jeopardy.
>
> 146. NEA members have been similarly impacted. At least fourteen NEA affiliates have reported harms to members due to the termination of SBMH grants including Crystal Lake Elementary Teachers' Association (Illinois), whose district lost funding for 12 positions, including 11 social workers or counselors; the Eureka Teachers Association (California), whose district lost funding for 7 mental health service providers; the La Mesa-Spring Valley Teachers' Association (California), whose district lost funding for 30 mental health professionals who staffed a Parent Empowerment program and after-school programming for students; and the Lemon Grove Teachers Association (California), whose district lost funding for two new social worker positions. The loss of these positions harms students and staff and is contrary to Congress's direction.

(ECF No. 58 ¶¶ 145–46.)  Further, NEA and NEA affiliate members have been impacted by the

discontinuation of these grants, resulting, for example, in cuts of their grant-funded positions.

(ECF No. 61-37 ¶¶ 47–49.)

Further, Plaintiffs contend "[t]he dismantling of OCR has already harmed Plaintiffs and

their members."  (ECF No. 58 ¶ 97.)  For example, Lubbock NAACP "work[s] to ensure

educational equality and eliminate racial hatred and discrimination," and it specifically "rel[ies]on

the Department's work, and particularly OCR, in pursuing these aims."  *Id.* ¶ 14.  It "has active

OCR complaints challenging two West Texas school districts' failure to effectively stop and

prevent racial bullying and harassment of Black students and imposition of inappropriate and harmful discipline against those students." *Id.* ¶ 97. These complaints were pending in OCR's Dallas regional office that was closed on March 11, 2025. *Id.* Since then, "there have not been any substantive improvements or remedies for the ongoing discrimination." *Id.* NAACP members further allege delays in their OCR complaints, with Plaintiff Jane Doe 1 (mother of C.E.) receiving little information on her pending complaint of disability discrimination and retaliation against her son that resulted in his involuntary transfer to a different high school, academic regression, and loss of education progress. (ECF No. 58 ¶ 97; ECF No. 61-66 ¶¶ 6–7, 16.)

## II.     LEGAL STANDRD

### A.  Federal Rule of Civil Procedure 12(b)(1)

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 176 (D. Md. 2019) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)). "In determining whether jurisdiction exists, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue.'" *Id.* (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003)).

Subject matter jurisdiction challenges may proceed in two ways: "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). In a facial challenge,

"the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same). Conversely, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. "In that circumstance, the court 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

Defendants here mount a series of challenges to the court's exercise of jurisdiction. Where the challenges raised include standing and ripeness, the court considers materials outside the pleadings. *See United States ex rel. Fadlalla*, 402 F. Supp. 3d at 176, *supra*; *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (noting "it is within the trial court's power to allow or to require the plaintiff to supply . . . by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing"); *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 293–94 (4th Cir. 2022) (quoting *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 208 (4th Cir. 2022)) (noting that "because ripeness is peculiarly a question of timing, [courts] may look to factual developments that occurred after the complaint was filed to determine whether [the plaintiff]'s claims were ripe for review at the time of the district court's judgment").

### B. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Papasan v. Allain*, 478 U.S. 265, 283 (1986)). To survive a motion to

dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citation modified) (quoting *Twombly,* 550 U.S. at 555, 570). The plausibility requirement is not "a probability requirement but rather a mandate that a plaintiff 'demonstrate more than a sheer possibility that a defendant has acted unlawfully." *In re Birmingham*, 846 F.3d at 92 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)). Reliance on "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

In their Motion, Defendants mount both jurisdictional and plausibility challenges. Prior to their jurisdiction challenges, however, Defendants advance preliminary argument that the Supreme Court's preliminary injunctions stays entered in *Department of Education v. California*, 604 U.S. 650 (2025), and *New York v. McMahon*, 606 U.S. —, 145 S. Ct. 2643 (2025), support dismissal of the instant action. (ECF No. 92-1 at pp. 4–5.) The court disagrees. While the court previously found Plaintiffs had not met the high burden to win their requested preliminary injunctive ("PI")

22

relief, in part in view of the stays (*see* ECF No. 86), the stays do not present the same barrier here for multiple reasons.

First, this matter is now before the court on a motion to dismiss, not a motion for preliminary injunction—requiring application of a vastly different standard (and, although not material here, the Fourth Circuit recently vacated its decision from which this court drew in part on the standard it applied to the PI motion).[12]  Further, the Supreme Court and Fourth Circuit have since provided guidance on how district courts should consider the precedential value (if any) of Supreme Court stays.  The Fourth Circuit positively cited Justice Gorsuch's opinion:

> Of course, decisions regarding interim relief are not necessarily "conclusive as to the merits" because further litigation may follow. *Trump* v. *Boyle*, 606 U. S. ——, 145 S.Ct. 2653, 2654, —— L.Ed.2d —— (2025). But regardless of a decision's procedural posture, its "reasoning—its *ratio decidendi*"—carries precedential weight in "future cases." *Ramos v. Louisiana*, 590 U.S. 83, 104, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) (opinion of GORSUCH, J.); see also *Bucklew v. Precythe*, 587 U.S. 119, 136, 139 S.Ct. 1112, 203 L.Ed.2d 521 (2019) ("[J]ust as binding as [a] holding is the reasoning underlying it"). And *California*'s reasoning was clear. There, the Court explained that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money . . . .  Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States." 604 U. S., at 651, 145 S.Ct., at 968 (internal quotation marks omitted). That reasoning binds lower courts as a matter of vertical *stare decisis*.

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. — , 145 S. Ct. 2658, 2663–64 (2025) (Gorsuch, J., concurring in part and dissenting in part); *see Sustainability Inst. v. Trump*, 165 F.4th 817, 826 (4th Cir. 2026) (referencing same).  The court has endeavored to do as instructed in

---

[12] Fourth Circuit precedent that this court relied upon in part in ruling on the PI motion has since been abrogated. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 366 (4th Cir. 2026) ("Better, we think, to stick with the traditional approach. Consistent with *Winter*, we reiterate that plaintiffs seeking a preliminary injunction must show they are likely to succeed on the merits of their lawsuit. Plaintiffs need not clear a different or additional hurdle in cases involving multiple issues or defenses. All statements to the contrary in *AFT* are abrogated.").

addressing Defendants' arguments here.  For the reasons set forth below, however, the court does not find that the Supreme Court's stays referenced by Defendants support dismissal of Plaintiffs' claims.

The court now turns to Defendants' arguments that the court lacks jurisdiction to hear this case.  The arguments include: (1) Plaintiffs lack standing; (2) Plaintiffs' grant- and contract-related cancellation claims must be channeled through the Tucker Act, 28 U.S.C. § 1491; (3) Plaintiffs' RIF-related claims must be channeled through the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101, *et seq.*; (4) Plaintiffs' APA claim fails because they do not seek review of a discrete final agency action and the challenged actions are committed to agency discretion by law;[13] and (5) Plaintiffs' claims related to closure of the Department are not ripe.  (ECF No, 92-1 at pp. 6–21.)

### A. Standing

The Constitution extends the judicial power of Article III courts to "cases" or "controversies."  U.S. CONST. ART. III, § 2, cl. 1.  The doctrine of standing, among others, "implements" this limit.  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  In particular, this doctrine requires "a plaintiff to have a 'personal stake' . . . in the suit he brings."  *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 420 (4th Cir. 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "Federal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law.'"  *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)).  "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," "do not possess a roving commission to publicly opine on every legal question,"

---

[13] Although Defendants assert the agency discretion exception as a plausibility challenge, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

"do not exercise general legal oversight of the Legislative and Executive Branches," and "do not issue advisory opinions." *TransUnion*, 594 U.S. at 423–24.

To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Requiring a plaintiff to demonstrate these three elements 'ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separated government.'" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *27 (4th Cir. Apr. 30, 2025) (quoting *TransUnion LLC*, 594 U.S. at 423). It is well-recognized that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431 (first citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); then citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). Importantly, Plaintiffs bear the burden to establish their standing.[14] *Lujan*, 504 U.S. at 561.

Regarding an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504

---

[14] "If at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006)); *Bost v. Illinois State Bd. of Elections*, 607 U.S. —, 146 S. Ct. 513, 519 (2026) (citing same).

U.S. at 560). This requirement "prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339. A concrete injury is one that is "'real,' and not 'abstract.'" *Id.* at 340. The injury-in-fact requirement works to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 368. Common examples of injuries in fact include "a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." *Id.* at 381. "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citations omitted) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). But a theory of standing that "relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

"The second and third requirements, causation and redressability, are usually 'flip sides of the same coin.'" *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 380). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Id.* (quoting *TransUnion*, 594 U.S. at 423). This is because where "a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 381). While "redressability 'can still

pose an independent bar in some cases,' . . . 'the two key questions in most standing disputes are injury in fact and causation.'"  *Id.* (quoting *Alliance for Hippocratic Medicine*, 602 U.S. at 381, n.1).

The causation requirement "ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court."  *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)).  While the complained of injury cannot be "the result of the *independent* action of some third party not before the court,'" *see Bennett v. Spear*, 520 U.S. 154, 169 (1997) (emphasis in original) (citation modified) (quoting *Lujan*, 504 U.S. at 560–61), this element "does not require the challenged action to be the sole or even immediate cause of the injury."  *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018).

In turn, the redressability element "ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury."  *Sheppheard*, 143 F.4th at 243 (citing *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020)).  The court looks to "the relationship between 'the judicial relief requested' and the 'injury' suffered."  *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen*, 468 U.S. 753 n.19).  A plaintiff "must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth*, 528 U.S. at 181).

Organizational Plaintiffs—here, NAACP, NEA, PGCEA, and AFSCME Council 3—"can demonstrate Article III standing 'either in [their] own right or as a representative of [their] members.'"  *Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at*

*Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)).  The former is referred to as organizational standing, and the latter is referred to as representational or associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 2025 WL 1249608, at *28.  When asserting injuries sustained by the organization itself, an organization must "make the necessary showing to demonstrate . . . an injury-in-fact, caused by the defendant, that can be redressed by a favorable decision from the court."  *Pub. Int. Legal Found., Inc. v. Wooten*, 164 F.4th 362, 366 (4th Cir. 2026) (quoting *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395 (4th Cir. 2024)).   When asserting representational standing, an organization must instead demonstrate: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).  An organization need only "make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *S. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184 (emphasis omitted) (quoting *Summers*, 555 U.S. at 498).

For the reasons set forth below, the court finds Plaintiffs sufficiently demonstrate standing to bring their claims.[15]

---

[15] The court notes, as a general matter, that some of Defendants' standing arguments are more properly understood as challenges to the underlying merits of Plaintiffs' claims.  Such challenges are not compelling.  "Courts 'must not confuse standing with the merits,' and [a plaintiff's] standing to bring a case 'does not depend upon [its] ultimate success on the merits underlying [its] case.'" *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 589 (4th Cir. 2025) (quoting *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007)).  Instead, the court "accept[s] as valid the merits of [a plaintiff's] legal claims,' . . . so long as they are plausible on their face." *Id.* (first quoting *Fed. Elec. Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); and then citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### 1. Asserted Injuries from Discontinuation of the Grants for Mental Health Programs

The court first turns to Plaintiffs' asserted injuries related to the *en masse* discontinuation of the SBMH and MHSP grants. (ECF No. 96 at p. 9; ECF No. 58 ¶¶ 140, 145–46.) Plaintiffs proceed on a theory of representational standing.[16] They assert:

> 145. NEA members also participated in SBMH and MHSP grant programs nationwide. PGCEA members, and NEA members in Anne Arundel and Montgomery County, Maryland schools, benefited from the STAR Project, an MHSP grant to recruit and retain culturally and linguistically diverse school counselors and school psychologists. The grant funded tuition reimbursement for students, recruitment efforts, and mentoring and practicum programs. Members in all three districts received training, professional development, and compensation for their work as mentors and intern or practicum supervisors in the Project that is now in jeopardy.

> 146. NEA members have been similarly impacted. At least fourteen NEA affiliates have reported harms to members due to the termination of SBMH grants including Crystal Lake Elementary Teachers' Association (Illinois), whose district lost funding for 12 positions, including 11 social workers or counselors; the Eureka Teachers Association (California), whose district lost funding for 7 mental health service providers; the La Mesa-Spring Valley Teachers' Association (California), whose district lost funding for 30 mental health professionals who staffed a Parent Empowerment program and after-school programming for students; and the Lemon Grove Teachers Association (California), whose district lost funding for two new social worker positions. The loss of these positions harms students and staff and is contrary to Congress's direction.

(ECF No. 58 ¶¶ 145–46.) Plaintiffs also provide evidence of NEA affiliate members impacted by the termination of the SBMH grants, including resultant cuts to NEA member grant-funded positions, and pertaining to NEA members who "have been and will continue to be affected by the mass termination of MHSP grants." (ECF No. 61-37 ¶ 48–49.)

---

[16] Plaintiffs previously asserted direct harms in their own right based on "pocketbook injury from the actual and imminent elimination of membership position because of lost membership dues." (ECF No. 81 at p. 14.) Plaintiffs do not present this argument in opposition to the Motion; the court constrains its analysis accordingly.

These asserted injuries are sufficient to demonstrate standing of at least one of NEA's members. *See S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184, *supra*. As Plaintiffs note, "a loss of employment and the resulting loss of wages and other benefits . . . are 'classic and paradigmatic' injuries for standing purposes." *DiCocco v. Garland*, 52 F.4th 588, 591–92 (4th Cir. 2022) (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)). Defendants contend, however, that these harms are "attenuated":

> Plaintiffs grant- and contract-related attenuated harms all flow from a third party – a grantee or contractee – losing its grant or contract and then, having lost that source of income, chosen to not furnish Plaintiffs with a benefit. But this was a choice made by the third party. And should the Plaintiffs ultimately prevail on their claims, it is by no means certain that these harms will be redressed – the contractee or grantee may not want to participate in the program, or they may not use the funds received to provide the benefits that Plaintiffs allege that they have lost.

(ECF No. 92-1 at pp. 7–8.)

Defendants neglect the allegations and evidence provided by Plaintiffs to support that these grants awards were used to fund positions and services that will be not funded and/or have been discontinued. *See, e.g.*, Bilal-Threats Decl., ECF No. 61-37 ¶¶ 47–49 (detailing injuries to NEA members whose salaries were funded by mental health grant awards); Vinson Decl., ECF No. 61-106 ¶¶ 28–29, 34–35 (detailing reliance on funds "to pay salaries and benefits" and "to fill two of the full-time social worker positions that were funded through the SBMH grant" that it will not receive); Christy Decl., ECF No. 61-40 ¶¶ 21, 33 (detailing that termination of the SBMH grant will result in loss of staff positions at the end of the current budget period in Prince George's County Public Schools). Plaintiffs allege that concrete injuries have resulted, and will result, from Defendants' actions broadly to discontinue the SBMH and MHSP grant awards—and they offer specific facts in support of these allegations.

30

Causation and redressability are similarly satisfied. It is not impossible to establish standing "where a causal relation between injury and challenged action depends upon the decision of an independent third party." *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195 (4th Cir. 2026) (quoting *California*, 593 U.S. at 675). Where a plaintiff "allege[s] that the defendants' actions had a 'predictable effect . . . on the decisions of third parties,' . . . or when the 'injury [was] produced by determinative or coercive effect upon the action of someone else,'" the causation requirement is satisfied. *Id.* (first quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); and then quoting *Bennett*, 520 U.S. at 169). That is the case here: Plaintiffs' standing does not rest on mere speculation about how third parties have operated; rather, they allege (and offer evidence) that the predictable effect of Defendants' actions on the decisions of those third parties is the loss of positions and services. *See Dep't of Com.*, 588 U.S. at 768. In this same vein, action to remedy the purportedly discontinuation cancellation of these grants would cure Plaintiffs' injuries.

On this point, the court addresses Defendants' challenge that "Plaintiffs lack standing to enforce the rights of nonparties." (ECF No. 92-1 at p. 8.) Indeed, on Plaintiffs' PI motion, the court similarly expressed concern that a non-party to a contract typically does not have standing to sue to enforce a contract (*e.g.*, to obtain order that funds be restored pursuant to the grant award contracts). The court's related findings at that stage, however, turned (of course) on the present state the law applicable to Plaintiffs' requested relief.

First, Plaintiffs' burden as to standing on a motion to dismiss is considerably lighter than on a PI motion:

> Of especial relevance here, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (citation modified). In that regard, although a plaintiff is required to allege

31

"nonconclusory factual details" in the complaint, our Court has recognized that this requirement is "tempered by the recognition that a plaintiff may only have so much information at [his or her] disposal at the outset" of litigation. *See Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012).

Moreover, a federal court is obliged to analyze the issue of Article III standing "differently depending on the stage of the litigation at which the challenge is brought and the substance of the defendant's arguments." *See Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 212 (4th Cir. 2017). At the motion to dismiss stage, the Supreme Court has characterized the *Lujan* standing requirements as being "relatively modest." *See Bennett v. Spear*, 520 U.S. 154, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). And that is particularly so as it relates to traceability. *See DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (recognizing that "[a]t the motion-to-dismiss stage, [the traceability] burden is relatively modest . . . and lower than the causation showing required to prevail in a tort suit"); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ("Proximate causation is not a requirement of Article III standing[.]").

*Lowy*, 167 F.4th at 194.

Further, the Fourth Circuit has since issued a decision discussing the Tucker Act in the context of *en masse* grant terminations by the Executive, *see Sustainability Inst. v. Trump*, 165 F.4th 817, 827 (4th Cir. 2026), and provided guidance on the interpretation of the Supreme Court's interim orders, including the one in *California*.[17] This new authority informs the court's analysis under the Tucker Act (as set forth below), but does not support Defendants' contention that Plaintiffs lack standing.

---

[17] Additionally, on the PI motion, the court's concern stemmed in large measure from the Fourth Circuit's stay of this court's preliminary injunction entered in *AACTE v. McMahon*, 770 F. Supp. 3d 822, 856 (D. Md. 2025), which injunction provided, in part, the very relief Plaintiffs sought in their PI motion. AACTE's appeal to the Fourth Circuit was held in abeyance pending decision of the Fourth Circuit in *The Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. Case No. 25-1281, Dkt. 50). As discussed below, in *The Sustainability Institute,* the Fourth Circuit ultimately concluded that the relief sought, which related to freezing or terminating grants *en masse*, was "was sufficiently contractual to trigger the Tucker Act." 165 F.4th 817, 828 (4th Cir. 2026).

32

Many other courts have considered whether a plaintiff has standing to challenge the Executive's cancellation of a contract or grant (under a contract) where the plaintiff is not a party to the contract but claims to suffer direct consequences as a result of the cancellation. Many well-reasoned opinions have concluded that a plaintiff's non-contractee status does not impair or impede standing where the plaintiff otherwise meets the essential standing requirements. *See, e.g.*, *Thakur v. Trump*, 787 F. Supp. 3d 955, 993 (N.D. Cal. 2025) (rejecting Government argument that "because Plaintiffs [were] not parties to or 'intended beneficiaries' of the grant agreements that funded their projects, they cannot have standing"); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 146 (D.D.C. 2025) (rejecting Government argument that "plaintiff failed to allege any injury traceable to [the section at issue] by not specifically alleging being party to any government contract or currently performing work on any government contract," and explaining "[w]hether plaintiff itself is directly a signatory to a federal government contract is immaterial if plaintiff sufficiently pleads injury-in-fact traceable to [the section at issue] and redressable by the injunctive relief requested by performing work for clients holding or seeking to hold federal government contracts"); *President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 110–11 (D. Mass. 2025) (finding standing of organizational plaintiffs based on member harms and reasoning that "[a]lthough the Court recognizes that Defendants' actions ultimately impact grant agreements that are awarded, in name, to the 'President and Fellows of Harvard College,' . . . the notion that the resultant harm to professors and graduate students is at best speculative or attenuated is divorced from the reality of how federal research grants function"); *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 204 (D.D.C. 2025) (finding association had standing where its "individual members . . . have standing because

they were employed by grant recipients and were let go because their employers lost grant funding").[18]

Based on the foregoing, and in view of the allegations and evidence Plaintiff's offer, the state of the law, as well as the present posture of this case, the court finds that Plaintiffs' non-contractee status neither impairs nor impedes their standing to challenge, and seek relief from, Defendants' actions to discontinue the SBMH and MHSP grant awards.

Finally, while Defendants do not address the representational standing factors, the court is satisfied they are met. *See Students for Fair Admissions*, 600 U.S. at 199, *supra*. At issue here, NEA's mission "is to advocate for education professionals and to unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world." (ECF No. 58 ¶ 18.) The members' "interests in continued employment are plainly germane" to NEA's "purpose as a labor union advocating on its members' behalf." *See Harris Cnty.*, 786 F. Supp. 3d at 204. Further, where, as here, organizational Plaintiffs "seek prospective or injunctive relief for [their] members," individual participation "is not normally necessary." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343).

In view of the foregoing unrefuted evidence, and the "relatively modest" standing burden on a motion to dismiss, Plaintiffs demonstrate standing based on their injuries from the SBMH and MHSP grant cancellations.[19] *See Lowy*, 167 F.4th at 195–96, *supra*.

---

[18] It also bears mention that this court's memorandum opinion on the PI motion, and the case referenced therein, *American Educational Research Association v. Department of Educ.*, No. CV SAG-25-1230, 2025 WL 1665401, at *5 (D. Md. June 12, 2025), addressed concerns of standing as related to the requested preliminary injunctive relief, including specific injunctive relief not presently before the court.

[19] This same analysis is applicable to Plaintiffs' claims relating to termination of the grant awards under the competitive grant programs, including SEED, TQP, and TSL grants—as Plaintiffs allege (and offer unrefuted evidence) that their members have been injured, or imminently will be injured, in the form of loss of positions by the *en masse* termination of these grant awards. (ECF No. 61-37 ¶¶ 35–42; ECF No. 61-78 ¶¶ 21–25; ECF No. 61-91 ¶

### 2. *Asserted Injuries from the March 11 RIF*

The court next considers Plaintiffs' asserted injuries related to the March 11 RIF, specifically focusing on the injury caused by the March 11 RIF at OCR. (ECF No. 96 at p. 15–20.) Organizational Plaintiffs assert both organizational and representational standing with regard to these asserted harms.

As to organizational injury, Plaintiffs assert that Lubbock NAACP "work[s] to ensure educational equality and eliminate racial hatred and discrimination," and it specifically "rel[ies]on the Department's work, and particularly OCR, in pursuing these aims." (ECF No. 58 ¶ 14.) It "has active OCR complaints challenging two West Texas school districts' failure to effectively stop and prevent racial bullying and harassment of Black students and imposition of inappropriate and harmful discipline against those students." *Id.* ¶ 97. These complaints were pending in OCR's

21.) Again, Plaintiffs' allegations and theory of the case support that the loss of these positions is a predictable result of Defendants' actions. *See Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195 (4th Cir. 2026).

Plaintiffs separately address their standing related to the March 11 RIF's impact on IES. The court remains unpersuaded based on causation and redressability. Plaintiffs claim they are injured because IES plays an essential role in administering formula grants, that they lack the necessary workforce to collect and compute key data points related to same, that inaccurate data will be used in statutory allocation formulas, and that it will significantly shift recipients' formula grant awards, resulting in injury to Plaintiffs (primarily) in the form of lost position funding. (ECF No. 96 at pp. 18–20.) Unlike the competitive grant programs, where lost position funding is alleged to be the predictable culmination of the Department's termination or where a discontinued grant award directly funded a particular position, the tether here is too attenuated. The alleged injuries rely on too many contingencies—that IES will not be able to carry out its statutorily mandated functions for collection and computation of data necessary to administer formula grants; that the Department will then plug outdated and inaccurate data into the statutory allocation formulas; that States and school districts will then not receive sufficient funds; and States and school districts will then fail to fund jobs of NEA's members. (ECF No. 58 ¶¶ 62–70, 102, 104–108.) This is the type of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Another material impediment to standing here is, as Plaintiffs readily point out, States and school districts are making decisions and taking action in the face of financial uncertainty—*i.e.*, making budget choices in anticipation of funding shortages. (ECF No. 58 ¶¶ 57, 115.) This raises concerns about whether the relationship between the challenged action and Plaintiffs' alleged RIF-related injuries "depends upon the decision of an independent third party." *See Lowy*, 167 F.4th at 195. Relatedly, it also kicks up a redressability problem; even were the court to grant the requested relief, it is pure speculation to assert that States and school districts would allocate their funding in a manner to cure the injuries Plaintiffs complain were, and will be, caused by the RIF's impact on IES. In summary, the court is not persuaded Plaintiffs have standing based on injury caused by the March 11 RIF at IES.

35

Dallas regional office that was shuttered on March 11, 2025. *Id.* Since then, "there have not been any substantive improvements or remedies for the ongoing discrimination." *Id.*

Further, Plaintiffs assert harm to NAACP members who have also experienced delays in their OCR complaints. Plaintiff Jane Doe 1 (mother of C.E.) is one such member. *Id.* ¶ 16. She has a pending complaint of disability discrimination and retaliation of her son with OCR's Philadelphia office and "fears the office's closure will deprive her son of meaningful redress." *Id.* Doe's complaint arises from the involuntary transfer of her son to a different high school, resulting in academic regression and loss of education progress. (ECF No. 61-66 ¶¶ 6–7.) She similarly "has received little information about her OCR complaint, which was pending in the now-closed Philadelphia office." (ECF No. 58 ¶ 97.) Jane Doe 1 explains: "I fear that the closure of the Philadelphia regional office and the staff cuts at OCR have stopped my OCR complaint, and that my son will now not get redress for the harms caused to him by the events underlying my OCR complaint. My son is now in his second semester of his senior year, so it is doubtful that the academic regression he suffered as a result of the discrimination will be addressed by the time the school year ends." (ECF No. 61-66 ¶ 16.)[20]

Defendants challenge these asserted harms as "too speculative" to support standing. (ECF No. 92-1 at p. 7.) While perhaps a close call, the court disagrees. As discussed above, Plaintiffs assert injuries (both to the organization itself for Lubbock NAACP and at least one member) arising from delays in adjudication. With regard to Lubbock NAACP's asserted injury, the impact of the March 11 RIF on OCR "perceptibly impairs" Lubbock NAACP's "ability to provide a key component of [its] mission," *see Republican Nat'l Comm. v. N. Carolina State Bd. of Elections,*

---

[20] Further, Hannah Secka, a member of Florence NAACP, filed an OCR complaint against her son's school district, alleging retaliation in the form of initiating litigation against her. (ECF No. 61-101 ¶ 9.) She asserts that, in contrast to her prior interactions with OCR, she "[has] received only a single reply which contained no substantive updates and no indication that my case is still being processed." *Id.* ¶ 19.

120 F.4th 390, 395 (4th Cir. 2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), and "directly affected and interfered with [a] core business activit[y]," *see Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Further, as explained, Jane Doe 1's child reports experiencing discrimination and involuntary transfer resulting in regression and loss of education progress.    (ECF No. 58 ¶¶ 16, 97; ECF No. 61-66 ¶¶ 6–7, 16.)  Plaintiffs contend, and offer unrefuted evidence to support, that the March 11 RIF has impaired OCR's ability to investigate and provide redress for the complained-of discrimination, involuntary transfer and associated education harms Jane Doe 1 attests have befallen her son.  Contrary to Defendants' contention, Plaintiffs' claims do not arise from purported entitlement to a particular investigation outcome; Plaintiffs complain that Defendants' actions have effectively destroyed OCR's ability to carry out its statutorily-mandated functions of which Plaintiffs (and their members) have availed themselves.

Moreover, contrary to Defendants' contention, Plaintiffs' allegations of harm do not rest on mere speculation.  Plaintiff present plausible evidence that the above-described alleged harms are the direct impact of the March 11 RIF at OCR.  And Plaintiffs recite and rely on detailed evidence of deviation from past practice, *see, e.g.*, ECF No. 61-66 ¶¶ 8–15; ECF No. 61-101 ¶¶ 8, 10–19, as well as attestations from OCR employees (both former and, at the time, current) noting the inability to complete the necessary work, *see, e.g.*, ECF No. 61-52 ¶¶ 16–25; ECF No. 61-55 ¶¶ 15–25; ECF No. 61-62 ¶¶ 20–21; ECF No. 61-64 ¶¶ 9–127; ECF No. 61-72 ¶ 38; ECF No. 61-86 ¶ 49.  This unrefuted evidence supports Plaintiffs' claims that they have experienced concrete harms based on the March 11 RIF and that there "is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citations omitted).

Accordingly, Plaintiffs have standing to pursue claims based on their injuries from the March 11 RIF impact at OCR.[21]

### B. Channeling Through the Tucker Act

"The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347). "When [the Tucker Act] applies, [it] 'vest[s] subject matter jurisdiction exclusively in' the Court of Federal Claims." *Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026) (quoting *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983)).

Over the course of the past year, federal courts have repeatedly grappled with appropriate application of the Tucker Act in challenges to alleged Executive overreach. These decisions have been informed (and, to some extent, made more complicated) by Supreme Court stays of preliminary injunctions issued in *Department of Education v. California*, 604 U.S. 650 (2025) and

---

[21] The Supreme Court did not provide substantive analysis as to why it stayed the preliminary injunction in *New York v. McMahon*, 606 U.S. —, 145 S. Ct. 2643 (2025). This court does not presume to know the Justices' minds. Therefore, the *New York* stay carries little precedential weight here. Defendants contend that in "granting Defendants' stay request, the Supreme Court necessarily accepted Defendants' arguments." (ECF No. 92-1 at p. 6.) This is an oversimplification; instead, the Supreme Court's stay demonstrates that Defendants were likely to succeed in a challenge, not necessarily all challenges (or any particular challenge). Further, even considering defense arguments advanced in *New York*, Defendants here make no effort to compare favorably the specific injuries and harms alleged here to those in *New York*—this alone is detrimental to their argument where the standing inquiry is necessarily fact-specific.

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. — , 145 S. Ct. 2658 (2025).  Tucker

Act jurisprudence has thus rapidly evolved and developed over the past year.

The Fourth Circuit's recent decision, discussing Supreme Court stays, summarizes:

> The Supreme Court's recent decisions in *Department of Education v. California* and *National Institutes of Health v. American Public Health Association* are instructive. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, ⸺ U.S. ⸺, 145 S. Ct. 2658, 2664, 222 L.Ed.2d 1191 (2025) (Gorsuch, J., concurring part and dissenting in part) (emphasizing that the "reasoning" of Supreme Court decisions regarding interim relief "binds lower courts as a matter of vertical *stare decisis*"); *see also Trump v. Boyle*, ⸺ U.S. ⸺, 145 S. Ct. 2653, 2654, 222 L.Ed.2d 1181 (2025) (explaining that the Supreme Court's "interim orders ... inform how a court should exercise its equitable discretion in like cases"). In *California*, the district court entered an order on the plaintiffs' APA claims "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." 145 S. Ct. at 968. The Supreme Court stayed the district court's order pending appeal, finding that "the Government [was] likely to succeed in showing that the District Court lacked jurisdiction" to issue the order. *Id.* The Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).
>
> In *National Institutes of Health*, the district court "vacat[ed] the Government's termination of various research-related grants." 145 S. Ct. at 2659. The Supreme Court again stayed the district court's order. *See id.* The Court explained that "[t]he Administrative Procedure Act's limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (internal quotation marks and brackets omitted). The Government was therefore likely to succeed in showing that the district court lacked jurisdiction to enter the order vacating the grant terminations. *See id.*

*Sustainability Inst.*, 165 F.4th at 826.

In considering application of the Tucker Act, the Fourth Circuit explained:

> There is no meaningful difference between the district court's order here and the district court's order in *California.* Like in *California*, the Government here froze or terminated grants *en masse*, allegedly without individualized analysis. *See Sustainability Inst.*, 784 F. Supp. 3d at 870; *California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 77 (D. Mass. 2025) ("The record reflects that there was no individualized analysis of any of the programs . . . "). Like in *California*, Plaintiffs here sought restoration of their specific grants under the APA. *See, e.g.*, J.A. 150–151 (asking the district court to "[p]reliminarily and permanently enjoin Defendants from continuing to freeze or terminating grants or effectuating any termination" and "[p]rohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds"); *see California*, 769 F. Supp. 3d at 80. And like in *California*, that relief is exactly what the district court awarded. *See Sustainability Inst.*, 784 F. Supp. 3d at 871 ("set[ting] aside the freeze and/or termination of Grants 1–26 and 33–38" and "direct[ing] [the Government] to restore Plaintiffs['] access to grant funds immediately"); *California*, 145 S. Ct. at 968 (explaining that the *California* district court "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]"). If the *California* district court lacked jurisdiction to issue its order, it follows that the district court here did as well. And our conclusion is further confirmed by the Supreme Court's subsequent decision in *National Institutes of Health. See* 145 S. Ct. at 2659 (explaining that the APA "does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants" (internal quotation marks omitted)).

*Id.* at 826–27. The Fourth Circuit rejected the plaintiffs' attempts to distinguish their claims from those in *California* and *National Institutes of Health*, including argument that their claims arise from the Constitution and federal statute, as opposed to contracts, and that their claims are not contractual in nature because they sought forward-looking injunctive and declaratory relief. The Fourth Circuit explained:

40

> We see no meaningful distinction between the relief ordered here and the relief ordered in those cases, which the Supreme Court determined was sufficiently contractual to trigger the Tucker Act. The relief Plaintiffs sought and the relief the district court gave them was the reinstatement of their grants. That is "the classic *contractual* remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (emphasis added)[.]

*Id.* at 828.

This binding authority supports that, if—relevant here—Plaintiffs were grant recipients, any request for judicial relief (even forward-looking injunctive and declaratory relief) that includes reinstatement of grant awards would seemingly trigger the Tucker Act. But this case presents a different circumstance for a simple reason: Plaintiffs are not grant recipients.[22] Because Plaintiffs are not parties to the underlying contracts, the court is not persuaded the Tucker Act bars its consideration of their claims. "[T]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting *Ransom v. United States,* 900 F.2d 242, 244 (Fed. Cir. 1990)). This is "the sine qua non of jurisdiction in the Court of Federal Claims" for claims arising under the Tucker Act. *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) (citing *Erikson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed. Cir. 1984)).

Although not at issue in the Fourth Circuit's analysis in *Sustainability Institute*, that Plaintiffs are not parties to the contracts at issue also supports that their claims are not essentially contractual in nature. *See* 165 F.4th at 825; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). *Cf. Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937 (9th Cir. 2025) ("[C]ontrary to the Government's argument, plaintiffs' APA

---

[22] While Plaintiffs' arguments on this point focus on the SMBH and MHSP grant cancellations, the same analysis is applicable to the cancellation of the TQP, SEED, and TSL grant awards.

claims are based on the Government's statutory and regulatory violations, not any government contract. In fact, no contract exists between plaintiffs and the Government. Instead, the Government has entered into a nationwide agreement with an organization called Acacia, who in turn subcontracts with legal service providers such as plaintiffs.").

Accordingly, where Plaintiffs are not parties to the contracts at issue, and are thus barred from asserting claims under the Tucker Act, the Act does not divest this court of jurisdiction.

### C. Channeling Through the CSRA

The CSRA "establish[s] a comprehensive system for reviewing personnel action taken against federal employees." *State of Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 215 (4th Cir. 2025) (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5–6 (2012)). It provides a means for "certain federal employees [to] obtain administrative and judicial review of specified adverse employment actions." *Elgin*, 567 U.S. at 5. Reviewable agency actions include "removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less." *Id.* at 6 (citing 5 U.S.C. § 7512).

At issue here, "[a] special statutory review scheme, [the] Court has recognized, may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Importantly, however, "a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action." *Id.* District courts consider the two-step farmwork set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), "to assess whether Congress divested the district courts of jurisdiction to hear challenges to federal agency action." *Maryland v. United States Dep't of Agric.*, 777 F. Supp. 3d 432, 462 (D. Md. 2025), *vacated and remanded sub nom. State of Maryland*

*v. United States Dep't of Agric.*, 151 F.4th 197 (4th Cir. 2025); *see Nat'l Ass'n of Immigr. Judges ("NAIJ") v. Owen*, 139 F.4th 293, 304 (4th Cir. 2025) (discussing same).

At the first step, the court considers "whether Congress's intent to preclude district court jurisdiction is 'fairly discernible in the statutory scheme.'" *NAIJ*, 139 F.4th at 304 (quoting *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 181 (4th Cir. 2016)). The court "look[s] to the statute's language, structure, and purpose to assess whether Congress intended to funnel covered federal employees' claims through the CSRA's administrative scheme, stripping district courts of jurisdiction." *Id.* At the second step, courts must determine whether the "claims are of the type Congress intended to be reviewed within this statutory structure." *Id.* (quoting *Thunder Basin Coal*, 510 U.S. at 212). The court considers three factors on this point: (1) "whether the statutory scheme 'foreclose[s] all meaningful judicial review,'" (2) "the extent to which the [plaintiff's] claims are 'wholly collateral' to the statute's review provisions," and (3) "whether 'agency expertise could be brought to bear on the . . . questions presented.'" *Id.* (quoting *Thunder Basin Coal*, 510 U.S. at 212–13, 215). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'" *Axon Enter.*, 598 U.S. at 186 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)).

As to the first step of the *Thunder Basin* test, the court notes, as the Supreme Court, Fourth Circuit, and this court have previously, that the CSRA, "when functioning as Congress intended, was designed to strip district courts of jurisdiction." *NAIJ*, 139 F.4th at 304; *see also United States v. Fausto*, 484 U.S. 439, 452 (1988); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 553 (D. Md. 2025); *Maryland*, 777 F. Supp. 3d at 462. The court is not persuaded, however, at the second step, that the claims here "are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal*, 510 U.S. at 212.

Plaintiffs' claims are plainly not "of the type Congress intended to be reviewed within this statutory structure." *Id.* By its statutory language, the CSRA does not apply to Plaintiffs, who are neither federal employees nor unions of or for federal employees. *See, e.g.*, 5 U.S.C. § 7103(a)(1), (2). As they have in other cases, Defendants contend here that the CSRA provides "the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions," *see* ECF No. 92-1 at p. 9, but Defendants "do not cite to any authority supporting that 'other interested parties' are subject to the CSRA or define who these 'other interested parties' are."[23] *Elev8 Baltimore*, 804 F. Supp. 3d at 553 (quoting *New York v. McMahon*, 784 F. Supp. 3d 311, 347 (D. Mass. 2025))); *see also Does 4, 7, 22, 27, 28, & 29 v. Musk*, No. CV 25-0462-TDC, 2025 WL 2346258, at *7 (D. Md. Aug. 13, 2025), *motion to certify appeal denied sub nom.*, 2026 WL 242062 (D. Md. Jan. 29, 2026) ("[T]he Court finds that the CSRA does not provide for meaningful judicial review of Plaintiffs' claims. Specifically, as alleged in the Second Amended Complaint, Plaintiffs' claims, and their injuries, flow not from any specific employment action, but from the decision to dismantle and abolish USAID entirely."); *Wiley v. Kennedy*, 789 F. Supp. 3d 447, 464 (S.D.W. Va. 2025) ("It is patently absurd to suggest that an illegal agency action that includes termination of employees is unreviewable. That federal law provides a different procedural avenue for relief for employees aggrieved by the unlawful closure of these programs is irrelevant to the relief available to other stakeholders. Firing people does not insulate arbitrary and capricious agency action from review.").

---

[23] Defendants cite page 455 of *United States v. Fausto*, 484 U.S. 439 (1988), to support this proposition. (ECF No. 92-1 at p. 9.) *Fausto*, however, concerned a federal employee. 484 U.S. at 440. Further, the portion of the opinion referenced provides: "The CSRA established a comprehensive system for reviewing personnel action taken against federal employees." *Id.* at 455. That case is inapposite.

Defendants urge that courts have "repeatedly rejected these sorts of end runs" around the CSRA. (ECF No. 92-1 at p. 10.) Defendants mistake the point. Where the plain language of the CSRA bears no applicability to Plaintiffs, permitting them to proceed (where the court has found they have sufficiently established standing) is not an end run around anything. The plain language of the CSRA reflects no intent of Congress to channel their claims through the CSRA. It simply does not apply here.

Beyond that, Plaintiffs' claims—rooted in their contention that Defendants have exceeded the bounds of their constitutional authority in their decisions and acts to facilitate closure of the Department—are "sufficiently distinct from the employee- and union-focused harms Congress intended to channel away from the district courts." *Maryland*, 777 F. Supp. 3d at 463; *see New York*, 784 F. Supp. 3d at 348 (D. Mass. 2025) (finding same).

The CSRA does not extend to Plaintiffs, nor does it evince Congress's intent to channel the types of claims at issue away from district courts. The CSRA does not, therefore, foreclose judicial review of Plaintiffs' claims by this court.[24]

---

[24] Defendants offer cursory argument that channeling Plaintiffs' claims through the CSRA "does not foreclose the RIF from meaningful judicial review," because Plaintiffs would have the opportunity to intervene "to the extent the [RIF] may affect Plaintiffs' rights or duties." (ECF No. 92-1 at p. 12.) In making this assertion, Defendants rely upon a regulation related to the Federal Service Labor-Management Relations Statute, which, they say, may provide an option for Plaintiffs. 5 U.S.C. §§ 7101–7135. As the D.C. Circuit recently explained:

> The Federal Service Labor-Management Relations Statute (Statute), 5 U.S.C. §§ 7101–7135, "grants federal agency employees the right to organize, provides for collective bargaining, and defines various unfair labor practices." *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 783 (D.C. Cir. 2010). Every federal agency must meet and negotiate in good faith with the chosen representative of employees covered by the Statute. 5 U.S.C. § 7114(a)(4); *Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 644, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990). If a federal agency or labor organization fails "to consult or negotiate in good faith" with its counterpart, it commits a statutory unfair labor practice (ULP). 5 U.S.C. § 7116(a)(5) and (b)(5).

*Fed. Educ. Ass'n Stateside Region v. Fed. Lab. Rels. Auth.*, 104 F.4th 275, 278 (D.C. Cir. 2024). Whether intervention is permitted in such matters bears no relevance whatsoever upon the facts here, which are not concerned with unfair labor practices or collective bargaining.

### D. Challenges to Judicial Review Under the APA

The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. It "establishes a 'basic presumption of judicial review' of agency action." *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024); *see Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) (explaining that the APA "creates a basic presumption of judicial review [for] one suffering legal wrong because of agency action") (citation modified). "Courts may not, however, exercise jurisdiction over an APA claim if the claim falls under an exception to the APA's judicial-review provisions," *see Lovo*, 107 F.4th at 205 (citing *Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021))—which is to say that where "the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or . . . the action is 'committed to agency discretion by law,' § 701(a)(2)." *Weyerhaeuser*, 586 U.S. at 23. Where judicial review is proper, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," relevant here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants argue this court may not exercise jurisdiction pursuant to the APA's judicial review provisions because Plaintiffs mount a programmatic challenge as opposed to a challenge to discrete final agency actions and because the challenged actions are committed to agency discretion by law. (ECF No. 92-1 at pp. 17–20, 26–28.) As discussed in detail below, the court disagrees.

#### 1. *Final Agency Action*

An "agency action" under the APA is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). It is

"meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001) (citing *FTC v. Standard Oil Co. of Cal.,* 449 U.S. 232, 238, n.7 (1980)).  This definition "limits the scope of judicial review in two important respects."  *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).  First, the plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations."  *Id.* (quoting *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64 (2004)).  This distinction "is vital to the APA's conception of the separation of powers," as courts are "well-suited to reviewing specific agency decisions," yet "woefully ill-suited . . . to adjudicate generalized grievances asking us to improve an agency's performance or operations."  *Id.*  Second, the plaintiff "must demonstrate that the challenged act had 'an immediate and practical impact,' . . . or 'alter[ed] the legal regime' in which it operates."  *Id.* (first quoting *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010); then quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

> In all, as the Fourth Circuit aptly summarized in *City of New York*:

> Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations. The result is a scheme allowing courts to review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management. *See SUWA*, 542 U.S. at 64-65, 124 S. Ct. 2373.

*Id.* at 432.

Defendants' challenge as to this requirement focuses on the nature of the agency action. They contend that Plaintiffs' APA count "seek[s] to bring a collective, programmatic challenge to a collection of individual actions," which seemingly amounts to a broad programmatic attack. (ECF No. 92-1 at pp. 17–20.)  To be sure, a broad programmatic attack is not entitled to a judicial

theater under the APA.  *See City of New York*, 913 F.3d at 431, *supra*.  Supreme Court precedent

is clear on this:

> Respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see Norton*, 542 U.S. at 64 (discussing

same).

This issue here, however, is that Plaintiffs have identified discrete agency actions;

Defendants just reject them and assert they conceal Plaintiffs' true intent.  (ECF No. 92-1 at pp.

17–20; ECF No. 102 at pp. 8–9.)  There can be no doubt that Plaintiffs bring this action based on

Defendants' purported efforts to close the Department, but Plaintiffs identify specific agency

actions in supports of their APA claim, alleging:

> 164. Defendants' dismantling of the Department, closure of statutorily mandated offices and components, cessation of mandatory statutory functions necessary for formula grant program administration, termination of competitive grant programs, and decimation of the Department's workforce through the March 11 RIF and other actions, constitute final agency actions.
>
> 165. Defendants' actions are contrary to law and in excess of statutory authority. Defendants lack the constitutional or statutory authority, as the President's agents, to dismantle the Department; wind down its statutorily mandated programs and activities; or withhold, terminate, or otherwise interfere with funds appropriated to the Department for its programs and operations. Defendants' actions are also contrary to law because they violate the Department's own regulations. See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954).

(ECF No. 58 ¶¶ 164–65.)

Defendants cite to no authority that Plaintiffs may not challenge multiple discrete final agency actions undertaken by the same officials during the same general period.[25]  Indeed, as multiple courts have held, "nothing prevents a plaintiff from challenging more than a single discrete final agency action in a single suit," and doing so does not transform such a challenge into "an impermissible 'programmatic attack.'" *New York v. Trump*, 171 F.4th 1, 18 (1st Cir. 2026); *see also Thakur v. Trump*, 787 F. Supp. 3d 955, 985 (N.D. Cal. 2025) (discussing same); *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, No. 3:03-CV-0213-PK, 2018 WL 1811467, at *1 (D. Or. Apr. 16, 2018), *aff'd,* 957 F.3d 1024 (9th Cir. 2020) (noting "there is no reason Plaintiffs' decision to challenge a large number of agency decisions in one lawsuit, versus multiple lawsuits, is per se problematic under the [APA]").

This court agrees with the reasoning of the Honorable Matthew J. Maddox of this court:

> Although Plaintiffs describe the actions they challenge collectively as a "dismantling" of AmeriCorps, ECF No. 1 (Complaint), ¶¶ 1–3, 8, 12, 77–107; ECF No. 25-1 (Pl. Mem.) at 1–8, they make a clear showing that this "dismantling" consisted of several discrete agency actions: (1) a categorical termination of all NCCC projects and participants, including termination of Doe 1 and Doe 2, on April 15, 2025; (2) a sweeping cancellation of approximately $400,000,000 in AmeriCorps grants, including Nonprofit Plaintiffs' grants and subgrants and Doe 3's participation in VISTA, between April 25 and 28, 2025; and (3) a mass termination of more than 600 AmeriCorps employees, amounting to 85% of the staff, through placement on administrative leave on April 16, 2025, and issuance of RIF notices

---

[25] In support of their position here, Defendants rely upon the D.C. Circuit's opinion in *Nat'l Treasury Emps. Union ("NTEU") v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated,* No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).  (ECF No. 92-1 at p. 9.)  The decision in *NTEU*, however, has since been vacated and therefore offers no persuasive value here. *See NTEU v. Vought*, No. 25-5091, 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025).  In any event, the D.C. Circuit acknowledged that the plaintiffs' allegations that Defendants "laid off employees, cancelled contracts, decided to move to smaller headquarters, declined additional funding, and subjected work to an advance-approval requirement" could, "[i]n the ordinary course," face challenge in court; however, the case there was "not constructed like that," and instead the plaintiffs sought "to challenge what they describe as a single, overarching decision to shut down the [agency], which they infer from the various discrete actions noted above." *NTEU*, 149 F.4th at 777.  This is not what Plaintiff have done here; Plaintiffs specifically focus their challenge on discrete agency actions. (The court addresses separately Plaintiffs' contention regarding the decision to close the Department as a final agency action.)  Further, the *NTEU* decision stemmed from an appeal of a preliminary injunction and the extent of relief ordered.  That is not a consideration here in determining whether Plaintiffs ably identify final agency actions that fall within the APA's presumption of judicial review.

> on April 24, 2025. The foregoing discrete agency actions all occurred within a period of less than two weeks and reflect a final and categorical decision on part of Defendants either to eliminate or reduce to a significant degree AmeriCorps' ability to operate as required by statute.

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 556–57 (D. Md. 2025).

The same is so here. While Plaintiffs' theory is that Defendants' actions are collectively aimed at shuttering the Department, they are careful to tailor their APA claim to "several discrete agency actions," including cancellation of the mental health program grant awards and the March 11 RIF.[26] *Id.* at 557. When considering the specific discrete agency actions at issue, Plaintiffs' challenges are neither generalized challenges to the Department's day-to-day operations, nor broad programmatic attacks. *See Lujan*, 497 U.S. at 899 and *Norton*, 542 U.S. at 64, *supra*. As discussed above, Plaintiffs allege harms as a direct result of these discrete agency actions and challenge "specific agency decisions," which this court is "well-suited" to review. *See City of New York*, 913 F.3d at 431, *supra*. Plaintiffs do not come bearing a "generalized grievance" seeking judicial redress to "improve on an agency's performance or operations." *Id.*

The only remaining question, then, is whether these discrete agency actions are indeed final. Defendants do not meaningfully argue to the contrary, and the court finds that cancellation

---

[26] Citing the dissenting opinion in *NTEU v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), Plaintiffs assert by footnote that "[t]he decision to close the Department is also a reviewable agency action," but that the court "need not reach that issue to deny the motion to dismiss." (ECF No. 96 at p. 25 n.5.) As indicated in the court's memorandum opinion on the PI motion, the court remains unpersuaded by Plaintiffs' claim that the decision to close the Department is itself a final agency action as opposed to the culmination of a series of final agency actions. There is no dispute that Defendants do not have the authority to close the Department—and Plaintiffs' theory is that, through a series of discrete agency actions, Defendants aim to dismantle the Department. (ECF No. 58 ¶ 1.) While (at least some of) those discrete agency actions are reviewable, as set forth above, the court is not persuaded that the combination of those discrete agency actions amounts to a separate, distinct discrete agency action in the form of Department dismantlement; in the view of the court, that smacks of a broad programmatic attack. And, as the court noted in its PI memorandum opinion, such a theory appears self-defeating.

of the mental health program grant awards by form template letters and the March 11 RIF meet the requirements of finality.

The court's APA review is limited to "final agency action[s]" where there exists "no other adequate remedy."[27] 5 U.S.C. § 704. "Final agency action is a term of art that does not include all [agency] conduct such as, for example, constructing a building, operating a program, or performing a contract, but instead refers to an agency's [final] determination of rights and obligations whether by rule, order, license, sanction, relief, or similar action." *Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (citation omitted). Because the APA "waives the federal government's sovereign immunity 'to permit judicial review of only final agency action[s],'" finality "is a jurisdictional requirement."[28] *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (first quoting *Nat'l Veterans Legal Servs. Program*, 990 F.3d at 839; then quoting *City of New York*, 913 F.3d at 430).

Courts take a "pragmatic" approach to the finality inquiry. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 591 (2016) (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967)). The "core question" of finality "is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Thus, an agency action is "final" when two conditions are met: (1) "the action must mark the consummation of the agency's decision making process— it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by

---

[27] Defendants also argue that Plaintiffs' APA claim ought to be dismissed because Plaintiffs have adequate remedies pursuant to the CSRA, the Tucker Act, and FSL-MRS. (ECF No. 92-1 at p. 28.) For the reasons set forth herein, the court disagrees.

[28] This is of course because sovereign immunity itself is jurisdictional in nature. *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (quoting *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019)).

which rights or obligations have been determined, or from which legal consequences will flow."

*Bennett*, 520 U.S. at 177–78 (citations omitted); *see also Biden v. Texas*, 597 U.S. 785, 808 (2022)

(quoting *Bennett*, 520 U.S. at 178) (discussing same).

> a.   Discontinuation of Mental Health Program Grant Awards

This court agrees that Defendants' use of boilerplate letters to cancel the SBMH and MHSP

competitive grant awards constitutes a final agency action reviewable under the APA.  Defendants

do not meaningfully challenge that the discontinuation of more than 200 SBMH and MHSP grant

awards by boilerplate letter "mark[ed] the consummation of [the Department's] decision making

process" or that such action was one "by which rights or obligations have been determined or from

which legal consequences flow."  *See Bennett*, 520 U.S. at 177–78, *supra*.

As Plaintiffs assert:

> 135. The Department sent boilerplate letters to more than 200 (of about 260) SBMH and MHSP grant recipients, claiming that they "used the funding to implement race-based actions like recruiting quotas." Because these uses "conflict[ed] with [the priorities] of the current Administration," the grants were "inconsistent with . . . the best interest of the Federal Government" and were being discontinued under 34 C.F.R. § 75.253(a)(5), effective December 31, 2025. On information and belief, the Department did not undertake any individualized analysis and has not indicated how it will use the funds appropriated to the programs or re-compete the money.
>
> 136. Defendants' discontinuation of these hundreds of SBMH and MHSP grant awards was unlawful. On information and belief, before January 2025, the Department had never relied on 34 C.F.R. § 75.253(a)(5) to discontinue a grant award or asserted that grants in conflict with the current administration's politics are not in the "best interest of the Federal Government."

(ECF No. 58 ¶ 135–36.)  These allegations support, and Defendants do not argue otherwise, that

discontinuation of these grants was the consummation of Defendants' decision making.  Plaintiffs

further plainly assert the challenged action "had 'an immediate and practical impact,'" *see City of*

*New York*, 13 F.3d at 431, *supra*), from which legal consequences flow, *see Bennett*, 520 U.S. at 177–78 (citations omitted).

Indeed, in a separate case challenging these same SBMH and MHSP grant discontinuations, Defendants "[did] not dispute that the discontinuation notices constitute individual final agency actions." *Washington v. United States Dep't of Educ.*, 813 F. Supp. 3d 1222, 1235 (W.D. Wash. 2025); *see Washington v. United States Dep't of Educ.*, 807 F. Supp. 3d 1275, 1287 n.5 (W.D. Wash. 2025), *appeal dismissed,* No. 25-7157, 2026 WL 395718 (9th Cir. Jan. 14, 2026) (noting same). This conclusion is also consistent with the reasoning of other courts that have found the termination or cancellation of grant awards to be final agency actions. *See, e.g.*, *Elev8 Baltimore*, 804 F. Supp. 3d at 557–58 (regarding "a sweeping cancellation of approximately $400,000,000 in AmeriCorps grants"); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 91 (D. Md. 2025) (regarding "[t]he decision to terminate grant funding and close over 1,000 AmeriCorps programs"); *Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 190 (D.D.C. 2025) (regarding the Department's form termination of an Equity Assistance Center grant); *S. Educ. Found. v. United States Dep't of Educ.*, 784 F. Supp. 3d 50, 72–73 (D.D.C. 2025), *dismissed,* No. 25-5262, 2025 WL 2793138 (D.C. Cir. Sept. 30, 2025) (same); *Urb. Sustainability Directors Network v. United States Dep't of Agric.*, No. CV 25-1775 (BAH), 2025 WL 2374528, at *26 (D.D.C. Aug. 14, 2025) (regarding the termination of six grants by the United States Department of Agriculture and component agencies); *Oregon Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 882–83 (D. Or. 2025) (regarding grant termination letters from the National Endowment for the Humanities); *Thakur*, 787 F. Supp. 3d at 985 (regarding termination of grants from Environmental Protection Agency, National Science Foundation, and National Endowment for the Humanities).

Accordingly, Plaintiffs' APA claim challenges final agency actions—discontinuation of the SBMH and MHSP grant awards—that are subject to review under the APA.[29]

b. The March 11 RIF

As with the grant discontinuations discussed above, Defendants do not dispute that the March 11 RIF "mark[ed] the consummation of [the Department's] decision making process," and was one from which "rights or obligations have been determined or from which legal consequences flow." *Bennett*, 520 U.S. at 177–78, *supra*. Indeed, there is no challenge that the March 11 RIF is final or that it resulted in legal consequences, and the court easily concludes the March 11 RIF constitutes a discrete final agency action. This conclusion finds deep support by other courts reviewing this same RIF. *See, e.g.*, *Victim Rts. L. Ctr. v. United States Dep't of Educ.*, 788 F. Supp. 3d 70, 87 (D. Mass. 2025), *appeal dismissed,* No. 25-1787, 2026 WL 374364 (1st Cir. Jan. 15, 2026) (regarding the March 11 RIF at OCR); *New York v. McMahon*, 784 F. Supp. 3d 311, 353–54 (D. Mass. 2025), *appeal dismissed,* No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025) (regarding the March 11 RIF). Conclusion that the March 11 RIF was a discrete final agency action also finds support from courts opining on challenged terminations and reductions in force at other Executive agencies. *See, e.g.*, *Elev8 Baltimore*, 804 F. Supp. 3d at 557 (regarding "a mass termination of more than 600 AmeriCorps employees"); *Am. Fed'n of State Cnty. & Mun. Emps.,*

---

[29] While Plaintiffs' arguments on this point focus on the SMBH and MHSP grant cancellations, the same analysis is applicable to the cancellation of the TQP, SEED, and TSL grant awards. And while the different grants may be informed by different statutes or regulations, there is no argument that the *en masse* terminations of same are not final. Further, as with the SBMH and MHSP grant cancellations, Defendants repeatedly have not challenged the finality (for APA purposes) of cancellation of TQP, SEED, and TSL grant awards in other cases challenging such action. *See, e.g.*, *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 845 (D. Md. 2025), *reconsideration denied,* No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025) (noting Defendants agree that termination of TQP, SEED, and TSL grant awards constituted final agency action); *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 n.1 (D. Mass. 2025), *appeal dismissed sub nom.*, No. 25-1244, 2025 WL 2604596 (1st Cir. Apr. 23, 2025) (same).

*AFL-CIO v. United States Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1033 (N.D. Cal. 2025), *appeal dismissed,* No. 25-7998, 2026 WL 809820 (9th Cir. Jan. 2, 2026) (regarding RIF notices); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025) (regarding "termination of entire bargaining units of employees").

Accordingly, Plaintiffs' APA claim challenges another final agency action subject to review under the APA—the March 11 RIF.

### 2.   *Committed to Agency Discretion*

Defendants also argue Plaintiffs' APA claim should be dismissed because the challenged final agency actions are committed to agency discretion by law.  (ECF No. 92-1 at p. 26–28.)  As discussed above, the presumption of judicial review under the APA is successfully rebutted where the challenged action "is 'committed to agency discretion by law.'"  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting 5 U.S.C. § 701(a)(2)).  "Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'"  *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)).  This exception is read "quite narrowly" and restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *see Weyerhaeuser*, 586 U.S. at 23 (quoting *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993)), such as "an agency's decision not to prosecute or enforce," *see Heckler*, 470 U.S. at 831, and an agency director's decision to terminate an employee pursuant to an applicable provision in the National Security Act, *see Webster v. Doe*, 486 U.S. 592, 603–604 (1988).  *See Pharm. Coal. for Patient Access*, 126 F.4th at 964 (discussing same).

As an initial matter, with one exception discussed below, Defendants cite no statute or regulation in support of their contention that the challenged actions are committed to agency discretion as a matter of law. Instead, Defendants rest their argument on an unpersuasive overbroad reading of caselaw, which flags against the backdrop of the presumption of judicial review under the APA and concomitant narrow application of the agency discretion exception. *See Weyerhaeuser,* 586 U.S. at 23, *supra*. The court turns again to the two categories of final agency actions discussed above.

a.  Discontinuation of Mental Health Program Grant Awards

Defendants first assert, with regard to grants like the SBMH and MHSP grants, that "the Secretary is invested with broad discretion as to whom the grants are delivered." (ECF No. 92-1 at p. 28, quoting 34 C.F.R. § 75.1(b)). The Secretary's broad discretion to determine recipients of grant award funding has no bearing on whether Defendants' termination of such grants (that have already been awarded) is committed to agency discretion. As Plaintiffs note, each of the competitive grant awards at issue (including the TQP, SEED, and TSL grants) is subject to statutory and regulatory frameworks. *See, e.g.*, 20 U.S.C. §§ 6632(a), 6672; 2 C.F.R. § 200.340(a)(4). Whatever discretion Defendants may have in termination or discontinuation of these grants is provided, delineated, and restricted by those statutory and regulatory frameworks. "These regulatory and statutory limits on the Department's discretion thus create 'meaningful standard[s] by which to judge the [agency]'s action.'" *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97–98 (1st Cir. 2025) (quoting *Dep't of Com.*, 588 U.S. at 772) (regarding TQP and SEED grants); *see Washington v. United States Dep't of Educ.*, No. C25-1228-KKE, 2025 WL 2966255, at *11 (W.D. Wash. Oct. 21, 2025) (regarding MHSP and SBMH grants). These regulatory and statutory limits "cabin[] the Department's authority to discontinue funding," and materially

56

distinguish the instant case from the Supreme Court's *Lincoln v. Vigil*, cited by Defendants, where there was no meaningful standard against which to judge the agency's discretion.  508 U.S. 182, 191 (1993).

Defendants do not persuade the court that the challenged final agency action at issue—discontinuation of the SBMH and MHSP grants awards—is committed to agency discretion by law.[30]

b.  The March 11 RIF

Defendants also contend that the March 11 RIF is merely a staffing decision that "fit[s] neatly among those 'categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  (ECF No. 92-1 at p. 26, quoting *Lincoln*, 508 U.S. at 191.)  The court disagrees.  As the District of Massachusetts explained, the March 11 RIF of about 50% of the Department's work force—which, according to the Secretary's public announcement, constituted the "first step" in an effort to close the Department—"cannot be fairly categorized as mere managerial or staffing decisions that are typically afforded discretion."  *New York v. McMahon*, 784 F. Supp. 3d 311, 354 (D. Mass. 2025), *appeal dismissed,* No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025).  These are not individualized personnel decisions (and Plaintiffs do not challenge them as such).  (ECF No. 58 ¶ 45.)  Defendants identify no authority, and the court locates none, that such a decision is committed to agency discretion.

Defendants rest on the broad assertion that it is the Executive's entitlement to determine how to meet its statutory responsibilities and order its priorities.  As is typical of Defendants'

---

[30] Once again, while different grant programs may be subject to different statutes and regulations, this reasoning is similarly applicable to cancellation of the TQP, SEED, and TSL grants, as this court previously held in *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 845 (D. Md. 2025), *reconsideration denied,* No. 1:25-CV-00702-JRR, 2025 WL 863319 (D. Md. Mar. 19, 2025), and as the District of Massachusetts held in *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 n.1 (D. Mass. 2025), *appeal dismissed sub nom.*, No. 25-1244, 2025 WL 2604596 (1st Cir. Apr. 23, 2025) (same), with the First Circuit also rejecting Defendants' argument on this point, *see California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025).

arguments here, this is an oversimplification of the law, and is therefore unpersuasive.  Under Defendants' framing, no action by an Executive agency, like the Department, is subject to judicial review.  This turns the presumption of APA judicial review on its head, and ignores Supreme Court precedent on the (now well-recognized) narrow application of the agency discretion exception to judicial review.  *See Weyerhaeuser*, 586 U.S. at 23, *supra*.  Defendants would have the court turn the exception into the rule.

Once again, this court's view is in accord with other courts' consideration of this issue. *See, e.g.*, *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 73 (1st Cir. 2025) (citing *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974), for the proposition that "a district court could issue injunctive relief in cases where a plaintiff challenges an agency's decision regarding their employment"); *Elev8 Baltimore*, 804 F. Supp. 3d at 559 (finding "Defendants' singular decision to terminate 85% of AmeriCorps' staff is not committed to agency discretion by law," and that it was "not a commonplace personnel decision," but instead "an effort to eliminate or substantially reduce AmeriCorps' operations and ability to perform functions mandated by statute");  *New York*, 784 F. Supp. 3d at 355 (finding implementation of the RIF to dismantle the Department did not "fall[] within the narrow exception to judicial review under the APA").[31]

The court thus concludes the challenged final agency action at issue—the March 11 RIF— is not committed to agency discretion by law.

---

[31] Defendants also cite *Heckler v. Chaney*, 470 U.S. 821 (1985), for the proposition that ""an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." (ECF No. 92-1 at pp. 26–27.)  This has no application here.  Plaintiffs do not challenge an agency decision to prosecute or enforce; they complain about the March 11 RIF's impact on OCR to carry out its statutorily mandated functions.

### 3.  Ripeness

Defendants next challenge Plaintiffs' claims as unripe.  "While standing involves 'the question[] of *who* may sue,' ripeness involves '*when* they [may] sue.'"  *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (quoting *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)).  Like standing, ripeness raises a threshold question and "is a question of subject matter jurisdiction."  *South Carolina*, 912 F.3d at 730.  Plaintiffs bear the burden to demonstrate their claims are ripe.  *Wild Virginia*, 56 F.4th at 293.  "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'"  *Id.* at 294 (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)).  Ripeness "can rest on anticipated future injury," but such injury may not be "wholly speculative" or "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Id.* at 295 (quoting *South Carolina*, 912 F.3d at 730).

In considering whether claims are ripe, the court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Wild Virginia,* 56 F.4th at 294 (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018)).  "To be fit for judicial review, a controversy should be presented in a 'clean-cut and concrete form.'"  *South Carolina*, 912 F.3d at 730 (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).  "This occurs when the action is 'final and not dependent on future uncertainties or intervening agency rulings.'"  *Id.* at 730 (quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)).  For its part, the hardship prong "is 'measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law.'"  *Doe*, 713 F.3d at 759 (quoting *Charter Fed. Sav. Bank v. Off. of Thrift*

*Supervision*, 976 F.2d 203, 208–209 (4th Cir. 1992), *as amended* (Nov. 2, 1992)).  The court may consider "the cost to the plaintiff of delaying review."  *Id.* (citing *Miller,* 462 F.3d at 319).

As the Fourth Circuit aptly summarized in *Wild Virginia*:

> At bottom, "the purpose of the ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *South Carolina*, 912 F.3d at 730 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

*Wild Virginia*, 56 F.4th at 295.

Plaintiffs challenge specific actions by Defendants which, they argue, constitute impermissible efforts to close the Department; and they allege resultant present as well as imminent harms.  These issues are fit for judicial review and ripe for adjudication.  *See South Carolina*, 912 F.3d at 730, and *Doe*, 713 F.3d at 759, *supra*.  Defendants' arguments on this point are not compelling; they either echo Defendants' standing challenges, which the court has rejected, or they challenge the underlying merits of Plaintiffs' claims.  That an injury or violation is ongoing does not mean the claim is not ripe.[32]

Accordingly, the court rejects Defendants' arguments that it lacks jurisdiction to hear the instant matter and turns to Defendants' plausibility challenge.

---

[32] Defendants note in rote fashion that "the Department has reactivated certain contracts and rebid others to meet its statutory duties."  (ECF No. 92-1 at p. 21.)  Such an assertion, if anything, would appear to bear on mootness, not ripeness.  In any event, Defendants offer no evidence in support of same or argue how, if at all, such action bears on the issue asserted here.

## C. Plausibility of Plaintiffs' Constitutional Claims

The court turns to Defendants' remaining challenge—that Plaintiffs' Counts I, II, III, and V fail to state a claim because "[t]hese 'constitutional' claims are nothing more than Plaintiffs' statutory objections dressed up in constitutional garb." (ECF No. 92-1 at pp. 21–26.)  The claims at issue include violation of the Take Care Clause (Count I), violation of the Appropriations and Spending Clauses (Count II), violation of the Separation of Powers (Count III), and an *ultra vires* claim (Count V), meaning "action entirely outside [Defendants'] authority," *see Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 674 (2025).  (ECF No. 58 ¶¶ 149–161, 169–171.)

"The general rule is that the sovereign, *i.e.*, the United States, may not be sued without its consent."  *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022).  However, "[t]he Supreme Court has recognized, in what is sometimes referred to as the *Larson-Dugan* exception to sovereign immunity, that a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority because such actions 'are considered individual and not sovereign actions.'"  *Id.* (footnote omitted) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)).  "These types of claims are generally referred to as nonstatutory review claims."  *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 (4th Cir. 2026) (quoting *Strickland*, 32 F.4th at 363).  Application of this review "depends largely on whether the claimed violation is statutory or constitutional."  *Id.*

Where a plaintiff brings *ultra vires* claims—alleging "that a federal actor has violated a federal statute"—the review is "necessarily narrow."  *Id.* at 830 (quoting *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012)).  Indeed, "[b]ecause *ultra vires* review could become an easy end-run around" the applicable judicial review statute, it must be strictly limited and applied "only when an agency has taken action entirely 'in excess of

61

its delegated powers and contrary to a *specific prohibition*' in a statute," and not simply where "an agency has arguably reached 'a conclusion which does not comport with the law.'" *Nuclear Regul. Comm'n*, 605 U.S. at 681 (emphasis in original) (first quoting *Railway Clerks v. Association for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965); and then quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).

Thus, *ultra vires* review can only be invoked where (1) "an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute," (2) no "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review," and (3) no "statutory review scheme forecloses all other forms of judicial review." *Id.* (emphasis in original) (citations omitted). "An *ultra vires* claim is 'essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds.'" *Sustainability Inst.*, 165 F.4th at 830 (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681–82). Importantly, however, where Plaintiffs' nonstatutory review claims allege constitutional violations, they "are not subject to the same restrictions." *Id.*

While Executive actions may be reviewable for constitutionality, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952), not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). "The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474. As the Supreme Court explained it:

> Our decision in *Youngstown, supra,* does not suggest a different conclusion. In *Youngstown,* the Government disclaimed any statutory authority for the President's seizure of steel mills. See 343 U.S., at 585, 72 S.Ct., at 866 ("[W]e do not understand the

> Government to rely on statutory authorization for this seizure"). The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces. *Id.,* at 587, 72 S.Ct., at 866–867. Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions. *Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority. The case cannot be read for the proposition that an action taken by the President in excess of his statutory authority necessarily violates the Constitution.

*Id.* at 473 (emphasis in original). Thus, *Dalton* does not stand for the principle that an Executive official's action cannot be subject to review where he or she acts in the "*absence* of *any* statutory authority." *Id.* (emphasis in original).

Defendants' argument presents a question of first whether Plaintiffs' nonstatutory review claims are properly raised as constitutional claims or whether they are "statutory objections dressed up in constitutional garb." (ECF No. 92-1 at p. 22.) The Fourth Circuit has recently opined on nonstatutory review claims in the context of the Executive's decision to suspend and terminate federal environmental and agricultural grants previously awarded to nonprofit organizations and local governments. *Sustainability Inst.*, 165 F.4th at 821. The plaintiffs there asserted nonstatutory review claims (in addition to APA claims), arguing that the Government's actions violated the Separation of Powers and were *ultra vires*. *Id.* at 824. The Fourth Circuit explained:

> Though Plaintiffs style their claims as constitutional, the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here.
>
> .            .            .
>
> Here, both of Plaintiffs' constitutional claims assert that because executive officials and agencies violated statutes, they also violated the Constitution. Plaintiffs' separation of powers claim turns on the allegation that the Government's actions "directly contravene[d] Congress's directives *in the IRA, IIJA, and other statutes* to carry out and fund the statutory programs at issue in this case." J.A. 139

63

(emphasis added); *see also Sustainability Inst.*, 784 F. Supp. 3d at 875 ("Plaintiffs' nonstatutory review claims are based on the argument that Defendants[ ] have failed to faithfully execute[ ] the laws . . . ." (internal quotation marks omitted)). Similarly, Plaintiffs' Presentment Clauses claim is premised on the idea that the Government's actions would "terminate or modify parts of the *IRA or IIJA and other relevant statutes* after they were passed by Congress and signed by the President." J.A. 140 (emphasis added) (internal quotation marks and brackets omitted); *see also Sustainability Inst.*, 784 F. Supp. 3d at 875.

At their core, both claims "simply alleg[e] that the [Government] has exceeded [its] statutory authority." *Dalton*, 511 U.S. at 473, 114 S.Ct. 1719. The claims are therefore "statutory one[s]." *Id.* at 474, 114 S.Ct. 1719; *accord Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) ("Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*." (citation omitted)).

*Id.* at 830–31.

The Fourth Circuit rejected the plaintiffs' arguments to distinguish their case from *Dalton*, noting that where "Congress gave the Executive authority to issue grants under the various statutes at issue here, and in their constitutional claims Plaintiffs complain that the Executive directly contravene[d] Congress's directives in [those] statutes," it was "demonstrably incorrect" for the plaintiffs to assert that their constitutional claims were sanctioned by *Dalton* because the Executive acted in the absence of statutory authority. *Id.* at 832 (record citations omitted).

With this as helpful guidance, the court turns to Plaintiffs' constitutional claims. Counts I and III concern violations by the Secretary of the Take Care Clause,[33] under Section 3 of Article

---

[33] Defendants also assert that the Take Care Clause does not provide "a basis to review the actions of subordinate Executive Branch officials," as it speaks only to the President. (ECF No. 92-1 at p. 24.) As other courts have, this court rejects this reading. The requirement to take care "extends 'across the entire Executive Branch—including independent' agencies.'" *Child Trends, Inc. v. United States Dep't of Educ.*, 795 F. Supp. 3d 700, 725 (D. Md. 2025) (quoting *English v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018)); *see Ortiz v. United States*, 585 U.S. 427, 486 (2018) (Alito, J. dissenting) (recognizing "[t]he most basic duty of the President and his subordinates . . . is to 'take Care that the Laws be *faithfully executed*'") (quoting U.S. CONST. art. II, § 3). "[B]ecause federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute," the agencies "possess[] only the authority that Congress has provided them.'" *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 36 (D.D.C. 2025) (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir.

II of the Constitution, and the Separation of Powers, respectively. These claims stem from the President's directives, and Secretary's actions to implement them, in essence, to close the Department. (ECF No. 58 ¶¶ 153, 161.) The court agrees that Plaintiffs plausibly allege the Secretary's actions are akin to those contemplated in *Youngstown* and *Dalton*, which is to say, by attempting to close the Department without congressional approval, the Secretary is acting in the "*absence* of *any* statutory authority." *See Dalton*, 511 U.S. at 473, *supra*. Indeed, there is no statutory grant of authority on this front; so doing so cannot be articulated as exceeding the grant of authority under the Department of Education Organization Act.[34]

Plaintiffs' Count II, brought under the Appropriations and Spending Clauses claims, presents a distinct issue. Plaintiffs base Count II on their allegation that the Secretary's "unlawful impoundment of the Department's congressionally appropriated funds infringes Congress's exclusive power over the federal purse." (ECF No. 58 ¶ 158.) They allege the Secretary has failed to spend the congressionally-appropriated funds used for the statutorily-mandated programs within the Department, citing the relevant statutes and acts related to same. *See e.g.*, *id.* ¶¶ 28–29, 51, 53–54. These allegations—that Defendants directly contravened Congress's directives to carry out and fund the statutory programs at issue—appear to face the same issues as those in *Sustainability Institute*; violation of Congress's statutory directives form the "predicate" for Plaintiffs' Appropriations and Spending Clauses claims "because without the appropriations statutes there could be no improper withholding of funds." *Sustainability Inst.*, 165 F.4th at 831, *supra*. Based on this, at this juncture, the court assumes without deciding that Count II amounts

---

2024)). "If Defendants were correct that the Take Care clause only applies to the President, a President could evade Article II review by simply delegating the task to subordinates." *New York v. McMahon*, 784 F. Supp. 3d 311, 352 (D. Mass. 2025), *appeal dismissed,* No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025).

[34] To the extent Defendants argue that the Secretary is not shutting down the Department but merely reordering its priorities, consistent with statutory authority, such argument raises a factual challenge to Plaintiffs' claim, which the court does not consider on a Rule 12(b)(6) motion.

to a statutory claim.[35]  The court thus considers whether Plaintiffs plausibly allege such a claim in the context of the heightened review discussed above.

Even with this heightened review, the court is satisfied Plaintiffs plausibly allege claims "within 'the painstakingly delineated procedural boundaries' of 'nonstatutory ultra vires review.'" *Id.* at 832 (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681).  Unlike the plaintiffs in *Sustainability Institute*, Plaintiffs' claims here do not stem from an allegation that Defendants must contract with them, *see id.* at 833, but instead that Defendants "unlawful[ly] impound[ed] . . . the Department's congressionally appropriated funds."  (ECF No. 58 ¶ 158.)  The Fourth Circuit specifically declined to address the argument presented here—that the Government cancelled entire grant programs wholesale and refused to spend money appropriated by Congress. *Sustainability Inst.*, 165 F.4th at 833–34.

Plaintiffs point to Defendants' actions, which, they allege, have ended congressionally-mandated programs and cut off congressional appropriations for same.  The court is satisfied that Plaintiffs' claims, as pled, plausibly allege that Defendants have taken actions in direct contravention of the statutes creating such programs and directing appropriations thereto.  *Nuclear Regul. Comm'n*, 605 U.S. at 681.  Further, Defendants point to no statutory review scheme that provides for, or forecloses, this review.[36]  *Id.*  Based on the foregoing, Plaintiffs similarly plausibly allege a nonstatutory review claim under the Appropriations and Spending Clauses at Count II.[37]

---

[35] The court declines to hold this as a matter of law at the present stage where binding Fourth Circuit precedent followed the parties' Motion briefing.

[36] To the contrary, it appears to be Defendants' contention that Defendants' alleged actions in this respect are entirely unreviewable—full stop.

[37] Based on the court's analysis as to Counts I through III, the court need not address separately Plaintiffs' *ultra vires* claim (Count V), which shall proceed for these same reasons.

## IV.   CONCLUSION

For the reasons set forth herein, Defendants' Motion (ECF No. 92) will be denied by separate order.


May 8, 2026                                      /S/

                                              Julie R. Rubin
                                              United States District Judge